IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Yukos Capital Limited
(f/k/a Yukos Capital S.à.r.l.),

     Palm Grove House
     P.O. Box. 438
     Road Town – Tortola
     British Virgin Islands

          *Petitioner*,

   v.

The Russian Federation,

     Ministry of Justice
     ulitsa Zhitnaya, 14
     Moscow, 119991
     Russian Federation

          *Respondent*.

Civil Action No.   22-cv-00798     

## Petition to Enforce Arbitral Award

Petitioner Yukos Capital Limited ("Yukos Capital," formerly known as Yukos Capital S.à.r.l.) brings this action to enforce an arbitral award (the "Award" or the "Final Award") issued on July 23, 2021 in Permanent Court of Arbitration ("PCA") Case No. 2013-31 against Respondent, the Russian Federation ("Russia"), following arbitration proceedings, seated in Geneva, Switzerland, that were conducted pursuant to the Energy Charter Treaty (the "ECT"). An apostilled copy of the Award is attached as Exhibit A to the Declaration of Matthew S. Rozen ("Rozen Declaration" or "Rozen Decl."), Exhibit 1 hereto.  A copy of the Energy Charter Treaty is attached hereto as Exhibit 2.

Pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention") (Ex. 3 hereto) and its implementing

legislation, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–08, Yukos Capital requests that this Court enforce the Award and enter judgment in Yukos Capital's favor in the amount of the Award.

**Parties**

1.      Petitioner Yukos Capital Limited is a company organized and registered under the laws of the British Virgin Islands.  Formerly named Yukos Capital S.à.r.l, Petitioner was originally incorporated in Luxembourg in January 2003 and remained organized and registered under the laws of Luxembourg until its corporate restructuring and redomiciliation in 2016.  Because the Award was issued in its name, Yukos Capital Limited is Petitioner in this action.

2.      Respondent the Russian Federation is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1602–1611.

**Jurisdiction and Venue**

3.      This Court has subject-matter jurisdiction over this action pursuant to the FSIA, 28 U.S.C. § 1330(a), because this is a "nonjury civil action against a foreign state" on a claim "with respect to which the foreign state is not entitled to immunity from jurisdiction" under the FSIA, 28 U.S.C. § 1605(a)(1), (6).

4.      Pursuant to Section 1605(a)(1) of the FSIA, Russia is not entitled to immunity from jurisdiction because this is a proceeding to confirm an arbitral award pursuant to the New York Convention, and Russia implicitly waived its immunity from jurisdiction over such proceedings by agreeing to that Convention.  *See Tatneft v. Ukraine*, 771 F. App'x 9, 9–10 (D.C. Cir. 2019) (per curiam); *Creighton Ltd. v. Gov. of the State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999).

5.      In addition, pursuant to Section 1605(a)(6) of the FSIA, Russia is not entitled to immunity from jurisdiction over this action because this is an action to confirm an arbitral award that is governed by the New York Convention, which is a treaty in force in the United States for the recognition and enforcement of arbitral awards.

6.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a "proceeding falling under the [New York] Convention," and is therefore "deemed" by the FAA "to arise under the laws and treaties of the United States," 9 U.S.C. § 203.

7.      This Court has personal jurisdiction over Russia pursuant to the FSIA.  28 U.S.C. § 1330(b).

8.      Venue is proper in this Court pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(f)(4).

## The Underlying Dispute

9.      The Award arises from Russia's illegal expropriation of Yukos Capital's multi-billion dollar investments in Yukos Oil Company ("Yukos Oil") in the form of two loans made in 2003 and 2004 respectively (the "Loans").

### The Russian State's Expropriation of Yukos Oil

10.      Yukos Capital is a former, indirect, wholly-owned subsidiary of Yukos Oil. Yukos Oil and its subsidiaries were the largest producers of crude oil in Russia and the largest exporters of crude oil from Russia.  As of April 2004, Yukos's market capitalization was estimated at over $40 billion.  But after Yukos's Chairman and controlling shareholder, Mikhail Khodorkovsky, openly criticized Vladimir Putin's regime in 2003, the Russian state initiated a series of politically motivated attacks against Yukos, arresting, charging, and convicting more

than 40 Yukos Oil shareholders, executives, and employees, and executed a systematic plan to force Yukos back into the hands of the state.

11.     This expropriation was accomplished through abuse of police power and regulatory authority by the Russian government.  The Russian tax authorities began by "re-auditing" Yukos Oil for the tax years 2000–04 and finding large sums of back taxes supposedly owing.  None of the related court proceedings or decisions were made public, and some of the court decisions were not even disclosed to Yukos itself.  The resulting massive, fabricated back tax claims were used first to seize and "auction" Yugansknefteqaz, Yukos's primary production subsidiary—through expedited proceedings devoid of any due process—and next to force the company into a sham bankruptcy.  Yet, even while its assets were frozen to prevent Yukos from satisfying its outstanding debts and its most valuable asset, Yugansknefteqaz, was sold off to state-owned Rosneft for a bargain basement price in a rigged proceeding, Yukos remained very much solvent.  Nonetheless, Yukos was then liquidated, and its remaining assets were split between state-owned Rosneft and state-controlled Gazprom.

12.     Within Russia's coordinated and multi-pronged attack on Yukos Oil, Russian courts served to rubber stamp these illegal acts; the rare judges who dared to deviate were removed and disciplined, while those who adhered to the party line were rewarded.  This was all accompanied by a brutal campaign of terror and intimidation designed to paralyze Yukos employees and associates and to deter anyone from resisting.  Raids and seizures were regularly conducted by heavily armed units of government prosecutors.  Countless persons associated with or assisting Yukos were interrogated, arrested, indicted, and if they did not manage to escape from Russia in time, jailed.

**Yukos Capital's Loans and Their Expropriation by the Russian State**

13.     The treatment of Yukos Capital in the Yukos Oil bankruptcy was part of the
Russian State's attack on the Yukos group of companies ("Yukos Group"), equally marked by
shameless disregard for Russian and international law, intimidation and harassment of Yukos
Capital's lawyers, indiscriminate seizure of documents, and politically-influenced decision-
making by Russian court judges—amounting to a fundamental denial of justice to Yukos Capital.

14.     In 2003, Yukos Oil had been engaged in a major expansion process that included
a series of important mergers.  Accordingly, Yukos Oil sought financing from numerous sources,
both outside and within the Yukos Group, including Yukos Capital, which agreed to provide
financing through the Loans.

15.     Pursuant to a loan agreement dated December 2, 2003 (the "December 2003
Loan"), Yukos Capital agreed to loan Yukos Oil an amount not to exceed RUR 80 billion ($2.7
billion).  Interest was to be paid quarterly at a rate of 9%, with the borrowed principal due to be
repaid by December 31, 2008.  Any delay in payment entitled Yukos Capital to a daily penalty in
the amount of 0.1% of the amount overdue.  Between December 2003 and June 2004, the $2.7
billion available under the December 2003 Loan was drawn down by Yukos Oil in full.

16.     Pursuant to a second loan agreement dated August 19, 2004 (the "August 2004
Loan"), Yukos Capital agreed to loan Yukos Oil an amount not to exceed $355 million.  Unlike
the first loan, the August 2004 Loan was extended to help Yukos Oil survive a growing
onslaught by the Russian State.  Interest was to be paid semi-annually at a rate of six-month
LIBOR plus 1.75%, with the borrowed principal due to be repaid by December 30, 2009.  Any
delay in payment entitled Yukos Capital to a daily penalty in the amount of 0.1% of the amount

overdue.  The $355 million available under the August 2004 Loan was disbursed to Yukos Oil contemporaneously with the execution of the agreement.

17.     Yukos made quarterly interest payments under the December 2003 Loan through June 30, 2004.  However, due to Russia's illegal acts, no further payments were made under either Loan and, on November 11, 2005, Yukos Capital communicated a formal notice of default to Yukos Oil with respect to both Loans.  Yukos Capital has recovered no further repayments.

18.     In April 2006, during the pendency of the bankruptcy of Yukos Oil, Yukos Capital filed an application in Russian court for its claims under the Loans to be included among other Yukos Oil creditors' claims.  That application was denied.

19.     Days after Yukos Capital appealed the denial, Russia's General Prosecutor's Office initiated a criminal case against Yukos Capital and its officers, conducting a search of the offices of Yukos Capital's Moscow attorneys, seizing their documents, and subjecting one of the attorneys to interrogation.  The pendency of this criminal investigation was then cited as grounds for suspending Yukos Capital's appeal.  Yukos Capital's second application for its claims under the Loans to be included among other Yukos Oil creditors' claims was likewise denied.

20.     Shortly thereafter, Yukos Oil's remaining assets were sold off purportedly to satisfy its creditors' claims.  99% of the satisfied claims belonged to Russia's Federal Taxation Service and the Russian State-owned Rosneft.

21.     On November 15, 2007, the Yukos Oil bankruptcy proceedings were formally terminated and the unsatisfied creditor claims were declared expired.  Yukos Capital's challenge to this decision was denied, and by November 21, 2007, Yukos Oil ceased to exist.

## **The Agreement to Arbitrate**

22.     Yukos Capital's investments in Yukos Oil, then a Russian company, were protected by the Energy Charter Treaty.

23.     The ECT is a multilateral framework designed to promote open and competitive energy markets and cross-border cooperation in the energy sector, including by protecting foreign investors and encouraging stable, fair and transparent conditions for foreign investments. States that join the ECT ("Contracting Parties") accept various obligations towards investors of other Contracting Parties, and agree to arbitrate disputes resulting from breaches of those obligations. In the event of a "[d]ispute[] between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former," "the Investor party to the dispute" is entitled to "provide its consent in writing for the dispute to be submitted to," *inter alia*, an "ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law." *See* ECT, art. 26(1)–(4).

24.     Russia consented to arbitrate its dispute with Yukos Capital pursuant to the ECT. Russia signed the ECT on December 17, 1994, and accepted provisional application of the ECT pending ratification. The ECT entered into force with respect to Russia in April 1998, making Russia a Contracting Party to the ECT. *See* ECT, art. 1(2) (defining a "Contracting Party" as "a state . . . which has consented to be bound by this Treaty and for which the Treaty is in force").

25.     Russia remained bound by the ECT until at least October 2009, long after completing its expropriation of Yukos Capital's investments, the Loans. And after withdrawing from the treaty, Russia remained bound by the ECT with respect to its past conduct. *See* ECT, art. 26(3). All of Russia jurisdictional objections were assessed and rejected comprehensively by a majority of the arbitral tribunal, as reflected in the Interim Award and the Final Award.

26.     Because at all relevant times Yukos Capital was incorporated in Luxembourg, a Contracting Party to the ECT, Yukos Capital qualifies as an "investor of another Contracting Party" under the ECT.  *See, e.g.*, Interim Award on Jurisdiction ("Interim Award"; included as pp. 359–562 of Exhibit A to the Rozen Declaration) ¶ 395 (noting that Russia "does not dispute that [Yukos Capital] meets the definition of 'Investor'" under the ECT).

27.     By becoming a party to the ECT, therefore, Russia agreed to submit to arbitration of disputes between itself and Yukos Capital "relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III." *See* ECT, art. 26(1).  Russia gave its "unconditional consent to the submission of [such] dispute[s] to international arbitration or conciliation in accordance with the provisions of [Article 26 of the ECT]."  *See id.*, art. 26(3).  Russia's "unconditional consent," "together with the written consent" of Yukos Capital pursuant to Article 26(4)(b), "satisfy the requirement for . . . an 'agreement in writing' for purposes of" the New York Convention.  *See* ECT, art. 26(5).

**The Arbitration and the Award**

28.     Seeking to recover the approximately $3 billion in loans to Yukos Oil expropriated by the Russian State (exclusive of interest and penalties), Yukos Capital initiated arbitration proceedings against Russia pursuant to Article 26(4)(b) of the ECT and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law by Notice of Arbitration ("UNCITRAL"), dated February 15, 2013 ("Notice of Arbitration") (attached hereto as Exhibit B to the Rozen Declaration).

29.     In its Notice of Arbitration, Yukos Capital asserted that by expropriating its investments, the Loans, Russia breached its obligations under Part III of the ECT:

    (a) to provide fair and equitable treatment (ECT, art. 10(1));

    (b) to provide constant protection and security (*id.*);

    (c) not to impair the use, enjoyment or disposal of an investment by unreasonable or discriminatory measures (*id.*);

    (d) not to accord treatment less favorable than that required by international law (*id.*);

    (e) not to accord treatment less favorable than that accorded to other investors (*id.*, art. 10(7));

    (f) to provide effective means for the assertion of claims and the enforcement of rights (*id.*, art. 10(12)); and

    (g) not to expropriate investments or subject them to measures having an effect equivalent to expropriation (*id.*, art. 13(1)).

30.    By its Notice of Arbitration, Yukos Capital appointed J. William Rowley QC as the first arbitrator. Award ¶ 9. On May 3, 2013, Russia appointed Professor Brigitte Stern as the second arbitrator. *Id.* ¶ 10. At Yukos Capital's request, with agreement from Russia, the Secretary-General of the PCA then appointed Professor Campbell McLachlan QC as the presiding arbitrator. *Id.* ¶¶ 11–14.

31.    By February 18, 2014, the three-member arbitral tribunal (the "Tribunal") was constituted, and the parties and members of the Tribunal had signed the Terms of Appointment, confirming, *inter alia*, that (i) "the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules"; (ii) the proceedings would be governed by the UNCITRAL Rules; (iii) "the Tribunal shall determine the legal seat of the arbitration … after hearing the Parties on the issue"; and (iv) "the issues in dispute shall be decided in accordance with the ECT and applicable rules and principles of international law." Award ¶ 15.

32.     The Tribunal conducted 16 days of hearings: a preliminary procedural hearing in Vienna, Austria, on April 14, 2014; a five-day Hearing on Jurisdiction in The Hague, Belgium, between August 31 and September 4, 2015; and a ten-day Hearing on the Merits in London, England, between July 1 and 12, 2019.

33.     Following written submissions by the parties and a preliminary procedural hearing, on April 24, 2014, the Tribunal issued an order (i) determining that the arbitration would be seated in Geneva, Switzerland, and (ii) bifurcating the proceedings into a preliminary phase to resolve three jurisdictional objections raised by Russia and a merits phase.  Award ¶¶ 16–19.

34.     After the Hearing on Jurisdiction, on January 18, 2017, the Tribunal issued its Interim Award on Jurisdiction.  *See* Interim Award.  In its 195-page decision,  incorporated by reference into the Award, the Panel rejected Russia's three jurisdictional objections (the first two by two-member majority, and the third unanimously):

(a)   The Tribunal concluded that Russia consented to arbitrate disputes under Article 26(3)(a) by virtue of its provisional application of the ECT, overruling Russia's argument that it "never ratified the ECT and applied the ECT until October 18, 2009 on a provisional basis pursuant to Article 45(1) ECT only 'to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.'"  *See* Award ¶ 19(i) & *id.* ¶ 28(1).

(b)   As to Russia's argument that "[t]he intra-company loans allegedly made by Claimant to Yukos Oil Company are not 'investments' within the meaning of Article 1(6) ECT," the Tribunal concluded that the Loans qualify as investments under the ECT.  *See* Award ¶ 19(ii) & *id.* ¶ 28(2).

(c) In rejecting Russia's argument that Article 17 of the ECT entitles Russia "to deny [Yukos Capital] the advantages of" Part III of the treaty because Yukos Capital "is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of" the United States (a non-signatory to the ECT), the Tribunal also found that Yukos Capital is controlled by its shareholder, an entity organized under the laws of the Netherlands, which is a Contracting Party to the ECT. *See* Award ¶ 19(iii) & *id.* ¶ 28(3).

35.     After the Hearing on the Merits, on July 23, 2021, a two-member majority of the Tribunal issued the Final Award, Rozen Decl. Ex. A at 1–315, a 303-page decision determining, among other things, that:

(a) Russia's additional jurisdictional objections—that Yukos Capital is not a protected investor under the ECT because it is "controlled by Russian nationals" and "no longer a national of an ECT Contracting State," Award ¶ 171—were meritless because Yukos Capital is controlled by a Dutch entity and, at the time of initiation of the arbitral proceedings, was incorporated in Luxembourg, a party to the ECT.

(b) Russia breached its obligations under Article 13 of the ECT by illegally expropriating Yukos Capital.  Specifically, "the disallowance of the proof of debt of Yukos Capital in the bankruptcy of Yukos Oil constituted expropriation of that debt by [Russia] because the taking was without 'due process of law' and was discriminatory, amounting to a denial of justice."  Award ¶ 440.

(c) These actions formed "part of . . . an orchestrated campaign against the Yukos Group as a whole," as exemplified by two "particularly relevant" circumstances. Award, ¶¶ 464–47.

    i.  First, the imposition of tax assessments against Yukos Oil, resulting in its bankruptcy, in the face of uncontroverted, exculpatory evidence submitted by Yukos Oil "constituted a denial of justice" "aimed [at] taking the property of Yukos Oil." Comparing these events with the treatment of Yukos Capital's "subsequent claim to recover its Loans in the bankruptcy of Yukos Oil" led the Tribunal to "conclude[] that the treatment of Yukos Capital was part of a wider campaign . . . to deprive companies in the Yukos Group of their property." Award ¶¶ 474–75.

    ii.  Second, the "actions taken against [Yukos Capital's] Russian lawyers and the effect on [Yukos Capital's] ability to defend its interests before the Russian courts in the bankruptcy" were "part of a concerted campaign with actions taken against the lawyers for other companies within the Yukos Group." Award ¶¶ 476–84. This evidence "corroborat[ed]" the Tribunal's "finding that the Respondent expropriated the Claimant's investment of funds under the Loans through its refusal to recognise the Claimant's claim in the bankruptcy." *Id*. ¶ 485.

(d) Yukos Capital was entitled to be compensated for damages and losses resulting from Russia's illegal expropriation of the Loans, subject to a reduction to account for certain losses that the Tribunal concluded were foreseeable and/or proximately

caused (in whole or in part) by Yukos Capital and were therefore irrecoverable. Award ¶¶ 683–85, 697–99.

36.     The Tribunal devoted 70 of the remaining 74 pages of the Award to assessing both parties' damages arguments and "determin[ing] the amount of compensation" due to Yukos Capital, Award ¶¶ 700–897, and ultimately ordered Russia to pay approximately $5 billion in compensation:

(a) $2,630,706,272.17 for loss of the value of the principal of the December 2003 Loan (after a reduction for Yukos Capital's contribution, as noted above), *id.* ¶ 898(6)(i);

(b) contractual interest at a 9% annual rate accrued quarterly on sums drawn down under the December 2003 Loan from the day after the date of drawdown to December 31, 2008, *id.* ¶ 898(6)(ii), amounting to $1,065,924,619.34;

(c) pre-award interest on the sum of the principal and accrued contractual interest, *id.* ¶ 898(7), amounting to $1,336,623,902.77;

(d) reimbursement of Yukos Capital's share of the Tribunal's fees and expenses, amounting to € 1,557,508.42, *id.* ¶ 898(9); and

(e) reimbursement of reasonable legal costs and expenses incurred by Yukos Capital, amounting to $20,552,462.46, *id.* ¶ 898(10).

37.     Russia has not complied with its obligation to compensate Yukos Capital.

38.     Instead, on September 14, 2021, Russia filed an application in the First Civil Court of the Swiss Federal Tribunal seeking to set aside the Interim and Final Awards and to stay enforcement of both Awards pending resolution of Russia's set-aside application.

39.     On November 1, 2021, Russia's application to stay enforcement of the Award pending resolution of its set-aside application was denied.  In its decision (attached hereto as Exhibit C to the Rozen Declaration), the Swiss court explained that it was rejecting Russia's request for a stay of enforcement because "it cannot be said, *prima facie*, . . . that [Russia's set-aside application] will in all likelihood have to be accepted."  Rozen Decl., Ex. C at 3.

## Legal Basis for Relief

40.     The New York Convention is a multilateral international treaty among 162 nations governing "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention, art. I(1).  The Convention provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  *Id.*, art. III.

41.     The United States is a contracting party to the New York Convention and has agreed to apply the Convention to disputes arising out of a "commercial" relationship.  New York Convention, 21 U.S.T. at 2560.  Congress codified the New York Convention in the FAA, 9 U.S.C. §§ 201–08.

42.     In the United States, an award issued pursuant to arbitration conducted in the territory of a party to the Convention falls under the Convention and its implementing provisions under the FAA if the award "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial."  9 U.S.C. § 202.  Thus, the FAA applies when "'(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely

domestic in scope.'" *Africard Co. Ltd. v. Republic of Niger*, 210 F. Supp. 3d 119, 123 (D.D.C. 2016).

43.     Enforcement of an arbitral award that is subject to the New York Convention is governed by Section 207 of the FAA, which entitles "any party to the arbitration" to apply "for an order confirming the award as against any other party to the arbitration" within three years after the arbitral award has been issued.  9 U.S.C. § 207.  The party seeking to confirm an award must submit the "duly authenticated original award or a duly certified copy thereof" and the "original agreement [to arbitrate] . . . or a duly certified copy thereof."  New York Convention, art. IV(1).

44.     Upon submission of an application for confirmation, the court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  "Federal courts in the United States have minimal discretion to refuse to confirm an arbitration award under the FAA." *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 184 (D.D.C. 2018) (citing 9 U.S.C. § 207). "Confirmation proceedings are generally summary in nature" because the New York Convention "provides only several narrow circumstances where a court may deny confirmation of an arbitral award."  *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).  "[T]he showing required to avoid summary confirmation . . . is high."  *Id.*

## Cause of Action and Request for Relief

45.     Petitioner repeats and re-alleges the allegations in paragraphs 1 through 44 as if set forth fully herein.

46.     The Award falls under the New York Convention because it is based on the multi-billion dollar investments of Yukos Capital, then a Luxembourgish company, in the form of

loans to Yukos Oil, then a Russian company, that were commercial in nature, not domestic in scope, and entitled to protection under the ECT, which provides for arbitration of disputes arising thereunder. *See, e.g.*, Award ¶ 503 ("[T]he Tribunal has already found (by majority) in its Interim Award that the Loans constitute an investment that the Claimant has made in the territory of the Respondent such that its jurisdiction under the ECT is engaged.").

47.     The Award is the result of an arbitration seated in Switzerland between Russia and Yukos Capital, with both parties consenting to the dispute resolution mechanism set forth in the ECT, which provides for the application of the New York Convention, ECT, art. 26(5). The Award was made within the past three years, on July 23, 2021.

48.     As required by Article IV of the New York Convention, the Petition attaches (i) an apostilled copy of the Award, Rozen Decl. Ex. A at 1–315, and (ii) copies of the ECT and Notice of Arbitration, Ex. 2 and Rozen Decl. Ex. B, as Russia's "consent given in [Article 26(3)] together with the written consent of the Investor . . . satisfy the requirement for[] . . . an "'agreement in writing' for purposes of [the New York Convention]," ECT, art. 26(5).

49.     Therefore, under the FAA, the Court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the New York Convention. 9 U.S.C. § 207. None of the New York Convention grounds for denying recognition and enforcement of an award apply in this case.

50.     For the foregoing reasons, Yukos Capital is entitled to an order (a) confirming the Award pursuant to the New York Convention, and (b) entering judgment in Yukos Capital's favor in the amount specified in the Award.

WHEREFORE, Yukos Capital requests that the Court enter an order:

(a)     confirming the Award against Russia; and

(b)      entering judgment against Russia and in Yukos Capital's favor, ordering Russia to

pay Yukos Capital $5,033,254,794.28, the amount specified in the Award:

   (i)      $2,630,706,272.17 in principal;

   (ii)      $1,065,924,619.34 in contractual interest;

   (iii)      $1,336,623,902.77 in pre-award interest on the sum of the principal and

   accrued contractual interest;

   (iv)      $1,833,419.76 for reimbursement of Yukos Capital's share of the

   Tribunal's fees and expenses;

   (v)      $20,552,462.46 in legal costs and expenses incurred by Yukos Capital;

(c)      awarding Yukos Capital pre-judgment interest thereon at a rate corresponding to

the US Prime Rate from the date of the Award, July 23, 2021, to the date of entry of judgment,

compounded annually; and

(d)      awarding Yukos Capital post-judgment interest at the statutory rate set forth in 28

U.S.C. § 1961 from the date of entry of judgment to the date the judgment is satisfied in full.

Dated:  March 23, 2022                         Respectfully submitted,

Robert Weigel (*pro hac vice* forthcoming)        /s/ Matthew S. Rozen
rweigel@gibsondunn.com
Jason Myatt (*pro hac vice* forthcoming)          Matthew D. McGill, D.C. Bar #481430
jmyatt@gibsondunn.com                             mmcgill@gibsondunn.com
Andrei Malikov (*pro hac vice* forthcoming)       Matthew S. Rozen, D.C. Bar #1023209
amalikov@gibsondunn.com                           mrozen@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP                        GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue                                    1050 Connecticut Avenue, N.W.
New York, NY 10166                                 Washington, DC  20036
Telephone:  212.351.4000                          Telephone:  202.955.8500
Facsimile:  212.351.4035                          Facsimile:  202.467.0539

*Attorneys for Yukos Capital Limited*