IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Yukos Capital Limited<br>(f/k/a Yukos Capital S.à.r.l.),<br><br>       *Petitioner*,<br><br>   v.<br><br>The Russian Federation,<br><br>       *Respondent*. | **Civil Action No.**   22-cv-00798 |

**<u>Declaration of Matthew S. Rozen in Support of Petition to Enforce Arbitral Award</u>**

# EXHIBIT A

PCA Case No 2013-31

IN THE MATTER OF
AN ARBITRATION PURSUANT TO
ARTICLE 26 OF THE ENERGY CHARTER TREATY

BEFORE
A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH
THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW OF 1976

– between –

**YUKOS CAPITAL LIMITED**
**(formerly YUKOS CAPITAL S.À R.L.)**

**(the Claimant)**

– and–

**THE RUSSIAN FEDERATION**

**(the Respondent and, together with the Claimant, the Parties)**

---

## FINAL AWARD

---

### Arbitral Tribunal

Professor Campbell McLachlan QC (Chairman)
Mr J William Rowley QC
Professor Brigitte Stern

Mr Jack L W Wass, Assistant to the Tribunal

Ms Helen F Brown, Assistant Secretary to the Tribunal

| **Claimant's Counsel** | **Respondent's Counsel** |
|---|---|
| Mr Cyrus Benson | Lord Peter Goldsmith QC |
| Ms Penny Madden QC | Ms Samantha J Rowe |
| Ms Ceyda Knoebel | Ms Aimee-Jane Lee |
| Mr Piers Plumptre | Mr Conway Blake |
| Ms Sophy Helgesen | Mr Maxim Osadchiy |
| Ms Sasha Kobyasheva | Ms Monika Hlavkova |
| Mr Theo Tyrrell | Ms Sonja Sreckovic |
| *Gibson, Dunn & Crutcher UK LLP* | Ms Svetlana Portman |
| | *Debevoise & Plimpton LLP* |

## TABLE OF CONTENTS

LIST OF DEFINED TERMS ...................................................................................... IV

I.   INTRODUCTION ............................................................................................. 1

    A.   THE PARTIES AND THEIR REPRESENTATIVES ........................................ 1

    B.   BACKGROUND TO THE DISPUTE ............................................................... 1

II.  PROCEDURAL HISTORY .............................................................................. 2

    A.   COMMENCEMENT OF THE ARBITRATION ............................................... 2

    B.   CONSTITUTION OF THE TRIBUNAL AND PRELIMINARY PROCEDURAL MATTERS ........ 2

    C.   JURISDICTION AND ADMISSIBILITY PHASE ............................................ 5

    D.   MERITS PHASE .......................................................................................... 9

        1.   Stay of the arbitration pending set-aside proceedings in Switzerland ........... 10

        2.   Procedural calendar and written submissions ................................ 11

        3.   Claimant's corporate reorganisation ............................................. 15

        4.   Document production ...................................................................... 17

        5.   Motion to strike .............................................................................. 18

        6.   Expert reports ................................................................................. 20

        7.   Security for costs ............................................................................ 20

        8.   Hearing on the merits ..................................................................... 21

        9.   Post-Hearing proceedings .............................................................. 23

III. FACTUAL BACKGROUND ........................................................................... 23

    A.   THE CLAIMANT ........................................................................................ 24

    B.   THE STRUCTURE OF THE YUKOS OIL BUSINESS ................................... 25

    C.   THE LOANS ............................................................................................... 27

    D.   THE YUKOS OIL TAX ASSESSMENTS ..................................................... 30

    E.   THE ENFORCEMENT AGAINST YUKOS OIL ........................................... 36

        1.   Enforcement of Tax Assessments ................................................... 36

        2.   The Yuganskneftegaz auction ........................................................ 41

    F.   THE BANKRUPTCY PROCEEDINGS ......................................................... 45

    G.   THE EXCLUSION OF THE CLAIMANT'S CLAIMS FROM THE BANKRUPTCY OF YUKOS OIL ........ 51

    H.   THE LIQUIDATION OF YUKOS OIL ......................................................... 55

IV.  JURISDICTIONAL OBJECTIONS ............................................................... 57

    A.   INTRODUCTION ......................................................................................... 57

        1.   Tribunal's consideration in Interim Award on Jurisdiction ........... 57

        2.   Remaining jurisdictional objections .............................................. 58

B.     **OBJECTION (III): CLAIMANT'S STATUS AS PROTECTED INVESTOR**............................**58**

       1. **The Respondent's position** ................................................................**58**

       2. **The Claimant's position** .....................................................................**63**

       3. **The Tribunal's analysis**......................................................................**65**

C.     **OBJECTION (V): ARTICLE 21 CARVE-OUT**.............................................**72**

       1. **The Respondent's position** ................................................................**72**

       2. **The Claimant's position** .....................................................................**75**

       3. **The Tribunal's analysis**......................................................................**77**

V.    **LIABILITY AND ILLEGALITY – PARTIES' ARGUMENTS** ..........................**83**

A.     **EXPROPRIATION AND UNFAIR TREATMENT** .........................................**83**

       1. **The Claimant's position** .....................................................................**83**

       2. **The Respondent's position** ................................................................**96**

B.     **LEGALITY OF 'INVESTMENTS'** .............................................................**107**

       1. **The Respondent's position** ..............................................................**107**

       2. **The Claimant's position** ...................................................................**117**

VI.    **LIABILITY AND ILLEGALITY – TRIBUNAL'S ANALYSIS** .........................**127**

A.     **INTRODUCTION** .................................................................................**127**

       1. **An investment constituted by a loan** ...............................................**128**

       2. **The relation between the causes of action** ......................................**133**

B.     **EXPROPRIATION** ................................................................................**139**

       1. **Introduction** ....................................................................................**139**

       2. **Treatment of Yukos Capital in the bankruptcy**.............................**141**

       3. **Did the Respondent expropriate the Loans in breach of Article 13 ECT?**.........**156**

C.     **ILLEGALITY** ......................................................................................**173**

       1. **Legal character of allegations of illegality**.....................................**173**

       2. **Evaluation of the evidence** .............................................................**187**

       3. **Conclusion** ......................................................................................**197**

VII.   **CAUSATION AND CONTRIBUTION TO THE INJURY** ...............................**198**

A.     **INTRODUCTION** .................................................................................**198**

B.     **ARGUMENTS OF THE PARTIES** ...........................................................**199**

       1. **The Respondent's position** ..............................................................**199**

       2. **The Claimant's position** ...................................................................**205**

C.     **THE TRIBUNAL'S ANALYSIS** ..............................................................**208**

       1. **Characterisation of the issue**...........................................................**208**

       2. **The facts**..........................................................................................**217**

       3. **Conclusion on causation and contribution** .....................................**229**

**VIII. COMPENSATION** .................................................................................................**240**

    **A.**   **INTRODUCTION** ...............................................................................**240**

    **B.**   **NATURE OF LOSS** ...........................................................................**240**

        **1. The issue** .............................................................................**240**

        **2. Arguments of the Parties** ...................................................**242**

        **3. The Tribunal's analysis** .....................................................**245**

    **C.**   **THE APPLICABLE STANDARD** .........................................................**259**

        **1. The issue** .............................................................................**259**

        **2. Arguments of the Parties** ...................................................**259**

        **3. The Tribunal's Analysis** ....................................................**264**

    **D.**   **PRIOR RECOVERY** .........................................................................**273**

        **1. The issues** ...........................................................................**273**

        **2. Arguments of the Parties** ...................................................**274**

        **3. The Tribunal's analysis** .....................................................**275**

    **E.**   **INTEREST** ......................................................................................**283**

        **1. The claim to interest** .........................................................**283**

        **2. The Tribunal's analysis** .....................................................**284**

    **F.**   **COSTS** ..........................................................................................**292**

        **1. The legal framework** .........................................................**292**

        **2. Costs in the procedure to date** .........................................**293**

        **3. Fees and expenses of the Tribunal and the PCA**...............**294**

        **4. Costs for legal representation** ...........................................**296**

**IX.**   **DISPOSITION** ....................................................................................**301**

## LIST OF DEFINED TERMS

| | |
|---|---|
| **2000 Tax Assessment** | Tax Assessment of Yukos Oil by the Russian Federation for the 2000 tax year |
| **2001 Tax Assessment** | Tax Assessment of Yukos Oil by the Russian Federation for the 2001 tax year |
| **2002 Tax Assessment** | Tax Assessment of Yukos Oil by the Russian Federation for the 2002 tax year |
| **2003 Tax Assessment** | Tax Assessment of Yukos Oil by the Russian Federation for the 2003 tax year |
| **2004 Tax Assessment** | Tax Assessment of Yukos Oil by the Russian Federation for the 2004 tax year |
| **Armenian Branch** | A branch of offshore Yukos Oil subsidiaries, headed by Yukos CIS Investments, a limited liability company incorporated in Armenia |
| **ARSIWA** | International Law Commission, Draft Articles on Responsibility of States for Internationally Wrongful Acts [2001] 2(2) YB ILC 26 |
| **ATAs** | Advance Tax Agreements |
| **August 2004 Loan** | The August 2004 loan, made to Yukos Oil by Yukos Capital, in the principal amount of USD 355 million |
| **B Loan** | A USD 1.6 billion loan agreement between Yukos Oil and SG |
| **Baikal** | OOO Baikalfinancegroup, a company incorporated in Tver |
| **Brill** | Brill Management Ltd, incorporated in the BVI |
| **Brittany** | Brittany Assets Ltd |
| **Brittany Loan** | The loan established pursuant to the Brittany Loan Agreement |
| **Brittany Loan Agreement** | Agreement establishing a loan between Brittany (lender) and Yukos Capital (borrower) dated 20 November 2003 |
| **BVI** | The British Virgin Islands |

343945

| | |
|---|---|
| **Claimant / Yukos Capital** | Yukos Capital Ltd, formerly Yukos Capital S.à r.l., the Claimant |
| **Corporate Reorganisation** | The changing of the Claimant's domicile from Luxembourg to the British Virgin Islands, as notified to the Tribunal on 15 January 2018 |
| **Counter-Memorial** | Respondent's Counter-Memorial on the Merits dated 11 July 2018 |
| **Cyprus companies** | The Cyprus holding companies Dunsley Ltd and Nassaubridge Management Ltd |
| **Cyprus DTA** | Cyprus-Russia Double-Tax Agreement |
| **December 2003 Loan** | The December 2003 loan, made to Yukos Oil by Yukos Capital, in the principal amount of RUB 79.3 billion |
| **DKW** | Dresdner Kleinwort Wasserstein |
| **DKW Valuation** | Valuation of YNG by Dresdner Kleinwort Wasserstein, dated 6 October 2004 |
| **Dunsley** | Dunsley Ltd, incorporated in Cyprus |
| **ECT / Treaty** | Energy Charter Treaty, 1994 |
| **ECtHR** | European Court of Human Rights |
| **English Judgment** | Judgment of 24 June 2005 of the High Court of England and Wales |
| **Fargoil** | OOO Fargoil, incorporated in Mordovia, Russia |
| **Federal Tax Service** | The Federal Tax Service of the Russian Federation |
| **FET** | Fair and equitable treatment |
| **First Appeal** | Claimant's appeal dated 28 July 2006 of the decision denying its First Bankruptcy Application |
| **First Bankruptcy Application** | Claimant's application of 27 April 2006 for the inclusion of its claims in the Register of Creditors |
| **First Cassation Appeal** | Claimants cassation appeal dated 27 November 2006 against the suspension of its appeal from the First Bankruptcy Application |
| **FMV** | Fair market value |

| | |
|---|---|
| **Gazprom** | OAO Gazprom |
| **Gazpromneft / Sibneft** | OOO Gazpromneft, a subsidiary of Gazprom, formerly Sibneft |
| **Group Menatep** | Group Menatep Ltd, a limited liability company incorporated in Gibraltar |
| **Giga-dividend** | A USD 2 billion dividend issued by Yukos Oil, declared on 28 November 2003 |
| **Guidelines** | World Bank Guidelines on the Treatment of Foreign Direct Investment |
| **Hearing** | The hearing on the merits, held between 1-12 July 2019 in London |
| **Hearing on Jurisdiction** | The hearing on jurisdiction, held between 31 August and 4 September 2015 in The Hague |
| **Hedgerow** | Hedgerow Ltd, formerly Rospan |
| **Hedgerow Loan** | The loan established pursuant to the Hedgerow Loan Agreement |
| **Hedgerow Loan Agreement** | Agreement establishing a loan between Hedgerow (lender) and Yukos Capital (borrower) dated 18 August 2004 |
| ***Hulley* Final Awards** | The final awards rendered in *Hulley Enterprises Ltd (Cyprus) v Russian Federation, Yukos Universal Ltd (Isle of Man) v Russian Federation*, and *Veteran Petroleum Ltd (Cyprus) v Russian Federation* |
| ***Hulley* Awards** | The interim awards on jurisdiction and admissibility and the final awards rendered in *Hulley Enterprises Ltd (Cyprus) v Russian Federation, Yukos Universal Ltd (Isle of Man) v Russian Federation*, and *Veteran Petroleum Ltd (Cyprus) v Russian Federation* |
| ***Hulley* Proceedings** | The arbitration proceedings in *Hulley Enterprises Ltd (Cyprus) v Russian Federation, Yukos Universal Ltd (Isle of Man) v Russian Federation*, and *Veteran Petroleum Ltd (Cyprus) v Russian Federation* |
| **Interim Award** | Tribunal's Interim Award on Jurisdiction dated 18 January 2017 |
| **JHV** | James Holding Venture Corp, incorporated in the BVI |

| | |
|---|---|
| **Loans** | The December 2003 Loan and the August 2004 Loan |
| **Low-tax regions / LTRs** | Jurisdictions within the Russian Federation with lower profit-tax rates |
| **LTR Subsidiaries** | Subsidiaries of Yukos Oil registered in low-tax regions |
| **Luxembourg DTA** | Luxembourg-Russia Double-Tax Agreement |
| **Memorial** | Claimant's Memorial on the Merits dated 27 October 2017 |
| **Miwok** | Miwok Wealth PIC Ltd, an entity incorporated in the BVI into which Yukos Capital S.à r.l. was merged |
| **Moonstone** | Moonstone Investments Ltd, incorporated in the BVI |
| **Nassaubridge** | Nassaubridge Management Ltd, incorporated in Cyprus |
| **Nomos** | NOMOS Law Office, the firm representing Yukos Capital in the bankruptcy proceeding |
| **Notice of Arbitration** | Notice of Arbitration dated 15 February 2013 |
| **Parties** | The Claimant and the Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCIJ** | Permanent Court of International Justice |
| **PO N° 1** | Procedural Order N° 1 dated 24 April 2014 |
| **PO N° 2** | Procedural Order N° 2 dated 20 January 2015 |
| **PO N° 3** | Procedural Order N° 3 dated 13 November 2017 |
| **PO N° 4** | Procedural Order N° 4 dated 18 May 2018 |
| **PO N° 5** | Procedural Order N° 5 dated 28 September 2018 |
| **PO N° 6** | Procedural Order N° 6 dated 1 November 2018 |
| **PO N° 7** | Procedural Order N° 7 dated 10 December 2018 |
| **PO N° 8** | Procedural Order N° 8 dated 1 April 2019 |
| **PO N° 9** | Procedural Order N° 9 dated 30 April 2019 |
| **PO N° 10** | Procedural Order N° 10 dated 30 April 2019 |

| | |
|---|---|
| **Production Subsidiaries** | Yukos Oil's main oil-production subsidiaries, being Yuganskneftegaz, Samaraneftegaz and Tomskneft |
| **Promneftstroy** | OOO Promneftstroy |
| **Promneftstroy action** | Proceedings in the Dutch courts regarding the ability of Yukos Capital to direct its claims pursuant to the Loans against Promneftstroy |
| **PwC** | PricewaterhouseCoopers |
| **Ratibor** | OOO Ratibor, incorporated in Mordovia, Russia |
| **Rebgun action** | Proceedings in the Dutch courts regarding the ownership of Yukos Finance |
| **Register of Creditors** | The three tiers of claims comprising the register of creditors in Yukos Oil's bankruptcy proceedings |
| **Rehabilitation Plan** | Yukos Oil's financial rehabilitation plan of June 2006 |
| **Rejoinder** | Respondent's Rejoinder on the Merits dated 14 May 2019 |
| **Reply** | Claimant's Reply on the Merits dated 8 January 2019 |
| **Respondent / Russia / Russian Federation** | Government of the Russian Federation, the Respondent |
| **RFPF** | The Russian Federal Property Fund |
| **Rosneft** | Oil Company Rosneft OJSC |
| **Rospan** | Rospan Overseas Ltd, now Hedgerow |
| **Russia / Russian Federation / Respondent** | Government of the Russian Federation, the Respondent |
| **Second Appeal** | Claimant's appeal dated 18 December 2006 of the decision denying its Second Bankruptcy Application |
| **Second Bankruptcy Application** | Claimant's application dated 6 October 2006 for the inclusion of its claims in the Register of Creditors |
| **Second Cassation Appeal** | Claimant's cassation appeal dated 10 April 2007 seeking to reverse the judgments on the Second Bankruptcy Application and the Second Appeal |
| **Set-Aside Application** | Respondent's application to Swiss Federal Tribunal to set aside the Interim Award |

343945

| | |
|---|---|
| **Sibneft / Gazpromneft** | OOO Gazpromneft, a subsidiary of Gazprom, formerly Sibneft |
| **SN** | Samaraneftegaz, one of Yukos Oil's main oil-production subsidiaries |
| **Société Générale** | Société Générale SA |
| **Stichting** | Stichting Administratiekantoor Yukos International, a foundation incorporated in the Netherlands in 2005 |
| **Syndicate Loan** | A USD 1 billion loan agreement between Société Générale and the Western Banks |
| **Tax Assessments** | The tax assessments of Yukos Oil by the Russian Federation for the 2000-2004 tax years |
| **Terms of Appointment** | Terms of Appointment between the Parties appointing the Tribunal dated 17 February 2014 |
| **The Hague District Court Judgment** | Judgment of The Hague District Court dated 20 April 2016 in Action Nos C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and C/09/481619 / HA ZA 15-112, in relation to the *Hulley* Final Awards and the interim awards on jurisdiction and admissibility in the same cases |
| **TMF** | TMF Corporate Services SA, the manager of Yukos Capital |
| **TN** | Tomskneft, one of Yukos Oil's main oil-production subsidiaries |
| **Treaty / ECT** | Energy Charter Treaty, 1994 |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **VAT** | Value-added tax |
| **Western Banks** | A consortium of European and North American banks that had granted loans to Yukos Oil, led by Société Générale |
| **YNG** | Yuganskneftegaz, one of Yukos Oil's main oil-production subsidiaries |
| **Yukos Capital / Claimant** | Yukos Capital Ltd, formerly Yukos Capital S.à r.l., the Claimant |

| | |
|---|---|
| **Yukos CIS** | Yukos CIS Investments, a company incorporated in Armenia and the head of the Armenian Branch |
| **Yukos Finance** | Yukos Finance BV, a private limited liability company incorporated in the Netherlands |
| **Yukos Group** | All companies within the Yukos group of companies |
| **Yukos Hydrocarbons** | Yukos Hydrocarbons Ltd, a private limited liability company incorporated in the BVI |
| **Yukos International** | Yukos International UK BV, a private limited liability company incorporated in the Netherlands |
| **Yukos Oil** | Yukos Oil Company OJSC, a joint stock company incorporated in the Russian Federation in 1993 |
| **Yukos Tax Arrangement** | The corporate structure designed by the Yukos Group for purposes of tax optimisation for the profits of Yukos Oil |
| **ZATOs** | Closed Administrative Territorial Formations within the Russian Federation |

## I.   INTRODUCTION

### A.   THE PARTIES AND THEIR REPRESENTATIVES

1.   The Claimant in this arbitration is Yukos Capital Ltd (formerly Yukos Capital S.à r.l.) (**Yukos Capital**, or the **Claimant**), a private company organised and existing under the laws of the British Virgin Islands (the **BVI**), with its registered address at Palm Grove House, PO Box 438, Road Town, Tortola, British Virgin Islands. The Claimant is represented in these proceedings by Mr Cyrus Benson, Ms Penny Madden QC, Ms Ceyda Knoebel, Mr Piers Plumptre, Ms Sophy Helgesen, Ms Sasha Kobyasheva and Mr Theo Tyrrell of Gibson, Dunn & Crutcher UK LLP, Telephone House, 2-4 Temple Avenue, London EC4Y 0HB, United Kingdom.

2.   The Respondent is the Government of the Russian Federation (**Russia**, the **Russian Federation**, or the **Respondent** and, together with the Claimant, the **Parties**). The Respondent is represented by Lord Peter Goldsmith QC, Ms Samantha J Rowe, Ms Aimee-Jane Lee, Mr Conway Blake, Mr Maxim Osadchiy, Ms Monika Hlavkova, Ms Sonja Sreckovic and Ms Svetlana Portman of Debevoise & Plimpton LLP, 65 Gresham Street, London, EC2V 7NQ, United Kingdom.

### B.   BACKGROUND TO THE DISPUTE

3.   A dispute has arisen between Yukos Capital and the Russian Federation in respect of which the Claimant commenced arbitration pursuant to the Energy Charter Treaty (the **ECT**, or the **Treaty**).

4.   The dispute concerns the Claimant's alleged investments by way of loans to its parent company in Russia, Yukos Oil Company OJSC (**Yukos Oil**), the Russian Federation's alleged expropriation of the Claimant's purported investments, and the Russian Federation's allegedly unfair and discriminatory treatment of Yukos Capital. The Respondent objects to the jurisdiction of the Tribunal.

## II.   PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THE ARBITRATION

5.   By letter dated 23 May 2008, the Claimant 'notified the Russian Federation, through the Russian Ministry of Justice, of its claims under the ECT, accepted the Russian Federation's offer to arbitrate and invited the Russian Federation to engage in settlement discussions.'[1]

6.   On 25 July 2008, the Ministry of Justice informed the Claimant that receipt of that notice was not within the Ministry's competence.[2]

7.   On 27 August 2008, the Claimant forwarded that notice to the Government of the Russian Federation and to the Administration of the President of the Russian Federation.[3]

8.   By **Notice of Arbitration** dated 15 February 2013, the Claimant commenced arbitration proceedings against the Russian Federation pursuant to Article 26(4)(b) of the ECT and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law (the **UNCITRAL Rules**).[4]

### B.   CONSTITUTION OF THE TRIBUNAL AND PRELIMINARY PROCEDURAL MATTERS

9.   By its Notice of Arbitration, the Claimant appointed Mr J William Rowley QC as the first arbitrator. Mr Rowley's address is 20 Essex Street, London WC2R 3AL, United Kingdom.

---

[1] Notice of Arbitration (15 February 2013), [31].

[2] Letter from the Russian Federation Ministry of Justice to Gibson Dunn & Crutcher LLP (25 July 2008) (**C-103**).

[3] Notice of Arbitration, [31]; Letter from Gibson Dunn & Crutcher LLP to the Government of the Russian Federation, including attachments (27 August 2008) (**C-103**).

[4] Arbitration Rules of the United Nations Commission on International Trade Law, 1976, GA Res. 31/98. The Notice of Arbitration purported to invoke the revised 2010 UNCITRAL Arbitration Rules, but it was accepted by the Parties and recorded in the Terms of Appointment of the Tribunal that the 1976 Rules were applicable: Terms of Appointment (17 February 2014) (**Terms of Appointment**), [4](a).

10. By letter to the Claimant dated 3 May 2013, the Respondent appointed Professor Brigitte Stern as the second arbitrator. Professor Stern's address is 7 rue Pierre Nicole, 75005 Paris, France.

11. On 8 October 2013, the Claimant requested that the Secretary-General of the Permanent Court of Arbitration (the **PCA**) act as the appointing authority with regard to the appointment of a presiding arbitrator, pursuant to Articles 6 and 7 of the UNCITRAL Rules. In its submission, the Claimant stated that the Parties were 'in agreement as to the employment of the list-procedure referred to in Article 6(3) of the 1976 Rules..., but wish for the list to be provided by the Secretary-General to include at least five names.'[5]

12. On 9 October 2013, the PCA proposed to the Parties the use of a modified list procedure, allowing each of the Parties to eliminate a maximum of three names from a list of seven and requiring each Party to rank by preference the remaining names. On 15 October 2013, each of the Parties agreed to the PCA's proposal.

13. In a letter of 4 November 2013, the PCA implemented the modified list procedure, sending each Party a list of seven candidates who could be appointed as Presiding Arbitrator, and, in separate letters of 19 November 2013, each Party submitted comments to the PCA regarding the list of candidates.

14. On 22 November 2013, Professor Campbell McLachlan QC was appointed as Presiding Arbitrator by the Secretary-General of the PCA. Professor McLachlan's address is Victoria University of Wellington, School of Law, Old Government Buildings, 55 Lambton Quay, Wellington, New Zealand.

15. By 18 February 2014, both Parties and all Tribunal members had signed the **Terms of Appointment**, confirming that: (i) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (ii) the proceedings shall be governed by the UNCITRAL Rules; (iii) the Tribunal shall determine the legal seat of the arbitration in Procedural Order Nº 1 after hearing the Parties on the issue; (iv) the language of the arbitration shall be English; (v) the International Bureau of the

---

[5] Claimant's Application for the Secretary-General to Act as Appointing Authority (8 October 2013), [17].

PCA shall act as registry; (vi) the issues in dispute shall be decided in accordance with the ECT and applicable rules and principles of international law; and (vii) the arbitral proceedings shall be held in private and all documents in these proceedings created for the purpose of the arbitration as well as all other documents or evidence produced by either Party shall be confidential, unless the Parties expressly agree in writing to the contrary.

16. On 31 March 2014, each Party submitted arguments regarding the Tribunal's determination of the seat of the arbitration. The Respondent proposed Vienna, Austria or Frankfurt, Germany, but indicated that it would also support the designation of Geneva, Switzerland, or Paris, France. The Claimant proposed The Hague, the Netherlands, or London, United Kingdom.

17. On 12 April 2014, both Parties, all Tribunal members and Mr Jack L W Wass signed the Terms of Appointment of the Assistant to the Tribunal, confirming that Mr Wass would be appointed as Assistant to the Tribunal on the terms set out therein. Mr Wass' address is Stout Street Chambers, Level 6, Huddart Parker Building, Wellington 6011, New Zealand.

18. On 14 April 2014, the Tribunal convened a preliminary procedural hearing in Vienna, Austria. At the hearing, the Tribunal heard the Parties regarding the determination of the seat of arbitration and the issue of whether or not to bifurcate proceedings, and the Tribunal and Parties discussed a draft Procedural Order N° 1 and the procedural calendar. The following individuals attended the hearing before the Tribunal:

|                          |                          |
| ------------------------ | ------------------------ |
| <u>Claimant</u>          | <u>Respondent</u>        |
| Mr Cyrus Benson          | Mr David Sabel           |
| Ms Ceyda Knoebel         | Ms Claudia Annacker      |
| *Gibson, Dunn & Crutcher LLP* | Mr Cameron Murphy   |
|                          | *Cleary Gottlieb Steen & Hamilton LLP* |
| Mr Daniel Feldman        |                          |
| *Party Representative*   |                          |

<u>Registry</u>
Mr Hanno Wehland
*PCA*

<u>Court Reporter</u>
Ms Claire Hill

343945

19. On 24 April 2014, the Tribunal issued Procedural Order N° 1 (**PO N° 1**), in which it determined, *inter alia*, that the seat of the arbitration shall be Geneva, Switzerland. The Tribunal also decided to bifurcate the proceedings, setting forth a procedural calendar for a preliminary phase during which three of the objections raised by the Respondent to the jurisdiction of the Tribunal would be heard and decided. Those objections were:

    (i)    '[t]he Russian Federation never ratified the ECT and applied the ECT until October 18, 2009 on a provisional basis pursuant to Article 45(1) ECT only "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations"';[6]

    (ii)    '[t]he intra-company loans allegedly made by Claimant to Yukos Oil Company are not "investments" within the meaning of Article 1(6) ECT';[7] and

    (iii)    '[s]ince Claimant is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of a third State, Respondent is entitled to deny Claimant the advantages of Part III of the ECT pursuant to Article 17 ECT.'[8]

## C.    JURISDICTION AND ADMISSIBILITY PHASE

20. Pursuant to PO N° 1, the Parties submitted the following pleadings and evidence:

    (i)    On 28 July 2014, the Respondent filed a Memorial on Jurisdiction, together with an Expert Report of Professor Anton V Asoskov.

    (ii)    On 3 November 2014, the Claimant filed a Counter-Memorial on Jurisdiction, together with a Witness Statement of Bruce K Misamore and Expert Reports of Professor Paul B Stephan, Stuart B Gleichenhaus, and Professor Justice J H M Willems.

---

[6] PO N° 1 (24 April 2014), [2.1](a) (emphasis omitted).

[7] PO N° 1, [2.1](b).

[8] PO N° 1, [2.1](c).

(iii)    On 2 March 2015, the Respondent filed a Reply on Jurisdiction, together with a Second Expert Report of Professor Asoskov and Expert Reports of Professor Thomas Z Lys, Lionel Noguera, and Professor Dr Riemert Pieter Jan Lucris Tjittes.

(iv)    On 15 June 2015, the Claimant filed a Rejoinder on Jurisdiction, together with a Second Witness Statement of Mr Misamore, further Expert Reports of Professor Stephan, Mr Gleichenhaus, and Professor Willems, and Expert Reports of Professor Stephen E Shay and Andrew Grantham.

21.    Following the exchange of the first round of pleadings, the Parties made a simultaneous exchange of requests for the production of documents from each other as provided by PO N° 1. Following the exchange of responses and replies, a number of requests remained outstanding, and, on 18 December 2014, each Party submitted a Redfern Schedule together with introductory comments, requesting that the Tribunal make an order on those requests. On 20 January 2015, the Tribunal set forth its decision on the Parties' requests by issuing Procedural Order N° 2 (**PO N° 2**).

22.    Following the issuance of PO N° 2, the Parties exchanged correspondence on their respective compliance with the Tribunal's decisions in that Order. By letter dated 26 March 2015, the Tribunal determined a number of requests made by the Respondent in relation to the Claimant's compliance with the Tribunal's Order. By letter dated 4 May 2015, the Tribunal determined a number of requests made by the Claimant in relation to the Respondent's compliance with the Tribunal's Order.

23.    A pre-hearing telephone conference was held by the Chairman with the Parties on 29 July 2015, the result of which were recorded by the Chairman in a Minute on Arrangements for Hearing on 31 July 2015.

24.    The **Hearing on Jurisdiction** was held over five days from 31 August to 4 September 2015 at the Peace Palace in The Hague. The following persons attended the Hearing on Jurisdiction before the Tribunal:

<table>
<tr><td align="center">Claimant</td><td align="center">Respondent</td></tr>
</table>

|  |  |
|---|---|
| **Claimant** | **Respondent** |
| Mr Cyrus Benson | Dr Claudia Annacker |
| Ms Penny Madden | Mr David G Sabel |
| Ms Ceyda Knoebel | Mr Lawrence B Friedman |
| Mr Piers Plumptre | Mr Matthew D Slater |
| Ms Sophy Cuss | Mr Larry C Work-Dembowski |
| Mr Sergey Okoev | Dr Enikő Horvath |
| *Gibson, Dunn & Crutcher LLP* | Ms Laurie Achtouk-Spivak |
|  | Mr Lorenzo Melchionda |
| Mr David Godfrey | Ms Ksenia Khanseidova |
| Ms Natalia Kantovich | Ms Aija Lejniece |
| Ms Sophy Bae | Ms Sarah Schröder |
| *Party Representatives* | Mr Sean McGrew |
|  | *Cleary Gottlieb Steen & Hamilton LLP* |
| Mr Bruce K Misamore |  |
| *Fact Witness* | Mr Andrey Kondakov |
|  | *Party Representative* |
| Professor Paul B Stephan |  |
| Mr Stuart B Gleichenhaus | Mr Jesse Stevenson |
| Professor Stephen E Shay | *Trial Graphic Consultant* |
| Mr Andrew Grantham FCA |  |
| Professor Justice J H M (Huub) Willems LLM | Professor Anton V Asoskov |
| *Expert Witnesses* | Professor Thomas Z Lys |
|  | Professor Dr Riemert P J L Tjittes |
|  | *Expert Witnesses* |

**Tribunal Assistant**
Mr Jack L Wass

**Registry**
Dr Hanno Wehland
Mr Robert James
*PCA*

**Court Reporter**
Mr Trevor McGowan

**Interpreters**
Ms Irina van Erkel
Mr Sergei Mikheyev

25.   The Hearing on Jurisdiction proceeded by way of opening arguments, witness and expert testimony, and closing arguments. At the conclusion of the Hearing on Jurisdiction, the

343945

Parties confirmed that they had no further procedural matters to draw to the attention of the Tribunal.[9]

26.    In accordance with the Tribunal's directions, the Parties exchanged submissions on costs relating to the jurisdiction phase on 5 October 2015 and comments on the other Party's costs submissions on 19 October 2015.

27.    On 17 May 2016, the Tribunal invited the Parties' observations on **The Hague District Court Judgment** in Action Nos C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and C/09/481619 / HA ZA 15-112, which were duly provided by the Claimant on the same date, and by the Respondent on 23 May 2016. On 26 May 2016, the Tribunal decided to admit The Hague District Court Judgment into the record. It also advised that it would consider the Claimant's further submissions of 24 May 2016, and permitted the Respondent to provide a reply, which it submitted on 31 May 2016.

28.    On 18 January 2017, the Tribunal issued its Interim Award on Jurisdiction (the **Interim Award**). The Tribunal decided that:

> (1)    The Respondent's provisional application of the Energy Charter Treaty under the terms of Article 45(1) does include its consent to international arbitration under Article 26(3)(a) (by majority).

> (2)    The Claimant does own an asset constituted by a debt of a company associated with an Economic Activity in the Energy Sector in the Area of the Respondent such that it has made an Investment to which the present dispute with the Respondent relates (by majority).

> (3)    Citizens or nationals of a third State did not control the Claimant on 11 April 2014 when the Respondent sought to deny the Claimant the advantages of Part III of the Energy Charter Treaty, such that the Respondent was not entitled to invoke the provisions of Article 17(1).

> (4)    The three objections to jurisdiction and admissibility raised by Respondent in its Notice dated 11 April 2014 that the Tribunal set down for determination in a preliminary phase by Procedural Order No 1 dated 24 April 2014 are therefore dismissed (by majority in respect of objections (1) and (2)).

---

[9] Jurisdiction, T5/232/9-15.

(5)    Any other objections to jurisdiction and admissibility are, pursuant to Procedural Order No 1, joined to the merits.

(6)    The stay of proceedings on the merits ordered in Procedural Order No 1 is lifted with effect from 28 days following the communication of this Interim Award on Jurisdiction to the Parties.

(7)    The Tribunal shall thereafter fix by procedural order, after consultation with the Parties, a revised timetable for further pleadings and a hearing on the merits.

(8)    All costs of and occasioned by the hearing of these objections to jurisdiction shall be reserved.[10]

29.    Professor Brigitte Stern issued a dissenting opinion in relation to the first two issues, in which she considered that:

(i)    Article 26 of the ECT cannot be introduced in the Russian legal order through an administrative act and, therefore, cannot be provisionally applied on the international level, and therefore the Tribunal has no jurisdiction *ratione temporis*; and

(ii)    The Claimant cannot be considered as having made an autonomous investment and the Tribunal has no jurisdiction *ratione materiae* to deal with the case.

**D.   MERITS PHASE**

30.    On 20 February 2017, following the lifting of the stay of the proceeding on the merits pursuant to the Interim Award, the Tribunal wrote to the Parties proposing a procedural calendar for the phase on the merits. By letter of 22 February 2017, the Tribunal wrote further to propose Lausanne, Switzerland, as the venue for the hearing on the merits (the **Hearing**).

31.    A number of discrete procedural matters arose during the merits phase of the proceedings, which, in the interest of clarity, will be set out *seriatim* rather than strictly chronologically.

---

[10] Interim Award, [567].

### 1.    Stay of the arbitration pending set-aside proceedings in Switzerland

32.    On 25 February 2017, the Respondent wrote to the Tribunal to advise that:

(i)    Debevoise & Plimpton LLP had been appointed as counsel for the Respondent in these proceedings, to replace Cleary Gottlieb Steen & Hamilton LLP;

(ii)    The Respondent had made an application to set aside the Interim Award (the **Set-Aside Application**) before the Swiss Federal Tribunal and that the latter had issued a Provisional Measures Order for the stay of the present arbitration proceedings; and

(iii)    The Respondent was ready to submit a formal application for the stay of the proceedings should the Tribunal so require.

33.    On 1 March 2017, the Claimant advised that: (i) it did not object to the stay of the proceedings, subject to the Tribunal being permitted during the pendency of the Set-Aside Application proceedings to decide on the venue of the Hearing and the provisional schedule for the phase on the merits; and (ii) that it had no objection to Lausanne as the venue for the Hearing subject to the assurance of safe passage of the Claimant's witnesses and client representatives.

34.    By letter of 7 March 2017, the Respondent: (i) expressed its agreement with the Claimant's proposal concerning the stay of the proceedings; (ii) indicated its agreement with Lausanne as the venue for the Hearing; and (iii) submitted several comments with regard to the provisional timetable for the phase on the merits.

35.    On 16 March 2017, following consultation with the Tribunal, the Parties wrote jointly to the Swiss Federal Tribunal, indicating that:

(i)    The Claimant consented to the stay of the arbitral proceedings requested by the Respondent; and

(ii)    The Parties had agreed that the Tribunal should in the interim be able to rule on the place of the Hearing and the provisional timetable for the procedural phase

in the merits, which would only be applicable in the event the Set-Aside Application was rejected.

36. On 10 August 2017, the Claimant wrote to the Tribunal to inform it that the Set-Aside Application had been dismissed by the Swiss Federal Tribunal as premature, the Interim Award having reserved several of the Respondent's jurisdictional objections to the merits phase.

## 2. Procedural calendar and written submissions

37. On 15 September 2017, the Parties jointly submitted an agreed procedural calendar for the phase on the merits.

38. By letter of 4 October 2017, the Tribunal confirmed its agreement with the written phase of the procedural calendar proposed by the Parties. Following an exchange of correspondence between 12 and 25 October 2017, the Parties agreed that the Hearing be held in Lausanne, Switzerland, between 1 and 12 July 2019.

39. On 27 October 2017, the Claimant filed a **Memorial** on the Merits, together with a Third Witness Statement of Mr Misamore (**Misamore 3**), Witness Statements of Andrei **Illarionov**, Steven **Theede**, Vladimir Dubov (**Dubov 1**), Rudolf Mkhitaryan (**Mkhitaryan 1**) and Yuri **Schmidt**, a Third Expert Report of Professor Stephan (**Stephan 3**), and an Expert Report of Mr Gleichenhaus and Howard N. Rosen (**Gleichenhaus-Rosen**).

40. On 13 November 2017, the Tribunal issued Procedural Order N° 3 (**PO N° 3**), memorialising the procedural calendar for the phase on the merits as agreed by the Parties.

41. On 11 July 2018, the Respondent filed a **Counter-Memorial** on the Merits, together with Witness Statements of Gitas P. **Anilionis**, Dmitry Gololobov and Yevgeny **Rybin**, a Third Expert Report of Professor Asoskov (**Asoskov 3**), a Second Expert Report of Mr Noguera (**Noguera 2**) and Expert Reports of Andreas **Michaelides**, Zaitsev Oleg **Romanovich**, Philip **Haberman**, Professor Gennady Esakov (**Esakov 1**), Professor Dr Mark Pieth (**Pieth 1**), Professor Dr Robert J. Danon (**Danon 1**), Professor S.P. **Kothari**, Roman S. **Bevzenko** and Viktor V Batsiev (**Batsiev 1**).

42. Following a joint request by the Parties, by letter of 26 July 2018 the Tribunal confirmed a further amendment to the procedural calendar and noted that 'the written pleadings phase will close on 7 May 2019', and that '[n]o further slippage in the date for close of written pleadings can be contemplated.'

43. On 8 January 2019, the Claimant filed a **Reply** on the Merits, together with a Fourth Witness Statement of Mr Misamore (**Misamore 4**), Second Witness Statements of Mr Mkhitaryan (**Mkhitaryan 2**) and Mr Dubov (**Dubov 2**),[11] a Witness Statement of Alexey Smirnov (**Smirnov**), a fourth Expert Report of Professor Stephan (**Stephan 4**), a Second Expert Report of Prof Shay (**Shay 2**) and Expert Reports of Mr Rosen (**Rosen**) and Dr Vladimir Gladyshev (**Gladyshev**).

44. On 5 February 2019, the Respondent wrote concerning Claimant's compliance with the Tribunal's directions in the filing of the Reply. By letter of 21 February 2019, the Claimant provided explanations on the matter and confirmed it had completed the filing of its Reply.

45. On 25 March 2019, the Claimant informed the Tribunal and the Respondent that one of its fact witnesses, Dr Andrei Illarionov, would not appear at the Hearing and that his witness statement dated 24 October 2017 was withdrawn.

46. On 6 April 2019, the Respondent indicated that it objected to the withdrawal of Dr Illarionov's evidence from the proceedings and requested: (i) that the withdrawal of Dr Illarionov's evidence be rejected; (ii) that the Tribunal order the Claimant to confirm that Dr Illarionov would be available at the Hearing for cross-examination; and alternatively, (iii) that the Tribunal order the Claimant to procure Dr Illarionov to appear at the Hearing for testimony and cross-examination.

47. On 15 April 2019, the Respondent submitted an application for amendment of the procedural timetable, requesting, in particular: (i) the postponement of the Hearing to a time to be determined; (ii) an extension of the time for the filing of its Rejoinder; and

---

[11] Under prior notice, the Second Witness Statement of Vladimir M. Dubov was submitted by the Claimant on 9 January 2019.

(iii) further consequential relief and amendments to the procedural timetable. In its application, the Respondent alleged, *inter alia*, that the Claimant had been 'harassing' one of Respondent's witnesses, Mr Gololobov, referring to his inclusion on the 'Free Russia' website.[12]

48. On 16 April 2019, the Tribunal directed the Claimant to file its written response to the Respondent's application by 23 April 2019. On 19 April 2019, the Tribunal fixed the date of Saturday 27 April 2019 for a procedural hearing by telephone conference on the Respondent's application.

49. On 23 April 2019, the Claimant submitted its response, in which it requested that the Respondent's application for amendment of the procedural timetable be dismissed.

50. On 27 April 2019, the Tribunal held a procedural hearing by telephone conference to determine the Respondent's application for postponement of the Hearing.

51. On 30 April 2019, the Tribunal issued Procedural Order N° 10 (**PO N° 10**), in which it: (i) decided that all references to Dr Illarionov's witness statements are expunged from the record in this arbitration; (ii) ordered the Claimant to file and re-serve amended copies of its Memorial and Reply omitting such references; (iii) granted the Respondent a one-week extension for the service of its rejoinder submissions; (iv) extended the date for notification of witnesses to be cross-examined at the Hearing; (v) otherwise dismissed the Respondent's application; and (vi) decided that the reasonable costs of and occasioned by the Respondent's application are payable by the Respondent in any event upon the conclusion of the proceedings. In the course of its reasoning in PO N° 10, the Tribunal found 'no evidence on the record that might support the proposition that the Claimant or its officers or agents are behind the inclusion of Dr Gololobov on the "Free Russia" Website or that his inclusion on that Website is in any way connected with the present case.'

---

[12] The Respondent further indicated that it would shortly file an application "for provisional measures to protect its witnesses from Claimant's harassment", but no such application was filed.

52. On 10 May 2019, the Claimant wrote to the Tribunal, advising that due to safe passage concerns regarding the Claimant's witnesses, the Parties jointly proposed that the Hearing be moved to London, United Kingdom.

53. On 14 May 2019, the Respondent filed its **Rejoinder** on the Merits, together with Second Expert Reports of Professor Esakov (**Esakov 2**), Professor Pieth (**Pieth 2**) and Professor Danon (**Danon 2**).

54. On 25 May 2019, a procedural hearing by telephone conference was held to discuss *inter alia* the Parties' joint request to transfer the venue for the Hearing. On 27 May 2019, the Tribunal wrote to the Parties to advise that it acceded to their request to transfer the venue for the Hearing from Lausanne to London.

55. On 28 May 2019, the Parties gave notice of the persons whose witness statements and expert reports had been served by the other Party that were required to attend the Hearing to give oral evidence. In particular, the Claimant notified *inter alia* that it required Mr Gololobov's attendance at the Hearing to be cross-examined.

56. On 3 June 2019, and in accordance with PO N° 10, the Claimant submitted amended copies of its Memorial and Reply omitting references to Dr Illarionov's witness statements.

57. On 5 June 2019, the Claimant wrote to the Tribunal regarding 'new submissions and evidence' included in the Rejoinder. It requested that the Tribunal grant it two additional hours at the Hearing (taken from the Respondent's time allocation) to allow its counsel and its fact and expert witnesses to address such submissions and evidence. The Respondent objected to this proposal.

58. On 7 June 2019, the Respondent wrote to advise the Tribunal and the Claimant that Mr Gololobov would not be attending the Hearing. It alleged that this was as a result of 'harassment' from individuals who stand behind or are otherwise closely associated with the Yukos Group. It invited the Tribunal to receive and consider Mr Gololobov's written evidence and afford it the weight it deemed appropriate.

59.   On 11 June 2019, the Claimant replied to the Respondent's letter, alleging that the harassment allegation was a 'smokescreen' for Mr Gololobov's absence. It requested an order that Mr Gololobov's statement should be disregarded.

60.   On 14 June 2019, the Presiding Arbitrator held a pre-hearing telephone conference with the Parties to discuss, *inter alia*, the schedule for the Hearing. The Presiding Arbitrator, on behalf of the Tribunal, declined the Claimant's application for two additional hours of Hearing time, in view of the principle of equality of the Parties. He noted however that the principle of equality does not prescribe equal Hearing time in a literal sense, and that the Tribunal would ensure that the Claimant had a proper opportunity to examine its witnesses on the new submissions and evidence as the principle of fairness and equality require.

61.   Further to the discussion at the pre-hearing telephone conference, on 24 June 2019 the Parties submitted an agreed indicative schedule for the Hearing.

62.   On 26 June 2019, and further to the Tribunal's proposal, the Parties submitted an agreed *Dramatis Personae* and Joint Chronology of Events.

63.   Also on 26 June 2019, the Tribunal issued Procedural Order N° 11 (**PO N° 11**) on the admissibility of the statement of Mr Gololobov. It found no evidence to support the Respondent's allegation that he had been harassed by or on behalf of the Claimant. It held that basic principles of the equality of the parties and the right of a party to test the evidence presented by the opposing party required that, in default (without a valid reason) of the witness's attendance for cross-examination when requested, his statement is inadmissible and must be excluded from the record.

64.   On 27 June 2019, and in accordance with PO N° 11, the Respondent submitted amended copies of its Counter-Memorial and Rejoinder omitting references to Mr Gololobov's witness statement.

### 3.   Claimant's corporate reorganisation

65.   On 15 January 2018, the Claimant's counsel wrote to advise that the Claimant had 'changed its place of domicile from Luxembourg to the BVI, and is now known as Yukos

Capital Limited' (the **Corporate Reorganisation**). It did not provide the date of the change in domicile in this communication.

66.   The Parties exchanged correspondence and submissions between 17 January 2018 and 7 May 2018 with regard to the Corporate Reorganisation. In sum, the Respondent made two applications concerning: (i) production of documents and provision of explanations about the circumstances of the Corporate Reorganisation; and (ii) security for costs. The Claimant provided certain information and documents in response and otherwise objected to both applications.

67.   On 18 May 2018, the Tribunal issued Procedural Order N° 4 (**PO N° 4**) ruling on the Respondent's applications. The Tribunal ordered that:

   (i)    The case intituling in these proceedings should be amended so that the Claimant's name shall appear as 'Yukos Capital Ltd (formerly Yukos Capital S.à r.l.)';

   (ii)   The Claimant was to provide the reasons for its Corporate Reorganisation and for lack of disclosure thereof at the time it took effect;

   (iii)  The Respondent should pursue any further request for production of documents on this matter alongside the document production requests on the merits as provided in PO N° 3; and

   (iv)   The Respondent's application for security for costs was adjourned pending the completion of the steps set out in (b) and (c) above.

68.   By its letter of 31 May 2018 and separate Statement of the same date by David A Godfrey, director of Yukos Capital Ltd (formerly Yukos Capital S.à r.l), the Claimant gave an explanation for its reorganisation.

69.   Following an exchange between the Parties regarding an adjustment to the procedural calendar, the Tribunal confirmed on 6 June 2018 that the procedural calendar had been adjusted in accordance with the Parties' agreement.

70.  On 6 June 2018, the Respondent submitted comments on the Claimant's letter and the Statement of Mr Godfrey of 31 May 2018, and requested that the Tribunal order the Claimant to provide an additional statement by Mr Godfrey. By letter of 15 June 2018, the Claimant replied to these comments and objected to the Respondent's request.

71.  On 28 June 2018, the Tribunal wrote to the Parties rejecting the Respondent's request that a further statement be filed by Mr Godfrey.

### 4.  Document production

72.  Following the exchange of the first round of pleadings, the Parties made a simultaneous exchange of requests for the production of documents as provided by PO N° 1. Following the exchange of objections and responses, a number of requests remained outstanding. The Parties submitted Redfern Schedules and introductory comments on 31 August 2018, and requested that the Tribunal make an order on those outstanding requests.

73.  On 21 September 2018, the Respondent wrote to the Tribunal with regard to 'an issue that has arisen between the Parties regarding their obligations under [PO N° 1] with respect to documents relied upon by expert witnesses' and requesting the Tribunal to clarify the scope of such obligations. By letter of 28 September 2018, the Claimant provided its response to the Respondent's letter.

74.  On 28 September 2018, the Tribunal issued its decision on the Parties' requests for production of documents in Procedural Order N° 5 (**PO N° 5**).

75.  Pursuant to PO N° 5 and by further agreement of the Parties, on 3 December 2018 the Parties respectively submitted signed statements summarising the steps taken to comply with PO N° 5.[13]

---

[13] Further to the deadline provided in PO N° 5 and following subsequent joint requests by the Parties, the Tribunal granted extensions of the time period for production of documents to 15 November 2018 first and to 30 November 2018 afterwards. *See* PO N° 5, [33](2); Letter from the Tribunal to the Parties (18 October 2018); Letter from the Tribunal to the Parties (16 November 2018).

76. Following *inter partes* correspondence between December 2018 and January 2019, on 5 February 2019 the Respondent applied to the Tribunal for relief, alleging that the Claimant had failed to comply with its document production obligations. Further submissions were made in writing on 1 March 2019, 7 March 2019, 13 March 2019, 19 March 2019 and 5 April 2019. Oral submissions were also made at a procedural hearing convened by telephone conference in relation to a separate application on 27 April 2019.

77. On 30 April 2019, the Tribunal issued its decision on the Parties' further requests for production of documents in Procedural Order N° 9 (**PO N° 9**).

### 5.   Motion to strike

78. On 11 July 2018, the Respondent filed a Motion to Strike with its Counter-Memorial requesting that the Tribunal strike from the record three sets of arbitral awards on which the Claimant sought to rely, on the ground that these awards had been set aside by the competent court at the place of arbitration in those cases. The three sets of awards were:

   (i)   *Hulley Enterprises Ltd (Cyprus) v Russian Federation, Yukos Universal Ltd (Isle of Man) v Russian Federation*, and *Veteran Petroleum Ltd (Cyprus) v Russian Federation* (the **Hulley** Final Awards);[14]

---

[14] *Hulley Enterprises Ltd (Cyprus) v Russian Federation*, UNCITRAL, PCA Case No AA226, Final Award (18 July 2014) (**CL-10, MTS-1**); *Yukos Universal Ltd (Isle of Man) v Russian Federation*, PCA Case No AA227, Final Award (18 July 2014) (**MTS-2**); *Veteran Petroleum Ltd (Cyprus) v Russian Federation*, PCA Case No AA228, Final Award (18 July 2014) (**MTS-3**). When referred to together with the interim awards on jurisdiction and admissibility in each case, the term *Hulley* **Awards** is used. *See Hulley Enterprises Ltd (Cyprus) v Russian Federation*, UNCITRAL, PCA Case No AA226, Interim Award on Jurisdiction and Admissibility (30 November 2009) (**CL-9**); *Yukos Universal Ltd (Isle of Man) v Russian Federation*, PCA Case No AA227, Interim Award on Jurisdiction and Admissibility (30 November 2009) (**CL-27**); *Veteran Petroleum Ltd (Cyprus) v Russian Federation*, PCA Case No AA228, Interim Award on Jurisdiction and Admissibility (30 November 2009) (**CL-26**).

(ii)     *RosInvestCo UK Ltd v Russian Federation*;[15] and

(iii)    *Quasar de Valores et al v Russian Federation.*[16]

79.    On 17 August 2018, the Claimant submitted a Response on the Motion to Strike.

80.    In accordance with the leave granted by the Tribunal, on 12 September 2018 the Respondent filed its Reply on the Motion to Strike. On 19 September 2018, the Claimant submitted its Rejoinder on the Motion to Strike.

81.    On 1 November 2018, the Tribunal issued Procedural Order N° 6 (**PO N° 6**) on the Respondent's Motion to Strike, *inter alia*:

(i)     Holding that the Parties are at liberty to rely on any of the five contested awards, as well as on related decisions of national courts, as legal authorities, and that the Tribunal will determine the weight to be given to such legal authorities;

(ii)    Noting the Claimant's statement that it does not rely on the Awards as evidence of fact, and that each Party shall bear the burden of proving the facts relied upon to support its pleadings; and

(iii)   Joining the Claimant's plea of collateral estoppel to the merits.

82.    At the Hearing on the Merits, the Claimant confirmed that it did not pursue its argument that the Respondent was precluded from contesting the findings in the *Hulley, RosInvest* and *Quasar de Valores* Awards as to the legal consequences of the facts as found by those Tribunals on the grounds of collateral estoppel.[17]

---

[15] *RosInvestCo UK Ltd v Russian Federation*, SCC Case No V079/2005, Final Award (12 September 2010) (**C-109**).

[16] *Quasar de Valores SICAV SA et al v Russian Federation*, SCC Case No 24/2007, Final Award (20 July 2012) (**C-116**).

[17] T10/2061/7-11 (Claimant).

### 6.    Expert reports

83.    By letters dated 21 and 28 September 2018, the Parties sought the Tribunal's directions concerning exhibits to the Respondent's experts' reports, and the interpretation of the requirement in [8.2](f) of PO N° 1 that expert reports contain copies of all documents relied upon or citations to such documents. Guidance was sought in relation to, *inter alia*, whether this requirement applied to documents provided to an expert as background but on which the expert had not placed specific reliance.

84.    On 10 December 2018, the Tribunal issued Procedural Order N° 7 (**PO N° 7**), in which it ordered *inter alia* that the Parties are not obliged to place on the record documents that merely formed background to the experts' reports and which the experts did not cite or rely upon in their analysis, and that the Parties are entitled to call for copies of any background documents that were provided to the expert but not exhibited to the corresponding report.

### 7.    Security for costs

85.    On 14 December 2018 the Respondent wrote to notify the Tribunal pursuant to PO N° 4 of its intention to pursue its application for security for costs.[18] Accordingly, on 21 December 2018 the Respondent filed a revised application for security for costs.

86.    Pursuant to the directions of the Tribunal set forth in its letter of 17 January 2019, the Parties filed the following submissions on the Respondent's application for security for costs:

---

[18] Further to the deadline provided in PO N° 4 and in line with the extensions of the time period for production of documents, the Tribunal granted extensions of the deadline for the Respondent to give notice of its intention to pursue its application for security for costs, firstly, to 5 October 2018; secondly, to 1 November 2018; thirdly, to 29 November 2018; and, eventually, to 14 December 2018. *See* PO N° 4, [74](d); Letter from the Tribunal to the Parties (27 August 2018); Letter from the Tribunal to the Parties (5 October 2018); Letter from the Tribunal to the Parties (22 October 2018); Letter from the Tribunal to the Parties (16 November 2018).

(i)     The Claimant's response to the Respondent's application for security for costs, dated 1 February 2019 and supplemented with the Claimant's letter of 5 February 2019;

(ii)    The Respondent's comments on the Claimant's response, dated 8 February 2019; and

(iii)   The Claimant's response to the Respondent's comments, dated 15 February 2019.

87.   On 1 April 2019, the Tribunal issued Procedural Order N° 8 (**PO N° 8**), dismissing the Respondent's application for security for costs.

## 8.    Hearing on the merits

88.   The Hearing was held over ten days between 1 and 12 July 2019 (6 and 7 July being rest days) at the International Dispute Resolution Centre in London. The following persons attended the Hearing:

### Tribunal

Professor Campbell McLachlan QC (Chairman)
Mr J. William Rowley QC
Professor Brigitte Stern

| Claimant | Respondent |
|---|---|
| Mr Cyrus Benson | Lord Peter Goldsmith QC |
| Ms Penny Madden QC | Ms Samantha J Rowe |
| Ms Ceyda Knoebel | Ms Aimee-Jane Lee |
| Mr Piers Plumptre | Mr Conway Blake |
| Ms Sophy Helgesen | Ms Ceri Chave |
| Ms Sasha Kobyasheva | Mr Maxim Osadchiy |
| Mr Theo Tyrrell | Ms Monika Hlavkova |
| Ms Lindsey Schmidt | Ms Sonja Sreckovic |
| Mr Paul Evans | Ms Svetlana Portman |
| Ms Grace Webster | Ms Janine Godbehere |
| Ms Olga Ivleva | Mr Simon Alton |
| Mr Michael Stewart (via videoconference from Dubai) | Ms Prasheela Vara |
| *Gibson, Dunn & Crutcher LLP* | Mr Shaun Brennan |
| | Mr Tom Cornell (via videoconference from Dubai) |
| Mr David Godfrey *(also as fact witness)* | *Debevoise & Plimpton LLP* |
| Ms Natalia Kantovich | |
| *Party Representatives* | Mr Anton Garmoza |
| | Mr Andrey Kondakov |
| Ms Kathleen Gregor *(expert)* | *Party Representatives* |

Ms Anastasia Kantovich *(translator)*
Mr Maarten Drop *(counsel to Mr Godfrey)*
*Other Support Staff*

Mr Tom Almeida
*Other Support Staff*

Mr Steven Theede
Mr Bruce K Misamore
Mr Alexey Smirnov
Mr Vladimir Matveevich Dubov
Mr Rudolf Mkhitaryan
*Fact Witnesses*

Mr Gitas Polivo Anilionis
*Fact Witness*

Professor Stephen E Shay
Professor Paul B Stephan
Dr Vladimir Gladyshev
Mr Stuart B Gleichenhaus
Mr Howard N Rosen
*Expert Witnesses*

Professor Robert J Danon
Professor Danil Vinnitskiy
Mr Andreas Michaelides
Mr Viktor Valentinovich Batsiev
Professor Gennady Aleksandrovich Esakov
Professor Roman Sergeevich Bevzenko
Professor Oleg Romanovich Zaitsev (via
videoconference from Dubai)
Mr Valery Knyazev
*Expert Witnesses*

Tribunal Assistant
Mr Jack L Wass

Registry
Ms Helen Brown
*PCA*

Court Reporter
Mr David A Kasdan

Interpreters
Ms Irina van Erkel
Ms Tanya Gesse
Mr Yuri Somov

89.  The Hearing proceeded by way of opening arguments, witness and expert testimony, and closing arguments. On behalf of the Claimant, oral arguments were presented by Mr Cyrus Benson and Ms Penny Madden QC. On behalf of the Respondent, oral arguments were presented by Lord Peter Goldsmith QC, Ms Samantha J Rowe, Ms Aimee-Jane Lee, Mr Conway Blake, Ms Ceri Chave, Mr Maxim Osadchiy and Ms Monika Hlavkova.

90.  On 8 July 2019, the sixth day of the Hearing, the Respondent advised that one of its experts, Professor Oleg Zaitsev, would not be able to travel to London in time to give testimony, due to delays in the processing of his visa application. Following discussions between the Tribunal and the Parties, Professor Zaitsev eventually testified on 10 July 2019 from the offices of the Claimant's counsel in Dubai, accompanied by a representative of each Party's counsel at the same venue.

91.  At the conclusion of the Hearing, the Tribunal provided instructions regarding the procedure and schedule for: (i) the review and correction of the Hearing transcript; and (ii) the filing of submissions on costs. Following the discussion of these issues, the Parties confirmed that they had no further procedural matters to draw to the attention of the Tribunal.[19]

### 9.  Post-Hearing proceedings

92.  On 15 August 2019, the Parties submitted their agreed amendments to the Hearing transcript, as well as their respective positions with regard to disputed amendments.

93.  The Respondent filed its Submission on Allocation of Costs on 27 September 2019 (**Respondent's Costs Submission**), and the Claimant filed its Cost Submission for Merits Phase on 29 September 2019 (**Claimant's Costs Submission**).

94.  On 16 October 2019, the Parties filed their observations on the other Party's cost submission (**Claimant's Costs Observations** and **Respondent's Costs Observations**, respectively).

95.  On 23 October 2019, the Tribunal issued its decision concerning the Parties' disputed amendments to the Hearing transcript, which were then incorporated into the final Hearing transcript along with the Parties' agreed amendments.

## III.  FACTUAL BACKGROUND

96.  In this section of the Award, the Tribunal briefly summarises the factual background to the present dispute. The Tribunal returns to a more detailed analysis of the facts where necessary in the context of its assessment of the Parties' contentions on jurisdiction, liability and compensation.

---

[19] T10/2268/23-2269/9; T10/2271/2-5.

## A.    THE CLAIMANT

97.    Yukos Capital was incorporated in Luxembourg on 31 January 2003 as a group finance company to serve the needs of the wider Yukos group of companies (the **Yukos Group**).[20] At its formation, Yukos Capital's direct parent was Yukos Finance BV (**Yukos Finance**), a Dutch company owned by Yukos Oil. In 2005, Yukos Finance transferred ownership of Yukos Capital to its subsidiary, Yukos International UK BV (**Yukos International**), another Dutch company. Yukos Finance then delivered its shares in Yukos International (in exchange for depository receipts) to a Dutch foundation, Stichting Administratiekantoor Yukos International (the **Stichting**). Accordingly, the Stichting wholly owns Yukos International and, through it, Yukos Capital.[21]

98.    On 4 August 2016, Yukos Capital S.à r.l. merged with Miwok Wealth PIC Ltd (**Miwok**), an entity incorporated in the BVI in 2014 also owned by the Stichting.[22] The Articles of Merger provided that Yukos Capital S.à r.l. would be the merging company, and Miwok the surviving company. On 1 September 2016, Miwok changed its name to Yukos Capital Ltd, and on 8 February 2017 Yukos Capital S.à r.l. was struck off the Luxembourg company register.[23] This Corporate Reorganisation is relevant to the Respondent's objection to jurisdiction with regard to the Claimant's status as a protected investor under the ECT, and is discussed in that context below.[24]

---

[20] Yukos Capital S.à r.l., Extract of the Luxembourg Registry of Commerce and Companies (11 September 2012) (**C-117**).

[21] Interim Award, [34].

[22] Letter from Gibson Dunn & Crutcher LLP to Debevoise & Plimpton LLP (23 February 2018) (**SFC-10**).

[23] Certificate of Merger (4 August 2016) and Certificate of Name Change (1 September 2016) (**SFC-8**); Letter from Debevoise & Plimpton LLP to the Tribunal (3 April 2018), 3 (**SFC-11**).

[24] *See* Part IV.B below.

B.    THE STRUCTURE OF THE YUKOS OIL BUSINESS

99.   Yukos was privatised in the 1990s, and by the time of the events with which this proceeding is concerned was one of the largest oil companies in Russia.

100.  Yukos Oil itself (*i.e.* Yukos Oil Company OJSC) was a holding company that held interests in a number of onshore (Russian-incorporated) and offshore (foreign-incorporated) companies.[25]

101.  Among those subsidiaries, Yukos owned three primary oil production companies (the **Production Subsidiaries**): Yuganskneftegaz (**YNG**), Samaraneftegaz (**SN**) and Tomskneft (**TN**).[26] Yukos also owned a number of refining and trading companies, both onshore (Russian-incorporated) and offshore (foreign-incorporated). These trading companies purchased oil and refined petroleum products from Yukos production and refining companies, and sold them to the market or to other Yukos subsidiaries.[27]

102.  One of the principal offshore structures established by Yukos was known as the **Armenian Branch**, because the principal holding company under Yukos Oil itself for the Group companies in question, Yukos CIS Investments (**Yukos CIS**), was incorporated in Armenia. It consisted of the following elements:[28]

        (i)      Yukos CIS was incorporated in Armenia as a fully-owned subsidiary of Yukos Oil;

        (ii)     Its fully-owned subsidiary was Yukos Hydrocarbons Ltd (incorporated in the BVI) (**Yukos Hydrocarbons**);

        (iii)    Its fully-owned subsidiary was Brittany Assets Ltd (incorporated in the BVI) (**Brittany**);

---

[25] *See* Counter-Memorial, [81]; 'Yukos Oil Structure Circa 2003' (C-755).

[26] Misamore 3, [52], [58].

[27] Memorial, [87] and *see* 'Yukos Group Audit – Report by PwC Cyprus', Appendix B (R-242).

[28] *See* Counter-Memorial, [81] and 'Yukos Oil Structure circa 2003' (C-755).

(iv)    Brittany owned 10% of the share capital in Brill Management Ltd (incorporated in the BVI) (**Brill**), the remaining 90% being owned by a trust known as the 'Stephen Trust';

(v)    Brill owned a number of other subsidiaries. Of most relevance for the present dispute are two parallel chains of companies that terminated in Russian trading companies:

    i.    Brill owned 10% of James Holding Venture Corp (incorporated in the BVI) (**JHV**),[29] which in turn fully owned Dunsley Ltd (incorporated in Cyprus) (**Dunsley**), which in turn fully owned OOO Ratibor (**Ratibor**), one of the Yukos trading subsidiaries incorporated in Russia;

    ii.    Brill fully owned Moonstone Investments Ltd (incorporated in the BVI) (**Moonstone**), which in turn fully owned Nassaubridge Management Ltd (incorporated in Cyprus) (**Nassaubridge**) which fully owned OOO Fargoil (**Fargoil**), another Yukos trading subsidiary incorporated in Russia.

103.  Both Ratibor and Fargoil were incorporated in Mordovia, a **low-tax region** (or **LTR**) established under Russian law that offered preferential tax arrangements to certain investors.

104.  The Armenian Branch is depicted on the following diagram:[30]

---

[29] The remaining 90% was owned by the James Trust.

[30] 'Yukos Oil Structure Circa 2003' (**C-755**). This diagram was prepared as a demonstrative exhibit by the Claimant to update the diagram at Counter-Memorial, [81]. The entities in white boxes were added by the Claimant to the Respondent's diagram but are not material to the Tribunal's analysis, so for the Tribunal's purposes the structure diagram is agreed between the Parties.

Exhibit C755 Page 1 of 1
Yukos Offshore Structure circa 2003



105. As that diagram shows, Yukos Oil also owned a separate chain of companies in Cyprus: Yukos UK Ltd, then Hedgerow Ltd (**Hedgerow**), then Rospan Overseas Ltd (**Rospan**).

## C.  THE LOANS

106. The claims in this arbitration concern the treatment of two loans advanced by Yukos Capital to Yukos Oil under agreements dated 2 December 2003 (the **December 2003 Loan**)[31] and 19 August 2004 (the **August 2004 Loan**).[32]

107. Each of the Loans was advanced with funds that were loaned to Yukos Capital by another company in the Yukos Group: the December 2003 Loan was backed by a loan from

---

[31] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003) (**C-9**).

[32] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (19 August 2004) (**C-30**).

Brittany in the sum of RUB 80,000,000,000 (the **Brittany Loan**),[33] and the August 2004 Loan was backed by a USD 355,000,000 loan from Hedgerow (the **Hedgerow Loan**).[34]

108. Each of the Loans was back-to-back and non-recourse: the funds were advanced to Yukos Capital for the express purpose of Yukos Capital advancing those funds to Yukos Oil, and Yukos Capital was only liable to repay its lender when it was repaid by its borrower. The terms and effects of the Loans were considered in detail by the Tribunal in its Interim Award.[35]

109. The December 2003 Loan was drawn down progressively between 2 December 2003 and 28 June 2004, and the August 2004 Loan was drawn down on the day it was executed.[36]

110. The Loans were among 26 loans that Yukos Capital made to Yukos Oil or its subsidiaries between 2 June 2003 and 19 August 2004. In each case these loans were backed by loans from another Yukos entity, in all but two cases being Brittany.[37]

111. As to the *source* of the funds:

   (i)    It is common ground that the December 2003 Loan was funded primarily[38] from profits of oil trading activities, in particular that had accumulated in Russian subsidiaries (Ratibor and Fargoil) and passed by way of dividends to their

---

[33] Loan Facility Agreement between Brittany Assets Ltd and Yukos Capital S.à r.l. (20 November 2003) (**Brittany Loan Agreement**) (C-130). The agreement was actually signed on 18 February 2004 (with effect from 20 November 2003).

[34] Loan Agreement HgYCS-1808/04 between Hedgerow Ltd and Yukos Capital S.à r.l. (18 August 2004) (**Hedgerow Loan Agreement**) (C-131).

[35] Interim Award, [502]-[513].

[36] Claimant Opening Slides, 142.

[37] *See* table to Counter-Memorial, [104]. The two exceptions are the first loan on 2 June 2003 (made with funds advanced from John Brown Hydrocarbons) and the August 2004 Loan (advanced with funds from Hedgerow).

[38] T2/475/8 (Misamore).

Cyprus parents (Dunsley and Nassaubridge), to their parents in the BVI (JHV and Moonstone), then to Brill and finally to Brittany.

(ii)     At that point the Parties differ: the Claimant's evidence is that the loans were also sourced from fixed income debt investments and offshore investments;[39] the Respondent submits that the entirety of the loans were derived from Fargoil and Ratibor via Brill (described with Brittany as a 'cash accumulation center'),[40] and notes that there was no documentary support for the Claimant's testimony.[41]

112.  As to the *application* of the funds:

(i)      It is common ground that part (USD 0.9 billion) of the December 2003 Loan was used to fund part of a USD 2 billion dividend issued by Yukos Oil (the so-called **giga-dividend**).[42] The dividend was declared on 28 November 2003[43] and the December 2003 Loan was approved by Yukos Oil shortly thereafter.[44]

(ii)     Thus Yukos Oil's bank statements record a payment of RUB 30.4 billion (USD 1 billion) on 5 December 2003, which the Respondent says represented the share of the dividend due to Hulley, one of the shareholders in Yukos Oil. The same day, Yukos Capital transferred RUB 26.0 billion (USD 0.9 billion) to Yukos Oil under the December 2003 Loan.

(iii)    The Parties agree that part of the funds advanced under the December 2003 Loan could also have been used to redeem promissory notes. Beyond this, the record

---

[39] T2/478/8-20, T2/480/10-482/3 (Misamore).

[40] Interim Award, [330]-[332]; Counter-Memorial, [8], [107]-[109]; Haberman, [3.6.1]; Knyazev, [4.2.2].

[41] T2/482/4-15 (Misamore).

[42] Haberman, [3.5.4]; Misamore 1, [36].

[43] Minutes No 4 of an extraordinary general meeting of shareholders of Yukos Oil Company OJSC (28 November 2003) (**R-248**); Counter-Memorial, [112]. The dividend had been recommended by the Board on 28 October 2003: Abstract from Minutes No 120/1-24 (28 October 2003) (**C-182**).

[44] Minutes No 120/1-27 of a meeting of the Board of Directors of Yukos Oil Company OJSC (28 November 2003) (**R-249**).

does not confirm how the rest of the December 2003 Loan was applied or how the rest of the giga-dividend was financed.[45]

(iv)     The Claimant says that the giga-dividend was required to implement the merger with **Sibneft** that had been completed on 3 October 2003, and in particular to achieve a specified debt-equity ratio.[46] The Respondent says that this is a pretence and the giga-dividend was an 'asset-stripping tool'.[47] The Tribunal returns to this issue below.[48]

113. It is common ground that the Hedgerow Loan was funded by the sale of Hedgerow's 56% interest in its subsidiary Rospan, and that the August 2004 Loan was used by Yukos to pay part of the first tax re-assessment levied by the Respondent against Yukos Oil in the circumstances described below.[49]

## D.   THE YUKOS OIL TAX ASSESSMENTS

114. On 25 October 2003, Mr Mikhail Khodorkovsky, the CEO of Yukos Oil, was arrested on charges of fraud, embezzlement and tax evasion.[50] On 2 July 2003, Mr Platon Lebedev

---

[45] Haberman, [3.5.2]-[3.5.9]; Knyazev, [4.2.4]; Misamore 3, [34].

[46] Misamore 3, [35], T2/499/22-517/11 (Misamore); T3/541/25-554/11 (Misamore). Part of that transaction was also the buyback of shares worth USD 3.7 billion: *Yukos Powers Ahead with Sibneft Merger*, Moscow Times (8 July 2003) (**R-243**); *Yukos Repurchases its Shares*, Vedomosti (7 July 2003) (**R-506**).

[47] Rejoinder, [105]; T1/154/2-155/7 (Respondent).

[48] *See* Part VIII.D.3(b) below.

[49] Interim Award, [333].

[50] *Yukos oil oligarch arrested in raid*, The Washington Times (26 October 2003) (**R-538**); Resolution to Bring Charges against Mikhail B. Khodorkovsky (10 November 2003) (**R-553**).

(a close associate of Mr Khodorkovsky) had been arrested on similar charges.[51] Both were ultimately convicted and sentenced to imprisonment.[52]

115. *The first tax audit.* Between October 2002 and March 2003, the Russian tax authorities conducted a Field Tax Audit of Yukos Oil concerning the 2000 and 2001 tax years. The resulting report was delivered to Yukos Oil on 28 April 2003.[53] Following the submission of certain objections by Yukos Oil, the Inspectorate for the city of Nefteyugansk issued a decision finding Yukos Oil liable for certain limited tax offences,[54] requiring a total payment of RUB 8,936,233.22 by Yukos Oil.[55] Subsequently, by certificates of 19 September 2003, 23 October 2003 and 17 November 2003, Russian tax authorities declared that Yukos Oil had settled its tax liabilities.[56]

116. *The 2000 Tax Assessment.* In early December 2003, the Russian tax authorities conducted another Field Tax Audit of Yukos Oil concerning only the 2000 tax year. A report was issued on 29 December 2003, finding that Yukos Oil had committed violations of tax law with regard to value-added tax (**VAT**), Corporation Tax, Motorway User Tax, Fuel and Lubricant Sales Tax, Corporate Property Tax and Housing Stock and Social Amenities

---

[51] *See* Resolution to Bring Charges against Platon L. Lebedev (22 July 2003) (**R-552**).

[52] They were subsequently convicted of other offences and sentenced to further terms of imprisonment: Memorial, [46]-[47].

[53] Report No 66 on Field Tax Audit of the Open Joint-Stock Company "YUKOS" Oil Company (28 April 2003) (**C-4**).

[54] Decision No 289 to hold Yukos Oil Company OJSC liable for a tax offence, Inspectorate for the City of Nefteyugansk (9 June 2003), 29-31 (**C-5**).

[55] Decision No 289 to hold Yukos Oil Company OJSC liable for a tax offence, Inspectorate for the City of Nefteyugansk (9 June 2003), 29-31 (**C-5**).

[56] Certificate of Absence of Unsettled Liabilities on Taxes and Other Compulsory Payments and Tax Violations, No 47-10-11/994/1, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (19 September 2003) (**C-6**); Certificate of Absence of Unsettled Liabilities on Taxes and Other Compulsory Payments and Tax Violations, No 47-10-11/1612, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (23 October 2003) (**C-7**); Certificate No 47-10-11/1908, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (17 November 2003) (**C-8**).

Maintenance Tax.[57] Following the submission of certain objections by Yukos Oil, the Deputy Minister for Taxes and Duties of Russia issued a resolution on 14 April 2004 whereby it held Yukos Oil liable for intentional non-payment of tax (the **2000 Tax Assessment**).[58] The 2000 Tax Assessment required a total payment of RUB 99,375,538,234.40,[59] which in turn was comprised of (i) RUB 47,989,241,953 in indebted taxes, (ii) RUB 19,195,696,780 in fines and (iii) RUB 32,190,599,501.40 in default interest.[60] A resolution of the Ninth *Arbitrazh* Court of Appeal released on 23 November 2004 confirmed the 2000 Tax Assessment.[61]

117. In brief, the 2000 Tax Assessment determined that the '**Yukos Tax Arrangement**'—and in particular its onshore structure—was 'an illegal tax evasion scheme' using 'fake organizations' registered in low-tax regions and involved in the 'oil and after-product movement chain'.[62] These corporations retained the revenue resulting from the sale of oil and refined products to utilise certain tax preferences.[63] According to the December 2003 audit, Yukos Oil was the 'true owner of the oil and after-products' and the entity in control of their purchase, transfer and sale.[64] Consequently, the 2000 Tax Assessment concluded

---

[57] Act No 08-1/1 on Field Tax Audit of the "Neftyanaya Compania "YUKOS" Public Joint-Stock Company OAO"NC "YUKOS" (29 December 2003), 73-76 (**C-10**).

[58] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 1, 111-118 (**C-13**).

[59] Equivalent to approximately USD 3.48 billion. Memorial on the Merits, [78].

[60] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 119-120 (**C-13**).

[61] Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-4078/04-AK (23 November 2004) (**C-253**).

[62] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 1 (**C-13**).

[63] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 2 (**C-13**).

[64] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 2 (**C-13**).

that Yukos Oil, having acted in bad faith, was 'the ultimate recipient of the economic benefit' and thus responsible for the entirety of the unlawfully obtained tax benefits.[65]

118. Between 2004 and 2006, the Russian tax authorities issued four additional decisions relating to Yukos Oil concerning the 2001-2004 tax years (together with the 2000 Tax Assessment, the **Tax Assessments**). The underlying reasoning and practical procedure was the same in the material respects for all five Tax Assessments.

119. *The 2001 Tax Assessment*. Between 23 March and 4 June 2004, the Russian tax authorities conducted an audit of Yukos Oil for the 2001 tax year.[66] In accordance with the audit report released on 30 June 2004, the Tax Ministry issued a decision holding Yukos Oil liable for several tax offences on 2 September 2004 (the **2001 Tax Assessment**).[67] On the same date, two payment demands were issued requesting that Yukos Oil pay RUB 79,279,641,154 in indebted taxes[68] and RUB 40,607,549,520 in tax penalties.[69] The 2001 Tax Assessment was upheld by the Federal *Arbitrazh* Court.[70]

120. *The 2002 Tax Assessment*. Between 9 August and 25 October 2004, the Russian tax authorities conducted an audit of Yukos Oil for the 2002 tax year.[71] In accordance with the audit report released on 29 October 2004, the Tax Ministry issued a decision holding Yukos Oil liable for several tax offences on 16 November 2004 (the **2002 Tax**

---

[65] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004), 116-117 (**C-13**).

[66] Report No 30-3-14/1 on the Repeat Field Tax Audit of Yukos Oil Company Open Joint Stock Company (30 June 2004), [4] (**C-26**).

[67] Decision on Holding a Taxpayer Liable for Tax Offences, No 30-3-15/3 (2 September 2004) (**C-32**).

[68] Demand to pay tax, No 133, Inter-Regional Inspectorate of the Russian Ministry of Taxes and Fees for Very Large Taxpayers No 1 (2 September 2004) (**C-33**).

[69] Tax Penalty Payment Demand, No 30-3-16/1 (2 September 2004) (**C-254**).

[70] Resolution of the Federal *Arbitrazh* Court for the Moscow District, Case No A40-45410/04-141-34 (15 November 2005) (**C-261**).

[71] Report No 52/852 on Field Tax Audit of Open Joint Stock Company Oil Company YUKOS (29 October 2004), [1.1] (**C-381**).

Assessment).[72] On the same date, two payment demands were issued requesting that Yukos Oil pay, respectively, RUB 121,771,662,840.58 in tax arrears and interest[73] and RUB 72,040,907,796 in tax penalties.[74] The payment, totalling approximately USD 6.7 billion,[75] was due on 17 November 2004. Yukos Oil's challenges to the lawfulness and collection of the 2002 Tax Assessment were substantially dismissed.[76]

121. *The 2003 Tax Assessment*. Between 28 October and 19 November 2004, the Russian tax authorities conducted an audit of Yukos Oil for the 2003 tax year.[77] In accordance with the audit report released on 19 November 2004, the Tax Ministry issued a decision holding Yukos Oil liable for several tax offences on 6 December 2004 (the **2003 Tax Assessment**).[78] On the same date, two payment demands were issued requesting that Yukos Oil pay, respectively, RUB 101,464,118,509.66 in tax arrears and interest[79] and RUB 68,939,326,976.40 in tax penalties.[80] The payment, totalling approximately USD 6

---

[72] Decision to hold the taxpayer liable for a tax offence, No 52/896, Interregional Inspectorate of the Russian Federation Ministry for Taxes and Duties for Major Taxpayers No 1 (16 November 2004) (C-37).

[73] Tax Payment Demand, No 175, Interregional Inspectorate for Major Taxpayers No 1 of the Russian Ministry of Taxes and Levies (16 November 2004) (C-262).

[74] Tax Penalty Payment Demand, No 175/1, Interregional Inspectorate for Major Taxpayers No 1 of the Russian Ministry of Taxes and Levies (16 November 2004) (C-263).

[75] Memorial, [79](b).

[76] Resolution of the Federal *Arbitrazh* Court for the Moscow District, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162 (30 June 2005) (C-270).

[77] Report No 52/907 on Field Tax Audit of Open Joint Stock Company Oil Company Yukos (19 November 2004), [1.1] (C-389).

[78] Decision to hold the taxpayer liable for a tax offence, No 52/985, Interregional Inspectorate of the Russian Federation Ministry for Taxes and Duties for Major Taxpayers No 1 (6 December 2004) (C-42).

[79] Tax Payment Demand, No 186, Interregional Inspectorate For Major Taxpayers No 1 of the RF Ministry of Taxes and Levies (6 December 2004) (C-271).

[80] Tax Penalty Payment Demand, No 186/1, Interregional Inspectorate For Major Taxpayers No 1 of the RF Ministry of Taxes and Levies (6 December 2004) (C-272).

billion,[81] was due on the following day 7 December 2004. Again the 2003 Tax Assessment was upheld apart from a small portion of the reassessed tax liabilities.[82]

122. *The 2004 Tax Assessment.* Between 4 August and 26 December 2005, the Russian tax authorities conducted an audit of Yukos Oil for the 2004 tax year.[83] In accordance with the audit report released on 27 December 2005, the Tax Ministry issued a decision holding Yukos Oil liable for several tax offences on 17 March 2006 (the **2004 Tax Assessment**).[84] This decision was ratified by ruling of the Moscow *Arbitrazh* Court of 21 June 2006, delivered within the context of the Yukos Oil bankruptcy proceedings, concerning tax arrears up to RUB 66,391,719,284[85] and, at the second instance, by a resolution of the Ninth *Arbitrazh* Court of Appeal of 18 August 2006 concerning fines imposed in the amount of RUB 42,036,873,518.[86] The lawfulness of the penalty fines was eventually confirmed, following a challenge by Yukos Oil to the Tax Ministry's decision, by the Moscow *Arbitrazh* Court on 4 October 2006.[87] In total, and as confirmed by the Russian courts, the 2004 Tax Assessment provided that approximately USD 3.9 billion be paid by Yukos Oil.[88]

---

[81] Memorial on the Merits, [79](c).

[82] Resolution of the Federal *Arbitrazh* Court for the Moscow District, Case No A40-4338/05-107-9/A40-7780/05-98-90 (5 December 2005) (C-277). *See* Decision of the Moscow *Arbitrazh* Court, Case No A40-4338/05-107-9/A40-7780/05-98-90 (28 April 2005) (C-276).

[83] Field Tax Audit Report No 52/996 of Open Joint Stock Company Yukos Oil Company (27 December 2005), [1.1] (C-278).

[84] Decision to Hold Taxpayer Liable for the Commission of Tax Offence, No 52/292 (17 March 2006) (C-388).

[85] Ruling of the Moscow *Arbitrazh* Court, Case No 40-11836/06-88-35 "B", 4 (21 June 2006) (C-383).

[86] Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-8628/2006-GK (18 August 2006) (C-298).

[87] Decision of the Moscow *Arbitrazh* Court, Case Nos. A40-37697/06-141-233 and A40-49860/06-127-206 (4 October 2006) (C-279).

[88] Memorial, [79](d).

### E.   THE ENFORCEMENT AGAINST YUKOS OIL

123. As a result of the Tax Assessments, total liabilities of approximately RUB 692 billion (equivalent to approximately USD 24 billion)[89] were imposed on Yukos Oil. This section first summarises the proceedings conducted by the Russian authorities to enforce the Tax Assessments, and then focuses on the enforcement measures concerning YNG.

#### 1.   Enforcement of Tax Assessments

124. *The 2000 Tax Assessment*. Simultaneously with the issuance of the 2000 Tax Assessment on 14 April 2004, the Tax Ministry demanded payment by 16 April 2004.[90] Also on that date, the Tax Ministry filed a claim before the Moscow *Arbitrazh* Court to enforce the payment demands, as well as a separate application for remedial measures to prevent Yukos Oil from alienating or encumbering any of its assets.[91] The application for interim injunction was accepted on 15 April 2004 and, on the following day, the enforcement proceedings were formally initiated.[92]

125. On 26 May 2004, the Tax Ministry's collection claim was upheld by the Moscow *Arbitrazh* Court.[93] At the hearing, which was held on 21 May 2004, Yukos Oil complained of an allegedly untimely filing by the Tax Ministry of thousands of supporting

---

[89] Memorial, [142].

[90] Tax Payment Demand No 14-3-05/1610-8, Ministry for Taxes and Duties of the Russian Federation (14 April 2004) (C-14); Tax Penalty Payment Demand No 14-3-05/1611-1, Ministry for Taxes and Duties of the Russian Federation (14 April 2004) (C-15).

[91] Petition of recovery of taxes, penalties and fines from OAO NK YUKOS, Ministry of Taxes and Dues of the Russian Federation (14 April 2004) (C-16); Application for providing the claim with remedial measures, Ministry of Taxes and Dues of the Russian Federation (14 April 2004) (C-17).

[92] Determination of the *Arbitrazh* Court of the City of Moscow, Case No A40-17669/04-109-241 (15 April 2004) (C-20); Resolution of Bailiff Denis A. Borisov to initiate enforcement proceeding No 11/5975 (16 April 2004) (C-232).

[93] Award of the Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (26 May 2004, released on 28 May 2004) (C-23). The *Arbitrazh* Court had previously declined to stay the proceedings. Ruling of the Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (14 May 2004) (C-233).

documents in various languages.[94] Yukos Oil also sought to join the government of one of the low-tax regions involved in the dispute as a third party to the proceedings.[95] These motions were rejected.

126. The effect of the assessment was temporarily suspended pending Yukos Oil's challenge to the Tax Assessments,[96] but the judge who issued this ruling was later challenged and replaced,[97] leading to the annulment of the suspension decision on 23 June 2004.[98]

127. Between 30 June 2004 and 14 July 2004, Russian authorities issued several orders to seize Yukos Oil's property. These orders involved, *inter alia*, the following:

    (i)    Freezing of Yukos Oil's accounts in 16 banks;[99]

    (ii)    Restriction of Yukos Oil's rights with respect to its securities;[100]

---

[94] Motion to adjourn the court hearing, Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (24 May 2004) (C-235); Transcript of the Court's Hearing, Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (21 May 2004), 3 (C-236). The transcript also reflects that Yukos Oil was only granted the possibility of asking a limited number of questions on the examination of the evidence. *See* ibid at 10.

[95] Motion to join a third party to the proceeding, Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (26 May 2004) (C-237).

[96] Ruling of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (19 May 2004) (C-233).

[97] Challenge of the Russian Federation Ministry of Taxes and Levies to Judge N.P. Cheburashkina, Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (11 June 2004) (C-238); Ruling of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (22 June 2004) (C-239).

[98] Appeal Resolution of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (23 June 2004) (C-240).

[99] Determination on initiation of execution proceedings, Case No 10249/21/04, First Interregional Division of Execution Service of the Central Administrative District of the city of Moscow (30 June 2004) (C-25).

[100] Resolution to restrict the rights of the securities owner, Bailiff of the First Inter-District Department of the Bailiffs Service for the Central Administrative District of Moscow (1 July 2004) (C-242).

    (iii)     An enforcement fee of 7% of the amount to be collected under the 2000 Tax Assessment (*i.e.*, RUB 6,848,291,175);[101]

    (iv)     Seizure of Yukos Oil's 14.5% stake in Sibneft;[102] and

    (v)     Seizure of Yukos Oil's shares in its largest production subsidiary YNG.[103]

128. On 12 August 2004, the Moscow *Arbitrazh* Court denied Yukos Oil's request for the collection claim to be executed by instalments.[104] On 23 August 2004, the decision to invalidate the seizure of YNG shares was reversed by the Ninth *Arbitrazh* Court of Appeal, concluding that these shares could indeed be prioritised.[105]

129. Between July and November 2004, Yukos Oil attempted to reach a settlement with the Respondent through the Right Honourable Jean Chrétien PC OM CC QC, former Prime Minister of Canada. On 6 July 2004, Yukos Oil offered a global settlement of USD 8 billion for its tax liabilities concerning the years 2000 to 2003. [106] The amount was proposed to be paid in three instalments in 2004, 2005 and 2006, providing Yukos Oil's

---

[101] Resolution to collect an enforcement fee, No 10249/21/04, Bailiff of the First Inter-District Department of the Bailiffs Service for the Central Administrative District of the Head Directorate of the Russian Federation Ministry of Justice for Moscow (9 July 2004) (**C-245**).

[102] Resolution to initiate enforcement proceeding No 10608\10\04, Bailiff of the First Inter-District Department of the Bailiffs Service of the Head Directorate of the Russian Federation Ministry of Justice for the City of Moscow (13 July 2004) (**C-246**).

[103] *See* Award of the *Arbitrazh* Court of the city of Moscow, Case No A40-36718/04-79-445 (6 August 2004), 1-2 (**C-29**). *See also* ibid at 18-20.

[104] Ruling of the Moscow *Arbitrazh* Court, Case No A40-1397/04ip-109 (12 August 2004) (**C-28**).

[105] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09АП-1554/04-AK (23 August 2004) (**C-31, C-250**).

[106] Letters from Jean Chrétien to Prime Minister Mikhail Fradkov (6 July 2004, 15 July 2004) and Letters from Jean Chrétien to President Vladimir Putin (30 July 2004, 10 September 2004, 17 November 2004) (**C-244**).

35% stake in Sibneft as security.[107] Mr Chrétien wrote again to Russian Prime Minister Fradkov and to President Putin several times, but received no formal response.[108]

130. The enforcement proceedings for the remaining Tax Assessments followed a similar sequence and were eventually conducted jointly. The following paragraphs overview the most relevant aspects of these proceedings.

131. *The 2001 Tax Assessment*. The due date for the payment demands pertaining to the 2001 Tax Assessment was 4 September 2004. On 6 September 2004, the Tax Ministry ordered the collection of the amounts corresponding to tax arrears and interest (over RUB 79 billion) from Yukos Oil's bank accounts.[109] On 9 September 2004, the enforcement proceedings were initiated and immediately joined to those of the 2000 Tax Assessment.[110] The bailiff allowed for voluntary execution by Yukos Oil within five days, following which (and absent good reasons for non-fulfilment) coercive measures could be adopted, including the 7% enforcement fee.

132. On 16 September 2004, Yukos Oil filed a petition for voluntary enforcement requesting that its shares in Sibneft and other subsidiaries not involved in production activities be prioritised.[111] The bailiffs did not respond to this request.[112] Yukos Oil's challenge

---

[107] Yukos Oil's liabilities under the 2000-2003 Tax Assessments amounted to approximately USD 20.3 billion.

[108] The Respondent now submits that '[t]his offer was plainly inadequate in light of the overall amount of Yukos's tax liability'. Rejoinder, [168](c).

[109] Decision to collect tax arrears and interest from the taxpayer's funds on its corporate bank accounts, No 2/595, Head of the Russian Tax Ministry's Interregional Inspectorate for Major Taxpayers No 1 (6 September 2004) (C-255).

[110] Resolution of Bailiff Denis A. Borisov to initiate an enforcement proceeding, No 13022/11/04 (9 September 2004) (C-256); Resolution of Bailiff Denis A. Borisov to join into consolidated enforcement proceedings (9 September 2004) (C-257).

[111] Petition for voluntary enforcement of OAO Yukos Oil Company, Consolidated Enforcement Proceedings No 10249/21/04 (16 September 2004) (C-258).

[112] Memorial, [160].

against a first instance judge and its application to join certain trading shells in Russian low-tax regions (**LTR Subsidiaries**) as third parties to the dispute were dismissed.[113]

133. *The 2002 Tax Assessment*. The due date for the payment demands pertaining to the 2002 Tax Assessment was 17 November 2004. On 18 November 2004, the Tax Ministry ordered the collection of the amounts corresponding to tax arrears and interest (*i.e.*, over RUB 121 billion) from Yukos Oil's assets.[114] On the same day, the enforcement proceedings were initiated and immediately joined to those of the 2000 and 2001 Tax Assessments.[115] Yukos Oil filed another petition for voluntary enforcement on 25 November 2004, but no response was provided by the bailiffs.[116]

134. As in previous proceedings, Yukos Oil did not succeed in recusing the first-instance judge or in joining LTR Subsidiaries as co-respondents.[117]

135. *The 2003 Tax Assessment*. The due date for the payment demands pertaining to the 2003 Tax Assessment was 7 December 2004. On 8 December 2004, the Tax Ministry ordered the collection of the amounts corresponding to tax arrears and interest (*i.e.*, over RUB 101 billion) from Yukos Oil's assets.[118] On the following day, the enforcement proceedings were initiated and immediately joined to those of the 2000, 2001 and 2002

---

[113] Transcript of the Hearing, Moscow *Arbitrazh* Court, Case Nos A40-51085/04-143-92 and A40-54628/04-143-134 (16-17 November 2004), 2 (**C-260**). *See* Letter from OAO Yukos Oil Company to the Highest Judicial Qualification Collegium of the Russian Federation (12 November 2004) (**C-259**).

[114] Decision to collect taxes and interest from the taxpayer's assets, No 52/900, Director of the Interregional Inspectorate of the Russian Federation Tax Ministry for Major Taxpayers (18 November 2004) (**C-264**).

[115] Resolution of Bailiff Ivan V Kochergin to initiate an enforcement proceeding (18 November 2004) (**C-265**). Resolution No 10249/21/04-2 (9 December 2004) (**C-268**).

[116] Petition for voluntary enforcement of OAO Yukos Oil Company, Consolidated Enforcement Proceedings No 10249/21/04 (25 November 2004) (**C-266**).

[117] Transcript of the Preliminary Hearing, Moscow *Arbitrazh* Court, Case Nos. No A40-61058/04-141-151 and No A40-63472/04-141-162 (8-9 December 2004), 1-2 (**C-267**); Transcript of the Hearing, Moscow *Arbitrazh* Court, Case Nos. A40-61058/04-141-151 and A40-63472/04-141-162 (14 December 2004), 1-2 (**C-269**). Judge Dzuba, challenged by Yukos Oil, had issued the first-instance decision on the 2001 Tax Assessment.

[118] Resolution to collect taxes and interest from the assets of a corporate taxpayer, No 52/999, Head of the Interregional Inspectorate of the Tax Ministry for Major Taxpayers No 1 (8 December 2004) (**C-273**).

Tax Assessments.[119] Yukos Oil again filed an unsuccessful petition for voluntary enforcement on 16 December 2004, requesting that the 7% enforcement fee not be collected.[120]

136. On 17 December 2004, the Bailiffs Department notified tax authorities on the status of the enforcement proceedings.[121] In sum, Yukos Oil was acknowledged to have voluntarily or coercively paid RUB 117,112,769,476.26 (approximately USD 4.21 billion),[122] while a total of RUB 344,222,156,424.22 remained to be collected under the enforcement proceedings for the 2000-2003 Tax Assessments.

137. *The 2004 Tax Assessment.* There are no formal payment demands on the record pertaining to the 2004 Tax Assessment.[123] However, the Russian courts permitted the inclusion of the claims of the Russian Federal Tax Service (the **Federal Tax Service**) in Yukos Oil's Register of Creditors' Claims (the **Register of Creditors**), recognising liabilities of around RUB 66 billion in tax arrears and interest and RUB 42 billion in penalties.[124]

### 2. The Yuganskneftegaz auction

138. YNG was the biggest of the Production Subsidiaries and accounted for around 60% of the oil production of the Yukos Group. On 20 July 2004, the Russian Ministry of Justice announced plans to sell the previously seized YNG shares in an effort to enforce the 2000

---

[119] Resolution of Bailiff Ivan V Kochergin to initiate an enforcement proceeding (9 December 2004) (C-274).

[120] Petition for voluntary enforcement of OAO Yukos Oil Company, Consolidated Enforcement Proceedings No 10249/21/04 (16 December 2004) (C-275).

[121] Notification from the First Inter-District Department of the Bailiffs Service for the Central Administrative District of Moscow to the Federal Tax Service (17 December 2004) (C-280).

[122] Memorial, [169].

[123] Memorial, [170]. *See Hulley* Final Award, [577] (CL-10).

[124] Ruling of the Moscow *Arbitrazh* Court, Case No 40-11836/06-88-35 "B" (21 June 2006), 4 (C-383); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-8628/2006-GK (18 August 2006) (C-298).

Tax Assessment.[125] At the request of Yukos Oil, Russian authorities accepted to conduct the sale of YNG by public auction.[126]

139. On 12 August 2004, the international investment bank Dresdner Kleinwort Wasserstein (**DKW**) was appointed to carry out the valuation of the seized YNG participation.[127] DKW provided its report on 6 October 2004 (the **DKW Valuation**), concluding that the total share capital of YNG had an estimated value between USD 18.6 and 21.1 billion. The report noted that, if present or future tax and environmental liabilities were accounted for, the estimated value could be reduced to a range between USD 15.7 and 18.3 billion.[128] Several alternative valuations, including one commissioned by Yukos Oil, provided ranges generally in line with the DKW Valuation.[129]

140. While YNG's market value was being determined, YNG was itself subject to further tax reassessments by the Russian authorities amounting to approximately USD 4.6 billion. These assessments concerned the 2001-2003 tax years and were primarily based on transfer pricing violations under Article 40 of the Tax Code of the Russian Federation.

141. Yukos Oil announced in early November 2004 that a shareholders meeting would be held on 20 December 2004 to discuss filing for bankruptcy.[130] On 18 November 2004, the

---

[125] Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn, International Herald Tribune (21 July 2004) (**C-326**); Rejoinder, [169].

[126] Letter from Dmitry V Gololobov to Chief Bailiff of the Russian Federation Arkady T Melnikov (6 August 2004), 7, 9 (**C-249**). As its primary claim, Yukos Oil requested that enforcement be directed at non-essential assets.

[127] Resolution to Appoint an Expert, Bailiff of the First Inter-District Department of the Bailiffs Service for the Central Administrative District of Moscow (12 August 2004) (**C-287**).

[128] Equivalent to RUB 542-617 billion. Dresdner Bank ZAO Valuation Report of OAO Yuganskneftegaz (6 October 2004), 7 (**C-34**).

[129] *See* JP Morgan Valuation Report of OAO Yuganskneftegaz (27 October 2004), 4 (**C-36**), estimating a fair value range between USD 16.1 and 22.1 billion; *TNK-BP may buy part of the assets of Yukos*, Les Echos (16 September 2004) (**C-329**), mentioning a USD 20-25 billion range; *Yukos Licenses Hang in the Balance*, Moscow Times (28 September 2004) (**C-331**), where Russia's Deputy Minister of Industry and Energy referred to a minimum value of USD 15 billion.

[130] Yukos shareholders to consider bankruptcy move, ICIS (3 November 2004) (**C-399**).

Russian Federal Property Fund (**RFPF**) was appointed to conduct the public auction of YNG.[131] Accordingly, the RFPF and the Russian Ministry of Justice concluded an agreement, which provided *inter alia* that the sale of the YNG shares (representing 76.786% of the company's capital) had to be completed by 25 December 2004 and for a price not lower than RUB 246,735,447,000.18 (*i.e.*, USD 8.65 billion), 'taking into account the recommendations of [DKW]'.[132] The auction was announced publicly on 19 November 2004.[133] The notice also indicated that the auction would be held on Sunday, 19 December 2004, the earliest available date under the auction's regulation.[134]

142.  Yukos Oil sought the suspension of the auction and the adoption of interim measures, but Russian courts dismissed these applications.[135] Yukos Oil also attempted to protect YNG by filing for Chapter 11 bankruptcy in the United States.[136] On 16 December 2004, the Bankruptcy Court for the Southern District of Texas issued an order temporarily preventing certain entities (but not the Respondent) from participating in the auction of YNG.[137]

---

[131] Resolution to appoint a seller, Bailiff of the First Inter-District Department of the Bailiffs Service for the Central Administrative District of Moscow (18 November 2004) (**C-288**).

[132] Agreement No 4-UYu/2-1/1772-1 between Ministry of Justice and Russian Federal Property Fund (18 November 2004), clause 2.1 (**C-384**).

[133] *The Russian Federal Property Fund (the "Seller") Hereby Announces Tender Conducting to Sell the Seized Shares of OAO Yuganskneftegaz*, Rossiyskaya Gazeta, No 257 (3634) (19 November 2004) (**C-38**). *See* Memorial, [201].

[134] *See* Regulation on OAO Yuganskneftegaz Share Sale at the Cash Auction, Order of the Main Department of the Ministry of Justice of the Russian Federation in Moscow No 48 (18 November 2004) (**C-391**).

[135] Ruling of the Moscow *Arbitrazh* Court, Case No A40-62215/04-144-87 (29 November 2004) (**C-40**); Ruling of the Moscow *Arbitrazh* Court, Case Nos. A40-63472/04-141-162 and A40-61058/04-141-151 (3 December 2004) (**C-41**). *See* also *Russia: Yukos Subsidiary Investigated*, The New York Times (4 December 2004) (**C-336**).

[136] Voluntary Petition by Yukos Oil Company, United States Bankruptcy Court for the Southern District of Texas (14 December 2004) (**C-43**). *See* Reply, [118].

[137] *In re Yukos Oil Company v Russian Federation et al.*, United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No 04-47742-H3-11, Adv No 04-3952 (16 December 2004) (**C-44**).

143. On 6 December 2004, a company named OOO Baikalfinancegroup (**Baikal**) was incorporated by a sole founder in the Russian town of Tver.[138] Baikal would be one of two participants in the auction of YNG, alongside OOO Gazpromneft (**Gazpromneft**), then a subsidiary of the oil giant OAO Gazprom (**Gazprom**).[139]

144. The auction of YNG finally took place on 19 December 2004 and Baikal won within a few minutes with its opening bid of RUB 260,753,447,303 (approximately USD 9.35 billion).[140] On 22 December 2004, Baikal was acquired at its nominal value by the then-State-owned Oil Company Rosneft OJSC (**Rosneft**).[141] As was later disclosed, Rosneft provided the funding for the purchase of YNG, with the involvement of State-owned banks in Russia.[142] President Putin acknowledged the practical nationalisation of YNG at a press conference on 23 December 2004.[143]

---

[138] Certificate of State Registration of a Legal Entity, Limited Liability Company Baikalfinancegroup (6 December 2004) (**C-289**). *See* Charter of Limited Liability Company Baikalfinancegroup (1 December 2004) (**C-385**).

[139] Memorial, [206].

[140] Protocol of the results of the auction to sell shares in OAO Yuganskneftegaz (19 December 2004) (**C-290**).

[141] Oil Company Rosneft Open Joint Stock Company, Prospectus for Offering of Ordinary Shares (14 July 2006), 75-76 (**C-310**); *State steps in for Yukos unit*, The Guardian (23 December 2004) (**C-46**).

[142] Oil Company Rosneft Open Joint Stock Company, Prospectus for Offering of Ordinary Shares (14 July 2006), 75-76 (**C-310**); OJSC Rosneft Oil Company, Consolidated Financial Statements (2003, 2004), 35-37, 47 (**C-308, C-380**).

[143] Press Conference with Russian and Foreign Media, President of Russia Official Web Portal (23 December 2004), 4 (**C-47**); Interview to the Spanish Media, President of Russia Official Web Portal (7 February 2006), 6 (**C-63**).

145. Yukos Oil later challenged the lawfulness of the YNG auction, but Russian courts dismissed the claims.[144] Yukos Oil's bankruptcy application in the United States was dismissed on 24 February 2005 for lack of jurisdiction.[145]

146. YNG was projected to be valued at USD 55.78 billion as of the end of 2005.[146] Starting in 2005, a major part of the tax assessments imposed on YNG before the auction was reduced or invalidated by Russian courts.[147] In 2008, the Russian Government approved a restructuring plan of Rosneft's tax liabilities (then amounting to a total of USD 2.34 billion), providing for quarterly payments over the next five years.[148]

## F.   THE BANKRUPTCY PROCEEDINGS

147. *Events prior to bankruptcy proceedings.* In September 2003, Yukos Oil concluded: (i) a USD 1 billion loan agreement (the **Syndicate Loan**) with a consortium of Western banks led by Société Générale SA (**Société Générale**, and collectively the **Western Banks**);[149] and (ii) a USD 1.6 billion loan agreement with Société Générale (the **B Loan**).[150] The

---

[144] Resolution of the Federal *Arbitrazh* Court for the Moscow District, Case No KG-A40/9508-07 (12 October 2007) (**C-291**).

[145] *In re Yukos Oil Company*, United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No 04-47742-H3-11, Memorandum Opinion (24 February 2005) (**R-618**).

[146] Oil Company Rosneft Open Joint Stock Company, Prospectus for Offering of Ordinary Shares (14 July 2006), Table 40, R-I-62 (**C-310**). *See* Extracts of Rosneft's website, Company: Place in economy of Russia, 14 (**C-311**).

[147] Decision of the Federal *Arbitrazh* Court for the Moscow District, Case No KA–A40/13133–04 (16 February 2005) (**C-283**); Decision of the Moscow *Arbitrazh* Court, Case No A40-6416/05-90-35 (12 October 2005) (**C-284**); Decision of the Moscow *Arbitrazh* Court, Case No A40-64005/04-109-584 (25 April 2006) (**C-285**); *see also* OJSC Rosneft Oil Company, Consolidated Financial Statements (2003, 2004, 2005), 49-50, 59 (**C-149**).

[148] OJSC Oil Company Rosneft, Consolidated Financial Statements (2005, 2006, 2007), 49-50 (**C-99**); Rosneft Oil Company, Management's Discussion and Analysis of Financial Condition and Results of Operations (September 2006-September 2007), 38 (**C-309**).

[149] Loan Agreement between Yukos Oil, Société Générale SA and others (24 September 2003) (**PH-168**).

[150] Loan Agreement between Yukos Oil, Société Générale SA and others (30 September 2003) (**PH-169**).

rights under the B Loan were eventually transferred to Moravel Investments Ltd, a company associated with the Yukos Oil shareholders.[151]

148. The Western Banks raised concerns about Yukos Oil's ability to repay the Syndicate Loan.[152] Between May and June 2004, Yukos Oil made some prepayments[153] and provided guarantees for the Syndicate Loan and the B Loan through YNG and other Production Subsidiaries.[154] On 2 July 2004, the Western Banks declared an Event of Default under the Syndicate Loan,[155] but eventually agreed to rely on the security mechanisms.[156] Following the auction of YNG, Yukos Oil stopped making payments under the Syndicate Loan.[157] As a result, the Western Banks filed a claim against Yukos Oil for the outstanding debt under the Syndicate Loan (amounting to USD 472,787,663.10), which was recognised by the High Court of England and Wales on 24 June 2005 (the **English Judgment**).[158]

149. The Western Banks sought to enforce the English Judgment before Dutch courts, referring to Yukos Oil's shares in Yukos Finance. The Western Banks argued that, due to the corporate restructuring that led to Yukos International's shares being transferred to the Stichting (which had taken place earlier in 2005), the shares in Yukos Finance had

---

[151] *Moravel Investments Ltd v Yukos Oil Company*, LCIA Arb. No 5668, Award (16 September 2005), [20] (**A1-088**).

[152] *BNP Paribas SA & Ors v Yukos Oil Company* [2005] EWHC 1321 (Ch) (24 June 2005), [11] (**C-382**).

[153] Notice of Prepayment from Yukos Oil Company to Société Générale SA (25 May 2004) (**R-586**); Notice of Prepayment from Yukos Oil Company to Société Générale SA (22 June 2004) (**R-593**).

[154] Financial and Performance Guarantee between OAO Yuganskneftegaz and Société Générale SA (24 May 2004) (**R-585**); Financial and Performance Guarantee between OAO Yuganskneftegaz and Société Générale SA (25 May 2004) (**R-587**).

[155] *BNP Paribas SA & Ors v Yukos Oil Company* [2005] EWHC 1321 (Ch) (24 June 2005), [12]-[13] (**C-382**).  .

[156] *See* for instance Letter from Yukos Oil Company to Société Générale (27 July 2004) (**R-600**).

[157] Memorial, [222]-[223]. *See Go Ask Yukos*, Vedomosti (11 April 2005) (**R-619**).

[158] *BNP Paribas SA & Ors v Yukos Oil Company* [2005] EWHC 1321 (Ch) (24 June 2005) (**C-382**).

become 'worthless and more or less unsellable'.[159] They requested that an investigation for alleged mismanagement of Yukos Finance be initiated, so that the seized shares in this entity could be 'sold at the highest possible price'.[160] The decision was suspended by the District Court of Amsterdam on 29 September 2005, pending further submission of documents by Yukos Oil.

150. *Initiation of the bankruptcy proceedings.* On 13 December 2005, the Western Banks concluded a confidential agreement with Rosneft for the transfer of certain rights under the Syndicate Loan.[161] In practice, the agreement provided that Rosneft would pay the outstanding debt under the Syndicate Loan (around USD 455 million), in exchange for the assignment of the lenders' rights and subject to the Western Banks initiating enforcement and bankruptcy proceedings against Yukos Oil.[162]

151. On 21 December 2005 the Moscow *Arbitrazh* Court recognised the English Judgment and issued a writ of execution.[163] On 29 December 2005, the Western Banks resorted to bailiffs to recover the amounts from Yukos Oil, but the enforcement proceedings failed.[164]

152. On 6 March 2006, the Western Banks filed an application requesting that Yukos Oil be declared bankrupt.[165] Yukos Oil tried to stop the bankruptcy proceedings by requesting

---

[159] *BNP Paribas SA et al. v OAO Yukos Oil Company et al.*, District Court of Amsterdam Second Three-Judge Civil Section, Case No 320964/H 05-0568 (NM), Decision (29 September 2005), [2.3] **(R-632)**.

[160] Ibid, [2.4] **(R-632)**.

[161] Sale Agreement Relating to Certain Rights and Benefits Arising under a Credit Agreement dated 24 September 2003 between, amongst others, 'Yukos Oil Company' and Société Générale SA (13 December 2005) **(Loan Sale Agreement) (C-62)**.

[162] Ibid, 4, 37-38 (Schedule 8) **(C-62)**.

[163] Ruling of the Moscow *Arbitrazh* Court, Case No A40-53839/05-8-388 (21 December 2005) **(R-635)**. A previous application had been reversed on appeal.

[164] Memorial, [225]; Rejoinder, [184](e).

[165] *BNP Paribas SA & others v Yukos Oil Company Open Joint-Stock Company*, Moscow *Arbitrazh* Court, Plea That Debtor Be Declared Bankrupt (6 March 2006) **(C-64)**.

the bailiffs to lift the freezing orders over its property in an amount sufficient to cover the debt under the Syndicate Loan, but apparently no response was provided.[166]

153.   In parallel, YNG (by then a subsidiary of Rosneft) submitted a separate bankruptcy petition against Yukos Oil, which was accepted for consideration on 27 March 2006.[167] On 29 March 2006, the Moscow *Arbitrazh* Court commenced bankruptcy proceedings on the basis of the Syndicate Loan and formalised the replacement of the Western Banks by Rosneft as the applicant.[168] By the same Ruling, Mr Eduard K Rebgun was appointed as 'temporary receiver' of Yukos Oil.

154.   *The bankruptcy declaration.* The bankruptcy proceedings began as a 'supervision procedure', with Mr Rebgun being required to convene a meeting with the creditors of Yukos Oil to determine whether the company should be declared bankrupt or to consider alternative plans of viability. In advance of this meeting, which was originally scheduled for 16 June 2006, Yukos Oil approved a financial rehabilitation plan (the **Rehabilitation Plan**) that would, in principle, allow the company to satisfy its debts within two years while remaining a going concern. The Rehabilitation Plan provided, *inter alia*:

(i)     A separate cash pool, to be funded mainly from the sale of ancillary and non-core assets, would be created for payment of several claims originating in Russia, including those of tax authorities and YNG;

(ii)    The claims arising from the Syndicate Loan and the B Loan (as well as other remaining claims), would be paid through the assets already made subject to attachment by Dutch courts; and

---

[166] Letter from Yukos Oil Company to the Head of the Interdistrict Department for Special Enforcement Proceedings of the Chief Directorate of the Federal Bailiffs Service for Moscow (undated) (C-370).

[167] Ruling of the Moscow *Arbitrazh* Court to accept a petition for consideration, Case No A40-15780/06-88-39 B (27 March 2006) (C-292).

[168] Ruling of the Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (29 March 2006) (C-65). According to the Syndicate Loan Sale Agreement, Rosneft was required to satisfy the debt by 28 April 2006 at the latest. *See* Loan Sale Agreement, [2.3.1] (C-62).

(iii)     Yukos Oil would order that none of its subsidiaries pursue any claims against it, removing around USD 13.7 billion in intragroup claims.

155.  The Rehabilitation Plan estimated that the aggregate value of Yukos Oil's available assets was approximately USD 31 billion, while the recognised claims amounted to approximately USD 29.5 billion (including the intragroup claims). Following execution of the Rehabilitation Plan, Yukos Oil was projected to remain a viable company worth over USD 15 billion.[169]

156.  The creditors' meeting was eventually postponed due to a hearing of the Moscow *Arbitrazh* Court held on 14 June 2006, where a USD 13.1 billion claim of the Tax Ministry was being considered.[170] Yukos Oil complained that the Tax Ministry had filed around 127,000 documents, alleging that the judge had reviewed those in only a few minutes.[171] The tax claims were admitted into the bankruptcy, confirming the Federal Taxation Service as Yukos Oil's largest creditor.[172]

157.  On 19 July 2006, the Moscow *Arbitrazh* Court included two additional claims from YNG in the bankruptcy proceedings. The claims amounted to over RUB 33.8 billion (including interest) and concerned arrears from the sale of oil between YNG and certain LTR Subsidiaries.[173]

---

[169] *See* Letter from Fulbright & Jaworski LLP to Chadbourne & Parke LLP, enclosing 'Yukos' Outline of Proposed Financial Rehabilitation Plan and Debt Payment Schedule and/or Offer of Voluntary Arrangement of Creditors Company, Inc.' (1 June 2006), 3-5, 10 (**R-50**).

[170] Yukos creditors' meeting delayed by Moscow court, Dow Jones Factiva (8 June 2006) (**C-349**).

[171] *Judge sets speed-reading record...*, Reuters (16 June 2006) (**C-350**).

[172] Memorial, [232].

[173] Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10669/2006-GK (7 September 2006) (**C-301**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10671/2006-GK (7 September 2006) (**C-302**).

158. The creditors' meeting eventually took place on 20 and 25 July 2006, with twenty-four creditors holding participation and voting rights.[174] The report prepared by Mr Rebgun estimated that the total value of Yukos Oil's assets, following the application of profit tax to be incurred in their sale, was around RUB 458.7 billion, while the claims admitted to the bankruptcy proceedings amounted to RUB 491.2 billion.[175] Particularly, Mr Rebgun concluded that even in the scenario that current loss-free operations were possible, 'the oil company's solvency is impossible to restore.'[176]

159. At the creditors' meeting, Yukos Oil defended the viability of the Rehabilitation Plan and the solvency of the company, arguing that Mr Rebgun's valuation was misguided.[177] However, the creditors rejected considering the Rehabilitation Plan and voted in favour of filing a petition requesting that Yukos Oil be declared bankrupt. Both decisions were approved with the favourable vote of only four of the twenty-four creditors, which held 93.87% of the claims and thus necessarily included the largest creditors of Yukos Oil: the Federal Taxation Service, Rosneft and YNG.[178]

160. On 4 August 2006, the Moscow *Arbitrazh* Court declared Yukos Oil bankrupt, initiated its liquidation and appointed Mr Rebgun as receiver of the company.[179]

---

[174] Memorial, [234].

[175] Respectively USD 17.75 billion and USD 18.3 billion. Memorial, [234].

[176] Data from the Yukos Interim Receiver's Report (24 July 2006), 5 (C-72) (emphasis in original).

[177] Protocol of the First Meeting of the Creditors of Open Joint Stock Company "YUKOS Oil Company" (20-25 July 2006), 12-13 (C-293); Supplemental Statement by Mr Tim Osborne at the First Creditors Meeting (25 July 2006) (C-294); Statement of Yukos Oil Company to Continued Meeting of Creditors (25 July 2006) (C-295).

[178] *See* Protocol of the First Meeting of the Creditors of Open Joint Stock Company "YUKOS Oil Company" (20-25 July 2006), 8-9, 14, 17 (C-293). In both decisions, four creditors abstained, while the remaining ones voted in favour of considering the Rehabilitation Plan.

[179] Decision of the Moscow *Arbitrazh* Court, Case No A40-11836/06-68-35B (4 August 2006) (C-74).

161.  On 1 October 2006, YNG formally merged into Rosneft,[180] as a consequence of which all of YNG's claims in the bankruptcy were attributed to Rosneft.[181]

### G.   THE EXCLUSION OF THE CLAIMANT'S CLAIMS FROM THE BANKRUPTCY OF YUKOS OIL

162.  The treatment of the Claimant's claims in the bankruptcy of Yukos Oil lies at the heart of this arbitration. The Tribunal will consider the evidence on this in Part VI.B.2 below. Here it will suffice to summarise in outline the key steps in the proceedings that led to the final exclusion of the Claimant's claims under the Loans from the bankruptcy of Yukos Oil:[182]

(i)  On 27 April 2006, the Claimant filed an application with the Moscow *Arbitrazh* Court to include its claims under the Loans in the Register of Creditors of Yukos Oil (the **First Bankruptcy Application**).[183]

(ii)  On 1 May 2006, the Federal Tax Service filed its objections to the First Bankruptcy Application.[184] This was followed by objections from Rosneft and Mr Rebgun respectively on 23 and 31 May 2006.[185]

---

[180] OJSC Oil Company Rosneft, Consolidated Financial Statements (2005, 2006, 2007), 8 (C-99).

[181] Ruling of the Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35-B (9 November 2006) (C-305).

[182] This summary account is derived from the Parties' agreed Joint Chronology of Events.

[183] Application for inclusion of a claim by Yukos Capital S.à r.l. in the registry of claims of creditors of Yukos Oil Company OJSC, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (27 April 2006) (First Bankruptcy Application) (C-66).

[184] Explanation of the Federal Tax Service, Moscow City *Arbitrazh* Court (undated) (C-401).

[185] Objections of Rosneft Oil Company OJSC Regarding the claims of Yukos Capital S.à r.l. for inclusion of its claim in the registry of Yukos Oil Company OJSC creditors, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (23 May 2006) (C-67); Temporary Receiver's Objections To the claims of the creditor, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (31 May 2006) (C-69).

(iii)     On 12 July 2006, the Moscow *Arbitrazh* Court held a hearing on the First Bankruptcy Application.[186] A letter from Yukos Oil confirmed its receipt of a Notice of Default from Yukos Capital dated 11 November 2015 and the company's obligation to repay the Loans early,[187] but the Federal Tax Service opposed the First Bankruptcy Application on the ground that the Loans were not yet due.[188]

(iv)     On 19 July 2006, the Moscow *Arbitrazh* Court dismissed the First Bankruptcy Application.[189] On 28 July 2006, the Claimant filed an appeal from that judgment with the Ninth *Arbitrazh* Court of Appeal (the **First Appeal**).[190]

(v)      On 8 August 2006, the General Prosecutor's Office (**GPO**) initiated a criminal case against the Claimant and its officers;[191] conducting a search of the offices of its Moscow attorneys, NOMOS Law Office (**Nomos**), on 9 August 2006;[192]

---

[186] Minutes Of The Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (12 July 2006) (**C-70**).

[187] Email TMF to D Gupta (7 July 2006) (**C-563**).

[188] U.K. Foreign and Commonwealth Office Written Evidence in Inquiry of the Foreign Affairs Committee (19 April 2016) (**C-470**).

[189] Minutes Of The Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (12 July 2006) (**C-70**); Ruling of the Moscow City *Arbitrazh* Court, Case No A40-11836-88-35 "B" (19 July 2006) (**C-71**).

[190] Appeal to the Moscow Court Decision from 19 July 2006, Ninth *Arbitrazh* Court of Appeal, Case No A40-11836/06-88-35 «B» (28 July 2006) (**C-73**).

[191] Order to initiate a criminal case and proceedings in the case, Deputy Prosecutor General of the Russian Federation (8 August 2006) (**C-75**).

[192] Letter from NOMOS Law Office to Yukos Capital S.à r.l. (17 August 2006) (**C-402**); Search (Seizure) Record and Record of Examination of Items (Documents), Investigative Group of the Office of the RF Prosecutor General (9 August 2006) (**R-297**).

seizing documents there; and interrogating Ms Titievskaya of Nomos on 11 August 2006.[193]

(vi)     On 28 September 2006, the Ninth *Arbitrazh* Court of Appeal suspended the Claimant's appeal on the ground of the pending criminal proceedings.[194]

(vii)    On 11 October 2006, the Claimant filed a **Second Bankruptcy Application**.[195] The Federal Tax Service opposed the Second Bankruptcy Application on the same day.[196] The Claimant applied in November 2006 for this Application to be heard in the absence of its attorneys on the ground that it was unable to secure legal representation following the criminal investigation of Nomos.[197]

(viii)   The Second Bankruptcy Application was heard on 27 November 2006 and dismissed on 4 December 2006.[198] The Claimant's appeal against that dismissal was filed on 18 December 2006; heard by the Court of Appeal on 15 February 2007 and dismissed on 22 February 2007 (the **Second Appeal**).[199] The Claimant

---

[193] Transcript of Witness Interview, Marina Petrovna Titievskaya (15 August 2006) **(R-298)**.

[194] Court Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10665/2006-GK (28 September 2006) **(C-76)**.

[195] Application for inclusion of a claim by Yukos Capital S.à r.l. in the registry of claims of creditors of Yukos Oil Company OJSC, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (6 October 2006) **(C-77)**. This document is dated 6 October 2006, but bears a stamp of the Moscow *Arbitrazh* Court dated 11 October 2006.

[196] Comments of the Federal Tax Service concerning the claims of Yukos Capital S.à r.l. of 11 October 2006, Case No A40-11836/06-88-35 B (undated) **(C-78)**.

[197] Application of Yukos Capital S.à r.l., Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 "Б" (November 2006) **(C-403)**.

[198] Decision of the Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (4 December 2006) **(C-82)**.

[199] Appeal of Yukos Capital S.à r.l. against the decision of the Moscow *Arbitrazh* Court as of 4 December 2006, Ninth *Arbitrazh* Court of Appeal, Case No A40-11836/06-88-35 «В» (18 December 2006) **(Second Appeal)** **(C-83)**; Record of Court Proceedings, Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2006-GK (15 February 2007) **(C-405)**; Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007) **(C-84)**.

filed a cassation appeal against that decision on 10 April 2007 (the **Second Cassation Appeal**).[200]

(ix)     Also on 27 November 2006, the Claimant filed a cassation appeal against the suspension of its appeal from the First Bankruptcy Application (the **First Cassation Appeal**).[201]

(x)     On 17 May 2007, Mr Rebgun filed petitions with the Moscow *Arbitrazh* Court to invalidate the Loans;[202] and then filed a motion on 24 May 2007 to suspend the Second Cassation Appeal on the ground of the pendency of the invalidation proceedings.[203]

(xi)     The Federal *Arbitrazh* Court granted the suspension on 31 May 2007.[204] It also suspended the First Cassation Appeal on 20 July 2007.[205] The Claimant petitioned the Court to remedy the circumstances that gave rise to the suspension

---

[200] Cassation Appeal by the Yukos Capital S.à r.l. Company, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (10 April 2007) **(C-85)**.

[201] Cassation Appeal of Yukos Capital S.à r.l. against Decision No 09AP-10665/2006-GK of 28.09.2006 of the Ninth Arbitration Court of Appeal, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 «B» (27 November 2006) **(C-426)**.

[202] Petitions of the Receiver To Have Loan Agreements Ruled Invalid, Moscow City *Arbitrazh* Court (17 May 2007) **(C-86)**.

[203] Motion of Yukos Oil Company OJSC Receiver For Suspension of Proceedings in Cassation Appeal, Moscow District Federal *Arbitrazh* Court, Case No KG-A40/4522-07 (24 May 2007) **(C-87)**.

[204] Decision of the Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (31 May 2007) **(C-88)**.

[205] Decision on deferral of the cassation appeal, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (20 July 2007) **(C-90)**.

in October 2007,[206] but the Court finally rejected the appeal on 24 October 2007.[207]

## H.   THE LIQUIDATION OF YUKOS OIL

163. On 23 October 2006, a consortium of appraisal firms led by ZAO Roseco was selected for making the inventory and evaluation of Yukos Oil's assets.[208] In the report submitted after the conclusion of the liquidation, Mr Rebgun recorded the accumulation of a bankruptcy estate totalling RUB 877 billion (approximately USD 35.55 billion) from the sale of Yukos Oil's assets.[209]

164. Yukos Oil's assets were divided into 20 different 'lots' and progressively auctioned between March and August 2007, under the organisation of the RFPF and the supervision of Mr Rebgun.[210] The sale of some of the most relevant assets resulted as follows:

   (i)   On 27 March 2007, Lot 1 containing Yukos Oil's remaining 9.44% stake in YNG was sold for USD 7.59 billion to Rosneft's subsidiary OOO RN-Razvitiye;[211]

   (ii)  On 4 April 2007, Lot 2 containing a 20% stake in Gazpromneft and three minor Production Subsidiaries was sold for USD 5.83 billion to OAO EniNeftegaz, a

---

[206] Federal *Arbitrazh* Court of the Moscow Circuit, Case No A40-11836/06-88-35 "B" (undated) (C-589).

[207] Decision of the Federal *Arbitrazh* Court of the Moscow Circuit, Case No A40-11836/06-88-35B (24 October 2007) (C-590).

[208] Receiver's Report on His Activities and on the Results of the Receivership for the period from August 4, 2006 through November 1, 2007 (1 November 2007), 4 (C-307).

[209] *See* Receiver's Report on His Activities and on the Results of the Receivership for the period from August 4, 2006 through November 1, 2007 (1 November 2007), 14-24, 56 (C-307). *See* also Memorial, [236].

[210] *See* Receiver's Report on His Activities and on the Results of the Receivership for the period from August 4, 2006 through November 1, 2007 (1 November 2007), 11-14 (C-307).

[211] *See* Yuk, The Economist (31 March 2007) (C-360); *Rosneft Outbids TNK-BP In YUKOS carve-up auction*, Reuters (27 March 2007) (C-358); *Rosneft Outbids TNK-BP in auction of former Yukos assets*, The Independent (28 March 2007) (C-359).

subsidiary of Italian companies Eni and Enel S.p.A. (although the assets ended under the control of Gazprom);[212]

(iii)    On 3 May 2007, Lot 10 containing TN and other Yukos Oil subsidiaries was sold for USD 6.82 billion to Rosneft's subsidiary OAO Neft-Aktiv;[213] and

(iv)    On 10 May 2007, Lot 11 containing SN and other Yukos Oil subsidiaries was sold for USD 6.4 billion to Rosneft's subsidiary OAO Neft-Aktiv.[214]

165.    Following the sale of all of Yukos Oil's available assets, the entirety of the amounts included in the first, second and third tiers of the Register of Creditors was paid.[215] Over 99% of these claims belonged to the Federal Taxation Service and Rosneft, while the claims of other entities, such as the Claimant, were not included in the Register.[216]

166.    Mr Rebgun submitted the results of the liquidation to the Moscow *Arbitrazh* Court, accounting for additional claims arising from taxes allegedly incurred in the sale of Yukos Oil's assets, resulting in a negative balance of funds. On 15 November 2007, the bankruptcy proceedings of Yukos Oil were formally terminated and the unsatisfied claims of creditors were declared expired.[217]

167.    The Claimant sought to challenge this decision, and filed an unsuccessful application for injunctive relief requesting that the termination of the bankruptcy be withheld.[218] On

---

[212] Eni announces USD 5.83 billion acquisition of Yukos Assets. Major first step into Russian upstream market, Eni Press Release (4 April 2007) (C-362); Russian bargain that comes at a price, Financial Times (5 April 2007) (C-363); Eni and Enel to cede control of Yukos gas assets, Financial Times (5 April 2007) (C-364).

[213] See Rosneft wins auction for Yukos' oil assets, Financial Times (4 May 2007) (C-365).

[214] *See* Memorial, [243](d).

[215] Receiver's Report on His Activities and on the Results of the Receivership for the period from August 4, 2006 through November 1, 2007 (1 November 2007), 32-33 (C-307).

[216] Memorial, [243], [245].

[217] Ruling of the *Arbitrazh* Court of the City of Moscow, Case No. A40-11836/06-88-35-B (15 November 2007), 17 (C-96).

[218] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-16994/2007-GK (26 November 2007) (C-97).

21 November 2007, Yukos Oil was finally removed from the Russian register of legal entities and, on this basis, the Claimant's appeal was dismissed a few weeks later.[219]

## IV.   JURISDICTIONAL OBJECTIONS

### A.   INTRODUCTION

#### 1.   Tribunal's consideration in Interim Award on Jurisdiction

168.   The Tribunal begins by recalling its decision, in PO Nº 1, that it would address three of the Respondent's jurisdictional objections in a preliminary phase, and join any other objections to jurisdiction or admissibility to the merits.[220] The three jurisdictional objections accordingly determined by the Tribunal in its Interim Award dated 18 January 2017 were:

(i)      That '[t]he Russian Federation never ratified the ECT and applied the ECT until October 18, 2009 on a provisional basis pursuant to Article 45(1) ECT only "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations"';

(ii)     That '[t]he intra-company loans allegedly made by Claimant to Yukos Oil Company are not "investments" within the meaning of Article 1(6) ECT'; and

(iii)    That, '[s]ince Claimant is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of a third State, Respondent is entitled to deny Claimant the advantages of Part III of the ECT pursuant to Article 17 ECT.'[221]

The Tribunal rejected the first and second of these objections by majority, and the third unanimously.

---

[219] Ruling of the Federal *Arbitrazh* Court of the District of Moscow, Case No A40-11836/06-88-35 B (26 February 2008) (C-**100**).

[220] PO Nº 1, [2.1]-[2.2].

[221] Interim Award, [18].

### 2.   Remaining jurisdictional objections

169. In the present phase of the arbitration, the Respondent raises a number of further objections on which basis it submits the Tribunal should decline jurisdiction. The jurisdictional objections now advanced are:

   (i)   That the Loans were illegal under international law;

   (ii)   That the Loans were illegal under domestic law;

   (iii)   That the Claimant does not qualify as a protected investor under Article 1(7) of the ECT in light of its corporate structure and current nationality;

   (iv)   That the current proceedings are an abuse of process; and

   (v)   That the Claimant's claim is excluded by virtue of the tax carve-out in Article 21 of the ECT.

170. Grounds (iii) and (v) raise discrete points as to the Tribunal's jurisdiction and can conveniently be considered and determined in this section. The Respondent's jurisdictional objections based upon illegality (objections (i) and (ii)) raise issues that are intertwined with the facts relevant to the merits and therefore fall to be considered in connection with the Tribunal's analysis of liability. The claim of abuse of process (objection (iv)) specifically concerns the questions whether the present proceedings seek recovery for a loss that was foreseeable when the investment was made or alternatively seek abusively to achieve double recovery. Without prejudice to the character of this objection, the Tribunal finds it convenient to consider its implications in connection with the facts relevant to causation and compensation in Parts VII and VIII below.

### B.   OBJECTION (III): CLAIMANT'S STATUS AS PROTECTED INVESTOR

### 1.   The Respondent's position

171. The Respondent submits that the Claimant does not qualify as a protected 'investor' under Article 1(7) of the ECT, on the basis that: (i) Yukos Capital is a shell company controlled

by Russian nationals; and (ii) that Yukos Capital is no longer a national of an ECT Contracting State.[222] Each of these submissions will be set out in further detail below.

172.   As a preliminary point, the Respondent contends that it is not precluded from raising new objections to the jurisdiction of the Tribunal and the admissibility of the Claimant's claims, arguing that the record demonstrates that it intended to raise several objections to jurisdiction and that the Interim Award was limited in scope to specific objections.[223] In particular, it contends that Article 1(7) was not at issue in the jurisdiction phase of the proceedings, and that any findings in the Interim Award relating to the Claimant's status as an investor under the ECT are limited to the objections at issue in that phase.[224] In any event, the Respondent submits that the Tribunal would have the power to reconsider any findings it may have made in its Interim Award that it considers were premature or incorrect.[225]

173.   Turning to its substantive objection, the Respondent first submits that the ECT does not protect investments made by host States' own nationals ('round-trip' investments), arguing that a proper contextual reading of Article 1(7) in light of the object and purpose of the ECT mandates that its provisions should only be applied to protect investments by foreign investors.[226] In relation to context, the Respondent refers to various provisions of the ECT referring only to investors of 'another' Contracting Party without reference to Article 1(7),[227] as well as Article 17 (excluding investments made by third-State nationals from ECT protection), which it submits should apply *a fortiori* to shell companies owned by nationals of the host State.[228] It also refers to an understanding adopted by the ECT Contracting Parties, which envisages a factual determination of 'control' to ascertain

---

[222] Counter-Memorial, [227], [231]-[233], [259]; Rejoinder, [371].

[223] Rejoinder, [373]-[374].

[224] Rejoinder, [375]-[377], [381].

[225] Rejoinder, [378].

[226] Counter-Memorial, [227]-[228]; Rejoinder, [379]-[380].

[227] Counter-Memorial, [234]-[235]; Rejoinder, [381].

[228] Counter-Memorial, [236]-[237].

whether an investor is controlled by 'another' Contracting Party to the ECT.[229] It submits that this understanding, along with the other provisions of the ECT referred to, provides contextual support for the interpretation of 'investor' in Article 1(6) to exclude investors of the host State.[230]

174. In relation to the object and purpose of the ECT, the Respondent contends that the ECT is intended to promote and protect foreign, cross-border investment, in particular by Western investors in the former USSR, thereby excluding host-State investments.[231] It refers to various references in Article 2 of the Treaty to 'political and economic cooperation', 'complementarities', 'mutual benefits', the 'flow of investments and technologies', and the desire to provide a 'stable, transparent legal framework for foreign investments'.[232] It also refers to the Final Act of the European Energy Charter Conference, to which the text of the ECT was appended, which states that the Treaty was 'designed to promote East-West industrial co-operation by providing legal safeguards in areas such as investment, transit and trade', and submits that the promotion of 'round-trip' investments falls outside the object and purpose of the ECT.[233]

175. The Respondent submits that international law principles further support its interpretation of Article 1(7) of the ECT as excluding 'round-trip' investments.[234] It submits that two fundamental principles are widely recognised by arbitral tribunals and national courts (and there is no evidence that the ECT's Contracting Parties intended to derogate from them), being that the investment treaty regime is not intended to provide domestic investors with recourse against their home States,[235] and that international law recognises

---

[229] Counter-Memorial, [238]-[240], referring to Final Act of the European Energy Charter Conference, adopted in Lisbon on 17 December 1994, 6 (C-1).

[230] Counter-Memorial, [241].

[231] Counter-Memorial, [242]; Rejoinder, [382].

[232] Counter-Memorial, [243].

[233] Counter-Memorial, [243]-[244].

[234] Counter-Memorial, [245]; Rejoinder, [383].

[235] Counter-Memorial, [246], [251].

only a beneficial or substantive owner, not the formal and legal owner of an investment.[236] It refers to cases where tribunals have denied claims where an investment is owned or controlled by nationals of the host State, noting that in such cases meeting the formal definition of investor is not sufficient to extend investment treaty protections.[237]

176. The Respondent also draws upon the subsequent State practice of a large number of ECT Contracting Parties to submit that 'round-trip' investments fall outside Article 1(7) of the ECT.[238] By way of example, the Respondent points to the EU-Canada Free Trade Agreement between Canada, the European Union, and EU Member States, which excludes shell companies from the scope of treaty protection.[239] The Respondent also points towards the 2014 consultation notice to the Transatlantic Trade and Investment Partnership which expressly excludes that shell companies and those without 'substantive business operations in the territory of one of the Parties could qualify as an "investor".'[240]

177. With this in mind, the Respondent submits that, although officially incorporated in Luxembourg, Yukos Capital was at all times beneficially owned and controlled by Russian nationals for illicit purposes.[241] It argues, *inter alia*, that Yukos Capital was managed and controlled from Moscow by the 'Yukos Oligarchs', its banking was conducted from Russia, it has no physical presence, no business activity, no significant assets or employees in Luxembourg, its ultimate holding company (the Stichting) was under the control of the 'Yukos Oligarchs', and the 'Yukos Oligarchs' currently control the Claimant through a kickback agreement revealed in 2015.[242]

---

[236] Counter-Memorial, [247]-[248], [251].

[237] Counter-Memorial, [249]-[250].

[238] Counter-Memorial, [252]; Rejoinder, [384].

[239] Counter-Memorial, [252]-[253]; Rejoinder, [384].

[240] Counter-Memorial, [253].

[241] Counter-Memorial, [229].

[242] Counter-Memorial, [230].

178. Further, the Respondent argues that the abuse of Yukos Capital's corporate structure warrants lifting the corporate veil to expose the Russian national investors beneath.[243] It submits that it is a fundamental principle of international law, supported by international jurisprudence and decisions of numerous arbitral tribunals, that an abuse of the corporate structure through illegality or fraud warrants piercing the corporate veil.[244] In the Respondent's submission, the conduct of the Russian nationals in the present case is especially egregious, given that the corporate form of the Claimant was not abused simply to gain access to the investment treaty dispute resolution mechanisms, but also to further a criminal enterprise.[245] The Respondent therefore contends that the Tribunal should lift the corporate veil and deny the Claimant, as a shell company controlled by Russian nationals, the protections of the ECT.[246] It also refers to the Claimant's submission that the Respondent has waived all veil-piercing arguments due to its counsel's comments at the Hearing on Jurisdiction,[247] and contends that such comments cannot satisfy the legal standard that waiver of arguments must be express or unequivocally implied.[248]

179. Second, and in the alternative, the Respondent contends that Yukos Capital lost its qualifying Luxembourg nationality due to its 'change of domicile' and merger into a BVI entity in 2016.[249] It contends that it is a long-established rule of international law that a claimant must hold continuous nationality in a contracting State of the relevant treaty from the time it suffers its alleged loss until the date of the award.[250] In support, the Respondent refers to *Loewen v United States* in the investor-State context, as well as other

---

[243] Counter-Memorial, [254].

[244] Counter-Memorial, [255]-[257].

[245] Counter-Memorial, [258].

[246] Counter-Memorial, [258].

[247] Rejoinder, [385].

[248] Rejoinder, [386].

[249] Counter-Memorial, [259]; Rejoinder, [388]-[389].

[250] Counter-Memorial, [260].

decisions in arbitrations from the first half of the twentieth century.[251] The Respondent therefore submits that the Corporate Reorganisation terminated Yukos Capital's rights under the ECT.[252]

## 2. The Claimant's position

180. The Claimant's principal response to the Respondent's case on Article 1(7) of the ECT is that the issues raised by the Respondent are *res judicata*. However, in the event the Tribunal finds otherwise, the Claimant submits that Yukos Capital is under the control of the Stichting and that the 'Yukos Oligarchs' never exercised any degree of control over Yukos Capital or the Stichting. It also rejects the Respondent's arguments regarding the Claimant's Corporate Reorganisation, contending that the relevant date for jurisdiction purposes is the date of commencement of proceedings.

181. First, the Claimant argues that the Respondent made a considered choice not to present a jurisdictional argument based on Article 1(7) in the jurisdiction phase of these proceedings,[253] and submits that the same is the case for arguments relating to the Claimant as a shell company and piercing the corporate veil.[254] It contends that the Respondent has already accepted that the Claimant is an 'investor' for the purpose of Article 1(7) of the ECT and controlled by the Stichting, and that its current submissions regarding 'round-trip' investments and shell companies are a flagrant disregard for the Tribunal's Interim Award and the arbitral process.[255] It also argues that any objections that the Respondent expressly disclaimed or which should have been made in the jurisdictional phase should be rejected, on the ground that they were not made as early as

---

[251] Counter-Memorial, [260]-[261], citing *Loewen v United States of America*, ICSID Case No ARB(AF)/98/3, Award (26 June 2003), [229] **(CL-128)**.

[252] Counter-Memorial, [262]-[263].

[253] Reply, [502].

[254] Reply, [503]-[504].

[255] Reply, [505]-[507], [513].

possible.[256] It submits that *res judicata* is a general principle of law, and refers to Article 32(2) of the UNCITRAL Rules which provides that awards are final and binding on the parties, which it submits applies to the Interim Award.[257]

182. The Claimant then responds to the Respondent's substantive jurisdictional objection, arguing that the Respondent's interpretation of Article 1(7) is flawed.[258] It argues that there is no basis to depart from the ordinary meaning of the provision or to read words into Article 1(7), and that the Respondent's contextual argument is circular since the provisions it invokes refer the reader back to the definition of investor in Article 1(7).[259] It also contends that the reference to the Contracting Parties' 'understandings' relates to Article 1(6) of the ECT, which is *res judicata* by virtue of the Interim Award.[260]

183. The Claimant characterises the Respondent's reliance on purported subsequent practice of the ECT's Contracting Parties as 'particularly disingenuous' since the instruments referred to by the Respondent do not have the same Contracting Parties as the ECT and do not establish the agreement of the ECT's Contracting Parties regarding the ECT's interpretation.[261] Finally, and with reference to the evidence of Mr Misamore, the Respondent contends that the 'Yukos Oligarchs' did not exercise any degree of control over Yukos Capital or the Stichting.[262]

184. In respect of the Respondent's contention that the Claimant's Corporate Reorganisation has caused the Claimant to lose standing before this Tribunal the Claimant submits that it is generally recognised that the determination of standing before an arbitral tribunal is

---

[256] Reply, [514].

[257] Reply, [509]-[512].

[258] Reply, [519].

[259] Reply, [520].

[260] Reply, [521].

[261] Reply, [523].

[262] Reply, [515]; Misamore 2, [5]-[10].

made by reference to the date the proceedings are instituted.[263] It argues that there is nothing in the ECT that requires an investor to maintain continuous nationality between the commencement of proceedings and the date of the award, and that such a requirement could require an investor to ignore all commercial and legal realities that might warrant a change in domicile throughout the duration of the proceedings (which might take many years to conclude).[264] It submits that the Claimant was a Luxembourg entity (as Yukos Capital S.à r.l.) between its date of incorporation and until 2016, which it submits covers the date the investments were made, the date alleged violations of the ECT occurred, the date losses were sustained and the date the proceedings were instituted. [265] For completeness, the Claimant contends that the BVI entity (Yukos Capital Ltd) is the owner of all rights and property of Yukos Capital S.à r.l., including the investment,[266] and that the Stichting remains in control of the Claimant despite its Corporate Reorganisation.[267]

### 3.   The Tribunal's analysis

185. *Res judicata.* The Tribunal approaches the Respondent's objection to its jurisdiction under Article 1(7) as a new objection. It does not consider that the Respondent is precluded generally from bringing this objection on the ground of *res judicata*. When the Tribunal decided to bifurcate these proceedings, it did so on the basis that this was to enable three specific objections to jurisdiction, enumerated in [2.1] of PO N° 1, to be determined in a preliminary phase. The third such objection (as formulated in the Respondent's letter dated 11 April 2014 and provided in [2.1](c)) was:

> Since Claimant is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of a third State, Respondent is entitled to deny Claimant the advantages of Part III of the ECT pursuant to Article 17 ECT.

---

[263] Reply, [524], referring to Claimant's letters to the Tribunal dated 16 April 2018 (CRSFC-1) and 7 May 2018 (SFC-22).

[264] Claimant's letter to the Tribunal (16 April 2018), 2-3 (CRSFC-1).

[265] Claimant's letter to the Tribunal (16 April 2018), 3 (CRSFC-1).

[266] Claimant's letter to the Tribunal (16 April 2018), 4 (CRSFC-1).

[267] Claimant's letter to the Tribunal (16 April 2018), 5-6 (CRSFC-1).

186. The Tribunal went on to provide in [2.2] of PO N° 1 that: 'Any other objections to jurisdiction or admissibility… are to be joined to the merits.'

187. The objection that the Respondent now advances is brought under Article 1(7) ECT. The Respondent submits that an 'Investor' for the purpose of the Treaty does not include a company that, though 'organized in accordance with the law applicable in [another] Contracting Party', is controlled by nationals of the Contracting Party in which the investment was made. This objection does involve the question of the control of the Claimant, the significance of which the Tribunal will explain below. Nevertheless, it proceeds under a different provision of the ECT and engages the significance *vel non* of alleged control by nationals of the host State, not a third State.

188. Further or alternatively, the Respondent alleges that, whatever may have been the previous position, as a result of the Corporate Reorganisation carried out by the Claimant since the Hearing on Jurisdiction, it has ceased to be organised in accordance with the law applicable in another Contracting Party. On any view, this objection could not be precluded by a plea of *res judicata* since it relates to facts and matters that arose after the Hearing on Jurisdiction and were not available to be considered by the Tribunal in its Interim Award.

189. The statements that the Respondent's counsel made at the Hearing on Jurisdiction are to be read in this light. The Chairman specifically referred Respondent's counsel to Article 1(7) in the course of the Hearing and asked whether its definition of 'Investor' affected her analysis. She replied:

> To be clear, Respondent does not object on the basis of Article 1(7) ECT to the Tribunal's jurisdiction *at this stage.*[268]

190. The understanding that this statement was limited to the issues that had been bifurcated and was without prejudice to any subsequent objection that might be raised at a later stage in the proceedings is confirmed by the terms in which the Tribunal recorded the Respondent's confirmation in its Interim Award, when it stated:

---

[268] Jurisdiction T5/118/24–119/1 (Respondent), emphasis added.

During the Hearing, the Respondent confirmed that *for the purpose of this phase of the proceedings,* it:

(a) Does not object to the Tribunal's jurisdiction on the ground that Yukos Capital does not qualify as an Investor in terms of Article 1(7).[269]

191. The *dispositif* of the Interim Award limits the Tribunal's decisions at that stage to the three objections to jurisdiction that were the subject of bifurcation. It goes on to provide:

Any other objections to jurisdiction and admissibility are, pursuant to Procedural Order No 1, joined to the merits.[270]

192. The above finding makes it unnecessary for the Tribunal to rule on the question of the circumstances (if any) in which decisions taken in an interim award on jurisdiction are capable of being reopened while the proceedings are extant. At the same time, the evidence given in the jurisdiction phase remains part of the arbitration record and available to the Tribunal in its assessment of the issues presently before it.

193. *Ownership and control of the 'Investor'*. Article 26 ECT provides for the submission to arbitration of '[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III…'

194. Article 1(7) ECT defines 'Investor'. It provides in relevant part:

"Investor" means:

(a) with respect to a Contracting Party:

…

(ii) a company or other organization organized in accordance with the law applicable in that Contracting Party.

---

[269] Interim Award, [308], citing the above passage from the transcript, emphasis added.

[270] Interim Award, [567](5).

195. The Respondent submits that the Tribunal has no jurisdiction because: 'Although
formally incorporated in Luxembourg, Yukos Capital was at all times beneficially owned
and controlled by nationals of the host State, *i.e.,* the Yukos Oligarchs.'[271]

196. In order to advance this claim as a matter of law, the Respondent submits that the Tribunal
must look beyond the ordinary meaning of the text of Article 1(7). It refers to a number
of material sources that it alleges are relevant to this exercise.

197. If (which the Tribunal does not decide) these sources were relevant, it could only be on
the basis that the Claimant met the Respondent's proposed test of being 'owned and
controlled by nationals of the host State' *at the material time.*

198. The material time for the purpose of determining the jurisdiction of the Tribunal is the
date upon which the dispute was submitted to arbitration. This was 15 February 2013,
being the date on which the Claimant claimed to accept Russia's consent to arbitration.[272]
Such an approach is, as the Tribunal has already observed in its Interim Award, 'in
conformity with the constant practice of international courts and tribunals.'[273] Investment
arbitration is no exception.[274]

199. The factual record as to the ownership and control of the Claimant as at that date was
established on an undisputed basis during the jurisdiction phase.[275] As the Tribunal then
found, as from 14 April 2005, a Dutch *Stichting* became the sole shareholder of Yukos
Capital, through Yukos International, another company in the Yukos Group.[276]

---

[271] Counter-Memorial, [229].

[272] Interim Award, [177].

[273] Ibid, citing Nottebohm (Liechtenstein v Guatemala) [1953] ICJ Rep 123; Arrest Warrant of 11 April 2000
(Democratic Republic of the Congo v Belgium) [2002] ICJ Rep 1.

[274] Schreuer et al, *The ICSID Convention: A Commentary* (2nd ed, 2009) 91–3, citing *Vivendi v Argentina II* ICSID
Case No ARB/97/3, Decision on Jurisdiction (14 November 2005), [61]; *CSOB v Slovak Republic* ICSID Case No
ARB/97/4 (Decision on Jurisdiction) 24 May 1999, [31].

[275] Interim Award, [555].

[276] Ibid.

343945

200. At that Hearing, the Tribunal was concerned to determine an objection on the ground of ownership or control by natural persons of a third State (namely United States nationals, members of the Board of the Stichting). This required the Tribunal to determine who in turn owned or controlled the Stichting. The agreed evidence that the Tribunal received from two distinguished experts of Dutch law, called respectively by the Claimant and the Respondent, was to the effect that 'it is the board as an organ that controls the *stichting* and not the individual natural persons.'[277] As a consequence, the Tribunal found that 'the "control" of Yukos Capital for the purposes of Article 17(1) of the ECT is exercised by an organisation organised under the laws of a Contracting State, namely the *Stichting* acting by its Board. It is not controlled by nationals of a third state, since it is the Board as a collective organ and not its individual members that exercise control over the *Stichting*'s affairs.'[278]

201. This finding was reached in relation to the Respondent's jurisdictional objection under Article 17, where 'control' is expressly stated to be a part of the legal test. As the Tribunal has already found above, it does not bind it or the Parties *per se* in relation to the Respondent's present objection under Article 1(7).

202. Nevertheless, the evidence given on that question was and is undisputed. The necessary consequence is that, even if the Tribunal were to make the assumption in the Respondent's favour that ownership or control of the Claimant is to be taken into account as part of the test for whether it is an 'Investor' for the purpose of Article 1(7) ECT (which the Tribunal does not decide), the uncontradicted evidence is that, at the material time, the Claimant was not so owned or controlled. Rather it was owned and controlled by a Dutch Stichting acting by its Board.

203. The result is that this first limb of the Respondent's objection under Article 1(7) must fail. In reaching this conclusion, the Tribunal does not neglect the Respondent's contention that the Claimant's corporate veil must be pierced in light of Respondent's allegation that the Claimant was a vehicle for an illegal enterprise. This contention necessarily depends

---

[277] Ibid, [564].

[278] Ibid, [565].

upon a consideration of the facts and matters upon which the allegation of illegality depends, to which the Tribunal will turn in Part VI.C below.

204. *Continuous nationality.* The Respondent then objects that, even if the Claimant met the test of Article 1(7) at any earlier date, it has ceased to be 'a company or other organization organized in accordance with the law applicable' in a Contracting State, as a result of a corporate reorganisation by which it was merged into a BVI entity in 2016. It submits that, in order to be able to continue to invoke the jurisdiction of the Tribunal, the Claimant must maintain the nationality of a Contracting State continuously until the date of the Award.

205. The Tribunal rejects this submission as a matter of law. As it has observed above, the constant practice of international courts and tribunals is to determine jurisdiction as at the date of institution of the proceedings. There are sound reasons of principle for this. That is the date on which the Tribunal is seised of the dispute as formulated in the Claimant's claim. If the court or tribunal had jurisdiction at that stage on the basis of a valid submission by way of consent by both Parties, it cannot lose its jurisdiction in that case by a subsequent change in the factual situation.[279] The same consideration applies to the fulfilment of the elements of the instrument of consent. The court or tribunal is determining its jurisdiction on the basis of facts that have arisen up to the date of the institution of proceedings and not thereafter.

206. The ECT contains no express provision that would support a requirement that continuous nationality must be maintained to the date of the Award. The Respondent alleges that such a requirement is to be implied from what it characterises as 'long established rules of international law.'[280] Putting aside for present purposes the question whether rules of customary international law on the nationality of corporations are applicable within the framework of the specific provisions of the ECT, the Respondent's submission must in

---

[279] *Military and Paramilitary Activities in and against Nicaragua (Nicaragua v United States of America)*, Jurisdiction and Admissibility [1984] ICJ Rep 392, [54].

[280] Counter-Memorial, [260].

any event be rejected because the rule for which it contends is not a rule of customary international law.

207. The Respondent relies upon the Award of a NAFTA tribunal in the *Loewen* case.[281] To the extent that this case may be said to stand for a broad proposition that, as a matter of customary international law, a claimant must maintain its nationality continuously until the date of the award, the International Law Commission has rejected it. Save in cases where the corporation acquires the nationality of the State against which the claim is brought after presentation of the claim[282] (which was the position in *Loewen,* but is not the case here), the Commission, in its Draft Articles on Diplomatic Protection 2006, adopted the date of presentation of the claim as the final date for the determination of nationality.[283]

208. The Commission expressly disapproved the suggestion in *Loewen* that nationality must be maintained until final resolution of a claim. It decided that it 'was not prepared to follow the *Loewen* tribunal in adopting a blanket rule that nationality must be maintained to the date of resolution of the claim… Instead, preference is given to the date of the official presentation of the claim as the *dies ad quem.*'[284]

209. This Tribunal finds this to be a correct statement of the current position in customary international law. It follows that, even if it were to accept the Respondent's submission that a rule from international custom on nationality should be imported into the construction of the definition of 'Investor' in Article 1(7) ECT, the Respondent's submission must be rejected because customary international law does not support the rule for which it contends.

---

[281] *Loewen v United States of America*, ICSID Case No ARB(AF)/98/3, Award (26 June 2003) **(CL-128)**.

[282] International Law Commission, Draft Articles on Diplomatic Protection with Commentaries [2006] II Pt 2 YBILC 25, Art 10(2).

[283] Ibid, Art 10(1).

[284] Ibid, 32, 39.

## C.   OBJECTION (V): ARTICLE 21 CARVE-OUT

210. The Respondent contests the admissibility of the Claimant's expropriation claims on the basis of a composite act (*see* Section V.A.1(a)). The Respondent submits that the composite act expropriation theory is precluded by the taxation carve-out in Article 21 of the ECT, which excludes taxation measures from its protections. According to the Respondent, the measures referred to by the Claimant to support its expropriation claim are legitimate taxation measures, which fall within the scope of the carve-out.

211. The Claimant disputes that Article 21 precludes the Claimant's claims or the Tribunal's jurisdiction, arguing that Article 21(1) is not an unqualified carve-out and that the acts complained of are not taxation measures. These arguments will be discussed in turn below.

212. The Parties' views in respect of the objection based on Article 21 are summarised below, without prejudice to its proper characterisation as an objection to admissibility or the Tribunal's jurisdiction.

### 1.   The Respondent's position

213. The Respondent claims that the ECT's taxation carve-out in Article 21 precludes the Claimant's composite act theory of expropriation.[285] In the Respondent's view, the term 'taxation measures' in the ECT covers 'the panoply of regulatory activities related to the State's tax regime and the payment of taxes, including tax legislation, enforcement and collection of taxes.'[286] It submits that this interpretation is consistent with the ordinary meaning of the terms 'taxation' and 'measures,' as well as with the ECT's *travaux préparatoires*.[287] According to the Respondent, arbitral tribunals have interpreted the

---

[285] Counter-Memorial, [286]; Rejoinder, [456].

[286] Counter-Memorial, [286].

[287] Counter-Memorial, [286].

term 'taxation measures' broadly and have applied a *prima facie* test when determining whether a taxation carve-out applies to certain measures.[288]

214. The Respondent contends that the allegations used by the Claimant to support its expropriation claim relate to taxation measures under the ECT, as they were taken to implement tax laws and therefore fall within the Article 21 carve-out.[289] The Respondent specifically refers to: (i) charging Yukos Oil with tax liabilities based on re-assessments; (ii) freezing Yukos Oil's assets to forestall payment of the alleged tax claims; (iii) threatening the revocation of Yukos Oil's oil licences; (iv) conducting searches and seizures on Yukos Oil's operations; (v) conducting the seizure and auction of YNG; (vi) conducting bankruptcy proceedings in respect of Yukos Oil; and (vii) auctioning the remainder of Yukos Oil's Russian assets.[290] According to the Respondent, each of these actions was taken to implement tax laws and therefore falls within the Article 21 carve-out.[291]

215. The Respondent submits that Article 21(1) does not require a determination of whether a taxation measure is *bona fide*.[292] It contends that such a determination would be improper given the provision's aim of preserving States' sovereign prerogative to conduct fiscal affairs.[293] In any event, the Respondent submits that the taxation measures were legitimate, as is the basis for its case on the merits.[294]

216. Further, the Respondent contends that the 'claw-back' in Article 21(5)(a) does not apply to the alleged composite expropriation.[295] It distinguishes the term 'taxes' from 'taxation

---

[288] Counter-Memorial, [287].

[289] Counter-Memorial, [290]-[291].

[290] Counter-Memorial, [290].

[291] Counter-Memorial, [291].

[292] Rejoinder, [458]-[461].

[293] Rejoinder, [459].

[294] Rejoinder, [462].

[295] Counter-Memorial, [293]-[296]; Rejoinder, [463]-[465].

measures,' and submits that the difference in wording denotes a difference in scope.[296] 'Taxes,' the Respondent argues, are monetary charges imposed by the State,[297] which does not extend to executive or judicial measures that administer or enforce such monetary charges.[298] To the extent that such an interpretation would create a 'hole' in the legal regime, the Respondent submits that would be a 'hole' that the ECT drafters intended to include.[299] It therefore contends that the actions referred to by the Claimant fall outside the scope of the 'claw-back' provision.[300]

217. In the alternative, the Respondent submits that the Claimant did not follow the referral mechanism established in Article 21(5)(b)(i),[301] contending that the Claimant's failure to refer the matter to the tax authorities renders its composite expropriation claim inadmissible.[302] It argues that the Article's text and relevant jurisprudence make clear that the referral process is mandatory,[303] and contends that the use of the word 'shall' indicates a legally binding obligation.[304] In the event that the Article does contain an exception where the referral to tax authorities would be futile, the Respondent submits that the Claimant has advanced no evidence in this regard.[305]

---

[296] Counter-Memorial, [294]; Rejoinder, [464].

[297] Counter-Memorial, [295].

[298] Counter-Memorial, [295].

[299] Rejoinder, [464]-[465].

[300] Counter-Memorial, [296].

[301] Counter-Memorial, [297]-[300]; Rejoinder, [466]-[472].

[302] Counter-Memorial, [297]-[300]; Rejoinder, [467].

[303] Rejoinder, [467].

[304] Rejoinder, [467].

[305] Rejoinder, [471].

### 2.   The Claimant's position

218. The Claimant disputes that Article 21 precludes the Claimant's claims or the Tribunal's jurisdiction.[306] It argues that Article 21(1) does not provide an absolute, unqualified carve-out from investment protection,[307] that the acts complained of in this case are not 'taxation measures' under Article 21(1),[308] and that, even if they could be classified as such, the 'claw-back' in Article 21(5) would apply.[309]

219. The Claimant submits that Articles 21(3) and 21(5) provide that a tax action falls outside the definition of 'taxation measure' if it is applied in a discriminatory manner, or else is expropriatory or discriminatory.[310] To the Claimant, these exceptions demonstrate that the ECT provides investment protection with regard to taxes and contemplates 'independent oversight' of host-State taxation measures.[311]

220. The Claimant also disputes that the impugned actions constitute 'tax measures' within the meaning of Article 21(1).[312] It argues that a complete analysis must include a factual component—whether the State implemented the taxation measure with the aim of generating revenue to be used for public purposes.[313] If the answer to this question is no, then, in the Claimant's view, the State action is not truly a taxation measure and therefore falls outside the scope of Article 21(1).[314]

---

[306] Reply, [471].

[307] Reply, [471].

[308] Reply, [471].

[309] Reply, [471].

[310] Reply, [474]-[475].

[311] Reply, [475].

[312] Reply, [476]-[490].

[313] Reply, [478].

[314] Reply, [478].

221. According to the Claimant, this interpretation complies with the object and purpose of the ECT to protect and promote investments in the energy sector.[315] It contends that the Respondent's interpretation would allow a State to evade ECT obligations by disguising treaty breaches as taxation measures.[316] In this regard, the Claimant submits that its interpretation is consistent with the good faith requirement in Article 26 of the Vienna Convention on the Law of Treaties,[317] and contends that its interpretation of Article 21 of the ECT has been confirmed by various investment tribunals interpreting that Treaty.[318] The Claimant therefore contends that the Respondent's actions cannot constitute 'taxation measures' within the scope of Article 21(1).[319]

222. In the alternative, the Claimant submits that the 'claw-back' in Article 21(5) applies.[320] First, the Claimant refers to the Respondent's argument that the 'claw-back' applies only to 'taxes' and not to the administration and enforcement of the same.[321] The Claimant argues that this distinction is illogical, since the 'claw-back' concerns expropriation, but tax laws alone, without administration and enforcement, cannot effect an expropriation.[322] It further contends that taxation can constitute an expropriation whether or not it results in the insolvency of the taxpayer.[323]

223. Second, the Claimant submits that there was no need for it to follow the referral mechanism established in Article 21(5)(b)(i).[324] It notes that Article 21(5)(b)(i) provides

---

[315] Reply, [479].

[316] Reply, [479].

[317] Reply, [479].

[318] Reply, [482].

[319] Reply, [484]-[490].

[320] Reply, [491]-[500].

[321] Reply, [493].

[322] Reply, [493].

[323] Reply, [493].

[324] Reply, [494]-[500].

for a tribunal to make a referral to the Competent Taxation Authority if the investor has not,[325] which it contends supports the conclusion that it is implicit that an investor may initiate proceedings without making a prior referral to the Competent Taxation Authority.[326]

224.  Finally, the Claimant submits that Article 21(5) does not require the Tribunal to make a referral where there is no effective remedy.[327] It argues that any reference to the Russian tax authorities would 'undoubtedly have been futile,' given their 'key role… in bringing about the demise of Yukos Oil.'[328] The Claimant also notes that the tribunal in the *Hulley* Final Awards found that any referral to the competent authorities would have been futile because of the volume and complex nature of the material.[329]

### 3.  The Tribunal's analysis

225.  *Taxation Measures.* Article 21 ECT provides in relevant part:

> (1)  Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provisions of the Treaty, this Article shall prevail to the extent of the inconsistency.
>
> …
>
> (5) (a) Article 13 [Expropriation] shall apply to taxes.
>
> (b)  Whenever an issue arises under Article 13, to the extent that it pertains to whether a tax constitutes an expropriation of whether a tax alleged to constitute an expropriation is discriminatory…

---

[325] Reply, [494].

[326] Reply, [494].

[327] Reply, [496]-[500].

[328] Reply, [499].

[329] Reply, [500].

       (i)     The Investor or the Contracting Party alleging expropriation shall refer the issue of whether the tax is an expropriation of whether the tax is discriminatory to the relevant Competent Tax Authority...

       (ii)    The Competent Tax Authorities shall, within a period of six months of such referral, strive to resolve the issues so referred...

       (iv)   Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six month period... lead to a delay of proceedings under Articles 26 and 27.

   (7)    For the purpose of this Article:

   (a)    The term "taxation measure" includes:

       (i)     any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof of a local authority therein; and

       (ii)    any provision relating to taxes of any convention for the avoidance of double taxation or of any other international agreement or arrangement by which the Contracting Party is bound.

226. *Issues.* The Respondent's objection under this head gives rise to four sub-issues:

   (i)     Is the Claimant's right that is here invoked a right 'with respect to Taxation Measures' (including provisions in Russia's domestic tax law or in its Double Taxation Agreements)?

   (ii)    If so, does the exception in Article 21(5) for expropriation claims apply?

   (iii)   If so, was the Claimant obliged to refer its claim to the Respondent's Competent Tax Authorities?

   (iv)   If so, what is the effect, if any, of any failure on its part to do so on the jurisdiction of this Tribunal to determine the present claim?

227. The first of these is a threshold issue. It would only be if the Claimant's claim were properly characterised as a claim with respect to Taxation Measures that it would be necessary to go on to analyse whether the carve-out for expropriation claims applies, and then to consider whether the procedure laid down in the ECT in that event had been complied with and, if not, the consequences for the jurisdiction of the Tribunal. Yet, in

the particular context of the claims advanced in the present case, it is necessary to consider both sets of issues arising under Article 21. The Article must, in any event, be read as a whole in order to determine its object and purpose.

228. *Composite Act.* The Respondent advances its objection to the Tribunal's jurisdiction under this head solely in relation to that element of the Claimant's claim, which the latter refers to as its 'composite act' theory.[330] It does not submit that this objection applies to deprive the Tribunal of jurisdiction to determine the Claimant's claim that its Loans were expropriated in the bankruptcy proceedings. As a result, this objection, if it were accepted, would not apply to the whole of the case, but only to one way in which the Claimant pleads its case.

229. Yet, simply put, the Claimant only has one claim. It has only suffered one loss: the loss of the sums due under its Loans. It does not, and could not, advance a claim for losses suffered by any other person other than itself. Indeed it is fundamental to the Claimant's claim that the Loans constituted *its* distinct investment in an economic activity in Russia. The Tribunal (by majority) accepted in its Interim Award that:

> The Claimant does own an asset constituted by a debt of a company associated with an Economic Activity in the Energy Sector in the Area of the Respondent such that it has made an Investment to which the present dispute with the Respondent relates.[331]

230. Further, the Claimant's claim against the Respondent consists only in an allegation that, by its actions, the Respondent has breached its international obligations to the Claimant under ECT Article 13 (Expropriation) and, secondarily, Article 10 (Promotion, Protection and Treatment of Investments). This gives rise to two causes of action under the Treaty; but it does not alter the subject matter or object of the claim. To be actionable at the suit of the Claimant, the actions of the Respondent must have caused the loss of the Claimant's investment, and not that of anyone else. In the language of Article 21(1), it is the 'rights'

---

[330] Counter-Memorial, [275] *et seq.*

[331] *Dispositif,* Interim Award, [567](2).

343945

of the Claimant and the 'obligations' of the Respondent vis-à-vis the Claimant with which this Tribunal is concerned.

231. For reasons that will be developed more fully when the Tribunal opens its analysis of the merits in Part VI.A below, these elementary points have real consequences for the nature of the Claimant's claim. They mean that the essential gravamen of the claim concerns the actions of the Respondent that allegedly invaded the rights of Yukos Capital vis-à-vis its Loans. This point applies equally to the Claimant's case and to the Respondent's objections.

232. As will be explained further below, the concept of a 'composite act' may conveniently encapsulate a series of acts to be considered together when the Tribunal is assessing whether the Respondent has committed an international delict. But this does not make all of the acts allegedly directed against Yukos Oil *ipso facto* part of a composite act directed against Yukos Capital. That would run counter to the principle that the position of a creditor is legally distinct from that of its debtor. This does not exclude the possibility that the alleged acts of the Respondent were part of a campaign directed against the Claimant as part of the Yukos Group, along with Yukos Oil and other members of the Group. But the purpose of the Tribunal's enquiry will be to determine the relevance of those acts to, and their effect upon, the Claimant.

233. In turn, this point also addresses the Respondent's objection under Article 21. The Claimant does not sue in respect of a Taxation Measure levied by Russia against it. No such charge was imposed. To the extent that its case concerns Taxation Measures, these were imposed upon its parent company, Yukos Oil, which stands in the context of the present claim as its creditor. Those measures are not actionable at the suit of the Claimant. To the extent that they are relevant in the present case, it is not because the Claimant may advance a claim in respect of them: it is only to the extent that they may provide the context for the actions of the Respondent that were directed against Yukos Capital.

234. The consequence is that this is not a claim of the Claimant 'in respect of a Taxation Measure' of the Respondent. The point may be further tested by reference to the procedure contemplated by the Contracting Parties under the Article 21(5) carve-out. This procedure contemplates that, in the first instance, the investor (here Yukos Capital) shall

'refer the issue of whether the tax is an expropriation or whether the tax is discriminatory to the relevant Competent Tax Authority.'[332] These provisions would operate naturally and sensibly in a dispute between the taxpayer and the Tax Authority. But the matters of which the Claimant makes complaint in the present proceedings do not give rise to a claim in respect of its tax liability. It is not possible to see how the Claimant could have been expected to make such a reference, or how vis-à-vis it the Competent Tax Authorities might be expected 'to resolve the issues so referred.'[333]

235. *Expropriation carve-out.* Further, even if the claim were properly to be regarded as 'with respect to Taxation Measures,' the exception for expropriation claims in Article 21(5) applies and is not excluded by the procedure prescribed thereunder.

236. The Claimant's principal claim is that the Respondent has breached Article 13 of the ECT by expropriating the entirety of the sums remaining due under its Loans otherwise than in accordance with the provisions of that Article.

237. The Claimant asserts in addition a claim under Article 10 (Promotion, Protection and Treatment of Investments). However, as will be explained in greater detail in Part VI.A.2 of this Award, the facts and matters upon which the Claimant relies for this alleged cause of action are the same as those pleaded in respect of its Article 13 claim. Moreover, there is, in the circumstances of this case, substantial overlap in the legal elements that would be required to be established for the purpose of Article 10. One of the elements specified in Article 13 for a lawful act of expropriation is that the taking be 'carried out under due process of law.'[334] In its Article 10 claim, the Claimant alleges that the standard 'involves a lack of due process that leads to an outcome which offends judicial propriety.'[335]

238. It would only be if the Tribunal were to reach the view that the claim under Article 13 for expropriation of the investment does not succeed that it would be necessary to consider whether the Article 10 claim might import a different standard of liability for the

---

[332] Art 21(5)(b)(i) ECT.

[333] Art 21(5)(b)(ii) ECT.

[334] Art 13(1)(c) ECT.

[335] Memorial, [361].

determination of loss. In any event it will be necessary to consider the expropriation claim first.

239. This leaves the question whether the operation of the carve-out under Article 21(5) is precluded by the procedural provisions set out thereunder. The Tribunal has already given its principal answer to this above: As the present claim is not in respect of a tax liability of the Claimant, the provisions requiring a reference to the Competent Tax Authority are inapplicable to the Claimant's claim.

240. If, contrary to this conclusion, it were appropriate to examine the conduct of Yukos Oil (the debtor subjected to the tax liability), the record that the Tribunal has examined, and which were analysed in detail in Part III.E, demonstrates that Yukos Oil made multiple attempts to challenge its tax liabilities before the competent Russian tax authorities, which attempts did not succeed.

241. Further and in any event, Article 21(5)(b)(iv) provides that: 'Under no circumstances shall involvement of the Competent Tax Authorities, beyond the end of the six month period… lead to a delay of proceedings under Articles 26 and 27.' As a matter of construction, this provision indicates that the Contracting Parties did not intend that compliance or not with the procedural requirements of Article 21(5) should constitute a bar to resort to arbitration under Article 26.[336] Nor is there any suggestion in the Respondent's case that such resort would have been reasonably available to the Claimant within the prescribed six month period or at all.[337]

242. For the above reasons, the Respondent's objection to jurisdiction under Article 26 must be rejected.

---

[336] Cf. *BG Group Plc v Argentina* 572 US 25 (2014).

[337] *Urbaser SA v Argentina*, ICSID Case No ARB/07/26, Decision on Jurisdiction (19 December 2012) (CL-185).

343945

## V.   LIABILITY AND ILLEGALITY – PARTIES' ARGUMENTS

243. The Claimant's essential case on liability is that the Respondent, through its various actions against it and its parent Yukos Oil, expropriated the Claimant's investment and failed to afford it fair and equitable treatment (**FET**), in breach of the ECT. The Respondent's answer is that such actions were legal and therefore do not amount to expropriation under the ECT, and that the Claimant's investments were illegal under both international and domestic law and are therefore not entitled to protection.

### A.   EXPROPRIATION AND UNFAIR TREATMENT

#### 1.   The Claimant's position

244. The Claimant submits that the Respondent unlawfully expropriated the Claimant's investment, in breach of Article 13(1) of the ECT.[338] Particularly, the Claimant asserts that the Respondent's acts had the effect equivalent to expropriation, and that they: (i) lacked a public interest purpose; (ii) were discriminatory; (iii) disregarded the due process of law; and (iv) lacked payment of prompt, adequate and effective compensation.[339]

245. The Claimant alleges that the Respondent's acts against Yukos Oil and Yukos Capital constitute a composite expropriation of the Claimant's investment, in that the Russian Federation illegally rendered Yukos Oil insolvent through its various actions previously described. It further submits that the Russian judiciary's acts against Yukos Capital during the bankruptcy proceedings establish a separate instance of expropriation, independently capable of meeting the standard under the ECT.[340]

---

[338] Memorial, [316].

[339] Memorial, [318]-[319].

[340] Reply, [18].

### (a)   Expropriation through composite act

246. The Claimant submits that an indirect expropriation occurs when a State 'substantially deprives' an investor of the title, possession or access to the benefit and economic use of its investment.[341] It contends that an indirect expropriation need not result from a single, discrete act, but rather may stem from a 'composite act' comprised of acts that individually may not qualify as an expropriating measure but, in the aggregate, have the effect equivalent to an expropriation.[342]

247. The Claimant contends that the Respondent's acts, in the aggregate, 'mortally affected' Yukos Oil's ability to repay the Loans and therefore deprived the Claimant of the benefit of its investment.[343] In its view, the alleged acts should be considered in the aggregate because 'they are linked so as to converge to the composite result,'[344] and that such composite act constitutes an indirect expropriation.[345]

248. The Claimant submits that Article 13(1) of the ECT contains four conditions for lawful expropriation: (i) a public interest purpose; (ii) non-discrimination; (iii) due process of law; and (iv) prompt, adequate and effective compensation.[346] It elaborates on each of these points separately as set out below.

249. *Public interest purpose.* The Claimant submits that the Respondent's acts did not pursue a purpose in the public interest.[347] According to the Claimant, the Respondent's real goal was not to collect taxes legitimately, but to expropriate Yukos Oil.[348] It contends that the

---

[341] Memorial, [321]-[324].

[342] Memorial, [325]-[326].

[343] Memorial, [327].

[344] Memorial, [328].

[345] Memorial, [320]-[329].

[346] Memorial, [330].

[347] Memorial, [332]-[333].

[348] Memorial, [333].

'virtually cost-free' transfer of a private oil company to a State-owned oil company does not constitute a legitimate public interest,[349] and supports its argument with the contention that the Tax Assessments had no basis in Russian law and were therefore 'wrongful, arbitrary and capricious.'[350]

250. The Claimant further asserts that the Respondent's 'brutal enforcement strategy and refusal to engage with Yukos Oil's settlement offers' show its intent to dismantle Yukos Oil and expropriate its assets.[351] According to the Claimant, the Russian courts and bailiffs worked in tandem to 'ratchet up the alleged tax liabilities' while freezing Yukos Oil's assets and preventing it from discharging those liabilities.[352] The Claimant equally disputes the public interest purpose of the bankruptcy proceedings, which it maintains were a 'sham.'[353]

251. *Non-discrimination*. The Claimant contends that the Respondent's acts were discriminatory.[354] The Claimant maintains, among other allegations, that the Respondent: (i) summarily rejected Yukos Capital's claims but accepted claims from similarly situated creditors in the bankruptcy proceedings; (ii) subjected Yukos-related entities to impossible evidentiary standards while 'rubber-stamping' the claims of Rosneft, the Federal Tax Service and YNG; and (iii) did not allow YNG to renegotiate its tax liability, but allowed Rosneft to acquire YNG, reduce YNG's liability by 80% and restructure payment into a five-year plan.[355] According to the Claimant, these acts, among others,

---

[349] Memorial, [333].

[350] Reply, [68].

[351] Reply, [96]-[111].

[352] Reply, [96].

[353] Reply, [112]-[124].

[354] Memorial, [334]-[335].

[355] Memorial, [334]-[335]; Reply, [296]-[308].

expose the Respondent's discriminatory behaviour towards Yukos Capital and Yukos Oil.[356]

252. The Claimant disputes that the Register of Creditors included a significant number of claims by Yukos-related entities.[357] It submits that 99% of such claims were made by TN,[358] and that the Respondent only included those claims because it knew that Rosneft would acquire them.[359] As for the remaining 1% of Yukos-related claims, the Claimant notes that together they represented a value of only RUB 150 million.[360] The Claimant posits that such claims 'likely slipped through the net while Rosneft and the Federal Tax service were preoccupied with devising spurious grounds to challenge the far more substantial claims of Yukos Capital, Glendale and Vostok Trade, valued at over RUB 140 billion.'[361]

253. *Due process of law.* The Claimant submits that the Respondent's acts violated principles of due process.[362] According to the Claimant, due process requires 'basic legal mechanisms, such as reasonable advance notice, a fair hearing and an unbiased and impartial adjudicator to assess the actions in dispute.'[363] It emphasises that an investor must have a 'reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard.'[364]

---

[356] Memorial, [334]-[335].

[357] Reply, [294]-[295].

[358] Reply, [294].

[359] Reply, [294].

[360] Reply, [295].

[361] Reply, [295].

[362] Memorial, [336]-[338].

[363] Memorial, [337], citing *ADC Affiliate Ltd & Anor v Hungary*, ICSID Case No ARB/03/16, Award (2 October 2006), [435] (CL-1).

[364] Ibid.

254. The Claimant contends that the Respondent's actions 'could not be further away from these standards,'[365] citing *inter alia* the following allegations: (i) improper and illegal raids of Yukos Oil's offices and those of its affiliates, and seizures of their respective property; (ii) document seizures in violation of Russian laws; (iii) failure to provide reasonable timeframes to pay and challenge the tax reassessments; (iv) the sale of YNG; (v) the removal of judges that issued judgments in favour of Yukos-related entities, and the promotion of judges that cooperated with Russian authorities; (vi) the 'rubber stamping' of Rosneft's judicial submissions; (vii) the hasty manner in which proceedings were conducted without giving Yukos-related entities a reasonable opportunity to structure a defence; (viii) the denial of the right to counsel by intimidating and threatening the lawyers for Yukos Oil and Yukos Capital; and (ix) the denial of the Claimant's participation in the Yukos Oil bankruptcy based on unfounded grounds contrary to Russian law.[366]

255. *Compensation.* The Claimant submits that it has not received any compensation from the Russian Federation despite the expropriation of its investment.[367]

256. In response to the Respondent's arguments regarding proximate cause, the Claimant contends that the Respondent's actions were the proximate cause of the Loans' destruction.[368] In the Claimant's view, the standard for proximate causation is whether the actions caused harm within the ambit of Article 13, in light of its purpose.[369] In this regard, the Claimant submits that the purpose of Article 13 is 'to create a climate favourable to the operation of enterprises and to the flow of investments' and the 'best

---

[365] Memorial, [338].

[366] Memorial, [338].

[367] Memorial, [331].

[368] Reply, [313]-[328].

[369] Reply, [315]-[316], citing Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (CUP, 2002), Article 31, [10] (CL-193).

possible access to capital.'[370] In light of such a purpose, the Claimant argues that the destruction of the Loans is a harm within the ambit of Article 13.[371]

257. The Claimant contends that it is well established that an equity investment in a company is expropriated when a State unlawfully takes the company or its assets.[372] It asserts that this conclusion holds for debt investments as well, noting that the ECT makes no distinction between the level of protection provided to debt versus equity.[373] In this regard, the Claimant disputes the Respondent's characterisation of *Petrobart Ltd v Kyrgyz Republic*, being that acts directed at a claimant's debtor are too remote to serve as a basis for an investment treaty claim.[374] The Claimant notes that the tribunal in *Petrobart* was considering the question of breach, not proximate cause or remoteness,[375] and it argues that while the tribunal rejected an expropriation claim, it nevertheless found a breach of the FET standard.[376] In any event, the Claimant argues that *Petrobart* is distinguishable from the present case, because it involved the right to be paid under a sales contract, which, in the Claimant's view, is different from a creditor's rights under a loan agreement.[377]

258. The Claimant also submits that intent is irrelevant to the question of proximate causation, and that it need not demonstrate that the Respondent's actions were directed at the Claimant or its investment.[378] Rather, the Claimant maintains that the test for causation turns on the effect on the investment of the host State's acts, since the requirement that

---

[370] Reply, [319], citing Interim Award, [444].

[371] Reply, [313]-[328].

[372] Reply, [319]-[320], citing Interim Award, [494].

[373] Reply, [319]-[320], citing Interim Award, [494].

[374] Reply, [321].

[375] Reply, [321].

[376] Reply, [321].

[377] Reply, [323].

[378] Reply, [317].

actions be directed at the specific investor would run counter to the ECT's object and purpose of encouraging inward investment in the energy sector.[379] In any event, the Claimant submits that—in light of the actions taken by the Russian Federation against Yukos Oil—it would be implausible to suggest that the Respondent's actions were not directed at the Claimant and its investment.[380]

259.  The Claimant also submits that Russia's actions against Yukos Oil were the factual cause of the Claimant's loss, since Yukos Oil would have remained financially stable and repaid the Loans but for the Tax Assessments.[381] It maintains that even if the corporate profit tax was legal, the VAT taxes constitute an independent factual cause of Yukos Oil's insolvency, because, absent the improper imposition of VAT, Yukos Oil would have been able to pay the corporate profit tax, remain solvent and satisfy its obligations to the Claimant.[382]

### (b)   Judicial expropriation

260.  The Claimant also submits that the Russian judiciary's treatment of Yukos Capital constitutes an independent act of expropriation, as the judgments denying Yukos Capital's claims in the bankruptcy proceedings were improper, discreditable, or manifestly contrary to Russian law.

261.  The Claimant submits that, in order to find judicial expropriation, the Tribunal must find that the State judiciary acted illegally.[383]

262.  The Claimant clarifies that, in its view, it need not demonstrate a denial of justice in order to demonstrate illegal judicial behaviour,[384] but that it need only establish any of the

---

[379] Reply, [317].

[380] Reply, [318].

[381] Reply, [325], [344].

[382] Reply, [344].

[383] Reply, [195]-[200].

[384] Reply, [195].

following: (i) abuse of rights; [385] (ii) arbitrary behaviour; [386] or (iii) disregard for due process. [387] The Claimant contends that all three of these criteria can be satisfied in the present case. [388]

263. With regard to the First Bankruptcy Application, the Claimant contends that:

> ...the Moscow Arbitrazh Court had no grounds whatsoever on which to refuse Yukos Capital's claim: the Notice of Default had been properly delivered and received, there was no 'material change in circumstances' requirement to accelerate the Loans, and even if there was, the court's 'assessment' of the facts was wrong on all accounts. The court's decision, which simply copied verbatim large sections of Federal Tax Service's arguments without independent verification, was baseless, arbitrary and wholly contrary to Russian law. [389]

264. The Claimant submits that its appeal of this decision was unlawfully suspended due to an unrelated investigation that, according to the Claimant, never actually existed. [390] The Claimant adds that its appeal of this suspension was, in its view, summarily rejected without any analysis of Yukos Capital's arguments. [391] The suspension was lifted following Yukos Oil's liquidation, and the Claimant's appeal was rejected as moot. [392]

265. As discussed above, the Claimant alleges that the Russian courts' treatment of its Second Application was equally flawed. [393] According to the Claimant, the Moscow *Arbitrazh* Court made 'ludicrous' and 'illogical' findings based on irrelevant evidence, undertaking

---

[385] Reply, [197], citing *Saipem S.p.A. v Bangladesh*, ICSID Case No ARB/05/07, Award (30 June 2009), [161] **(CL-180)**.

[386] Reply, [198], citing *Karkey Karadeniz Elektrik Uretim A.S. v Pakistan*, ICSID Case No ARB/05/07, Award (22 August 2017), [645], [648] **(CL-169)**.

[387] Reply, [196]-[200].

[388] Reply, [200]-[265].

[389] Reply, [219].

[390] Reply, [220]-[229].

[391] Reply, [230]-[231].

[392] Reply, [232].

[393] Reply, [233]-[244].

'no legal analysis and provid[ing] no legal justification for its decisions.'[394] The Claimant asserts that 'no impartial court' could reach the same conclusion as the Moscow *Arbitrazh* Court, given the same evidence.[395]

266. The Claimant submits that its appeal of this decision was rejected 'in blatant disregard for due process.'[396] The Claimant further contends that 'Mr Rebgun's invalidation proceedings, no doubt initiated as a delaying tactic, prevented any further appeal, again leaving Yukos Capital's claim ultimately unheard.'[397]

267. Moreover, the Claimant submits that it was severely prejudiced in its ability to mount a defence in the bankruptcy proceedings, due to the Russian courts' wilful blindness to the alleged harassment and intimidation of its lawyers, leading to their withdrawal as Yukos Capital's representatives.[398]

268. The Claimant asserts that the above factual contentions demonstrate an abuse of rights, as well as arbitrary decision-making and a violation of due process.[399] It therefore maintains that the Russian courts' behaviour in isolation amounts to a judicial expropriation, but also fits within a wider pattern of conduct in breach of Articles 13 and 10.[400]

269. The Claimant disputes the Respondent's contention that it would not have recovered under its bankruptcy claims even if it had been successful, since the Claimant's claims would have been subordinate to the claims of other eligible creditors and therefore not

---

[394] Reply, [242]-[243].

[395] Reply, [243].

[396] Reply, [245]-[251].

[397] Reply, [258].

[398] Reply, [289].

[399] Reply, [200]-[265].

[400] Reply, [200].

able to be satisfied due to insufficient funds.[401] The Claimant argues that the record of proceedings makes no reference to the subordination principle, and relies on Dr Gladyshev's opinion that a broader interpretation of 'Exception (d)' (by which founders or shareholders of the debtor are excluded from the third priority ranking of claims) would not have been applied by the courts to Yukos Capital at the time of the bankruptcy proceedings.[402]

### (c)   Fair and equitable treatment

270.   The Claimant submits that Russia breached Article 10(1) of the ECT by failing to provide fair and equitable treatment to its investment in Yukos Oil.[403] Specifically, the Claimant asserts that: (i) the Respondent's conduct was grossly unfair, inequitable, capricious and arbitrary and lacked in transparency, procedural propriety and due process; (ii) the Respondent denied justice to the Claimant; and (iii) the Respondent failed to provide a predictable and stable legal framework.[404]

271.   The Claimant clarifies that, in its view, the FET standard in the ECT surpasses the international minimum standard and has a specific legal meaning.[405] It contends that this meaning should be discerned with reference to the ordinary meaning of the terms of Article 10(1) and in the light of their context and purpose.[406] Accordingly, the Claimant submits that in interpreting the FET standard, the Tribunal should consider whether the Russian Federation's conduct was conducive to providing a stable, transparent legal framework for foreign investments in the context of the energy sector.[407]

---

[401] Reply, [266]-[272].

[402] Reply, [266]-[272].

[403] Memorial, [341]-[393].

[404] Memorial, [342]; Reply, [193].

[405] Memorial, [343].

[406] Memorial, [344]-[350].

[407] Memorial, [350].

272. According to the Claimant, investment tribunals have identified protections against unfair State conduct that is: (i) unreasonable, arbitrary, or disproportionate; (ii) lacking in transparency; or (iii) lacking in due process.[408] It asserts that the FET standard protects against State abuses of sovereign power, such as harassment, coercion or unfounded investigations,[409] and maintains that under investment jurisprudence, the composite act principle applies to FET claims.[410]

273. The Claimant submits that there can be 'no serious debate' that a State violates the ECT's FET standard where the State 'exercises its sovereign powers – investigatorial, prosecutorial, regulatory or otherwise – to harass, intimidate, or retaliate against an investor for political purposes.'[411] As set out in relation to its expropriation arguments, the Claimant maintains that the Respondent 'engaged in acts of harassment, intimidation and retaliation for a political purpose designed to crush Claimant's debtor Yukos Oil and all those associated with it, including Claimant and its Investment.'[412] In the Claimant's view, this 'deliberate conspiracy' alone violated Article 10(1).[413]

274. The Claimant also submits that the FET standard protects against conduct that 'involves a lack of due process leading to an outcome which offends judicial propriety.'[414] In this regard, the Claimant makes a number of factual contentions, including allegations of: (i) unlawful seizures; (ii) accelerated proceedings with insufficient time to respond to

---

[408] Memorial, [351].

[409] Memorial, [352].

[410] Memorial, [353]-[356], citing *Compañía de Aguas del Aconquija SA and Vivendi Universal SA v Argentina*, ICSID Case No ARB/97/3, Award (20 August 2007), [7.4.46] (**CL-91**); *Walter Bau AG (in liq) v Thailand*, UNCITRAL, Award (1 July 2009), [9.90], [12.37], [12.43] (**CL-134**); *El Paso Energy International Company v Argentina*, ICSID Case No ARB/03/15, Award (31 October 2011), [515], [518] (**CL-96**). Reply, [194].

[411] Memorial, [358], citing *Tokios Tokelés v Ukraine*, ICSID Case No ARB/02/18, Dissenting Opinion of Daniel M. Price (26 July 2007), [2] (**CL-132**).

[412] Memorial, [360].

[413] Memorial, [360].

[414] Memorial, [361].

evidence; (iii) a rigged auction; (iv) an orchestrated bankruptcy of a solvent company; (v) State harassment of Yukos-related agents and lawyers; and (vi) judicial decisions that were the result of State coercion, corruption and conspiracy.[415] In the Claimant's view, these actions demonstrate a lack of transparency and due process, in violation of the FET standard and the ECT.[416]

275. Similarly, the Claimant submits that the Respondent's actions constituted a denial of justice, which is a separate element of the FET standard.[417] According to the Claimant, a denial of justice takes place when a State's courts: (i) refuse to entertain a valid suit; (ii) subject a case to undue delay; (iii) administer justice in a seriously inadequate way; or (iv) maliciously misapply the law.[418] The Claimant asserts that a denial of justice involves a judicial act that is clearly improper and discreditable, wilfully disregards due process and shocks a sense of juridical propriety.[419]

276. The Claimant maintains that the Russian courts pursued the following actions as part of a State campaign to destroy Yukos and expropriate its assets:[420] (i) adopting verbatim the submissions of Russian tax authorities while failing to consider the evidence and arguments submitted by the Claimant; (ii) accepting submissions by Rosneft, Mr Rebgun and the Russian tax authorities on the day of hearings, thereby denying the Claimant the opportunity to respond; (iii) holding hearings in the absence of Claimant's counsel while knowing that such absence was a result of State harassment and intimidation; (iv) rejecting the Claimant's bankruptcy applications without any critical analysis at the initial or appellate levels; (v) arbitrarily suspending the Claimant's bankruptcy appeals; and (vi) terminating the suspended appeals when the sham Yukos Oil bankruptcy had

---

[415] Memorial, [363]-[374].

[416] Memorial, [377]. *See also* ibid at [363]-[374].

[417] Memorial, [378].

[418] Memorial, [379].

[419] Memorial, [380]-[381]; Reply, [202].

[420] Memorial, [384].

completed.[421] Accordingly, the Claimant submits that these actions, both individually and in the aggregate, demonstrate a denial of justice in violation of Article 10(1).[422]

277. The Claimant also contends that the same actions demonstrate a breach of the effective means requirement in Article 10(12).[423] According to the Claimant, the standard for effective means is similar to, but less demanding than, the denial of justice standard.[424] The Claimant asserts that the standard requires that: (i) the host State establish a proper system of laws and institutions, and (ii) those systems work effectively in any given case.[425] In the Claimant's view, the facts above demonstrate that Russia's systems of laws and institutions 'fell far below this standard.'[426]

278. Referring to Article 10(1)'s express protection against 'unreasonable or discriminatory measures,' the Claimant submits that the Respondent's actions also violated this protection.[427] It contends that this protection is inherent in the FET standard,[428] and prohibits conduct that is arbitrary, grossly unfair, unjust, idiosyncratic or discriminatory.[429] The Claimant asserts that a measure is arbitrary if it is not reasonably related to a rational policy.[430] To the Claimant, the Respondent's alleged campaign to destroy and expropriate Yukos does not constitute a rational policy.[431] The Claimant

---

[421] Memorial, [382]-[383].

[422] Memorial, [385]; Reply, [203], [265].

[423] Memorial, [386]; Reply, [292].

[424] Memorial, [386]; Reply, [292].

[425] Reply, [292].

[426] Reply, [292].

[427] Memorial, [387].

[428] Memorial, [387].

[429] Memorial, [387].

[430] Memorial, [388].

[431] Memorial, [389].

therefore submits that the measures related to that alleged campaign violated Article 10(1)'s prohibition of 'unreasonable and discriminatory measures.'[432]

279.  Finally, the Claimant asserts that the Respondent has breached the FET standard by failing to provide a stable and predictable legal framework for the Claimant's investment.[433] Arguing that FET requires a host State 'to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor…',[434] the Claimant submits that Russia's conduct violated this standard, particularly in the way its tax laws were applied by the tax authorities and its bankruptcy laws were enforced by the Russian courts.[435]

### 2.    The Respondent's position

280.  The Respondent contends that both of the Claimant's theories regarding expropriation—being the composite act theory and the judicial expropriation theory—are misconceived and lack legal or evidentiary basis.[436]

### (a)    Expropriation through composite act

281.  The Respondent advances four objections to the Claimant's composite act theory. The first objection is linked to its claim that the Tribunal has no jurisdiction over the alleged acts because they are taxation measures and are thus excluded by operation of the ECT's taxation carve-out.[437] That objection has already been set out at length above and will not be repeated.[438] The Respondent's remaining objections will be discussed *seriatim* below,

---

[432] Memorial, [390].

[433] Memorial, [391].

[434] Memorial, [392], citing *Técnicas Medioambientales Tecmed SA v Mexico*, ICSID Case No ARB (AF)/00/2, Award (29 May 2003), [154] (**CL-126**).

[435] Memorial, [393].

[436] Counter-Memorial, [274]-[279], [325].

[437] Counter-Memorial, [275].

[438] *See* above at section IV.C.

being: (i) that the Claimant has failed to establish a composite act, both legally and factually;[439] (ii) that the acts directed against Yukos Oil were not a proximate cause of the Claimant's losses;[440] and (iii) that the various acts were not a factual cause of the Claimant's losses.[441]

282. *Legal and factual proof of composite act.* The Respondent submits that the Claimant's composite act theory fundamentally misunderstands the applicable rules of international law, arguing that a 'composite wrongful act' arises where an obligation can only be breached through a series of measures rather than through an individual act.[442] The Respondent therefore contends that the Claimant must show that there are a number of separate acts amounting to an international wrong, but that none of those acts when considered in isolation is expropriatory.[443] In this regard, the Respondent refers to a number of occasions on which the Claimant asserts that an expropriation is made out on the basis of an individual act alone—including in relation to VAT, fines, penalty and enforcement measures, and the refusal to permit the Claimant to participate as a creditor in the bankruptcy proceedings.[444] In the Respondent's view, each of these allegations constitutes a discrete, independent and self-sufficient alleged international wrong and therefore cannot logically form the basis of a composite act expropriation argument.[445]

283. Moreover, the Respondent submits that the Claimant's description of a 'coordinated campaign' within the Russian State meets the definition of a 'conspiracy', and that the Claimant fails to meet the high evidential threshold required for such allegations.[446] It contends that, while the Claimant has avoided characterising its case as a conspiracy, its

---

[439] Rejoinder, [408]-[410].

[440] Counter-Memorial, [276]; Rejoinder, [409]-[410].

[441] Counter-Memorial, [277]; Rejoinder, [409]-[410].

[442] Rejoinder, [417]-[418].

[443] Rejoinder, [418]-[419].

[444] Rejoinder, [421] (citing Reply, [18],[20]-[21]).

[445] Rejoinder, [422].

[446] Rejoinder, [424]-[426].

composite act case clearly amounts to one and the Claimant must therefore prove 'a conscious combination of various agencies of government without justification to defeat the purposes of an investment agreement.'[447]

284. The Respondent also draws attention to the Claimant's contention that the Loans were expropriated when Yukos Oil was struck off the register of companies in 2007,[448] arguing that this is illogical in light of the Claimant's simultaneous contention that the Loans were expropriated in 2006 when Yukos Capital's bankruptcy claims were denied.[449]

285. *Proximate cause.* The Respondent asserts that the Claimant's composite act theory fails because the underlying acts were not directed at the Claimant or the Loans, and therefore have no direct or legally significant link to the claimed losses.[450] It contends that a more substantial nexus between the Respondent's actions and Yukos Oil's bankruptcy is required; in other words, the Claimant has failed to establish causation.[451]

286. The Respondent submits that causation is a necessary element of State responsibility under public international law and the ECT,[452] and that the alleged wrong must directly cause the harm suffered.[453]

287. More specifically, the Respondent argues that acts directed at a claimant's debtor are too remote to give rise to an investment treaty claim.[454] While acknowledging that the ECT includes both debt and equity in its definition of investment, the Respondent submits that

---

[447] Rejoinder, [424]-[426], citing *Waste Management, Inc. v Mexico*, ICSID Case No ARB(AF)/00/3, Award (30 April 2004), [138] (**CL-136**).

[448] Counter-Memorial, [311].

[449] Counter-Memorial, [311]-[312]; Rejoinder, [406]-[407].

[450] Counter-Memorial, [301]; Rejoinder, [428].

[451] Counter-Memorial, [301], [309]; Rejoinder, [428].

[452] Counter-Memorial, [301], citing ARSIWA, [31] (**RL-319**); Rejoinder, [427], [430]-[433].

[453] Rejoinder, [430]-[431].

[454] Counter-Memorial, [303]-[309]; Rejoinder, [434]-[444].

343945

this does not eliminate the distinction between the two.[455] It submits that debt and equity remain separate forms of investment under the ECT since they may need to be treated differently when analysing whether a breach of the Treaty has occurred.[456] The Respondent notes that, unlike equity holders, debt holders are protected by bankruptcy regimes, and therefore it is only if the creditor or its loans have been subjected to some illegal conduct in the course of bankruptcy proceedings that expropriation arguments may arise.[457] The Respondent further asserts that an investor cannot claim for expropriation of debt where the contractual debt continues to exist and the legal characterisation of the obligation to pay has not been altered.[458]

288. The Respondent submits that it 'is similarly untenable for a creditor, such as Claimant, to maintain an expropriation claim solely on the basis that Respondent's actions were a factual predicate of the debtor's bankruptcy. A more substantial *nexus* is required.'[459] For example, the Respondent argues that even *accepting* the Claimant's allegation of discrimination vis-à-vis its investment, this would constitute discrimination against Yukos Oil—not Yukos Capital.[460] Thus, according to the Respondent, there is no legal causation between the discrimination and Yukos Capital's harm.[461]

289. *Factual cause.* The Respondent likewise contends that the impugned actions were not the factual cause of Yukos Oil's bankruptcy.[462] It asserts that the Claimant cannot demonstrate any State actions directed at the Claimant or its investment,[463] and maintains

---

[455] Rejoinder, [436].

[456] Rejoinder, [436].

[457] Rejoinder, [440].

[458] Rejoinder, [441].

[459] Counter-Memorial, [309].

[460] Counter-Memorial, [310].

[461] Counter-Memorial, [310].

[462] Counter-Memorial, [314]-[324]; Rejoinder, [446-455].

[463] Rejoinder, [446].

that there is no proof that it was even aware of the Claimant's existence before the bankruptcy proceedings.[464]

290. Even if the Respondent's actions against Yukos Oil satisfied the requirements of legal causation, it submits that its actions were not a factual cause of the Claimant's harm since the bankruptcy proceedings resulted from the Yukos Group's own allegedly unlawful actions.[465] In this regard, the Respondent argues that the share buyback scheme and the giga-dividend—resulting in a divestment of billions of dollars from Yukos Oil—meant that Yukos Oil did not have sufficient resources to satisfy the demands made pursuant to the Tax Assessments.[466] It therefore argues that Yukos Oil would have properly faced bankruptcy following the Tax Assessments regardless of the enforcement measures later taken by the Russian Federation in respect of them.[467]

291. Furthermore, the Respondent asserts that Yukos Capital could not have recovered under the Loans pursuant to the bankruptcy proceedings.[468] It submits that Yukos Oil faced two possibilities at that point: (i) financial rehabilitation; or (ii) a formal declaration of bankruptcy,[469] and that its creditors voted against rehabilitation and instead chose to liquidate the company.[470] The Respondent therefore submits that the Russian courts rejected Yukos Capital's claims in line with 'fundamental rules and principles of Russian bankruptcy law,'[471] and that the Claimant would not have recovered even if its claims had been accepted in light of the subordination principle.[472] Finally, the Respondent contends

---

[464] Rejoinder, [446].

[465] Counter-Memorial, [314]-[324]; Rejoinder, [447]-[455].

[466] Counter-Memorial, [315]-[318].

[467] Counter-Memorial, [316]-[318].

[468] Counter-Memorial, [321].

[469] Counter-Memorial, [320].

[470] Counter-Memorial, [322].

[471] Counter-Memorial, [322].

[472] Counter-Memorial, [322].

that, even if the Rehabilitation Plan had been chosen, the Claimant would not have been able to recover under the Loans since the financial Rehabilitation Plan envisaged extinguishing inter-company claims such as the Loans.[473]

292. Therefore, the Respondent submits that the Claimant's allegations, even if true, do not establish factual causation.[474]

### (b)   Judicial expropriation

293. The Respondent contests the Claimant's judicial expropriation theory on three grounds. First, it contends that the theory relies on acts taken by Mr Rebgun, Yukos Oil's liquidator,[475] and that his actions are not attributable to the Russian Federation.[476] These arguments are set out along with the Tribunal's analysis, and are therefore not repeated here.[477] Second, the Respondent argues that the Claimant has failed to articulate the 'exacting standard' for investment claims premised upon judicial acts.[478] Third, it submits that the Claimant has failed to meet this standard and demonstrate that the Russian courts violated the ECT.[479] These latter arguments will be addressed below.

294. The Respondent submits that the Claimant must satisfy an 'exceedingly high legal standard' in order to establish judicial misconduct.[480] The Respondent relies on a number of international authorities to submit that, as a corollary of the presumption of regularity that applies to the conduct of judicial bodies of sovereign States, only gross or manifest instances of injustice are sufficient to found an international law claim based on alleged

---

[473] Counter-Memorial, [323]-[324].

[474] Counter-Memorial, [316]-[318].

[475] Counter-Memorial, [325]-[336].

[476] Counter-Memorial, [325]-[336].

[477] *See* below, [437]-[439].

[478] Counter-Memorial, [337]-[344].

[479] Counter-Memorial, [345]-[413].

[480] Counter-Memorial, [337]-[344]; Rejoinder, [475]-[476].

judicial misconduct.[481] It submits that denial of justice claims must be premised upon a systemic failure of the State's judicial system, as opposed to individual judicial decisions, and that even a substantial error does not generally rise to the level of international responsibility in international investment cases.[482] Otherwise, the Respondent submits that the Tribunal would be at risk of inappropriately substituting its own views for those of the Russian courts on matters of Russian law.[483]

295. The Respondent further submits that allegations of grave judicial impropriety, such as corruption, are subject to a particularly high standard.[484] It advocates for a standard of clear and convincing evidence when approaching allegations of criminal conduct, since 'the graver the charge the more confidence must there be in the evidence relied on.'[485]

296. Turning to the allegations made by the Claimant in the present case, the Respondent submits that such acts do not meet the exacting standard set out above for judicial expropriation.[486] Specifically, the Respondent contends that the Claimant has failed to establish its allegations that the Russian judiciary: (i) behaved corruptly; (ii) participated in a conspiracy to frustrate the Claimant's bankruptcy claims; (iii) illegally denied the Claimant's bankruptcy claims; (iv) subjected the Claimant to discriminatory treatment in the bankruptcy proceedings; (v) violated principles of due process; or (vi) unduly interfered with the Claimant's lawyers or their ability to present their case.[487] According to the Respondent, the Claimant 'relies on a factual narrative which is one-sided, incomplete, replete with omissions, and deliberately misleading,'[488] maintaining that the

---

[481] Counter-Memorial, [338]; Rejoinder, [475].

[482] Counter-Memorial, [338]-[341]; Rejoinder, [475](c).

[483] Counter-Memorial, [343].

[484] Counter-Memorial, [344]; Rejoinder, [475]-[476].

[485] Counter-Memorial, [344], citing *Oil Platforms (Iran v United States of America)* [2006] ICJ Rep 225 (6 November 2003), Separate Opinion of Judge Higgins, [33] (**RL-416**); Rejoinder, [475]-[476].

[486] Counter-Memorial, [345]-[413]; Rejoinder, [477]-[488].

[487] Counter-Memorial, [345]-[413].

[488] Counter-Memorial, [345].

factual record does not support the Claimant's contentions.[489] The Respondent makes specific submissions in relation to each of the Claimant's contentions, as set out below.

297. First, in relation to the Claimant's allegation that the Russian judiciary behaved corruptly, the Respondent contends that the Claimant has failed to present any admissible or persuasive evidence in this regard.[490] Rather than applying the presumption of regularity, which the Respondent submits is well established in decisions of Dutch courts in other Yukos-related matters and investment treaty jurisprudence, the Respondent argues that the Claimant effectively imposes a presumption of irregularity on the Russian legal system.[491] The Respondent opposes this approach and maintains that specific judicial decisions may only be discredited in light of clear, convincing and conclusive evidence of corruption.[492]

298. Second, the Respondent submits that the Claimant has failed to establish a conspiracy between the Russian judiciary and executive during the bankruptcy proceedings.[493] It argues that there is nothing suspicious about the fact that the Claimant's claim was opposed by other existing creditors, as it was in accordance with their commercial best interest due to the impact it would have had on their entitlements to Yukos Oil's assets.[494] Moreover, the Respondent disputes that evidence of conspiracy can be found in the verbatim adoption of the submissions of the Russian tax authorities, as this is common practice within Russia for efficiency reasons and is adopted by Russia's highest

---

[489] Counter-Memorial, [345].

[490] Counter-Memorial, [347]; Rejoinder, [486]-[487].

[491] Counter-Memorial, [349], [354]; Rejoinder, [486]-[487].

[492] Counter-Memorial, [354]; Rejoinder, [486]-[487].

[493] Counter-Memorial, [356]-[364].

[494] Counter-Memorial, [357]-[358].

commercial court.[495] The Respondent therefore disputes that this practice demonstrates that the impugned judgments evidenced bad faith or bias.[496]

299.  Third, the Respondent contends that the Claimant has failed to establish that the Russian judiciary acted illegally by denying Yukos Capital's bankruptcy claims.[497] In this regard the Respondent relies on Professor Zaitsev's expert report, which concludes that the courts were fully entitled to reject the claims as a matter of Russian law and on the basis of the evidence before them.[498] The Respondent therefore argues that the courts' rulings had 'ample basis' and thus fall short of the standard that the Claimant must meet.[499] Further, the Respondent argues that even if Yukos Capital's bankruptcy claims had been accepted, they would have been subordinated and thus would not have yielded recovery.[500]

300.  Fourth, the Respondent submits that the Claimant has failed to establish discriminatory treatment in the bankruptcy proceedings.[501] It opposes the Claimant's assertion that the courts rejected the claims of entities related to Yukos Oil but 'rubber stamped' those of Rosneft and YNG,[502] arguing that the bankruptcy courts: (i) accepted a significant number of claims by Yukos-related entities;[503] (ii) 'clearly justified' their denial of other

---

[495] Counter-Memorial, [360]-[362].

[496] Counter-Memorial, [363]-[364].

[497] Counter-Memorial, [365]-[376]; Rejoinder, [478]-[481].

[498] Counter-Memorial, [365]. *See also* ibid at [366]-[375].

[499] Counter-Memorial, [376]; Rejoinder, [481].

[500] Counter-Memorial, [378].

[501] Counter-Memorial, [379]-[387].

[502] Counter-Memorial, [379].

[503] Counter-Memorial, [380].

claims by Yukos-related entities;[504] (iii) appropriately assessed evidentiary questions;[505] and (iv) rejected some of the claims submitted by the Federal Tax Service and YNG.[506]

301. Fifth, the Respondent maintains that the Claimant has failed to establish any procedural defects in the bankruptcy proceedings.[507] In the Respondent's view, Yukos Capital had 'ample opportunity' to present its case and made extensive, repeated submissions to the courts.[508] The Respondent asserts that the Claimant was duly notified of the time and place of court hearings and presented its case at many of them.[509] Additionally, the Respondent notes that the bankruptcy court granted the Claimant's extension application in the face of Rosneft's opposition.[510] Moreover, the Respondent disputes that the court was 'determined to proceed' when Yukos Capital failed to secure representation.[511] According to the Respondent, it was the Claimant that requested the court to proceed in the absence of its counsel.[512]

302. Sixth and finally, the Respondent opposes the claim that it harassed the Claimant's lawyers or otherwise undermined their ability to present their case.[513] According to the Respondent, international law recognises the 'fundamental prerogative right and duty of States' to conduct criminal investigations.[514] It submits that its investigation into Yukos Capital and its lawyers was connected to a legitimate investigation into an 'elaborate

---

[504] Counter-Memorial, [381].

[505] Counter-Memorial, [382]-[384].

[506] Counter-Memorial, [385]-[387].

[507] Counter-Memorial, [388]-[391]; Rejoinder, [482]-[485].

[508] Counter-Memorial, [389]; Rejoinder, [483].

[509] Counter-Memorial, [389]; Rejoinder, [483].

[510] Counter-Memorial, [389]; Rejoinder, [483].

[511] Counter-Memorial, [391].

[512] Counter-Memorial, [390]-[391].

[513] Counter-Memorial, [392]-[412]; Rejoinder, [482].

[514] Counter-Memorial, [393].

money laundering and tax evasion scheme,'[515] and that the resulting searches and seizures were fully consistent with Russian law, as were the interviews of the Claimant's lawyers.[516] Moreover, the Respondent contends that Yukos Capital has failed to establish that the Russian Federation's investigation prevented it from presenting its case.[517] The Respondent submits that: (i) a letter between Yukos Capital and its attorneys suggests that only copies of materials were seized;[518] and (ii) the record is 'unclear' as to why Yukos Capital's lawyer resigned and why the Claimant decided to proceed unrepresented in the Second Bankruptcy Application.[519] In the Respondent's view, the Claimant's lack of counsel at that stage, without more, cannot amount to a treaty breach.[520]

### (c)  Fair and equitable treatment

303. The Respondent raises the same defences against the Claimant's FET claim as it does against the expropriation claim. First, the Respondent opposes the Claimant's main factual claim and the contentions that comprise it: Russia discriminated against the Claimant and its investment and disregarded due process norms in furtherance of a State-wide campaign to transfer Yukos-related assets to the State and State-related entities.

304. Second, the Respondent submits that the Claimant has failed to establish that the impugned acts were the proximate and factual cause of the Claimant's loss. This argument, summarised under expropriation, applies equally to the Claimant's FET claim.

305. Third and finally, the Respondent maintains that the Claimant has failed to meet the 'exacting' standard required to demonstrate judicial misconduct. Therefore, the

---

[515] Counter-Memorial, [394]-[395].

[516] Counter-Memorial, [396]-[402].

[517] Counter-Memorial, [403]-[412].

[518] Counter-Memorial, [412].

[519] Counter-Memorial, [403]-[404]; Rejoinder, [482].

[520] Counter-Memorial, [405].

Respondent contests the Claimant's denial of justice and effective means claims, as well as the FET claim insofar as it implicates judicial behaviour.

## B.   LEGALITY OF 'INVESTMENTS'

### 1.   The Respondent's position

306. The Respondent contends that the Claimant's investments are illegal under domestic and international law, and therefore do not qualify as protected investments under the ECT.[521] It alleges that the Claimant and the Loans were an integral part of a criminal enterprise used for money laundering and tax evasion and are therefore outside the Tribunal's jurisdiction.[522]

307. Specifically, the Respondent argues that: (i) the Loans are void under Russian and New York law; (ii) the Claimant's investments were illegal, and illegal investments are not protected under the ECT and international law; (iii) the Claimant's 'unclean hands' preclude protection under the ECT and international law; and (iv) the Claimant's investments violate international public policy.

### (a)   Legality of the investments under domestic law

308. The Respondent contends that Claimant's Loans were void *ab initio* under both Russian law and New York law, and therefore do not qualify as investments under Article 1(6) of the ECT.[523] It submits that if the Loans are objectively void as a matter of law, this is a jurisdictional matter unaffected by whether the Respondent has previously raised these arguments during the bankruptcy proceedings or elsewhere.[524]

309. Beginning with Russian law, the Respondent first submits that the Loans contravened the legal prohibitions on abuse of right and bad faith transactions in Articles 10 and 168 of

---

[521] Counter-Memorial, [174](a); Rejoinder, [293]-[300].

[522] Counter-Memorial, [175].

[523] Counter-Memorial, [174](b).

[524] Rejoinder, [367]-[368].

the Russian Civil Code because they facilitated the transfer of illegal proceeds.[525] It contends that a Russian court would not hesitate to invalidate a transaction made for the purpose of laundering funds accumulated as a result of unlawful tax evasion, and characterise it as a 'bad faith' transaction for the purposes of Articles 10 and 168 of the Civil Code.[526] In this sense, the Respondent argues that these provisions provide for a 'good faith taxpayer' doctrine under Russian law.[527] The Respondent also contends that the Loans contravene these provisions because they violate the fundamental principle of Russian law prohibiting arbitrary interference by a party with the exercise of free rights of its contractual counterparty.[528] In this respect, the Respondent argues that the loan decisions were imposed on Yukos Capital by the Russian Yukos Group directors,[529] and that the Loans did not confer any conceivable 'benefit' to Yukos Oil; only to Group Menatep Ltd (**Group Menatep**), and Yukos Capital.[530]

310.  The Respondent then submits that the Loans were a 'mere façade' executed to disguise and facilitate illegal tax evasion and money laundering, and therefore constituted 'sham' or 'mock' transactions invalid under Article 170 of the Russian Civil Code.[531] The Respondent contends that the Loans were made for appearance purposes only, and that if it is proved that funds were provided by Yukos Capital for some economic purpose other than the genuine provision of credit on commercial terms, such as the payment of a large dividend to Yukos Oil's majority shareholders, then the Loans must be considered void 'sham' and 'mock' transactions.[532] It further submits that an alternative purpose for the

---

[525] Counter-Memorial, [202]-[204], [210].

[526] Counter-Memorial, [204]-[205].

[527] Counter-Memorial, [205].

[528] Counter-Memorial, [207].

[529] Counter-Memorial, [208].

[530] Counter-Memorial, [209].

[531] Counter-Memorial, [202], [213]-[214].

[532] Counter-Memorial, [215]-[217].

Loans could have been to allow Yukos Oil later to claim its own funds in the bankruptcy proceedings through Yukos Capital as the formal creditor.[533]

311. Turning to New York law, the Respondent submits that contracts made for an illegal purpose or contrary to public policy are void and unenforceable thereunder.[534] It contends that courts applying New York law have refused to enforce contracts made for the purpose of avoiding New York law or foreign taxes,[535] or where the subject of the contract is the proceeds or fruit of crime.[536] It further submits that fraudulent contracts are also void and unenforceable under New York law, and refers to the use by courts of 'badges of fraud' to determine whether a contract was motivated by fraudulent intent.[537] In the present case, the Respondent submits that these are: (i) the fact that the Claimant is a mere shell company controlled by the 'Yukos Oligarchs'; (ii) the Loans are structured as non-recourse agreements; (iii) that the loan agreements did not state the purpose of the Loans; (iv) that no security or collateral was provided against the Loans; (v) that the Loans were part of a series of back-to-back loan arrangements; and (vi) that the Loans did not reflect commercial reality and lacked economic substance.[538] On this basis, the Respondent claims that the Loans are unenforceable under New York Law.

---

[533] Counter-Memorial, [218].

[534] Counter-Memorial, [220].

[535] Counter-Memorial, [222]; citing *Nameh v Muratex Corp*, 34 F App'x 808, 810 (2d Cir 2002), 810 (**RL-344**); *Comprehensive Habilitation Services, Inc v Commerce Funding Corp*, No 05 CIV 9640 (PKL) (7 April 2009) (**RL-270**); *Sabia v Mattituck Inlet Marina and Shipyard, Inc*, 24 AD 3d 178 (2005) at 179 (**RL-369**); *Parpal Rest, Inc v Robert Martin Co*, 258 AD 2d 572 (2017) at 573 (**RL-355**).

[536] Counter-Memorial, [223]; citing *McConnell v Commonwealth Pictures Corp*, 7 NY 2d 465 (1960) at 469-470 (**RL-338**).

[537] Counter-Memorial, [225]; citing *Wallstreet Associates v Brodsky*, 257 AD 2d 526 (NY App Div 1999), 529 (**RL-393**).

[538] Counter-Memorial, [226].

### (b)   Legality of the investment under international law

312.   The Respondent submits that an investment must be 'made in accordance with law' in order to benefit from ECT protection,[539] and that this is a principle of general international law that applies even in the absence of explicit treaty text.[540] It contends that the ECT must be interpreted in good faith in accordance with the ordinary meaning of its terms in their context and in light of its object and purpose.[541] In this regard, it points to the reference, in the introductory note, to the ECT's fundamental aim, being 'to strengthen the rule of law on energy issues,' and argues that the ECT should therefore be interpreted in a way that encourages respect for the rule of law.[542] The Respondent contends that the ECT's legality requirement is not constrained to infringements of the host State's criminal law, but extends to international law and other relevant national laws.[543]

313.   The Respondent submits that the Loans were not made in accordance with law, and are therefore not protected by the ECT.[544] In light of what it terms the extensive and cross-border nature of the criminal activity in this case, the Respondent submits that the Loans are contrary to international law, international public policy and the national laws of both Russia and other relevant implicated jurisdictions.[545] It refers to its allegations of 'treaty abuse, tax evasion and wide-scale money laundering' on the part of the Claimant, and contends that such unlawful conduct cannot be viewed as minor or trivial so as to not engage the legality requirement as argued by the Claimant.[546] It also submits that the

---

[539] Counter-Memorial, [176].

[540] Counter-Memorial, [178]-[179]; Rejoinder, [293]-[295], citing *Plama Consortium Ltd v Bulgaria*, ICSID Case No ARB/03/24, Award (27 August 2008), [138] **(RL-89)**; *Gustav F W Hamester GmbH & Co KG v Ghana*, ICSID Case No ARB/07/24, Award (18 June 2010), [123] **(RL-310)**.

[541] Counter-Memorial, [177].

[542] Counter-Memorial, [177].

[543] Rejoinder, [299].

[544] Counter-Memorial, [180].

[545] Rejoinder, [299].

[546] Rejoinder, [297].

illegality of the Loans arises as from their inception, since they were designed with the above illegal purposes in mind.[547]

314. The Respondent contends that the applicable standard of proof in relation to this jurisdictional objection is the 'balance of probabilities' or the 'preponderance of evidence', even where allegations of serious criminal misconduct are made.[548] It argues that, given the covert nature of the alleged crimes (tax evasion and money laundering), a case will generally depend on an accumulation of circumstantial evidence.[549] It submits that the evidence in the present case raises a number of 'red flags', and that the Tribunal should give significant weight to the fact that the Claimant is either unwilling or unable to answer the serious questions that consequently arise.[550]

315. With respect to its specific allegations of illegality, the Respondent contends that the Loans were: (i) an instrument of abuse of the Luxembourg-Russia Double-Tax Agreement (the **Luxembourg DTA**) giving rise to criminal tax evasion under Russian law; and (ii) the proceeds of a scheme of criminal tax evasion under Russian criminal law and money laundering, which the Respondent termed 'the Laundromat.'[551]

316. *Abuse of the Luxembourg DTA.* First, the Respondent contends that the Loans constituted an abuse of the Luxembourg DTA on the basis that the Claimant structured the Loans to claim improperly such benefits of the Luxembourg DTA and avoid paying Russian taxes.[552] It submits that a proper construction of the Luxembourg DTA requires that Yukos Capital be the beneficial owner of the relevant income,[553] and that the Claimant

---

[547] Rejoinder, [298].

[548] Rejoinder, [302].

[549] Rejoinder, [303]; *Unión Fenosa Gas, SA v Egypt*, ICSID Case No ARB/14/4, Award (31 August 2018), [7.52] (**RL-481**).

[550] Rejoinder, [303]-[304].

[551] Rejoinder, [306].

[552] Rejoinder, [307].

[553] Rejoinder, [309]; Danon 2, [93]-[109].

does not satisfy the meaning of beneficial ownership under the substance-over-form approach required by international law.[554] As to the Claimant's permanent establishment in Russia, the Respondent submits that this is a factual question answered by the evidence demonstrating the management and control of Yukos Capital from Moscow by Yukos Group executives.[555] Finally, the Respondent submits that the non-pursuit of other Russian companies using the Luxembourg DTA in the same manner as the Claimant is not relevant to the question of the illegality of the Claimant's behaviour.[556]

317. The Respondent submits that all three elements of the crime of tax evasion under Russian law have been satisfied by the Claimant's alleged abuse of the Luxembourg DTA.[557] The Respondent relies on the evidence of Professor Esakov to argue that tax evasion under Russian law has three elements: (i) non-payment of due taxes; (ii) failure to submit a tax declaration or other required document, or knowingly including false information in such documents; and (iii) non-payment of taxes on a large scale.[558] Focusing primarily on the second element, the Respondent contends that Yukos Capital and Yukos Oil made false representations on tax declarations by stating that they were entitled to obtain the benefits under the Luxembourg DTA, in circumstances where they knew they were not entitled to such benefits.[559]

318. The Respondent also submits that the Loans in and of themselves were impermissible State Aid under EU law.[560] It contends that the Luxembourg tax authorities had applied a 'safe harbour' rule to the Loans later determined illegal by the European Commission,[561] and that despite the illegality ruling Yukos Capital was able to obtain two Advance Tax

---

[554] Rejoinder, [310].

[555] Rejoinder, [311].

[556] Rejoinder, [312].

[557] Rejoinder, [317].

[558] Rejoinder, [317]; Esakov 1, [46]; Esakov 2, [11].

[559] Rejoinder, [318].

[560] Counter-Memorial, [172]-[173].

[561] Counter-Memorial, [173].

Agreements (**ATAs**) for the Loans which validated a cost-plus margin of less than half the lowest rate permitted under the rule.[562] It submits that no effort was made to check whether the Loans corresponded to the economic reality of the underlying services, and therefore the Loans benefitted from impermissible State Aid and were thus contrary to law.[563]

319. *The 'Laundromat'*. Further or alternatively, the Respondent contends that the Loans were the proceeds of a criminal scheme of tax evasion and money-laundering scheme within the Yukos Group, which it terms the 'Laundromat.'[564] Under this head, the Respondent relies upon its allegations of:

    (i)      Illegal acts in the privatisation of Yukos in 1995;[565]

    (ii)     Onshore tax evasion using 'Closed Administrative-Territorial Formations' or '**ZATOs**';[566]

    (iii)    Onshore tax evasion using LTR Subsidiaries in other low-tax regions, notably in this case, Fargoil and Ratibor;[567]

    (iv)    Offshore tax evasion through abuse of the Cyprus-Russia Double-Tax Agreement (the **Cyprus DTA**); and finally (as already detailed),

    (v)    Offshore tax evasion through abuse of the Luxembourg DTA.

320. Relying on the evidence of Professor Pieth, the Respondent submits that the general international consensus reveals two key elements of money laundering: (i) a predicate criminal offence from which the funds or other property derives; and (ii) the act of

---

[562] Counter-Memorial, [173].

[563] Counter-Memorial, [173].

[564] Counter-Memorial, [27]-[173]; Rejoinder, [29]-[106]; T10/2156/22–2162/4.

[565] Counter-Memorial, [27]-[47].

[566] Counter-Memorial, [59]; Batsiev 1, [72]-[92].

[567] Counter-Memorial, [62]-[70]; *see* the diagram above at [104].

laundering itself (*i.e.* the transfer or concealment of the proceeds of crime by knowing persons).[568] In relation to (i), the Respondent contends that the predicate offences in the present case, for which no conviction is formally required,[569] include the corruption and bribery of public officials in the privatisation of Yukos Oil, fraud, and both onshore and offshore tax evasion.[570] As to (ii), the Respondent argues that there are a number of 'red flags' signalling that money laundering has occurred in the present case, including the use of slush funds, trusts, shell companies, tax havens and frequent restructurings, liquidations and name changes.[571] On this basis, the Respondent submits that the Loans were an instrument of money laundering, and therefore an instrument of illegality not entitled to the protections extended by the ECT.[572]

(c)  **Clean hands**

321.  The Respondent alternatively submits that the Claimant's claims should be precluded because it comes to the Tribunal with 'unclean hands' by engaging in abusive and wrongful conduct.[573] It submits that the clean hands doctrine has been widely recognised and applied in international law, including by arbitral tribunals as a basis to decline to exercise jurisdiction.[574] The Respondent submits that since the Russian Federation's acts forming the basis of the Claimant's claims were intended to address the Claimant's own

---

[568] Counter-Memorial, [122]; Rejoinder, [321]; Pieth 1, [8], [23]-[34].

[569] Rejoinder, [338]-[341].

[570] Counter-Memorial, [124]. *See also* ibid at [125]-[141]; Rejoinder, [323]-[337].

[571] Counter-Memorial, [142]-[171].

[572] *See* Rejoinder, [344].

[573] Counter-Memorial, [181]; Rejoinder, [345].

[574] Counter-Memorial, [182]-[184], citing *Spentex Netherlands BV v Uzbekistan*, ICSID Case No ARB/13/26, Award (not public) (27 December 2016), [819], as cited in K Betz, *Proving Bribery, Fraud and Money Laundering in International Arbitration* (Cambridge UP, 2017), 130-131 (**RL-254**); *Plama Consortium Ltd v Bulgaria*, ICSID Case No ARB/03/24, Award (27 August 2008), [143]-[146] (**RL-89**); *Hesham Talaat M. Al-Warraq v Indonesia*, Final Award (15 December 2014), [647] (**RL-311**); *Churchill Mining and Planet Mining Pty Ltd v Indonesia*, ICSID Case No ARB/12/14 and 12/40, Award (6 December 2016), [528] (**RL-268**). Rejoinder, [345].

illegal actions, the clean hands principle squarely applies to both Yukos Capital and the Loans.[575]

322.  The Respondent further submits that the Tribunal should reject the Claimant's suggestion that the application of the clean hands doctrine is restricted to continuing violations.[576] It argues that the application of the clean hands doctrine in international disputes where a continuing violation was occurring does not limit the application of the principle to other scenarios,[577] and submits that the principle underpinning the clean hands doctrine (that he who seeks equity must do equity) can apply in investment treaty disputes where damages are sought, rather than be protection against a continuing violation.[578]

### (d)   International public policy

323.  The Respondent submits that the Loans violate international public policy because they were advanced both to launder the proceeds of crime and to evade taxes.[579] It contends that it is well-established that claims arising from investments that violate international public policy cannot benefit from protections offered by international investment treaties.[580] Noting that investment tribunals have previously identified a rule of international public policy prohibiting corruption and bribery,[581] the Respondent submits that such rule also extends to tax evasion and money laundering since those crimes are the focus of the same anti-corruption treaties that formed the basis for the rule in relation to corruption and bribery.[582]

---

[575] Counter-Memorial, [185].

[576] Rejoinder, [349].

[577] Rejoinder, [350]-[351].

[578] Rejoinder, [351]-[352].

[579] Counter-Memorial, [188]; Rejoinder, [364].

[580] Counter-Memorial, [187]; Rejoinder, [354].

[581] Counter-Memorial, [188]; Rejoinder, [355].

[582] Counter-Memorial, [188].

324. First, the Respondent contends that there is an international public policy against tax evasion, noting that tax evasion has severe consequences for the international community and is against the international legal order.[583] It contends that a rule of international public policy against tax evasion can be established through an examination of State and international practice, and is not precluded by the absence of a formal 'international criminal tax law.'[584] In this regard, the Respondent submits that combating tax evasion has become a pressing priority at the national and international levels,[585] and highlights the criminalisation of and serious sanctions imposed for tax offences in numerous domestic jurisdictions.[586] The Respondent further argues that the relevant period for assessing a rule of international public policy is the time of adjudication, not the time of the acts in question, as public policy is a mandatory imperative binding on a tribunal in the present.[587]

325. Second, the Respondent argues that there is a clear emergence of an international public policy against money laundering,[588] noting that this is not disputed by the Claimant.[589] It contends that money laundering has serious and wide-ranging consequences, and that it amounts to a threat to the integrity of the world's banking system.[590] It submits that the detection and prevention of money laundering is a priority at both the national and international levels, and that such developments demonstrate the emergence of international public policy in this regard.[591]

---

[583] Counter-Memorial, [188].

[584] Rejoinder, [361]-[362].

[585] Counter-Memorial, [189]-[192].

[586] Counter-Memorial, [193].

[587] Rejoinder, [363].

[588] Counter-Memorial, [194]-[199].

[589] Rejoinder, [360].

[590] Counter-Memorial, [195]-[196].

[591] Counter-Memorial, [198]-[199].

326. Finally, the Respondent contends that the application of international public policy is not contingent on the establishment of criminal conduct under any particular domestic law, as that would render the international public policy defence otiose.[592] It argues that it would be unprincipled for a tribunal to endorse conduct contrary to an established international legal consensus simply because the law of the host State did not at the relevant time proscribe the conduct in question.[593]

### 2.   The Claimant's position

327. The Claimant submits that the Respondent's jurisdictional objection on illegality grounds cannot succeed. It contends that the Respondent's arguments are undermined by its assumption that the crimes of tax evasion and money laundering have been committed,[594] submitting that there is no underlying criminal conduct or similar behaviour that could form the basis for the Respondent's objection.[595] In any event, the Claimant makes specific submissions in relation to the legality of the investment, the clean hands doctrine and international public policy, which are set out below.

### (a)   Legality of the investments under domestic law

328. The Claimant submits that the transactions were not 'mock' or 'sham' transactions under Russian law. In addition to its general submissions regarding the overall legality of the Yukos Oil arrangement, the Claimant contends that there is no evidence of any lack of intent on the part of the trading companies and Yukos Oil to create the legal consequences entailed by the oil sale contracts.[596] It argues that the Russian Tax Ministry had the opportunity to challenge both the eligibility of the trading companies for the preferences

---

[592] Rejoinder, [357]-[359].

[593] Rejoinder, [358].

[594] Reply, [354]-[357].

[595] Reply, [363].

[596] Reply, [65].

claimed and the transfer pricing used in the relevant transactions, but submits that the Respondent chose not to do so.[597]

329.  The Claimant further submits that the assessment of good faith under the Russian Civil Code relates only to the relationship between the taxpayer and its business counterparty, not between a taxpayer and the State.[598] It therefore contends, drawing support from the authorities cited by the Respondent, that Articles 168-170 of the Russian Civil Code do not serve as useful tools for the tax authorities, since the Civil Code concept of good faith as between civil parties does not apply outside that context—for example, in Russian tax law (between taxpayers and the State).[599] It therefore rejects the concept of a 'good faith taxpayer' doctrine, and submits that any reference to good faith in the taxation context has no relation to civil law good faith.[600]

330.  The Claimant also contends that it is striking that the Respondent has never before made the submission that the Loans were void *ab initio* or were sham or mock transactions under Articles 10, 168 or 170 of the Russian Civil Code.[601] It points out that there was no reference to these provisions in the 2000 Tax Assessment or in the court decisions that upheld it.[602]

### (b)   Legality of the investment under the ECT

331.  The Claimant first notes the absence of an express legality requirement in the ECT, and argues that a number of ECT tribunals have rejected the argument that such a requirement should be read into the Treaty.[603] While maintaining its general submission that there is

---

[597] Reply, [66].

[598] Reply, [55]-[57].

[599] Reply, [58]-[62].

[600] Reply, [63]-[64].

[601] Reply, [258].

[602] Reply, [65].

[603] Reply, [363].

no illegality present in this case, the Claimant contends that the language of the ECT suggests a bar to Respondent's illegality defence as a matter of jurisdiction.[604] Further, the Claimant submits that the question of illegality applies only at the time of the making of the investment, and not to subsequent actions during the performance of the investment.[605]

332.  The Claimant also submits that the Respondent bears a 'particularly heavy' burden of proof in relation to an admissibility defence based on illegality.[606] While not defining the precise standard to be applied in the present case, the Claimant notes that some tribunals have applied standards higher than the balance of probabilities, such as 'reasonable certainty' or 'clear and convincing evidence.'[607] The Claimant submits that, whatever the standard is, the Respondent has failed to meet it in this case.[608]

333.  With reference to its general submission that the Yukos Oil arrangement was not illegal, the Claimant addresses the following allegations made by the Respondent in turn: (i) alleged onshore tax evasion; (ii) alleged offshore tax evasion; (iii) alleged abuse of the Luxembourg DTA and EU State Aid rules; (iv) *mens rea* with respect to the alleged money laundering scheme; and (v) the absence of a connection between the Loans and the privatisation of Yukos Oil.[609]

334.  *Onshore tax evasion.* The Claimant submits that there is no legal basis for the conclusion that Yukos Oil's 'tax optimisation' scheme constituted money laundering.[610] It contends that, in the relevant period, the Russian Criminal Code expressly excluded tax evasion as a predicate offence for money laundering, and therefore even if tax evasion could be

---

[604] Reply, [363].

[605] Reply, [364].

[606] Reply, [375], citing *Saba Fakes v Turkey*, ICSID Case No ARB/07/20, Award (14 July 2010), [131] (**RL-368**).

[607] Reply, [375].

[608] Reply, [376].

[609] *See* Reply, [377]-[469].

[610] Reply, [384].

proved it could not form the basis for that offence.[611] It further submits that an application of current laws (which include tax evasion as a predicate offence) would offend the criminal law principle that an accused must have reason to know that the conduct being engaged in was a crime.[612] The Claimant then argues that money laundering also requires a conviction for the predicate offence, and submits that no convictions were obtained in the present case.[613] It also submits that, even if there was a legal basis for a money laundering argument, no tax evasion was committed in any event and Yukos Oil's tax structure was legal.[614]

335. As to the act of laundering, the Claimant argues that the Loans were not made with money criminally acquired by the Claimant or as a result of it having committed a crime, as they were borrowed from other companies in the Yukos Group.[615] It contends that the only 'predicate offence' alleged against it is its role in assisting Yukos Oil to 'eliminate the obligation to pay withholding tax on interest payments under the Loans', and that the proceeds therefrom were not used to make the Loans.[616] Further, the Claimant contends that the reasons for the giga-dividend were legitimate, and therefore was not the aim of any money laundering exercise.[617] In any event, it submits that only a fraction of the funds paid to the Cyprus holding companies, Dunsley and Nassaubridge (the **Cyprus companies**) by way of dividend resulted from savings in corporate profit tax and that the remainder remained untainted by any offence, and further contends that the Respondent has not proved that the funds for the Loans originated from these small fractions.[618]

---

[611] Reply, [379]-[381], [393].

[612] Reply, [382]-[384].

[613] Reply, [385]-[386].

[614] Reply, [387].

[615] Reply, [394].

[616] Reply, [394].

[617] Reply, [395].

[618] Reply, [396].

336. The Claimant also submits that the Respondent cannot show that a manager or other individual involved had the requisite *mens rea* to commit a crime. It contends that, since all major companies in Russia engaged in the use of trading companies in the low-tax regions and the tax authorities were aware of it, no-one could have been on notice that such activity was criminal.[619] The Claimant further argues that no weight should be given to the conclusions of the Respondent's expert Professor Esakov on this matter, since his analysis is premised on an assumption that criminal tax evasion had occurred.[620]

337. *Offshore tax evasion.* As a starting point, the Claimant submits that the alleged use of the Cyprus DTA to minimise withholding tax on dividends from the Russian trading companies, even if proved, cannot constitute a predicate offence for money laundering under Russian law for the same reasons it advances regarding its onshore activities.[621] It also repeats its argument that the Respondent has not proved that the funds for the Loans originated from the small fractions of the dividends from the Russian trading companies allegedly representing illegal tax savings.[622]

338. More generally, the Claimant also submits that there was no illegality in connection with the offshore structure. It argues that the effect of the Cyprus DTA was to reduce Russian withholding tax on dividends to non-Russian companies from 15% to 5%, and that dividends paid to Russian companies in the same circumstances would have been taxed at 6%.[623] The Claimant submits that the realisation of the 1% spread between these figures would be too insignificant to justify putting the 'Laundromat' into operation.[624]

---

[619] Reply, [388].

[620] Reply, [389]-[392].

[621] Reply, [400].

[622] Reply, [401].

[623] Reply, [404]-[405]; Shay 1, [64].

[624] Reply, [403]-[405].

343945

339. The Claimant then contends that benefits under the Cyprus DTA were rightly claimed.[625] It submits that the only live issues in this regard are whether the Cyprus companies were beneficial owners of the dividends distributed, and whether those companies had a permanent establishment in Russia.[626] To the first question, the Claimant submits that Russia's position on beneficial ownership at the relevant time was a formal one, and relies on Russian tax authorities' guidance and the rejection of the substance over form approach by a Russian court.[627] On this basis, the Claimant contends that the Cyprus companies both satisfy the formal standard for beneficial ownership, being residence in Cyprus and legal control over whether to retain or distribute the dividends they received.[628] To the second question, the Claimant submits that under Russian tax law at the time, a foreign entity—such as the Cyprus companies—would not be considered to have a permanent establishment in Russia where its assets consisted of equity and debt investments and it did not conduct active commercial activities in the Russian Federation.[629] It further contends that evidence of effective management in Russia is not relevant since the relevant legal amendment to this effect occurred in 2015,[630] and further that such effective management could not be established by the Respondent in any event.[631]

340. *Abuse of the Luxembourg DTA and EU State Aid rules.* First, the Claimant argues that the Respondent cannot re-open the issues of whether the Claimant was eligible to claim the benefit of the Luxembourg DTA, since that was already determined by the Tribunal in the Interim Award.[632] Nevertheless, the Claimant submits that the two live issues relating

---

[625] Reply, [408], [415], [424].

[626] Reply, [410].

[627] Reply, [411]-[414].

[628] Reply, [415].

[629] Reply, [418]-[422].

[630] Reply, [420].

[631] Reply, [422]-[423].

[632] Reply, [427]; Interim Award, [509].

to the Luxembourg DTA are whether Yukos Capital was a resident of Luxembourg and whether it had a permanent establishment in Russia.[633] To the first question, the Claimant submits that the Respondent's expert has conceded that Yukos Capital was lawfully entitled to obtain its Luxembourg tax residency certificate, and further argues that companies owned by the Respondent have taken the same approach as the Claimant in this regard.[634] It also argues that there is no beneficial ownership concept incorporated into the Luxembourg DTA, and that as a matter of Russian tax law this would have been satisfied in any event as the beneficial owner concept at the time was equivalent to the legal owner.[635] As to the second question, the Claimant argues that Russian law did not have an 'effective management' standard for determining permanent establishment at the relevant time,[636] and that the Respondent cannot prove that the Claimant was partly managed from within Russia in any event.[637] On this basis, the Claimant asserts that it was entitled to claim the benefits of the Luxembourg DTA.[638]

341. The Claimant then addresses the Respondent's submissions regarding the EU State Aid rules, arguing that the European Commission decision determining that the Luxembourg rule was illegal did not apply to the ATAs in the present case, but to a previous system.[639] It also argues that there is no evidence that the Commission had referred Luxembourg's non-compliance with its directive to the European Court of Justice,[640] that even the Respondent's tax expert does not suggest that the ATAs in respect of the Loans were

---

[633] Reply, [428]-[429].

[634] Reply, [430]-[432].

[635] Reply, [433].

[636] Reply, [435].

[637] Reply, [436]-[437].

[638] Reply, [438].

[639] Reply, [439](a).

[640] Reply, [439](b).

unlawful,[641] and finally that any breach of the EU's State Aid rules would be an unlawful act by Luxembourg, not the Claimant.[642]

342. *Failure to prove mens rea.* The Claimant then submits that the Respondent has failed to show that anyone at Yukos Oil or Yukos Capital believed that there were issues with the legality of the offshore tax arrangements, and therefore the Respondent cannot demonstrate criminal intent in that regard.[643] The Claimant submits that Yukos Oil's offshore structure was intended to create a platform for international expansion, and in support contends that the relevant offshore elements were created with the advice and assistance of international experts, corporate and legal advisers, as well as professional auditors and tax advisors.[644] It contends that its reliance on professional tax advisors is significant in light of the accepted principle of tax law that international tax optimisation is not criminal if the taxpayer believes in good faith that the actions taken do not give rise to an additional tax liability.[645] The Claimant further argues that the Respondent does not identify the specific individual(s) possessing the criminal intent to evade tax and launder the proceeds of that crime, since that allegation amounts to no more than invention.[646]

343. *Absence of connection between the Loans and privatisation.* The Claimant contends that there is no connection between the Loans and the privatisation of Yukos Oil.[647] To the extent that the Respondent relies on bribery of former Yukos Oil managers as a predicate offence for money laundering, the Claimant submits that there was no such bribery and further that any question of bribery is irrelevant in any event.[648] It contends that all relevant activity that the Respondent relies upon for the bribery allegation occurred prior

---

[641] Reply, [439](c).

[642] Reply, [439](d).

[643] Reply, [440].

[644] Reply, [442]-[445].

[645] Reply, [446].

[646] Reply, [448].

[647] Reply, [450].

[648] Reply, [451].

to Yukos Capital's incorporation and the making of the Loans, and that the funds later used for the Loans were drawn from Yukos Oil's oil production activities—not any alleged bribery.[649] It further submits that, as in the *Hulley* Final Awards and therefore here, the Respondent cannot demonstrate that the alleged illegalities to which it refers are sufficiently connected with the final investment transaction.[650]

344. The Claimant also submits that even if the alleged bribery had occurred, money laundering requires the use of the proceeds of the specific predicate offence alleged (*i.e.* bribery).[651] It argues that, if the proceeds of the alleged bribery are 'tainted shares' held by the majority shareholders, Yukos Oil's cash flows remain separate to such shares and therefore cannot be said to be the proceeds of any alleged bribery.[652] The Claimant also points to the lack of conviction or any charges brought by the Russian authorities regarding the Yukos Oil privatisation, or against any of the individuals alleged to have committed the crimes in question.[653] Finally, the Claimant submits that the limitation period for bribery has expired under the Russian Criminal Code,[654] and that no tolling argument can succeed since the Respondent has known about the arrangements with the former Yukos Oil managers since at least 2003.[655]

345. In relation to the Respondent's specific allegation that a bribe was paid by Yukos executives to the former managers of Yukos Oil, the Claimant submits that this is not a bribe. It contends that it was common practice to conclude agreements between potential investors and company management during the acquisition process in order to incentivise managers to increase the chances of profitability of the acquired company.[656] The

---

[649] Reply, [452](c).

[650] Reply, [454]-[455]; *Hulley* Final Awards, [1369]-[1370] (**CL-10**).

[651] Reply, [456].

[652] Reply, [456]; Gladyshev 1, [410]-[412].

[653] Reply, [457].

[654] Reply, [458].

[655] Reply, [459].

[656] Reply, [461]; Dubov 2, [28], [29]-[34].

Claimant refers to the evidence of Mr Misamore, who states that Yukos Oil's accountants were also aware of and indeed assisted in documenting the legal arrangement.[657]

346. In conclusion, the Claimant submits that the Respondent's illegality defence must fail, and that 'the Laundromat is an invention conjured in bad faith in an attempt by Respondent to avoid being held responsible for its very serious violations of the ECT.'[658]

### (c) Clean hands

347. Turning to the Respondent's clean hands argument, the Claimant contends that, under international law, there is no general interpretation of the clean hands doctrine that would effectively bar an investor's claim.[659] It argues that the authorities cited by the Respondent are inapposite, since the tribunals in those cases declined jurisdiction because the investment itself had been procured via illegal means such as fraud or corruption, which it submits does not advance the Respondent's case beyond illegality.[660]

348. The Claimant submits that the elements to be satisfied to bar a claim under the clean hands doctrine are: (i) the breach must concern a continuing violation; (ii) the appropriate remedy sought by the claimant should relate to protection against a continuing violation and not past violations; and (iii) there must be a relationship of reciprocity between the obligations considered; namely, that the defendant's reliance on its clean hands argument must flow from the reciprocal obligation by the claimant as the basis for its claim.[661]

---

[657] Reply, [462].

[658] Reply, [465].

[659] Reply, [366]-[368].

[660] Reply, [369].

[661] Reply, [370]; *Niko Resources Ltd v Bangladesh*, ICSID Case No ARB/10/11 and ARB/10/18, Decision on Jurisdiction (19 August 2013), [481] (RL-350), citing *Guyana v Suriname*, PCA Case No. 2004-04, Award (17 September 2007), [420]-[421] (CL-165).

349. According to the Claimant, the Respondent has failed to satisfy these three requirements.[662] It submits that the Respondent's breach is not continuing, that it is not seeking specific performance but rather compensation, and that the Claimant has not itself violated a reciprocal obligation on which it then seeks to rely.[663] On this basis, the Claimant contends that the clean hands doctrine does not apply.

### (d)   International public policy

350. The Claimant submits that the Respondent's argument relying on international public policy must fail.[664] It contends that the authorities relied upon by the Respondent do not support the view that tribunals may dismiss claims on international public policy grounds independently from a finding of illegality,[665] adding that international public policy has never been invoked to preclude a claim in the absence of illegality and that such illegality (if it existed) is limited to bribery of foreign public officials or contracts secured by fraudulent misrepresentation.[666] The Claimant therefore concludes that tax evasion without any other conduct cannot not give rise to public policy considerations, and that, while there are international initiatives aimed at preventing tax evasion, those do not amount to a system of international criminal tax law which could give rise to international public policy considerations.[667]

## VI.   LIABILITY AND ILLEGALITY – TRIBUNAL'S ANALYSIS

### A.   INTRODUCTION

351. The Tribunal has had adduced before it a voluminous documentary record and has heard the evidence of witnesses of fact and of a number of experts on detailed issues of Russian

---

[662] Reply, [371].

[663] Reply, [371].

[664] Reply, [372].

[665] Reply, [372].

[666] Reply, [374].

[667] Reply, [374].

law and international tax law. It has had the benefit of very detailed and learned submissions of counsel, both in their written memorials and in oral pleading, summarised in Part V above. In order to decide the matter it will be necessary to consider these arguments, and the evidence relevant to them, carefully and in detail.

352. However, before embarking on this exercise, the Tribunal makes some preliminary observations about the way in which it approaches the overall character of the present case so as to frame the ensuing analysis. These observations concern:

(i)     The claim as based upon an investment made by way of a loan; and

(ii)    The relation between the alleged causes of action.

### 1.    An investment constituted by a loan

353. The present case is one of a number of disputes that have arisen in diverse international courts and tribunals between the holders of interests in Yukos Oil and the Russian Federation over the circumstances that ultimately led to the demise of that company.

354. This case nevertheless falls to be considered on its own merits. The Tribunal is not bound by the decisions of other tribunals. It is common ground that the prior decisions give rise to no estoppel and that each Party has borne the burden of proving by way of evidence adduced before the present Tribunal the facts on which it relies to support its claim or defence.[668]

355. The Claimant's claim has a feature that distinguishes it from the majority of other investment arbitration claims. The Claimant was never a shareholder in Yukos Oil. The investment upon which it is founded was made by way of loans. Moreover the Claimant was an intra-Group finance company, a wholly owned indirect subsidiary of Yukos Oil. It advanced the Loans to its parent in that capacity. As a result, Yukos Oil stood in the position of debtor vis-à-vis the Claimant, its creditor.

---

[668] PO N° 6, [41]. Claimant withdrew its plea of collateral estoppel during the course of the Hearing: T9/2090/20-21 (Claimant).

356. The Tribunal has already decided, by majority, for the reasons set out in its Interim Award, that the Claimant 'does own an asset constituted by a debt of a company associated with an Economic Activity in the Energy Sector in the Area of the Respondent such that it has made an Investment to which the present dispute with the Respondent relates.'[669] In order to reach that conclusion, it determined (in summary) that, for the purpose of the ECT:

(i)     An investment may be made by way of a loan, provided that such investment has both a legal materialisation (being an asset belonging to the claimant) and an economic materialisation (being a commitment of resources that constitutes both an economic contribution and an assumption of risk).[670]

(ii)    The Claimant had made a contribution to an economic activity in the Russian Federation by way of the Loans. This contribution was not to be determined by reference to the origin of the funds[671] nor was it excluded because the Loans were made by way of inter-company transfers within a corporate group.[672]

(iii)   The making of an investment by way of a loan also involves an assumption of risk as to the success or failure of the venture, which would in turn affect the prospects for repayment.[673] In the instant case, the only holder of the right to repayment of the debt constituted by the Loans in the present case was Yukos Capital. The fact that it had entered into back-to-back arrangements with two other Yukos Group companies (Brittany and Hedgerow) did not affect that position since it had not 'transferred that right—legally or beneficially—to Brittany.'[674]

---

[669] Interim Award *dispositif,* [567](2) (by majority), Professor Stern dissenting.

[670] Interim Award, [430]–[454].

[671] Interim Award, [460]-[465].

[672] Interim Award, [466]-[488].

[673] Interim Award, [489]-[494].

[674] Interim Award, [495]-[511], citation at [506].

357. Throughout these proceedings, the Claimant has insisted on its separate corporate personality. It invokes its right to pursue the present claim based on the rights that it alone is entitled to vindicate under the Loans, which it asserts are separate and distinct from the claims of the shareholders in relation to the treatment of Yukos Oil.

358. Nevertheless, at the merits stage, the fact that the investment was made by way of a loan does affect the scope of the matters that are legally relevant to the determination of the claim. Yukos Capital is not a member of Yukos Oil. It is its creditor. As the International Court of Justice held in *Barcelona Traction*: 'Creditors do not have any right to claim compensation from a person who, by wronging their debtor, causes them loss. In such cases, no doubt, the interests of the aggrieved are affected, but not their rights.'[675]

359. The Tribunal considers that this principle is applicable in the case of a claim under the ECT that is founded upon a loan. It applies in the present context with particular cogency. The Claimant itself does not conflate its rights with those of Yukos Oil. On the contrary, its claim is founded upon its distinct right. Were it otherwise, there would be an unconscionable overlap with the claim already pursued by Yukos Oil before the European Court of Human Rights (ECtHR) and determined there and the claims of the Yukos Oil shareholders, which have already been pursued and determined in prior ECT arbitration proceedings.

360. The necessary consequence is that the focus of this Award will be on the alleged invasion of the rights of Yukos Capital vis-à-vis its Loans. That is not to say that: (i) the circumstances in which those Loans were made; and (ii) the course of events by which the Loans were not repaid in full is irrelevant to the Tribunal's enquiry. On the contrary, both form an essential part of the context against which the Tribunal will assess the claim.

361. Indeed, both Parties rely on elements of the wider course of events in advancing their rival claims and defences:

   (i)     The Claimant alleges that the tax reassessments raised against Yukos Oil were part of an orchestrated campaign by the Russian State to drive Yukos Oil into

---

[675] Barcelona Traction, Light and Power Co Ltd (Belgium v Spain) [1970] ICJ Rep 3, [44].

bankruptcy and deprive it of its assets. It contends that these acts in turn deprived Yukos Oil of its ability to repay the Loans. The subsequent disallowance of a claim for the debt in the bankruptcy was simply part and parcel of a composite act that affected the Yukos Group as a whole.

(ii) The Respondent, whilst denying that the Claimant is entitled to invoke a claim based on acts directed against Yukos Oil, nevertheless affirmatively relies on what it sees as the inextricable connection between the two companies for its positive case. It alleges that the Loans were simply part of an illegal scheme or 'Laundromat' devised by Yukos Oil to evade the payment of tax in Russia by circulating the profits made by oil trading within the Yukos Group around group companies both inside and outside Russia for the enrichment of the Yukos Oil shareholders.

(iii) For its part, the Claimant accepts that, whatever may be the precise legal basis, if the Respondent were to persuade the Tribunal that the Claimant was 'engaged in a vast operation of criminal tax evasion and criminal money-laundering' it would not prevail in the arbitration.[676]

362. The Tribunal will need to consider and evaluate aspects of the wider record of events concerning the Yukos Group as a whole in order to decide these allegations. But it is important to be clear from the outset as to the basis upon which it does so. The Tribunal has no mandate to re-determine the entirety of the acts of the Russian State against the Yukos Group. Nor (as already observed) is it entitled to rely for this purpose on the findings of prior tribunals. It is solely concerned with the investment made by the Claimant and the allegations of expropriation and unfair treatment directed against that investment.

363. The concept of a 'composite act' may conveniently encapsulate a series of acts to be considered together when the Tribunal is assessing whether the Respondent has

---

[676] T1/102/6-9 (Claimant).

committed an international delict.[677] But this does not make all of the acts allegedly directed against Yukos Oil *ipso facto* part of a composite act directed against Yukos Capital. That would run counter to the principle that the position of a creditor is legally distinct from that of its debtor. However, this does not exclude the possibility that the alleged acts of the Respondent were part of a campaign directed against the Claimant as part of the Yukos Group, along with Yukos Oil and other members of the Group. But the purpose of the Tribunal's enquiry will be to determine the relevance of those acts to, and their effect upon, the Claimant.

364.  A different way of putting the same point is as a matter of causation: the alleged acts must *cause* the loss to the creditor. For this purpose, the Tribunal's enquiry must be directed at considering those acts that are the proximate cause of the creditor's loss. The chain of causation may be broken if the acts are too remote or if the actions of the creditor or of a third party intervene. The Tribunal will return to consider the implications of this point in Part VII below on causation.

365.  The Tribunal considers that similar considerations must also necessarily guide its approach to the Respondent's case on illegality. The question for the Tribunal is whether the *investment* constituted by the Claimant's Loans was tainted by illegality when it was made so as to deprive the Claimant of the protections of the ECT or its rights under the Loans. In approaching this question, the Tribunal will have to determine whether the Loans constitute the proceeds of illegal acts of tax evasion and money laundering. This in turn requires an enquiry into the role played by the Loans as part of a larger transaction of which they form a part and the role of other persons in guiding and directing that transaction.

366.  Such an enquiry does not mandate the Tribunal to consider the conduct of Yukos Oil in its tax affairs generally in matters unrelated to the transaction giving rise to the Loans, nor that of its shareholders from their initial acquisition of that company. This, too, would be to conflate the issue necessarily engaged by the Claimant's making of the Loans with other matters that are not germane to that issue and do not properly concern the present

---

[677] International Law Commission, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, II(2) Yearbook of the International Law Commission (2001) (**ARSIWA**), Art 15 (**RL-319**).

dispute. For this reason, the Tribunal must exclude those parts of the Respondent's 'Laundromat' case that relate to: (i) acts alleged to have taken place in the initial privatisation of Yukos; or (ii) the use of trading companies other than those specifically in the Armenian Branch used to fund the Loans.

### 2.   The relation between the causes of action

367.  The second issue of general import that arises from the way in which the present case is advanced is the relationship between the causes of action that the Claimant advances respectively under Article 13 (Expropriation) and Article 10 (Promotion, Protection and Treatment of Investments) of the ECT insofar as these claims relate to the Respondent's treatment of the Claimant's investment in the bankruptcy.

368.  The Claimant submits that its treatment in the bankruptcy of Yukos Oil amounts to both: (i) 'judicial expropriation'; and (ii) a violation of the guarantee of fair and equitable treatment.

369.  These interrelated claims give rise to four interrelated preliminary sub-issues of law:

(i)     What is the standard applicable to a claim of expropriation by the judicial organs of the State?

(ii)    Must the Claimant establish that the actions of the judiciary constitute a failure of 'due process of law' amounting to a denial of justice?

(iii)   What is the relationship in this context between a failure of due process and illegality?

(iv)    In the circumstances of the present case, does the claim under Article 10 import a different or lesser standard or include other considerations in respect of the liability of the Respondent that would not otherwise be applicable under Article 13?

370.  *Application of expropriation to judicial acts.* Article 13 of the ECT provides in pertinent part:

(1) Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is:

    (a) for a purpose which is in the public interest;

    (b) not discriminatory;

    (c) carried out under due process of law; and

    (d) accompanied by the payment of prompt, adequate and effective compensation.

371. Article 13 (which is in a form widely recognised in general international law) imposes four requirements for the validity of a taking of property: (i) public interest purpose; (ii) non-discrimination; (iii) due process of law; and (iv) compensation. All four such requirements must be met. Otherwise, the taking will constitute an expropriation, giving rise to a breach of Article 13. So far as concerns liability in the present case, the principal areas of dispute between the Parties have concerned (iii) due process of law and (ii) non-discrimination. The Tribunal will consider the due process requirement first.

372. Neither Article 13 nor the ECT as a whole draws any distinction in relation to this obligation between the organs of the Contracting Party.

373. General international law draws no distinction between the organs of the State in ascribing the responsibility of the State for a breach of an international obligation. The general rule is:

> The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.[678]

---

[678] ARSIWA, Art 4(1) (**RL-319**).

374. The acts of the judiciary may therefore engage the responsibility of a State for expropriation as much as the acts of executive officials, as other investment tribunals have recognised.[679] Where, as here, the alleged taking consists of a number of acts taken by both executive and judicial organs of the State, the tribunal must therefore consider the totality of the State's conduct vis-à-vis its treatment of the investment.

375. Although (as in this case) an alleged taking as a result of judicial decision has sometimes been referred to for convenience as 'judicial expropriation',[680] in the view of the Tribunal such reference does not denote a separate or distinct cause of action.

376. Nevertheless the application of the expropriation test to judicial organs gives rise to some specific considerations, which flow from the nature of the judicial task. An important function of municipal courts is to determine claims to property according to the applicable law. Such courts cannot normally be faulted if they determine such rights in accordance with due process; apply a law that is not in itself expropriatory; do not subject the investor to discrimination and reach a result that is not manifestly improper, whether or not the result is to deprive the claimant of its property. As the tribunal in *Garzanti Koza* put it:

> A seizure of property by a court as a result of normal domestic legal process does not amount to an expropriation under international law unless there was an element of serious and fundamental impropriety about the legal process.[681]

377. The question in such cases, consistent with the requirements of Article 13, is whether the court has reached its decision 'under due process of law' and without discrimination.

378. *Due process of law and denial of justice.* The requirement of Article 13(1)(c) that any taking be in accordance with 'due process of law'[682] imports a set of considerations that are also engaged when an international court or tribunal is required to determine whether

[679] *Saipem S.p.A v Bangladesh*, ICSID Case No ARB/05/07, Award (30 June 2009), [189]-[190] (CL-180).

[680] *Swisslion DOO Skopje v Macedonia*, ICSID Case No ARB/09/16, Award (6 July 2012), [313] (CL-22).

[681] *Garanti Koza LLP v Turkmenistan*, ICSID Case No. ARB/11/20, Award (19 December 2016), [365] (RL-307).

[682] *ADC Affiliate Ltd & Anor v Hungary*, ICSID Case No ARB/03/16, Award (2 October 2006), [435] (CL-1).

a State has acted in an arbitrary manner giving rise to a denial of justice, since, as a Chamber of the International Court of Justice has observed:

> Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law... It is a wilful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety.[683]

379. When it is the acts of the municipal courts that are being considered, the considerations that apply in the case of a denial of justice will also determine whether due process of law has been followed for the purpose of an expropriation claim. That is to say: the international tribunal will be concerned to enquire whether the claimant has been afforded access to the court for a hearing on the merits of its claim; without undue delay; in accordance with a fair procedure. The international tribunal may also scrutinise the judgments of the municipal court. This is not with a view to substituting its decision on questions of municipal law to that of the municipal court. The international tribunal is not a court of appeal on matters of municipal law. Nevertheless, the decision itself may constitute relevant evidence of judicial propriety or impropriety.[684]

380. It is important to be clear about the point that is being made here. An expropriation claim is concerned with a substantive deprivation of property; whereas a denial of justice claim (like a claim for breach of a guarantee of fair and equitable treatment more generally) is concerned with the process of decision-making by the State and its effect upon the investor.

381. Nevertheless, as a constituent requirement of the ECT protection from expropriation is the requirement that any taking be 'under due process of law', the tribunal must consider the process of decision as part of its evaluation of whether a breach of Article 13 has been committed. Where the impugned acts of the State include judicial acts, this means that it will be necessary for the conduct of the judiciary to be assessed according to the same standard and applying the same factors as would arise in a denial of justice claim.

---

[683] Elettronica Sicula S.p.A. (ELSI), United States of America v Italy, [1989] ICJ Rep 15, [128] (CL-99).

[684] *Mondev International Ltd v United States of America*, ICSID Case No ARB(AF)/99/2, Award (11 October 2002), [127] (RL-154).

382. *Due process of law and 'illegality'*. There is some suggestion in prior arbitral awards and in the Parties' pleadings that the test for the Tribunal is one of 'illegality'.[685] This may be traced in particular to the award in *Saipem*.[686] The Tribunal doubts whether this criterion is of much assistance in clarifying the nature of its task. In *Saipem* itself, the treaty provision for expropriation at issue in the case imposed a condition that the measures be 'in conformity with all legal provisions and procedures.'[687] It was common ground in that case that this entitled the tribunal to consider questions of illegality under both municipal and international law. The tribunal made clear that it only considered this question because of the Parties' 'agreement that the unlawful character of the actions was a necessary condition' and was not otherwise to be treated as a departure from the doctrine that would normally apply.[688] The *Saipem* tribunal also found a distinct breach by Pakistan of its obligations under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958.[689] This factor, particular to the circumstances of that case, enabled it to apply the consideration of illegality under international law to a concrete breach of a treaty obligation, in addition to its more general finding of abuse of right.

383. In the present case, the treaty test is 'due process of law' not 'illegality.' An international tribunal is not to be conflated with a final court of appeal on legality under municipal law. It is only concerned with whether a breach of international law has been committed. That is a distinct question of legality under international law, since:

> The characterization of an act of a State as internationally wrongful is governed by international law. Such characterization is not affected by the characterization of the same act as lawful by internal law.[690]

---

[685] Counter-Memorial, [340](a); Reply, [195]-[199]; *Swisslion DOO Skopje v Macedonia*, ICSID Case No ARB/09/16, Award (6 July 2012), [313] **(CL-22)**.

[686] *Saipem S.p.A v Bangladesh*, ICSID Case No ARB/05/07, Award (30 June 2009) **(CL-180)**.

[687] Art 5(2) Italy–Bangladesh BIT, cited ibid, [124].

[688] Ibid, [134].

[689] Ibid, [170].

[690] ARSIWA, Art 3 **(RL-319)**.

In the present context, legality under international law can only be determined by reference to the standard specified under Article 13 of the ECT, which comprises each of the specified elements, including the requirement of 'due process'. It does not add anything, and may only add an element of circularity or confusion, to describe the test as one of illegality.

384. *Due process of law and fair and equitable treatment.* Article 10 of the ECT provides in relevant part:

> (1) Each Contracting Party shall... encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. ...

> (12) Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments. ...

385. The Tribunal will have considered the question whether the Respondent accorded the Claimant's investment 'due process of law' and whether any taking was or was not 'discriminatory' for the purpose of its assessment of the claim of expropriation under Article 13. In so doing, as explained above, it will examine the same factors that also apply under Article 10. In the circumstances of this case, it would only be if the Tribunal were to reach the view that the claim did not otherwise constitute a breach of Article 13 (as, for example, if the Tribunal were to take the view that the act did not constitute a taking) that it would be obliged to go on to consider whether there was, in the alternative, a breach of Article 10.

386. For this reason, the Tribunal will concentrate its attention on the claim of expropriation. If that claim is sustained, it will be unnecessary for it to consider the alternative formulation of the claim under Article 10, since it would not add anything to the analysis or the relief sought.

387. In view of the matters that are at issue in this case and the analysis above, the Tribunal will now proceed to consider the evidence as to whether or not the Claimant's property

in the sums advanced under the Loans was taken without due process of law such that it amounted to a denial of justice and was discriminatory.

## B.   EXPROPRIATION

### 1.   Introduction

388.   The Claimant's written case alleged that the Respondent's conduct constituted: (i) expropriation through a composite act; (ii) judicial expropriation; and (iii) a violation of the guarantee of fair and equitable treatment vouchsafed by Article 10 of the Treaty.

389.   In closing, it drew these threads together into two propositions:

   (i)   Russia enacted a politically-motivated plan to destroy Yukos Oil through the imposition of tax assessments that had no basis;[691] and

   (ii)   The treatment of the Claimant in the bankruptcy constituted breaches of the ECT, and in particular the denial of the Claimant's claims violated the guarantee of fair and equitable treatment, including through a denial of justice and judicial expropriation.[692]

390.   For the reasons already developed above in Part VI.A, the Tribunal has reached the view that:

   (i)   This case is concerned with the Respondent's treatment of Yukos Capital's claim under the Loans, and not the claims of its debtor Yukos Oil or other members of the Yukos Group (Part VI.A.1);

   (ii)   As a consequence, the first question for the Tribunal is to assess whether the refusal to admit the Loans in the bankruptcy of Yukos Oil amounts to expropriation under Article 13 of the ECT (Part VI.A.2);

---

[691] Claimant's Closing Slides, 5-36.

[692] Claimant's Closing Slides, 37-47.

(iii)    In considering that question, the Tribunal will also consider whether its conclusions under (ii) are further supported by evidence suggesting that the treatment of Yukos Capital was part of a campaign directed against the Claimant as part of the Yukos Group, along with Yukos Oil and other members of the Group.

(iv)    The test for expropriation under Article 13 of the ECT requires consideration of whether any State taking was carried out 'under due process of law' and was 'not discriminatory.' These considerations are the same as those applicable under Article 10. So it would only be necessary for the Tribunal to consider the claim for failure to provide fair and equitable treatment in the event that, for other reasons, the claim under Article 13 is not established.

391.   As a result of these conclusions, the Tribunal will consider first the Claimant's treatment in the bankruptcy, analysing the record as to the facts (section 2) and then the question whether this amounts in international law to a breach of Article 13 of the ECT (section 3).

392.   At that point, it will also consider whether the treatment of the Claimant was part of an orchestrated campaign against it and other members of the Yukos Group.

393.   The Claimant identifies eight elements of the Claimant's treatment in bankruptcy that it said, individually and collectively, breached the ECT:[693]

(i)    The Claimant's applications in the bankruptcy were rejected on spurious grounds without any proper legal analysis;

(ii)    The Claimant's appeals were suspended and eventually terminated without its claims being heard;

(iii)    The Claimant's lawyers were intimidated, including by searches and raids of the Claimant's and its lawyers' offices (as part of a campaign against lawyers acting for Yukos Group entities generally);

---

[693] Claimant's Closing Slides, 41.

(iv)     Documents were seized in violation of Russian law;

(v)      Attempts were made to expropriate the Claimant through a rigged auction of Yukos Finance;

(vi)     Criminal investigations were started to stall the Claimant's applications and intimidate the Claimant and its counsel;

(vii)    Vexatious invalidation claims were brought to stall the Claimant's applications; and

(viii)   Discriminatory treatment was suffered compared with non-Yukos-related creditors.

394. The Respondent maintains that the Claimant has failed to establish the high threshold necessary for expropriation by its judicial organs. The Russian courts had dismissed Yukos Capital's claims on good legal grounds and without judicial impropriety.

## 2.     Treatment of Yukos Capital in the bankruptcy

395. The Tribunal has summarised at a high level the background facts to this arbitration in Part III above. In this section of the Award, it reviews the evidence concerning the treatment of Yukos Capital in the bankruptcy in particular.[694]

396. *Sources of evidence:*

(i)      The only witness of fact to give evidence and appear before the Tribunal in relation to the detail of the bankruptcy proceedings for either Party was Mr Rudolph Mkhitaryan, a witness for the Claimant, who had been appointed Head of the Legal Department at Yukos Refining and Marketing in 2005.[695] Mr Mkhitaryan travelled to London on 5 April 2006 and did not thereafter return

---

[694] These topics correspond in particular to the allegations made by the Claimant at points (ii)-(iv), (vi) and (vii) of Claimant's Closing Slides, 41 cited at [393] above.

[695] Mkhitaryan 1, [25].

to Russia. He accepted that he did not have direct knowledge of all aspects of Yukos Capital's attempts to lodge a claim in Yukos Oil's bankruptcy. [696] Nevertheless, the Tribunal was assisted by his evidence, which was tested under cross-examination.

(ii)    The Tribunal heard expert evidence from Dr Gladyshev for the Claimant[697] and from Professor Zaitsev (as to the bankruptcy procedure)[698] and from Professor Esakov (as to the criminal procedure)[699] for the Respondent.

(iii)    The documentary record of the procedure relating to the Claimant's applications in the bankruptcy is particularly detailed and the Tribunal has examined this record closely.

397.  *The First Bankruptcy Application.* Following the commencement of the bankruptcy proceedings, the Claimant filed the First Bankruptcy Application on 27 April 2006 for the inclusion of its claims in the Register of Creditors. [700] These claims comprised principal and interest payments, as well as late repayment penalties under the Loans, and amounted to a total of RUB 117,814,316,436.44 (approximately USD 4.3 billion).[701]

398.  This application was made on Yukos Capital's behalf by Nomos pursuant to a power of attorney dated 20 April 2006.[702] Yukos' lawyer Mr Yan Das Gupta of Gridnev & Partners had recommended the engagement of Nomos, originally in connection with disputes

---

[696] Mkhitaryan 1, [35]; *see* for example T4/850/7-851/9 (Mkhitaryan).

[697] Gladyshev 1; T7/1608–1686 (Gladyshev).

[698] Zaitsev 1; Zaitsev 2; T8/1723–1800 (Zaitsev).

[699] Esakov 1; Esakov 2; T7/1496–1579 (Esakov).

[700] Yukos Capital First Bankruptcy Application (C-66).

[701] *See* Memorial, [266].

[702] Yukos Capital First Bankruptcy Application, 8 (C-66).

before the International Commercial Arbitration Centre at the Chamber of Commerce and Industry (**ICAC**) and then to assist with Yukos Capital's claim in the bankruptcy.[703]

399. Yukos Oil recognised the debt, objecting only to the inclusion of the late repayment penalty.[704] It confirmed by letter dated 12 July 2006 that it had received the Claimant's Notice of Default of 11 November 2005, which demanded payment of the full amount of the debt pursuant to Articles 2.4.1 and 2.4.3 of the December 2003 Loan Agreement, on 14 November 2005.[705] Due receipt is supported by the shipping bills and fax transmission reports on the arbitration file.[706]

400. However, Mr Rebgun, Rosneft and the Federal Tax Service all objected to the First Bankruptcy Application:

  (i)   Mr Rebgun argued that the evidence submitted with the First Bankruptcy Application failed to: (i) prove the transfer of all funds included in the Loans; (ii) reflect whether the individuals who signed the Loans were authorised to do so; (iii) include bank statements of the accounts where the Loans were received; (iv) include a 'suitable translation' of the letter on early termination of the Loans; (v) contain enclosures representing 'an integral part of the agreement'; and (vi) apply the relevant RUB-USD exchange rate.[707]

---

[703] Transcript of Witness Interview, Marina Petrovna Titievskaya (15 August 2006) (**R-298**); Mkhitaryan 1, [39]-[40].

[704] Yukos Oil Company OJSC's Objections to the creditor's claims against the debtor, Moscow City *Arbitrazh* Court, Case No A40-11836.06-88-35 "B" (23 May 2006) (**C-400**); Minutes Of The Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (12 July 2006), 2 (**C-70**). *See* Mkhitaryan 1, [43].

[705] Letter from Mr Theede, President Yukos Oil to Mrs Titiveskaya, Nomos, on behalf of Yukos Capital dated 12 July 2006 (**C-564**).

[706] Email TMF to D Gupta (7 July 2006) (**C-563**).

[707] Temporary Receiver's Objections To the claims of the creditor, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (31 May 2006) (**C-69**).

(ii)     Rosneft opposed the First Bankruptcy Application on the basis that the Loans were still not due at the time bankruptcy proceedings began, arguing that Yukos Capital was not entitled to demand an early repayment of the Loans.[708]

(iii)    The Federal Tax Service also contended that the Loans had not yet become due and added that, to the extent that Yukos Capital was aware of the tax claims against Yukos Oil when it granted the Loans (suggesting that the December 2003 Loan was in fact granted in January 2006), it could not rely on these circumstances to request early repayment.[709] The Federal Tax Service also submitted that Yukos Oil had referred to the Loans as 'Long-Term Loans'[710] and that, '[i]n reality, [Yukos Oil] had reserved its own funds for the purpose of settling the claims of the tax authorities.'[711]

401.  On 19 July 2006, the Moscow *Arbitrazh* Court denied the First Bankruptcy Application, taking the view that the Loans were not yet due and thus could not be included in the Register of Creditors. The Court's decision was aligned with the position of the Federal Tax Service, and adopted a major part of its written submission *verbatim*.[712]

402.  On 28 July 2006, the Claimant filed the First Appeal against the decision of the Moscow *Arbitrazh* Court dismissing the First Bankruptcy Application.[713] On 31 July 2006, the

---

[708] Objections of Rosneft Oil Company OJSC Regarding the claims of Yukos Capital S.à r.l. for inclusion of its claim in the registry of Yukos Oil Company OJSC creditors, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (23 May 2006) (C-67). YNG also raised similar objections. *See* Minutes Of The Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (12 July 2006), 3 (C-70).

[709] Explanation of the Federal Tax Service, Moscow City *Arbitrazh* Court (undated) (C-401).

[710] *See* Explanatory Note regarding the Accounts of the Open Joint-Stock Company 'NK Yukos' (2005), 2-3 (R-289); Minutes Of The Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (12 July 2006), 3 (C-70).

[711] Explanation of the Federal Tax Service, Moscow City *Arbitrazh* Court (undated), 2 (C-401).

[712] Ruling of the Moscow City *Arbitrazh* Court, Case No A40-11836-88-35 "B" (19 July 2006) (C-71).

[713] Appeal to the Moscow Court Decision from 19 July 2006, Ninth *Arbitrazh* Court of Appeal, Case No A40-11836/06-88-35 «B» (28 July 2006) (C-73).

Federal Tax Service wrote to the GPO concerning Yukos Capital's attempts to be recognised as a creditor of Yukos Oil. The Federal Tax Service reiterated the objections raised against the First Bankruptcy Application, and added that Yukos Oil's apparent recognition of the early payment demand of the Loans was contrary to its accounting records, and said:

> [T]he Federal Tax Service of Russia requests prosecutorial response to these facts indicating unlawful actions by officers of Yukos Oil Company OJSC with the intent of embezzling funds from the Russian Federation budget and their commission of fraud and document forgery regarding the existence of a debt totaling over RUB 100 billion.[714]

403. *Criminal investigation and searches.* On 8 August 2006, the Russian Deputy General Prosecutor initiated criminal proceedings and began an investigation of the Claimant on the basis of indications of fraud. The initiating order referred to the alleged unlawfulness of the Yukos Tax Arrangement and stated that the materials provided by the Federal Tax Service indicated that Yukos Capital 'had been used to amass financial resources acquired by illicit means', concluding that the Loans were 'fraudulent' and 'knowingly false' agreements 'with the aim of deceiving officials' in charge of the bankruptcy proceedings.[715]

404. Pursuant to a search warrant issued that day, the investigative group of the GPO conducted a search of the Moscow office of Nomos on 9 August 2006.[716] The record of the search describes the search of rooms in the Nomos offices, records the seizure of

---

[714] Letter from the Deputy Director of the Federal Tax Service to the Office of the Prosecutor General of the Russian Federation, with enclosures (31 July 2006), 3 *et seq.* (**R-642**). The Claimant asserts that it had never seen this communication, which was disclosed by the Respondent on 14 March 2019 as part of its document production obligations. *See* Memorial, [271]; Rejoinder, [217].

[715] Order to initiate a criminal case and proceedings in the case, Deputy Prosecutor General of the Russian Federation (8 August 2006) (**C-75**).

[716] Resolution to apply for a search warrant, Deputy Prosecutor General of the Russian Federation (8 August 2006) (**R-297**).

computer devices and hard copy documents, and lists 242 documents seized.[717] In a letter dated 17 August 2006, Nomos informed the Claimant that the search included seizure of all documents received from Yukos Capital, and seizure of the power of attorney granted by the Claimant (dated 24 April 2006) for the purposes of, *inter alia*, the First Appeal.[718] Yukos Capital complained contemporaneously that the homes of its lawyers were searched,[719] and Mr Mkhitaryan testifies to a recollection that Mr Das Gupta had told him that his father's home had been searched, mistaken for his own.[720]

405. The record of the search of the Nomos offices noted that its representatives had stated three complaints: that an inventory of documents contained in the seized folders was absent; that there was no mention of the paperback folder seized in one office; and that documents concerning Transneft were seized despite not being mentioned in the search warrant.[721] The search record also refers to the seizure of a number of hard disk drives and floppy disks from Nomos servers and computers. [722] The Tribunal accepts Mr Mkhitaryan's evidence that, although there is no specific complaint about this noted

---

[717] Search (Seizure) Record and Record of Examination of Items (Documents), Investigative Group of the Office of the RF Prosecutor General (9 August 2006), 7-27 (**R-297**).

[718] Letter from NOMOS Law Office to Yukos Capital S.à r.l. (17 August 2006) (**C-402**). *See* Transcript of Witness Interview, Marina Petrovna Titievskaya (15 August 2006) (**R-298**). *See* also Mkhitaryan 1, [44]-[47]. The Nomos letter refers to a hearing of the First Appeal on 23 August 2006, but the hearing was actually held on 28 September 2006.

[719] Application of Yukos Capital S.à r.l., Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 "Б" (November 2006), [4] (**C-403**); Mkhitaryan 2, [7]. Under cross-examination Mr Mkhitaryan also had possession of a letter from Ms Titievskaya following a search of her home in November 2006, not on the record: T4/888/22-889/10 (Mkhitaryan).

[720] Mkhitaryan 1, [47].

[721] Search (Seizure) Record, Investigative Group of the Office of the RF Prosecutor General (8 August 2006), 15 (**R-297**).

[722] Ibid, 3, 5, 7, 8 (**R-297**).

on the search record, the removal of hard disk drives is likely to have had a significant effect on the data files of Nomos in general.[723]

406. On 15 August 2006, the Managing Partner of Nomos, Ms Titievskaya, was interviewed for approximately three hours. The transcript records her refusing to testify about any facts known to her in connection with the rendering of legal services. When questioned about the legal services agreement with Yukos Capital dated 24 April 2006, Ms Titievskaya explained that Nomos corresponded by email with Yukos Capital through the three directors of TMF Corporate Services SA (**TMF**), that she did not discuss the firm's engagement agreement with Mr Das Gupta, and that the only time she contacted him was for assistance getting in touch with Mr Theede (from whom she obtained a letter confirming Yukos Oil's receipt of Yukos Capital's early repayment demand).[724] Nomos mentioned this interview in its letter of 17 August 2006 to the Claimant.[725]

407. Mr Mkhitaryan's evidence under cross-examination was that he understood (through Mr Das Gupta) that Ms Titievskaya was 'scared' of the repercussions of being involved in the Yukos case, so expressed a preference not to communicate directly with Yukos managers and instead to be hired by Mr Das Gupta.[726]

408. In the letter of 17 August 2006, Nomos explained that in the upcoming appeal hearings, it would have to inform the court that, as a consequence of the search, all relevant documents received from Yukos Capital had been seized, as well as the power of attorney, and that 'in this connection the Lawyers have no possibility to represent the above mentioned documents in the court hearings.'[727] Mr Mkhitaryan also deposed that the

---

[723] T4/914/15–915/2.

[724] Transcript of Witness Interview, Marina Petrovna Titievskaya (15 August 2006) (**R-298**).

[725] Letter from NOMOS Law Office to Yukos Capital S.à r.l. (17 August 2006), 2 (**C-402**).

[726] T4/854/7-855/18 (Mkhitaryan).

[727] Letter from NOMOS Law Office to Yukos Capital S.à r.l. (17 August 2006), 2 (**C-402**).

authorities had threatened to initiate criminal proceedings against Ms Titievskaya's husband.[728]

409. Mr Mkhitaryan's evidence as to the effect of the search and seizure and interrogation of Ms Titievskaya on the ability of Nomos to carry on business was derived primarily from his conversations with Mr Das Gupta.[729] Nevertheless, reviewing both his evidence and the documentary record, the Tribunal is satisfied, and so finds, that it was these events that led to her decision to withdraw from legal representation of the Claimant in the bankruptcy.[730]

410. *The First Appeal.* At the hearing for the First Appeal, held on 28 September 2006, counsel for Yukos Capital requested an adjournment based on the Nomos search, but the request was denied and the court proceeded to consider a motion filed by the Federal Tax Service to stay the proceedings due to the pendency of the criminal case against Yukos Capital. Rosneft supported this motion, and Yukos Capital's representatives (having lost their application to have the proceeding adjourned) did not object.[731]

411. In a ruling issued on the same day of the hearing, the Ninth *Arbitrazh* Court of Appeal granted the motion of the Federal Tax Service and suspended the First Appeal on the basis of the GPO's order of 8 August 2006.[732] The court found that, to the extent that the determination whether the Loans were agreements with 'knowingly false information' was 'of direct significance for establishing the validity of the claims made by Yukos

---

[728] Mkhitaryan 1, [45]; his evidence was that he was told this by Mr Das Gupta: T4/883/24-884/11 (Mkhitaryan).

[729] Mkhitaryan 1, [44]; T4/858/24-860/3; T4/882/9-15 (Mkhitaryan).

[730] Mkhitaryan 2, [5], [10]-[12]; T4/856/16-857/8; T4/878/16-880/7 (Mkhitaryan).

[731] Minutes of a Court Hearing, Ninth Commercial (*Arbitrazh*) Appeals Court, Case No 09AP-10665/2006-GK (28 September 2006), 2 (**R-646**).

[732] Court Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10665/2006-GK (28 September 2006) (**C-76**). The Claimant contends that this ruling was not delivered to it until 27 October 2006: Memorial, [275].

Capital', the proceedings should be suspended until a decision was rendered in the criminal case.[733]

412. On 27 November 2006, Yukos Capital submitted the First Cassation Appeal against the ruling of the Ninth *Arbitrazh* Court of Appeal, arguing, *inter alia*, that the criminal case needed to be in the process of 'being tried exactly by the court' to warrant suspension of another proceeding, and that the investigation of the GPO only constituted a 'pre-trial proceeding on the criminal case.'[734]

413. *The Second Bankruptcy Application.* Yukos Oil was formally declared bankrupt on 1 August 2006 and liquidation proceedings commenced. As a result, all debts owed by Yukos Oil became due and owing as a matter of Russian law. [735]

414. The Claimant then filed the Second Bankruptcy Application for the inclusion of the Loans in the Register of Creditors on 11 October 2006.[736] By then, the debt claimed by Yukos Capital amounted to RUB 128,132,862,918.13.[737]

415. Both Mr Rebgun and the Federal Tax Service objected to the Second Bankruptcy Application. Mr Rebgun requested that the Second Bankruptcy Application be denied, arguing that it concerned the same issues that were still pending under the suspended First

---

[733] Court Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-I0665/2006-GK (28 September 2006), 3 (C-76).

[734] Cassation Appeal of Yukos Capital S.à r.l. against Decision No 09AP-10665/2006-GK of 28.09.2006 of the Ninth Arbitration Court of Appeal, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 «B» (27 November 2006), 3 (C-426).

[735] Art 126, Federal Law on Insolvency (Bankruptcy) 2002 (**PBS-66**); Zaitsev 2, [53]; T8/1769/22-25.

[736] Application for inclusion of a claim by Yukos Capital S.à r.l. in the registry of claims of creditors of Yukos Oil Company OJSC, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (6 October 2006) (C-77). This document is dated 6 October 2006, but bears a stamp of the Moscow *Arbitrazh* Court dated 11 October 2006.

[737] Consisting of RUB 88,822,099,402 in principal, 15,861,729,274 in interest and 23,449,034,242.13 in late repayment penalty. *See* ibid, 6 (C-77).

Appeal.[738] The Federal Tax Service's opposition to the Second Bankruptcy Application relied primarily on the premise that the funds pertaining to the Loans were 'essentially the funds of Yukos Oil Company OJSC itself.'[739] The Federal Tax Service submitted that the Moscow *Arbitrazh* Court had already reached this conclusion when rejecting the First Bankruptcy Application, and submitted that this was confirmed by the alleged evidence that: (i) the role of the offshore companies within the Yukos Tax Arrangement was to amass proceeds obtained through tax evasion; (ii) the demand for early repayment of the Loans was only proved by a letter of Yukos Oil's CEO but not properly reflected in the company's public records; and (iii) the Rehabilitation Plan foresaw that Yukos Oil would eliminate all intragroup claims, which would therefore include the Loans.[740]

416. In advance of the hearing on the Second Bankruptcy Application, the Claimant notified the Moscow *Arbitrazh* Court that it could neither 'ensure participation of its representatives' nor access qualified legal assistance, owing to the pressure placed on its lawyers at Nomos and the seizure of documents through the criminal investigation; it explained that it had no choice but to ask for the Court to proceed in the absence of Yukos Capital's representatives.[741] Mr Mkhitaryan explained that it was not in Yukos Capital's interest to request a postponement of the hearing, because it needed to have its claims registered before the liquidation was completed.[742]

---

[738] Petition of the Receiver of Yukos Oil Company OJSC, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (23 November 2006) (C-80).

[739] Comments of the Federal Tax Service concerning the claims of Yukos Capital S.à r.l. of 11 October 2006, Case No A40-11836/06-88-35 B (undated) (C-78). The Federal Tax Service also argued at the court session. *See* Record of Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (27 November 2006), 2 (C-81).

[740] *See* Memorial, [284]. The Parties disagree on the extent to which Yukos Oil's alleged ownership of the Loans was proved at the moment. *See for instance* Memorial, [285]-[286]; Rejoinder, [223]-[225].

[741] Application of Yukos Capital S.à r.l., Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 "Б" (November 2006), [4]-[7] (C-403). *See also* Mkhitaryan 1, [46], [48].

[742] T4/906/2-8 (Mkhitaryan).

417. The hearing on the Second Bankruptcy Application was held, as originally scheduled, on 27 November 2006. Yukos Capital's representatives did not appear at the session, but the court decided to proceed on the basis that Yukos Capital's representatives 'had been notified of the time and place of the proceeding' and had requested that the claim be heard in their absence.[743]

418. Following the hearing, the Moscow *Arbitrazh* Court issued an oral decision rejecting the Second Bankruptcy Application, which was provided in writing on 4 December 2006.[744] The court dismissed Mr Rebgun's objection, finding that the grounds on which the Second Bankruptcy Application was based (particularly Yukos Oil's bankruptcy declaration) differed from those concerned in the First Appeal. Conversely, the Federal Tax Service's position was upheld in its entirety, with its written submission being incorporated *verbatim* into the ruling.

419. *The Second Appeal*. On 18 December 2006, the Claimant filed the Second Appeal against the decision denying the Second Bankruptcy Application. Yukos Capital submitted that it had never had access to the objections of Mr Rebgun and the Federal Tax Service on the Second Bankruptcy Application, that previously undisclosed evidence could not be relied upon, and that the decision of the Moscow *Arbitrazh* Court had no basis.[745] As for the existence of a debt under the Loans, the Claimant submitted that the tax returns to which the decision referred could not modify civil liabilities, while contending that the bankruptcy declaration rendered the debate on the enforceability of its claims moot.[746] With regard to the ownership and origin of the funds, Yukos Capital argued that it sufficed to prove the existence of a loan agreement and the maturity of the obligations therein,

---

[743] Record of Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (27 November 2006), 1 (C-81). The hearing lasted nine minutes.

[744] Decision of the Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (4 December 2006) (C-82).

[745] Second Appeal, [3]-[5], [20]-[23] (C-83).

[746] Second Appeal, [6]-[12] (C-83).

denying that the Loans could be illegal or invalid, let alone on the sole basis that they were related-party transactions.[747]

420. The hearing on the Second Appeal started on 17 January 2007, but it was postponed due to the absence of Yukos Capital's representatives.[748] In advance of that hearing, Yukos Capital (by TMF) requested that the hearing be held in its absence because it was 'effectively deprived of the opportunity to have procedural representatives in Russia.' In explaining the reasons for that application, Yukos Capital noted that it had been represented by Nomos but said:[749]

> 6. From the moment the Application for inclusion of the Company's claims in the register of Yukos Oil Company OJSC creditors was filed, however, these attorneys were subjected to pressure by means of searches conducted by investigators from the Prosecutor General's Office of the Russian Federation at the offices of NOMOS Law Firm and the attorneys' home addresses, as well as attempts to interview them on aspects of the provision of legal assistance to the Company.

> 7. In the course of the investigative actions, documents were seized from the NOMOS Law Firm attorneys that relate to the rendering of legal assistance to the Company, as a result of which the attorneys were and still remain unable to properly represent the Company's interests in the court of first instance and in the court of appeal, while the Company, lacking the relevant procedural documents, cannot hire other representatives.

> 8. Thus, the Company has effectively been deprived of the opportunity to receive qualified legal assistance and have procedural representatives in the instant case.

> ...

> 10. At the same time, the Company understands that no matter which Russian attorneys it hires to represent it in this case, those attorneys will immediately

---

[747] Second Appeal, [18]-[19] (C-83).

[748] Record of Court Proceedings, Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2006-GK (17 January 2007) (C-404).

[749] Application of Yukos Capital S.à r.l., Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2006-GK (A40-11836/06-88-35 "B") (undated but said by Mkhitaryan 2, [7] to be dated on or around 1 February 2007) (C-575).

be subjected to similar actions by the law-enforcement agencies, aimed at
getting them to withdraw from representing the Company in court.

421. Mr Mkhitaryan rejects the Respondent's suggestion that Yukos Capital had other options
available, testifying in his written evidence in particular that the necessary documentation
required by any new lawyers to appear (including powers of attorney executed by Yukos
Capital's then-directors, Mr Godfrey and Mr Misamore) had been seized in the Nomos
raids and could not be replaced in time.[750] Yukos Capital was left formally unrepresented
between early January 2007 and May 2007.

422. The hearing was resumed on 15 February 2007. Mr Rebgun, Rosneft and the Federal Tax
Service all opposed the Second Appeal, referring to the decision on the Second
Bankruptcy Application and its conclusion that the funds at stake belonged to Yukos Oil
at all times, and adding that the Claimant had failed to prove that the Loans had been
effectively transferred. [751]

423. On 22 February 2007, the Ninth *Arbitrazh* Court of Appeal denied the Second Appeal.[752]
The court rejected the Claimant's arguments and reiterated that: (i) the existence of an
obligation of early repayment of the Loans was not proved; and (ii) Yukos Oil was the
actual owner of the funds involved in the Loans, which were the result of formal
agreements based on 'the common interests of the debtor's former management and the
appellant's current management.'[753]

424. The Claimant filed the Second Cassation Appeal on 10 April 2007, seeking to reverse the
judgments on the Second Bankruptcy Application and the Second Appeal.[754] This appeal

---

[750] Mkhitaryan 2, [8].

[751] Record of Court Proceedings, Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2006-GK (15 February 2007) (C-405).

[752] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007) (C-84).

[753] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007), 2-4 (C-84). The court adopted *verbatim* a major part of the first instance decision.

[754] Cassation Appeal by the Yukos Capital S.à r.l. Company, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (10 April 2007) (C-85).

was signed by Mr Daniel Feldman as Manager of Yukos Capital, and included a copy of an extract from the Register of Commerce and Enterprises confirming his powers.[755]

425. On 17 May 2007, Mr Rebgun initiated separate proceedings requesting that the Loans be declared invalid. The petition alleged that, to the extent that Yukos Oil was the ultimate owner of the funds involved and also had control over the Claimant, the Loans constituted a transaction 'with an interested party' the performance of which would signify real harm to Yukos Oil and losses for its creditors.[756] One week later, Mr Rebgun filed a motion for the suspension of the proceedings on the First Cassation Appeal and the Second Cassation Appeal, arguing that 'the possible invalidation of the loan agreements could deprive Yukos Capital S.à r.l. of grounds for filing claims pursuant to the Federal Law on Insolvency.'[757]

426. *Suspension of the Cassation Appeals.* On 31 May 2007 the Second Cassation Appeal was suspended pending a decision on the petition to declare the Loans invalid.[758] Yukos Capital was by then represented by Mr Morozov of Gridnev and Partners.[759] The Court rejected Yukos Capital's request for a recess to file written submissions on the petition to suspend the appeal, on the basis that it had made its position clear in the oral hearing and

---

[755] Cassation Appeal by the Yukos Capital S.à r.l. Company, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (10 April 2007), 7 (C-85).

[756] Petitions of the Receiver To Have Loan Agreements Ruled Invalid, Moscow City *Arbitrazh* Court (17 May 2007), 2-3, 6-7 (C-86).

[757] Motion of Yukos Oil Company OJSC Receiver For Suspension of Proceedings in Cassation Appeal, Moscow District Federal *Arbitrazh* Court, Case No KG-A40/4522-07 (24 May 2007) (C-87).

[758] Decision of the Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (31 May 2007) (C-88).

[759] Decision of the Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (31 May 2007) (C-88); Power of Attorney granted to Yan Das Gupta and Aleksandr Morozov (8 December 2005) (C-734).

procedural law did not require written statements 'regarding every issue that arises during a court session.'[760]

427.  On 20 July 2007, the Moscow District Federal *Arbitrazh* Court found that the First Cassation Appeal had been submitted in violation of procedural requirements, because it was not accompanied by documents proving the authority of the persons who signed the appeal, granting the Claimant until 20 September 2007 to submit those documents and confirm service failing which the Court would 'recommit the cassation appeal.'[761] On 28 September 2007, the Ninth *Arbitrazh* Court of Appeal stayed the proceedings pending resolution of the criminal proceedings against Yukos Capital,[762] a decision which was upheld by the Federal *Arbitrazh* Court on 24 October 2007.[763]

428.  The liquidation of Yukos Oil was finalised in November 2007, leading to the dissolution of the company. On this basis, the pending proceedings regarding the Claimant's attempt to be included in the Register of Creditors were terminated.[764] The case initiated by Mr Rebgun on the validity of the Loans was also terminated.[765]

---

[760] Decision of the Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (31 May 2007), 4 (C-88).

[761] Decision on deferral of the cassation appeal, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 "B" (20 July 2007) (C-90).

[762] A copy of which does not appear to be on the arbitration record. There is on the record a document entitled Petition of Yukos Capital S.à r.l. to remedy circumstances that served as grounds for deferring consideration of the cassation appeal, Federal *Arbitrazh* Court of the Moscow Circuit, Case No A40-11836/06-88-35 "B" (undated) (C-589).

[763] Decision of the Federal *Arbitrazh* Court of the Moscow Circuit, Case No A40-11836/06-88-35B (24 October 2007) (C-590).

[764] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No AP-10665/2006-GK (28 February 2008) (C-597) (in respect of First Bankruptcy Application); Ruling of the Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (26 February 2008) (C-100); Determination of the Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 "b" (8 May 2008) (C-101) (in respect of Second Bankruptcy Application)

[765] Memorial, [297].

429. The Claimant cites a number of other applications by which the Claimant attempted to appeal the rejection of its bankruptcy applications that were terminated on the ground that Yukos Oil had ceased to exist.[766]

430. *Applications of other Yukos subsidiaries*. As the bankruptcy proceedings evolved, several subsidiaries of the Yukos Group aside from the Claimant also sought to have their claims included in the Register of Creditors. In total, the claims of 23 subsidiaries were recognised. Many of these entities (*e.g.* TN, SN) were eventually acquired by Rosneft and its subsidiaries during the liquidation of Yukos Oil.[767]

431. In contrast, a number of other Yukos subsidiaries had their applications rejected by Russian courts, further to the objections raised by Mr Rebgun, Rosneft and YNG, and the Federal Tax Service.[768] As in relation to Yukos Capital, the courts generally found that the applicants had failed to prove the validity or existence of their claims.

### 3. Did the Respondent expropriate the Loans in breach of Article 13 ECT?

432. The Tribunal must first deal with two preliminary objections raised by the Respondent:

(i)  That the decision of the Dutch courts that the Loans continue to exist and can be enforced means necessarily that they have not been expropriated because the Claimant cannot establish the 'virtual annihilation and effective

---

[766] Reply, [262].

[767] *See* Register of OAO NK Yukos Creditor Claims, Bankruptcy Receiver (30 October 2007) (**R-657**); Financial Report of Yukos Oil for the second half of 2006 (undated) (**R-684**). *See also* Rejoinder, n. 580.

[768] *See for instance* Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-8164/2006-GK (2 August 2006) (**C-296**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-7695/2006-GK (7 August 2006) (**C-297**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-7786/2006-GK (31 August 2006) (**C-299**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-9325/2006-GK (31 August 2006) (**C-300**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10777/2006-GK (7 September 2006) (**C-303**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-12382/2006-GK (4 October 2006) (**C-304**); Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-2242/2007-GK (13 March 2007) (**C-306**); Ruling of the *Arbitrazh* Court of the City of Moscow, Case No A40-11836/06-88-35 "B" (4 December 2006) (**C-428**).

neutralisation' [769] of its investment or their 'irreversible and permanent taking.'[770]

(ii)   That the actions of Mr Rebgun as Receiver of Yukos Oil in the bankruptcy are not attributable to the Respondent, which is accordingly not liable for them.

433.   *Continued existence of Loans.* The Respondent is correct that the Loans that are the legal materialisation of the investment that is the subject of the present proceedings have been ruled valid and enforceable at the suit of the Claimant in proceedings against OOO Promneftstroy (**Promneftstroy**). [771] The judgment is subject to appeal.

434.   The Tribunal does not accept that this finding excludes the Claimant's claim for expropriation. In the Tribunal's view, the Respondent's submission conflates the legal form by which the investment was held with its economic materialisation. The question for the Tribunal is whether any or all of the sums advanced under the Loans have been irreversibly and permanently taken as a result of the Respondent's actions. The fact that the Loans as legal instruments remain in force and can be sued upon is not determinative of that question.

435.   This has been the constant jurisprudence of international tribunals considering expropriation claims:

(i)   The Iran–US Claims Tribunal has held that:

> A deprivation or taking of property may occur under international law through interference by a state in the use of that property or with the enjoyment of its benefits, even where legal title to the property is not affected.[772]

---

[769] *Enkev Beheer BV v Poland*, PCA Case No 2013-01, First Partial Award (29 April 2014), [344] (**RL-438**).

[770] *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC BV v Paraguay*, ICSID Case No ARB/07/9, Decision on Jurisdiction (29 May 2009), [114] (**RL-428**).

[771] Judgment of the Amsterdam District Court (5 December 2018) (**CL-188**).

[772] Tippets, Abbett, McCarthy, Stratton v TAMS-AFFA Consulting Engineers of Iran (1984) 6 Iran–USCTR 219, 225; and see, to like effect: Starrett Housing Corporation v Iran (1983) 4 Iran-US CTR 122, 154 (**CL-125**).

(ii)     The same point has been made by arbitral tribunals. In *Occidental,* the tribunal
         observed:

> The Tribunal agrees with the Claimant in that expropriation need not involve the
> transfer of title to a given property, which was the distinctive feature of traditional
> expropriation under international law. It may of course affect the economic value of
> an investment.[773]

436.  The Tribunal will consider in Part VIII.D below the extent to which credit must be given
      for sums recovered by the Claimant under the Dutch judgment.

437.  *Attribution of acts of Mr Rebgun.* On the second preliminary issue, however, the Tribunal
      accepts the correctness of the Respondent's position that the actions of a Temporary
      Receiver are not attributable to the State.[774] The Tribunal agrees with the findings of the
      Grand Chamber of the ECtHR in *Kotov v Russia* that, under Russian law, a liquidator is
      substantially autonomous from the State authorities. He cannot be treated as an agent of
      the State, whose acts engage the responsibility of the State at international law.[775] The
      position is in substance the same in relation to a temporary receiver.[776]

438.  For its part, the Claimant (while insisting that Mr Rebgun was not in fact acting
      independently[777]) nevertheless makes clear that it does not rely on the acts of Mr Rebgun
      as attributable to the Respondent. It states:

> Claimant's case does not turn on Mr. Rebgun's acts and omissions being attributed
> to Respondent.
>
> …
>
> Instead, Claimant maintains that the Russian administrative, prosecutorial and
> judicial organs acted in cohort in expropriating Claimant's Investment and the

---

[773] *Occidental Exploration and Production Company v Ecuador*, LCIA Case No UN 3467, UNCITRAL, Final
Award (1 July 2004), [85] (**RL-229**).

[774] Counter-Memorial, [326]–[336].

[775] *Kotov v Russia*, Complaint No 54522/00, ECtHR (3 April 2012), [107] (**RL-329**).

[776] Zaitsev 1, [67].

[777] Reply, [163]–[192].

> Russian State adopted Mr. Rebgun's egregious acts as its own when its courts failed to exercise their proper supervisory role in the bankruptcy.[778]

439. As a result, the Tribunal will approach its analysis of the treatment of the Claimant's Loans in the bankruptcy of Yukos Oil by focussing on the conduct of the Russian State itself: the process of the Russian courts and the contemporaneous actions of the prosecutorial authorities.

### (a)  Treatment of the Loans in the Yukos Oil bankruptcy

440. Having considered the totality of the evidence (summarised in Part VI.B.2 above), the Tribunal has reached the conclusion that the disallowance of the proof of debt of Yukos Capital in the bankruptcy of Yukos Oil constituted expropriation of that debt by the Respondent because the taking was without 'due process of law' and was discriminatory, amounting to a denial of justice. As already observed, Article 13 ECT requires all four conditions for a State taking not to constitute expropriation.[779] Accordingly, the Respondent's failure to meet the requirements of due process of law and non-discrimination amounting to a denial of justice constitutes a breach of its obligations under Article 13.

441. As to absence of due process of law, the Tribunal relies in particular on the following facts and matters.

442. *First Bankruptcy Application.* The Claimant's proof of debt, including the notice of default, was regularly submitted.[780] It was rejected by the Moscow *Arbitrazh* Court not on the ground that the debt was invalid, but on a ground that had no basis in law or fact, namely that the debt had not been and could not be accelerated.[781] The Court adopted

---

[778] Reply, [160]–[161].

[779] Above at [371].

[780] Yukos Capital First Bankruptcy Application **(C-66)**.

[781] Ruling of the Moscow City *Arbitrazh* Court, Case No A40-11836-88-35 "B" (19 July 2006) **(C-71)**.

verbatim the objections of the Federal Tax Service. [782] The Tribunal finds no indication of an independent judicial consideration. The Moscow *Arbitrazh* Court ignored the evidence of acceleration that had been submitted.[783]

443. *Initiation of criminal proceedings.* Immediately following the filing by Yukos Capital of an appeal to the Ninth *Arbitrazh* Court of Appeal,[784] the Federal Tax Service sent its letter to the GPO requesting initiation of criminal proceedings.[785] This letter was based upon the demonstrably incorrect ground that the Loans had been advanced in 2006 after Yukos Oil had already been the subject of revised tax assessments. On the basis of this request alone, and without independent examination, on 8 August 2006, the GPO ordered the initiation of criminal proceedings eight days later.[786]

444. *Search and seizure of the files of Claimant's lawyers.* Based on the GPO's Order, the Court approved searches and seizures of files in the offices of Yukos Capital's lawyers, Nomos, and Ms Titievskaya was interrogated. [787] Following this interrogation, Ms Titievskaya no longer signed applications advancing Yukos Capital's claim, leaving the Claimant without effective legal representation.

445. The Tribunal finds that these criminal proceedings were instituted in order to intimidate the Claimant and its legal representatives from pursuit of the Claimant's claim in the bankruptcy. It notes in particular that:

---

[782] Explanation of the Federal Tax Service, Moscow City *Arbitrazh* Court (undated) (**C-401**).

[783] Notice of default (11 November 2005) (**C-139**); Affidavit of TMF Directors (30 June 2006) (**C-561**); Letter from Steven M. Theede to Mrs. M. P. Titievskaya (12 July 2006) (**C-564**).

[784] Appeal to the Moscow Court Decision from 19 July 2006, Ninth *Arbitrazh* Court of Appeal, Case No A40-11836/06-88-35 «В» (28 July 2006) (**C-73**).

[785] Federal Tax Service Deputy Director Request to Office of the Prosecutor (31 July 2006) (**R-642**).

[786] Order to initiate a criminal case and proceedings in the case, Deputy Prosecutor General of the Russian Federation (8 August 2006) (**C-75**).

[787] Search (Seizure) Record, Investigative Group of the Office of the RF Prosecutor General (8 August 2006) (**R-297**); Transcript of Witness Interview, Marina Petrovna Titievskaya (15 August 2006) (**R-298**); Mkhitaryan 1, [44]; Mkhitaryan 2, [5].

(i) The criminal proceedings were instituted shortly after the Claimant had filed an appeal from the decision of the Moscow *Arbitrazh* Court denying its First Bankruptcy Application;

(ii) The search was directed at the Claimant's legal representatives in the bankruptcy;

(iii) The GPO seized many files and computer hard drives from the Nomos offices, apparently without any regard for the need to protect the confidentiality of the lawyer-client relationship. Professor Esakov's expert evidence was that this would have to be assessed on a document-by-document basis,[788] but there is no evidence or suggestion that this was done;

(iv) No criminal charges have been brought against the Claimant or its directors, officers or agents as a result of this investigation since the institution of the criminal proceedings;[789]

(v) Yet the pendency of the criminal proceedings served as a basis upon which the Federal Tax Service could apply to suspend the Claimant's pursuit of relief in the bankruptcy, while the bankruptcy proceedings were still ongoing; applications that the Russian courts granted.

446. *Suspension of appeal.* On the basis of the pending criminal proceedings, the Court suspended the Claimant's appeal from the decision denying its First Bankruptcy Application on 28 September 2006.[790]

447. *Second Bankruptcy Application.* Following the Court's declaration of the bankruptcy of Yukos Oil on 4 August 2006, all debts became due and owing by operation of law.

---

[788] T7/1584/15–1585/1

[789] T4/915/4-11.

[790] Court Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10665/2006-GK (28 September 2006) (C-76).

Accordingly, the Claimant filed a Second Bankruptcy Application on 6 October 2006.[791] The Claimant was not provided with the objections to its Application filed by the Federal Tax Service and the Receiver. Following the harassment of its lawyers in the criminal investigation, it had no effective legal representation.[792] It was left with no option but to seek the consideration of the Court in the absence of its representatives. The Court rejected the Second Bankruptcy Application after a cursory hearing and in the absence of any evidence to support the assertion that the funds were those of Yukos Oil, relying instead on its judgment in the First Bankruptcy Application (which was the subject of a stayed appeal) and without evidence of an independent examination of the Federal Tax Service's objections.[793]

448.  *Second Appeal.* The Claimant appealed the rejection of the Second Bankruptcy Application, but, as a result of the actions taken by the GPO, it was unable to obtain any legal representation.[794] The Court of Appeal rendered its judgment on a basis that neither party had argued, namely that the debt did not exist because the Loans were invalid.[795]

---

[791] Application for inclusion of a claim by Yukos Capital S.à r.l. in the registry of claims of creditors of Yukos Oil Company OJSC, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (6 October 2006), [15] (C-77).

[792] Application of Yukos Capital S.à r.l., Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 "Б" (November 2006) (C-403).

[793] Record of Court Proceedings, Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (27 November 2006) (C-81); Decision of the Moscow City *Arbitrazh* Court, Case No A40-11836/06-88-35 B (4 December 2006) (C-82); Comments of the Federal Tax Service concerning the claims of Yukos Capital S.à r.l. of 11 October 2006, Case No A40-11836/06-88-35 B (undated) (C-78).

[794] Second Appeal (C-83); Application of Yukos Capital S.à r.l., Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2006-GK (A40-11836/06-88-35 "B") (undated but said by Mkhitaryan 2, [7] to be dated on or around 1 February 2007), 2 (C-575).

[795] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007) (C-84).

449. *Petitions to invalidate the Loans.* Only after the Claimant petitioned the Court of Cassation on 10 April 2007,[796] did the Receiver petition to invalidate the Loans as *de facto* funds of Yukos Oil in reliance on the Court of Appeal's judgment.[797]

450. *Suspension of cassation hearing.* On 31 May 2007, the Federal *Arbitrazh* Court granted the motion of the Receiver to suspend the Second Cassation Appeal on the basis that the Loans were subject to invalidation proceedings, refusing the request of Yukos Capital for an adjournment so as to be able to present written argument.[798]

451. *Liquidation of Yukos Oil.* In November 2007, Yukos Oil was placed into liquidation. On that basis, the Claimant's application to be entered in the Register of Creditors was terminated without a substantive determination of the validity of the Loans or its rights thereunder.[799]

452. In the Tribunal's view, the process outlined above is the very opposite of a due process of law. This is not simply a case of a debt being wrongly excluded in a bankruptcy or the liquidation of company while an application to admit a debt was still outstanding. Considering the totality of the process summarised above, the Claimant was never afforded a proper opportunity to have its claim considered and admitted. On the contrary, it was subjected to a series of actions, both by the courts and the prosecutorial authorities, which precisely foreclosed that opportunity. In short, it was subject to a denial of justice, as a result of which its rights relating to the Loans were taken.

---

[796] Cassation Appeal by the Yukos Capital S.à r.l. Company, Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (10 April 2007) (C-85).

[797] Petitions of the Receiver To Have Loan Agreements Ruled Invalid, Moscow City *Arbitrazh* Court (17 May 2007), 2-3, 6-7 (C-86).

[798] Decision of the Moscow District Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (31 May 2007) (C-88).

[799] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No AP-10665/2006-GK (28 February 2008) (C-597) (in respect of First Bankruptcy Application); Ruling of the Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 B (26 February 2008) (C-100); Determination of the Federal *Arbitrazh* Court, Case No A40-11836/06-88-35 "b" (8 May 2008) (C-101) (in respect of Second Bankruptcy Application).

453. *Discrimination.* Further, the actions of the Respondent in excluding Yukos Capital from the creditors of Yukos Oil were discriminatory. The claims of YNG, Yukos Oil's production subsidiary, were substantially accepted.[800]

454. It will be recalled (Part III.E.2 above) that YNG had been Yukos Oil's principal Production Subsidiary, accounting for around 60% of the oil production of the Yukos Group. It had been acquired at its nominal value by the then State-owned oil company Rosneft on 22 December 2004.[801]

455. YNG submitted a bankruptcy petition against Yukos Oil, which was accepted for consideration on 27 March 2006.[802] The bulk of YNG's claims were admitted in the bankruptcy, either as part of the Rehabilitation Plan or as payment for arrears from the sale of oil between YNG and certain LTR Subsidiaries.[803] On 1 October 2006, YNG formally merged into Rosneft, as a result of which all of YNG's claims in the bankruptcy were attributed to Rosneft.[804]

456. The Respondent maintains that there was no discrimination in fact, as not all of YNG's claims were admitted in the bankruptcy, and a number of claims by Yukos-owned entities were so admitted.[805]

---

[800] Ruling of the City of Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35 B (6 June 2016) **(R-295)**.

[801] *Supra* [129]–[132].

[802] Ruling of the Moscow *Arbitrazh* Court to accept a petition for consideration, Case No A40-15780/06-88-39 B (27 March 2006) **(C-292)**.

[803] *Supra* [140]–[145]; Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10669/2006-GK (7 September 2006) **(C-301)**; Resolution of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-10671/2006-GK (7 September 2006) **(C-302)**.

[804] Ruling of the Moscow *Arbitrazh* Court, Case No A40-11836/06-88-35-B (9 November 2006) **(C-305)**.

[805] Counter-Memorial, [379]–[387]; Rejoinder, [263]–[284].

457. The Tribunal finds that the portions of YNG's claim that were not admitted were *de minimis,* amounting to just 1.37% of the total amount claimed.[806]

458. The largest portion (99%) of the claims of other Yukos Oil subsidiaries that were admitted in the bankruptcy was the claim of TN, another Production Subsidiary,[807] which was itself subsequently acquired by Rosneft.[808]

459. Having reviewed the record of court decisions, and considered the expert evidence submitted by Dr Gladyshev for the Claimant and Professor Zaitsev for the Respondent, the Tribunal can find no valid reason for the exclusion of the Claimant's claims in the bankruptcy, when the claims of other Yukos subsidiaries that had been or were subsequently acquired by Rosneft were admitted.

460. Professor Zaitsev accepted that, by virtue of Article 126 of the Russian Bankruptcy Law, all debts became due and owing from the date of Yukos Oil's bankruptcy.[809] It follows that the first reason advanced by the Ninth *Arbitrazh* Court of Appeal in its decision of 22 February 2007, namely that the existence of an obligation of early repayment of the Loans was not proven,[810] had no legal basis.

461. The second ground relied upon by the Court was that Yukos Oil was the actual owner of the funds in question, based on 'the common interests of the debtor's former management and the appellant's current management.'[811]

---

[806] Rulings of Moscow *Arbitrazh* Court on YNG's bankruptcy claim: 2 June 2006 (**R-294**); 14 June 2006 (**R-295**).

[807] Ruling of Moscow *Arbitrazh* Court, 1 June 2006 (**R-290**).

[808] Protocol on the Sale of Property of Yukos Oil included in Lot No 10, 3 May 2007 (**R-653**). The remaining 1% of claims by Yukos related entities that were admitted amounted to approximately RUB 150 million, an amount that the Tribunal considers to be *de minimis, see* Reply, [295].

[809] Zaitsev 2, [53]; T8/1769/10-25.

[810] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007) (**C-84**).

[811] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AP-18728/2007-GK (22 February 2007), 2-4 (**C-84**). The court adopted *verbatim* a major part of the first instance decision.

462. The Tribunal accepts the evidence of Dr Gladyshev that this finding had no basis in Russian law at the time, which excluded only the claims of shareholders arising from their shareholding.[812] It had no application to loans, including shareholder loans, still less to an inter-company loan from subsidiary to parent. The Tribunal considers that Professor Zaitsev's alternative 'subordination theory', which is not referred to in the judgments of the Russian courts in the Yukos Oil bankruptcy, is an 'ex-post facto rationale' that is not supported by the Russian law in force at the material time.[813]

463. Accordingly, the Tribunal is satisfied that there was no legitimate basis upon which the Russian courts could distinguish between the claim of YNG and the claim of Yukos Capital. It concludes that the Respondent discriminated against Yukos Capital. This constitutes discrimination for the purpose of Article 13(1) ECT, and contributes, with the denial of due process, to a denial of justice. On this basis, the Tribunal finds the Respondent to be in breach of its obligations to the Claimant under Article 13 of the Treaty.

### (b) As part of an orchestrated campaign against the Yukos Group?

464. The Tribunal further finds that, for the reasons set out below, its conclusion that the Claimant was subject to an expropriation of its property as a result of denial of justice is corroborated by actions taken against other companies in the Yukos Group as part of an orchestrated campaign.[814] For the reasons explained in Part VI.A.1 above, it is neither necessary nor appropriate for its purpose for the Tribunal to review the whole course of events that led to the bankruptcy of Yukos Oil. This Tribunal is concerned only with the claim of Yukos Capital as to the Respondent's conduct affecting its rights in the Loans. Nevertheless, it is entitled to consider the evidence adduced before it in relation to the treatment of the Yukos Group as a whole to the extent that it may be relevant to the

---

[812] Gladyshev 1, [234]; T8/1682/8–1684/4; Art 4(2) Bankruptcy Code 2002 (OZ-2).

[813] Gladyshev 1, [232].

[814] Above at [363].

allegation that the treatment accorded to Yukos Capital was part of an orchestrated campaign on the part of the Respondent against the Group.

465. As summarised in Parts III and V above, the present Tribunal has heard substantial submissions and evidence adduced on behalf of both Parties on this larger context. It reaches its decision solely on the basis of the evidence presented before it. Having considered that evidence, the Tribunal finds certain elements of the conduct affecting Yukos Oil to be shared in common with the procedure affecting Yukos Capital, so that the acts that are the subject of the present proceedings are part of such an orchestrated campaign against the Yukos Group as a whole.

466. Two elements are particularly relevant for this purpose:

    (i)     The imposition of VAT on Yukos Oil in relation to oil exports, which was the single largest element in the Tax Assessments that led to its bankruptcy and which received no substantive review by the Russian courts; and

    (ii)    The campaign of harassment of Yukos Oil's lawyers.

467. Each of these elements corroborates the Tribunal's finding that the denial of justice to which the Claimant was subjected was part of an orchestrated campaign against the Yukos Group as a whole.

468. *VAT*. The Claimant submits that 56% of the tax assessment claims against Yukos Oil related to the non-payment of VAT, amounting to USD 13.59 billion (including fines and interest relating to VAT).[815] It alleges that the imposition of VAT on Yukos Oil had no basis in Russian law and that, but for the VAT element in the tax reassessments, Yukos Oil would have been able to meet its tax liabilities and thereby avoid bankruptcy.[816]

---

[815] 2000-2004 Tax Assessments (C-516), Claimant's Closing Slides, 10.

[816] Reply, [344].

469. The Tribunal heard evidence from Judge Batsiev, an expert called on behalf of the
Respondent, on this point.[817] In summary, Judge Batsiev confirmed that:

(i)    VAT in Russia is a federal tax and that therefore the region in which the taxpayer
resides is irrelevant;[818]

(ii)    'The VAT Law provided that <u>export operations</u> (regardless of whether the
exported goods were produced by the exporter or were purchased by him for re-
sale) were exempt from tax; and Chapter 21 of the Tax Code envisages taxation
at the rate of 0%';[819]

(iii)    The LTR Subsidiaries submitted the documents required under the VAT Law to
support their claim to a 0% rate on the basis that the oil in question was
exported;[820]

(iv)    The Tax Ministry reassessed the tax as payable by Yukos Oil on the ground that
the revenues were in fact the revenues of Yukos Oil and consequently the
documents had to be provided to the tax authorities at the place of Yukos Oil's
location;[821]

(v)    Judge Batsiev confirmed that, in view of the fact that the requisite documents
had already been submitted by the subsidiaries, this was a 'formal position';[822]

(vi)    Judge Batsiev was then shown the transcript of the hearing of the appeal to the
Moscow *Arbitrazh* Court in which Yukos Oil, while stating that the requisite

---

[817] T6/1349–1370.

[818] T6/1349/8-22.

[819] Batsiev 1, 60, Annex A, [6], internal citations omitted; confirmed: T6/1350/7-19.

[820] T6/1353/3-21.

[821] E.g. Tax Ministry Decision No 30-3-15/3 (2 September 2004) in respect of tax year 2001, 21 (**R-269**).

[822] T6/1357/2.

documents had already been provided, exercised its right to resubmit them.[823]
He was unable to provide information as to why this was not sufficient.[824]

470. The Tribunal specifically asked counsel in closing to address *inter alia* the question:

> [D]oes Respondent maintain that the VAT element of the Yukos Oil 2000-2004 Tax
> Reassessments was lawfully imposed? If so, on what evidence does Respondent rely
> for this purpose?[825]

471. The Respondent's submission, in response to this question, was to rely to the evidence of
Judge Batsiev to the effect that 'the Tax Authorities have always had a position of very
strict compliance with formal requirements, including presenting a full list of documents
and absence of defects in those documents and presenting those documents by the proper
entity.'[826]

472. The Tribunal can find no evidence on the record that might be capable of supporting the
proposition that, even if the Russian tax authorities had determined that Yukos Oil and
not the LTR Subsidiaries was the proper taxpayer, VAT on the oil exports of the Yukos
Group was properly chargeable, nor that there was any failure to support the claim with
the proper documentation. On any view, it is uncontested that the LTR Subsidiaries did
submit the requisite documents. Moreover, the hearing transcript shows that Yukos Oil
resubmitted the same documents.

473. Yet the Moscow *Arbitrazh* Court and the Ninth *Arbitrazh* Court of Appeals held this
evidence inadmissible, since it showed receipt of the revenue by the LTR Subsidiaries
and not Yukos Oil.[827] The result was to base a USD 13.59 billion VAT liability on what

---

[823] Moscow *Arbitrazh* Court, Transcript of Hearing, 14 December 2004, 21 (C-269).

[824] T6/1369/9–1370/5.

[825] T7/1690/14-17.

[826] T10/2212/3-13; Respondent's Closing Slide 85, citing Batsiev T6/1357/7-11.

[827] Judgment of the Moscow *Arbitrazh* Court, Case Nos. A40-4338/05-107-9; A40-7780/05-98-90 (28 April 2005),
[378]–[382] (C-56); Judgment of the Ninth *Arbitrazh* Court of Appeal, Case Nos. A40-4338/05-107-9; A40-
7780/05-98-90 (16 August 2005), [271]–[272] (C-58).

was at most a failure to comply with a question of form in the submission of documents, in circumstances in which Yukos Oil was entitled to and did resubmit the documents. As a matter of substance, it is incontestable—and was not contested by the Respondent's expert—that no VAT is properly chargeable on oil exports.

474. In the light of these circumstances, the Tribunal concludes that the Russian courts' summary acceptance of the position of the tax authorities and their refusal to reconsider the imposition of VAT in the face of the uncontroverted evidence submitted by Yukos Oil constitutes a denial of justice,[828] which, in complicity with the tax authorities, was aimed taking the property of Yukos Oil.

475. When this record is compared with the record of the treatment of the Claimant's subsequent claim to recover its Loans in the bankruptcy of Yukos Oil, the Tribunal concludes that the treatment of Yukos Capital was part of a wider campaign on the part of the Respondent, in which the judiciary participated, with the common objective to deprive companies in the Yukos Group of their property.

476. *Harassment.* A second example of the orchestrated nature of the campaign against the Yukos Group, including the Claimant, relates to the treatment of its legal advisors. The Tribunal has referred above to the enforcement actions taken against the Claimant's Russian lawyers and the effect on the Claimant's ability to defend its interests before the Russian courts in the bankruptcy.

477. A similar pattern may be observed in relation to other legal advisors to the Yukos Group. The Tribunal received evidence on this from two witnesses:

   (i)   A witness statement of Mr Yuri Schmidt.[829] Mr Schmidt had been Mr Khodorkovsky's criminal defence lawyer. He gave his statement in the proceedings *Hulley Enterprises Ltd v Russia* (the ***Hulley*** Proceedings). It was signed on 15 September 2010. The Respondent elected not to cross-examine

---

[828] Above at [379], citing *Mondev International Ltd v United States of America*, ICSID Case No ARB(AF)/99/2, Award (11 October 2002), [127] (**RL-154**).

[829] Schmidt (15 September 2010).

Mr Schmidt in the *Hulley* Proceedings, so its contents were unchallenged there. [830] Mr Schmidt passed away in 2013. The Claimant in the present proceedings produced this statement with its Memorial and referred to it also in oral argument without objection from the Respondent. The Tribunal therefore receives this statement as evidence, while taking due account of the fact that it could not be tested in the proceedings before it.

(ii)     Mr Mkhitaryan, who had been a member of the Yukos Moscow Legal Department from 1997, and was its Head in 2005, becoming a member of the Legal Department of Yukos Services UK Ltd from 2006, a position that he still holds, signed two statements in these proceedings and appeared before the Tribunal to give oral evidence under cross-examination. [831]

478.  Both Mr Schmidt and Mr Mkhitaryan testified that there was an orchestrated campaign against lawyers representing the Yukos Group.

479.  Mr Schmidt devoted Part III of his statement to: 'The systematic intimidation and harassment of lawyers and Yukos personnel.' He stated:

> The victims of the harassment campaign by the Russian authorities were not only Mr Khodorkovsky's defense lawyers, but also defense lawyers for Yukos and Yukos-related persons, as well as Yukos' in-house counsel and outside lawyers. As one of the two senior members of Mr. Khodorkovsky's team, I can refer to a non-exhaustive list of facts of harassment and intimidation of lawyers by the Russian authorities through personal attacks, threats, attempts to disbar, illegal raids and seizures in their offices. [832]

---

[830] Memorial, [49]; T1/11/17–12/1

[831] T4/827–920.

[832] Schmidt, [13].

480. He then set out a number of examples of each of these types of harassment.[833] Of particular relevance to the present case are the examples that he gave of raids and seizures in lawyers' offices.[834] He concluded:

> It is important to note that the timing of the attacks... was always meticulously calculated to correspond to the critical stages in the dismantlement of Yukos. ... By depriving lawyers of their files and intimidating them, Russian authorities ensured that Yukos and its former management would not be in a position to properly defend themselves, and that Yukos' jewel asset could be confiscated without difficulty.[835]

481. Mr Mkhitaryan deposed not only to his knowledge of the actions taken against Ms Titievskaya but also to his own interrogation; to the arrest of Vasily Alesanyan (Head of the Legal Department at Yukos Oil until 2006); and to the circumstances that led to Mr Mkhitaryan's departure from Moscow, stating that he was '[f]earful of my personal freedom.'[836]

482. At the Hearing, he was questioned extensively about his knowledge of the circumstances in which the offices of Nomos were raided and Ms Titiyevskaya resigned from representing the Claimant. In the course of giving this evidence, he reiterated that 'lawyers of Yukos were frightened and interrogated'[837] and that 'the main reason' for such intimidation was 'to obtain all the assets.'[838]

483. In the course of the closing submissions, a member of the Tribunal specifically asked counsel for the Respondent to address any submissions that he wished to advance both about the treatment accorded to the internal and external lawyers to the Claimant and the lawyers for Yukos Oil.[839] Counsel submitted that 'there is no evidence to show--to

---

[833] Ibid, [14]–[22].

[834] Ibid, [16].

[835] Ibid, [17].

[836] Mkhitaryan 1, [35].

[837] T4/879/6.

[838] T4/903/23–25.

[839] T12/2232/22–2233/1; 2234/13-16.

support the allegation of harassment and intimidation with respect to Yukos Capital's bankruptcy lawyers.'[840] He added: 'there is not enough support to seriously suggest that any pressure was being put on internal lawyers to the extent that that could affect the ability of Yukos Oil to defend itself in the courts and to vindicate its rights as that could become necessary.'[841]

484. In light of the evidence summarised above, the Tribunal rejects that submission. It considers that there is clear and uncontroverted evidence that the lawyers—internal and external—for the Yukos Group were subjected to a campaign of harassment. The object of that campaign was to undermine the ability of companies within the Group to defend themselves in the proceedings against the confiscation of their assets. In this regard, the Tribunal finds that the actions taken against the lawyers for the Claimant form part of a concerted campaign with actions taken against the lawyers for other companies within the Yukos Group.

485. The Tribunal relies on this additional evidence of a concerted campaign as corroborating its finding that the Respondent expropriated the Claimant's investment of funds under the Loans through its refusal to recognise the Claimant's claim in the bankruptcy.

## C. ILLEGALITY

486. Having reached the conclusion in Part VI.B that the Claimant's investment of funds under the Loans was expropriated by the Respondent, the Tribunal must now consider whether the Claimant's claim is precluded on the ground that the sums for which it is seeks recovery were the fruits of illegal or fraudulent conduct.

### 1. Legal character of allegations of illegality

487. As detailed in Part V.B above, the Respondent pleads its case on illegality in a number of different ways, relying on legal doctrines that it alleged to be relevant under both national law and international law. In their written pleadings, the Parties developed extensive

---

[840] T12/2233/4–7.

[841] T12/2234/21–25.

argument on the elements of illegality under each of the theories advanced by the Respondent and adduced pertinent expert evidence, which was tested under cross-examination at the Hearing.

488. Nevertheless, during the course of the Hearing, and in particular in closing argument, partly in response to specific written questions posed by the Tribunal and partly as a result of concessions made by the Parties, it has become clear that the scope of the issues in dispute between the Parties which the Tribunal is required to determine, has been significantly narrowed.

489. *The Respondent's final case.* In closing, the Respondent put its case on illegality in two ways:

   (i)   *Interest payments on the Loans.* Its primary case is that, under the proper construction of the Luxembourg DTA, the Claimant was obliged to pay tax in Russia on the interest payments under the Loans. Its failure to do so constitutes criminal tax evasion, which renders the Claimant's claims unenforceable.[842]

   (ii)  *The 'Laundromat'.* Its alternative case [843] is that the Loans constitute the proceeds of criminal tax evasion either through the use of on-shore tax structures or through the payment of dividends under the Cyprus DTA and are unenforceable as such.[844] As Respondent's counsel put it in closing:

   > Really the fundamental part of what we call the "Laundromat case," is that the money that was being advanced under the Loans was the proceeds of a crime.

   ...

---

[842] T10/2164/12-23 (Respondent).

[843] The Respondent's counsel stated at T10/2186/16-19 that 'this is our alternative case on illegality. So to be completely clear, the Laundromat is not a necessary part of our case on illegality.'

[844] T10/2156/22-2158/5 (Respondent).

> On the basis that... all of the money originated in the LTRs, and so was the product of on-shore tax evasion, and was funneled through Cyprus so was the product of the DTA abuse in Cyprus.[845]

490. *Regulatory default.* Even if the Claimant's failure was not criminal, but only a regulatory default, the Respondent maintains that the Tribunal must still dismiss the claim either under the international law doctrines of public policy or unclean hands, or because the domestic law governing the Loans (whether Russian or New York law) holds that a contract made for the purpose of tax evasion, or where its subject matter is the fruits of a crime, is void.[846]

491. *The Claimant's concession.* The Claimant for its part concedes that if the Tribunal were satisfied that it was 'engaged in a vast operation of criminal tax evasion and criminal money-laundering' then it could not succeed in its claim.[847] In response to the Tribunal's questions in closing, the Claimant's counsel made clear that this concession applies whether or not the Tribunal's finding of criminal conduct is based on the onshore tax arrangements; tax on dividends under the Cyprus DTA or tax on interest under the Luxembourg DTA. In any of these three events, the Claimant accepts that it cannot succeed if the Tribunal were to make a finding of criminal conduct such that 'some portion of the investment could be described as the proceeds of crime.'[848]

492. *Criminal tax evasion.* As a result, the Parties are agreed that, for purposes of both the Respondent's primary and its secondary case, the principal question for the Tribunal to consider is whether the conduct in question constituted a crime of tax evasion. That question must necessarily be assessed under Russian law, being the law that the

---

[845] T10/2161/13-16, 2161/25-2162/4.

[846] T10/2184/11–2185/17; T10/2187/19-22 (Respondent).

[847] T1/102/3-9 (Claimant).

[848] T9/2094/2-16 (Claimant). The Claimant's counsel stated at T9/2094/11-16: 'If all you find is that Yukos Capital should have paid more interest, and it knew it should have done that in such a way that it's criminal, I suspect I could–I could craft an argument that would say that's not a public international law illegality defense, *but I'm not making that argument.*' (emphasis added).

Respondent alleges the Claimant criminally evaded. This requires the Tribunal to determine the constituent elements of that crime and then to evaluate the evidence.

493. In light of the Claimant's concession, it will not be necessary for the Tribunal to determine whether, as the Respondent alleges, the conduct could also constitute criminal money laundering.[849] The Respondent accepts that tax evasion was not a predicate offence for money laundering at the material time under Russian law.[850]

494. In any event, the Tribunal does not consider that the Respondent's characterisation of the Loans as part of a money laundering scheme or 'Laundromat' adds materially to the underlying question of whether the Loans were funded by the fruits of criminal tax evasion. The Tribunal Chairman raised the following question about the Respondent's case in this respect in the course of its closing submissions:

> [I]f the object, then, of the Laundromat in, on your case, was to extract more money than should have been extracting because it was extracted without payment of the proper taxes for the benefit of the shareholders, why the second part of the transaction? Why couldn't, on your case, the shareholders have simply taken the money at the point that it reached Cyprus? What on Earth was the point of running the risk of repatriating it to Russia and re-extracting it at that point...?[851]

495. After referring to various aspects of the structure of the series of transactions, the Respondent concluded:

> Really, the fundamental part of what we call the "Laundromat case," is that the money that was being advanced under the Loans was the proceeds of crime. So the Laundromat almost sort of stops there for the purposes of our defense. We then go on to explain what happened to the money, but as I say that's really just to close the circle and provide you with the context and the explanation.
>
> CHAIRMAN McLACHLAN: And the basis upon which you say—do you say that all of the money was the proceeds of crime?
>
> ...

---

[849] In reliance on Pieth 1, [35]–[43].

[850] Esakov 1, [83]–[95].

[851] T10/2157/18–2158/1.

> MS. ROWE: On the basis that I don't believe it's disputed that all of the money originated in the LTRs, and so was the product of on-shore tax evasion, and was funneled through Cyprus so was the product of the DTA abuse in Cyprus.[852]

496. The Respondent accepts that the dividend payments that in turn funded the Loans were the proceeds of real oil sales, but submits that the entire pool is tainted by the illegal conduct, namely the alleged criminal evasion of Russian tax.[853]

497. *Regulatory breach for non-payment of tax.* Before analysing the evidence as to criminal conduct, it is necessary in order to delineate the scope of the Tribunal's analysis, to determine whether, absent criminal intent, a regulatory breach of tax law would suffice, whether as a matter of domestic or international law.

498. The Claimant's concession does not go so far as to extend to the alternative basis on which the Respondent puts its case under each of the two alleged bases of illegality outlined above in the event that the Tribunal were to find that criminality is not made out, but that there was nevertheless a regulatory failure to pay tax that was lawfully due under Russian law.

499. In that event, the Respondent nevertheless maintains that the claim should be dismissed. For its principal case under the Luxembourg DTA, it submits that the Loans are void under their governing law (whether that may be Russian or New York law).[854] In both the principal and the secondary case, it also invokes international public policy and the clean hands doctrine under international law.

500. For its part, the Claimant disputes that a failure to pay tax that is a regulatory breach but does not constitute a criminal offence can give rise to a public international law illegality defence that would deprive it of investment protection.[855] Insofar as the Respondent also

---

[852] T10/2161/13–2162/4 (Respondent).

[853] T10/2162/5-24.

[854] Above at [308]–[311]. On Russian civil law, the Respondent relies upon the Expert Reports of Professor Bevzenko (Bevzenko 1 & Bevzenko 2) and Professor Bevzenko's oral testimony at T7/1586/13–1600/19.

[855] T9/2093/2-13 (Claimant).

advances its case on the basis that the Loans are void under domestic law, the Claimant maintains that 'this argument quite obviously (and by its terms) fails with the "Yukos Laundromat".'[856]

501.   In considering the scope of the issues raised for the Tribunal's decision on the Respondent's case on regulatory breach for non-payment of tax, it is necessary to consider *seriatim*:

(i)      The claim that the Loans are void under their applicable domestic law; and

(ii)     The claim that a regulatory breach in failure to pay tax engages the public international law doctrines of unclean hands and international public policy.

502.   *Loans void under their applicable law.* In considering this question, it is necessary to start by recalling five axiomatic principles of international investment law that frame the enquiry:

(i)      'International law does not create property rights. Rather, it accords certain protections to property rights created according to municipal law.'[857]

(ii)     From this first proposition, it follows that 'for there to have been an expropriation of an investment... the rights affected must exist under the law which creates them.'[858]

(iii)    Since 'expropriation concerns interference in rights in property, it is important to be meticulous in identifying the rights duly held by the Claimant... [since

---

[856] Reply, [467].

[857] *Emmis International Holding, B.V. v Hungary*, ICSID Case No ARB/12/2, Award (16 April 2014), [162] (**CL-59**).

[858] *EnCana Corp v Ecuador*, LCIA, UNCITRAL, Award (3 February 2006), [184] (**RL-288**).

there] cannot be an expropriation of something to which the Claimant never had a legitimate claim.'[859]

(iv) Whether or not it is properly regarded as a jurisdictional requirement,[860] 'the substantive protections of the ECT cannot apply to investments that are made contrary to law.'[861]

(v) This requirement applies *ratione temporis* to the time of the making of the investment and not to the subsequent conduct of the investor.[862] It is not engaged by merely technical breaches of the law: the violation of the law must be non-trivial.[863]

503. *The present case.* In the present case, the Tribunal has already found (by majority) in its Interim Award that the Loans constitute an investment that the Claimant has made in the territory of the Respondent such that its jurisdiction under the ECT is engaged.[864] In so doing, the Tribunal found that the Loans have both a legal materialisation according to the law applicable to them and an economic materialisation in the form of a commitment of resources.

---

[859] *Generation Ukraine Inc. v Ukraine*, ICSID Case No ARB/00/9, Final Award (16 September 2003), [6.2], [22.1] (CL-8).

[860] A matter of some doubt, *see* the authorities cited in Reply, [363] n 653: *Liman Caspian Oil BV & Anor v Kazakhstan*, ICSID Case No ARB/07/14, Award (22 June 2010), [187] (CL-13); *Anatolie Stati & Ors v Kazakhstan*, SCC Case No 116/2010, Award (19 December 2013), [812] (CL-3); and *see* generally Z. Douglas, 'The plea of illegality in investment treaty arbitration' (2014) 29 ICSID Rev 155.

[861] *Plama Consortium Ltd v Bulgaria*, ICSID Case No ARB/03/24, Award (27 August 2008), [139] (RL-89).
[862] *Gustav F W Hamester GmbH & Co KG v Ghana*, ICSID Case No ARB/07/24, Award (18 June 2010), [128] (RL-310); *Quiborax SA v Bolivia*, ICSID Case No ARB/06/2, Decision on Jurisdiction (27 September 2012), [266] (RL-57).

[863] *Quiborax SA & Ors v Bolivia*, ICSID Case No ARB/06/2, Decision on Jurisdiction (27 September 2012), [263]–[265] (RL-57); *Tokios Tokelés v Ukraine*, ICSID Case No ARB/02/18, Decision on Jurisdiction (29 April 2004), [86] (CL-24).

[864] Interim Award, [567](2).

504. Nevertheless, these findings in no way preclude the Respondent from raising in the present phase an allegation of the illegality of the Loans under their applicable law, whether as an objection to jurisdiction or as a defence on the merits. The Respondent specifically notified its intention to raise a plea of illegality as early as 11 April 2014.[865] The Tribunal determined in PO N° 1 that this objection could not be determined in the preliminary phase, but should be joined to the merits.[866]

505. *The nature of the Respondent's allegations.* In these circumstances, it becomes important to analyse the substantive nature of the grounds for illegality raised by the Respondent that it alleges render the Loans void, whether under Russian or New York law. When this is done, it becomes apparent that the Respondent does not merely allege that the sums that were advanced under the Loans constituted an investment that was contrary to Russian law. That is to say, it does not allege that it was itself illegal for an intra-group finance company in the position of Yukos Capital to advance funds by way of a loan to its ultimate parent. Rather, the Respondent maintains that the unlawful character arose from the failure to pay due tax in relation to the Loans themselves or antecedent transactions from which the funds advanced under the Loans were derived. It alleges that the Loans were advanced as part of a scheme to facilitate the transfer of the illegal proceeds of criminal tax evasion and money laundering. This is the case that is advanced whether the matter is put under Russian law, or under New York law or as a matter of international law.

506. *Russian law.* The Respondent alleges that:

> [T]he Loans were void *ab initio* and without legal effect under Russian law, because (i) the Loans facilitated the transfer of illegal proceeds and therefore contradicted the legal prohibition on abuse of right and bad faith transactions; and (ii) the Loans were a mere *façade* executed to disguise and facilitate illegal tax evasion and money laundering, and therefore constituted void "sham" and "mock" transactions.[867]

---

[865] Respondent's letter dated 11 April 2014 (R-664).

[866] PO N° 1, [2.2].

[867] Counter-Memorial, [202].

507. It relies in support on the evidence of Professor Bevzenko, its expert on Russian civil law. Professor Bevzenko makes clear from the outset in his First Report that he was instructed to assume that:

    1)   the "loans" were part of a large-scale multi-jurisdictional money laundering scheme;

    2)   Yukos Capital, a shell company, was part of the money laundering scheme that existed to disguise the origin of the monies obtained as a result of illegal activities, including aggressive tax evasion;

    3)   the funds Yukos Oil received under the Loan Agreements represented the proceeds of illegal activities, including: tax evasion through the abuse of preferential taxation schemes, and the abuse of international conventions for the avoidance of double taxation; and

    4)   the funds that Yukos Capital extended to Yukos Oil under the Loan Agreements were in economic terms, Yukos Oil's own funds that it continued to own.[868]

508. Professor Bevzenko confirmed at the Hearing that these assumptions formed the basis for the conclusion in his Report that the Loans would be treated as void as a matter of Russian law.[869] Specifically in relation to the Luxembourg DTA he stated that 'tax evasion under that breach of Double Taxation Treaty forms the bad-faith behaviour, and that bad faith behaviour, the breach of the principle of good faith and fair dealing, is the ground for invalidation of the contract under Russian law.'[870]

509. *New York law.* The Respondent also advances a case that the Loans would be void under New York law, in the event that the Tribunal were to take into account the Addenda to the Loans of 27 October 2005, whereby the applicable law was said to be amended and restated as 'the substantive law of the State of New York, USA.'[871] Citing various New

[868] Bevzenko 1, [18].

[869] T7/1589/18–1591/9 (Bevzenko).

[870] T7/1597/14-18 (Bevzenko).

[871] Addendum Agreement to the Loan Agreement dated 2 December 2003 (27 October 2005), cl. 1 (C-59); Addendum Agreement to the Loan Agreement dated 19 August 2004 (27 October 2005), cl. 1 (C-60).

York judicial decisions,[872] the Respondent alleges that a contract made for the purpose of defrauding tax authorities[873] or to 'evade tax liability'[874] are unenforceable and so too are contracts the subject matter of which represent 'the fruit of a crime'[875] and contracts made 'with intent to defraud.'[876]

510. The Tribunal finds nothing exceptional in these general principles of civil law, whether as embodied in the Russian Civil Code or under New York law. Their common feature is that they all require a deliberate intent to commit a criminal act or fraud. Indeed this was the explicit premise on which Professor Bevzenko was instructed to opine. The result is that they do not on analysis add a materially different set of legal considerations to those that the Tribunal will have to consider when analysing the Respondent's principal ground on which it bases its case. The national laws invoked do not support the proposition that, absent criminal intent, a regulatory breach suffices to render the Loans void.

511. *Illegality under international law?* Nor is the position different if the nature of the Respondent's allegations is considered under the public international law doctrines of public policy or unclean hands.

512. These doctrines are a manifestation of the general principle of good faith. The Tribunal accepts that this principle provides a basis under international law upon which investment protection may be denied that is separate and distinct from the requirement that investments be made in accordance with host State law. As the tribunal in *Hamester* put it:

> An investment will not be protected if it has been created in violation of national or international principles of good faith; by way of corruption, fraud or deceitful conduct; or if its creation itself constitutes a misuse of the system of international investment protection under the ICSID Convention. It will also not be protected if it

---

[872] Counter-Memorial, [219]–[223].

[873] *Nameh v Muratex Corp*, 34 F. Appx. 808, 810 (2d Cir. 2002) (**RL-344**).

[874] *Comprehensive Habilitation Services, Inc. v Commerce Funding Corp*, No 05 CIV 9640 (PKL) (SDNY 7 April 2009), [18] (**RL-270**).

[875] McConnell v Commonwealth Pictures Corp, 7 NY 2d 465 (1960) (**RL-338**).

[876] *Wallstreet Associates v Brodsky*, 257 AD 2d 526 (NY App Div 1999) (**RL-393**).

343945

is made in violation of the host State's law (as elaborated, *e.g.* by the tribunal in *Phoenix*).[877]

513.   It also follows from the source of these doctrines in the general principle of good faith under international law that something more than a breach of national law is required for such principles to be engaged so as to deprive the investment of international law protection. To this extent, the Tribunal accepts the Respondent's proposition that international public policy is an autonomous ground for dismissal and is not co-extensive with, nor does it require the establishment of a breach of, domestic law.[878]

514.   *Public policy.* Tribunals have invoked international public policy to dismiss an investment claim in two categories of case: (i) when there was corruption and bribery; and (ii) when the investment was procured through fraud or forgery.

515.   *Corruption.* The first category of cases include:

   (i)     *World Duty Free*, where the contract had been procured by paying a bribe to the President of the Respondent State;[879]

   (ii)    *ICC Case No 1110*, where the contractual arrangements contemplated the payment of bribes;[880] and

   (iii)   *Spentex v Uzbekistan*, where the investment had been procured through corruption.[881]

---

[877] *Gustav F W Hamester GmbH & Co KG v Ghana*, ICSID Case No ARB/07/24, Award (18 June 2010), [123] (**RL-310**).

[878] Rejoinder, [358].

[879] *World Duty Free Co Ltd v Kenya*, ICSID Case No ARB/00/7, Award (4 October 2006) (**RL-397**).

[880] *ICC Case No 1110*, Award of 1963, annexed to J Gillis Wetter, 'Issues of Corruption before International Arbitral Tribunals: The Authentic Text and True Meaning of Judge Gunnar Lagergren's 1963 Award in ICC Case No 1110' (1994) 10(3) Arb Int 277 (**RL-448**).

[881] Spentex, discussed in K Betz, Proving Bribery, Fraud and Money Laundering in International Arbitration (Cambridge UP, 2017), 130-1 (**RL-254**).

516. *Fraud.* The second category of cases include:

    (i)    *Inceysa v El Salvador*, where the investor obtained a concession contract through fraud in the public bidding process;[882]

    (ii)    *Churchill Mining v Indonesia*, where the investments were procured by means of forged documents, to the production and preparation of which the investor had been wilfully blind;[883] and

    (iii)    *Plama v Bulgaria*, where the investor obtained the investment by providing materially misleading information about the shareholding which was required for the Government's approval of the investment.[884]

517. The common element that links all of these cases is that of an *intention* to procure the investment through corrupt or fraudulent means (including wilful blindness to such means). Unless this can be established, the doctrine does not assist the Respondent.

518. *Unclean hands.* Alternatively, the Respondent invokes the international law doctrine that (in the language of Sir Gerald Fitzmaurice) a party 'which is guilty of illegal conduct may be deprived of the necessary *locus standi in judicio* for complaining of corresponding illegalities on the part of other States, especially if these were consequential on or were embarked upon in order to counter its own illegality—in short were provoked by it.'[885]

519. In invoking this doctrine, the Respondent accepts that its application would require the Tribunal to assess the *relationship* between its conduct and that of the Claimant. Citing the above formulation, it submits that 'the role of Claimant and the Loans as instrumentalities in the Yukos Oligarchs' money-laundering and tax evasion schemes'

---

[882] *Inceysa Vallisoletana S.L. v El Salvador*, ICSID Case No ARB/03/26, Award (2 August 2006) (**RL-315**).

[883] *Churchill Mining and Planet Mining Pty Ltd v Indonesia*, ICSID Case No ARB/12/14 and 12/40, Award (6 December 2016), [504] (**RL-268**).

[884] *Plama Consortium Ltd v Bulgaria*, ICSID Case No ARB/03/24, Award (27 August 2008), [112] *et seq.* (**RL-89**).

[885] G Fitzmaurice, 'The General Principles of International Law' (1957) 92 *Recueil des Cours* 119 (**RL-303**).

gives rise to 'the quintessential case in which the alleged acts about which the Claimant complains… were consequential on or were embarked upon in order to counter [Claimant's] own illegality.'[886]

520. In the case of this plea, as in the case of public policy, the Respondent relies upon its allegations of the Claimant's participation in criminal or fraudulent conduct: money-laundering and tax evasion. Respondent's counsel stressed this in closing, when stating:

> It was a structure purposefully and intentionally set up to evade $350 million in Russian taxes.
>
> …
>
> There can be no doubt that a policy, condemning tax evasion in its strongest possible terms exists.[887]

521. This type of conduct was also at the heart of the principal case on which the Respondent relies as a contemporary application of the unclean hands doctrine (in addition to those already cited in relation to public policy): *Al-Warraq v Indonesia.*[888] In that case, the treaty in question, the OIC,[889] contained an Article, which expressly provided that:

> The investor shall be bound by the laws and regulations in force in the host state and shall refrain from all acts that may disturb public order or morals or that may be prejudicial to the public interest. He is also to refrain from exercising restrictive practices and from trying to achieve gains through unlawful means.[890]

522. This Article contemplates a much broader enquiry into the conduct of the investor, both *ratione materiae* and *ratione temporis,* than would otherwise be required in international investment law on the authorities analysed above. The tribunal's analysis in *Al-Warraq* was necessarily guided by the specific treaty language. It is that specific language that

---

[886] Counter-Memorial, [185].

[887] T10/2183/15-17; 2185/5-7 (Respondent).

[888] *Hesham Talaat M. Al-Warraq v Indonesia,* Final Award (15 December 2014) (**RL-311**).

[889] Agreement on Promotion, Protection and Guarantee of Investments among Member States of the Organisation of the Islamic Conference 1981 ('OIC').

[890] Ibid, Art 9.

explains the tribunal's comment that criminality was not required.[891] It sufficed under the OIC that the investor's actions failed to uphold the laws and regulations in force in the host State and were prejudicial to the public interest.

523. Nevertheless, in holding that the clean hands doctrine applied (as distinct from the broader provisions of the article) the tribunal emphasised that the actions of the investor amounted to fraud, an immoral or illegal act.[892]

524. There is some doubt as to whether the clean hands doctrine exists as a separate doctrine of general international law outside the express provisions of particular treaties.[893] The authorities that have been cited all consider categories of serious wilful wrongdoing in the context of the international public policy plea.[894] They all address cases where there was something more than mere failure to comply with domestic law. In international law, the clean hands doctrine is closely linked to the principle of good faith, which is concerned with wilful wrongdoing, such as corruption, fraud or deceitful conduct or conduct that constitutes a breach of international as opposed to domestic law. The Respondent's case is in any event put on the basis that the Claimant is indeed guilty of such an intentional crime or fraud on the Respondent. The Tribunal considers that the conduct in question would need to reach this threshold in order for the clean hands doctrine to be engaged.

---

[891] *Hesham Talaat M. Al-Warraq v Indonesia*, Final Award (15 December 2014), [645] (RL-311) which reads: 'The Tribunal concludes from the above that the Claimant failed to uphold Indonesian laws and regulations. The Tribunal further considers that the Claimant's action, whether criminal or not, caused a liquidity issue to Bank Century, and his actions have been prejudicial to the public interest, in this case the Indonesian financial sector. The Claimant having breached the local laws and put the public interest at risk, he deprived himself of the protection afforded by the OIC Agreement.'

[892] Ibid, [634], [646] (RL-311).

[893] *See* the doubts expressed in *Guyana v Suriname*, PCA Case No. 2004-04, Award (17 September 2007), [418] (CL-165); and the inconclusive state of the authorities summarised in S Schwebel, 'Clean Hands, Principle', *Max Planck Encyclopaedia of Public International Law* (2013).

[894] As the Special Rapporteur on Diplomatic Protection put it: 'According to the clean hands doctrine no action arises from wilful wrongdoing: *ex dolo malo non oritur actio.*' International Law Commission, Sixth report on diplomatic protection (Dugard, Special Rapporteur) UN Doc A/CN.4/546 (11 August 2004), [2].

525. The result of the above analysis is that, in considering the Respondent's plea of illegality, the question for the Tribunal is whether it finds on the evidence before it that the Claimant was guilty of intentional wrongdoing that constituted either a criminal misconduct or fraud. Whether it is analysed as a matter of the law applicable to the Loans or under general principles of international law, the issue for the Tribunal's decision comes to the same: were the sums extended under the Loans the proceeds of *criminal* evasion of Russian tax?

526. In light of that decision, the Tribunal does not find it necessary finally to decide whether any or all of the Respondent's objections based on illegality are properly to be treated as objections *in limine* to the jurisdiction of the Tribunal or as preliminary objections on grounds of admissibility or as substantive defences to the Claimant's claim. The nature of such objections is that they can only be determined in light of all the evidence of the conduct of both Parties. It was for this reason that the Tribunal originally ordered that the plea of illegality be joined to the merits, where such evidence could be fully tested.

### 2.   Evaluation of the evidence

527. In the application of the law to the facts, the Tribunal will, as it must, determine the facts on issues that require its decision on the basis of the evidence presented before it in the present arbitration. For that purpose, as Article 24(1) UNCITRAL Rules provides: 'Each party shall bear the burden of proving the facts relied on to support his claim or defence.' As it is the Respondent that advances the plea of illegality, it is the Respondent that bears the burden of proving the facts that it relies upon to support its plea.

528. *Criminal intent.* In addressing this issue, the critical factor is that of *intention.* In other words, even if there were a failure to pay tax that was properly due, did the persons that set up the structure of payments from which the sums paid by the Claimant under the Loans were derived intend to defraud the Russian tax authorities? This does not require knowledge that the acts would constitute a specific crime. What is required is well captured in the Russian Criminal Code which requires:

> A crime shall be deemed to be committed with direct intention if the person was conscious of the social danger of his acts (omission), foresaw the possibility or the

inevitability of the onset of socially dangerous consequences, and willed such consequences to ensue.[895]

529. The principle so stated accords with the way in which intention is generally understood in criminal law in other major legal systems.

530. *Scope of enquiry.* For this purpose, the fact that the Tribunal is concerned with determining illegal intent vis-à-vis the funds that were used for the purpose of the Loans serves to focus its enquiry. The Respondent advances very wide-ranging allegations of illegal conduct by the 'Yukos Oligarchs' from the inception of their acquisition of Yukos Oil in 1995.[896] The Tribunal has already held[897] that these allegations are not germane to the enquiry that it must undertake in relation to the claims in the present arbitration.

531. The Respondent also raises allegations concerning the alleged misuse by Yukos Oil of other forms of on-shore tax evasion through the incorporation of companies in low-tax regions of Russia or ZATOs. Professor Batsiev confirmed in evidence that Yukos Oil was not using any such companies in the years 2001–2003.[898] The use of such companies is therefore also not germane to the present case, since the Loans were not derived from funds received from the use of companies in ZATOs but from trading subsidiaries principally in Mordovia and Evenkia.

532. The result is that the Tribunal will focus its enquiry on the specific structure that was actually used at the material time in 2003-2004, when the Loans were made. The Tribunal has summarised this structure in Part III.B above. It is depicted in diagrammatic form at [104] and is referred to as the Armenian Branch.

533. Recalling then the elements of the Respondent's illegality case enumerated above at [319], this means that the relevant steps in the transaction that could be potentially relevant are:

---

[895] Art 25(2) Criminal Code of the Russian Federation: Easkov 1, [23] n 24.

[896] Counter-Memorial, [27]–[53].

[897] Above at [366].

[898] T6/1372/8-19 (Batsiev).

(i)     The onshore use of the trading companies Fargoil and Ratibor, incorporated in the low-tax regions of Mordovia and Evenkia respectively;

(ii)    The payment of dividends to Dunsley and Nassaubridge in Cyprus, claiming the benefit of the Cyprus DTA; and

(iii)   The payment of the Loans themselves, claiming the benefit of the Luxembourg DTA.

534. The material question for the Tribunal is whether in the operation of this set of transactions the Claimant had the criminal intention to evade the payment of Russian tax.

535. The Tribunal will now consider the evidence on the arbitration record that is relevant to that question. It considers first the testimony of witnesses, fact and expert, relied upon by each of the Parties together with the documentary record to which they referred.

536. *Claimant.* The Claimant tendered the following witnesses of fact with relevant testimony on this issue:

(i)     *Mr Smirnov*, who was Head of the Tax Department of Yukos Oil from 2000–2003;

(ii)    *Mr Misamore*, who was CFO of Yukos Oil from 2001–2005;

(iii)   *Mr Dubov*, who was a member of the Board of Yukos Oil until 1999 and continued thereafter to hold major shareholding interests;

(iv)    *Mr Theede*, who was Chief Operating Officer of Yukos Oil from August 2003–June 2004; and

(v)     *Mr Godfrey*, who was Special Counsel to Yukos Oil from 2002–2005.

537. Each of these witnesses filed statements in the proceedings and attended the Hearing for cross-examination and to answer the Tribunal's questions.

538. The Claimant's witnesses categorically denied any criminal intent to evade tax. Mr Smirnov deposed in his statement that the Respondent's allegations of illegal tax

evasion were 'not correct.'[899] He stated that Yukos Oil's onshore tax optimisation arrangements, including the use of the companies within the Armenian Branch, such as Fargoil, had been disclosed to Inspectorate N° 1 of the Federal Tax Service at the time.[900] He did not resile from this evidence under cross-examination.[901] He was not challenged as to the alleged criminality of the arrangements for the funding of the Loans.[902]

539. Mr Misamore deposed that 'from the time when I joined YUKOS Oil as CFO in 2001, I sought assurances that the structure was fully compliant with all relevant Russian tax laws. I received those assurances from multiple expert legal and tax advisers.'[903] In a prior interview that he had given to the Russian criminal authorities investigating Mr Khodorkovsky, Mr Misamore had dealt specifically with the arrangements for the funding of the Loan through the Armenian Branch.[904] Considering the payment of the dividend from Fargoil to Nassaubridge in Cyprus, he stated: 'There was absolutely nothing about this dividend that could possibly constitute money laundering.'[905] He explained the purpose of the dividend and subsequent payments as being to minimise taxes in order to fund the cash needs of the Yukos Group, in particular in relation to the Sibneft merger. He deposed that the payment of the dividend was disclosed to the Russian tax authorities, because withholding tax was paid on it.[906] Mr Misamore was taken to this

---

[899] Smirnov, [15].

[900] Smirnov, [14]–[44]

[901] T3/652–661 (Smirnov).

[902] At T3/697–712, counsel for the Respondent did question Mr Smirnov as to the intent behind the operation and closure of the ZATO arrangements. For the reason stated above at [531] the Tribunal does not consider this pertinent to the issues before it, because it does not relate to the funding of the Loans.

[903] Misamore 4, [13].

[904] Record of Interview with B Misamore (9 March 2009) (R-39).

[905] Ibid, 36.

[906] Ibid, 37.

interview record under cross-examination.[907] His evidence that the dividend was not money laundering was not challenged.[908]

540. Mr Dubov gave evidence as to the decision of Yukos Oil to use commercial companies (of which Fargoil was one) in the Republic of Mordovia, in order to obtain preferential tax treatment.[909] He deposed as to his personal role in negotiating these arrangements with senior ministers and officials in Mordovia, concluding that 'the Russian authorities were fully aware that YUKOS and other oil companies were using the commercial companies operating in regions with preferential tax systems, which took place under laws then in force.'[910] He did not resile from his statement under cross-examination. The Respondent's allegation of criminal intent was not put to him.

541. Neither Mr Theede nor Mr Godfrey dealt with this allegation in their statements and they were not questioned about it at the Hearing.

542. *Respondent.* The Respondent did not call any witnesses of fact as to the alleged criminality. This despite the fact that the Deputy Prosecutor General had approved an Order from the Investigator for Major Cases, who, on the basis of a report from the Federal Tax Service dated 31 July 2006,[911] had initiated a criminal investigation against the Claimant on 8 August 2006.[912] The record in the arbitration does not disclose any further information obtained in the course of that investigation, which has not resulted in criminal charges being laid. It was said in 2017—some eleven years later—to be part of an investigation that is still 'ongoing.'[913]

---

[907] T2/482/16–485/23.

[908] T2/483/9-14.

[909] Dubov 1, [13]-[36].

[910] Ibid, [36].

[911] Federal Tax Service Deputy Director Request to Office of the Prosecutor (31 July 2006) (R-642).

[912] Order to initiate a criminal case and proceedings in the case, Deputy Prosecutor General of the Russian Federation (8 August 2006) (C-75).

[913] Declaration of Colonel of Justice S A Mikhailov (24 November 2017) (GE-51); T7/1530/12-15 (Esakov).

543. The Respondent placed some reliance at the Hearing on its alleged inability to call Mr Dimitry Merinson, who had been cash manager in the Treasury Group in Moscow at the relevant time, to give evidence.[914] Prior to the Hearing, on 15 April 2019, the Respondent had raised alleged difficulties in obtaining evidence from Mr Merinson (and two other former Yukos Oil employees) as one ground for an application for adjournment of the merits Hearing.[915] Having received both written and oral submissions from both Parties, the Tribunal ruled on this application in PO N° 10 on 30 April 2019. The Tribunal found that the Respondent had been aware of the likely testimony of Mr Merinson since his interrogation by the Russian Prosecutor on 25 April 2018.[916] It had also been aware of the confidentiality undertakings given by Mr Merinson since the Judgment of the English High Court on 27 February 2018.[917]

544. The Tribunal ruled:

> 78. If therefore the Respondent had wished to adduce evidence from any of these persons, it has had ample time to do so at a time in which any issues of confidentiality could have been addressed and, if necessary, appropriate provision in that respect could have been made by the Tribunal.
>
> 79. It is, in the Tribunal's view, no answer to say, as the Respondent does, that it had hoped to obtain the relevant evidence through the disclosure process and, this not having been obtained, it must seek to prove its case by other means.
>
> 80. In international arbitration, each Party is obliged to support its case by reference to all of the evidence on which it relies, including written statement of witnesses. The present case is no different.
>
> 81. It is thus incumbent on each party to decide whom it wishes to call as witnesses to support its allegations. In the present case, this issue is one that the Parties would have had to consider in relation to the merits since the resumption of the case in September 2017, and in particular in Respondent's case at the latest since the Claimant's service of the Memorial on 27 October 2017.
>
> 82. It cannot, in the Tribunal's view, be a ground for adjournment if a party chooses not to progress the steps necessary to adduce evidence from particular witnesses and

---

[914] T10/2174/1-7 (Respondent).

[915] Respondent's Application for Adjournment (15 April 2019), [18]-[22].

[916] Record of Interrogation of Dimitry G Merinson (25 April 2018) (R-396).

[917] *Yukos International UK BV v Merinson* EWHC 335 (Comm) (27 February 2018).

> instead waits to see whether the requisite evidence is produced as a result of disclosure from the opposing party.
>
> 83. In any event, the Claimant has confirmed that 'any confidentiality obligations to which Messrs. Merinson and Ketcha are subject would **not** be enforced to prohibit their providing any testimony in these proceedings'.
>
> 84. The Tribunal therefore rejects the suggestion that the Respondent's inability (if it be the case) to call evidence from these persons results from a failure to cooperate on the part of the Claimant.[918]

545. *Expert evidence.* On criminal intent, the Respondent relied upon the expert evidence of Professor Esakov, Head of the Department of Criminal Law at the National Research University Higher School of Economics in Moscow. Professor Esakov submitted two reports and also attended the Hearing for cross-examination.

546. Professor Esakov draws a fundamental distinction in Russian law between: (i) 'a simple omission in payment of taxes'; and (ii) the crime of tax evasion. He explains that the non-payment of taxes that are due constitutes 'an administrative violation' but 'is not punishable under Russian criminal legislation.'[919] The crime of tax evasion requires more. It requires 'knowingly including false information in a tax declaration'[920] and the subjective element of 'intention.'[921]

547. He reached the conclusion that: 'The subjective element of criminal tax evasion crime (the intention) appears to be satisfied for the reasons stated above, at § 22.'[922]

---

[918] PO N° 10 (30 April 2019), [78]-[84], internal citations omitted.

[919] Esakov 1, [44].

[920] Esakov 1, [46].

[921] Esakov 1, [47].

[922] Esakov 2, [37].

548. The Tribunal has closely examined the reasons given in [22] of Professor Esakov's Second Report, on which he was tested under cross-examination. Professor Esakov there states that his opinion is 'on the basis of the documents referred to in §§ 23-24 below.'[923]

549. In [23], he 'substantiate[s] this conclusion' by reference to five 'documents provided to me by Counsel.' Professor Esakov confirmed under cross-examination that these documents were 'sufficient' to enable him to reach his conclusion as to criminal intent.[924]

550. The Tribunal has considered each of the documents relied upon by Professor Esakov in [23]:

   (i)     Two documents relate to the use of tax incentives in the ZATOs. As already pointed out, the ZATOs were not used in the transaction that funded the Loans.[925] These documents are not therefore germane to the enquiry that the Tribunal must undertake in these proceedings.

   (ii)    One document relates to a 'Production Development Fund', which is also not alleged to have been involved in the transaction at issue in the present case.[926]

   (iii)   The remaining two documents mention a possible risk of 'significant tax claims' arising from the use of low-tax region entities, if the tax optimisation mechanisms were successfully challenged by the tax authorities.[927] The documents identify a risk that tax might be held payable if the mechanisms could be successfully challenged. In other words, they identify the risk that an

---

[923] Ibid, [22].

[924] T7/1522/8 (Esakov).

[925] Email D L Maruev (15 March 2002) (**R-221**); Memorandum V G Aleksanyan to I E Golub (14 December 2001) (**R-455**).

[926] Pricewaterhouse Coopers Audit (2002), 9 (**GE-59**).

[927] Email P N Maly to B Misamore (7 August 2002) (**GE-66**); Draft from N Kuznetsova (PwC) to S Wilson (23 July 2002) (**R-564**).

administrative liability to pay tax might arise. They do not suggest criminal intent to evade tax.

551. Professor Esakov also referred to and relied upon the Request of the Federal Tax Service to the GPO to open a criminal investigation against the Claimant.[928] He deposed that 'the materials presented by the tax authorities themselves set out sufficient data pointing to the existence of the elements of a crime.'[929] The grounds set out in that Request were that 'at the time the loan was granted, Yukos Oil Company OJSC had already been presented with significant tax claims.'[930] The Request reaches this conclusion on the basis that the Loan was paid to the borrower's account on 13 January 2006.

552. This is plainly incorrect. The sums that were advanced under the Loans were so advanced from December 2003–October 2004. The initial payments predated any tax claim against Yukos Oil. When this was put to him in cross-examination, Professor Esakov accepted that the GPO would not have conducted a pre-investigative inquiry into the facts supporting grounds for the Request.[931]

553. Professor Esakov also placed some evidentiary reliance on the findings of the ECtHR in the claims brought by Yukos Oil and Messrs Khodorkovsky and Lebedev against the Respondent.[932] These judgments, while they are undoubtedly to be accorded the greatest of respect as decisions on matters within that Court's remit, cannot constitute evidence of fact before the present Tribunal. As the Tribunal had cause to explain in its PO N° 6 dated 1 November 2018, for this to be so, it would be necessary to establish that these decisions constitute *res judicata* between the Parties to the present arbitration.[933] If that were the

---

[928] Federal Tax Service Deputy Director Request to Office of the Prosecutor (31 July 2006) (R-642).

[929] Esakov 2, [68].

[930] Federal Tax Service Deputy Director Request to Office of the Prosecutor (31 July 2006) (R-642).

[931] T7/1569/18–1572/9 (Esakov).

[932] Esakov 2, [23]–[24], citing *OAO Neftyanya Kompaniya Yukos v Russia*, App No 14902/04, Judgment (17 January 2012) (C-390); *Khodorovsky and Lebedev v Russia*, App Nos 11082/06 and 13772/05, Judgment (25 July 2013) (SFC-35).

[933] PO N° 6, [36].

case, it would of course have much wider implications for the case as a whole, in light of the conclusions reached by the ECtHR on the claimants' various claims of expropriation in those cases. But the Respondent makes no such allegation, nor could it in view of the difference in the identity of the parties.

554. *PwC.* Two of the documents relied upon Professor Esakov and referred to in [550] above emanated from the auditors to the Yukos Group, PricewaterhouseCoopers (**PwC**). At the Hearing, both Parties sought to support their respective cases on illegality by reference to the position of PwC:

   (i)     The Claimant argues that the structure which the Yukos Group had adopted was set up on the advice of PwC, which had endorsed its legality, [934] as its fact witnesses, Mr Misamore and Mr Smirnov, attest.[935]

   (ii)    The Respondent submits that the Claimant has produced no documentary evidence from PwC that would support this proposition. It points out that it sought any such documents in the production phase and none were produced. The Respondent invites the Tribunal to draw an adverse inference from the absence of such documents that 'either they do not have it anymore, they never had it, they don't want us to see it.'[936] It adds that PwC subsequently withdrew its certification of the Yukos Group's financial statements.

555. The Tribunal considers that the absence of specific documentation from PwC relevant to the Armenian Branch is a point that ultimately assists neither Party. In the absence of such documentation, the Tribunal is not prepared to draw the conclusion that the Claimant invites it to make to the effect that the structure was considered and approved by PwC.

556. On the other hand, it is the Respondent that bears the burden of proving its case on illegality. It had the opportunity to cross-examine the Claimant's witnesses of fact on their

---

[934] T1/109/8-17; 111/2-3; T9/2085/13-15; 2088/2-5 (Claimant)

[935] Misamore 2, [13]; Smirnov, [31].

[936] T10/2180/16-18.

statements as to the support derived from PwC. Their testimony on this point was not materially altered under cross-examination.[937] Nor did such cross-examination give the Tribunal cause to doubt the Claimant's verification of the adequacy of its production of documents, which was confirmed by the signed statement of Mr Godfrey.[938]

557. In these circumstances, the Tribunal draws no adverse inference from the absence of documentation from PwC of the kind that the Respondent urges it to make in support of its case on illegality.

### 3.   Conclusion

558. In light of the evidence presented, the Tribunal finds that the Respondent has not established that the arrangements through which the funds were remitted to make the Loans were the fruits of a scheme established with the criminal intent to evade Russian tax.

559. The case that the Respondent has advanced depends (whatever the applicable law) on a finding of deliberate criminal intent. As this crucial element has not been established, it is unnecessary for the Tribunal to go on to determine the question (much debated in the expert evidence adduced by both Parties[939]) whether or not the transfer of sums under the Loans did or did not meet the requirements of the Luxembourg–Russia DTA such that interest payable under the Loans could benefit from that Treaty's provisions. This question would only have arisen if the Tribunal were satisfied on the evidence that the Claimant had the requisite *mens rea*. For the reasons developed above, the Tribunal does not consider that such criminal intention has been established, and so it is not necessary

---

[937] Misamore: T2/496/21-22, T3/583/11-15; Smirnov: T3/682.

[938] Statement of D Godfrey (3 December 2018), [3]-[7] (SFC-17).

[939] For the Claimant: Professor Shay; for the Respondent: Professor Danon and Mr Noguera.

to reach the question whether tax ought to have been paid in Russia on the interest payments under the Loans. [940]

## VII.  CAUSATION AND CONTRIBUTION TO THE INJURY

### A.  INTRODUCTION

560.  There is no dispute between the Parties that sums were advanced under the Loans. Nor is it disputed that (save for some initial interest payments) the Loans were not repaid by the debtor, Yukos Oil, and that no sums in respect of them were recovered in the latter's bankruptcy, Yukos Capital's proof of debt having been declared inadmissible.

561.  There is nevertheless a substantial issue raised by the arguments of the Parties that the Tribunal must resolve relating to foreseeability and causation of loss. The resolution of this issue will affect whether the sums due under the Loans are properly to be treated as recoverable compensation against the Respondent for its breach of the ECT.

562.  The Respondent submits that this issue goes to the admissibility of the claim before the Tribunal because it gives rise to an abuse of its process. The Claimant accepts that this issue is relevant, but submits that, on the facts of this case, it goes to 'damages, not admissibility' [941] and is concerned with the question of 'proximate cause.' [942] For the reasons developed below, the Tribunal considers that the question whether the risk of loss of its investment was reasonably foreseeable by the Claimant goes to *causation*: whether the proximate cause of the Claimant's loss is attributable to its own actions in committing funds when the risk of their loss was already foreseeable rather than to the Respondent's breaches of the Treaty.

---

[940] Further, the Respondent does not allege that any award of compensation to the Claimant should be reduced by the amount of tax that should otherwise have been paid pursuant to the construction of the Luxembourg DTA for which it contends.

[941] Reply, [526].

[942] Reply, [314].

563. In view of the importance of this issue and the difference of approach adopted by the Parties in their written pleadings, the Tribunal formulated some specific questions to the Parties and invited their submissions on them in closing. The pertinent questions were:

> 5. Respondent alleges that Claimant's claim is an abuse of process because the present dispute was foreseeable at the time the Investments were made: (a) is there a distinction, as a matter of international law, between restructuring an existing investment to take advantage of treaty protection that would not otherwise be available, which parenthetically we note is the subject of many of the cases, and the initial making of an investment? (b) on what authority does Claimant rely for the proposition advanced in its Reply at 526 that the foreseeability of a dispute is relevant to the calculation of loss but not to an allegation of abuse of process?

> 6. To what extent was the dispute that is the subject matter of the present proceedings foreseeable when—and then we take each of the three stages in the chronology: Firstly, when the 2003 Loan was executed; secondly, when the drawdowns were made under that Loan; and then thirdly, and finally, when the 2004 Loan was executed and drawn down?

> 7. Does it make a difference (on each Party's theory) whether funds are advanced to support a related party of the Claimant (here Yukos Oil) in a process that with hindsight formed part of the alleged expropriation which is the basis of the Claimant's claim? And if so, why?[943]

564. Both Parties availed themselves of the opportunity thus afforded to address these questions in their closing submissions.

565. The Tribunal therefore addresses this issue before considering whether compensation is due and, if so, on what basis and in what amount.

## B.   ARGUMENTS OF THE PARTIES

### 1.   The Respondent's position

566. The Respondent contends that the Loans are not entitled to investment protection because they were advanced at a time when the dispute was foreseeable, and specifically they were advanced when there was a foreseeable risk that Yukos Oil would not be able to repay the Loans because of the Tax Assessments that form the basis of the present claim.

---

[943] T7/1691/11–1692/10 (McLachlan).

567. The Respondent formulates this objection in terms of abuse of process, and relies on two lines of authority for the proposition that investment protection is not available for investments that were made when the dispute was foreseeable:[944]

    (i)    First, tribunals have dismissed claims where a claimant has restructured its investment to benefit from the protection of an investment treaty 'at a point in time when a specific dispute was foreseeable';[945]

    (ii)    Second, tribunals have denied protection 'when the claimant has knowingly assumed the investment risk that ultimately materialized'[946] on the basis that 'Bilateral Investment Treaties are not insurance policies against bad business judgments.'[947]

568. The Respondent says that the funds were advanced at a time when the dispute was not only foreseeable but already ongoing, and in those circumstances the claim is an abuse of process and contrary to the international law principle of good faith.[948]

569. The Respondent maintains that there is no relevant distinction in result between restructuring an existing investment and making a new investment when the dispute was foreseeable at the time: both constitute an abuse of process.[949] In the latter case, the

---

[944] Respondent Opening Slides, 74-76.

[945] Counter-Memorial, [267], quoting *Philip Morris Asia Ltd v Australia*, PCA Case No 2012-12, Award on Jurisdiction and Admissibility (17 December 2015), [554] (**RL-357**) and citing *Tidewater Investment SRL v Venezuela*, ICSID Case No ARB/10/5, Decision on Jurisdiction (8 February 2013), [145]-[147], [184] (**RL-381**) and *Transglobal Green Energy, LLC & Anor v Panama*, ICSID Case No ARB/13/28, Award (2 June 2016), [103] (**RL-383**).

[946] Counter-Memorial, [268], citing Ripinsky & Williams, *Damages in International Investment Law* (BIICL, 2008), 328-329 (**RL-360**) and the cases there cited.

[947] Rejoinder, [391], quoting *Emilio Agustín Maffezini v Spain*, ICSID Case No ARB/97/7, Award (13 November 2000), [64] (**RL-287**).

[948] Rejoinder, [390]-[393], citing *Phoenix Action Ltd v Czech Republic*, ICSID Case No ARB/06/5, Award (15 April 2009), [113] (**RL-65**).

[949] T10/2195/8-2196/4 (Respondent).

investor is assuming the risk of the dispute and the loss of the investment: the investor must take the company in which it invests as it finds it.[950] The Respondent accepts that there is overlap between questions of abuse of process and questions of causation, since the same facts could be relevant to both.[951]

570. In that connection, the Respondent submits that the Tribunal must focus on the knowledge held by Yukos Capital at the relevant time (not necessarily information held by the market). The Tribunal must take into account the risks that Yukos Oil was deliberately running in 2003 and 2004, and that Yukos Capital must have known about those risks. In this respect, the Respondent accepts that foreseeability cannot be assessed with hindsight but that hindsight can help to assess objective and subjective risk at the time.[952]

571. In closing, the Respondent advanced five related points:[953]

(i)     It was foreseeable that Yukos Oil might not be willing or able to repay the Loans;[954]

(ii)    The risk of insolvency was foreseeable and assumed by Yukos Capital;

(iii)   The Respondent's alleged offending acts did not cause the insolvency;

(iv)    The Respondent's alleged offending acts were foreseeable; and

(v)     Yukos Capital assumed the risk of Yukos Oil's own reckless behaviour.

572. *Causation.* First, the Respondent argues that the necessary causation was not present. Yukos Oil's working capital position showed it to be in a 'precarious state' when the

---

[950] T10/2196/5-2198/1 (Respondent).

[951] T10/2199/7-11 (Respondent).

[952] T10/2198/11-2199/5 (Respondent).

[953] Respondent's Closing Slides, 80; T10/2199/12-2212/25 (Respondent).

[954] At T10/2199/12-16 the Respondent's counsel focused their submissions on the extent to which the Claimant could have foreseen Yukos Oil's unwillingness or inability to repay, rather than assessing that question in the abstract.

December 2003 Loan was executed, and this called into question its willingness or ability to service the Loan.[955]

573.  In particular, Yukos Oil needed to borrow money in order to meet its needs (including from Brittany via Yukos Capital).[956] As a holding company, Yukos Oil relied on cash flow but was not receiving dividends because this income was being diverted to the LTR Subsidiaries. Thus, the Respondent submits there is no factual basis for the assumption that Yukos Oil would have obtained funding from its subsidiaries.[957] While the Respondent accepts that Yukos Oil could have sold an asset or taken on more debt to service the Yukos Capital Loan, it submits that this is an artificial assumption when there would be no repercussions if they did not pay off the Yukos Capital Loan.[958] The Respondent accepts that there was enough money within the Group to satisfy the Loans, but it was offshore.[959]

574.  *Foreseeability of insolvency.* Second, the Respondent submits that Yukos Oil's insolvency was foreseeable in December 2003, because it had negative working capital and no discernible income, in a legal framework where non-payment of debts for three months is sufficient to commence insolvency procedures. This is why Société Générale and Moravel required security. In contrast, Yukos Capital did not demand any protection from Yukos Oil's weak liquidity.[960]

575.  Third, the Respondent submits that the Claimant had presented no financial analysis to demonstrate what caused Yukos Oil to become insolvent, submitting that it was in fact

---

[955] T10/2199/13-2200/20 (Respondent).

[956] T10/2200/22-2201/13 (Respondent).

[957] T10/2201/23-2202/20 (Respondent).

[958] T10/2203/5-2204/1 (Respondent).

[959] T10/2205/7-10 (Respondent).

[960] T10/2206/14-2208/7 (Respondent).

the Société Générale decision to initiate bankruptcy proceedings and Yukos Oil's decision not to pay that liability.[961]

576. Fourth, the Respondent submits that the Respondent's acts that are said to have pushed Yukos Oil into insolvency were foreseeable, particularly in light of the arrest of Messrs Khodorkovsky and Lebedev.[962]

577. *Assumption of risk.* Finally, the Respondent submits that because of its related party status, Yukos Capital assumed the risk of Yukos Oil's reckless behaviour throughout 2003 and 2004, and in particular the failure to pay the Tax Assessments, the making of 'meaningless' settlement agreements (involving offering shares in Sibneft while the transaction was being unwound), and its 'reckless' interference with the YNG auction.[963]

578. *Failure to mitigate/contribution.* Alternatively, the Respondent argues that the Claimant failed to mitigate its loss or contributed to it, submitting that the Claimant's failures in this regard ought to preclude or reduce recovery in the present case since 'investment treaties such as the ECT are not insurance policies against business risk.'[964] Citing Article 39 of the Draft Articles on the Responsibility of States for Internationally Wrongful Acts (**ARSIWA**), it argues that the principle of contributory fault is well known in arbitral practice and was applied in *MTD v Chile* with the consequence that, even though the tribunal found the respondent liable for breach of treaty, it reduced the damages by 50% because the claimant had not conducted itself as a wise investor. It submits that the effect of the Claimant's various 'uncommercial decisions' means that, if the Tribunal were to find in favour of the Claimant 'it should negate or reduce any award of damages' to reflect its contributory fault.[965]

---

[961] T10/2208/8-2210/17 (Respondent).

[962] T10/2210/19-2211/12 (Respondent).

[963] T10/2211/21-2212/25 (Respondent).

[964] Counter-Memorial, [419]-[420], [423]; Rejoinder, [557].

[965] Rejoinder, [558]-[560].

579. In this regard, the Respondent argues that Yukos Capital failed to mitigate its risk by extending two unsecured loans to Yukos Oil on 'uncommercial terms, in circumstances where truly arms' length lenders undoubtedly would have refrained.'[966] Specifically in relation to the August 2004 Loan, it points out that this Loan was made in circumstances where Yukos Oil already had frozen bank accounts, had significant tax liabilities, had already referred to its own possible bankruptcy in a press release, and already had a public notice of default issued against it in respect of another loan.[967] The Respondent further notes that, at the time of the August 2004 Loan, Yukos Capital had not received and had failed to request information regarding Yukos Oil's financial health under the December 2003 Loan.[968]

580. The Respondent submits that the Claimant and its controllers borrowed and loaned funds without formal loan agreements and did so on uncommercial terms.[969] The Respondent also argues that the Claimant failed to mitigate its damages by failing to call the Loans until more than 15 months following Yukos Oil's last interest payment, despite the fact that under each of the Loans the Claimant could do so, if it considered that Yukos Oil's financial position would not allow their timely repayment.[970]

581. The Respondent further contends that this argument extends to the interest spread damages, submitting that since there was a very significant risk that Yukos Oil would not make any of the outstanding payments under the Loans from July 2006, the interest spread damages should also be reduced to zero.[971]

---

[966] Counter-Memorial, [422].

[967] Counter-Memorial, [422](a), (b), (c), (e).

[968] Counter-Memorial, [422](d).

[969] Rejoinder, [557].

[970] Counter-Memorial, [423].

[971] Counter-Memorial, [441].

343945

### 2.    The Claimant's position

582.  *Legal principles.* The Claimant accepts that foreseeability of a dispute is relevant. It submits that on the facts of this case it should not be assessed in terms of abuse of process, but rather is relevant to damages taking into account the requirement for causation.[972] In particular, the Claimant submits:[973]

   (i)     Re-domiciling an existing investment in order to obtain treaty protection is recognised as giving rise to an abuse of process.

   (ii)    Where a new investment is being made, it is necessary to distinguish between cases where there was no existing financing vehicle in place (and the investor chose to establish the vehicle in a particular country to obtain treaty protection) and cases where an existing financing vehicle was already established in a country with treaty protection.

583.  The Claimant argues that where there is no existing financing vehicle in place, to make an investment when there were hostilities against the borrower that made a dispute foreseeable, might give rise to an abuse of process. However, it submits that in the second category no abuse of process could arise. On the facts of the present case, the Claimant submits that because it was incorporated in January 2003 before any of the relevant acts occurred, it was 'already treaty-protected for any investment it makes' and there can be no abuse of process.

584.  Nevertheless, the Claimant accepts that an investor in that position 'may have quantum issues if it makes an investment where a dispute is foreseeable'[974] so that on the facts of the present case, any question of foreseeability can only be relevant 'to the calculation of loss.'[975]

---

[972] Reply, [526].

[973] T9/2094/17-2096/24 (Claimant).

[974] T9/2096/7-9 (Claimant).

[975] T9/2096/16-17 (Claimant).

585. The Claimant did not disagree with the proposition that knowledge held by Yukos Oil could be taken into account in assessing whether the Claimant could or should have foreseen the dispute. Mr Godfrey's evidence was that the decision to make the Loans would have been made by the Management Board in Moscow and executed by the Treasury Group.[976]

586. *Factual submissions.* The Claimant advanced its submissions on the evidence in closing in response to the Tribunal's Question 6, in which it had asked the Parties to address the foreseeability of the dispute at three periods: (i) when the December 2003 Loan was executed; (ii) when the drawdowns were made under that Loan; and (iii) when the August 2004 Loan was executed and drawn down.

587. The Claimant says that in December 2003, there was no reason to believe that there was going to be a dispute under an investment agreement, noting in particular the conclusion of the internal working group that it was 'business as usual.'[977] The Claimant also submits that there was no reason for concern during the period of the drawdowns until the 2000 Tax Assessment (issued on 14 April 2004) was first upheld by the courts on 26 May 2004, because until that point the advice received by Yukos was that 'even the Russian courts could withstand political pressure' in relation to the December 2003 audit 'because [it] was so ridiculous.'[978] It noted, in particular, that any dispute would have to involve the liquidation of Yukos Oil, since otherwise it would be able to meet the repayments.

588. The Claimant states that '*the key date for the drawdowns is 26 May 2004,*' being 'the first time a Russian court validates the Tax Assessment.'[979] It goes on to explain:

---

[976] T2/350/12-19; T2/352/1-6; T2/352/13-353/4 (Godfrey). Mr Theede testified to having no recollection of this issue (T2/392/1-21), and Mr Misamore's evidence was that the Treasury Group 'determined the need for funds within the Group' and sent out 'proposals' and Yukos Capital would have made the loan 'if they had no issues with it' (T2/493/12-494/2).

[977] T9/2097/6-18 (Claimant).

[978] T9/2097/23-2098/16 (Claimant), citing Summary of the tax inspection of OAO NK Yukos, Sergey Pepeliev (5 January 2004) (R-577).

[979] T9/2097/20-21 (Claimant), emphasis added.

Up until that time, you have an assessment that's been issued in late 2003. The advice from the counsel, that's the Pepeliaev memo that's in the record, was that even the Russian courts could withstand political pressure because that was so ridiculous, but—so it's not until May that the Russian courts actually do validate that. And that's a fact. *And that makes a dispute*—well, it begins to suggest, is there an issue?[980]

On the other hand, it submits that these 'rumblings' were counteracted by President Putin's subsequent statement in June 2004 that the State had no intention to bankrupt Yukos Oil.[981]

589. The August 2004 Loan was made in the midst of an escalation of events 'and for the purpose of trying to satisfy some of the Tax Assessment[s].'[982] By that stage, the Claimant could foresee that the Russian State was hostile to Yukos Oil in a way that might impact its investment.[983]

590. Nevertheless, Claimant submits that it could not foresee that the bankruptcy of Yukos Oil was likely or a real possibility, given that Yukos Oil was meeting its obligations.[984] The Claimant submits that it was only after the 'sham' auction of YNG that Yukos Capital had real cause for concern.[985]

591. The Claimant accepts that 'foreseeability is the legal touchstone'[986] and that, in light of the expert evidence of Mr Rosen,[987] by August 2004, there is the possibility of a legal dispute which the Tribunal is entitled to weigh in its deliberations.[988]

---

[980] T9/2097/23–2098/5 (Claimant), emphasis added.

[981] T9/2098/14-2099/7 (Claimant).

[982] T9/2099/11-12 (Claimant).

[983] T9/2099/14-16 (Claimant).

[984] T9/2099/8-18 (Claimant).

[985] T9/2099/19-2100/18 (Claimant).

[986] T9/2100/25-2101/1 (Claimant).

[987] T8/1898/1-4 (Rosen).

[988] T9/2100/5-13 (Claimant).

592. *No failure to mitigate.* The Claimant argues that the risk that caused Yukos Capital to suffer under the Loans 'had nothing to do with their commercial terms or unreasonable commercial risks', but was rather caused by the Respondent's illegal expropriation of the issuer of the debt, Yukos Oil.[989] It contends that this particular risk 'could not have been anticipated.'[990]

593. With particular reference to the August 2004 Loan, the Claimant contends that, while the first tax assessment had been issued and certain enforcement actions had indeed commenced against Yukos Oil at the time the Loan was made, positive public assurances had been given by the Respondent as to the future of Yukos Oil on which the Claimant was entitled to rely.[991]

594. The Claimant therefore submits that the Respondent's assertion that the Claimant failed to mitigate its risk is unfounded, and its assertion that 'truly arms' length lenders undoubtedly would have refrained' from lending to Yukos Oil is unsupported by the evidence.[992]

## C.   THE TRIBUNAL'S ANALYSIS[993]

### 1.   Characterisation of the issue

595. The Tribunal has already stated in its Introduction to Part VII that it attaches particular importance to the proper characterisation of the issue that arises for decision in relation to the legal significance (if any) of the Claimant's own conduct at the time of the making of its investments. Upon this preliminary question of characterisation hangs the legal test to be applied to the facts. It was for this reason that it invited the Parties to address closing submissions in response to the Tribunal's specific questions on the point.

---

[989] Reply, [346].

[990] Reply, [346].

[991] Reply, [347].

[992] Reply, [346].

[993] This part of the Award is by majority (McLachlan & Stern, Rowley dissenting in part).

596. There are in summary, four sub-issues that arise:

   (i)    Is the question one of admissibility to be determined by reference to the principle of abuse of process, or does it go to the extent of the substantive obligation to make reparation for the injury caused by the Respondent's illegal act?

   (ii)   If the latter, what legal test is applicable to determine causation?

   (iii)  Is there a distinction between causation and contribution to the injury, and, if so, what is the difference?

   (iv)   What date or dates are relevant for this purpose?

597. *Abuse of process or causation?* The Tribunal has already indicated that it has reached the view that the Claimant's conduct in this case is properly analysed as a question of causation and not as one of abuse of process.

598. Undoubtedly there are cases in which the manner in which a claimant seeks to engage the jurisdiction of the tribunal constitutes an abuse of process. A classic instance is where 'an investor has changed its corporate structure to gain the protection of an investment treaty at a point in time when a specific dispute was foreseeable.'[994] This type of circumstance is properly characterised as an abuse of process because the investor is abusively seeking to invoke the protection of an international tribunal before whom to pursue its claim where, prior to the dispute, it had no such right. The Tribunal agrees with the Respondent that this type of conduct constitutes bad faith on the part of the investor and renders the claim inadmissible and liable to dismissal.

---

[994] *Philip Morris Asia Ltd v Commonwealth of Australia*, PCA Case No. 2012-12, Award on Jurisdiction and Admissibility (17 December 2015), [554] **(RL-357)**; see also: *Phoenix Action, LTD v The Czech Republic*, ICSID Case No. ARB/06/5, Award (April 15, 2009), [92]–[95] **(RL-65)**; *Tidewater Investment SRL & Anor v Venezuela*, ICSID Case No ARB/10/5, Decision on Jurisdiction (8 February 2013), [145]-[147], [184] **(RL-381)** and *Transglobal Green Energy, LLC & Anor v Panama*, ICSID Case No ARB/13/28, Award (2 June 2016), [103] **(RL-383)**.

599. However, this is not the present case. The Claimant did not change its corporate nationality between incorporation and the events of which it makes complaint in order to seek to take the benefit of an investment treaty to which it had not previously been entitled. It was on any view already incorporated in Luxembourg before the dispute arose.

600. The second category of cases on which the Respondent relies are cases in which 'the claimant has knowingly assumed the investment risk that ultimately materialized'[995] on the basis that 'Bilateral Investment Treaties are not insurance policies against bad business judgments.'[996]

601. The Tribunal accepts the elementary principles (i) that an investor must take the conditions of the host State as it finds them and cannot make complaint simply because the known hazards of investing in a particular country materialise;[997] and (ii) that an investor must take responsibility for its own business decisions. But the cases on which the Respondent relies in support of these propositions were not decided on grounds of want of jurisdiction or inadmissibility. On the contrary, they were decided on the merits in which the tribunals were concerned to determine whether the relevant treaty standard had been breached or the true cause of the claimant's alleged loss.

602. As a result, the Tribunal rejects the Respondent's submission that objections of this kind are properly characterised as abuse of process, such that they go to the jurisdiction of the Tribunal or admissibility of the claim. This does not mean that the Claimant's conduct is irrelevant to its claim for damages.

---

[995] Counter-Memorial, [268], citing Ripinsky & Williams, Damages in International Investment Law (BIICL, 2008), 328-329 (RL-360); Starrett Housing Corporation et al., v The Government of the Islamic Republic of Iran, et al. (Interlocutory Award No. ITL 32- 24-1), Interlocutory Award (19 December 1983) reprinted in 4 Iran-US CTR 122 (CL-125); Alex Genin, Eastern Credit Ltd, Inc. and A.S. Baltoil v The Republic of Estonia, ICSID Case No. ARB/99/2, Award (25 June 2001) (RL-239).

[996] Rejoinder, [391], quoting *Emilio Agustín Maffezini v Spain*, ICSID Case No ARB/97/7, Award (13 November 2000), [64] (RL-287).

[997] *Oscar Chinn Case (Britain v Belgium)*, PCIJ Series A/B No 63, Judgment (1934) (CL-184).

603. *Causation & reasonable foreseeability.* Where, as here, the Tribunal has found the Respondent liable for breach of its international obligations under treaty, its obligation is 'to make full reparation for the injury *caused* by the internationally wrongful act.'[998] As Bin Cheng put it, summarising the earlier arbitral authorities: 'The proper criterion… is, therefore, not the directness of the consequences, but their foreseeability or proximate causality in relation to the wrongful act.'[999]

604. One way in which the chain of causation may be broken is by the victim's own actions. As the International Law Commission observed in its Commentary on ARSIWA:

> It is possible to envisage situations where the injury in question is entirely attributable to the conduct of the victim and not at all to that of the 'responsible' State. Such situations are covered by the general requirement of proximate cause referred to in article 31…[1000]

The distinction drawn in this passage between the conduct of the victim and that of the responsible State means neither more nor less than that—as in any case in which the chain of causation is broken by conduct other than that of the respondent—the tribunal is presented with two possible causes and finds that one (in this context the conduct of the victim) is the proximate cause, because it is the predominant or operative cause of the claimant's loss.

605. This question, being a pure question of causation, does not depend upon the establishment of fault or negligence on the part of the claimant or any apportionment of responsibility between the claimant and the respondent State. The question of causation only arises where the tribunal has already determined that the respondent has committed an internationally wrongful act. The tribunal must then determine whether the actions of the

---

[998] ARSIWA, Art 31(1) (RL-319).

[999] Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals (Stevens & Sons Ltd, London, 1953), 242 (CL-192).

[1000] ILC, 'Draft articles on Responsibility of States for Internationally Wrongful Acts with commentaries' [2001] YBILC II (2) 31, 110 n 627. See, e.g. *Spanish Zone of Morocco Claims: Rzini-Tetuan Orchards* (1925) II RIAA 615, 651 at 658 (cited in Cheng op cit at 243-4 n 7), where the arbitrator found that the proximate cause of the victim's loss was the victim's own decision; Alexandrov & Robbins, 'Proximate causation in international investment disputes' [2009] YIILP 317, 320 (RL-240).

State *caused* the claimant's loss. The chain of causation may be broken where the proximate cause of the claimant's loss is the claimant's own decision to invest in light of the reasonable foreseeability that its investment may well be lost. It is not necessary for this purpose that the claimant could foresee the precise form of unlawful act that the respondent may commit or the particular character of the resulting dispute between the parties.

606. A finding that the proximate cause of the claimant's loss is his own actions has been dispositive in a number of cases, despite findings of culpability on the part of the respondent. In *ELSI*,[1001] a Chamber of the ICJ held that, although the respondent State had requisitioned the company, the underlying cause of the company's difficulties lay in its own mismanagement and not the act of requisition. In *Maffezini*, the tribunal concluded that '[w]hile it is probably true that there were shortcomings in the policies and practices'[1002] of the relevant State entities, the respondent could not be held responsible for Mr Maffezini's own business losses. In *Olguín*,[1003] the tribunal concluded that the relevant State organs 'clearly appear to have been negligent.'[1004] However, it went on 'it needs to be determined whether, in this case, there existed a suitable *causal link* that would produce specific legal consequences, such as an obligation, on the part of the State of Paraguay, and a right, on the part of Mr. Olguín, to demand and obtain compensation for the losses he suffered.'[1005] The tribunal ruled that Mr Olguín's claim must be denied. His losses were caused by his own imprudence in making his investments.[1006]

---

[1001] Elettronica Sicula S.p.A. (ELSI), United States of America v Italy, [1989] ICJ Rep 15, [100]–[101] (**CL-99**).

[1002] *Maffezini v Spain*, ICSID Case No ARB/97/7, Award (13 November 2000), [64] (**RL-287**).

[1003] *Olguin v Paraguay*, ICSID Case No ARB/98/5, Award (26 July 2001), [68]-[75] (**RL-291**).

[1004] Ibid [70].

[1005] Ibid [71], emphasis added.

[1006] Ibid [75].

607. In *Biwater*,[1007] the tribunal found that the respondent State had committed multiple breaches of the BIT, including by means of expropriation.[1008] It nevertheless dismissed all of the claimant's claims for damages.[1009] The tribunal's reasoning is instructive. It held that 'it is well settled that one key requirement of any claim for compensation (whether for unlawful expropriation or any other breach of Treaty) is the element of causation.'[1010] Citing Article 31(2) ARSIWA, the commentary thereon and *ELSI*, it decided that '[t]he key issue in this case is the factual link between the wrongful acts and the damage in question, as opposed to any issue as to remoteness or indirect loss.'[1011] Applying the principles of causation to the facts of that case, the tribunal concluded that 'the actual, proximate or direct causes of the loss and damage for which [the claimant] now seeks compensation' were its own acts and not the respondent's violations of the BIT.[1012] In that case, this was despite the fact that the claimant's conduct preceded the respondent State's measures.

608. In the present case, the Claimant accepts that the Respondent's actions must be the 'proximate cause'[1013] of its loss, and that, for this purpose 'foreseeability is the legal touchstone.'[1014] The Respondent, for its part (while insisting on abuse of process) nevertheless submits that 'it is intimately related to foreseeability.'[1015] It explains that: 'Because you foresee the risk, you assume it.'[1016]

---

[1007] *Biwater Gauff (Tanzania) Ltd v Tanzania*, ICSID Case No. ARB/05/22, Award (24 July 2008) (RL-493).

[1008] Ibid [814](b) & (c).

[1009] Ibid [814](e).

[1010] Ibid [778].

[1011] Ibid [786].

[1012] Ibid [798].

[1013] Reply, [314].

[1014] T9/2100/25-2101/1 (Claimant).

[1015] T10/2196/12 (Respondent).

[1016] T10/2196/13 (Respondent).

609. *Contribution to injury.* Even where the chain of causation is not broken in this way, the Tribunal may be required, in order to do equity between the claimant and the respondent to take account of 'the contribution to the injury by wilful or negligent action or omission of the... entity in relation to whom reparation is sought.'[1017] The determination of the extent of such contribution requires an assessment of the proportional extent to which the claimant's own negligent or wilful conduct contributed to its loss.

610. This was the approach adopted in *MTD v Chile*,[1018] where the Tribunal found a breach of treaty on the part of the respondent, but apportioned the claimant's damages 50:50 in order to take account of the contribution of the claimant to its own loss. An *ad hoc* committee comprising Judge Guillaume, Professor Crawford (as he then was) and Dr Ordóñez Noriega, upheld this approach on annulment. Citing Article 39 ARSIWA, it held: 'There is no reason not to apply the same principle of contribution to claims for breach of treaty brought by individuals.'[1019]

611. The committee then went on to consider whether the tribunal had been at fault in failing to give reasons for its 50:50 apportionment. Finding that there was no annullable error in this respect, it explained:

> As is often the case with situations of comparative fault, the role of the two parties contributing to the loss was very different and only with difficulty commensurable, and the Tribunal had a corresponding margin of estimation. Furthermore, in an investment treaty claim where contribution is relevant, the respondent's breach will normally be regulatory in character, whereas the claimant's conduct will be different, a failure to safeguard its own interests rather than a breach of any duty owed to the host State. In such situations it is not unusual for the loss to be shared equally. International tribunals which have reached this point have often not given any 'exact explanation' of the calculations involved.[1020]

---

[1017] ARSIWA, Art 39 (**RL-319**); applied in *MTD Equity Sdn. Bhd. v Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment (21 March 2007), [99].

[1018] *MTD Equity Sdn. Bhd. v Republic of Chile*, ICSID Case No. ARB/01/7, Award (25 May 2004), [242]-[243] (**RL-343**).

[1019] *MTD Equity Sdn. Bhd. v Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment (21 March 2007), [99].

[1020] Ibid [101].

343945

612. The consequence is that if, at any given date, the evidence falls short of breaking the chain of causation, it is still necessary to consider whether the Claimant has, by wilfully or negligently extending or continuing to extend advances to Yukos Oil, contributed to its own loss, and, if so, by what extent.

613. The Parties also addressed this second question as one of whether the Claimant had failed to mitigate its loss. There is indeed a connection, since the International Court of Justice has observed as a basis for the calculation of damages that 'an injured State which has failed to take the necessary measures to limit the damage sustained would not be entitled to claim compensation for that damage which could have been avoided.'[1021] The same principle is applicable to the conduct of a private claimant.

614. In the Tribunal's view, on the facts of this case, the issue is more properly analysed as one of the Claimant's contribution to its own loss. It is not alleged that there were steps that the Claimant ought to have taken that might have mitigated a loss already suffered. Rather the issue is whether the Claimant ought not to have made certain of its investments by way of advances under the Loans in light of the risk of loss that was then reasonably foreseeable. In other words, did the Claimant, by its own deliberate or negligent acts or omissions, contribute to its loss?

615. *Relevant dates.* The relevant dates on which to assess reasonable foreseeability are the dates on which the Claimant made its investment. As a starting point for analysis, this means the dates on which the Claimant entered into the Loans to Yukos Oil, namely: (i) 2 December 2003 in respect of the December 2003 Loan; and (ii) 19 August 2004 in respect of the August 2004 Loan. These were the two dates on which the Claimant had to decide whether to enter into a legal commitment by way of loan in the amount specified in the loan documentation to make an investment in Russia.

616. However, the structure of the Loans was different.

---

[1021] Gabčíkovo-Nagymaros Project (Hungary v Slovakia) [1997] ICJ Rep 7, 55, [80], cited in Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (Cambridge UP, 2002), [205] **(CL-193)**.

617. In the case of the December 2003 Loan, the Claimant undertook to grant Yukos Oil interest bearing loans up to a total of 80 billion Russian roubles upon the issue of Notices of Drawdown.[1022]

618. The December 2003 Loan was executed on 2 December 2003, and the first two notices of drawdown were issued the same day.[1023] Further notices of drawdown were issued on 4 December 2003 (5), 10 December 2003, 18 December 2003, 12 January 2004, 13 January 2004, 9 February 2004, 13 February 2004, 17 February 2004, 19 February 2004, 20 February 2004 (3), 24 February 2004 (3), 26 February 2004 (2), 23 March 2004, 25 March 2004, 29 March 2004 (3), 22 April 2004, 27 April 2004, 13 May 2004, 24 May 2004, 26 May 2004, 16 June 2004, 22 June 2004 and 28 June 2004.[1024] The first funds were transferred on 3 December 2003.[1025] Yukos Oil made its quarterly interest payment on 30 December 2003, 31 March 2004 and 30 June 2004 but ceased paying from that date.[1026]

619. In the case of the August 2004 Loan, the Claimant undertook to grant Yukos Oil a single interest bearing loan of USD 355 million,[1027] which it paid on the same day as the date of the Loan Agreement (19 August 2004).

620. The consequence is that:

   (i)   In the case of the December 2003 Loan, the Tribunal must evaluate the position first as at 2 December 2003. It will then have to consider whether during the period within which Yukos Oil issued further Notices of Drawdown that led to

---

[1022] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003), Art 1 (C-9).

[1023] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003) (C-9); Yukos Oil – Notice of Drawdowns on December 2, 2003 Loan Agreement (Drawdowns #1-36), 1-2 (B-2).

[1024] Yukos Oil – Notice of Drawdowns on December 2, 2003 Loan Agreement (Drawdowns #1-36), 3-36 (B-2).

[1025] Yukos Capital Bank Statements – 36 Transfers to Yukos Oil under December 2003 Loan Agreement (RUB 79.3 B), 1-2 (B-17).

[1026] Yukos Capital bank statements - interest payments, 2, 5-6 (C-134); Letter from Yukos Oil to Yukos Capital (12 November 2004) (C-135).

[1027] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (19 August 2004), Art 1 (C-30).

the Claimant advancing further sums by way of investment (up to and including 28 June 2004), there had been a material change as to the foreseeability of the recovery its investment, or alternatively whether, when making these further advances, the Claimant had contributed to its own loss.

(ii)     In the case of the August 2004 Loan, the Tribunal must evaluate the position on the single date of 19 August 2004.

### 2.     The facts

621.  The following section summarises the events relevant to the assessment of whether the present dispute was foreseeable when the Loans were advanced, summarising:

(i)     The events leading up to the first Loan being advanced on 2 December 2003; and

(ii)     The events before the second Loan was advanced on 19 August 2004.

#### (a)     Events prior to 2003 Loan

622.  Yukos Capital was incorporated on 31 January 2003.[1028]

623.  In April 2003, the Sibneft merger was announced[1029] and deeds of share purchase and share exchange were signed.[1030]

---

[1028] Yukos Capital S.à r.l., Extract of the Luxembourg Registry of Commerce and Companies (11 September 2012) (C-117).

[1029] *Yukos and Sibneft Agree in Principle to Merger*, Yukos Press Release and Sibneft Press Release (22 April 2003) (C-133).

[1030] Deed of Share Purchase, Principal Shareholders of Siberian Oil Company and OJSC "Yukos Oil" (30 April 2003) (C-179); Deed of Share Exchange, Principal Shareholders of Siberian Oil Company and OJSC "Yukos Oil" (30 April 2003) (C-180).

624. On 3 July 2003, Mr Lebedev was arrested and detained on charges including fraud, embezzlement and tax evasion.[1031] Two days later, Mr Khodorkovsky and Mr Leonid Nevzlin (former Vice-Chairman of the Board of Yukos Oil) were summoned for questioning by the GPO.[1032]

625. On 7 July 2003, Yukos Oil announced a share buyback worth USD 3.7 billion.[1033]

626. In July 2003, Yukos Oil's offices were raided.[1034] Mr Mkhitaryan testified that following Mr Khodorkovsky's arrest, 'the raids and interrogations intensified, and an atmosphere of fear and uncertainty became pervasive at Yukos.'[1035] At the same time, contemporary news reports confirmed that company analysts continued to recommend investors to buy Yukos stock, stating that '[t]his is a temporary development… Company fundamentals remain unchanged.'[1036]

627. On 24 July 2003, Yukos formed a working group to investigate how the recent events were affecting the company. The working group's interim conclusions on 9 August 2003 suggested that operational activities were proceeding normally and that investigations of the company would not lead to viable legal challenges, but that 'defensive measures' against individuals associated with the company had not been successful.[1037] The view that it was 'business as usual' was reiterated on 25 September 2003.[1038]

---

[1031] Yukos Review, Special Issue: Attack on Yukos: Chronology, Facts, Comments (2003) (**C-228**); Resolution on indictment of P L Lebedev (22 July 2003) (**R-552**).

[1032] Yukos Review, Special Issue: Attack on Yukos: Chronology, Facts, Comments (2003) (**C-228**).

[1033] *Yukos powers ahead with Sibneft merger* (8 July 2003) Moscow Times (**R-243**); *Yukos repurchases its shares* (7 July 2003) Vedomosti (**R-506**); Yukos Oil's US GAAP Interim Condensed Consolidated Financial Statements (30 September 2003), 11 (**PH-50**).

[1034] Memorial, [58]; Mkhitaryan 1, [15].

[1035] Mkhitaryan 1, [16].

[1036] 'Prosecutors search Yukos office for 17 hours' *The Moscow Times* (14 July 2003), 3 (**PH-53**).

[1037] Agenda of Yukos Oil Company Board Meeting (23 September 2003), 46-48 (**R-539**).

[1038] Ibid, 50 (**R-539**); *see also* T3/561/11-564/15 (Misamore).

628. On 19 September 2003, 23 October 2003 and 17 November 2003, the Ministry of Taxes and Duties issued certificates confirming that Yukos Oil had no tax debts outstanding and (in the first two certificates) that it had not committed any violations of the tax legislation.[1039] These certificates were for submission to the Central Bank of the Russian Federation (in the first two instances) and the Ministry of Power Industry.[1040] The Claimant states that these certificates applied to both the 2000 and 2001 tax years.[1041]

629. Yukos Oil entered into the Syndicate Loan and the B Loan in September 2003, under which it borrowed USD 2.6 billion.[1042]

630. In October 2003, Mr Smirnov (head of the Tax Department at Yukos Oil) left Russia for London 'for reasons of personal safety.'[1043] In the course of 2003, Messrs Nevzlin, Brudno and Dubov (who Respondent describes as the three other 'Yukos Oligarchs') fled the country.[1044]

631. On 25 October 2003, Mr Khodorkovsky was arrested on charges including fraud, embezzlement and tax evasion.[1045] Contemporaneous reports described the arrest as

---

[1039] Certificate of Absence of Unsettled Liabilities on Taxes and Other Compulsory Payments and Tax Violations, No 47-10-11/994/1, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (19 September 2003) (C-6); Certificate of Absence of Unsettled Liabilities on Taxes and Other Compulsory Payments and Tax Violations, No 47-10-11/1612, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (23 October 2003) (C-7); Certificate No 47-10-11/1908, Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1 (17 November 2003) (C-8). The certificates are issued under the letterhead of the Interregional Inspection of Ministry of Taxes and Duties of Russian Federation on Major Taxpayers #1.

[1040] The first and second certificates are stated as being valid until 19 October and 23 November 2003 respectively.

[1041] Memorial, [76].

[1042] Loan Sale Agreement (C-62); *Yukos Oil Company arranges 1.6 billion loan*, Press Release (R-573).

[1043] Smirnov, [5].

[1044] Counter-Memorial, [111].

[1045] Yukos Review, Special Issue: Attack on Yukos: Chronology, Facts, Comments (2003) (C-228). The Respondent also notes that Mr Shakhonovsky had been arrested: Counter-Memorial, [269].

being part of a 'politically charged probe' into Yukos Oil, and suggesting that 'the actions are a Kremlin-directed campaign to keep Mr Khodorkovsky out of politics.' [1046] The subsequent resolution on Mr Khodorkovsky's indictment included charges under Article 199 of the Russian Criminal Code, which concerns the evasion of taxes by organisations. [1047] On this basis, the Respondent submits that the charges concerned Yukos Oil rather than Mr Khodorkovsky's personal affairs. [1048]

632. On 29 October 2003, the District Court of Moscow issued Resolution 375 allowing prosecutors to seize the shares in Yukos held by Hulley Enterprises Ltd and Yukos Universal Ltd and 'de facto owned' by Mr Khodorkovsky. [1049]

633. On 28 November 2003, an Extraordinary General Meeting (**EGM**) of Yukos Oil was held. The EGM had been called principally to implement the Sibneft merger, and the first two items on the agenda were the election of a new board and the adoption of a restated charter. The third item on the agenda was the approval of the giga-dividend. [1050]

634. However, that day Sibneft announced that the merger was being suspended in accordance with an agreement between the shareholders. [1051] It was subsequently unwound at the instigation of its principal shareholder Mr Roman Abramovich. [1052] The votes on the first

---

[1046] *Yukos Oil oligarch arrested in raid*, The Washington Times (26 October 2003) (C-325).

[1047] The Criminal Code of the Russian Federation No. 63-FZ (with amendments) (13 June 1996), Art 199 (CL-207).

[1048] Respondent's Closing Slides, 83; T10/2211/5-12 (Respondent).

[1049] Resolution No. 375 to seize Yukos' shares in Hulley Enterprises Limited and Yukos Universal Limited; Protocol of Seizure of Securities (29 October 2003) (R-246).

[1050] Minutes No 4 of an extraordinary general meeting of shareholders of Yukos Oil Company OJSC (28 November 2003), 3-4 (R-248).

[1051] *Completion of Yukos, Sibneft Merger Suspended*, Interfax News Agency (28 November 2003) (C-730).

[1052] Reply, [101]-[102].

two resolutions failed, and the third passed.[1053] Mr Nevzlin was quoted as stating that Sibneft shareholders had asked the controlling interests of Yukos Oil to postpone the scheduled vote on the first two items for undisclosed 'technical difficulties', but emphasised that the merger had not been shelved and that the exchange of shares was still effective. Mr Theede's evidence was that he became aware at some point after the meeting that the shareholders of the two companies had met.[1054]

635. A representative of Sibneft was reported as confirming that Yukos executives might be unaware of these developments because they arose out of an agreement between the shareholders. Both Yukos Oil CEO Mr Kukes and Mr Theede stated that they had not been notified of the merger being suspended, and the former stated that all merger processes were going to plan.[1055] Mr Theede's evidence under examination was that he found out after the meeting that the 'Sibneft people' were trying to unwind the transaction,[1056] while Mr Misamore's recollection was that the two shareholder groups were willing to discuss unwinding the transaction and this was related to the arrest of Mr Khodorkovsky.[1057]

636. Commenting on the suspension of the merger, the Russian Minister of Economic Development and Trade stated that the 'whole situation with Yukos is generally negative for the economy' but that the 'nationalization of Yukos is not at issue' since if damages (presumably arising out of unpaid taxes) were proven 'those damages will be paid for in cash or other company assets.'[1058]

---

[1053] Minutes No 4 of an extraordinary general meeting of shareholders of Yukos Oil Company OJSC (28 November 2003), 2-3 (R-248). The first resolution was opposed by 72.56% with no votes in favour, and on the second resolution 75.21% abstained.

[1054] T2/428/22-430/12 (Theede).

[1055] *Completion of Yukos, Sibneft Merger Suspended*, Interfax News Agency (28 November 2003), 1 (C-730).

[1056] T2/421/5-24 (Theede).

[1057] T2/522/17-523/3 (Misamore).

[1058] *Completion of Yukos, Sibneft Merger Suspended*, Interfax News Agency (28 November 2003), 2 (C-730).

637. The Board of Directors met that afternoon, expressing its concern at the Sibneft developments and recommending that the Management Board 'present the members of the Board of Directors with an analysis of the possible risks contained in the agreements previously signed by the Company relating to the transaction with Sibneft for the adoption of future decisions' by 10 December 2003. As part of the third item on the agenda, the Board 'expressed their concern regarding whether the management of the Company had duly assessed the political risks with the current situation' and voted to create a working committee to study the same.[1059] Finally, the Board voted to approve the Yukos Capital December 2003 Loan as a major transaction.[1060]

638. The Tribunal questioned Mr Misamore about the decision to advance the December 2003 Loan. Mr Misamore testified that at the time of arranging the December 2003 Loan and the first drawdown, he did not give any consideration to the risk that, as a result of the developments occurring in Russia affecting the company, it would not be repaid. Noting the tax certificates that the company had received, he testified:

> Clearly, when your—the CEO, effectively, of Yukos Oil Company had been arrested on charges, that's a pretty traumatic affair, and we rebounded from that, but the nature of the company and its continuing operations were still very strong, the company had a Market Capitalization in excess of 40 billion, I believe, right after the Sibneft merger; that was the same Market Capitalization in, I believe, April 2004, when I had a conference call.
>
> So, the market didn't perceive an awful lot of risk either, and we were continuing operations.[1061]

---

[1059] The members of the Board of Directors were named as Messrs Kukes, Golubev, Buclez, Kontorovich, Loze, Soublin, Pokholkov, Gupta, Carey and Kosciusko-Morizet, and the meeting was also attended by inter alia Mr Theede, Mr Misamore and Mr Gololobov.

[1060] Minutes No 120/1-27 of a meeting of the Board of Directors of Yukos Oil Company OJSC (28 November 2003), 2 (**R-249**).

[1061] T3/601/24–602/8 (Misamore).

639. Mr Misamore testified that the company was 'mystified' at the commencement of the tax audit in light of the 17 November 2003 certificate, and that they did not realise that the process was politically motivated at the time.[1062]

### (b)   Events between 3 December 2003 and the August 2004 Loan

640. On 8 December 2003, the Russian Tax Ministry served notice on Yukos Oil of its intention to conduct a further tax audit for the year 2000. This report was issued on 29 December 2003 and found that Yukos Oil was liable for underpaid taxes of RUB 79.6 billion (approximately USD 2.72 billion) together with fines and interest amounting to RUB 98.5 billion (USD 3.37 billion).[1063] In a memorandum, Mr Gololobov stated that it was probable that any objections to the report would most likely not be accepted, and that payment could be demanded to be paid within a day.[1064]

641. On 18 December 2003 and again on 22 April 2003, Standard & Poors downgraded Yukos Oil's credit rating.[1065]

642. Around this time, the home and offices of Mr Gololobov, who was coordinating Yukos Oil's response to the Tax Assessments, were raided.[1066]

643. Yukos Oil was advised by Russian counsel, Sergei Pepiliaev, on 5 January 2004, that:

> The position of the Ministry of Taxes and Levies stipulated in the inspection act is totally inconsistent with the Russian tax law and also the practice of its application.

---

[1062] T3/602/25–603/10 (Misamore).

[1063] Act No 08-1/1 on Field Tax Audit of the "Neftyanaya Compania "YUKOS" Public Joint-Stock Company OAO "NC "YUKOS" (29 December 2003) (C-10), using the conversion in Memorial, [77].

[1064] Email from Gololobov as to when to expect the Audit, 2 (29 December 2003) (A1-090); T2/402/20-403/7, T2/405/11-14. Mr Theede testified that he did not see that memorandum at the time.

[1065] According to Counter-Memorial, [270], the rating was downgraded to B2 then CC; *see also BNP Paribas SA & Ors v Yukos Oil Company* [2005] EWHC 1321 (Ch) (24 June 2005), [11] (C-382).

[1066] Mkhitaryan 1, [20].

...

Analysis of the act... affords grounds to assume that the results of the inspection must be invalidated by the arbitration court. Court practice in similar cases is not in favour of the Ministry of Taxes and Levies.

Even if we assume political pressure on the court the extent of violations committed by the Ministry for Taxes and Levies will make it impossible even for the most biased judge to support the clearly unlawful inspection act.[1067]

644. On 16 February 2004, the Moscow *Arbitrazh* Court made an interim order prohibiting Yukos Oil from taking actions to dispose of, transfer or encumber the Sibneft shares it had earlier acquired under the Deed of Share Exchange.[1068]

645. On 1 March 2004, the Moscow *Arbitrazh* Court invalidated Yukos Oil's issue of 1 million common shares used to acquire the Sibneft shares.[1069]

646. Mr Misamore stated that he did not consider, at the time any of the drawdowns were made under the December 2003 Loan up to March 2004, that there was a risk that Yukos Oil might not be able to repay, given the company's estimated cash flow of USD 9 billion for the year.[1070]

647. On 14 April 2004, the Tax Ministry issued its 2000 Tax Assessment, imposing on Yukos Oil an additional liability to tax, fines and penalty interests for the year 2000 of RUB 99.4 billion (USD 3.48 billion), due to be paid two days later,[1071] and issued payment demands, proceedings to recover the sums and an application for an *ex parte* injunction to secure payments the same day.[1072] Mr Theede's evidence was that although this decision had

---

[1067] Summary of the tax inspection of OAO NK Yukos, Sergey Pepeliev (5 January 2004), 3 (**R-577**).

[1068] Order of Moscow *Arbitrazh* Court on title to Sibneft shares (16 February 2004) (**A1-106**).

[1069] Decision of Moscow *Arbitrazh* Court on declaring shareholdings invalid (1 March 2004) (**A1-107**).

[1070] T3/604/18–605/5 (Misamore). March 2004 is the date when it became quite clear that the Sibneft transaction would not occur.

[1071] Resolution to hold the taxpayer fiscally liable for a tax offence, No 14-3-05/1609-1 (14 April 2004) (**C-13**).

[1072] Tax Payment Demand No 14-3-05/1610-8, Ministry for Taxes and Duties of the Russian Federation (14 April 2004) (**C-14**); Tax Penalty Payment Demand No 14-3-05/1611-1, Ministry for Taxes and Duties of the Russian

been forthcoming since the report issued on 29 December 2003, the company regarded it as an 'outlier' in light of the tax certificates it had received.[1073]

648. The following day, the Tax Ministry obtained court orders freezing certain of Yukos Oil's assets, the Tax Ministry registered claims with the Moscow *Arbitrazh* Court, and the Court issued a writ of execution.[1074]

649. On 16 April 2004, bailiffs commenced enforcement proceedings.[1075]

650. On 23 April 2004, Yukos Oil filed an application in the ECtHR against Russia.[1076]

651. On 19 May 2004, Judge Cheburashkina of the Moscow *Arbitrazh* Court granted interim relief suspending the 2000 Tax Assessment.

652. On 26 May 2004, the Moscow *Arbitrazh* Court granted the Tax Ministry's petition in relation to the 2000 Tax Assessment, allowing collection of approximately USD 3.48 billion,[1077] a decision that was upheld on 29 June 2004.[1078]

---

Federation (14 April 2004) (C-15); Petition of recovery of taxes, penalties and fines from OAO NK YUKOS, Ministry of Taxes and Dues of the Russian Federation (14 April 2004) (C-16); Application for providing the claim with remedial measures, Ministry of Taxes and Dues of the Russian Federation (14 April 2004) (C-17).

[1073] T2/407/11-408/18 (Theede).

[1074] Ruling of the Moscow *Arbitrazh* Court (15 April 2004) (C-18); Determination of the *Arbitrazh* Court Accepting Jurisdiction (15 April 2004) (C-19); Determination of the Moscow *Arbitrazh* Court (15 April 2004) (C-20); Writs of Execution (15 April 2004) (C-21).

[1075] Resolution of Bailiff Denis A. Borisov to initiate enforcement proceeding No 11/5975 (16 April 2004) (C-232).

[1076] *OAO Neftyanaya Kompaniya Yukos v Russia* App No 14902/04 (Judgment, 20 September 2011), [1] (R-339).

[1077] Award of the Moscow *Arbitrazh* Court, Case No A40-17669/04-109-241 (26 May 2004, released on 28 May 2004) (C-23).

[1078] Judgment of the Moscow City *Arbitrazh* Court (29 June 2004) (C-27).

343945

653. On 27 May 2004, Yukos Oil publicly acknowledged the possibility of bankruptcy as a result of the tax claims 'before the end of 2004.'[1079]

654. On 11 June 2004, Judge Cheburashkina was challenged by the Tax Ministry for alleged bias, on 15 June 2004 she was replaced and on 23 June 2004 the interim orders were annulled.[1080]

655. For his part, President Putin stated on 17 June 2004 that the Kremlin had no desire to bankrupt Yukos Oil.[1081]

656. On 30 June 2004, the Tax Ministry issued Repeat Field Tax Audit Report in respect of the 2001 tax year assessing liability of approximately USD 4.1 billion,[1082] and enforcement proceedings in relation to the 2000 Tax Assessment began.[1083]

657. On 2 July 2004, the Western Banks declared an event of default under the Syndicate Loan.[1084] The same month, raids were conducted on Yukos Oil's Moscow offices.[1085]

---

[1079] 'Statement by YUKOS Oil Company in connection with the court decision on collection of additional profit tax for the year 2000' (27 May 2004) (**R-588**).

[1080] Ruling of the Moscow *Arbitrazh* Court (19 May 2004) (**C-234**); Challenge of the Russian Federation Ministry of Taxes and Levies to Judge N.P. Cheburashkina, Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (11 June 2004) (**C-238**); Ruling of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (22 June 2004) (**C-239**); Appeal Resolution of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (23 June 2004) (**C-240**).

[1081] *Putin Says Russia Wants Yukos to Survive*, Seth Mydans, The New York Times (18 June 2004) (**C-24**).

[1082] Report No 30-3-14/1 on the Repeat Field Tax Audit of Yukos Oil Company Open Joint Stock Company (30 June 2004) (**C-26**).

[1083] Determination on initiation of execution proceedings, Case No 10249/21/04, First Interregional Division of Execution Service of the Central Administrative District of the city of Moscow (30 June 2004) (**C-25**).

[1084] Letter From Société Générale S.A. To Yukos Oil Company re: US$1 billion Loan Agreement dated 24 September 2003 with "Yukos Oil Company": Event of Default (2 July 2004) (**R-596**).

[1085] *Prosecutors Search Yukos Office for 17 Hours*, The Moscow Times (14 July 2003) (**C-324**).

Former Prime Minister of Canada Jean Chrétien attempted to broker a settlement on Yukos Oil's behalf to no avail.[1086]

658. In July 2004, the Ministry of Justice announced its plan to sell YNG, prompting Mr Osborne (a director of Group Menatep) to state that any purchaser would be 'buying a whole heap of trouble.'[1087] Observers suggested that seizure and sale of 'the crown jewel of oil production' at Yukos Oil 'would kick a vital foundation out from under' the company, that the result could be 'very similar' to renationalisation, that 'authorities are going in for the kill', leaving 'little doubt the authorities' final goal is for Yukos to cease to exist in its current form, materially erasing most, if not all, shareholder value in the process', although another observer suggested it could be a 'high-stakes bluff.'[1088]

659. On 23 July 2004, Yukos Oil was reported as stating that it could run out of cash by mid-August and the loss of YNG would compromise its ability to continue as a going concern, and Mr Theede acknowledged that bankruptcy was a possibility. The report also quoted Yukos Oil as stating that it had no cash reserves within the Group with which to pay the full amount of the tax bill.[1089]

660. Two petitions brought by Yukos Oil were denied in August 2004.[1090]

---

[1086] Letters from Jean Chrétien to Prime Minister Mikhail Fradkov (6 July 2004, 15 July 2004) and Letters from Jean Chrétien to President Vladimir Putin (30 July 2004, 10 September 2004, 17 November 2004) (C-244).

[1087] *Yukos Says Asset Sale Could Prove Fatal Blow*, Erin E. Arvedlund, The New York Times (23 July 2004), 3 (R-599); *see also* T2/451/18-453/19 (Theede).

[1088] Moscow set to seize huge Yukos oil division—Investors may lose everything in tax fight, analysts warn, International Herald Tribune (21 July 2004) (C-326).

[1089] *Yukos Says Asset Sale Could Prove Fatal Blow*, Erin E. Arvedlund, The New York Times (23 July 2004), 1 (R-599).

[1090] Ruling of the Moscow *Arbitrazh* Court, Case No A40-1397/04ip-109 (12 August 2004) (C-28); Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09АП-1554/04-АК (23 August 2004) (C-31, C-250).

661. Yukos Capital entered into the August 2004 Loan on 19 August 2004. The purpose of the Loan, as stated in the Minutes of Yukos Oil, was 'to satisfy a part of the 2000 tax liabilities.'[1091]

662. The same meeting considered Yukos Oil's current position, which is summarised in the following terms:

> S. Theede updated the Board on the Company's current cash situation as well as recent meetings of the management board members with legal advisers on the bankruptcy issues. At this time, the Company intends to avoid declaring bankruptcy. B. Misamore stated, that in order to avoid bankruptcy, the Company would need, in the nearest time, to stop paying VAT and the mineral extraction tax.[1092]

663. Mr Misamore deposed in his First Witness Statement that the August 2004 Loan was made in a context in which '[a]t the time we were desperately trying to keep the business alive in the hope that President Putin was not intent on destroying the entire company and that a negotiated resolution might be achieved.'[1093]

664. In response to a question from the Chairman, he accepted that at the time the August 2004 Loan was advanced there was 'probably more of a risk' that Yukos Oil might not survive, although it 'continued to believe' and 'continued to negotiate with the Russian government for a global settlement.'[1094] He pointed out that, in April 2004, Yukos Oil had filed a case with the European Court of Human Rights, because it had become apparent that the company was being treated improperly for political reasons.[1095]

---

[1091] Minutes No. 120-18 of the Meeting of the Board of Directors of OAO Yukos Oil Company (19 August 2004), Item 1 (**R-48, B-32**).

[1092] Ibid, Item 3.

[1093] Misamore 1, [38].

[1094] T3/608/10-18 (Misamore).

[1095] T3/609/19-610/5 (Misamore).

343945

665. Mr Rosen, Claimant's valuation expert, very fairly accepted that 'if the Tribunal decides these events should be considered, then they would absolutely affect the valuation of the assets.'[1096]

### 3.   Conclusion on causation and contribution

666. The question for the Tribunal is whether, on the dates on which Yukos Capital made its investments under the Loans, there was a reasonably foreseeable risk that these sums would be lost to the Claimant as a result of the actions of the Respondent. If that is so, the proximate cause of the Claimant's loss will be its own actions in choosing to make the investment despite this risk, not the Respondent's acts. Alternatively, it may have, by its own wilful or negligent acts, contributed to its loss.

667. In making this assessment, the Tribunal approaches Yukos Capital's decisions to make investments under the Loans as *its* decisions to contribute to an economic activity within the territory of the Respondent State, for which, on each occasion, it bore the risk. This necessarily follows from the decision of the majority of the Tribunal in the Interim Award. As it was then put, considering respectively the requirements of contribution and risk:

> A decision on the part of one subsidiary company within a multinational oil and gas group to make a loan to another group company that is engaged in economic activities in the energy sector in another state party to the ECT would (in principle and in absent other contrary evidence) constitute an 'Investment.'
>
> ...
>
> A loan to an enterprise or economic venture in the host state still involves risk as to the success or failure of the venture. At the point that the investor disburses funds under the loan to the venture, it is committed to its success or failure. The investor has a stake in that venture. Its risk materializes in a failure to repay.[1097]

668. In considering what was reasonably foreseeable by an investor in the position of Yukos Capital at the time funds were advanced under the Loans, the Tribunal takes account of

---

[1096] T8/1898/1-4 (Rosen).

[1097] Interim Award, [474], [494].

the evidence as to the knowledge actually held by Yukos Capital when the decisions to advance the funds were made.[1098]

### (a) December 2003 Loan

669. So far as concerns the December 2003 Loan, the Tribunal concludes from its examination of the evidence summarised above that it was not reasonably foreseeable, on 2 December 2003, that Yukos Oil would default on repayment because of the Respondent's actions.

670. It is certainly the case that the Respondent's arrests of members of the senior management of Yukos Oil, and the raid on the company's offices, were matters of grave concern. But the question for Yukos Capital as lender was simply whether the position of its borrower was then such that it was reasonably foreseeable that the Loan would not be repaid in light of the actions of the Respondent. Yukos Oil as the debtor was the parent company of a highly profitable, cash-generating group of companies. The arrest of Mr Khodorkovsky, while a very serious matter for the governance of Yukos Oil, is insufficient evidence to make it reasonably foreseeable that Yukos Oil would be driven into bankruptcy and unable to repay its debt to the Claimant.

671. The evidence is, in fact, to the contrary:

    (i)    An internal Yukos Oil review had concluded on 24 July 2003 and again on 25 September 2003 that it was business as usual at the Company, despite the actions taken against management. This was also the view of investment analysts reported in the press;

    (ii)    The Russian Ministry of Taxes had as recently as 17 September 2003 issued certificates confirming that Yukos Oil had no tax debts outstanding;

    (iii)    A syndicate of Western banks had been prepared to extend a secured loan to Yukos Oil in the amount of USD 2.6 billion in September 2003;

---

[1098] Above at [586].

(iv)   The Russian Minister of Economic Development and Trade stated that the 'whole situation with Yukos is generally negative for the economy' but that the 'nationalization of Yukos is not at issue' since if damages (presumably arising out of unpaid taxes) were proven 'those damages will be paid for in cash or other company assets.'[1099]

(v)   The Russian Tax Ministry had not commenced a further tax audit, nor had it issued any revised tax demand. Although both of those steps followed shortly after the Loan, there was no prior indication that such an audit would result in a claim for USD 3.37 billion.

672. In light of these considerations, the Tribunal concludes that it was not reasonably foreseeable on 2 December 2003 that the sums that the Claimant had committed to advance under the December 2003 Loan would prove to be irrecoverable as a result of the Respondent's actions.

673. The position evolved rapidly during the first half of 2004. The question for the Tribunal is whether it had changed so materially as to break the chain of causation or led to a situation in which the Claimant was contributing to its own loss. For these purposes it necessary to take this period in stages.

674. In the first quarter of the calendar year, Yukos Oil faced its first revised tax assessment from the Tax Ministry. On the other hand, the validity of that assessment had not yet been determined in court. Yukos Oil had estimated a cash flow for the year of USD 9 billion.[1100] The Tribunal accepts Mr Misamore's evidence that, until this time he did not consider that there was any risk that Yukos Oil would be unable to repay the Claimant.

675. There were a number of adverse material events in the second quarter. The Tribunal refers in particular to:

(i)   The freezing of certain of Yukos Oil's assets by court order on 15 April 2004;

---

[1099] *Completion of Yukos, Sibneft Merger Suspended*, Interfax News Agency (28 November 2003), 2 (C-730).

[1100] T3/605/3 (Misamore).

(ii)     The upholding of the 2000 Tax Assessment by the Moscow *Arbitrazh* Court on 26 May 2004;

(iii)    Yukos Oil's public statement on 27 May 2004 that the pendency of the tax claim and the freezing of its assets raised the possibility of bankruptcy 'before the end of 2004;'[1101] and

(iv)     The removal of Judge Cherburashkina on 22 June 2004 and the annulment of her interim orders suspending the 2000 Tax Assessment the following day.

676. The gravity of the situation was reflected in Yukos Oil's application to the ECtHR on 23 April 2004.

677. Considering all of this evidence in the round, the Tribunal concludes that there was a reasonably foreseeable risk that the Claimant's investment might not be repaid from 27 May 2004—the date on which Yukos Oil for the first time publicly acknowledged the risk that it might be driven into bankruptcy as a result of the actions of the Tax Ministry and the decision of the Moscow *Arbitrazh* Court upholding those actions on the previous day. From that date, any lender in the position of the Claimant was on notice that further sums that it advanced under the Loan were at some risk of non-recovery as a result of the actions of the Respondent.

678. The Claimant itself accepts in its submissions that 26 May 2004 was a 'key date' since the decision of the Moscow *Arbitrazh* Court upholding the 2000 Tax Assessment on that date gave rise to a dispute between the Parties.[1102]

679. The Claimant had committed, by Articles 1 and 2 of the December 2003 Loan, to grant loans against Notices of Drawdown, up to the total limit there specified. Each loan was to be 'lent as a separate drawdown' and 'requested by a separate Notice of

---

[1101] 'Statement by YUKOS Oil Company in connection with the court decision on collection of additional profit tax for the year 2000' (27 May 2004) (R-588).

[1102] Above at [588].

Drawdown.'[1103] It had undertaken to grant loans to Yukos Oil 'within 2 (two) business days from the date' of submission of a Notice of Drawdown.[1104] The loan is 'deemed to have been granted... when the funds have been credited to the Borrower's bank account.'[1105]

680.  Yukos Oil as Borrower undertook to repay all loans borrowed under the December 2003 Loan by no later than 31 December 2008. However under Article 2.4.1, the Claimant was entitled to request the return of the loan before maturity where 'the Lender shall [have] sufficient grounds to reckon that financial position of the Borrower does not allow timely repayment of the loan.'[1106]

681.  The Tribunal well understands that Yukos Capital's commercial decision to commit funds up to the maximum provided in the December 2003 Loan Agreement had been made when that agreement was entered into on 2 December 2003. The maximum amount had not been reached and the Agreement provided for the making of further loans on very short notice. The position of Yukos Oil as Borrower in May 2004 was unprecedented and fast developing. It remained uncertain.

682.  On the other hand, the decision of the Moscow Court on 26 May 2004 to uphold the 2000 Tax Assessment and Yukos Oil's statement on 27 May 2004 that it faced the risk of bankruptcy should have given a reasonable lender in Yukos Capital's position cause to consider whether it was prudent for it to continue to advance loans under the December 2003 Loan Agreement. Article 2.4.1 provides that Yukos Capital was entitled to request repayment prior to maturity if it as lender had reasonable grounds to consider that Yukos Oil might not be able to make timely repayment. If a lender is entitled to recall a loan already made where there are sufficient grounds to reckon that it will not be timely repaid, it must be implicit in such an arrangement that the lender is not bound to continue to advance further loans. The Tribunal considers that a public statement of the risk of

---

[1103] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003), Art 1 (**C-9**).

[1104] Ibid Art 2.1.

[1105] Idem.

[1106] Ibid Art 2.4.1.

bankruptcy does amount to such sufficient grounds. A lender in the Claimant's position might still recover its loan by way of a claim in the borrower's bankruptcy, but this is not the same thing as *timely* repayment of the loan in accordance with its terms.

683. There is no indication on the record that the Claimant made any assessment at this stage as to whether it was prudent for it to continue to advance further loans under the December 2003 Loan Agreement. In the circumstances as then existed between 27 May and end June 2004 (when the total amount under the Agreement had been advanced), the Tribunal considers that the Claimant was negligent in safeguarding its own interests as lender. By its failure to do so, the Claimant has contributed to its own loss in respect of sums advanced after 27 May 2004.

684. The Tribunal considers that the Claimant's failure in this respect equally contributed to this part of the loss along with the Respondent's subsequent breaches of the treaty. It therefore assesses the extent of that contribution at 50% of those sums. The Tribunal has in this regard a margin of appreciation. On this occasion, it finds no reason to depart from the usual approach of equal contribution.[1107]

685. Accordingly: compensation for the loss relating to the sums advanced under the December 2003 Loan from 3 December 2003 to 26 May 2004 is properly recoverable in the present action. Sums advanced after that date (namely the sums advanced on 16 June 2004, 22 June 2004 and 28 June 2004) may be included in the assessment of compensation due from the Respondent to the Claimant, but discounted by 50% to take account of the extent of the Claimant's contribution to its own loss.

    **(b)    August 2004 Loan**

686. In the case of the August 2004 Loan, the Claimant had to make a decision on 19 August 2004, in light of the information then available, whether to enter into the Loan at all. In terms of assumption of risk, this gave rise to a materially different situation to that which had applied under the successive drawdowns of the December 2003 Loan in the course

---

[1107] *MTD Equity Sdn. Bhd. v Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment (21 March 2007), [101].

of the second quarter of 2004, analysed above. The issue for the Claimant was now whether, in light of the situation as it had developed, it was reasonably foreseeable that any funds that it might decide to invest under this new Loan arrangement would be lost. If this were so, the proximate cause of Claimant's loss would be its own decision to invest in light of such knowledge, which knowledge could break the chain of causation.

687. In making this assessment, it matters not that the events of August 2004 took place well before the Yukos Oil bankruptcy proceedings and the Respondent's measures against the Claimant in those proceedings that have led to the Tribunal's finding of expropriation in this arbitration. This was precisely the position in *Biwater*[1108] and the other cases discussed above.[1109] The *proximate* cause of loss is the cause that is predominant or operative, which may not be the most immediate in time.

688. For this purpose (as already noted) the Tribunal must assess the actions of the Claimant vis-à-vis the August 2004 Loan as those of an investor choosing to make an investment. This necessarily follows from its Interim Award, in which the Tribunal held that an intra-group loan was to be treated as just as much an investment as any other and subject to the same requirements. That is to say: by advancing the August 2004 Loan, the Claimant was both making a contribution and assuming the 'risk as to the success or failure of the venture. At the point that the investor disburses funds under the loan to the venture, it is committed to its success or failure. The investor has a stake in that venture. Its risk materializes in a failure to repay.'[1110]

689. The significance of the Claimant's decision at this point is not to be underestimated. It is only *its* investment that gives rise to this claim. Had it decided not to enter into the August 2004 Loan, the consequence would be that the sum of USD 355 million, which was the subject of that Loan, would not have been paid into the territory of the Respondent. As a result it would neither have been subject to the financial position of Yukos Oil as borrower nor amenable to expropriation by the Respondent. They would have remained the

---

[1108] *Biwater Gauff (Tanzania) Ltd v Tanzania*, ICSID Case No. ARB/05/22, Award (24 July 2008) (**RL-493**).

[1109] Above at [606].

[1110] Interim Award, [474], [494].

property of the Claimant. Conversely, a decision to invest these funds in an economic activity in the energy sector in Russia by lending them to Yukos Oil made the fate of these funds immediately subject to the financial position of Yukos Oil and placed them on the territory of the Respondent and subject to the measures of its organs.

690. The position that had been reached by 19 August 2004 was that:

(i)    The Tax Ministry had assessed liability of approximately USD 4.1 billion for the 2001 Tax Year,[1111] and enforcement proceedings in relation to the 2000 Tax Assessment had begun.[1112]

(ii)   The Western Banks had declared an event of default under the Syndicate Loan.[1113]

(iii)  The Ministry of Justice had announced its plan to sell YNG, the Group's principal oil producing subsidiary, which generated the majority of its cash reserves.

(iv)   On 23 July 2004, Yukos Oil was reported as stating that it could run out of cash by mid-August and the loss of YNG would compromise its ability to continue as a going concern, and Mr Theede acknowledged that bankruptcy was a possibility. The report also quoted Yukos as stating that it had no cash reserves within the Group with which to pay the full amount of the tax bill.[1114]

---

[1111] Report No 30-3-14/1 on the Repeat Field Tax Audit of Yukos Oil Company Open Joint Stock Company (30 June 2004) (C-26).

[1112] Determination on initiation of execution proceedings, Case No 10249/21/04, First Interregional Division of Execution Service of the Central Administrative District of the city of Moscow (30 June 2004) (C-25).

[1113] Letter From Société Générale S.A. To Yukos Oil Company re: US$1 billion Loan Agreement dated 24 September 2003 with "Yukos Oil Company": Event of Default (2 July 2004) (R-596).

[1114] *Yukos Says Asset Sale Could Prove Fatal Blow*, Erin E. Arvedlund, The New York Times (23 July 2004), 1 (R-599).

(v)    At its Board meeting which approved the August 2004 Loan, Yukos Oil had been advised that 'in order to avoid bankruptcy, the Company would need, in the nearest time, to stop paying VAT and the mineral extraction tax.'[1115]

(vi)   The purpose of the Loan was stated to be 'to satisfy a part of the 2000 tax liabilities.'[1116]

691. On the other hand, there continued to be contrary indications, not least President Putin's public statement of 17 June 2004 that the Respondent had no desire to bankrupt Yukos Oil. The Tribunal's view, based on its assessment of the Respondent's conduct to this date, is that little weight can be placed on this statement in light of the facts as detailed above.[1117]

692. Considered from the perspective of a lender in the position of the Claimant, these events plainly raise an imminent risk that Yukos Oil as borrower would be driven into bankruptcy and that any sums advanced by way of loan would not be recovered in accordance with their terms, but would have to be recovered, if at all, by way of a claim in the bankruptcy. There is a risk inherent in advancing a loan to a business that has announced that it may be bankrupted as a result of the actions of the State.

693. This still leaves the question of whether the events as they then existed were such as to render it reasonably foreseeable that the Claimant's investment would be lost altogether. If this were so, it would break the chain of causation. This is not a question of fault on the Claimant's part. It is simply a question of what was reasonably foreseeable in light of the facts as then known to the Claimant.

694. As the Tribunal has recalled above, Mr Misamore very fairly accepted that the August 2004 Loan was made in a context in which '[a]t the time we were desperately trying to

---

[1115] Minutes No. 120-18 of the Meeting of the Board of Directors of OAO Yukos Oil Company (19 August 2004), Item 3 (**R-48, B-32**).

[1116] Ibid, Item 1.

[1117] *Continental Casualty Company v The Argentine Republic*, ICSID Case No. ARB/03/9, Award (5 September 2008), [261].

keep the business alive in the hope that President Putin was not intent on destroying the entire company and that a negotiated resolution might be achieved.'[1118] He accepted that at the time the August 2004 Loan was advanced there was 'probably more of a risk' that Yukos Oil might not survive, although it 'continued to believe' and 'continued to negotiate with the Russian Government for a global settlement.'[1119] He pointed out that, in April 2004, Yukos Oil had filed a case with the European Court of Human Rights, because it had become apparent that the company was being treated improperly for political reasons.[1120]

695. These statements amount to an acceptance that the August 2004 Loan was being advanced in circumstances in which it was not merely foreseen that Yukos Oil as borrower might be driven into bankruptcy, but that this was as a result of deliberate conduct on the part of the Respondent, which was 'intent on destroying the entire company.' The foreseeability of such an intention would affect the totality of the assets of the Yukos Group on the territory of the Respondent.

696. Moreover, the chronology of events demonstrates significant involvement of the Russian courts in this conduct:

(i)     The decision of Judge Cheburashkina on 19 May 2004 to grant interim relief suspending the 2000 Tax Assessment pending judgment on the merits had not only been annulled by the Moscow *Arbitrazh* Court on 23 June 2004,[1121] but had also led to the Court's decision on 22 June 2004 to replace her.[1122]

---

[1118] Misamore 1, [38].

[1119] T3/608/10-18 (Misamore).

[1120] T3/609/19-610/5 (Misamore).

[1121] Appeal Resolution of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (23 June 2004) (C-240).

[1122] Ruling of the Moscow *Arbitrazh* Court, Case No A40-21839/04-76-276 (22 June 2004) (C-239).

(ii)     On 12 August 2004, the Moscow *Arbitrazh* Court had denied Yukos Oil's petition to pay by instalments the amount levied by the court on 28 May 2004 in respect of the 2000 Tax Assessment of some USD 3.48 billion;[1123]

(iii)    On 18 August 2004, the Russian Tax Ministry appealed to the Ninth *Arbitrazh* Court of Appeal to revoke a judgment of the Moscow *Arbitrazh* Court delivered just two weeks earlier on 6 August 2004,[1124] which had granted Yukos Oil's application that the bailiffs enforce against its stake in Sibneft before enforcement against other assets, including notably its shares in YNG. In the course of the hearing, the Court of Appeal summarily denied Yukos Oil's application for a one-month adjournment and proceeded to hear the Tax Ministry's appeal (which it subsequently granted on 23 August 2004). [1125]

697.   In these circumstances, a lender in the position of Yukos Capital could have no confidence that any intention on the part of the Respondent to destroy the Yukos Group would be resisted by the Russian courts, such that the August 2004 Loan would be recovered, even if Yukos Oil as borrower were forced into bankruptcy.

698.   The Tribunal has concluded that the proximate cause of the loss of the August 2004 Loan is the Claimant's own deliberate decision to advance the Loan in circumstances in which it was reasonably foreseeable that it would be lost as part of the destruction of the entire Yukos Group.

699.   As a result, the Tribunal rules that the August 2004 Loan is irrecoverable in these proceedings.

---

[1123] Ruling of the Moscow *Arbitrazh* Court, Case No A40-1397/04ip-109 (12 August 2004) (C-28).

[1124] Award of the *Arbitrazh* Court of the city of Moscow, Case No A40-36718/04-79-445 (6 August 2004), 1-2 (C-29).

[1125] Ruling of the Ninth *Arbitrazh* Court of Appeal, Case No 09AП-1554/04-AK (23 August 2004) (C-31, C-250).

## VIII. COMPENSATION

### A.   INTRODUCTION

700. In light of the conclusion that the Tribunal has reached on causation, the Claimant is in principle entitled to compensation from the Respondent for its loss occasioned by the expropriation of the sums advanced under the December 2003 Loan (but subject to an apportionment of 50% in respect of the last three loans extended under that Loan Agreement to take account of its own contribution to its loss). In view of its decision on causation in relation to the August 2004 Loan, the Tribunal will disregard sums claimed in respect of this Loan and the arguments of the Parties in respect of such sums.

701. The Tribunal must now proceed to determine the amount of compensation that is due in respect of that loss.

702. In order to do so, it proceeds in the following five steps to consider:

    (i)      What is it that the Claimant has lost for which it is entitled to compensation?;

    (ii)     The valuation of that loss;

    (iii)    Whether the Claimant has already recovered any such sums, such that the amount of compensation is to be reduced accordingly;

    (iv)    Interest; and

    (v)     Costs.

### B.   NATURE OF LOSS

#### 1.   The issue

703. The first issue that the Tribunal must consider in fixing the compensation due to the Claimant is: what is it that the Claimant has lost for which it is entitled to compensation?

704. On this threshold issue, the Parties adopt diametrically opposite points of departure. The issue that the Tribunal must resolve is whether that loss is to be determined by reference to either:

(i) The amount of the profit or gain that the Claimant expected to make on the Loan; or

(ii) The total value of the Loan, comprising the principal advanced and any interest due thereunder.

705. The point arises here in the specific context of the back-to-back arrangements in respect of the December 2003 Loan as between Yukos Capital and Brittany dated 20 November 2003 (the **Brittany Loan Agreement**).[1126] The Tribunal considered these arrangements at length in its Interim Award.[1127]

706. Nevertheless, it expressly left open for the merits phase 'the questions that arise from the nature of these arrangements as to what loss the Claimant may have suffered in the event that the Tribunal were to find in its favour on liability.'[1128]

707. As summarised below, the Parties addressed this question in their written pleadings. Given its importance, the Tribunal also addressed the following question to them, inviting their oral submissions in closing:

> 13: What is the ordinary rule as to the account that the Tribunal should take of the means by which an investment was funded for the purpose of assessing its loss? And then some subsidiary questions: What is the principle underlying this rule? Is any such rule affected if the funder is a related party to the lender? Does the rule apply in this case? And if not, why not?[1129]

---

[1126] Brittany Loan Agreement (C-130).

[1127] Interim Award, [501]-[511].

[1128] Ibid, [512].

[1129] T7/1693/22–1694/3 (McLachlan).

2.    **Arguments of the Parties**

   (a)    **The Claimant's position**

708.   The Claimant argues that its contractual arrangements with Brittany and Hedgerow can raise no questions as to the extent of its loss.[1130] It accepts that where a third party 'has a right of ownership in the investment, the compensable damage must be reduced to the extent of that third party's ownership right.'[1131] However, it submits that where a party has debts and other obligations to a third party in relation to an investment, these cannot affect the compensable damages to which the party is entitled.[1132]

709.   In this regard, the Claimant contends that the Tribunal has already found in the Interim Award that Yukos Capital is the owner of the Loans, and that neither Brittany nor Hedgerow own any beneficial interest in them.[1133] It submits that this issue is *res judicata*, arguing that the question of beneficial and legal ownership of assets or rights is a substantive one, and cannot be limited to the jurisdiction phase of the case.[1134] With reference to the non-recourse or hedging arrangements in the Brittany and Hedgerow Loans, the Claimant argues that those arrangements 'restrict the manner in which the liability to those lenders is to be discharged', but do not extinguish Yukos Capital's liability.[1135] The Claimant applies the same analysis to the Respondent's arguments

---

[1130] Memorial, [404]-[405]; Reply, [339].

[1131] Memorial, [409], citing *Occidental Petroleum Corp v Ecuador* ICSID Case No ARB/06/11, Dissenting Opinion of Professor Brigitte Stern (5 October 2012), [154] (**CL-116**) ('*Occidental* Dissent')

[1132] Memorial, [406]-[408], [410], citing *Occidental Petroleum Corp v Ecuador* ICSID Case No ARB/06/11, Decision on the Annulment of the Award (2 November 2015), [288] (**CL-115**); *Occidental* Dissent [153]-[154]; *Hochtief AG v Argentina* ICSID Case No ARB/07/31, Decision on Liability (29 December 2014), [309] (**CL-60**); T10/2121—2126 (Claimant).

[1133] Memorial, [411]; Reply, [332].

[1134] Reply, [329]-[331].

[1135] Memorial, [412]-[415]. *See* Reply, [336]-[337].

regarding 'interest spread', submitting that Yukos Capital's funding arrangements can have no impact on its right to recover the value of the Loans.[1136]

710. The Claimant also submits that any argument as to beneficial ownership is in fact a jurisdictional objection to the Claimant's status as investor.[1137] It contends that the relevance of beneficial versus legal ownership ended when the Tribunal determined that the Claimant is the beneficial owner of the Loans for the purpose of qualifying as an 'Investor' under the ECT.[1138]

### (b)   The Respondent's position

711. The Respondent submits that the Claimant has suffered no loss, as Yukos Capital is not the beneficial owner of the Loans.[1139] While acknowledging that the Tribunal in its Interim Award has determined that neither Brittany nor Hedgerow owned any beneficial interest in the Loans, it submits that this conclusion is limited to the Tribunal's decision on jurisdiction and that the Tribunal has not yet decided that *the Claimant* was the beneficial owner of the Loans or of the repayment flows thereunder.[1140] The Respondent notes that the Tribunal left open for the merits phase 'the questions that arise from the nature of these arrangements as to what loss the Claimant may have suffered in the event that the Tribunal were to find in its favour on liability.'[1141]

712. The Respondent then contends that it is a fundamental principle of international law that relief should only be granted to the owner of a beneficial interest,[1142] defining 'beneficial owner' as a party 'unconstrained by a contractual or legal obligation to pass the payment

---

[1136] Reply, [335].

[1137] Ibid, [333].

[1138] Ibid, [333]-[334].

[1139] Counter-Memorial, [396], [399]; Rejoinder, [504].

[1140] Counter-Memorial, [405]; Rejoinder, [520]-[522].

[1141] Counter-Memorial, [405], citing Interim Award, [512].

[1142] Ibid, [400].

received to another person.'[1143] It argues that Yukos Capital was mandated to pass the payments received under the Loans to Brittany and Hedgerow, with its role being that of a 'passive conduit' of funds between those entities and Yukos Oil,[1144] and therefore the risk and the injury have been borne by a third party and not the Claimant.[1145] On this basis, it submits that it is for the ultimate beneficial owners of the Loans to pursue claims for damages, not Yukos Capital.[1146]

713. Characterising the Loans as a means to facilitate tax evasion, the Respondent argues that the Loans themselves had no value due to their lack of impact on Yukos Oil's consolidated balance sheet.[1147] It contends that the value of these 'intra-group loans' was included in the value of Yukos Oil, and has therefore already been taken into account in the *Hulley* Final Awards.[1148] Since international law does not permit double recovery, it submits that the Claimant should not be able to recover in these proceedings.[1149]

714. The Respondent submits that when determining loss, one must consider the economic substance of the transactions and not the legal formalities recorded in the paper documents.[1150] In support of its contention that the Loans were no more than 'paper assets', the Respondent refers to various instances where it submits that the Claimant and Yukos Group treated the Loans as assets of little to no value—such as Hedgerow's dismissal of any prospect of repayment of the Hedgerow Loan on 24 January 2005.[1151] It also argues that the Claimant's inability to provide a consistent basis for estimating the

---

[1143] Ibid, [401], citing OECD, 'Clarification of the Meaning of "Beneficial Ownership" in the OECD Model Tax Convention', *OECD Model Tax Convention* (29 April 2011) (**R-329**).

[1144] Ibid, [396], [402]-[403].

[1145] Ibid, [431]-[438].

[1146] Ibid, [404], [436].

[1147] Rejoinder, [511]-[513].

[1148] Ibid, [512]-[513].

[1149] Ibid, [513].

[1150] T10/2248/17–2249/9.

[1151] Rejoinder, [515].

value of the Loans demonstrates their lack of value, referring to Yukos Capital's financial statements, the bankruptcy proceedings and the present arbitration, arguing that the values ascribed to the Loans by the Claimant fluctuate in those instances between USD 0 and USD 13.07 billion.[1152] In light of the above, the Respondent submits that the Claimant could not have genuinely considered the Loans to be of any real value.[1153]

715. Following its argument relating to the back-to-back nature of the Loans, the Respondent submits that the maximum extent of Yukos Capital's loss must be limited to the 'interest spread' between the December 2003 Loan and the Brittany Loan.[1154] It argues that such damages have been claimed and awarded in cases involving non-recourse project financing, based on the net cashflows of the project after non-recourse project financing obligations have been discharged.[1155] The Respondent calculates the interest spread to be 0.0625%, submitting that the Brittany Loan required Yukos Capital to pay Brittany the principal under the December 2003 Loan as well as 99.9375% of the interest.[1156] It contends that 0.0625% of the interest under the December 2003 Loan is equivalent to USD 9.4 million.[1157]

### 3.  The Tribunal's analysis[1158]

716. In view of the fundamental nature of the disagreement on this issue, it is necessary for the Tribunal to start from first principles.

717. The Tribunal has already found in its Interim Award (by majority) that:

> *The Claimant does own an asset constituted by a debt of a company* associated with an Economic Activity in the Energy Sector in the Area of the Respondent such that

---

[1152] Ibid, [514].

[1153] Ibid, [516].

[1154] Counter-Memorial, [398], [425], [429].

[1155] Rejoinder, [554]-[556].

[1156] Counter-Memorial, [426](b).

[1157] Ibid, [426](a), (c).

[1158] This part of the Award is by majority (McLachlan and Rowley, Stern dissenting).

it has made an Investment to which the present dispute with the Respondent relates[1159]

718.  It has further held earlier in the present Award that the Respondent has breached Article 13 ECT by expropriating the Claimant's property in the sums advanced under the December 2003 Loan.[1160]

719.  *A property right of the Claimant.* The consequence is that the loss for which the Claimant is to be compensated is the loss of the Claimant's rights in that property.

720.  The *Emmis* Tribunal explained the relation between a claim of expropriation and the existence of a property right of the claimant in the following terms:

> In view of the fact that the only cause of action within the Tribunal's jurisdiction is that of expropriation, Claimants must have held a property right of which they have been deprived. This follows from the ordinary meaning of the term. The *Oxford English Dictionary* defines 'expropriate' as '(of the state or an authority) take (property) from its owner for public use or benefit'/'dispossess (someone) of property'. Its origin is from the medieval Latin *expropriat-* 'taken from the owner', from the verb *expropriare*, from *ex-* 'out, from' + *proprium* 'property', neuter singular of *proprius* 'own'.[1161]

721.  It also follows from the basic notion that an expropriation clause seeks to protect an investor from deprivation of his property that the property right or asset must have vested (directly or indirectly) in the claimant for it to seek redress. This has been recognised by many tribunals, for example:

(i)     In *Generation Ukraine v Ukraine*,[1162] the Tribunal noted that since 'expropriation concerns interference in rights in property, it is important to be

---

[1159] Interim Award, *dispositif* [567](2), emphasis added.

[1160] Above at [463], [485], subject to the Claimant's contribution to part of that loss as determined in Pt VII.

[1161] *Emmis International Holding, B.V. v Hungary*, ICSID Case No ARB/12/2, Award (16 April 2014), [159] (CL-59) (emphasis in original, footnotes omitted).

[1162] *Generation Ukraine Inc. v Ukraine*, ICSID Case No ARB/00/9, Final Award (16 September 2003), [6.2] (CL-8).

meticulous in identifying the rights duly held by the Claimant at the particular moment when allegedly expropriatory acts occurred.'

(ii) In *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v Islamic Republic of Pakistan*,[1163] the Tribunal noted that the 'first step in assessing the existence of an expropriation is to identify the assets allegedly expropriated.'

(iii) In *Apotex v United States of America*,[1164] the Tribunal rejected the claimant's argument that it had made an investment in the United States by applying for regulatory approval for a drug that it claimed it would have been granted but for the respondent's alleged breaches. The tribunal held 'the critical enquiry must be as to the nature of the alleged "*property*" as at the date of the alleged breach - not at some future point.'[1165]

722. *Proper approach to valuation of that loss.* The proper approach to be adopted to the valuation of that loss was authoritatively expounded by the Permanent Court of International Justice (**PCIJ**) in *Chorzów Factory* when it ruled on the issues of compensation following its finding that the factory had been expropriated:

> On approaching this question, it should first be observed that, in estimating the damage caused by an unlawful act, only the value of property, rights and interests which have been affected and the owner of which is the person on whose behalf compensation is claimed, or the damage done to whom is to serve as a means of gauging the reparation claimed, must be taken into account. This principle, which is accepted in the jurisprudence of arbitral tribunals, has the effect, on the one hand, of excluding from the damage to be estimated, injury resulting for third parties from the unlawful act and, on the other hand, of *not excluding from the damage the amount of debts and other obligations for which the injured party is responsible.* The damage suffered by the Oberschlesische in respect of the Chorzów undertaking is therefore

---

[1163] *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v Pakistan*, ICSID Case No ARB/03/29, Award (27 August 2009), [442] (**RL-251**).

[1164] *Apotex Inc. v Government of the United States of America*, ICSID Case No UNCT/10/2, Award on Jurisdiction and Admissibility (14 June 2013), [215] (emphasis in original). *See Apotex Holdings Inc. & Apotex Inc. v United States of America*, ICSID Case No ARB(AF)/12/1, Award (25 August 2014), Part VII – Annex, 8 (**CL-83**).

[1165] Ibid.

equivalent to the total value-but to that total only-of the property, rights and interests of this Company in that undertaking, *without deducting liabilities*.[1166]

723. This approach was approved by the *ad hoc* committee in *Occidental Petroleum v Ecuador*, in which the committee explained its application in the following way:

> It stands for the common sense proposition that in the calculation of damages for the taking of assets
>
> - debts and other obligations for which the injured party is responsible should not be excluded, while
>
> - injury resulting to third parties should indeed be excluded.
>
> To give an example: if a State expropriates a piece of real estate, the mortgage loan which served to finance the acquisition should not be deducted from the fair market value; but if the investor before the expropriation had transferred a 50% share of the property to a third party, the third party's share in the value of the investment must be deducted from the claim for compensation.[1167]

724. The committee partially annulled the award in that case. It adopted the fundamental distinction between (i) debts for which the injured party is responsible and (ii) injury resulting for third parties that had been made by the PCIJ in *Chorzów*.

725. Professor Stern had also applied that distinction in her partial dissent to the award. She explained its rationale in these terms:

> The plain text of the *Chorzów Factory* dictum indicates that a distinction has to be made, between *rights* belonging to a third party for which a claimant cannot assert any claim and *liabilities* towards a third party which are a constitutive part of a claimant's entitlements. In order to distinguish the two, a good point of departure is to state that a liability means that A (OEPC) is under an *obligation to transfer* something to B (AEC), a transfer means that A (OEPC) *has transferred* something to B (AEC). In other words, it is clear that the *Chorzów Factory* dictum means that, on the one hand compensation can only be granted to the *owner* of a right that has been interfered with, and that on the other hand, if a right belonging to an owner is

---

[1166] *Factory at Chorzów (Germany v Poland)* [1928] PCIJ Series A, No. 17, Judgement No. 13 (13 September 1928), 31 (**CL-86**), emphasis added.

[1167] *Occidental Petroleum Corporation v Ecuador*, ICSID Case No ARB/06/11, Decision on Annulment of the Award (2 November 2015), [289] (**CL-115**) (emphasis in original).

burdened with a *liability* this does not prevent its owner to receive full compensation for its right.[1168]

726. The Tribunal considers that this approach is correct. Applying this approach, it means that the Tribunal, in order to determine the Claimant's property interest, for the loss of the ownership of which it is to be compensated by the Respondent, must exclude any rights belonging to a third party for which the claimant cannot assert any claim, but not exclude any liabilities of the Claimant towards third parties.

727. *Application to the arrangements in the present case.* Applying this approach to the facts of the case requires the Tribunal to return to the nature and consequences of the back-to-back arrangements between (i) Yukos Oil and the Claimant on the one hand; and (ii) the Claimant and Brittany on the other. Although these arrangements were already set out in the Interim Award, for clarity of exposition it is necessary to repeat them here.

728. The December 2003 Loan Agreement establishes a loan between Yukos Capital (defined as 'Lender') and Yukos Oil (defined as 'Borrower'). It provides in relevant part:

1. SUBJECT

1.1 During the term hereof the Lender undertakes to grant to the Borrower interest bearing loans with total amount (hereinafter referred to as "Loan Amount") not exceeding 80'000'000'000-00 (Eighty billion) Russian Rubles, and the Borrower undertakes to repay such loans and to pay interest for use of funds hereunder at the rate of 9% per annum.

1.2. Each loan designated to be granted by the Lender to the Borrower hereunder shall be lent as a separate drawdown.

1.3. Each loan designated to be granted by the Lender to the Borrower within Loan Amount Stipulated in paragraph 1.1. hereof, shall be requested by a separate Notice of Drawdown, stating terms of such drawdown.

2. RIGHTS AND OBLIGATIONS OF THE PARTIES

2.1. The Lender undertakes to grant loans to the Borrower within 2 (two) business days from the date when the Borrower submitted to the Lender a Notice of Drawdown, stating drawdown amount, which neither separately nor in aggregate

---

[1168] *Occidental Petroleum Corporation v Ecuador*, ICSID Case No ARB/06/11, Dissenting Opinion (5 October 2012), [153] (CL-116) (emphasis in original).

with other loans granted earlier hereunder may exceed Loan Amount as defined in paragraph 1.1. hereof, and other terms of such drawdown.

A loan shall be deemed to have been granted by the Lender at the time when the funds have been credited to the Borrower's bank account.

2.2. The Borrower is entitled to return loans obtained hereunder prior to their maturity (before expiration of terms, stipulated in respective Notice of Drawdown, submitted by the Borrower to the Lender)

2.3. The Borrower undertakes to submit to the Lender a copy of its quarterly balance sheet with stamp of tax office evidencing its acceptance by the latter not later than the 10th of second month following the end of each quarter.

2.4. The Borrower undertakes to repay all loans, borrowed hereunder, to the Lender not later than 31st December 2008. Such term of maturity of the loans may be adjusted by mutual agreement of the Parties made in writing. The interest on the loans granted hereunder shall accrue quarterly and shall be payable not later than last business day of the last month in the quarter. The loan shall be deemed to be repaid in full at the time when respective funds have been credited to the Lender's bank account. At the request of the Lender the Borrower shall return the loan before maturity as stated above in the events as follows:

2.4.1. the Lender shall sufficient grounds [sic] to reckon that financial position of the Borrower does not allow timely repayment of the loan.

2.4.2 in other events, defined by the laws of the Russian Federation from time to time in force being.

3. RESPONSIBILITY OF THE PARTIES

3.1. In the event of nonfulfillment and/or not due fulfillment of obligations, hereunder the Parties shall be liable in accordance with civil legislation of the Russian Federation from time to time in force being.

3.2. In the event of delay in the repayment of the loan by the Borrower the Lender is entitled to require that penalty be payable by the Borrower in the amount of 0,1 (zero point one) per cent of the amount overdue. The payment of the penalty shall not relieve the Borrower from fulfillment of the obligation in kind (i.e. of the repayment of the loan and/or of payment of interest for using the loan).

4. FORCE MAJEURE

4.1. The Parties shall not bear responsibility for non-fulfillment or not due fulfillment of their obligations should such hereunder breach be caused events beyond their control (force majeure), i.e. extraordinary and unforeseen circumstances, which

being beyond control of the Party in breach prevented such Party from due fulfillment of its obligations.[1169]

729. The Brittany Loan Agreement establishes a loan between Brittany (defined as 'Lender') and Yukos Capital (defined as 'Borrower'). It provides in relevant part:

> WHEREAS:
>
> (a) Borrower intends to provide a loan facility to OAO "NK "YUKOS", a company duly organized and validly existing under the laws of the Russian Federation (hereinafter referred to as "Sub-Borrower"), such loan facility to be granted shall not exceed 80'000'000'000-00 (Eighty billion) Russian Rubles, shall bear interest at the rate of 9% per annum and shall mature not later than 31st December 2008 (hereinafter referred to as "Sub-Lending", and respective loan agreement documenting such Sub-Lending to be hereinafter referred to as Sub-Lending Agreement);
>
> (b) Lender has agreed to make available this Loan Facility on the terms set forth herein.
>
> NOW, THEREFORE, the Parties have agreed as follows:
>
> **1. Definitions**
>
> As used herein, the following terms shall have the following respective meanings:
>
> **Advance**
>
> Shall mean any advance made or to be made by Lender hereunder which Borrower undertakes to use for Sub-Lending.
>
> **Business day**
>
> Shall mean any day, other than Saturday or Sunday, on which banks are not required or authorised to close in the city or cities specified; provided if no city is specified, Business day shall mean a Business day in Cyprus, in New York and in Luxembourg.
>
> **Debt**
>
> Means all indebtedness of Borrower in respect of outstanding amounts under this Agreement.

---

[1169] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003) **(C-9)**.

**Drawdown Date**

Means the day when Borrower transfers funds to Sub-Borrower at the request of the latter under Sub-Lending Agreement.

**Disbursement date**

Shall mean the date on which the Loan amount is credited in cleared funds to Borrower's account.

**Facility amount**

Means 80'000'000'000-00 (Eighty billion) Russian Rubles.

**Final Repayment date**

2nd January 2009, which date may be either accelerated or postponed by mutual agreement in miring by the Parties hereto. Such Final Repayment date will not be later than one Business Day after the date on which the Sub-Lending is redeemed.

**Interest rate**

Means 8,9375% per annum payable quarterly and on the Final Repayment date. Such interest rate may be reduced by any Russian withholding taxes and other statutory deductions from the interest on Sub-Lending.

**2. Commitments**

Lender agrees on the terms and conditions herein, to make available to Borrower a loan facility equal to the Facility amount. Lender undertakes to transfer Advances hereunder in US Dollars to the account of Borrower in total Facility amount in order to make feasible Sub-Lending by Borrower, which accumulation in the amount sufficient to meet Sub-Borrower's request is to be completed in any case prior to any of the Drawdown date (should Sub-Lending be effected in several advances).

**3. Repayment**

Borrower shall repay the amount outstanding within one Business Day upon redemption of any part of Sub-Lending. The indebtedness shall be repaid in Russian Rubles or, on the mutual agreement between the Parties, in another currency as if converted using the Central Bank of the Russian Federation exchange rate on the date of repayment. Repayment may be made in installments.

### 4. Interest

The loan shall accrue interest at the interest rate determined above with effect from each Drawdown date for actual number of days elapsed thereupon on the basis of actual calendar year. The interest shall accrue quarterly and shall be payable on the next Business Days upon receipt of respective quarterly interest from Sub-Borrower, or on final Repayment Date together with repayment of last outstanding balance to Lender.

### 5. Hedge

Notwithstanding the foregoing and for the avoidance of doubt Lender shall bear all risks associated with Sub-Lending, including, but not limited to the following:

(a) Failure to pay, which means the failure by Sub-Borrower to make, when and where due, any payments under Sub-Lending Agreement;

(b) Sovereign risk, which means any of the following;

(i) the enactment, imposition, enforcement or modification of any governmental or regulatory restriction on the payment of any portion of the principal or interest due on Sub-Lending;

(ii) the existence, enactment, imposition, enforcement, or modification of any governmental or regulatory restriction on the payment or receipt of any amounts by non Russian residents;

(iii) the adoption, enactment or implementation of any rule, regulation or statute by any Governmental Authority, any modification thereof or any action whatsoever, which has the effect of imposing any exchange controls, limitations or restrictions on the transfer of securities and any other holding of Sub-Lending, or cash proceeds arising from the maintenance, redemption, purchase sale or holding of Sub-Lending;

(c) Foreign exchange risk, which means the risk that Lender may either not be able to convert proceeds in Russian Rubles into hard currency upon repayment hereunder by Borrower or proceeds from such conversion may not be sufficient to recover funds advanced by Lender as Advances under this Agreement or that non Russian Rubles proceeds when translated into Russian Rubles are less than the funds advanced by Lender as Advances under this Agreement;

(d) Tax risk, which means that interest receivable by Borrower on Sub-Lending may be reduced by any Russian withholding taxes and other statutory deductions.[1170]

---

[1170] Brittany Loan Agreement (**C-130**).

730. In its Interim Award, the Tribunal (by majority) analysed these transactions in the following way:

> 504. What was the substance of this set of transactions? Undoubtedly, Yukos Capital's obligation to repay Brittany only arose if and to the extent that Yukos Oil repaid its debt to Yukos Capital.[1171] As between Brittany and Yukos Capital, it is Brittany that bears the risk of default associated with Yukos Capital's loan to Yukos Oil, in terms of Yukos Oil's failure to pay and of Russian sovereign, foreign exchange and tax risks.[1172] Brittany has no right of recourse against Yukos Capital if and to the extent that Yukos Oil does not repay its loan to Yukos Capital.

> 505. Does this affect the substance of the transaction between Yukos Capital and Yukos Oil? A majority of the Tribunal's view is that it does not. The only person that holds the right to claim repayment of the debt represented by Yukos Capital's loan to Yukos Oil is Yukos Capital. It is Yukos Capital that advances the loans to Yukos Oil under the Yukos Capital Loan Agreement. Yukos Oil's undertaking to repay those loans with interest is made to Yukos Capital alone.[1173] Yukos Capital does, therefore, have an economic interest in the Loans, since it is Yukos Capital that holds the debt.

> 506. Those synallagmatic obligations between Yukos Oil and Yukos Capital are not held by the latter on behalf of Brittany or any other third party. This conclusion is confirmed by reference to both the Yukos Capital Loan Agreement and the Brittany Loan Agreement. Brittany has no right to claim recovery of Yukos Oil's debt. Yukos Capital has not transferred that right – legally or beneficially – to Brittany. Brittany does not receive under the Brittany Loan Agreement any right to Yukos Oil's debt to Yukos Capital or any ability to pursue a claim against Yukos Oil in respect of that debt. It merely limits its own rights of recovery vis-à-vis Yukos Capital by assuming the risk if and to the extent that Yukos Capital is not repaid.

> 507. Nor has Brittany indemnified Yukos Capital under the Brittany Loan Agreement against any loss that Yukos Capital may suffer as a result of default by Yukos Oil under the Yukos Capital Agreement. The right to seek repayment – and to invoke Yukos Oil's liability for nonfulfilment of its obligations[1174] – remains solely held by Yukos Capital on its own behalf.

731. In the Interim Award, the Tribunal expressly reserved the question of the effect of these arrangements on the extent of the Claimant's loss (if and to the extent it were to find

---

[1171] Ibid, cl. 3.

[1172] Ibid, cl. 5.

[1173] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003), cls. 1.1 & 2.4 (C-9).

[1174] Ibid, cl. 3.1.

liability).[1175] The Tribunal has therefore now revisited these findings in the light of the legal test applicable to the nature of the loss to be compensated, as determined above, namely the distinction between (i) a liability of the victim (which does not go to reduce its loss) and (ii) the transfer of an ownership interest in the property to a third party (which does).

732. The Tribunal finds that the effect of these arrangements is that it is the Claimant, and only the Claimant, which *owns* the asset constituted by the sums advanced under the December 2003 Loan. There was no transfer of any ownership interest (legal or beneficial) from Yukos Capital to Brittany. Rather, Yukos Capital simply retained a liability to Brittany in respect of repayments that Yukos Capital received of the sums that Yukos Capital had advanced to Yukos Oil under the Loans.

733. Comparing the two back-to-back loan agreements:

   (i)     Yukos Oil's obligation to repay the Loans is an obligation owed to Yukos Capital alone;[1176]

   (ii)    Yukos Capital, and only Yukos Capital, has the right to make Yukos Oil liable for failure to make due fulfilment of its obligations in accordance with Russian civil law;[1177]

   (iii)   Further, it is Yukos Capital, and only Yukos Capital, that has the right to demand early repayment on account of the financial position of Yukos Oil[1178] and to demand penalty interest for late repayment.[1179]

---

[1175] Interim Award, [508].

[1176] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003), cl. 2.4 (C-9).

[1177] Ibid cl. 3.1

[1178] Ibid cl. 2.4.1.

[1179] Ibid cl. 3.2.

734. Conversely, Brittany's Loan Agreement is only with Yukos Capital and not with Yukos Oil. Yukos Capital assumes a liability to repay Brittany under that Loan Agreement.[1180] That is a liability that Yukos Capital owes as lender. The Brittany Loan Agreement does not purport to and does not confer any ownership right upon Brittany in respect of Yukos Capital's property as constituted by its Loan to Yukos Oil.

735. Undoubtedly Yukos Capital's obligations to Brittany are greatly qualified by the terms of clause 5 (Hedge) in the Brittany Loan Agreement. These provisions qualify Brittany's right to obtain repayment of its loan to Yukos Capital in all of the events there listed, which include both (i) Yukos Oil's failure to repay Yukos Capital and (ii) sovereign risk. These terms affect Yukos Capital's borrowing risk. They do not qualify Yukos Capital's ability to seek repayment of its Loan from Yukos Oil. Nor do they negate the fundamental risk that Yukos Capital assumed as a lender to Yukos Oil as to the success or failure of the venture in Russia in which Yukos Capital was investing.[1181] If anything, the limited nature of Brittany's rights vis-à-vis Yukos Capital under the Brittany Loan Agreement serves to underscore the basic point that the property in Yukos Capital's Loans to Yukos Oil remains with Yukos Capital alone. A waiver granted by Brittany of its rights to recovery from Yukos Capital does not affect the value of Yukos Capital's asset, represented by the sums advanced to Yukos Oil under the December 2003 Loan.[1182]

736. This conclusion is not affected by the limited nature of the profit that Yukos Capital was projected to make under its Loan Agreement with Yukos Oil, as constituted by the spread of 0.0625%, between the interest rate payable by Yukos Oil to Yukos Capital and the interest rate that Yukos Capital was in turn obliged to pay to Brittany.

---

[1180] Brittany Loan Agreement (C-130).

[1181] Interim Award, [489]–[494].

[1182] In Yukos Capital's 2004 Accounts (PH-44), the capital asset represented by the Loans are recorded in full on the Balance Sheet (p.7) despite the notation at p.6 as to a contingent waiver on loans payable. For the same reason, Yukos Capital's 2019 release of Brittany (Letter from the Claimant to the Tribunal, 5 February 2019 (SFC-49) cited at [816] below) does not affect the existence or enforceability of Yukos Capital's Loans to Yukos Oil, as the Dutch Courts have confirmed: [809]–[810] below.

737. The valuation of *property*, which is the thing that is to be valued in determining loss for the purpose of a claim of expropriation, is not limited to any profit that may be expected to be earned on that property. The value of income flows may (depending upon the valuation methodology adopted) be an input to the capital value of the property, but it is not *the* value. To take a simple example, the value of a house is determined by its market valuation as a capital investment. If the house were in use for a commercial purpose, the income derived from that activity may be relevant to the value of the undertaking as a whole. It would not make the capital value of the house legally irrelevant. In the event that the house were expropriated, the victim's loss for which the respondent would be liable would include its loss of capital represented by the value of the house itself.

738. The position is no different where the victim's property is the chose in action represented by sums advanced by way of a loan. It is still the case that the claimant's property is the value of its capital interest in the sums advanced + any interest to be earned on that capital and not the net profit alone.

739. The Respondent submits, in answer to the Tribunal's Question N° 13, that, in determining loss, the Tribunal must look to 'economic substance' and to the 'money flows' and not to the legal character of the Loans and the legal ownership of the Loans.[1183]

740. In light of the *Chorzów Factory* test enunciated above, the determination of the loss cannot be considered in isolation from the character and consequences as a matter of law of the arrangements between the parties. This is because it really does matter whether the victim retains ownership of the property the loss of which is the subject of the claim, and whether its relationship with a relevant third party is properly characterised as a liability or as a transfer of beneficial ownership.

741. The Respondent's valuation expert, Mr Knyazev, accepted as much in response to the Tribunal's question. Mr Knyazev had been asked in re-examination as to his opinion in the event that a commercial bank had taken on the role of an intermediary in a back-to-

---

[1183] T10/2248/10-21 (Respondent).

back arrangement with an identified party for onward lending.[1184] Mr Knyazev accepted that this type of arrangement occurred where 'it's a syndicate of Western banks coming together and use a frontier agent lending money to risky operators in jurisdictions like Russia.'[1185] The Chairman then asked Mr Knyazev:

> [A]ssume a syndicate of banks that are lending into a frontier bank, and the frontier bank, in turn, lends on such that its profit on the transaction is just its turn on the transaction, but it, nevertheless, receives and pays as principal rather than agent.
>
> MR. KNYAZEV: Yes.
>
> CHAIRMAN McLACHLAN: What is your answer?
>
> MR. KNYAZEV: Then I would say the value—the value of the front loan, *they should get the full value to satisfy obligations.*
>
> So it would economically, again, it would be linked because the frontier company, acting as a principal, they still have these obligations to—if they diluted this, if there is no precondition that they could lend—they could source funds from anywhere without conditions, they I would say probably yeah, *it would be the principal value plus interest, yes, discounted.*[1186]

742. The Tribunal has found that Yukos Capital did lend to Yukos Oil as principal and not as agent. Its back-to-back arrangements with Brittany, by means of which the Loans were funded, did not result in Brittany acquiring a property interest in Yukos Capital's Loans to Yukos Oil. Yukos Capital simply retained a liability to Brittany, the extent of which was determined by the terms of the Brittany Loan Agreement.

743. Applying the test expounded in *Chorzów Factory* and applied in *Occidental v Ecuador,* the Tribunal *excludes* this liability from its calculation of Yukos Capital's loss. Rather, it

---

[1184] T9/2025/17-22 (Knyazev).

[1185] T9/2025/25–2026/3 (Knyazev).

[1186] T9/2027/1-17, emphasis added. Mr Knyazev qualified his answer by stating that there should be no preconditions on source of borrowing. This is inconsistent with the hypothetical that he was considering in which the frontier bank was borrowing as principal from a specific group of lenders. He added that it might be necessary to apply a discount from a valuation of principal plus interest. The Tribunal considers whether such a discount is applicable in the present case in section C below.

*includes* both the principal advanced under the December 2003 Loan plus the interest to be earned thereon.

## C.   THE APPLICABLE STANDARD

### 1.   The issue

744.   The next question to be addressed is the standard that is to be applied to the valuation of the loss of the property constituted by the principal and interest in sums advanced under the December 2003 Loan. This question involves consideration of whether, in the circumstances of the present case, there is a material difference between (i) a valuation based on the *Chorzów Factory* test for reparation wiping out the consequences of the Respondent's illegal actions and (ii) the fair market value (**FMV**) of the loans.

### 2.   Arguments of the Parties

#### (a)   The Claimant's position

745.   The Claimant advocates for a 'but-for' approach to reparation. While acknowledging that Article 13 of the ECT provides for a specific rule of compensation for expropriation, the Claimant contends that such rule does not cover reparation in case of a breach of Article 13,[1187] in which event it submits that customary international law requires that the Claimant be placed in the same position it would have been in had the wrongful acts not occurred.[1188]

746.   On the basis that the Respondent's wrongful acts were its 'destruction' of Yukos Oil, or, alternatively, its non-recognition of Yukos Capital's claims in the bankruptcy proceedings,[1189] the Claimant submits that the appropriate reparation in this case would include the principal amounts under the Loans, any unpaid interest, and pre-award interest

---

[1187] Memorial, [394].

[1188] Memorial, [394]-[398].

[1189] Memorial, [399]-[400].

from the date that the principal amounts were to be repaid.[1190] It contends that while it is entitled to choose the valuation date as either the date of the expropriation or the date of the Award, the damages suffered at those dates is the same.[1191] In any event, it clarifies that it calculates damages as at the date of the Award.[1192]

747. As to the precise quantum of its claim, the Claimant refers to the following valuations made by its expert (calculated to 31 December 2018, all amounts in USD millions):[1193]

| Loan | December 2003 Loan |
|---|---|
| Currency up to November 21, 2007 | RUB |
| Currency from November 21, 2007 | USD |
| Pre-award Interest Rate up to November 21, 2007 | UB ST interbank rate + 2.0% |
| Pre-award Interest Rate from November 21, 2007 | USD 6-month Libor + 2.0% |
| Principal | $2,697 |
| Loan Interest | $1,310 |
| Pre-award interest | $1,625 |
| **Total Damages (USD)** | **$5,633** |

748. With reference to the Respondent's expert, Mr. Haberman, the Claimant objects to his approach to the calculation of damages where he assumes that Yukos Oil engaged in tax evasion and that the Tax Assessments were legitimate.[1194] The Claimant contends that those issues are relevant to liability, not quantum, and have no place in a damages counterfactual where it should be assumed that the actions of the Respondent were not legitimate.[1195]

---

[1190] Memorial, [399]-[401].

[1191] Memorial, [401].

[1192] Reply, [349].

[1193] Rosen 2, [87] Table 1.

[1194] Reply, [340]-[344].

[1195] Reply, [341], [344].

### (b)    The Respondent's position

749.    The Respondent submits that FMV is the appropriate measure of damages in the present case, [1196] arguing that it applies where a claimant seeks damages for total loss of investment, whether a loan or otherwise.[1197] It defines the FMV standard as:

> the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical [willing] and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[1198]

750.    Referring to the *Chorzów Factory* standard, the Respondent argues that the Claimant makes no submissions on why that standard should prevail over FMV.[1199] It submits that the ECT in Article 13(1) explicitly requires that the FMV standard be applied in cases of expropriation,[1200] and contends that such standard should apply regardless of the nature of the breach found by the Tribunal, since 'there is no good reason to adopt different standards for assessing damages payable under different treaty provisions, when the loss alleged to result from those breaches... is the same.'[1201] It also seeks to distinguish the application of the *Chorzów Factory* standard on the basis that it is 'not particularly helpful' in cases between States and private parties.[1202] Given that, in the Respondent's

---

[1196] Counter-Memorial, [397], [405](a); Rejoinder, [531].

[1197] Counter-Memorial, [405](a), [408]-[409]; Rejoinder, [530].

[1198] Counter-Memorial, [406], referring to *National Grid Plc v Argentine Republic* UNCITRAL, Award (3 November 2008), fn 99, citing American Society of Appraisers, *International Glossary of Business Valuation Terms* (6 June 2001), 4, 'Fair market value'.

[1199] Rejoinder, [529].

[1200] Counter-Memorial, [405](b); Rejoinder, [531].

[1201] Counter-Memorial, [408]-[409]. *See* Rejoinder, [536].

[1202] Rejoinder, [535], citing J Crawford, 'Similarity of Issues in Disputes Arising under the Same or Similarly Drafted Investment Treaties' in Emmanuel Gaillard and Yas Banifatemi (eds), *Precedent in International Arbitration* (IAI, 2008), 99-100 (**RL-434**).

view, the Claimant has failed to establish the FMV of the Loans, it has failed to prove the compensation it seeks and is therefore not entitled to monetary relief.[1203]

751. As to the valuation date, the Respondent refers to Article 13(1) of the ECT, which provides that the valuation date for FMV is 'immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment'.[1204] It therefore submits that the FMV of the Loans should be determined at 17 July 2006, being the date on which Moscow *Arbitrazh* Court rejected Yukos Capital's First Bankruptcy Application.[1205]

752. Applying this valuation date, the Respondent contends that the FMV of the Loans is zero.[1206] With reference to Mr. Haberman's report, it submits that by 17 July 2006: (i) Yukos Oil had been rated 'Ca' by Moody's, which it contends suggests that loans to Yukos Oil were 'highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest';[1207] (ii) Yukos Oil had defaulted on both of the Loans; (iii) Yukos Capital had issued notices of default in respect of both Loans; (iv) Yukos Capital had written off the loan receivable balances in its financial statements for both Loans;[1208] and (v) Hedgerow had written off its remaining interest in the August 2004 Loan on the basis that it was 'not recoverable'.[1209]

753. The Respondent disputes the Claimant's calculation of the FMV of the Loans. First, it argues that the Claimant has no case that the August 2004 Loan exceeded zero, since the Claimant's expert cannot demonstrate the commercial interest for that Loan.[1210] Second,

[1203] Counter-Memorial, [410].

[1204] Counter-Memorial, [411].

[1205] Counter-Memorial, [411]-[412]; Rejoinder, [540].

[1206] Counter-Memorial, [410], [414]. *See* Rejoinder, [537], [548].

[1207] Counter-Memorial, [414].

[1208] Counter-Memorial, [415]-[416].

[1209] Counter-Memorial, [417].

[1210] Rejoinder, [542]-[544].

in relation to the December 2003 Loan, the Respondent submits that the expert's assessment that a willing buyer would not seek a discount on the December 2003 Loan is 'farcical' in light of the number of matters that would need to be overlooked to reach such a conclusion, including ignoring the absence of lender protections and the absence of financial information concerning Yukos Oil.[1211] In light of these factors, the Respondent submits that a willing buyer would have sought a significant discount on the December 2003 Loan.[1212]

754. Referring to its allegations of tax evasion and money laundering on the part of Yukos Capital, as well as Yukos Oil's 'massive hidden tax liabilities', the Respondent submits that true third parties would not be aware of such issues. On this basis, it argues that any FMV analysis resulting in a value of more than zero would be predicated on 'significantly incomplete information', and that an analysis that does not take this information into account would likely overstate the Loans' value.[1213]

755. Finally, in the event that the face value of the Loans is indeed the appropriate measure of damages, the Respondent submits that the Claimant has failed to establish that 'but for' the Respondent's acts, Yukos Oil would have been able to repay them.[1214] It contends that there are a number of matters, such as alleged acts by the Respondent that are not within this Tribunal's jurisdiction or that do not amount to breaches of the ECT, that have not been taken into account by the Claimant's expert when assessing Yukos Oil's financial health.[1215] It further submits that even if the Claimant can establish Yukos Oil's ability to repay the Loans, the inclusion of the 'bad debt' provision in the Hedgerow Loan Agreement suggests that repayment of the Loans was not anticipated.[1216]

---

[1211] Rejoinder, [545]-[546].

[1212] Rejoinder, [547].

[1213] Counter-Memorial, [418].

[1214] Rejoinder, [549].

[1215] Rejoinder, [549].

[1216] Rejoinder, [550]-[552].

### 3.  The Tribunal's Analysis

756.  The Parties' written pleadings and experts' reports suggested that there may be a material difference between them as to the appropriate *standard* by which to determine the extent of the Claimant's loss, as between:

    (i)       The FMV standard mandated by Article 13 ECT; and

    (ii)     The full reparation standard contemplated by the Permanent Court of International Justice in *Chorzów Factory*.

757.  In the end, in the light of the oral evidence of the experts and the closing submissions of counsel, the Tribunal is satisfied that, on the facts of this case, there is no material difference in the application of the two standards.

758.  In order to explain why this is so, and the legal standard that must be applied in this case, it is necessary to set out briefly the relevant formulations.

759.  Article 13(1)(d) ECT provides that any expropriation must be:

> …accompanied by the payment of prompt, adequate and effective compensation.

> Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the 'Valuation Date').

760.  The PCIJ, in its classic *dictum* in *Chorzów Factory*, expounded the following principle of general application to reparations for a breach of international law:

> The essential principle contained in the actual notion of an illegal act—a principle which seems established by international practice and in particular by the decisions of arbitral tribunals—is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it—such

are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[1217]

761. The Claimant is quite correct to point out that Article 13 ECT provides a standard for lawful expropriation, whereas the PCIJ was concerned with the legal test applicable to unlawful acts, contrary to international law. This still leaves the question whether, in the circumstances of this case, it makes a material difference.

762. The International Law Commission, which endorsed the *Chorzów Factory* test in its Commentary on Article 36 ARSIWA, [1218] made the following comment on the appropriate test for valuation of the compensation due:

> (21) The reference point for valuation purposes is the loss suffered by the claimant whose property rights have been infringed. This loss is usually assessed by reference to specific heads of damage relating to (i) compensation for capital value; (ii) compensation for loss of profits; and (iii) incidental expenses.

> (22) *Compensation reflecting the capital value of property taken or destroyed as the result of an internationally wrongful act is generally assessed on the basis of the 'fair market value' of the property lost.* The method used to assess 'fair market value', however, depends on the nature of the asset concerned. Where the property in question or comparable property is freely traded on an open market, value is more readily determined. ... Where the property interests in question... are not the subject of frequent or recent market transactions, the determination of value is more difficult....[1219]

763. These observations are germane to the present case. The Tribunal draws two preliminary conclusions:

(i)     Whether in the case of a lawful expropriation or an unlawful breach of treaty, the standard of compensation for the loss of the capital value of property rights is FMV;

---

[1217] *Factory at Chorzów (Germany v Poland)* [1928] PCIJ Series A, No. 17, Judgment No. 13 (1928), 47 (**CL-86**).

[1218] ARSIWA Commentary, 99 at Art 36 Commentary (13).

[1219] Ibid Art 36 Commentary (21)–(22).

(ii)     The method used to determine the FMV of a capital asset will depend upon the nature of the asset concerned, and in particular on whether the asset is 'freely traded on an open market.'

764.  The World Bank Guidelines on the Treatment of Foreign Direct Investment[1220] (the **Guidelines**) indicate that a range of different approaches to the determination of FMV may need to be applied depending on the nature of the asset and the relevant circumstances. The Guidelines distinguish between the valuation of: (i) a business that had been operating as a going concern; (ii) an enterprise that it not a proven going concern; and (iii) other assets.[1221]

765.  The Guidelines provide that 'other assets' may be compensated 'on the basis of (a) the replacement value or (b) the book value in case such value has been recently assessed or has been determined as of the date of the taking and can therefore be deemed to represent a reasonable replacement value.'[1222] 'Replacement value' is defined to mean 'the cash amount required to replace the individual assets of the enterprise in their actual state as of the date of the taking.'[1223]

766.  Although the accounting experts differed greatly in the approaches adopted in their respective reports, in the end, following cross-examination at the Hearing, the Tribunal is satisfied that these differences arise from the nature of the assumptions that each was instructed to make. They do not amount to a methodological difference.

767.  Mr Rosen, the Claimant's expert, confirmed that:

> ...my conclusion was consistent with fair market value, so in the end there really is no difference between whether you took a Chorzów standard of valuation or implied

---

[1220] World Bank Development Committee, Guidelines on the Treatment of Foreign Direct Investment, Guideline IV.5 (1992) (**RL-396**).

[1221] Ibid Art IV(6).

[1222] Idem.

[1223] Idem.

a fair market value standard of valuation. You would arrive at the same conclusion as I did in my Report.[1224]

768.  Mr Haberman, the Respondent's first expert, addressed in his Report the approaches to arriving at the FMV of a loan.[1225] He concludes that: 'The DCF [discounted cash flow] method... is the most relevant method to valuing loans.'[1226] He observes that:

> The cash flows from a loan are clearly defined as the loan interest payments due and the return of the nominal value of the loan upon its maturity. The principal uncertainties in valuing these cash flows are first whether they will actually be paid and secondly whether the interest rate on the loan maintains a reasonable return relative to underlying interest rates. The discount rate takes account of this risk and any other uncertainties, along with the time value of money.[1227]

769.  Applying this approach to the December 2003 Loan, Mr Haberman opines that the interest rate of 9% was not commensurate with commercial borrowing rates otherwise applicable in the Russian market and as a result that a commercial buyer of the Loan would discount the value of the Loan from inception.[1228] The remainder of his risk analysis refers to the effect of the Respondent's actions on and after April 2004 on the value of the Loans. Mr Haberman does not suggest that a discount to reflect the time value of money would be applicable here, in circumstances in which the entirety of the Loan ought to have been repaid in accordance with its terms prior to the present Award.

770.  Mr Rosen agrees that 'a commercial interest rate can be used to discount the interest and principal payments to the issue date to calculate the FMV of a loan.'[1229] However, he advances expert evidence to the effect that 'the loan interest rates of the Yukos Loans

---

[1224] T8/1859/4-9. The Claimant confirmed and adopted this position in closing submissions: T10/2130/1-14.

[1225] Haberman, [5.3.2]-[5.3.41].

[1226] Ibid n 221.

[1227] Ibid [5.3.7].

[1228] Ibid [5.3.26].

[1229] Rosen 2, [93].

reflect a reasonable commercial interest rate. Therefore the FMV of the Yukos Loans is equal to the face value of the Yukos Loans at each issue date.'[1230]

771. Mr Knyazev, Respondent's second expert, was asked by a member of the Tribunal to address himself to the appropriate assessment of the value of the loans in the event that he were (i) to exclude the allegations of fraud made by the Respondent and the back-to-back structure and (ii) then assume that Yukos Oil retained the ability to call upon its operating subsidiaries to obtain the cash required to fulfil its liabilities.[1231] His conclusion in that event was: 'it would then be book value, yes, plus interest, yes.'[1232]

772. The Tribunal therefore approaches the valuation of the property interest of the Claimant for which it is to be compensated as a result of the Respondent's expropriation on the basis that:

   (i)     It must assess the FMV of those loans (capital and interest) *excluding* any effect on the value of those assets as a result of the Respondent's illegal acts; and

   (ii)    As it is valuing a loan and not a business, the appropriate valuation method is likely to be the replacement or book value of that loan.

773. The Tribunal agrees that it is for the Claimant to prove its loss and that one cannot simply assume that the FMV of a loan is equivalent to its face value.[1233] It has therefore carefully examined the evidence adduced by the Claimant in support of its claim (which, on this issue is principally found in Mr Rosen's Second Report), along with the evidence for the Respondent, given by Messrs Haberman & Knyazev.

774. As at the issue date, the Tribunal finds no evidence to suggest that a discount to the face value should be applied. It accepts the evidence of Mr Rosen that the contractual interest rate under the December 2003 Loan was equivalent to a commercial rate. Accordingly, a

---

[1230] Ibid, [95], with detailed evidence at [151]-[160].

[1231] T9/2011/3–2012/16 (Knyazev).

[1232] T9/2012/20-21 (Knyazev).

[1233] *British Caribbean Bank Ltd (Turks & Caicos) v Belize*, PCA Case No. 2010-18, Award (19 December 2014), [265] (**CL-58; RL-260**).

FMV assessed on the basis of a DCF analysis of the kind proposed by Mr Haberman would, on the facts of this case (excluding the Respondent's illegal acts) produce the same outcome as replacement or book value.

775. In assessing the FMV of the December 2003 Loan but for the Respondent's illegal acts, the Tribunal rejects the Respondent's submission that the correct valuation date is 17 July 2006, being the date on which Moscow *Arbitrazh* Court rejected Yukos Capital's First Bankruptcy Application.[1234]

776. The Tribunal has already found above that:

(i)     The Respondent's actions against the Claimant were part of an orchestrated campaign against the Yukos Group as a whole, which ran from the first tax reassessment in April 2004;

(ii)    The Claimant itself accepts in its submissions that 26 May 2004 was a 'key date' since the decision of the Moscow *Arbitrazh* Court upholding the 2000 Tax Assessment on that date gave rise to a dispute between the Parties.[1235]

777. The Tribunal therefore excludes all of the actions of the Respondent directed against Yukos Capital's creditor, Yukos Oil, from its assessment of the value of the December 2003 Loan but for the Respondent's actions.

778. Once those matters for which the Respondent is responsible are excluded, the consequence is that (subject to the adjustments made in Part VII above to take account of the Claimant's contribution to its injury and causation), it does not matter what the correct valuation date is: the result will be the same.

779. There was some discussion with the experts at the Hearing, in part prompted by questions from the Tribunal, as to the extent to which the Loans could have been traded on the open market and the value or discount that might have been applied had the Loans been sold or assigned. In the final analysis, the Tribunal has reached the view that this approach

---

[1234] Counter-Memorial, [411]-[412]; Rejoinder, [540].

[1235] Above at [588].

would not provide a useful indication of FMV in this case. Yukos Capital advanced the Loans on an inter-company basis for intra-Group financing. The Loans were not structured as instruments to be traded on an open market, nor would examination of such a market readily yield relevant comparable transactions from which an open market value could be derived.

780. This does not mean that the Loans had no value, or must necessarily be discounted to take account of the fact that they could not be easily traded. Provided that, but for the Respondent's conduct, the Loans (both as principal and interest) would have been timely repaid in full by Yukos Oil as borrower, such that Yukos Capital bore no material credit risk, the Tribunal finds that book or replacement value represents the correct valuation by which to measure the Claimant's loss and there is no reason to discount that value.

781. The evidence demonstrates that Yukos Oil's financial position in December 2003 and up until 26 May 2004 was such that there was every likelihood that the Loans would have been repaid in full:

   (i)     In October 2003, Yukos Oil was rated Ba2 and BB by Moody's and Standard & Poor's rating agencies respectively.[1236] The Moody's rating was the highest that it had accorded to any Russian company in 2003, reflecting Yukos Oil's high quality proven reserves, strong production growth potential and low operating cost base.[1237]

   (ii)    Yukos Oil had achieved strong operational performance and financial stability for several years prior to April 2004.[1238]

---

[1236] Moody's Investor Services Global Credit Research, 10 October 2003, 1 (**SG-1**); Standard & Poor's Rating Services, Global Credit Portal Ratings Direct, 27 October 2003, 1 (**SG-2**).

[1237] Moody's 'Moody's assigns Ba1 senior implied and Ba2 foreign currency issuer ratings to Yukos', 15 January 2003 (**HR-2**).

[1238] Rosen 2, [41].

    (iii)    Its EBITDA would, but for the Respondent's actions, have amply supported the projected loan interest payments on both the Yukos Capital Loan and its other debt.[1239]

    (iv)    World oil prices rose throughout the period in question from around USD 30 per barrel to almost USD 80 per barrel in July 2006, reaching a maximum of over USD 140 per barrel in 2008.[1240]

    (v)    Yukos Oil's total assets by year-end 2003 were approximately four times its total debt (even after the December 2003 Loan and the giga-dividend).[1241]

782.  In the Tribunal's view, these factors provide overwhelming evidence establishing that, were it not for the Respondent's actions, the financial position of Yukos Oil would have been such as to enable it to repay Yukos Capital's Loan in full and to continue to make quarterly interest payments in accordance with its terms. A reasonable lender in the position of Yukos Capital would have so concluded and valued the FMV of the Loan at face value.

783.  In these circumstances, the Tribunal has carefully examined the contrary expert evidence of Mr Haberman for the Respondent, which was that the FMV of the Loans as at 17 July 2006 was 'zero'.[1242]

784.  The Tribunal finds that the reason for the difference between the experts is that Mr Haberman takes into account for the purpose of his valuation a series of actions of the Respondent against Yukos Oil and Yukos Capital between April 2004 and July 2006.[1243] Mr Knyazev adopts substantially the same reasoning in his subsequent report when he

---

[1239] Rosen 2, Table A3-5, 70.

[1240] Rosen 2, [53] & fig 2.

[1241] Haberman, 37, [3.5.16]; Rosen 2, [62].

[1242] Haberman, 55, [5.3.41].

[1243] Haberman, 52-55, [5.3.29]-[5.3.40].

concludes that by his valuation date of 17 July 2006 'Yukos Oil could not service its debts and therefore the FMV of the Yukos Loans at this date was nil.'[1244]

785. For the reasons already given, the Tribunal finds that these actions must be excluded in order to arrive at a FMV of the December 2003 Loan for purposes of compensation.

786. In light of all the evidence, the Tribunal therefore holds that the FMV of the December 2003 Loan for purposes of compensating the Claimant for the loss of its property is equivalent to the amount of principal actually advanced, together with the interest thereon, that was contractually due and remains unpaid. It finds no basis to apply a discount.

787. By virtue of its decision on contribution in [685] above, the Tribunal has concluded by majority[1245] that the amounts of principal that are recoverable as compensation from the Respondent in these proceedings must be reduced by 50% in respect of the final three sums that were drawn down under the December 2003 Loan on 16 June 2004 (RUB 1,740,480,000), 22 June 2004 (RUB 870,114,000) and 28 June 2004 (RUB 1,306,089,000) respectively.[1246] After deduction of 50% of these sums, the total amount of the principal under the December 2003 Loan that is payable by way of compensation in these proceedings is: RUB 77,342,764,401.89.

788. Under the terms of clause 2.4 of the December 2003 Loan Agreement, the Lender undertook to repay all loans borrowed thereunder by no later than 31 December 2008 (unless the term of maturity were adjusted by mutual agreement in writing).[1247]

789. For reasons developed more fully below in relation to interest, the Tribunal accepts the evidence of Mr Rosen that 'it is reasonable that Yukos Capital would have transferred the

---

[1244] Knyazev, 63, [8.3.18].

[1245] McLachlan and Stern, Rowley dissenting.

[1246] Yukos Oil – Notice of Drawdowns on December 2, 2003 Loan Agreement (Drawdowns #1-36), Drawdown Nos 34, 35 & 36 (B-2).

[1247] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003), cl 2.4 (C-9; B-1).

RUB-denominated cash flows into USD as it is the global reserve currency and a common default currency for international financial activity.'[1248] The Tribunal adopts the maturity date of the December 2003 Loan, namely 31 December 2008, as the date of currency conversion. It has therefore applied the rate of exchange between Russian roubles and US dollars as at that date specified in Mr Rosen's Second Report, namely 29.40 RUB to 1 USD.[1249] Applying that rate, the sum due by way of compensation in respect of the principal expressed in US dollars is **USD 2,630,706,272.17**.

790. Such compensation is, in the view of the majority,[1250] applying the test of the PCIJ in *Chorzów Factory*, 'a sum corresponding to the value which a restitution in kind would bear', the payment of which is necessary to 'reestablish the situation which would, in all probability, have existed if that act had not been committed.'[1251] That is because (subject to the deduction for contribution of Yukos Capital) such compensation represents the capital value of the sums advanced under the December 2003 Loan, which is the asset of the Claimant that was invested in Russia and taken by the Respondent without compensation.[1252]

### D.   PRIOR RECOVERY

#### 1.   The issues

791. The Tribunal must now consider whether the sums that it had found to be *prima facie* recoverable by way of compensation for the Respondent's breach of treaty fall to be reduced as a result of the Claimant's prior recovery of the same loss either (i) as a result of previous proceedings or (ii) by way of repayment.

---

[1248] Rosen 2, [81].

[1249] Rosen 2, Sch A2.

[1250] McLachlan and Rowley, Stern dissenting.

[1251] *Factory at Chorzów (Germany v Poland)* [1928] PCIJ Series A, No. 17, Judgment No. 13 (1928), 47 (CL-86).

[1252] For the reasons set out in his Opinion attached hereto, Arbitrator Rowley would also have awarded the whole of the remaining portion of the drawdowns under the December 2003 Loan and the August 2004 Loan.

## 2.    Arguments of the Parties

### (a)    The Respondent's position

792. As an objection to jurisdiction, the Respondent submits that the Claimant's claims constitute an abuse of process, because this arbitration represents the sixth attempt to recover the Loan proceeds.[1253]

793. The Respondent submits that, in addition to the present proceedings, the 'Yukos Oligarchs' have made numerous attempts to recover the Loan proceeds, namely:

   (i)      The payment of USD 0.9 billion via the giga-dividend in 2003;

   (ii)     The claims brought in the Russian bankruptcy proceedings;

   (iii)    The claims submitted by Yukos Capital to the European Court of Human Rights;

   (iv)    The *Hulley* Proceedings; and

   (v)     The Claimant's initiation of 'multiple and parallel' proceedings in the District Court of Amsterdam.[1254]

794. It contends that multiple pursuits of the same claim in different fora is tantamount to an abuse of process, and that the doctrine of unjust enrichment is also engaged to prevent the attempt to 'sixtuple dip.'[1255]

### (b)    The Claimant's position

795. The Claimant submits that the value of neither of the Loans has been recovered.[1256] It contends that the initiation of proceedings in different fora to recover losses arising out of the same factual matrix but based on different causes of action is not an abuse of

---

[1253] Counter-Memorial, [266]-[273]; Rejoinder, [390].

[1254] *See also* Rejoinder, [397]

[1255] Counter-Memorial, [273]; Rejoinder, [396].

[1256] Reply, [530](d).

process; any abuse would only crystallise when two tribunals with the same claim by the same person find jurisdiction (at which point it must make an election).[1257] The Claimant submits that the Respondent has not alleged that there are two such parallel proceedings in the present situation.[1258]

796. With reference to the proceedings put forward by the Respondent, the Claimant submits that:

(i) Yukos Oil's declaration and payment of the giga-dividend is not a proceeding, nor is it an action by the Claimant to recover the value of the Loans;

(ii) The Claimant's application for inclusion as a creditor in the bankruptcy proceedings forms the basis for its case on the merits;

(iii) It filed a 'placeholder' application in the European Court of Human Rights, which was subsequently withdrawn upon the commencement of this arbitration, and the rights and remedies under the ECHR and the ECT are different in any event; and

(iv) The Amsterdam proceedings were commenced to defend against its potential expropriation by the Respondent through Promneftstroy, which had acquired the Claimant's parent company in the bankruptcy auctions.[1259]

### 3.   The Tribunal's analysis

#### (a)   Introduction

797. If it were to be the case that the Claimant had already been compensated for the totality of its loss, or had already received an enforceable final judgment or award in its favour against the Respondent on the same claim as it advances in the present proceedings, its action in pursuing the present proceedings would be treated as abusive and liable to be

---

[1257] Reply, [529].

[1258] Reply, [529].

[1259] Reply, [530].

struck out. The first step is to analyse whether this is in fact the case. Even if an abuse of process is not made out, the Claimant would still be liable to give credit to the extent that it has already recovered all or part of the sums outstanding under the December 2003 Loan.

798. In analysing this question, the Tribunal must at the outset exclude from consideration three of the Respondent's alleged grounds:

(i)     *Yukos Capital claims in the Russian bankruptcy.* The claims brought by Yukos Capital in the Russian bankruptcy proceedings form the very gravamen of the present proceedings. It is because no recovery of the Loans was achieved in those domestic proceedings that the present claim is brought under international law. It is axiomatic that a claimant cannot be precluded from pursuit of a treaty claim by the very actions of the State organ that form the subject matter of its claim.

(ii)    *Yukos Capital ECtHR claim.* The claims of Yukos Capital before the ECtHR were withdrawn at an early stage and have not been the subject of adjudication by that Court.

(iii)   *The* Hulley *Proceedings.* The *Hulley* Proceedings were brought by shareholders in Yukos Oil and not by Yukos Capital. Following the Respondent's application to strike the *Hulley* Awards from the record in the present proceedings, the Claimant confirmed that it placed no reliance on the binding effect of the Awards in these proceedings. There has been no recovery under any of those Awards.

799. This leaves for consideration two grounds that do require closer examination:

(i)     *The giga-dividend.* The first concerns the effect, if any, of the fact that USD 0.9 billion of the proceeds of the December 2003 Loan was applied towards the payment of a dividend to the then shareholders of Yukos Oil;

(ii)    *The Dutch proceedings.* The second concerns the potential relevance of proceedings for the enforcement of the Loans before the Dutch courts and any proceeds derived therefrom.

### (b)   The giga-dividend

800. The Respondent claims that the portion of the proceeds paid under the December 2003 Loan that was used to fund a dividend payment to the shareholders of Yukos Oil must be excluded from any compensation awarded to the Claimant in these proceedings because the ultimate shareholders, to that extent, did not suffer a loss by virtue of the Loans, having taken out the cash as dividends.[1260]

801. The Claimant maintains that this is irrelevant, since the 'Yukos Oligarchs' as majority shareholders were not parties to the Loans. It adds that in any event the majority shareholders have disclaimed any interest in this proceeding.[1261]

802. The material facts in relation to the giga-dividend are not in dispute. They were canvassed in the course of the evidence of Mr Misamore.[1262] Although there was an extensive debate as to whether the payment of the dividend was or was not required for the purpose of the Sibneft merger, Mr Misamore did not dispute the ultimate outcome. He confirmed, in answer to a question from a member of the Tribunal that 'the payment of the dividend did one thing: It sent money out of the company.'[1263] He then elaborated under cross-examination from counsel:

> Q. But the result of doing what you did was actually to get cash out of the Group.
>
> A. Absolutely.
>
> Q. And it would go—where did it go?
>
> A. It went to all the shareholders.
>
> Q. So, the shareholders, the majority shareholders received a very substantial amount of cash as a result of this dividend?

---

[1260] T10/2238/9-12 (Respondent).

[1261] Reply, [348].

[1262] Misamore 1, [23]–[36]; Misamore 2, [34]–[37]; T2/499–517; T3/542–560 (Misamore).

[1263] T2/515/18-21 (Misamore).

A. They were the majority shareholders.

Q. Can you just answer 'yes' or 'no' please.

A. Yes.

Q. You're clearly not making some other refined answer. And, of course, the thing about a dividend is, once you pay the money, it's gone?

A. That's right.[1264]

803. Nor is it disputed that the present arbitration is pursued for the benefit of the same shareholders: that is to say the former shareholders of the Yukos Group, who remain the ultimate owners of Yukos Capital. The Claimant had placed some reliance on a letter from the majority shareholders in which they disclaim their interest in any recoveries from the present claim in favour of the minority shareholders.[1265] But Mr Godfrey very fairly accepted in cross-examination that the disclaimer of interest in this letter would be revocable,[1266] as did counsel for the Claimant in closing submissions in response to a specific question from the Chairman.[1267]

804. The question for the Tribunal is whether the payment of that dividend is legally relevant in considering whether Yukos Capital's December 2003 Loan has been repaid in whole or in part by Yukos Oil. The Tribunal is satisfied that it is not. The giga-dividend did not go to reduce Yukos Oil's indebtedness under the Loan. On the contrary, that debt remained outstanding and unpaid. It was that debt that formed the basis of Yukos Capital's right to claim in the bankruptcy of Yukos Oil, a right that it was unlawfully precluded from pursuing as a result of the actions of the Respondent.

805. By contrast, the dividend was paid by Yukos Oil to *its* shareholders. There is no evidence that any part of the dividend was applied to reduce or extinguish the Loan or was otherwise returned to Yukos Capital. The present Tribunal is concerned only with the

---

[1264] T3/559/11-25 (Misamore).

[1265] Letter from T Osborne to Yukos Capital, 5 March 2013 (C-634).

[1266] T2/315/6–11 (Godfrey).

[1267] T10/2115/25–2116/8 (Claimant).

claim of Yukos Capital: the extent of its rights and its losses, if any. It cannot take account of a dividend payment to Yukos Oil's shareholders, whether or not some of those same persons may ultimately benefit from sums recovered under the present Award.

806. The Tribunal therefore rejects the Respondent's submission that the payment of the giga-dividend amounted to repayment of the Loan, rendering the present proceedings an abuse of process.

### (c) The Dutch proceedings

807. The relation of the Dutch proceedings to the present arbitration is somewhat complex. Much of the relevant evidence was only elicited in the course of the Hearing as a result of the Tribunal's questions. This observation implies no criticism of the Parties, since a number of the most material developments in those proceedings occurred between the close of the written pleadings and the Hearing. The Tribunal will first set forth the state of the record in relation to the two proceedings that are relevant to the present claim as at the date of the Hearing in the present arbitration (July 2019) before analysing their effect on the quantum of the present claim. [1268]

#### i. *Yukos Capital Ltd v Promneftstroy (the **Promneftstroy** action)*

808. *Nature of the proceeding.* In this proceeding, Yukos Capital sued to enforce the Loans by seizing the shares of Yukos Oil in Yukos Finance (originally a direct subsidiary of Yukos Oil and the head of the Dutch branch within the Yukos Group). [1269] These shares had been

---

[1268] The Parties also referred to a third Dutch claim *Yukos Capital S.à r.l. v OAO Rosneft*, but it is not disputed that this concerned the enforcement of different loans to those that are the subject of the present proceedings: ICAC Awards, 19 September 2006 (C-429; C-430; C-431; C-432); Set Aside Decisions of the Moscow *Arbitrazh* Court, 23 and 18 May 2007 (C-414; C-415); Judgment of the Amsterdam Court of Appeal, 28 April 2009 (C-105); Judgment of the Supreme Court of the Netherlands, 25 June 2010 (C-314).

[1269] Reply, [189]-[190], [264], [466], [530](d); Counter-Memorial, [6], [272](d); Rejoinder, [6], [397]-[402]; T1/95/22-96/9, 169/17-173/7, T10/2117/1-2120/3, 2153/18-2154/6, 2213/20-2215/4, 2242/3-2244/16.

sold to Promneftstroy on 20 August 2007 in an auction held in the bankruptcy proceedings of Yukos Oil.

809.   The proceeding was initiated on 9 August 2007 before a provisional relief judge, while the liquidation of Yukos Oil was still ongoing. On 30 June 2008 (after Promneftstroy had acquired Yukos Finance) Yukos Capital demanded payment of the amounts pertaining to the Loans from Yukos Oil. Promneftstroy intervened in that proceeding and requested that the claims be dismissed for lack of jurisdiction, on the basis that Yukos Oil had ceased to exist. The Dutch Supreme Court ultimately resolved this motion on 13 November 2015,[1270] rejecting the jurisdictional objections and ruling that Yukos Capital should be given an opportunity to direct its claims against Promneftstroy (as the transferee of the shares in Yukos Finance) before the District Court.

810.   Yukos Capital proceeded accordingly. On 5 December 2018, the Amsterdam District Court issued a judgment ruling, *inter alia*, that: (i) Yukos Capital's claims pursuant to the Loans were admissible; and (ii) Yukos Capital may take recourse against the shares in Yukos Finance in payment of said claims.[1271]

811.   As at July 2019, Promneftstroy had appealed the first-instance resolution, and the case remained pending before the Amsterdam Court of Appeal.

      *ii.*    *Godfrey, Misamore & Yukos Finance B.V. v Rebgun (the Rebgun action)*

812.   *Nature of the proceeding.* This action concerns Mr Rebgun's measures as receiver in the bankruptcy of Yukos Oil and, specifically, the ownership of Yukos Finance.[1272]

---

[1270] *Yukos Capital S.à r.l. v OAO Yukos Oil Company and OOO Promneftstroy,* Case No. C/13/419369 2009/449, Judgment of the Supreme Court of the Netherlands (13 November 2015) (**R-493**).

[1271] *Yukos Capital S.à r.l. v OOO Promneftstroy et al.,* Judgment of the Amsterdam District Court (5 December 2018) (**CL-188**).

[1272] Letter from the Claimant to the Tribunal, 5 February 2019 (**SFC-49**); T2/366/5–372/25 (Godfrey), T10/2120/6–2121/1 (Claimant).

813. In January 2019, the Dutch Supreme Court resolved this action on a definitive basis, upholding the District Court's original finding that Yukos Oil's bankruptcy could not be recognised in the Netherlands, meaning that Promneftstroy was not entitled to the shares of Yukos Finance.[1273]

814. *The Parties' submissions.* The Claimant submits that it brought the Promneftstroy action to protect itself against a potential expropriation by the Respondent in the event that Dutch courts were to recognise Promneftstroy's ownership of Yukos Finance. However, since Promneftstroy's ownership was not recognised, it would no longer be necessary for Yukos Capital to pursue its enforcement action against the shares in Yukos Finance.[1274]

815. The Respondent describes the Promneftstroy action as 'an abuse of process' and submits that it evidences that the Loans have not been expropriated. It adds that the 'Yukos Oligarchs', by having been granted ownership over Yukos Finance, 'have been awarded full satisfaction for the Loans... against themselves', or that, in any event, credit for the value of Yukos Finance should be given in Yukos Capital's claim.[1275]

816. *Extent of recoveries*: The Claimant advised on 5 February 2019 that, following the ruling of the Supreme Court in the Rebgun action:

> Yukos Capital Ltd has redeemed the Brittany and Hedgerow Loans from Yukos Hydrocarbons International Ltd. Thereby, Brittany and Hedgerow Loans were terminated and Claimant is released and discharged from all obligations, claims, and demands under these loans.[1276]

817. At the Hearing, Mr Godfrey explained that, after the Supreme Court judgment, it became certain 'who owned the Dutch structure' because now 'the beneficiaries of both these structures are the same, [*i.e.*] the former shareholders of Yukos Oil.' He stated that the

---

[1273] Judgment of the Amsterdam District Court, 31 October 2007 (C-95); Judgment of the Amsterdam Court of Appeal, 19 October 2010 (PBS-61); Judgment of the Amsterdam Court of Appeal, 9 May 2017 (R-376; GE-20); Judgment of the Supreme Court of the Netherlands, 18 January 2019 (CRSFC-19);

[1274] Reply, [530](d).

[1275] Rejoinder, [397]; T1/169/24-170/15 (Respondent), T10/2242/19-2243/1 (Respondent).

[1276] Letter from the Claimant to the Tribunal (5 February 2019) (SFC-49).

redemption of the back-to-back loans was done to create 'a more tax-efficient distribution.'[1277]

818. Yukos Capital paid a distribution of USD 625,022,889.04 to its shareholder Yukos Hydrocarbons on 18 January 2019.[1278] Mr Godfrey informed the Tribunal that some USD 100 million was still retained within the Dutch structure.[1279]

819. On the record before it, the Tribunal finds that the Dutch courts have ruled that Yukos Capital retains a valid right to recover the proceeds of the Loans, enforceable against its creditor Yukos Oil. It was this right that enabled Yukos Capital to take recourse against Promneftstroy to the extent that the latter had received Yukos Oil's property in the bankruptcy (namely Yukos Oil's shares in Yukos Finance).

820. The Tribunal finds that Yukos Capital's pursuit of its claim in the Promneftstroy action in no way renders its pursuit of the present arbitration an abuse of process. On the contrary, it is the gravamen of its claim before the present Tribunal that it was unlawfully deprived of its ability to recover the sums extended under the Loans as a result of the actions of the Respondent State. There is no inconsistency between such a claim and the civil enforceability of the Loans against the creditor or those succeeding to the creditor's assets. There is no identity of parties or cause of action between the present arbitration and the Promneftstroy action.

821. Of course, if Yukos Capital did succeed in securing recoveries of the sums outstanding under the Loans in the Dutch proceedings, such recoveries would go to reduce its loss in the present proceedings and it would be bound to give credit for such recoveries accordingly. The Claimant acknowledges this and is prepared to give an undertaking to that effect. The Tribunal will record this undertaking in its *dispositif*.

---

[1277] T2/366/5–372/25 (Godfrey).

[1278] Letter from the Claimant to the Tribunal (5 February 2019) (SFC-49); T2/372/11–376/11 (Godfrey). See also T2/276/4–279/13 (Godfrey).

[1279] T10/2119/11–2120/3 (Claimant). See also T10/2242/19–2243/1 (Respondent).

822. The remaining question is whether, as a the result of the Dutch proceedings or of Yukos Capital's January 2019 distribution to its shareholder, any part of the sums due under the Loans has been recovered.

823. The Tribunal finds no evidence that this is the case. The Dutch Supreme Court ruled on 18 January 2019 in the Rebgun action that Promneftstroy did not own the shares in Yukos Finance. As a result, such shares ceased to be an asset against which Yukos Capital could enforce the Loans.

824. Further, there is no evidence that Yukos Capital's distribution to its shareholder on the same date represents the proceeds of any recovery of the Loans.

825. *Conclusion.* As a result, the Tribunal concludes that:

    (i)     Yukos Capital's pursuit of the Dutch proceedings does not render its claim in the present arbitration an abuse of process; and

    (ii)    There has been no prior recovery of the sums due under the Loans for which credit must be given in the present proceedings;

    (iii)   However, should any such recovery be effected, the Claimant is bound to give credit for it in its enforcement of the present Award.

### E.   INTEREST

#### 1.   The claim to interest

826. Thus far the Tribunal has been considering the basis for compensation of the Claimant for the loss of its property in the Loans primarily by reference to the loss of the principal sums extended under the December 2003 Loan and not repaid.

827. In addition to its claim for compensation in respect of the principal, the Claimant also claims interest on the following basis:

    (i)     *Contractual interest* at the rate provided under the December 2003 Loan Agreement, in the amount of USD 1,310,000,000; and

343945

(ii)     *Pre-award interest* on each tranche of the principal and interest from the date on which it would have been paid to the date of the Award.[1280]

828.   In calculating contractual interest, the Claimant does not claim the penalty rate provided for late payment in clause 3.2 of the December 2003 Loan Agreement. It submits that the correct basis for calculation of its loss is the difference between the value of cash flows that Yukos Capital received under the Loans, and the value of the cash flows that it would have received but for the illegal acts. It assumes that, in a 'but for' scenario, Yukos Oil as the creditor of Yukos Capital would have paid all sums due under the Loan in accordance with its terms.[1281]

829.   The Claimant calculates pre-award interest on the basis of the RUB rate + 2% up to 31 November 2007 (when Yukos Oil was struck off) and thereafter it applies the 6-month USD LIBOR + 2%. As at 31 December 2018, the Claimant calculates its pre-award interest on this basis at USD 1,625,000,000.[1282]

830.   The Respondent does not plead as to the correct approach to the award of interest. It relies on its primary position that the value of the Loans on 17 July 2006 was zero, a position that the Tribunal has rejected for the reasons given in Part VIII.C above. However, the Respondent's expert, Mr Haberman, does give evidence as to the rate to be applied to pre-award interest, which the Tribunal considers below.

### 2.     The Tribunal's analysis

#### (a)     Point of departure

831.   The Tribunal undoubtedly has the power to award interest. Article 26(8) ECT provides that:

> The awards of arbitration, *which may include an award of interest*, shall be final and binding upon the parties to the dispute.

---

[1280] Memorial, [399]–[403]; Gleichenhaus-Rosen, [29]–[41] & Sched 1; Rosen 2, [77]–[79].

[1281] Gleichenhaus-Rosen, [37]–[39].

[1282] Rosen 2, [87].

832. The ECT provides no further guidance as to the basis upon which such an award of interest is to be made. Nor is there any such express provision in the UNCITRAL Rules 1976, which govern the procedure of the present arbitration.

833. Article 38 ARSIWA encapsulates the general principle applicable to the award of interest for breach of an international law obligation:

> 1. Interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result.
>
> 2. Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.

834. The Tribunal approaches the award of interest in the present case on the basis that it must determine whether an award of interest is 'necessary to ensure full reparation' and, if so, it has discretion to decide upon the rate and mode of calculation in order to achieve that result.

### (b)   Issues of principle

835. The following points of principle arise:

  (i)    *Contractual interest.* Whether full reparation requires an award in respect of the contractual interest due and unpaid under the December 2003 Loan.

  (ii)   *Pre-award interest.* What rate of interest should apply to pre-award interest: the Claimant adopting a mixed Russian rouble and a USD LIBOR rate + a 2% premium; the Respondent's expert proposing a Euro deposit rate.[1283]

### (c)   Contractual interest

836. The Tribunal has already decided that the debt owed by Yukos Oil to Yukos Capital under the December 2003 Loan constitutes a form of property. As it held in its Interim Award:

---

[1283] Haberman, [5.5]; Rosen 2, [119]–[134].

Such a debt is not purely, as Respondent submitted, a "claim[] to money... pursuant to contract" under Article 1(6)(c) [ECT]. The debt will give rise to a contractual relationship of debtor and creditor, the incidents of which are determined by reference to the terms of such a contract. The debt also gives rise to a chose in action that is an "asset" – a property interest of the "Investor."[1284]

837. It noted with approval the following formulation of Douglas:

The provision of credit by the investor to an entrepreneur or enterprise engaged in commercial activities in the host state qualifies as an investment. The investor acquires rights to a debt, which can be assigned and thus has the feature of a right *in rem*. Credit can take the form of a loan....

A loan is the payment of money by the investor to the debtor (an entrepreneur or enterprise engaged in commercial activities in the host state) upon terms that the sum advanced, *with any stipulated interest*, must be repaid by the debtor in due course.

...

A loan is the form of credit that features most prominently as an investment in the corpus of investment treaty precedents.[1285]

838. The Tribunal reached the same conclusion in Part VIII.C.3 above when it considered the nature of the Claimant's property for the loss of which it is to be compensated, finding that 'where the victim's property is the chose in action represented by sums advanced by way of a loan... the claimant's property is the value of its capital interest in the sums advanced + any interest to be earned on that capital and not the net profit alone.'[1286]

839. Once the contractual interest payments are correctly analysed as part of the Claimant's property interest in the sums outstanding under the Loan, its loss of those payments is to be calculated by reference to the rate applicable under the December 2003 Loan Agreement and as at the date when the interest payments would have been made, but for the Respondent's actions.

---

[1284] Interim Award, [432].

[1285] Interim Award, [437]; Douglas, *The International Law of Investment Claims* (2012), [381]-[383] (**RL-64**), emphasis added.

[1286] Above at [738].

840. The Tribunal has considered whether it ought to make any adjustment to the contractual interest rate, taking account of the fact that, being an intra-Group loan, the rate was negotiated between related parties. However, the evidence is that the rate of 9.0% applicable under the December 2003 Loan was in fact significantly lower than the average interest rate on RUB denominated loans. The Respondent's expert Mr Haberman concluded that 'banks in Russia were offering an average interest rate on one year RUB-denominated loans to non-financial organisations of 12.4% at December 2003.'[1287]

841. In these circumstances, the Tribunal finds that the contractual interest due under the December 2003 Loan that was not paid, and would have been paid but for the Respondent's actions, must be included as part of the Claimant's property for the loss of which it is to be compensated.

### (d)   Pre-award interest

842. The Tribunal considers that an award of pre-award interest is 'necessary in order to ensure full reparation.' As a result of the Respondent's breach of treaty, the Claimant has been deprived of the use of its money since the relevant sums fell due under the December 2003 Loan Agreement.

843. The outstanding question between the Parties is the *rate* that is to be applied to pre-award interest on the sums payable to the date of this Award.

844. Both Parties' experts are agreed that pre-Award interest should be calculated on a compound basis[1288] and that international rates are applicable for at least part of the period. However, they disagree on the appropriate rate to be applied.

845. The Claimant adopts a RUB short-term interbank rate until 27 November 2007 and the 6-month USD LIBOR rate thereafter, each plus 2%. The RUB rate was 5.1% at December

---

[1287] Haberman, [5.3.25] citing Central Bank of Russia Interest Rates 2003 (**PH-61**).

[1288] Haberman, [5.5.9]; Rosen 2, [162].

2003 rising to 8.04% by November 2007. The LIBOR rate starts at 4.85% and falls to as low as 0.32% in May 2014, arriving at 2.89% by November 2018.[1289]

846. The Claimant's expert Mr Rosen, in his Second Report, offers an alternative calculation, in which the debt would be converted from Russian roubles to US dollars as at the maturity date of the December 2003 Loan, namely 31 December 2008.[1290] On this alternative basis, he calculates a difference in compensation in respect of interest of USD 243 million, arising from the deterioration in the exchange rate of the Rouble to the US dollar over that period.[1291]

847. The Respondent's expert Mr Haberman criticises the Claimant's experts' approach of applying the Rouble interbank rate + a 2% premium on the ground that this would, at some points, actually exceed the contractual rate.[1292]

848. He proposes conversion of the funds into Euros and adoption of a Euro-denominated deposit rate, which yielded rates between 0% and 4%, but mostly at the lower end. He does so on the basis that Yukos Capital reported in Euros. He provides a calculation of pre-award interest on the spread (on the assumption that the Tribunal found the spread to be recoverable without a discount).[1293]

849. This gives rise to the following sub-issues for the Tribunal's decision:

   (i)     The date of conversion;

   (ii)    Whether the debt is to be converted into US dollars or Euros;

   (iii)   Whether a deposit or a commercial lending rate is to be applied; and

---

[1289] Rosen 2, Sch A.

[1290] Rosen 2, [84]-[85].

[1291] Rosen 2, App 6, Table A6-1.

[1292] Haberman, [5.5.3].

[1293] Haberman, Apps 5.3 & 5.4.

(iv)     Whether a premium is to be added to the applicable rate, and, if so, at what percentage.

850. *Date of conversion.* The December 2003 Loan was denominated in Russian roubles. The Tribunal therefore considers that, in order to ensure full reparation, during the period until the Loan was intended to be repaid in full, the amount of any interest should be calculated by reference to the rates of interest applicable to Russian roubles.

851. The Tribunal determines that the appropriate date on which the outstanding debt should be converted into another currency for the purpose of determining the interest rates applicable thereafter is 31 December 2008. Mr Rosen very fairly accepts in his Second Report that 'this is also consistent with the Counterfactual Scenario in which Yukos Oil was not dissolved in November 2007.'[1294]

852. The Tribunal agrees. It finds that, in order to calculate interest rates it must compare the position that would have obtained but for the Respondent's breach. This is what the Article 38(2) ARSIWA mandates in providing that: 'Interest runs from the date when the principal sum should have been paid until the date the obligation to pay is fulfilled.'

853. *US dollars or Euros?* It is correct that Yukos Capital, as a company incorporated in Luxembourg, reported its accounts in Euros.[1295] Nevertheless, as an intra-Group finance company, it carried its long-term loans in Russian roubles or in US dollars.[1296]

854. The Tribunal therefore finds that a rate of interest for US dollars should be applied to the sums outstanding after the redemption date of 31 December 2008.

855. *Deposit or commercial lending rate?* The Tribunal agrees with Mr Rosen that, as the Claimant's business was a commercial lender to other Group companies, the rate that should be applied is one applicable to commercial lending and not to sums on deposit.

---

[1294] Rosen 2, [84].

[1295] Yukos Capital Financial Statements for the year ended 31 December: 2003 (VK-7a); 2004 (PH-44); 2005 (VK-7d); 2006 (VK-7e); 2007 (PH-70).

[1296] Ibid (in the case of each year), 7.

343945

856. Moreover, the Tribunal accepts Mr Rosen's evidence in reply that the Euro rates that Mr Haberman had used were not rates actually available to Yukos Capital, since they apply only as between registered commercial banks and the European Central Bank, and that Mr Haberman had in fact erroneously applied the ECB Main Refinancing Operations rate rather than the Deposit Facility Rate that he had stated he considered to be appropriate.[1297] In rejoinder, Mr Knyazev corrects the rate to the Deposit Facility Rate, but offers no response to Mr Rosen's larger critique of the artificiality of using deposit rate unavailable to the Claimant.[1298]

857. *Premium?* The Claimant's experts add a 2% premium to the applicable rates. The only justification that they provide for this is that this is 'a modest spread.'[1299]

858. As Mr Haberman points out, for some of the period in which the Rouble rates are to be applied, the application of such a premium leads to a rate that would actually exceed the 9% rate contractually agreed.[1300]

859. The Tribunal cannot accept that this is 'necessary in order to ensure full reparation.'

860. In fact, a review of the rates that Yukos Capital actually achieved on its long-term loans, as reported in its Accounts, shows that its loans in Russian roubles were provided at fixed rates, almost invariably of 9%.[1301]

861. Yukos Capital's long term loans in US dollars were at margins of LIBOR + 1.00% – 1.0625%, save only in the case of the August 2004 Loan (which the Tribunal has held must be excluded as made when the actions of the Respondent were reasonably

---

[1297] Rosen 2, [166].

[1298] Knyazev, [9.1.5].

[1299] Gleichenhaus-Rosen, [33].

[1300] Haberman, [5.5.3], referring to Gleichenhaus-Rosen, Sch A.

[1301] Yukos Capital 2006 Accounts, 7 (**VK-7e**). Only a loan to Yukos Vostok Trade is listed at 10%.

foreseeable) and a small loan of USD 1,065,000 to a company called Maltbase (at 2% above LIBOR).[1302]

862. In these circumstances, the Tribunal finds that a margin of 1% on both the Russian Rouble and the US dollar commercial lending rates would best ensure full reparation.

863. In the result, then, the Tribunal decides in respect of pre-award interest that the Respondent shall pay interest up to the date of this Award at the rate of:

    (i)    1% above the Russian rouble 3-month commercial lending rate[1303] on unpaid contractual interest from the date on which such interest fell due under the December 2003 Loan to 31 December 2008, converted into US dollars on that date at the same rate as applied to the principal sum, namely 29.40 Russian roubles to 1 US dollar;

    (ii)   1% above the 6-month USD LIBOR commercial lending rate[1304] on principal and interest from 31 December 2008 until the date hereof.

*    *    *

---

[1302] Idem.

[1303] Being the RUB ST lending rates specified in Rosen 2, Sch A2.

[1304] In respect of the period 31.12.08—31.12.18, these are the rates that are specified in Rosen 2, Sch A2.

F.   COSTS

1.   **The legal framework**

864.  These proceedings are governed by the 1976 UNCITRAL Rules, Article 38 of which lays down the following framework for the award of costs:

> The arbitral tribunal shall fix the costs of arbitration in its award. The term 'costs' includes only:
>
> (a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with Article 39;
>
> (b) The travel and other expenses incurred by the arbitrators;
>
> (c) The costs of expert advice and of other assistance required by the arbitral tribunal;
>
> (d) The travel and other expenses of witnesses to the extent that such expenses are approved by the arbitral tribunal;
>
> (e) The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;
>
> (f) Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

865.  Article 39(1) adds, as regards the fees and expenses of the Tribunal:

> The fees of the arbitral tribunal shall be reasonable in amount, taking into account the amount in dispute, the complexity of the subject-matter, the time spent by the arbitrators and any other relevant circumstances of the case.

866.  Article 40 provides in relevant part, as regards the allocation of costs:

> 1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

867. These Rules are applicable to this arbitration 'subject to such modification as the parties may agree in writing.'[1305]

## 2. Costs in the procedure to date

868. The Tribunal issued the following directions in respect of costs in the earlier course of the proceedings:

(i) At the conclusion of the Hearing on jurisdiction on 4 September 2015, the Tribunal directed each Party to exchange submissions on costs on 5 October 2015 and comments on the other Party's costs submissions on 19 October 2015;[1306]

(ii) In the event, the Tribunal decided to order in its Interim Award that: 'All costs of and occasioned by the Hearing of these objections to jurisdiction shall be reserved;'[1307]

(iii) Save in one instance, where the Tribunal was called upon to issue a procedural order on a contested application it reserved costs;[1308]

(iv) In its PO N° 10 concerning the Respondent's application for amendment of the procedural timetable, the Tribunal decided, substantially dismissing the application, that '[t]he reasonable costs of and occasioned by this application are payable by the Respondent in any event upon the conclusion of the proceedings.'[1309]

869. The following sections deal separately with (i) the fees and expenses of the Tribunal and the PCA; and (ii) the costs for legal representation.

---

[1305] 1976 UNCITRAL Rules, Art 1(1).

[1306] Interim Award, [27].

[1307] Ibid [567](8).

[1308] PO N° 2, [7]; PO N° 5, [33](9); PO N° 6 [79](e); PO N° 8, [69](2); PO N° 9, [57](6).

[1309] PO N° 10, [106](7).

3.    **Fees and expenses of the Tribunal and the PCA**

870.  The Tribunal's fees and expenses were the subject of an agreement in writing, being
      Terms of Appointment concluded between the Parties and the members of the Tribunal
      on 18 February 2014.

871.  These Terms of Appointment:

(i)    Fixed the hourly rates applicable to the Tribunal's time and the allowable
       expenses;[1310]

(ii)   Provided for deposits to be paid by the Parties from time to time to secure the
       Tribunal's fees and expenses;[1311]

(iii)  Appointed the International Bureau of the PCA to act as Registry in the
       arbitration, with the capacity to appoint an Administrative Secretary to the
       Tribunal, its fees and expenses to be charged in accordance with the PCA
       Schedule of Fees and paid in the same manner as Tribunal fees and expenses;[1312]

(iv)   Empowered the Tribunal, subject to the agreement of the Parties, to appoint an
       Assistant to the Tribunal in order to assist it in the organisation of the file and in
       research, such Assistant to be entitled to charge for his time and to recover his
       expenses.[1313]

872.  On 12 April 2014, the Parties and the Tribunal concluded Terms of Appointment of
      Mr Jack L W Wass as Assistant to the Tribunal. These Terms:

---

[1310] Terms of Appointment cl 11.

[1311] Ibid cl 12.

[1312] Ibid cl 7.

[1313] Ibid cl 13.

(i)     Specified the scope of the duties of the Assistant, 'subject in the performance of all such duties to the supervision of the Tribunal, which retains full responsibility personally to review the file and to draft its decisions and award(s);'[1314] and

(ii)    Fixed an hourly rate for the Assistant's time[1315] and made provision for the Parties' reimbursement of his expenses, providing that 'All reasonable fees and expenses of the Assistant shall be treated as costs of the arbitration.'[1316]

873.  In accordance with Article 38(a) and Article 39 of the UNCITRAL Rules and the Terms of Appointment, the fees of the members of the Tribunal are:

(i)     Professor Campbell McLachlan QC: EUR 925,534.00

(ii)    Mr J William Rowley QC: EUR 690,464.10

(iii)   Professor Brigitte Stern: EUR 666,522.60

874.  The fees of the Tribunal Assistant and of the Registry are:

(i)     Tribunal Assistant: EUR 105,312.63

(ii)    PCA: EUR 306,893.50

875.  The expenses incurred during the arbitration, including expenses relating to court reporting services, rental of hearing facilities, interpretation, travel, accommodation, catering, couriers and telephone charges amount to EUR 420,290.01.

876.  In accordance with the Terms of Appointment, the Tribunal's fees (and those of the Assistant and Registry), as well as the expenses incurred during the arbitration, totalling EUR 3,115,016.84, have to date been borne by the Parties in equal shares by way of advance deposits held by the PCA. The Parties each deposited EUR 1,610,213.74, being an overall total of EUR 3,220,427.48. After deducting the Tribunal's fees and expenses

---

[1314] Terms of Appointment of Tribunal Assistant, cl 3.2.

[1315] Ibid cl 4.1. This rate was uplifted with the Parties' agreement on 3 July 2018.

[1316] Ibid cl 4.5.

(and those of the Assistant and Registry), the balance of the deposit held by the PCA is EUR 105,410.64. This unused balance shall be returned to the Parties in equal shares.

877. Article 40(1) establishes a general principle that the above costs shall be borne by the unsuccessful party, subject to the Tribunal's discretion to apportion 'taking into account the circumstances of the case.'

878. In the present case, the Claimant has substantially prevailed on the majority of its claim. The Tribunal finds no grounds to depart from the general principle in Article 40(1). Accordingly, it shall make an order that the Respondent reimburse the Claimant for the portion of the Tribunal and administrative fees and expenses advanced by the Claimant.

### 4.   Costs for legal representation

879. Article 40(2) UNCITRAL Rules establishes a different rule with regard to the Parties' costs for legal representation and assistance. It confers upon the Tribunal a free discretion to determine which Party shall bear such costs or to apportion them between the Parties.

### (a)   The Parties' submissions

880. In accordance with a procedural direction issued by the Tribunal and agreed with counsel for both Parties at the close of the merits Hearing, the Parties were directed to file simultaneous costs submissions by 27 September 2019, providing therewith itemised schedules of the costs incurred, with liberty to file observations on the other Party's costs submissions by 11 October 2019. [1317]

881. Both Parties duly filed costs submissions and schedules on the specified date. By agreement between the Parties and the Chairman, the date for filing reply observations was extended to 16 October 2019. Both Parties filed such observations on that date.

882. Both Parties invite the Tribunal to award costs of legal representation on the basis of the costs follow the event principle, though they put this point in different ways:

---

[1317] T10/2266/9 (McLachlan).

(i)     The Claimant accepts that the Tribunal has a discretion, but requests an order that the Respondent pay the Claimant's costs on the basis that 'the successful party should be able to recover its costs related to the claims upon which it was successful' in order to ensure full reparation.[1318]

(ii)    The Respondent argues that the costs follow the event approach is applicable to costs of legal representation.[1319] It invites the Tribunal to consider in addition the Parties' conduct during the dispute.[1320]

883. So far as quantum of costs is concerned:

(i)     The Claimant seeks USD 23,178,637.97. [1321] This figure includes its contributions to the deposit on costs in the amount of USD 1,398,675.00. The Claimant's total claim for costs of legal representation is therefore: USD 21,779,962.97;

(ii)    The Respondent seeks USD 11,732,489.64 for the jurisdiction phase and GBP 18,708,206.08 for the merits phase. This latter amount includes its contributions to the deposit on costs in the amount of GBP 681,224.39. Its total claim for costs of legal representation is therefore USD 11,732,489.64 and GBP 18,026,981.69. Converted at the exchange rate prevailing at 24 February 2021 for purposes of a purely indicative comparison, the Respondent claims costs of legal representation in US dollars of:     USD 37,127,389.64

---

[1318] Claimant's Costs Submission, [4]-[5], n.1.

[1319] Respondent's Costs Submission, [4]; Respondent's Costs Observations, [5]

[1320] Respondent's Costs Submission, [5].

[1321] This figure does not include the costs associated with the cancellation of the Hearing in Lausanne, for which each Party paid EUR 10,213.74. As expressed in the Tribunal's letter to the Parties of 27 May 2019, the Tribunal considered that the Parties were 'jointly and severally responsible for all costs thrown away and incurred as a result of this late change of venue'. Having considered the Parties' costs submissions and observations, the Tribunal determines that each of the Parties shall bear its equal share of these costs. Accordingly, the Claimant's request to increase its claim for costs by EUR 10,213.74 is denied.

884. In both cases, the Parties include the expenses of witnesses (a separate category in Article 38(d) UNCITRAL Rules) in their schedules of costs.

### (b)  Apportionment

885. The Tribunal considers that the Claimant has substantially prevailed on its claim, both as to jurisdiction (by majority) and on the merits. Although the Tribunal has ultimately excluded the August 2004 Loan from recoverable losses on grounds of causation, and reduced the amount recoverable under the December 2003 Loan to take account of the Claimant's contribution to its own loss, it does not consider that these reductions alter the basic point that the Claimant has succeeded in its allegation of expropriation.

886. The Tribunal has carefully considered the Respondent's submissions to the effect that any costs award should be reduced to take account of the Claimant's conduct in the course of the proceedings. The Tribunal does not consider that the Claimant wasted costs or otherwise engaged in improper conduct in its pursuit of the claim, such that it should reduce any award of costs by way of apportionment.

### (c)  Quantum

887. This leaves the quantum of costs to be awarded.

888. Article 38(c) UNCITRAL Rules requires the Tribunal to determine whether the amount of legal representation costs is 'reasonable.'

889. On any view, this has been a substantial dispute, which has been vigorously and professionally litigated by counsel for both Parties.

890. One commonly utilised measure in the assessment of reasonableness is to compare the respective parties' costs. [1322] On this measure, the Tribunal notes that the Claimant's claimed legal costs, though still very large, are much less than those claimed by the Respondent.

---

[1322] Paulsson & Petrochilos, *UNCITRAL Arbitration* (2018), 365.

891. The Tribunal has also considered the objections to specific items that Respondent raises in its Observations as to: (i) the fees of Professor Shay, international tax expert; and (ii) the fees of Lalive, a Swiss law firm.

892. *Professor Shay.* The Claimant seeks to recover USD 1,629,853.62 in respect of the fees of Professor Shay for the merits phase of the proceedings (through his law firm, Ropes & Gray). The Respondent objects that this amount is unreasonable as it: 'exceeds the cumulative costs of <u>all</u> 14 experts engaged by the Respondent by more than 30%; and the cumulative costs of all of Claimant's remaining experts by more than 72%.'[1323]

893. The Tribunal considers that the fees of international tax experts may well reasonably differ depending upon the jurisdiction in which they practise and whether they work in a university or in a law firm. The question for the Tribunal is not whether such fees are reasonable on a lawyer-client basis, but whether they are a reasonable expense to be recoverable on a party-party basis. Looked at in this light, there is force in the Respondent's submission that Professor Shay's fees are disproportionate to the fees of other experts in the arbitration, including those giving evidence on tax matters. Further, in the event, the issues on which Professor Shay primarily concentrated in his evidence did not greatly assist the Tribunal in reaching its award. Taking all of these factors together, and in the exercise of its discretion to determine reasonableness, the Tribunal fixes the reasonable amount to be recoverable in respect of Professor Shay's fee at USD 800,000.00 and reduces the amount claimed accordingly.

894. *Lalive.* Second, the Claimant seeks USD 397,646.89 in respect of the costs of Lalive, the well-known Swiss law firm. The Claimant's itemised schedule of costs shows that these costs were incurred in relation to the Respondent's Set-Aside Application.[1324]

895. The Respondent objects that these costs do not constitute costs of the arbitral proceeding.[1325]

---

[1323] Respondent's Observations, [10].

[1324] Claimant's Costs Submission, 4.

[1325] *Sylvania Technical Systems Inc v Iran*, IUSCT Case No 64, Award (27 June 1985), [96] **(RL-506)**.

896. The Tribunal agrees. The costs of opposing Russia's Set-Aside Application before the Swiss Federal Tribunal are not costs of the present arbitration and are not recoverable by way of an award of costs by this Tribunal. These costs must be excluded from the amount claimed.

897. The Tribunal therefore determines the amount of the Claimant's costs for legal representation to be payable by the Respondent at USD 20,552,462.46.

IX.   DISPOSITION

898.  For the reasons set forth above, the Tribunal hereby DECIDES that:

(1) By taking the Claimant's Loans without due process or compensation, the Respondent expropriated those Loans in breach of Article 13 ECT;

(2) In view of its finding under (1) above, it is unnecessary for the Tribunal to determine the Respondent's liability for the Claimant's alternative claims under Article 10 ECT;

(3) The Respondent shall compensate the Claimant for its loss of the sums due under the December 2003 Loan, save to the extent set forth in (4) below;

(4) The recovery of sums advanced under the December 2003 Loan after 27 May 2004 falls to be reduced by 50% in view of the Claimant's contribution to its own loss in respect of those sums (by majority McLachlan and Stern; Rowley dissenting);

(5) The Respondent is not under a duty to compensate the Claimant for its loss of the sum advanced under the August 2004 Loan, as the Claimant caused its own loss of that sum because it extended that sum at a time when it was reasonably foreseeable that those funds would be lost (by majority McLachlan and Stern; Rowley dissenting);

(6) The Respondent shall pay compensation for the Claimant's loss of the value of the December 2003 Loan (after the reduction for contribution referred to in (4) above), comprising:

(i)     Principal of RUB 77,342,764,401.89, converted to US dollars at the rate applicable on 31 December 2008 (29.40 Russian roubles to the US dollar) namely: USD 2,630,706,272.17;

(ii)    Unpaid contractual interest at the rate of 9% per annum accrued quarterly on sums drawn down under the December 2003 Loan from the day after the date of drawdown to 31 December 2008, converted to US dollars on

31 December 2008 at the same rate as under (i) above (by majority McLachlan and Rowley; Stern dissenting);

**(7) The Respondent shall pay interest on the sum awarded under (6) up to the date of this Award at the rate of:**

(i)     1% above the Russian rouble 3-month commercial lending rate on unpaid contractual interest from the date on which such interest fell due under the December 2003 Loan to 31 December 2008, converted into US dollars on that date at the same rate as under (6)(i) above;

(ii)    1% above the 6-month USD LIBOR commercial lending rate on principal and interest from 31 December 2008 until the date hereof (by majority McLachlan and Rowley; Stern dissenting);

**(8) The Claimant shall give credit in the enforcement of this Award for any sums that it recovers under the December 2003 Loan, in accordance with its undertaking;**

**(9) The Respondent shall reimburse the Claimant for its share of the Tribunal's fees and expenses, together with the fees and expenses of the Tribunal Assistant and Registry, assessed at EUR 1,557,508.42;**

**(10) The Respondent shall pay the Claimant its reasonable legal costs and expenses, which are assessed at USD 20,552,462.46;**

**(11) The Tribunal's Interim Award on Jurisdiction, including the Dissenting Opinion of Professor Brigitte Stern, dated 18 January 2017 (annexed hereto) is hereby incorporated in, and forms part of this final Award.**

343945

Geneva, Switzerland

Date: 23 July 2021

_____          _____

Mr J William Rowley QC                    Professor **Brigitte Stern**


_____

Professor Campbell McLachlan QC

Chairman

343945

PCA Case No 2013-31

IN THE MATTER OF
AN ARBITRATION PURSUANT TO
ARTICLE 26 OF THE ENERGY CHARTER TREATY

BEFORE
A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH
THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW OF 1976

– between –

YUKOS CAPITAL LIMITED
(formerly YUKOS CAPITAL S.À R.L.)

(the Claimant)

– and–

THE RUSSIAN FEDERATION

(the Respondent and, together with the Claimant, the Parties)

---

## DISSENTING OPINION OF J. WILLIAM ROWLEY QC

---

### Arbitral Tribunal

Professor Campbell McLachlan QC (Chairman)
Mr J William Rowley QC
Professor Brigitte Stern

Mr Jack L W Wass, Assistant to the Tribunal

Ms Helen F Brown, Assistant Secretary to the Tribunal

| Claimant's Counsel | Respondent's Counsel |
|---|---|
| Mr Cyrus Benson | Lord Peter Goldsmith QC |
| Ms Penny Madden QC | Ms Samantha J Rowe |
| Ms Ceyda Knoebel | Ms Aimee-Jane Lee |
| Mr Piers Plumptre | Mr Conway Blake |
| Ms Sophy Helgesen | Mr Maxim Osadchiy |
| Ms Sasha Kobyasheva | Ms Monika Hlavkova |
| Mr Theo Tyrrell | Ms Sonja Sreckovic |
| *Gibson, Dunn & Crutcher UK LLP* | Ms Svetlana Portman |
| | *Debevoise & Plimpton LLP* |

## I.   INTRODUCTION

1.   I am in agreement with large parts of the Award, including the findings establishing the Respondent's liability under the ECT. I also agree with the conclusion that Claimant is entitled to compensation for its loss of the value of the December 2003 Loan in the amount of USD 2,630,706,272.17, plus interest, as set out in [6] of the Disposition. However, I consider that the Respondent's liability to compensate the Claimant goes beyond these amounts.

2.   My difference with my esteemed colleagues concerns their conclusions that: (a) only 50% of the sums advanced by Claimant after 26 May 2004 on the December 2003 Loan is recoverable (because Claimant contributed equally to its loss); and (b) Claimant's loss on its August 2004 Loan is irrecoverable in these proceedings (because Claimant alone caused its loss).

3.   These conclusions are untenable.

4.   As regards the irrecoverability of the loss of the August 2004 Loan, there is no credible legal support for the majority's decision.  No cases were cited in which an investor-state tribunal has ever concluded that an investor is entitled to no compensation where (as here) its loss would not have occurred in the absence of the impugned conduct of the host state. This almost certainly means that there are no such cases.

5.   The majority contends that "A finding that the proximate cause of the claimant's loss is his own actions has been dispositive in a number of cases, despite findings of culpability on the part of the respondent."[1]

6.   These cases relied on for this contention are discussed below where I deal with the August 2004 Loan.   However, they provide no support for the majority's conclusion that Respondent should be freed of its treaty obligation to compensate for its effective taking of the August 2004 Loan.   The cases cited all concern investments which became worthless, or had been lost (either by reason of the investor's own mistakes, mismanaged

---

[1] Award at [606].

or bad luck) before the relevant respondent state was alleged to have breached its treaty obligation. In the only case where a treaty breach was actually found, it occurred only after the investment had become valueless, thus causing no loss.

7. As regards the conclusion that Claimant contributed (to the extent of 50%) to the loss of the advances it made under the December 2003 Loan after 26 May 2004, the majority errs (as discussed below) by failing to take into account that, on the record before the Tribunal, even if Yukos Oil were to face bankruptcy it would have had sufficient assets to repay the December 2003 Loan absent Respondent's unlawful acts against it and against Claimant.

8. Put differently, even if the majority was correct to conclude that Claimant was negligent in making the final three advances on the December 2003 Loan, that negligence was not causative of its loss.

## II.   THE EFFECT OF THE MAJORITY'S CONCLUSIONS ON CONTRIBUTION/ CAUSATION

9. Before turning to the more detailed discussion of the majority's contribution/causation analysis of the two loans, the effect of the majority's conclusions makes plain the majority's error.

10. In the case of the December 2003 Loan, RUB 3,916,683,000.00 was advanced after 26 May 2004 (drawdowns of 16, 22 and 28 June 2004). The effect of the majority's 50% discount on Claimant's compensation for this component of its December 2003 Loan enables Respondent and its designees to retain and be unjustly enriched by RUB 1,958,341,500.00, or approximately USD 66,610,255.10[2] of Claimant's funds.

11. In the case of the August 2004 Loan of USD 355 million, the effect of the majority's holding that Claimant was entirely responsible for this loss enables Respondent and its designees to retain and be unjustly enriched by the whole of the USD 355,000,000.00.

---

[2] The same exchange rate as that set out at [789] of the Award is applied here, namely 29.40 Russian roubles to 1 US dollar.

12. A conclusion that Respondent should not be held to its treaty obligation to compensate Claimant for the taking of the entirety of its two loans and the associated contractual and pre-award interest (i.e., to have its obligation to compensate Claimant reduced by at least the principal sum of USD 421,610,255.10) cannot be correct in circumstances where Claimant would almost certainly have been repaid in full had Respondent: (a) not sold Yukos Oil's YNG to Rosneft in a rigged auction for a fraction of its true worth in a transaction that was acknowledged to be a practical nationalisation;[3] and (b) not treated Claimant unlawfully in Yukos Oil's eventual bankruptcy proceedings.

## III. DID CLAIMANT "CONTRIBUTE" TO ITS INJURY IN RELATION TO THE DECEMBER 2003 LOAN?

13. When performing a comparative contribution-to-loss analysis between an investor and, in this case, as found, a state which (in its relevant treaty breaches) intended to destroy the investor's ability to recover its investment, a tribunal should be very sure that it does not engage in hindsight as to what was foreseeable. In the case of doubt or uncertainty, it is certainly proper to give the innocent investor the benefit of the doubt over a state that has intended in its unlawful actions to injure the investor. A tribunal must also determine whether the risk foreseen would have occurred in the absence of the host state acting unlawfully. If not, the foreseen risk would not be causative of loss.

14. The majority's holding that the Claimant should bear 50% of its loss in relation to the three drawdowns that remained to be made after 26 May 2004 is based on the conclusion that "there was a reasonably foreseeable risk that the Claimant's investment might not be repaid from 27 May 2004".[4] This assessment of foreseeability was based on and limited to the possibility that Yukos Oil might have to declare bankruptcy. No consideration was given as to the prospects for Claimant to recover its loan in such a future bankruptcy. Nor did the majority consider the foreseeability of any treaty breach by Respondent in relation to Claimant's December 2003 Loan, including its ability to recover its loan in a

---

[3] Award at [138]-[146].

[4] Award at [677].

bankruptcy proceeding absent any unlawful action by Respondent. These omissions constitute a fundamental error. Finally, no real attempt was made to justify a 50% figure.

15. The majority placed much weight on the 26 May 2004 decision of one judge in the Moscow *Arbitrazh* Court to uphold the first Tax Assessment (the 2000 Tax Assessment) and Yukos Oil's statement the next day, on 27 May 2004, that it faced the risk of bankruptcy. It says that these facts "should have given a reasonable lender in Yukos Capital's position cause to consider whether it was prudent for it to continue to advance loans under the December 2003 Loan Agreement."[5]

16. At [683] of the Award, the majority states that "the Tribunal considers that the Claimant was negligent in safeguarding its own interests as lender", and at [684] it says that "[t]he Tribunal considers that the Claimant's failure in this respect equally contributed to this part of the loss along with the Respondent's subsequent breaches of the treaty."

17. With respect, this is an untenable conclusion and outcome. The majority gave no consideration to Claimant's ability to recover its loan in any bankruptcy proceeding that might be instituted. There was no suggestion that Respondent's future unlawful acts against Claimant could be foreseen. And the conclusion ignores the important facts that:

   (i)    Yukos Oil had been advised in very plain terms by its outside lawyers that there was utterly no merit in the 2000 Tax Assessment (discussed further below in relation to the August 2004 Loan);

   (ii)   another judge of the Moscow *Arbitrazh* Court had, on 19 May 2004, suspended the 2000 Tax Assessment, and that this suspension remained in force as at the 26 May 2004 court ruling;

   (iii)  even if Yukos Oil were to declare bankruptcy, at this stage of events (well before Respondent's unlawful behaviour in relation to the rigged YNG auction) Yukos Oil had more than enough assets (details below) to pay the 2000 Tax Assessment

---

[5] Award at [682].

and any penalties should the assessment survive the challenge Yukos Oil had launched against it;

(iv)    on 17 June 2004, the day after Claimant made its next advance on the Loan, President Putin made a strong statement (details below) that was evidently designed to reassure concerned foreign investors that the Russian authorities, the government and the economic officials of the country were not interested in seeing Yukos Oil go bankrupt; and

(v)     the last two advances on the December 2003 Loan were made (as required in the Loan Agreement) during the week that followed President Putin's widely reported reassurance (*i.e.*, on 22 and 28 June 2004).

18.    On these facts, it must be wrong to conclude that Claimant's decision to complete the December 2003 Loan Agreement was negligent, let alone of sufficient risk as would require Claimant to share equal responsibility with Respondent for its loss. It is true that Yukos Oil was being subjected to reassessment by the Russian tax authorities on how it had self-assessed its taxes for its 2000 and 2001 tax years. But this happens every day in every country in the world and it is not negligent for counterparties to continue to deal with companies who are facing tax audits. It is only negligent if the counterparty has reason to believe there is merit in the audit and that its borrower will not be able to repay a loan if, in the end, it is found that it has to pay the tax.

## IV.    OUGHT CLAIMANT TO BEAR THE SOLE RESPONSIBILITY FOR THE LOSS OF ITS AUGUST 2004 LOAN?

19.    Having assessed Claimant's loss on a foreseeability/contribution based analysis for the December 2003 Loan, the majority moves to a foreseeability/break-in-the-chain analysis of the August 2004 Loan. That Loan was made on 19 August 2004, less than two months after President Putin's announcement and the date Claimant made its final advances on the December 2003 Loan.

20.    The relevant cases and the ILC (in its Commentary on ARSIWA) make it clear that it is only proper to abandon a contribution-based analysis in favour of a break-in-the-chain analysis where, on the facts of a particular case, it is clear that <u>the investor's loss was</u>

incurred (or was inevitable) solely or predominantly because of its own conduct (or improvidence) before its investment was affected by the impugned conduct of the host state.

21.   As noted above, no case was cited in which a tribunal has determined that an investor is entitled to no compensation where its loss would not have been incurred in the absence of the impugned conduct of the host state.

22.   At [606] and [607] of the Award, reference is made to a number of cases in which other tribunals are said to have concluded that the relevant investor caused its own loss (and thus was entitled to no compensation from the relevant state) despite the fact that the state in question has also been found culpable. The paragraphs wrongly suggest that these cases are good precedents for the majority's conclusion that Claimant should receive no compensation for the loss of its August 2004 loan.

23.   These paragraphs give the wrong impression as to the findings in the cited cases and what they stand for. This is because, in each of these cases, the relevant investor's loss: (a) had accrued or become inevitable before the allegedly wrongful act of the state; and (b) no part of the relevant investor's loss flowed from or was made worse by any subsequent act of the state. Thus, each of these cases is fundamentally different from the present case, where the only reason Yukos Oil faced (and was ultimately driven into) bankruptcy and Claimant lost its investments was the internationally unlawful acts of Respondent.

24.   Put differently, Claimant did not make its August 2004 Loan to Yukos Oil when it was, through its own fault or mismanagement, unable to repay the Loan. Yukos Oil only became unable to repay, and Claimant only became unable to claim as a creditor in Yukos Oil's bankruptcy, because of multiple acts by Respondent in breach of the ECT, most of which occurred after both the December 2003 and August 2004 Loans had been made. The relevant factual chronology is set out at [46] below.

25.   In this case, had Respondent not acted against Yukos Oil and Claimant as it did, Yukos Oil would unquestionably have been able to repay both the December 2003 and the August 2004 Loans and Claimant would have suffered no loss.

26. The cases cited by the majority in [606] and [607] are summarised briefly below. I respectfully suggest that these cases do not support the conclusion that the loss suffered by Claimant in relation to the August 2004 Loan was entirely or predominantly attributable to its own conduct such that Respondent can properly be released of any responsibility for its unlawful treatment of Claimant.

27. **ELSI**:[6] In this case, the ICJ Chamber concluded that, prior to the "requisition" (the impugned act), ELSI was in an actual or virtual state of insolvency which had been brought about entirely by reason of its own mismanagement of its business. In any event, even though the requisition had no deleterious effect on ELSI's business (indeed it likely helped it), the Chamber was unable to see anything which could be said to amount to a violation of the relevant Article of the FCN Treaty by reason of the requisition.[7]

28. **MAFFEZINI v. SPAIN**:[8] Here, the tribunal concluded that the losses suffered by Mr Maffezini (*i.e.*, as the result of the failure of his investment in Spain) were not the result of allegedly wrong advice regarding the costs of the project given by a Spanish state entity (one of four alleged breaches of the relevant BIT). Rather, the tribunal held that the state entity was not carrying out a public function – hence Spain had committed no BIT breach. It was in this context that the Tribunal observed that BITs were not insurance policies against bad business judgements and that Spain could not be held responsible for Mr Maffezini's own business losses.[9] But this cannot be taken to suggest that BIT's do not constitute a form of insurance against the BIT state signatories' contravening the treaty in its treatment of a qualifying investor.

29. **OLGUÍN v. PARAGUAY**:[10] Mr Olguín invested in a project in Paraguay. In so doing, he lost the funds he deposited with a finance company when it went bankrupt. The funds were being held on deposit pending their commitment to the project. Four allegations of

---

[6] *Elettronica Sicula S.p.A. (ELSI) (United States of America v Italy)*, Judgment, ICJ Reports 1989, p. 15 (**CL-99**).

[7] Ibid [65], [66], [83], [92], [99], [100].

[8] *Emilio Agustín Maffezini v Spain*, ICSID Case No ARB/97/7, Award (13 November 2000) (**RL-287**).

[9] Ibid [39], [40]-[44], [62]-[64].

[10] *Eudoro Armando Olguín v Paraguay*, ICSID Case No. ARB/98/5, Award (26 July 2001).

breach of the relevant BIT were made. The allegations, which concerned the lost deposit, were all rejected by the tribunal. It held that the finance company went bankrupt because of the irregular conduct of its managers, not by reason of unlawful conduct of the state. While the tribunal noted that the finance company's bankruptcy might have been prevented had Paraguay's financial regulators performed better, this did not amount to a breach of the BIT, but simply reflected the rather lax regulation of financial institutions in Paraguay at the time the investment was made. This *obiter* observation by the tribunal was not a finding that the state was the cause of Mr Olguín's loss. The tribunal also noted that Mr Olguín had his reasons for investing in Paraguay and it was not reasonable for him (an accomplished businessman, with a track record as an entrepreneur going back many years, etc.) to seek compensation for losses he suffered on making a speculative, or at best, a not very prudent investment. The key take-away from this case is that Paraguay was found not to have breached the BIT in any way and that Mr Olguín had to bear the same risks as anyone else who put money on deposit with a financial institution in Paraguay at that time.[11]

30.   **BIWATER v. TANZANIA**:[12] This case is relied on by the majority in [607] and [608] of the Award as being particularly apposite to the proposed finding that Claimant was entirely or predominantly responsible for its loss in relation to the August 2004 Loan. The opposite is true. The case concerned Biwater's failed investment in rejuvenating and operating the Dar es Salaam water and sewerage systems. Biwater alleged a series of breaches of the relevant BIT that occurred between 13 May and 1 June 2005. While the tribunal concluded that each of the alleged breaches was proven, the fundamental difference between *Biwater* and the present case is that the tribunal also found on the facts before it that Biwater's investment had been such a bad one that, well before 13 May 2005 (the date of the first alleged breach of the BIT), the investment had become of no economic value.[13] That is to say, the state's conduct had nothing to do with (*i.e.*, had not

---

[11] Ibid [45], [48], [55], [59], [64], [65](a) and (b), [70]-[75].

[12] *Biwater Gauff (Tanzania) Limited Ltd v. Tanzania*, ICSID Case No. ARB/05/22, Award, (24 July 2008) (RL-493).

[13] Ibid [15], [778], [792].

caused) the loss because the investment had been lost by the investor before the state breached its treaty obligations.

31. By comparison, in the present case, it was not properly open to the majority to conclude that the August 2004 Loan, when made on 19 August 2004, would not or could not be repaid in the absence of Respondent's unlawful conduct, and thus that Claimant caused its own loss by making the Loan.

32. Although Russia's Ministry of Justice announced its plan to sell YNG on 21 July 2004 (three weeks after the last draw down on the December 2003 Loan), Claimant had no knowledge when it advanced the August 2004 Loan that the later YNG auction would be rigged, and that YNG's assets would be sold for a song. Had YNG's assets been sold properly, there would unquestionably have been sufficient funds to cover the August 2004 Loan. As to this, [139] and [140] of the Award set out details of the DKW valuation of the seized YNG assets. That valuation also stated that, even if future tax and environmental liabilities were accounted for, the value range would be between USD 15.7 and 18.3 billion. Respondent's later tax assessments (*i.e.*, those that come after the loans were advanced), would have reduced these amounts by less than USD 5 billion. It is to be recalled that YNG was valued by Rosneft at USD 55.78 billion at the end of 2005 in its prospectus for offering shares – *i.e.*, after YNG had been acquired by it through the rigged auction.[14]

33. In addition, even though the possibility that Yukos Oil might have to enter into bankruptcy proceedings in the future was known when the August 2004 Loan was advanced, those bankruptcy proceedings were not commenced in Russia until March 2006, 18 months after the August 2004 Loan was advanced.[15]

34. Against this background, the only proper conclusion is that Respondent's unlawful campaign against Yukos Oil and its unlawful acts against Claimant were the cause of Claimant's loss of the August 2004 Loan. The simple reason for this is that, on the balance of the evidence, the Loan would not have been lost had Russia not committed its

---

[14] Award at [146], n. 146.

[15] Award at [152]-[153].

campaign against Yukos Oil and expropriated Claimant's investment.  This is confirmed
by the Tribunal's conclusion (by majority of McLachlan/Rowley), that the factors set out
in [781]:

> ...provide overwhelming evidence establishing that, were it not for the Respondent's
> actions, the financial position of Yukos Oil would have been such as to enable it to
> repay Yukos Capital's Loan in full and to continue to make quarterly interest
> payments in accordance with its terms.  A reasonable lender in the position of Yukos
> Capital would have so concluded and valued the FMV of the Loan at face value.[16]

## V.    DID CLAIMANT "CONTRIBUTE" TO ITS INJURY IN RELATION TO THE 2004 LOAN?

35.    Assuming the impropriety of a conclusion that Claimant's loss of the August 2004 Loan
was "entirely attributable to [its own conduct] and not at all to that of the "responsible"
State [Russia]",[17] the question of whether it should bear some of its own loss (because it
contributed to it) turns on whether the dispute (*i.e.*, arising from Respondent's unlawful
treatment of Claimant) was reasonably foreseeable at the time the Loan was made on
19 August 2004.  This is because, absent Respondent's conduct which gave rise to the
dispute, Claimant could have claimed in the bankruptcy and would likely have been paid.

36.    The questions concerning contribution that the Tribunal put to the Parties prior to their
closings all bore on the foreseeability of the dispute at the time Claimant's investments
were made.[18]

37.    Claimant and Respondent agreed that the foreseeability of the dispute was relevant to the
calculation of damages.  Respondent also accepted that foreseeability cannot be assessed
with hindsight.[19]

38.    The majority concludes that: (a) there was a foreseeable risk that Claimant's investment
might not be repaid from 27 May 2004; and (b) it was reasonably foreseeable on

---

[16] Award at [782].

[17] ILC, *Draft articles on Responsibility of States for Internationally Wrongful Acts with commentaries* [2001] I
BILC II (2)31, 110 n 627, (**RL-240**).

[18] Award at [563].

[19] Award at [570].

19 August 2004, less than three months later, that Claimant's August 2004 Loan would be lost altogether.

39. There are at least two problems with these findings.

40. First, they do not focus on the actual dispute (*i.e.*, whether Respondent's conduct vis-à-vis Claimant, not Yukos Oil, constituted a breach of the ECT). Recall that the Tribunal limited its assessment of ECT breach to Respondent's treatment of Claimant's claims under the Loans and not the claims of its debtor Yukos Oil or other members of the Yukos Group. And Claimant's claims are limited to the treatment it received from Respondent as it attempted to make its claims in Yukos Oil's bankruptcy as a creditor based on the Loans.[20]

41. Second, the majority gives virtually no consideration in the Award as to the foreseeability of that dispute. With the exception of one paragraph ([695]), at no point in Part VII does the majority concern itself with whether it was reasonably foreseeable by Claimant, when it made the two Loans, that Respondent would attack it, as it did, when it later sought to register its claims in Yukos Oil's bankruptcy.

42. Dealing briefly with [695], the majority asserts that, on the date that Claimant advanced the August 2004 Loan (19 August 2004), it not only foresaw that Yukos Oil might be driven into bankruptcy, but it also foresaw:

> that this was as a result of deliberate conduct on the part of the Respondent, which was 'intent on destroying the entire company'. The foreseeability of such an intention would affect the totality of the assets of the Yukos Group on the territory of the Respondent.

43. With respect, this assertion can only be attributed to Claimant (or Yukos Oil) with the aid of hindsight. It is now evident, from a detailed review of its behaviour over a three-year period (2004-2007), that Respondent was then determined to eradicate the Yukos Group after devouring its assets and distributing them to its favoured entities. But the record

---

[20] Award at [4], [390].

before the Tribunal as to what was happening in the spring and summer of 2004 simply does not indicate that this was known at the time.

44.   The majority says that it does not matter that the August 2004 Loan was made "well before the Yukos Oil bankruptcy proceedings and the Respondent's measures against the Claimant in those proceedings".[21] But with respect, it does matter.

45.   Exactly what was happening and when is set out in useful detail at [114]-[153] of the Award. In broad sweep, it shows plainly that at the time the two Loans were advanced, what we now know was an unlawful campaign to acquire the Yukos Group's assets was only just getting underway.

46.   The chronological data-points below (taken from the paragraphs cited above) show clearly that Claimant had no reasonable basis, either in late May or in mid-August 2004, to foresee either the present dispute or that either of the Loans would not be repaid.

   (i)   Only the first of the five Tax Assessments had reached a stage where Yukos Oil had been found liable for tax offences when the August 2004 Loan was made. The second Assessment (the 2001 Tax Assessment) came to a decision on such liability only on 2 September 2004,[22] well after the two Loans had been made. All the others come later.

   (ii)  Initially, after it received the 2000 Tax Assessment, Yukos Oil's external Russian counsel stated in robust terms that it was so unmeritorious, and the extent of the tax ministry's violations were so apparent that it would be "impossible even for the most biased judge to support the clearly unlawful inspection act."[23]

---

[21] Award at [687].

[22] Award at [119].

[23] Award at [643], citing Summary of the tax inspection of OAO NK Yukos, Sergey Pepeliev (5 January 2004), 3 (R-577).

(iii)    Although the tax ministry's collection claim on the 2000 Tax Assessment was upheld by one judge of the Moscow *Arbitrazh* Court on 26 May 2004, the effect (*i.e.*, the enforceability) of that Assessment had previously been suspended (by another judge of the same court), and remained so until the suspension was annulled on 23 June 2004.[24]

(iv)    On 17 June 2004, a day before an expected court ruling on the 2000 Tax Assessment, President Putin was reported in the New York Times as saying:

> Russian authorities, the government, and the economic officials of our country are not interested in seeing Yukos go bankrupt... The government will try to do everything not to topple this company.[25]

The majority expressed the view, "based on its assessment of the Respondent's conduct to this date", that "little weight can be placed on this statement". Given that this statement was made less than six months after the 2000 Tax Assessment, and long before the rigged auction of YNG's assets and the 2006 bankruptcy, the majority's "view" can only be hindsight based. In any event, it is well established that what governments say in these circumstances to and about investors matters (and can have consequences) in the context of investor-state disputes. It may now be a relatively common view that Mr Putin cannot wholly be trusted. But that was not so clear in the summer of 2004. Moreover, the fact that he made the statement on behalf of the government and the relevant Russian authorities was clearly intended to calm roiling markets and to be believed.

(v)    The New York Times reported further that shares of Yukos Oil jumped 42% on the news (of Mr Putin's statement) before trading was suspended for the day and gave details of settlement discussions between Yukos Oil and Russia. The market's reaction to Mr Putin's statement was signalling the possibility of Yukos Oil's tax problems being resolved.

---

[24] Award at [125]-[126].

[25] *Putin Says Russia Wants Yukos to Survive*, Seth Mydans, The New York Times (18 June 2004) (C-24).

(vi)    As mentioned earlier, on 21 July 2004, the Ministry of Justice announced plans to sell the seized YNG assets. All of the valuations that were carried out at this time indicated that the share capital of YNG well exceeded the then known and future tax liabilities. Valuations ranged between USD 18.6-21.1 billion (DKW valuation), USD 16.1-22.1 billion (JP Morgan valuation) and USD 20-25 billion (possible bid range by TNK-BP).[26]

(vii)    The second to fifth Tax Assessments all occurred after the August 2004 Loan was advanced.[27] The rigged YNG auction took place on 19 December 2004[28] and Yukos Oil was petitioned into bankruptcy in March 2006.[29]

47.    The central point of the above chronology is that it shows that what Respondent was really up to only became clear well after the two Loans were advanced.

48.    On this record, I consider that it was not possible for the majority properly to conclude either that Claimant was entirely responsible for the loss of the August 2004 Loan or that it was reasonably foreseeable that a possible future bankruptcy proceeding against Yukos Oil would result in the loss of the Loan (having regard to Yukos Oil's and YNG's net asset values at this time).

49.    On this record, it is my respectful view that finding that Claimant was entirely responsible for the loss of the August 2004 Loan is perverse. It is equivalent to saying that if a state is sufficiently likely to breach its treaty obligations, then, even if a particular treaty breach against the investor itself cannot be foreseen, the state will be free to breach the treaty in the future and be relieved of its solemn treaty obligation not to do so and to compensate its investors if it does.

---

[26] Award at [139], n. 129.

[27] Award at [118]-[122].

[28] Award at [144].

[29] Award at [152]-[153].

50.   Even if treaties do not serve as "insurance policies against business risk", as pointed out
      in *Ripinsky and Williams*, BITs "do mitigate risks of certain government actions".[30]   That
      is to say, they do serve as insurance against behaviour prohibited by the treaty.

51.   I therefore would not have decreased the amount of compensation due on the basis of
      causation and contribution to the injury.   I consider that Claimant ought to be entitled to
      the total value of both the December 2003 and August 2004 Loans, comprising the
      principal advanced and any interest due thereunder.

Geneva, Switzerland

Date: **23 July 2022**

_____

J. William Rowley QC

---

[30] Ripinsky & Williams, *Damages in International Investment Law* (BIICL, 2008), 328-329, p. 4 (**RL-360**).

PCA Case No 2013-31

**IN THE MATTER OF
AN ARBITRATION PURSUANT TO
ARTICLE 26 OF THE ENERGY CHARTER TREATY**

**BEFORE
A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH
THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW OF 1976**

– between –

**YUKOS CAPITAL LIMITED
(formerly YUKOS CAPITAL S.À R.L.)**

(the Claimant)

- and-

**THE RUSSIAN FEDERATION**

(the Respondent and, together with the Claimant, the Parties)

---

### DISSENTING OPINION OF PROFESSOR BRIGITTE STERN

---

**Arbitral Tribunal**

Professor Campbell McLachlan QC (Chairman)
Mr J William Rowley QC
Professor Brigitte Stern

Mr Jack L W Wass, Assistant to the Tribunal

Ms Helen F Brown, Assistant Secretary to the Tribunal

| **Claimant's Counsel** | **Respondent's Counsel** |
|---|---|
| Mr Cyrus Benson | Lord Peter Goldsmith QC |
| Ms Penny Madden QC | Ms Samantha J Rowe |
| Ms Ceyda Knoebel | Ms Aimee-Jane Lee |
| Mr Piers Plumptre | Mr Conway Blake |
| Ms Sophy Helgesen | Mr Maxim Osadchiy |
| Ms Sasha Kobyasheva | Ms Monika Hlavkova |
| Mr Theo Tyrrell | Ms Sonja Sreckovic |
| *Gibson, Dunn & Crutcher UK LLP* | Ms Svetlana Portman |
| | *Debevoise & Plimpton LLP* |

## I.   INTRODUCTION

1.   I am in agreement with large parts of the Award, as indicated in its operative part. My main disagreement with my esteemed colleagues concerns the way in which the majority has considered the loss incurred by Yukos Capital, as a consequence of the violation by the Russian State of its international obligations under the ECT. In my view, the decision of the majority results in an **unjust enrichment of Yukos Capital**. It is quite striking for me that the majority of the Tribunal has decided to award Yukos Capital significant amounts of money which would never have been in its possession for more than a few hours if the course of events had been 'business as usual', *i.e.*, if the Respondent had not violated the ECT.

2.   This unfortunate outcome results, in my view, from the fact that the majority has not properly applied international law to the real economic facts of the case, but has instead created a fiction by relying on accounting valuation exercises that it bases on an incomplete and inaccurate picture of the economic business into which Yukos Capital had entered.

3.   In other words, Yukos Capital is now, with the Award adopted by the majority, in a much better position than the one it would have been without the illegal acts of the Respondent State: I do not think that this should be the goal of international arbitration.

*        *        *

4.   I will only examine here the loss incurred by Yukos Capital as a consequence of the fact that, under the December 2003 Loan, Yukos Capital did not receive some of the interest due on its Loan to Yukos Oil and that the Loan to Yukos Oil was not reimbursed by the latter. I will not deal with the August 2004 Loan, as I agree that it was made by the Claimant at a time when it was foreseeable that it would not be reimbursed and that the loss was therefore due to the deliberate decision of the Claimant to grant the Loan and was not a consequence of any action of the Respondent.

5.   I start from the premise that the December 2003 Loan[1] is an **investment of Yukos Capital**, as was decided by the majority in the Interim Award, and that the question is what, if anything, Yukos Capital has lost because of the actions of Russia. To be clear, I remain of the view that this premise – as framed by the majority – is wrong, as explained in my Dissenting Opinion annexed to the Interim Award. However, I want to explain here that even if it is considered that there is an investment made by Yukos Capital, the loss is very different from the one found by the majority.

6.   This Opinion will therefore concentrate on the following question: What is the loss of Yukos Capital?

7.   In order to answer this crucial question for the decision on quantum, I will proceed in four steps. First, the facts of the case and the law to be applied have to be clearly ascertained. As far as the facts are concerned, I consider it unavoidable to look at the December 2003 Loan from Yukos Capital to Yukos Oil, not in isolation, as has been done by the majority, but as an element of a global economic endeavour. As far as the law is concerned, it is useful to restate the well-known general principles of international law concerning compensation in case of a violation of international law by a State. Second, I will analyse what would have been the situation if there had been no violation of international law, to understand what was the potential profit derived by Yukos Capital from its investment operation. Third, I will examine thoroughly what is the situation of Yukos Capital after the violations committed by Russia, to understand what was its true loss. Fourth, I will indicate what are, in my view, the main flaws, both factual and legal, of the majority's approach.

## II.   THE FACTUAL AND LEGAL FRAMEWORK

### A.   THE DESCRIPTION OF THE GLOBAL INVESTMENT OPERATION

8.   As a point of departure of my analysis, I insist that in order to evaluate the entitlements of Yukos Capital, **a holistic approach is necessary**, analysing the Loan to Yukos Oil, in

---

[1] Loan Agreement between Yukos Oil Company and Yukos Capital S.à r.l. (2 December 2003) (**December 2003 Loan Agreement**) (C-9).

the general contractual framework of the other legal commitments with which they were intrinsically linked.[2]

9.    I indicate at the outset that this is a completely different situation from a loan made by one company to another after having itself borrowed money from a bank, the two operations being entirely distinct. A bank does not predetermine the use of the money by its borrower, and, even more importantly, a bank will never accept not to be repaid if the borrower is not repaid by the entity to which it happened to lend the money.

10.   In fact, in what are called back-to-back loans, the **Loan TO Yukos Capital** preceded the Loan to Yukos Oil and **entirely predetermined** all the conditions of the global deal, and specifically all the parameters of the **Loan FROM Yukos Capital** to Yukos Oil.

11.   **The purpose** of the overall contractual scheme put in place in 2003 must not be overlooked: it was for Brittany, a BVI company, to lend money to Yukos Oil, a Russian company, through the intermediary of Yukos Capital, a Luxembourg company at the time of the events at issue in this case.

12.   If we now look at the role of Yukos Capital in the back-to-back Agreements forming the investment operation, we see that Yukos Capital undertook to grant a Loan to Yukos Oil: this was the purpose of the December 2003 Loan Agreement.[3] Since Yukos Capital had no money of its own for this operation, it used money borrowed from Brittany: this was the purpose of the Brittany Loan Agreement, dated a few days before on 20 November 2003.[4] This first Agreement already identified the final recipient of the funds, and it was indicated in the Brittany Loan Agreement that the subsequent Loan from Yukos Capital to Yukos Oil was going to be performed by what was called 'Sub-Lending' for the same amount as the Brittany Loan:

    (a)    Borrower intends to provide a loan facility to OAO "NK "YUKOS" [**Yukos Oil**], a company duly organized and validly existing under the laws of the Russian Federation (hereinafter referred to as "Sub-Borrower"), such loan

---

[2] Loan Facility Agreement between Brittany Assets Ltd and Yukos Capital S.à r.l. (20 November 2003) (**Brittany Loan Agreement**) (C-130).

[3] December 2003 Loan Agreement.

[4] Brittany Loan Agreement.

> facility to be granted shall not exceed 80'000'000'000-00 (Eighty billion) Russian Rubles, shall bear interest at the rate of 9% per annum and shall mature not later than 31st December 2008 …[5]

13.   Yukos Capital, in turn, was under the obligation to transmit the money received from Brittany to Yukos Oil:

> **1. Definitions**
>
> …
>
> Advance
>
> Shall mean any advance made or to be made by Lender hereunder which Borrower undertakes to use for Sub-Lending.
>
> …
>
> **2. Commitments**
>
> Lender agrees on the terms and conditions herein, to make available to Borrower a loan facility equal to the Facility amount … in order to make feasible Sub-Lending by Borrower …[6]

14.   The interest to be paid by Yukos Capital to Brittany was '8,9375% per annum payable quarterly and on the Final Repayment date.'[7]

15.   **The interest to be paid by Yukos Oil to Yukos Capital** under what would become the December 2003 Loan was also predetermined in the Brittany Loan Agreement, and was set at 9%.[8] In other words, the money was going to flow from the Lender (Brittany) to the Borrower (Yukos Capital) and then from Yukos Capital (now the Sub-Lender) to Yukos Oil (now the Sub-Borrower).

---

[5] Brittany Loan Agreement, preamble. *See also* id., clause 1: 'Facility amount: Means 80'000'000'000-00 (Eighty billion) Russian Rubles'.

[6] Brittany Loan Agreement, clauses 1, 2.

[7] Brittany Loan Agreement, clause 1.

[8] *See* Brittany Loan Agreement, preamble; December 2003 Loan Agreement, clause 1.1.

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 343 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 5 of 19

16. **The drawdown dates and the repayment dates of the December 2003 Loan** were also predetermined in the Brittany Loan Agreement:

   <u>Drawdown Date</u>

   Means the day when Borrower transfers funds to Sub-Borrower at the request of the latter under Sub-Lending Agreement.

   …

   <u>Final Repayment date</u>

   2nd January 2009, which date may be either accelerated or postponed by mutual agreement in writing by the Parties hereto. Such Final Repayment date will not be later than one Business Day after the date on which the Sub-Lending is redeemed.[9]

17. This indicates without the slightest possible doubt that the two legal instruments are to be construed as a single legal operation. Indeed, the drawdown date of the Brittany Loan is not the date when the funds are transferred from Brittany to Yukos Capital, as it should be if it were an independent loan, but the date when the funds reach Yukos Oil through the December 2003 Loan. Therefore, the interest to be paid on the Brittany Loan only starts to accrue from the date when the December 2003 Loan is performed, which is another way of saying that the money from Brittany accrued interest only when it reached the final intended recipient, *i.e.*, Yukos Oil.

18. In other words, the two Agreements are highly interlinked, as **all the conditions of the second Agreement were already determined in the first Agreement**. In fact and law, all the parameters of the obligation to dispose of the Brittany Loan to Yukos Capital in order to transfer it to Yukos Oil were pre-determined in the Brittany Loan: the identical amounts to be loaned, the rate of interest, the maturity date of the December 2003 Loan to Yukos Oil (31 December 2008) and the linked maturity date of the Brittany Loan to Yukos Capital (2 January 2009).

19. Therefore, it will be necessary to analyse these global contractual arrangements which predetermine the economics of the loan transactions for the different actors involved, and

---

[9] Brittany Loan Agreement, clause 1.

in particular to examine what economic interest Yukos Capital could draw from the investment operation in order to ascertain what its possible loss could be.

20.   However, before entering into this inquiry, it is appropriate to recall the international rules on compensation in the event of a violation of international law.

**B.   THE UNCONTESTED PRINCIPLES OF INTERNATIONAL LAW**

21.   I hesitate to restate the well-known approach to **the standard of reparation** in case of damage caused by a violation of international law, which has been elaborated in the most quoted *Chorzów Factory* case, as reproduced in the Award in [760]:

> The essential principle contained in the actual notion of an illegal act ... is that reparation must, as far as possible, wipe out all the consequences of the illegal act and **re-establish the situation which would, in all probability, have existed** if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.[10]

22.   Of course, this theoretical approach has to be translated into figures; in other words, the damages have to be quantified. This is why the PCIJ had decided to ask experts to value the loss of the Oberschlesische, the company to which the Chorzów Factory belonged:

> [I]n order to obtain further enlightenment in the matter, the Court, before giving any decision as to the compensation to be paid by the Polish Government to the German Government, will arrange for the holding of an expert enquiry ... [11]

23.   Unfortunately, the PCIJ never had to deal with the results of the expert enquiry, as the parties entered into a settlement and the case did not go to the quantum phase.

24.   As will be elaborated upon later, I consider that the majority has not properly applied these principles and has not granted compensation that could, as far as possible, 'wipe out

---

[10] *Case Concerning the Factory at Chorzów (Germany v Poland)* [1928] PCIJ Series A, No. 17, Judgement No. 13 (13 September 1928), p. 47 **(CL-86)**.

[11] *Case Concerning the Factory at Chorzów (Germany v Poland)* [1928] PCIJ Series A, No. 17, Judgement No. 13 (13 September 1928), p. 51 **(CL-86)**.

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 345 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 7 of 19

all the consequences of the illegal act and **re-establish the situation which would, in all probability, have existed**' if the illegal act had not been performed.

25.  In order to ascertain the reparation that can 're-establish the situation which would, in all probability, have existed' if the illegal act had not been performed, it is necessary to develop but-for scenarios, which is now common practice in investment arbitrations.

26.  The questions therefore are: first, what would have been the economic situation of Yukos Capital, without the breach that the Tribunal did find (the but-for scenario), and second, what is the economic situation of Yukos Capital, with the breach that the Tribunal did find (the actual scenario). If there is a difference, this will be the damage supported by Yukos Capital, all other circumstances being equal.

## III.   THE BUT-FOR SCENARIO: WHAT WAS GOING TO BE THE PROFIT OF YUKOS CAPITAL?

27.  In order to fully understand what Yukos Capital might have **lost**, it is necessary to understand what it would have **gained**, in a situation in which there was no illegal act performed by the Respondent.

### A.   THE POSITIONS OF THE PARTIES

28.  The Claimant has argued that the Tribunal should apply a but-for approach when dealing with the compensation to be granted to Yukos Capital. Its position is summarised in the Award, in [745], in the following way:

> **The Claimant advocates for a 'but-for' approach to** reparation. While acknowledging that Article 13 of the ECT provides for a specific rule of compensation for expropriation, the Claimant contends that such rule does not cover reparation in case of a breach of Article 13, in which event it submits that **customary international law requires that the Claimant be placed in the same position it would have been in had the wrongful acts not occurred.** (Emphasis added)

29.  While the Respondent preferred to base its analysis of compensation on the FMV, it clearly acknowledged that, if the Tribunal were to apply a but-for analysis, the only entitlement of the Claimant would be the interest spread:

Yukos Capital's claim for damages is simply not met out on the "but for" or "Counter Factual", i.e., the situation that in all probability would have existed absent Respondent's alleged breach of the ECT. **Yukos Capital would never have been entitled to the value of the Loans in their entirety,** but merely the interest rate "spread" between … the December 2003 Loan and the Brittany Loan … [12]

… Even Claimant's preferred Chorzów Factory standard is of little avail to it because the but-for scenario only affords Claimant the spread between … the December 2003 Loan and the Brittany Loan … [13]

30. I will now analyse what would have been the situation without any breach by the Respondent State.

## B.   THE REPAYMENT OF THE LOAN BY YUKOS OIL TO YUKOS CAPITAL

31. Here, two different scenarios were considered in the contractual scheme.

### 1.   Main scenario: Yukos Oil pays the interest and repays the capital of the Loan from Yukos Capital

32. As soon as Yukos Capital received the capital back from Yukos Oil, it undertook to immediately transmit it back to Brittany:

### 3. Repayment

Borrower shall repay the amount outstanding **within one Business Day** upon redemption of any part of Sub-Lending. [14]

33. **This is the scenario that would, in all probability, have occurred** in the normal course of events, without a breach by the Respondent.

---

[12] Counter-Memorial, [425], emphasis added.

[13] Rejoinder, [505].

[14] Brittany Loan Agreement, clause 3, emphasis added.

2.  **Alternative scenario: Yukos Oil does not pay the interest nor repay the capital of the Loan from Yukos Capital**

34.  The Agreements however also envisioned a less probable, but possible scenario. The situation in which Yukos Oil would not fulfil its obligation to repay the December 2003 Loan was also foreseen in the Brittany Loan Agreement:

> **5. Hedge**
>
> Notwithstanding the foregoing and for the avoidance of doubt Lender shall bear **all risks** associated with Sub-Lending, **including, but not limited to the following**:
>
> (a)  **Failure to pay,** which means the failure by Sub-Borrower to make, when and where due, any payments under Sub-Lending Agreement;
>
> (b)  **Sovereign risk,** …
>
>       …
>
> (c)  **Foreign exchange risk,** …
>
> (d)  **Tax risk,** …[15]

35.  This indicates that **all risks, even if not mentioned in clause 5, were assumed by** Brittany.

36.  As a consequence, if Yukos Oil did not reimburse the December 2003 Loan, it committed a failure to pay, and the risk was not assumed by Yukos Capital, but by Brittany. This means that, if the obligation of Yukos Oil to reimburse its debt to Yukos Capital was not respected, the concomitant obligation of Yukos Capital to reimburse its debt to Brittany was automatically cancelled.

37.  In other words, the obligation of Yukos Capital to transfer the money back to Brittany was without a sanction in circumstances where the obligation was not fulfilled due to the non-fulfilment of its own obligation by Yukos Oil. This was indeed acknowledged in the Interim Award:

---

[15] Brittany Loan Agreement, clause 5, emphasis added.

Case 1:22-cv-00798  Document 1-2  Filed 03/23/22  Page 348 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 10 of 19

> Undoubtedly, Yukos Capital's obligation to repay Brittany only arose if and to the extent that Yukos Oil repaid its debt to Yukos Capital. As between Brittany and Yukos Capital, **it is Brittany that bears the risk of default** associated with Yukos Capital's loan to Yukos Oil, in terms of Yukos Oil's failure to pay … [16]

38. The same understanding was reiterated by the President during the Hearing:

> CHAIRMAN McLACHLAN: … my understanding … is that the effect of these Agreements was that Yukos Capital was under no obligation to make a repayment to Hedgerow and Brittany unless and until a repayment was made by Yukos Oil to Yukos Capital, and that's reflected in Clauses 3 and 5 of the Agreement. Is that your commercial understanding of the structure here?
>
> MR. GODFREY: Broadly speaking, yes. [17]

C.  HOW WAS THIS GOING TO WORK CONCRETELY?

39. In practical terms, what would have happened if the Agreements would have been performed in the absence of a violation?

40. First step: Yukos Capital receives the money from Brittany under the Brittany Loan Agreement. The interest rate for this Loan was 8,9375%. The second step was already foreseen in this Agreement, including the interest rate at which Yukos Capital was going to loan the money to Yukos Oil, which was 9%.

41. Second step: Yukos Capital has the obligation to transmit the money received from Brittany to Yukos Oil.

42. Third step **in the most probable main scenario**: If Yukos Oil repays 9% interest to Yukos Capital, the latter has to pay 8,9375% interest to Brittany, this operation being made quarterly. In that case, Yukos Capital has earned the difference between the interest rate in the December 2003 Loan Agreement and in the Brittany Loan Agreement: 9% - 8,9375% = 0.0625%, called the 'spread'. If Yukos Oil was going to reimburse its December 2003 Loan to Yukos Capital, the latter had to transmit the equivalent amount of money within one business day to Brittany, which means that in the but-for scenario Yukos Capital was not entitled to keep the property of the money lent.

---

[16] Interim Award, [504], emphasis added, internal references omitted.

[17] T2/370/25-371/10 (Godfrey).

43. Third step in **a possible alternative scenario**: If Yukos Oil, for one reason or another, does not pay the interest to Yukos Capital, the latter is not obliged to pay the interest to Brittany, but has lost what it was entitled to receive as a profit resulting from its role in the overall economic operation, *i.e.*, the spread. If Yukos Oil, for one reason or another, does not repay the amount of the December 2003 Loan to Yukos Capital, the latter is not obliged to repay the amount of the Brittany Loan to Brittany, which means that in this situation, Yukos Capital does not lose anything.

44. From the above, it is crystal clear that, in the but-for scenario, Yukos Capital was never going to be able to obtain and retain the amount of the Loan for itself, as this situation was not envisioned in the contractual scheme.

45. **In conclusion, it is quite clear that, in the main and most likely but-for scenario, what Yukos Capital would have received is the spread, all the spread, but only the spread.**

## IV.  THE ACTUAL SCENARIO: WHAT IS THE LOSS OF YUKOS CAPITAL?

46. What did Yukos Capital lose because of the partial implementation of the global contractual scheme, due to Russia's actions?

### A.  THE LOSS AS PRESENTED BY THE CLAIMANT

47. The Award summarises the loss as presented by the Claimant, in [709], in the following way:

> With reference to the non-recourse or hedging arrangements in the Brittany and Hedgerow Loans, the Claimant argues that those arrangements 'restrict the manner in which the liability to those lenders is to be discharged', but do not extinguish Yukos Capital's liability. The Claimant applies the same analysis to the Respondent's arguments regarding 'interest spread', submitting that Yukos Capital's funding arrangements can have no impact on its right to recover the value of the Loans.

### B.  THE LOSS AS PRESENTED BY THE RESPONDENT

48. The Award summarises the loss as presented by the Respondent, in [715], in the following way:

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 350 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 12 of 19

Following its argument relating to the back-to-back nature of the Loans, the Respondent submits that the maximum extent of Yukos Capital's loss must be limited to the 'interest spread' between the December 2003 Loan and the Brittany Loan. It argues that such damages have been claimed and awarded in cases involving non-recourse project financing, based on the net cashflows of the project after non-recourse project financing obligations have been discharged. The Respondent calculates the interest spread to be 0.0625%, submitting that the Brittany Loan required Yukos Capital to pay Brittany the principal under the December 2003 Loan as well as 99.9375% of the interest. It contends that 0.0625% of the interest under the December 2003 Loan is equivalent to USD 9.4 million.

## C. THE LOSS OF YUKOS CAPITAL IN THE ACTUAL SCENARIO, AS I ANALYSE IT

49. Since the only thing that Yukos Capital would have gained – if the global contractual scheme had been implemented according to its requirements and without any act of Respondent in violation of international law – is the spread, this is potentially also what it was susceptible to lose.

50. In the actual scenario, the contractual scheme was implemented normally, without any interference until 29 June 2004, which was the date of the last interest payment by Yukos Oil to Yukos Capital.

51. Therefore, the spread was lost starting with the payment of interest which was due quarterly between 29 June 2004 (the first missing spread being the one resulting from the absence of the quarterly payment on 30 September 2004) and 2 January 2009 (the Final Repayment Date of the Brittany Loan). In accordance with the conclusion as to causation and contribution in the Award at [685], the amount of interest (and therefore of the spread) is to be calculated on 100% of the sums drawn down before 26 May 2004, and 50% of the sums drawn down after that date (namely the sums drawn down on 16 June 2004, 22 June 2004 and 28 June 2004).

52. **Yukos Capital has therefore lost the difference between the interest rates on the sums which have not been paid**, *i.e.*, it has lost part of the spread.

53. The next question is whether in the actual scenario, Yukos Capital has also lost the amount of the December 2003 Loan itself, as concluded by the majority. In the actual scenario, as indeed in the but-for scenario, the role of Yukos Capital was to transmit the reimbursement by Yukos Oil of the December 2003 Loan to Brittany. The fact that Yukos

Capital did not receive the reimbursement means only that it had nothing to transmit – and thus lost the spread which was the price for the service rendered – but it lost nothing else, and particularly not the amount of the December 2003 Loan, which it was not entitled to keep.

54.   In conclusion, if no other events had occurred in the actual scenario, the Tribunal should have granted Yukos Capital part of the lost spread after 29 June 2004, and nothing more.

55.   My analysis is confirmed by the relevant observation that Yukos Capital has, before this arbitration, consistently acknowledged that it has suffered no loss. This is evidenced by reference to two documents mentioned on Slide 115 of the Respondent's Opening Argument:

(i)     The first document is Yukos Capital's financial statements for the period ending on 31 December 2004:

> **Contingent Waiver of loans payable, interest payable and interest expenses. The loans payable have a limited recourse and any losses on the loans receivable are born by the lenders.**[18]

(ii)    The second document is an email from Fred van Rouwendal to John Douglass and others:

> The loans you are referring to are back to back loans. From the relevant loan agreements granted to YC Sarl, it becomes clear that the loans payable have limited recourse on the related loans receivable. **Any losses on the loans receivable would not result in a loss for the company.**[19]

56.   The same position was expressed even during the arbitration. Indeed, on 5 February 2019, Gibson Dunn, counsel for the Claimant, wrote to the Tribunal that **it no longer had any claim under the Brittany or Hedgerow Loans:**

> Further to Claimant's submission dated 1 February 2019, please be advised following the judgment of the Dutch Supreme Court rendered on 18 January 2019 in

---

[18] Yukos Capital Financial Statements for the year ended 31 December 2004 (**PH-44**), *quoted in* Respondent's Opening Slides. 115, emphasis added by Respondent.

[19] Email from Fred van Rouwendal to John Douglass and others (26 April 2005) (**R-621**), *quoted in* Respondent's Opening Slides. 115, emphasis added by Respondent.

> *Promnefstroy et al. v Godfrey et al.,* (in which the Dutch Supreme Court confirmed
> that the sham Yukos Oil bankruptcy could not be recognized as contrary to Dutch
> public policy), Yukos Capital Ltd has redeemed the Brittany and Hedgerow Loans
> from Yukos Hydrocarbons International Ltd. Thereby, Brittany and Hedgerow
> Loans were terminated and **Claimant is released and discharged from all
> obligations, claims, and demands under these loans.**[20]

57. This is stated by the Claimant, not the Respondent.

58. All these elements of the record tend to the conclusion, also reached by the experts of the
Respondent, that the loss of Yukos Capital, due to the non-reimbursement by Yukos Oil
of some of the interest and of the capital due under the December 2003 Loan, is equal to
zero.

59. This is corroborated also in Respondent's Rejoinder on the Merits, [514][21], in which the
Respondent emphasises the fact that the Claimant itself does not have a clear view of its
loss and attributes a zero value to the December 2003 Loan in its financial statements of
2005, 2006 and 2007:

> The Loans lack of economic substance and therefore value is reflected by the fact
> that Claimant has been incapable of advancing a consistent basis to estimate either
> the value of the Loans or, in turn, the value of its loss. Claimant has variously valued
> the Loans or its loss between $0 and $13.07 billion:
>
> (a)   $0, as the value attributed to the Loans in Claimant's financial statements
>       including for 2005, 2006 and 2007;
>
> (b)   $4.3 billion and $4.8 billion (in April 2006 and October 2006 respectively), in
>       the bankruptcy proceedings of Yukos Oil;
>
> (c)   $13.07 billion (to 31 January 2013) in Claimant's Notice of Arbitration;
>
> (d)   $5.957 billion (to 27 October 2017) in Claimant's Memorial on the Merits;
>
> (e)   $11.214 billion (as at 31 December 2017) based on the Loans *"aggregated
>       gross value"*, while simultaneously valuing them with a book value of $1; and

---

[20] Letter from the Claimant to the Tribunal, 5 February 2019 (**SFC-49**), emphasis added.

[21] Internal references omitted.

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 353 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 15 of 19

(f)    $625 million, as the value that Claimant ascribed to the Hedgerow and Brittany Loans when it discharged these in January 2019. (Which are the near mirror images of the December 2003 and August 2004 Loans).

60.    In sum, I consider that the most convincing conclusion is that the Claimant's loss is close to zero, in view of all the circumstances of the case, but that in any case, **Yukos Capital's loss cannot be more than a part of the lost spread**. I consider therefore that the conclusion reached by the majority is utterly wrong.

## V.    THE MAIN FLAWS IN THE MAJORITY'S APPROACH

61.    In my view, the majority has disregarded both the factual situation and the applicable legal principles.

### A.    THE MAJORITY HAS DISREGARDED THE FACTS IN RESPECT OF YUKOS' GLOBAL ECONOMIC OPERATION

62.    I think that the main flaw in the majority's approach comes from its continued analysis of the back-to-back loans as if they were separate instruments, instead of taking into consideration their evident linkage. The majority looks at only half of the picture, and turns a blind eye to the other half.

63.    It is because the majority refused to analyse the two contracts as **a single legal operation** that they concluded that Yukos Capital has made an investment in Yukos Oil. Admitting this, for the sake of reasoning, I consider that it is for the same reason – because the majority refused to analyse the two contracts as **a single economic operation** – that the majority concludes that Yukos Capital is entitled to receive the capital which it lent to Yukos Oil, even though: (i) if it received the capital back from Yukos Oil, it was not entitled to benefit from it for more than one day; and (ii) if it did not receive the capital back from Yukos Oil, it was under no obligation to transmit the capital back to Brittany.

64.    I need to answer here what looks like a common-sense remark by the majority, but is in fact a complete fallacy in view of the situation of Yukos Capital. In order to justify that the loss of Yukos Capital was not only its profit (the spread), the majority writes the following in [737]:

> The valuation of *property*, which is the thing that is to be valued in determining loss for the purpose of a claim of expropriation, is not limited to any profit that may be expected to be earned on that property. The value of income flows may (depending upon the valuation methodology adopted) be an input to the capital value of the property, but it is not *the* value. To take a simple example, the value of a house is determined by its market valuation as a capital investment. If the house were in use for a commercial purpose, the income derived from that activity may be relevant to the value of the undertaking as a whole. It would not make the capital value of the house legally irrelevant. In the event that the house were expropriated, the victim's loss for which the respondent would be liable would include its loss of capital represented by the value of the house itself.

65. What is missing here is that Yukos Capital had no right to keep the 'house' after the maturity date of 2 January 2009.

66. Because the majority persists in analysing the two Agreements as if they were independent of one another, it adopts some conclusions which I find fundamentally wrong. This results in clearly inaccurate statements. For example, in [734], the majority writes:

> Conversely, Brittany's Loan Agreement is only with Yukos Capital and not with Yukos Oil.

67. Although this is formally correct if one looks only at the signatories of this Agreement, I consider this statement substantially incorrect since the Brittany Loan Agreement contains numerous references to Yukos Oil on its face. To be more precise, the Brittany Loan Agreement includes within its four pages one reference to OAO "NK "YUKOS" [this being Yukos Oil], as well as four references to the term 'Sub-Borrower', which is defined as Yukos Oil. Furthermore, as was developed in the analysis of the factual situation earlier in this Opinion, the terms and conditions of the Loan facility from Yukos Capital to Yukos Oil are fully defined in the Brittany Loan Agreement, where it appears under the term 'Sub-Lending', used 16 times. **This means that there are 21 direct or indirect mentions of the Loan from Yukos Capital to Yukos Oil in the Brittany Loan Agreement, which, in my view, mandates reading the two Agreements together.** Thus, in fact (as well as in law), the December 2003 Loan from Yukos Capital to Yukos Oil is actually governed by the Brittany Loan Agreement.

68. As will be seen later, this factual error has overwhelming consequences, as it is the first pebble that paved the way to a flawed interpretation of the applicable law, by carving out

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 355 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 17 of 19

a right governed by two concomitant and entangled Agreements and treating it in an independent manner so as to assign to it a value incommensurate with its expected earnings.

69.   As another example of an inaccurate statement, the majority considers that the Claimant is entitled to pre-award interest on the sums granted, to take into account the profit it could have made in using this money on the market, and grants therefore to Yukos Capital a commercial rate of interest.

70.   Such a decision brings into the light the flawed approach of the majority, as it grants to Yukos Capital interest on a sum that it was only entitled to keep for one day (and that in any case it would no longer possess from 2 January 2009), for a period stretching over more than 12 years. This is an easy way to make unjustified profit and benefit from an unjust enrichment.

## B.   THE MAJORITY DISREGARDED THE UNCONTESTED PRINCIPLES OF INTERNATIONAL LAW

71.   I consider that the majority, while purporting to apply the *Chorzów Factory* principles, manifestly applies its own interpretation of these principles. More precisely, the majority deliberately ignores the situation that would have existed in all probability without the breach even though it refers to *Chorzów*, which clearly indicates that the reparation has to reinstate the situation that would have existed without the breach. Once again, I quote the basic principle stated by *Chorzów*, already quoted above:

> The essential principle contained in the actual notion of an illegal act … is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed.

72.   It should be noted that this sets out a very general principle, which has to be given higher standing than the consequences it may have in terms of accounting practice, these being dependent on the particular circumstances of a case.

73.   In the present case, by considering the December 2003 Loan from Yukos Capital to Yukos Oil as an asset of its own, and not as a part of a set of two entangled Agreements, **the majority creates a situation that could never have happened**, not even with the

Case 1:22-cv-00798   Document 1-2   Filed 03/23/22   Page 356 of 598

PCA Case No. 2013-31
Yukos Capital v Russia
Award – Dissenting Opinion of Prof. Brigitte Stern
Page 18 of 19

slightest probability, in the normal course of events. Indeed, the Brittany Loan Agreement provides that:

> Borrower shall repay the amount outstanding within one Business Day upon redemption of any part of Sub-Lending.[22]

74.   Thus, the majority's approach amounts to a pure fiction, in which Yukos Capital is awarded the amount of the December 2003 Loan to Yukos Oil, while its obligation to repay its own debt is extinguished, or at least remains unsettled. This is inconsistent with the obligations of Yukos Capital, and is exactly where the issue of unjust enrichment arises.

75.   As was explained above in my analysis of the but-for scenario, the overall value of Yukos Capital cannot exceed the potential gain that this company could expect from its business, *i.e.*, the spread, possibly updated by some discounting formula following modern valuation theory. In other words, if Yukos Capital had been on sale, a willing buyer would have offered a sum of an order of magnitude close to the value of the spread.

76.   To support what I view as a fiction, the majority, unable to root its decision in general principles of international law, relies extensively on accounting practice rather than law, using valuation rules and discussing whether the FMV and the full compensation principle of *Chorzów* are equivalent. It gives a positive answer to this question, finally concluding in [786]:

> In light of all the evidence, the Tribunal therefore holds that the FMV of the December 2003 Loan for purposes of compensating the Claimant for the loss of its property is equivalent to the amount of principal actually advanced, together with the interest thereon, that was contractually due and remains unpaid.

77.   The actual issue – blurred in the reasoning of the majority – is not whether an accounting technique such as FMV correctly translates the legal principles of *Chorzów*, but whether *Chorzów* can dictate, in the circumstances of the present case, an amount of compensation that is several orders of magnitude higher than the actual value of Yukos Capital, based on its potential earnings. As explained in this Opinion, the answer is no.

---

[22] Brittany Loan Agreement, clause 3.

\*        \*        \*

78.    **In conclusion**, I continue to consider that Yukos Capital was not an investor whose investment was the Loans, as developed in my Dissenting Opinion annexed to the Interim Decision on Jurisdiction. However, even assuming the majority were right and accepting, for the sake of legal discussion, that Yukos Capital was an investor engaged in an investment activity, I consider that, at the stage of quantum, the majority has completely disregarded the reality and the true nature of Yukos Capital, whose role as an investor was to render a financial service, *i.e.*, to pass through sums of money from one company of the Yukos Group to another, for a profit consisting only of the spread. Moreover, as explained above, it has not applied the proper law to these distorted facts, engaging in accounting exercises of valuation foreign to the relevant international law principles. With the Award rendered by the majority, Yukos Capital will now receive the amount of a loan which it was never entitled to keep, and be able to reap interest at a commercial rate for 12 years, meaning, as mentioned at the outset of this Opinion, that Yukos Capital will benefit from an unjust enrichment.

Geneva, Switzerland

Date: **23 July 2021**

_Brigitte Stern._

Professor Brigitte Stern

PCA Case N° 2013-31

IN THE MATTER OF
AN ARBITRATION PURSUANT TO
ARTICLE 26 OF THE ENERGY CHARTER TREATY

BEFORE
A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH
THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON
INTERNATIONAL TRADE LAW OF 1976

–between–

## YUKOS CAPITAL S.À R.L. (LUXEMBOURG)

(the "Claimant")

–and–

## THE RUSSIAN FEDERATION

(the "Respondent" and, together with the Claimant, the "Parties")

---

## INTERIM AWARD ON JURISDICTION

---

### Arbitral Tribunal

Professor Campbell McLachlan QC (Chairman)
Mr J. William Rowley QC
Professor Brigitte Stern

Jack L. W. Wass, Assistant to the Tribunal

| Claimant's Counsel | Respondent's Counsel |
|---|---|
| Mr Cyrus Benson | Mr David G. Sabel |
| Ms Ceyda Knoebel | Ms Claudia Annacker |
| Ms Gail Elman | Mr Cameron Murphy |
| Ms Penny Madden QC | Ms Laurie Achtouk-Spivak |
| Mr Piers Plumptre | *Cleary Gottlieb Steen & Hamilton LLP* |
| Ms Sophie Cuss | |
| *Gibson, Dunn & Crutcher LLP* | |

TABLE OF CONTENTS

LIST OF DEFINED TERMS .......................................................................................... v

I.    INTRODUCTION ................................................................................................ 1

      A.    The Parties .................................................................................................. 1

      B.    Background to the dispute ........................................................................... 1

II.   PROCEDURAL HISTORY .................................................................................. 2

III.  THE FACTUAL BACKGROUND ...................................................................... 9

      A.    The Energy Charter Treaty .......................................................................... 9

      B.    Yukos Capital's Loans .............................................................................. 10

IV.   LEGAL PROVISIONS RELEVANT TO THE DISPUTE ................................. 11

V.    OUTLINE OF THE PARTIES' SUBMISSIONS .............................................. 14

      A.    The Respondent's submission ................................................................... 14

      B.    The Claimant's submission ....................................................................... 15

VI.   RELIEF REQUESTED ...................................................................................... 16

VII.  THE OBJECTIONS TO JURISDICTION ......................................................... 17

      A.    Does the provisional application of the ECT in the Russian Federation,
            pursuant to Article 45 of the ECT, provide a basis for the Tribunal's
            jurisdiction? ............................................................................................... 17

            1.    The correct interpretation of Article 45(1) ......................................... 18
                  (a)   The Respondent's position ........................................................ 18
                  (b)   The Claimant's position ............................................................ 28

            2.    Is Article 26 or its provisional application inconsistent with Russia's
                  constitution, laws or regulations? ....................................................... 40
                  (a)   The Respondent's position ........................................................ 40
                  (b)   The Claimant's position ............................................................ 56

            3.    The Tribunal's analysis ....................................................................... 67
                  (a)   Introduction .............................................................................. 67
                  (b)   The regime of provisional application under the ECT ............... 69
                  (c)   Provisional application in international law ................................ 79
                  (d)   Other guides to interpretation of Article 45 .............................. 84
                  (e)   Russian practice as a signatory to the ECT ............................... 86
                  (f)   "Not inconsistent with" Russian constitution, laws or
                        regulations ................................................................................ 89

      B.    Did the Claimant make a protected investment under the ECT? ............... 105

1.    Introduction and factual background................................................105

    (a)   The Respondent's objection .................................................105
    (b)   The relevant provisions of the ECT.....................................106
    (c)   Summary of the Parties' characterisation of the Loans...........107
    (d)   The Tribunal's approach to the evidence .................................109
    (e)   The factual background .........................................................111

2. The Parties' submissions ..............................................................120

    (a)   The Respondent's submissions............................................120
        (i)    Do the Loans constitute "other debt of a company,"
             "claims to money" or "Returns"?..................................120
        (ii)   Do the Loans bear the characteristics of an Investment in
             terms of Article 1(6)?.................................................122
        (iii)  Are the Loans associated with an Economic Activity in
             the Energy Sector? .....................................................130
    (b)   The Claimant's submissions...............................................132
        (i)    Do the Loans constitute "other debt of a company,"
             "claims to money" or "Returns"?..................................132
        (ii)   Do the Loans bear the characteristics of an Investment in
             terms of Article 1(6)?.................................................139
        (iii)  Are the Loans associated with an Economic Activity in
             the Energy Sector? .....................................................144

3.    The Tribunal's analysis ...............................................................146

    (a)   The material issues .............................................................146
    (b)   A loan associated with an Economic Activity in the Energy
        Sector.................................................................................150
    (c)   The materialization of an "Investment" ...............................155
    (d)   Contribution.......................................................................157
    (e)   Risk...................................................................................166

C.  Does the "denial-of-benefits" provision (article 17) of the ECT bar the

claims?..........................................................................................................176

1.    The Parties' submissions .............................................................177

    (a)   Can Article 17(1) give rise to a jurisdictional challenge? .......177
        (i)    The Respondent's position ...........................................177
        (ii)   The Claimant's position ...............................................177
    (b)   Was the Respondent entitled to invoke Article 17(1) after the
        commencement of the arbitration?.........................................178
        (i)    The Respondent's position ...........................................178
        (ii)   The Claimant's position ...............................................179
    (c)   Is the Claimant owned or controlled by nationals of a third
        state?..................................................................................180
        (i)    The Respondent's position ...........................................180
        (ii)   The Claimant's position ...............................................181
    (d)   Has the Respondent established that the Claimant had "no
        substantial business activities" in Luxembourg? .....................183
        (i)    The Respondent's position ...........................................183
        (ii)   The Claimant's position ...............................................185

    2.    The Tribunal's analysis ..................................................... 187

        (a)   The issue............................................................... 187
        (b)   Control by nationals of a third state ........................ 190

VIII. DECISION ....................................................................... 193

## LIST OF DEFINED TERMS

| | |
|---|---|
| **1991 FI Law** | *Law on Foreign Investments in the RSFSR,* 1991 |
| **1994 Joint EC Statement** | Joint statement on Article 45 of the European Energy Charter Treaty, made by the Council, Commission, and Member States of the European Community, 14 December 1994 |
| **1999 FI Law** | *Law on Foreign Investments in the Russian Federation,* 1999 |
| ***Achmea*** | *Achmea v. Slovak Republic,* PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension (26 October 2010) |
| *Alpha* | *Alpha Projektholding GmbH v. Ukraine* ICSID Case No. ARB/07/16, Award (8 November 2010) |
| ***Alps Finance*** | *Alps Finance and Trade AG v. Slovak Republic* (UNCITRAL Award) (5 March 2011) |
| ***Amto*** | *Limited Liability Company Amto v. Ukraine,* SCC Case No. 080/2005, Final Award (26 March 2008) |
| **August 2004 Loan** | The August 2004 loan, made to Yukos Oil by Yukos Capital, in the principal amount of USD 355 million |
| **Brittany** | Brittany Assets Ltd. |
| **Brittany Loan Agreement** | Agreement establishing a loan between Brittany (lender) and Yukos Capital (borrower) dated 20 November 2003 |
| ***Caratube*** | *Caratube International Oil Company LLP v. Republic of Kazakhstan,* ICSID Case No. ARB/08/12, Award (5 June 2012) |
| **Claimant / Yukos Capital** | Yukos Capital S.à r.l., the Claimant |
| **Constitution** | *Constitution of the Russian Federation,* 1993 |
| **Constitutional Court** | The Constitutional Court of the Russian Federation |

v

| | |
|---|---|
| **Counter-Memorial** | Claimant's Counter-Memorial on Jurisdiction dated 3 November 2014 |
| **December 2003 Loan** | The December 2003 loan, made to Yukos Oil by Yukos Capital, in the principal amount of RUB 79.3 billion |
| **Domestic Law Inconsistency Clause** | Article 45(1) of the Energy Charter Treaty: "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" |
| **ECT / Treaty** | Energy Charter Treaty, 1994 |
| *Electrabel* | *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) |
| *Emmis* | *Emmis International Holding BV v. Hungary* ICSID Case No. ARB/12/2, Award (16 April 2014) |
| **FLIT** | *Federal Law on International Treaties of the Russian Federation*, 1995 |
| **GATT** | 1994 General Agreement on Tariffs and Trade |
| **Gazprom** | O.J.S.C. Gazprom |
| **Gazprom ECP** | Gazprom ECP S.A. |
| **Hedgerow** | Hedgerow Ltd |
| **Hedgerow Loan Agreement** | Agreement establishing a loan between Hedgerow (lender) and Yukos Capital (borrower) dated 18 August 2004 |
| *Hulley Enterprises* | *Hulley Enterprises Limited v. Russian Federation*, PCA No. AA226, Interim Award on Jurisdiction and Admissibility (30 November 2009) |
| *Kardassopoulos* | *Ioannis Kardassopoulos v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction (6 July 2007) |
| *KT Asia* | *KT Asia Investment Group B.V. v. Kazakhstan*, ICSID Case No. ARB/09/8, Award (17 October 2013) |

| | |
|---|---|
| **Loans** | The December 2003 Loan and the August 2004 Loan |
| **Memorial** | Respondent's Memorial on Jurisdiction dated 28 July 2014 |
| **Notice of Arbitration** | Notice of Arbitration dated 15 February 2013 |
| ***Oil Platforms*** | *Oil Platforms (Islamic Republic of Iran v. United States of America) (Preliminary Objection)* [1996] ICJ Rep 803 |
| **Parties** | The Claimant and the Respondent |
| **PCA** | Permanent Court of Arbitration |
| ***Phoenix Action*** | *Phoenix Action Ltd v Czech Republic* ICSID Case No ARB/06/5, Award (15 April 2009) |
| ***Plama*** | *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction (8 February 2005) |
| **PO No. 1** | Procedural Order No. 1 dated 24 April 2014 |
| **PO No. 2** | Procedural Order No. 2 dated 20 January 2015 |
| **Rejoinder** | Claimant's Rejoinder on Jurisdiction dated 15 June 2015 |
| **Reply** | Respondent's Reply on Jurisdiction dated 2 March 2015 |
| **Resolution No. 8-P** | Resolution No. 8-P of the Constitutional Court of the Russian Federation dated 27 March 2012 |
| **Respondent / Russia / Russian Federation** | Government of the Russian Federation, the Respondent |
| ***Romak*** | *Romak S.A. (Switzerland) v. Uzbekistan*, PCA Case No. AA280, UNCITRAL, Award (26 November 2009) |
| **Rospan** | Rospan Overseas Ltd |
| **Russia / Russian Federation / Respondent** | Government of the Russian Federation, the Respondent |
| **Sibneft** | Sibneft, a joint stock company incorporated in the Russian Federation in 1995 |

| | |
|---|---|
| *Standard Chartered Bank* | *Standard Chartered Bank v. Tanzania*, ICSID Case No. ARB/10/12, Award (2 November 2012), para. 200 |
| *Stati* | *Stati v. The Republic of Kazakhstan*, SCC Case No. 116/2010, Award (19 December 2013) |
| **Stichting** | Stichting Administratiekantoor Yukos International, a foundation incorporated in the Netherlands in 2005 |
| **Terms of Appointment** | Terms of Appointment between the Parties appointing the Tribunal dated 17 February 2014 |
| **The Hague District Court Judgment** | Judgment dated 20 April 2016 of a District Court sitting at The Hague in action nos C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and C/09/481619 / HA ZA 15-112 re: *Hulley Enterprises Ltd/Yukos Universal Ltd (Isle of Man)/Veteran Petroleum Ltd (Cyprus) v. Russian Federation* |
| **TMF (or TMF Luxembourg)** | TMF Corporate Services S.A. and TMF Management Luxembourg S.A., the Claimant's corporate and management service providers in Luxembourg |
| *Toto Costruzioni* | *Toto Costruzioni Generali S.p.A. v. Lebanon*, Decision on Jurisdiction (11 September 2009) |
| **Treaty / ECT** | Energy Charter Treaty, 1994 |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law, 1976 |
| **USSR FLIT** | *Law of the USSR dated 6 July 1978 "On the Procedure for Conclusion, Performance, and Denunciation of International Treaties of the USSR"* |
| **USSR Fundamentals** | *Fundamentals of Legislation on Foreign Investments in the USSR*, 1991 |
| **VCLT** | Vienna Convention on the Law of Treaties, 1969 |
| **Yukos Capital / Claimant** | Yukos Capital S.à r.l., the Claimant |

| | |
|---|---|
| **Yukos Capital Loan Agreement** | Agreement establishing a loan between Yukos Capital (lender) and Yukos Oil (borrower) dated 2 December 2003 |
| **Yukos Oil** | Yukos Oil Company OJSC, a joint stock company incorporated in the Russian Federation in 1993 |
| **Yukos Finance** | Yukos Finance B.V., a private limited liability company incorporated in the Netherlands |
| **Yukos International** | Yukos International UK B.V., a private limited liability company incorporated in the Netherlands |

## I.   INTRODUCTION

### A. THE PARTIES

1.   The Claimant in this arbitration is Yukos Capital S.à r.l. ("**Yukos Capital,**" or the "**Claimant**"), a private company organized and existing under the laws of Luxembourg, incorporated in Luxembourg on 31 January 2003, as a "*société à responsabilité limitée,*" with its registered address at 46A, Avenue J. F. Kennedy, L-1855 Luxembourg P.O. Box 415, L-2014 Luxembourg.  The Claimant is represented in these proceedings by Mr Cyrus Benson, Ms Ceyda Knoebel, Ms Gail Elman, Ms Penny Madden QC, Mr Piers Plumptre, and Ms Sophie Cuss of Gibson, Dunn & Crutcher LLP, Telephone House, 2-4 Temple Avenue, London EC4Y 0HB, United Kingdom.

2.   The Respondent is the Government of the Russian Federation ("**Russia,**" or the "**Russian Federation,**" or the "**Respondent**").  The Respondent is represented by Mr David G. Sabel of Cleary Gottlieb Steen & Hamilton LLP, City Place House, 55 Basinghall Street, London EC2V 5EH, United Kingdom, and Ms Claudia Annacker, Mr Cameron Murphy, and Ms Laurie Achtouk-Spivak of Cleary Gottlieb Steen & Hamilton LLP, 12, rue de Tilsitt, 75008 Paris, France.

### B. BACKGROUND TO THE DISPUTE

3.   A dispute has arisen between Yukos Capital and the Russian Federation in respect of which the Claimant commenced arbitration pursuant to the Energy Charter Treaty (the "**ECT,**" or the "**Treaty**").[1]

4.   The subject matter of this dispute concerns the Claimant's alleged investments by way of loans to its parent company in Russia, Yukos Oil Company OJSC ("**Yukos Oil**"), the Russian Federation's alleged expropriation of the Claimant's purported investment, and the Russian Federation's allegedly unfair and discriminatory treatment of Yukos Capital.

---

[1] The Energy Charter Treaty ("ECT") and Related Documents (September 1994) (**Exhibit C-1**).

## II.    PROCEDURAL HISTORY

5.    By letter dated 23 May 2008, the Claimant "notified the Russian Federation, through the Russian Ministry of Justice, of its claims under the ECT, accepted the Russian Federation's offer to arbitrate and invited the Russian Federation to engage in settlement discussions."[2]

6.    On 22 August 2008, the Ministry of Justice informed the Claimant that receipt of the notice was not within the Ministry's competence.

7.    On 27 August 2008, the Claimant forwarded the notice to the Government of the Russian Federation and to the Administration of the President of the Russian Federation.[3]

8.    By Notice of Arbitration dated 15 February 2013 ("**Notice of Arbitration**"), the Claimant initiated arbitration proceedings against the Russian Federation pursuant to Article 26(4)(b) of the ECT and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law (the "**UNCITRAL Rules**").[4]

9.    By its Notice of Arbitration, the Claimant notified the Respondent of its appointment of Mr J. William Rowley QC as the first arbitrator.  Mr Rowley's address is 20 Essex Street, London WC2R 3AL, United Kingdom.

10.    By letter to the Claimant dated 30 May 2013, the Respondent appointed Professor Brigitte Stern as the second arbitrator.  Professor Stern's address is 7 rue Pierre Nicole, 75005 Paris, France.

11.    On 8 October 2013, the Claimant requested that the Secretary-General of the Permanent Court of Arbitration (the "**PCA**") act as the appointing authority with regard to the appointment of a presiding arbitrator, pursuant to Articles 6 and 7 of the UNCITRAL Rules.  In its submission, the Claimant stated that the Parties were "in agreement as to the

---

[2] Notice of Arbitration (15 February 2013) ("**Notice of Arbitration**"), para. 31.

[3] Notice of Arbitration, para. 31; Letter from Gibson Dunn & Crutcher LLP to the Government of the Russian Federation, including attachments (27 August 2008) (**Exhibit C-103**).

[4] Arbitration Rules of the United Nations Commission on International Trade Law, 1976, GA Res. 31/98. The Notice of Arbitration purported to invoke the revised 2010 UNCITRAL Arbitration Rules, but it was accepted by the Parties and recorded in the Terms of Appointment of the Tribunal that the 1976 rules were applicable: Terms of Appointment (17 February 2014) ("**Terms of Appointment**"), para. 4(a).

employment of the list-procedure referred to in Article 6(3) of the 1976 Rules . . . , but wish for the list to be provided by the Secretary-General to include at least five names."[5]

12. On 9 October 2013, the PCA proposed to the Parties the use of a modified list procedure, allowing each of the Parties to eliminate a maximum of three names from a list of seven and requiring each Party to rank by preference the remaining names. On 15 October 2013, each of the Parties agreed to the PCA's proposal.

13. In a letter of 4 November 2013, the PCA implemented the modified list procedure, sending each Party a list of seven candidates who could be appointed as Presiding Arbitrator, and, in separate letters of 19 November 2013, each Party submitted comments to the PCA regarding the list of candidates.

14. On 22 November 2013, Professor Campbell McLachlan QC was appointed as Presiding Arbitrator by the Secretary-General of the PCA. Professor McLachlan's address is Victoria University of Wellington, School of Law, Old Government Buildings, 55 Lambton Quay, Wellington, New Zealand.

15. By 18 February 2014, both Parties and all Tribunal members had signed the Terms of Appointment, confirming that: (a) the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules; (b) the proceedings shall be governed by the UNCITRAL Rules; (c) the Tribunal shall determine the legal seat of the arbitration in Procedural Order No. 1 after hearing the Parties on the issue; (d) the language of the arbitration shall be English; (e) the International Bureau of the PCA shall act as registry; (f) the issues in dispute shall be decided in accordance with the ECT and applicable rules and principles of international law; and (g) the arbitral proceedings shall be held in private and all documents in these proceedings created for the purpose of the arbitration as well as all other documents or evidence produced by either Party shall be confidential, unless the Parties expressly agree in writing to the contrary.

16. On 31 March 2014, each Party submitted arguments regarding the Tribunal's determination of the seat of the arbitration. The Respondent proposed Vienna, Austria or Frankfurt, Germany, but indicated that it would also support the designation of Geneva,

---

[5] Claimant's Application for the Secretary-General to Act as Appointing Authority (8 October 2013), para. 17.

Switzerland or Paris, France.  The Claimant proposed The Hague, the Netherlands or London, United Kingdom.

17.  On 14 April 2014, the Tribunal convened a preliminary procedural hearing in Vienna, Austria.  At the hearing, the Tribunal heard the Parties regarding the determination of the seat of arbitration and the issue of whether or not to bifurcate proceedings, and the Tribunal and Parties discussed a draft Procedural Order No. 1 and the procedural calendar. The following individuals attended the hearing before the Tribunal:

<table>
<tr><td align="center">Claimant</td><td align="center">Respondent</td></tr>
<tr><td align="center">Mr Cyrus Benson<br>Ms Ceyda Knoebel<br><i>Gibson, Dunn & Crutcher LLP</i></td><td align="center">Mr David Sabel<br>Ms Claudia Annacker<br>Mr Cameron Murphy<br><i>Cleary Gottlieb Steen & Hamilton LLP</i></td></tr>
<tr><td align="center">Mr Daniel Feldman<br><i>Party Representative</i></td><td></td></tr>
</table>

Registry

Mr Hanno Wehland
*PCA*

Court Reporter

Ms Claire Hill

18.  On 24 April 2014, the Tribunal issued Procedural Order No. 1 ("**PO No. 1**"), which determined that the seat of the arbitration shall be Geneva, Switzerland.  In PO No. 1, the Tribunal also decided to bifurcate the proceedings, setting forth a procedural calendar for a preliminary phase during which three of the objections raised by the Respondent to the jurisdiction of the Tribunal would be heard and decided.  Those objections are:

(i)   "[t]he Russian Federation never ratified the ECT and applied the ECT until October 18, 2009 on a provisional basis pursuant to Article 45(1) ECT only 'to the extent that such provisional application is not inconsistent with its constitution, laws or regulations'";[6]

---

[6] Procedural Order No. 1 (24 April 2014) ("**PO No. 1**"), para. 2.1(a) (emphasis omitted).

(ii) "[t]he intra-company loans allegedly made by Claimant to Yukos Oil Company are not 'investments' within the meaning of Article 1(6) ECT";[7] and

(iii) "[s]ince Claimant is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of a third State, Respondent is entitled to deny Claimant the advantages of Part III of the ECT pursuant to Article 17 ECT."[8]

19. Pursuant to PO No. 1, the Parties submitted the following pleadings and evidence:

(a) On 28 July 2014, the Respondent filed a Memorial on Jurisdiction, together with an Expert Report of Professor Anton V. Asoskov ("**Asoskov 1**").

(b) On 3 November 2014, the Claimant filed a Counter-Memorial on Jurisdiction ("**Counter-Memorial**"), together with a Witness Statement of Bruce K. Misamore ("**Misamore 1**") and Expert Reports of Professor Paul B. Stephan ("**Stephan 1**"), Stuart B. Gleichenhaus ("**Gleichenhaus 1**"), and Professor Justice J. H. M. Willems ("**Willems 1**").

(c) On 2 March 2015, the Respondent filed a Reply on Jurisdiction, together with a Second Expert Report of Professor Asoskov ("**Asoskov 2**") and Expert Reports of Professor Thomas Z. Lys ("**Lys**"), Lionel Noguera ("**Noguera**"), and Professor Dr. Riemert Pieter Jan Lucris Tjittes ("**Tjittes**").

(d) On 15 June 2015, the Claimant filed a Rejoinder on Jurisdiction, together with a Second Witness Statement of Mr Misamore ("**Misamore 2**"), further Expert Reports of Professor Stephan ("**Stephan 2**"), Mr Gleichenhaus ("**Gleichenhaus 2**"), and Professor Willems ("**Willems 2**"), and Expert Reports of Professor Stephen E. Shay ("**Shay**") and Andrew Grantham ("**Grantham**").

20. Following the exchange of the first round of pleadings, the Parties made a simultaneous exchange of requests for the production of documents from each other as provided by PO No. 1. Following the exchange of responses and replies, a number of requests remained outstanding, and, on 18 December 2014, each Party submitted a Redfern

---

[7] PO No. 1, para. 2.1(b).

[8] PO No. 1, para. 2.1(c).

Schedule together with introductory comments, requesting that the Tribunal make an order on those requests. On 20 January 2015, the Tribunal set forth its decision on the Parties' requests by issuing Procedural Order No. 2 ("PO No. 2").

21.  Following the issuance of PO No. 2, the Parties exchanged correspondence on their respective compliance with the Tribunal's decisions in that Order. By letter dated 26 March 2015, the Tribunal determined a number of requests made by the Respondent in relation to the Claimant's compliance with the Tribunal's Order. By letter dated 4 May 2015, the Tribunal determined a number of requests made by the Claimant in relation to the Respondent's compliance with the Tribunal's Order.

22.  Following a pre-hearing conference call held by the Chairman with the Parties on 29 July 2015, the Chairman issued a Minute on Arrangements for Hearing on 31 July 2015.

23.  The Hearing on Jurisdiction was held over five days from 31 August to 4 September 2015 at the Peace Palace in The Hague. The following persons attended the Hearing before the Tribunal:

|  Claimant | Respondent |
|---|---|
| Mr Cyrus Benson<br>Ms Penny Madden<br>Ms Ceyda Knoebel<br>Mr Piers Plumptre<br>Ms Sophy Cuss<br>Mr Sergey Okoev<br>*Gibson, Dunn & Crutcher LLP* | Dr Claudia Annacker<br>Mr David G. Sabel<br>Mr Lawrence B. Friedman<br>Mr Matthew D. Slater<br>Mr Larry C. Work-Dembowski<br>Dr Enikö Horvath<br>Ms Laurie Achtouk-Spivak<br>Mr Lorenzo Melchionda<br>Ms Ksenia Khanseidova<br>Ms Aija Lejniece<br>Ms Sarah Schröder<br>Mr Sean McGrew<br>*Cleary Gottlieb Steen & Hamilton LLP* |
| Mr David Godfrey<br>Ms Natalia Kantovich<br>Ms Sophy Bae<br>*Party Representatives* | |
| Mr Bruce K. Misamore<br>*Fact Witness* | Mr Andrey Kondakov<br>*Party Representative* |
| Professor Paul B. Stephan<br>Mr Stuart B. Gleichenhaus<br>Professor Stephen E. Shay<br>Mr Andrew Grantham FCA<br>Professor Justice J.H.M. (Huub) Willems LLM<br>*Expert Witnesses* | Mr Jesse Stevenson<br>*Trial Graphic Consultant* |
| | Professor Anton V. Asoskov<br>Professor Thomas Z. Lys<br>Professor Dr. Riemert P.J.L. Tjittes<br>*Expert Witnesses* |

Tribunal Assistant

Mr Jack Wass

Registry

Dr Hanno Wehland
Mr Robert James
*PCA*

Court Reporter

Mr Trevor McGowan

Interpreters

Ms. Irina van Erkel
Mr Sergei Mikheyev

24.  The Hearing proceeded by way of opening arguments, witness and expert testimony, and closing arguments. All of the witnesses who had submitted written evidence were required for cross-examination, save that the Claimant did not request to cross-examine Mr Noguera.

25.  By agreement of the Parties, neither Professor Tjittes nor Professor Willems was cross-examined but instead were collectively questioned by the Tribunal, following which the Parties were given the opportunity to ask questions arising.[9]

26.  At the conclusion of the Hearing, the Parties confirmed that they had no further procedural matters to draw to the attention of the Tribunal.[10]

27.  In accordance with the Tribunal's directions, the Parties each exchanged submissions on costs on 5 October 2015 and comments on the other Party's costs submissions on 19 October 2015.

28.  On 17 May 2016, the Tribunal wrote to the Parties in the following terms:

> The Tribunal has before it, as legal authorities introduced into the arbitration file in these proceedings, the Interim Awards on Jurisdiction and Admissibility in *Hulley Enterprises Ltd/Yukos Universal Ltd (Isle of Man)/Veteran Petroleum Ltd (Cyprus)*

---

[9] T4/95/25 – T4/104/14.
[10] T5/232/9-15.

*v. Russian Federation* (PCA Case Nos AA 226, 227 & 228, 30 November 2009), exhibited in this arbitration as CL-9, CL-26 & CL-27. Both Parties have pleaded as to the relevance of those Decisions for the issues of jurisdiction presently before this Tribunal.

It has come to the Tribunal's attention from the public record that on 20 April 2016 a District Court sitting at The Hague in action nos C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and C/09/481619 / HA ZA 15-112 rendered judgment in proceedings challenging these Awards (together **"The Hague District Court Judgment"**).

The Tribunal invites the Parties' observations as to (i) the admission of The Hague District Court Judgment into the record in the present proceedings; (ii) whether, if admitted, the Parties would wish to be heard on its relevance (if any) to the proceedings in the present case and (iii) if so, in what form they would wish to be heard. The Parties are requested to file their preliminary observations on these questions by 5pm (CET) on Monday, 30 May 2016.[11]

29.   In response:

(a)  By email of the same date, the Claimant replied, suggesting that "the fact that neither party has sought to introduce [The Hague District Court Judgment] into the record of this proceeding speaks for its relevance." In the event that the judgment were to be introduced into the record on the application of the Respondent, the Claimant submitted that its relevance could be addressed in submissions not exceeding three pages.

(b)  By letter dated 23 May 2016, the Respondent made certain observations on The Hague District Court Judgment and requested that it be admitted into the record and taken into account by the Tribunal in its award. The Respondent expressed the opinion that it was not necessary for the Parties to be further heard on the relevance of the judgment.

---

[11] Letter from the Tribunal to the Parties dated 17 May 2016.

(c) By letter of 24 May 2016, the Claimant advised that it did not object to the Respondent's request for The Hague District Court Judgment to be placed on the record, but offered certain observations on its relevance.

30.   On 26 May 2016, the Tribunal, having received and considered the Parties' submissions in response to this letter, wrote to note that, in view of their agreement, it had decided to admit The Hague District Court Judgment into the record; that the Tribunal had received and would consider the Claimant's submissions of 24 May 2016; and that the Respondent was permitted, if it wished, to submit any response by way of reply by 1 June 2016.  In accordance with that leave, by letter of 31 May 2016 the Respondent provided its response to the Claimant's letter.

## III.  THE FACTUAL BACKGROUND

### A. THE ENERGY CHARTER TREATY

31.   On 17 December 1994, the ECT became open for signature, with the purpose of establishing "a legal framework in order to promote long-term co-operation in the energy field . . . in accordance with the objectives and principles of the Charter."[12]

32.   Having signed the ECT, subject to ratification, on 17 December 1994, the Russian Government presented it for ratification to the State Duma in August 1996.[13]

33.   The State Duma did not ratify the Treaty.[14]  On 20 August 2009, the Russian Federation notified the depository of the ECT that it did not intend to become a contracting party to the Treaty.[15]

---

[12] ECT, Art. 2.

[13] Decree of the Government of the Russian Federation No. 1016 (26 August 1996) (**"Decree of Russia"**) (**Exhibit R-3**).

[14] Electronic Registration Card for Draft Law No. 96043844-2 on Ratification of the Energy Charter Treaty and the Protocol to the Energy Charter on Energy Efficiency and Related Environmental Aspects (**Exhibit R-4**).

[15] Notification by the Russian Federation to the Portuguese Republic pursuant to Article 45(3)(a) ECT (20 August 2009) (**"Notification of Russia to Portugal"**) (**Exhibit R-5**).

## B. YUKOS CAPITAL'S LOANS

34.   Yukos Capital was incorporated in Luxembourg on 31 January 2003. At its formation, Yukos Capital's direct parent was Yukos Finance B.V. ("**Yukos Finance**"), a Dutch company owned by Yukos Oil.[16] In 2005, Yukos Finance transferred ownership of Yukos Capital to its subsidiary, Yukos International UK B.V. ("**Yukos International**"), another Dutch company. Yukos Finance then delivered its shares in Yukos International (in exchange for depository receipts) to a Dutch foundation, Stichting Administratiekantoor Yukos International (the "*Stichting*"). Accordingly, the *Stichting* wholly owns Yukos International and, through it, Yukos Capital.[17] The structure and operation of the *Stichting* is relevant to the Respondent's third objection to jurisdiction, and is discussed in that context below.

35.   The purpose of this restructuring, according to the Claimant, was to protect Yukos Oil's foreign assets from being confiscated by the Russian State. Yukos Oil was dissolved in 2007 at the conclusion of bankruptcy proceedings in Russia.[18]

36.   At the core of the present dispute are two loans that the Claimant extended to Yukos Oil in December 2003 (the "**December 2003 Loan**") and August 2004 (the "**August 2004 Loan**" and, together with the December 2003 Loan, the "**Loans**"). The Claimant alleges that those loans constitute an investment, and that, by various acts attributable to it, the Respondent expropriated that investment.[19]

37.   The Respondent relies, *inter alia*, on Yukos Capital's financial statements and affidavits as well as witness statements of former Yukos Oil and Yukos Capital executives to assert that the Claimant "essentially acted as an 'intermediary'" by receiving the funds for the December 2003 Loan from Yukos Oil subsidiaries solely for the purpose of making loans to other Yukos Oil subsidiaries, and that the Loans were part of a "tax-efficient dividend repatriation strategy."[20] It is on the basis of this characterisation that the Respondent rests

---

[16] Notice of Arbitration, para. 10.
[17] *See* Claimant's Counter-Memorial on Jurisdiction (3 November 2014) ("**Counter-Memorial**"), paras. 178-180.
[18] Notice of Arbitration, para. 10.
[19] Notice of Arbitration, para. 12.
[20] Respondent's Memorial on Jurisdiction (28 July 2014) ("**Memorial**"), paras. 101, 111. *See also* Respondent's Reply on Jurisdiction (2 March 2015) ("**Reply**"), paras. 202-203.

its second objection to jurisdiction: that the Loans do not qualify as Investments in terms of Article 1(6) of the ECT. Further background to the Loans is described below.

## IV.   LEGAL PROVISIONS RELEVANT TO THE DISPUTE

38.   The Tribunal shall apply substantive law in accordance with Article 26(6) of the ECT, including the substantive provisions of the ECT, interpreted under the Vienna Convention on the Law of Treaties (the "**VCLT**"),[21] and any rules and principles of international law that are applicable.

39.   The relevant provisions of the ECT are as follows:

Article 1—Definitions

(6)   Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

    (a)   tangible and intangible, and moveable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

    (b)   a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

    (c)   claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

    (d)   Intellectual Property;

    (e)   Returns;

    (f)   any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.

---

[21] Vienna Convention on the Law of Treaties, 1155 UNTS 332 (signed 23 May 1969, entered into force 27 January 1980) ("**VCLT**").

"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.

(7) "Investor" means:

(a) with respect to a Contracting Party:

(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;

(b) with respect to a "third state," a natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party.

...

Article 17—Non-Application of Part III in Certain Circumstances

Each Contracting Party reserves the right to deny the advantages of this Part to:

(1) a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;

...

Article 26—Settlement of Disputes Between an Investor and a Contracting Party

(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible be settled amicably.

(2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party to the dispute;

(b) in accordance with any applicable, previously agreed dispute settlement procedure; or

(c) in accordance with the following paragraphs of this Article.

(3) (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.

(b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).

...

(4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:

...

(b) a sole arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (hereinafter referred to as "UNCITRAL")

...

(6) A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law.

...

### Article 45—Provisional Application

(1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

(2) (a) Notwithstanding paragraph (1) any signatory may, when signing, deliver to the Depository a declaration that it is not able to accept provisional application. The obligation contained in paragraph (1) shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depository.

(b) Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of that signatory may claim the benefits of provisional application under paragraph (1).

(c) Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.

(3) (a) Any signatory may terminate its provisional application of this Treaty by written notification to the Depository of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depository.

(b) In the event that a signatory terminates provisional application under subparagraph (a), the obligation of the signatory under paragraph (1) to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty

years following the effective date of termination, except as otherwise provided in subparagraph (c).

(c) Subparagraph (b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depository of its request therefor.

(4) Pending the entry into force of this Treaty the signatories shall meet periodically in the provisional Charter Conference, the first meeting of which shall be convened by the provisional Secretariat referred to in paragraph (5) not later than 180 days after the opening date for signature of the Treaty as specified in Article 38.

(5) The functions of the Secretariat shall be carried out on an interim basis by a provisional Secretariat until the entry into force of this Treaty pursuant to Article 44 and the establishment of a Secretariat.

(6) The signatories shall, in accordance with and subject to the provisions of paragraph (1) or subparagraph (2)(c) as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were Contracting Parties under Article 37(3). Any modifications made to Annex B by the signatories shall terminate upon the entry into force of this Treaty.

(7) A state or Regional Economic Integration Organization which, prior to this Treaty's entry into force, accedes to the Treaty in accordance with Article 41 shall, pending the Treaty's entry into force, have the rights and assume the obligations of a signatory under this Article.

## V.   OUTLINE OF THE PARTIES' SUBMISSIONS

### A. THE RESPONDENT'S SUBMISSION

40. The Respondent contends that the Tribunal lacks jurisdiction to hear Yukos Capital's claims. The Respondent bases its argument on three grounds:

(i) Arbitration of the present dispute is inconsistent with the Russian Federation's "constitution" and "laws" for purposes of Article 45(1) of the ECT, and, accordingly, the obligation to provisionally apply the ECT did not extend to Article 26; the arbitration agreement on which the Claimant seeks to rely is "null and void";[22]

---

[22] T1/26/8-16.

(ii)     Yukos Capital has not made an Investment protected under Article 1(6) of the ECT, because the purported Loans were in substance dividends designed to repatriate to Russia the profits of Yukos Oil's Russian trading subsidiaries, in which Yukos Capital played no meaningful role and should be "disregarded";[23] and

(iii)    The Respondent is entitled to deny the Claimant the benefits of Article 17 of the ECT because the Claimant is a shell company with "no substantial business activities" in Luxembourg and is controlled by nationals of a third state, namely the United States nationals who are members of the *Stichting*'s board.[24]

## B. THE CLAIMANT'S SUBMISSION

41.  The Claimant submits that the Tribunal should reject each of the Respondent's objections to the Tribunal's jurisdiction, arguing as follows:

(i)     In relation to Article 45(1), the Claimant makes three independent submissions: first, a signatory may avoid provisional application only where the principle of provisional application itself is inconsistent with domestic law – Article 45(1) does not contemplate a "piecemeal" comparison of specific provisions of the Treaty with domestic law;[25] second, provisional application is not inconsistent with Russian law because the executive had authority to commit the Respondent to provisional application of Article 26 (and that renders it consistent with Russian law); third, even examined on a piecemeal basis, Article 26 – the arbitration of investment disputes – is not inconsistent with Russian law.[26]

(ii)    The Loans qualify as "Investments" under Article 1(6) of the ECT;[27] the Claimant rejects the argument that they fail a test derived from "general international law" as to what qualifies as "investment."[28]

---

[23] T1/45/8 – T1/46/5.

[24] Memorial, paras. 10-11, 163.

[25] Counter-Memorial, para. 4.

[26] *See* T1/144/1-15; T5/127/8-11, T5/143/15 – T5/144/3.

[27] Counter-Memorial, para. 6.

[28] Counter-Memorial, paras. 7-8.

(iii)   The Respondent's attempt to invoke Article 17(1) cannot give rise to a jurisdictional challenge, since the Respondent would only be entitled to deny the benefits of Part III of the ECT (whereas Article 26 is found in Part V);[29] the Claimant submits that the Respondent's purported invocation of Article 17 after the arbitration had been commenced could not operate retrospectively to deny the Claimant accrued rights;[30] and that the Respondent cannot make out the two substantive requirements of the Article.

## VI.   RELIEF REQUESTED

42.   The Respondent requests that the Tribunal:

(i)   Decline to exercise jurisdiction over the Claimant's claims;

(ii)   Order the Claimant to pay to the Respondent the full costs of this arbitration, including, without limitation, arbitrators' fees and expenses, administrative costs, counsel fees and expenses and any other costs associated with this arbitration;[31]

(iii)   Order the Claimant to pay to the Respondent interest on the amounts awarded under (ii) above until the date of full payment; and

(iv)   Grant any further relief to the Respondent as it may deem appropriate.[32]

43.   The Claimant requests the Tribunal to dismiss all of the jurisdictional objections raised by the Respondent and to proceed to the merits stage of the proceedings.[33] In its Notice of Arbitration, it also seeks "its arbitration costs, including attorneys' fees."[34]

---

[29] Counter-Memorial, para. 9.

[30] Counter-Memorial, para. 10.

[31] The Respondent submitted in its submission of 5 October 2015 that if the Tribunal were to find that it had jurisdiction, it should not determine the question of costs until the conclusion of the proceedings. *See* Respondent's Submission on Costs (5 October 2015), para. 14.

[32] Memorial, para. 188.

[33] Counter-Memorial, para. 305.

[34] Notice of Arbitration, para. 215(b). The Claimant did not address the question of costs in its Counter-Memorial or Rejoinder. It provided a breakdown of its costs in its submission of 5 October 2015, but did not make any submissions on the question of whether costs should be determined at this stage if the Tribunal's jurisdiction were upheld.

## VII. THE OBJECTIONS TO JURISDICTION

44. The three objections raised by the Respondent to the jurisdiction of the Tribunal raise distinct points of substance. Each one of them would, if held to be well founded, operate to exclude the jurisdiction of the present Tribunal over the whole of the Claimant's claims.

45. Pursuant to Article 21(1) of the UNCITRAL Rules, "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement." This provision reflects the concept, fundamental to international arbitration, of *compétence–compétence,* namely that an international tribunal has jurisdiction to rule upon its own jurisdiction.

46. In view of the distinct character of each of the objections, the Tribunal shall proceed by considering each in turn, setting forth the Parties' arguments followed by its own analysis and decision.

### A. DOES THE PROVISIONAL APPLICATION OF THE ECT IN THE RUSSIAN FEDERATION, PURSUANT TO ARTICLE 45 OF THE ECT, PROVIDE A BASIS FOR THE TRIBUNAL'S JURISDICTION?

47. The first of the jurisdictional objections for the Tribunal's determination is whether Article 45 provides a jurisdictional predicate for the present claim, and in particular whether the proviso to Article 45(1), which provides for provisional application "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" (the **"Domestic Law Inconsistency Clause"**) excludes the provisional application of Article 26.

48. The Parties' first point of disagreement concerns the scope of that clause. The Claimant's case is that a respondent state may only rely on that limitation where the principle of provisional application itself is inconsistent with the state's "constitution, laws or regulations": the limitation is "all-or-nothing." Since the Respondent does not deny that Russian law recognizes the principle of provisional application (albeit subject to limits), the disposition of this issue in the Claimant's favour would dispose of the Respondent's first jurisdictional objection. The Respondent, on the other hand, submits that the clause contemplates a piecemeal analysis, such that a state will not be obliged to provisionally apply any individual provision of the Treaty that is inconsistent with its domestic law.

49. The second sub-issue that arises under this head is whether Article 26 itself, or its provisional application, is inconsistent with Russian law. The Tribunal now summarizes the submissions of each Party on both of these issues before coming to its own decision on provisional application as a whole.

### 1. The correct interpretation of Article 45(1)

#### (a) The Respondent's position

50. The Respondent contends that, pursuant to Article 45(1), a signatory applies the ECT provisionally pending its entry into force for that signatory "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations." The Respondent argues that, accordingly, the Domestic Law Inconsistency Clause of Article 45(1) applies (a) to conceptual inconsistencies (*e.g.* the non-recognition of the principle of provisional application in constitutional law) and also (b) to inconsistencies of individual treaty provisions (*e.g.* Article 26 of the ECT on the settlement of disputes between "Investors" and "Contracting Parties") with the laws or regulations of a signatory.[35]

51. Addressing the wording of Article 45(1) of the ECT, the Respondent notes that the plain language of the Domestic Law Inconsistency Clause and the ordinary meaning of the term "to the extent" mean that the scope of provisional application of the ECT by a signatory depends on whether or not each provision of the ECT is consistent with the "constitution, laws or regulations" of that signatory. The Respondent contends that the ordinary meaning of the words "to the extent," "scope" or "width" is to the same effect in the other authentic language versions of the ECT,[36] and is consistent with its use elsewhere in the ECT.[37] The Respondent objects to the interpretation of the Domestic Law Inconsistency Clause put forth by the Claimant, which suggests that the provision would only take effect if the domestic law of an ECT signatory prohibits provisional application of the Treaty in its entirety.[38] The Respondent contends that such an interpretation would siphon any meaning out of the term "to the extent," effectively substituting it with the term "if" or

---

[35] Memorial, paras. 38-39.

[36] Memorial, paras. 38-39; Reply, para. 52; T1/8/2-7.

[37] T1/8/8-22.

[38] *See* paras. 77-84 below.

"where"[39] and would eliminate the term "such."[40] If that meaning was intended, then Article 45(1) would not refer to "such provisional application" but would simply refer to "provisional application" or "provisional application as such."[41]

52. The Respondent points out that, while the Claimant attempts to draw support for its interpretation from an expert Opinion submitted by Professor Reisman on behalf of the claimant in *Hulley Enterprises Limited v. Russian Federation*[42] ("*Hulley Enterprises*") Professor Reisman expressly rejected the Claimant's position in a 2011 article, noting that "[i]f Article 45(1) had been intended to refer to the notion of the permissibility of the provisional application of a treaty as such, it would not have been necessary to introduce the phrase 'to the extent'."[43] The Respondent refers to several further authorities in accord with this view.[44]

53. The Respondent also sees as significant the inclusion of "laws" and "regulations" in the "to the extent" clause, observing that a prohibition of provisional application typically results from constitutional requirements or acts of legislation implementing constitutional principles; in contrast, such prohibition typically would not result from "several laws" or "hierarchically lower legal acts" such as regulations.[45] Thus, the Respondent argues that the inclusion of "regulations" in the Domestic Law Inconsistency Clause confirms "that not only conceptual inconsistencies, but also specific inconsistencies of particular treaty

---

[39] Memorial, para. 39; Reply, paras. 55-59.

[40] T1/12/12.

[41] T1/11/4-8.

[42] *Hulley Enterprises Limited v. Russian Federation*, PCA No. AA226, Interim Award on Jurisdiction and Admissibility (30 November 2009) ("*Hulley Enterprises*") (Exhibit CL-9). *See* para. 92 below.

[43] Reply, para. 56, *referring to* W. Michael Reisman & Mahnoush H. Arsanjani, "Provisional Application of Treaties in International Law: The Energy Charter Awards," in THE LAW OF TREATIES BEYOND THE VIENNA CONVENTION (Enzo Cannizzaro, ed., 2011) ("Reisman & Arsanjani"), p. 92 (Exhibit RL-116).

[44] Reply, paras. 57-59, *referring to* Annelise Q. Mertsch, PROVISIONALLY APPLIED TREATIES: THEIR BINDING FORCE AND LEGAL NATURE (2012) ("Mertsch"), p. 208, n.151 (Exhibit RL-117); Gerhard Hafner, "The Provisional Application of the Energy Charter Treaty," in INTERNATIONAL INVESTMENT LAW FOR THE 21ST CENTURY: ESSAYS IN HONOUR OF CHRISTOPH SCHREUER (Binder, et al., eds., 2009), p. 601 (Exhibit RL-118); Thomas Roe & Matthew Happold, SETTLEMENT OF INVESTMENT DISPUTES UNDER THE ENERGY CHARTER TREATY (2011), p. 73 (Exhibit RL-115).

[45] T1/11/9 – T1/12/1.

provisions with domestic laws and regulations are covered."[46]  The Respondent cites the
same article by Professor Reisman as confirmation of this observation.[47]

54.    The Respondent submits that its interpretation is supported by the context of the
provision. Firstly, with regard to the Claimant's argument that "'provisional application'
has the same meaning under both Articles 45(1) and 45(2)(a) (i.e. application of the
Treaty as a whole),"[48] the Respondent disagrees, arguing that "provisional application"
does not have the same meaning in Article 45(1) of the ECT as in Article 45(2) of the
ECT. In contrast to Article 45(1), with its "to the extent" language, Article 45(2)(a)
allows a signatory state to opt out of provisional application entirely. Further, under
Article 45(2)(c), a signatory must still provisionally apply the provisions of Part VII
("Structure and Institutions") "to the extent that such provisional application is not
inconsistent with its laws or regulations."[49]  Thus, "[p]ursuant to Article 45(1) ECT, a
signatory applies all parts of the ECT, but subject to inconsistencies with its domestic
law. Pursuant to Article 45(2)(c) ECT, a signatory applies only Part VII, but again subject
to inconsistencies with its domestic law."[50]

55.    The Respondent contends that, "[s]ince a signatory that applies Part VII on a provisional
basis pursuant to Article 45(2)(c) ECT has already opted out of provisional application
entirely," the Domestic Law Inconsistency Clause in Article 45(2)(c) of the ECT can only
refer to "inconsistencies between that signatory's '*laws or regulations*' and specific
obligations under Part VII of the ECT."[51]  Moreover, the Respondent points out that a
facsimile sent by the U.S. Department of State to the Energy Charter Conference
Secretariat in the context of the ECT negotiations supports this view.[52]

---

[46] Memorial, para. 40. *See also* Reply, paras. 60, 126-130; T5/28/14 – T5/29/22, *citing* Transcript of Energy Charter Conference (14 December 1993) (**Exhibit R-80**).

[47] Reply, para. 60, *citing* Reisman & Arsanjani, p. 93 (**Exhibit RL-116**).

[48] *See* para. 78 below and Counter-Memorial, para. 48.

[49] Reply, para. 64.

[50] Reply, para. 67.

[51] Memorial, para. 42 (emphasis in original). *See also* Reply, paras. 66-67; T1/13/2-21.

[52] Memorial, para. 43, *citing* Facsimile from the U.S. Department of State to the Energy Charter Conference Secretariat (24 February 1994) ("**U.S. Dept. of State Facsimile**") (**Exhibit R-15**).

56.  Secondly, the Respondent rejects the Claimant's assertion that Article 45(3)(b) of the
     ECT supports an "all-or-nothing" approach to Article 45(1),[53] arguing that "Article
     45(3)(b) ECT says nothing about the scope of a signatory's provisional application under
     Article 45(1) ECT."[54]

57.  Thirdly, the Respondent rejects the Claimant's argument that Article 45(6) of the ECT
     supports the Claimant's "all-or-nothing" approach to Article 45(1),[55] since the language
     of Article 45(6) "simply confirms that Article 45 provides for two distinct regimes of
     provisional application." The Respondent further notes that, if the Claimant were correct
     in its contention that Article 45(1) is an "all-or-nothing" provision, there would be no
     reason for Article 45(6) to provide expressly that cost contributions be made "in
     accordance with and subject to the provisions of paragraph (1)."[56]

58.  Fourthly, the Respondent rejects the Claimant's argument that Article 45(2)(b) of the
     ECT reflects a reciprocity of obligations and provides that investors of a signatory may
     not claim Treaty benefits unless the signatory consents to apply the Treaty in its entirety.[57]
     The Respondent points out that Article 45(2)(b) makes explicit reference to the "benefits
     of provisional application under paragraph (1)" (thus including the Domestic Law
     Inconsistency Clause), rather than to "this Treaty." Therefore, according to the
     Respondent, the reciprocity limitation provided in Article 45(2)(b) only applies to a
     signatory if it has opted out of provisional application pursuant to Article 45(2)(a).[58]

59.  The Respondent also regards the Claimant's argument in relation to Article 27 of the
     VCLT as misguided, noting that, while "Article 27 VCLT prohibits a State from invoking
     its domestic law as justification for failure to perform a treaty," "[a] State that invokes its
     internal law pursuant to a 'to the extent' clause does not seek to justify its failure to
     perform a treaty obligation," but rather does so "to determine the extent and content of
     the obligations it has accepted under a treaty."[59]   In this regard, the Respondent points

---

[53] *See* para. 90 below.

[54] Reply, para. 68.

[55] *See* para. 91 below.

[56] Reply, para. 69; T1/14/12-24.

[57] Reply, paras. 63, 70, *citing* Counter-Memorial, para. 49. *See* para. 86 below.

[58] Reply, para. 71.

[59] Reply, para. 40.

out that, contrary to the Claimant's argument,[60] Professor Lefeber's 1998 article and its 2011 entry in the *Max Planck Encyclopedia* fully support its position, acknowledging the ECT as an example of a treaty providing "that its provisional application is subject to national law, which means that, in case of conflict national law prevails over the treaty."[61] According to the Respondent, other commentators are in accord.[62]

60.  The Respondent takes the view that the authorities cited by Claimant for the proposition that the Respondent's interpretation of the Domestic Law Inconsistency Clause runs against Article 27 of the VCLT "are unavailing."[63]  The Respondent submits that the Claimant's citation of Resolution No. 8-P ("**Resolution No. 8-P**") rendered in 2012 by the Constitutional Court of the Russian Federation (the "**Constitutional Court**") is irrelevant because the quoted statement dealt with treaties that had entered into force, and the ECT has not yet entered into force for the Respondent.[64]  In like manner, the Respondent rejects the notion that the expert opinion of Professor Reisman in the *Hulley Enterprises* arbitration provides authority for the proposition that the Respondent's interpretation of the Domestic Law Inconsistency Clause runs counter to Article 27 of the VCLT.[65]

61.  The Respondent further contends that the Claimant's citation of an expert opinion submitted by Professor James Crawford in *Hulley Enterprises* is unavailing, as "[n]o authority is cited to support the statement that Article 27 VCLT has been relied upon to reduce the scope of a 'to the extent' clause to the principle of provisional application."[66] The Respondent also dismisses the relevance of the jurisdictional awards in

---

[60] *See* para. 94 below and Counter-Memorial, para. 75.

[61] Reply, paras. 44-45, *citing* René Lefeber, "The Provisional Application of Treaties and Other Unperfected Acts in International Law: Constitutional Functions," in ESSAYS ON THE LAW OF TREATIES: A COLLECTION OF ESSAYS IN HONOUR OF BERT VIERDAG (Jan Klabbers & René Lefeber, eds., 1998), p. 89 (**Exhibit RL-30**). The Respondent notes that the Claimant "[s]imply ignores the section [Section C] that addresses domestic law limitations," instead "quot[ing] from Section E, which describes the legal effects of provisional application provisions that do not contain a 'to the extent' clause." Reply, para. 45, *citing* Counter-Memorial, para. 74.

[62] Reply, para. 46.

[63] Reply, para. 86, *citing* Counter-Memorial, para. 56. *See* para. 92 below.

[64] Reply, para. 86, *citing* Counter-Memorial, para. 57. *See* Resolution No. 8-P, Constitutional Court of the Russian Federation (27 March 2012) ("**Resolution No. 8-P**"), para. 6 (**Exhibit R-35**).

[65] Reply, para. 88, *citing* Counter-Memorial, para. 59. *See Hulley Enterprises*, para. 318 (**Exhibit CL-9**). *See* para. 92 below.

[66] Reply, para. 89.

*Kardassopoulos v. Georgia* ("***Kardassopoulos***") and *Hulley Enterprises* relied on by the Claimant,[67] pointing out in particular that both cases were chaired by the same arbitrator and that the *Hulley Enterprises* award is currently subject to set aside proceedings in the Netherlands.[68]

62.  The Respondent further contends that the Claimant has inaccurately conflated the Domestic Law Inconsistency Clause under Article 45(1) of the ECT and the grounds for invalidating consent under Article 46(1) of the VCLT.[69] According to the Respondent, the two provisions have an "essentially different nature and function" and stand in marked contrast with regard to their language and the conditions under which they may be invoked.[70] In particular, the Respondent points out that it "does not seek to vitiate its consent to apply the ECT on a provisional basis" (as it might under Article 46(1) of the VCLT), but that it is invoking "its domestic law pursuant to the 'to the extent' clause in Article 45(1) ECT to determine the extent of its obligations under the ECT."[71]

63.  Regarding the issue of reciprocity, the Respondent further points to a memorandum[72] and an article[73] by Mr Craig S. Bamberger, acknowledging (in the words of the Respondent) "that a signatory that applies the ECT provisionally pursuant to Article 45(1) ECT might – or might not – apply a particular provision of the ECT, including, critically, the investor-State arbitration mechanism in Article 26 ECT, depending on whether the Treaty provision in question is consistent with the signatory's 'constitution, laws or regulations'."[74] The Respondent also submits that Mr Bamberger's article refutes a policy argument relied on by the tribunal in *Hulley Enterprises* and by the Claimant,[75]

---

[67] *See* para. 77 below. Counter-Memorial, paras. 43-45, *citing Ioannis Kardassopoulos v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction (6 July 2007) ("***Kardassopoulos***"), paras. 71, 73-74 (**Exhibit CL-11**); *Hulley Enterprises*, paras. 269, 309, 319 (**Exhibit CL-9**).

[68] Reply, paras. 93-96.

[69] Reply, para. 48.

[70] Reply, para. 49.

[71] Reply, paras. 50-51.

[72] European Energy Charter Conference Secretariat, Note from the Legal Sub-Group Chairman, "Status of matters pending before the Legal Sub-Group," LEG-20 (March 1993), para. 12 (**Exhibit R-84**).

[73] Craig S. Bamberger, "Epilogue: The Energy Charter Treaty as a Work in Progress," in THE ENERGY CHARTER TREATY – AN EAST-WEST GATEWAY FOR INVESTMENT AND TRADE (Thomas W. Wälde, ed., 1996) ("**Bamberger, Epilogue**"), p. 602 (**Exhibit RL-1**).

[74] Reply, para. 74.

[75] Counter-Memorial, para. 51. *See* para. 86 below.

that, if a signatory state were allowed to invoke inconsistencies with individual provisions of the ECT, a situation of "unacceptable uncertainty" would emerge.[76] The Respondent refers to Mr Bamberger to note that treaty drafting requires balancing competing interests through compromise, and that in the case of Article 45(1) of the ECT the drafters balanced "the signatories' interest to have the treaty applied as soon as possible" with a "respect for domestic law constraints."[77] In this manner, "flexibility in the scope of the ECT's provisional application" was instrumental in "ensur[ing] the widest possible participation in provisional application, including by signatories that were not in a position to commit to provisional application of the entire Treaty because of domestic law constraints."[78]

64.    In response to a question from the Tribunal, the Respondent identified a number of provisions of the ECT that it considered were provisionally applied by the Russian Federation because they reflected existing protections in Russian law.[79] To that extent an investor has the protection of substantive treaty obligations, although it may only enforce them in the Russian domestic courts.[80] In the Respondent's submission, each investor must be aware of the domestic law limitation in Article 45 of the ECT, and is responsible for conducting due diligence with the assistance of local counsel to determine which of the provisions of that treaty it will be entitled to rely on.[81]

65.    The Respondent goes on to argue that its interpretation is also in line with the "purpose and effect" of Article 45(1) of the ECT, which "is to accommodate the domestic law problems that provisional application raises for most States by limiting provisional application to those treaty provisions that are consistent with each signatory's domestic laws."[82] The Domestic Law Inconsistency Clause was, according to the Respondent, "clearly motivated by this goal," having been introduced according to a proposal by the United States in the draft Basic Protocol of October 1991.[83] As the Respondent

---

[76] Reply, para. 75, *citing* Counter-Memorial, para. 51.

[77] Reply, para. 75.

[78] Reply, para. 75.

[79] T5/51/7 – T5/59/8.

[80] T5/55/4-11.

[81] T5/56/11 – T5/57/8.

[82] Reply, para. 77.

[83] Reply, paras. 78-79, *citing* European Energy Charter Conference Secretariat, Document 21/91, Annex I, BA 4, Draft (31 October 1991), Art. 41 (**Exhibit R-86**); European Energy Charter Conference Secretariat, Document 14/91, BP 3 (11 October 1991) (**Exhibit R-87**).

highlights, the United States admitted in a facsimile that it "d[id] not have any legal difficulty with provisional application *per se*" and found the language of the Domestic Law Inconsistency Clause "essential to any provisional application obligation."[84]  The European Community likewise recognized the principle of provisional application, relying on the Domestic Law Inconsistency Clause itself to limit its provisional application to provisions within its competence.[85]

66.  The Respondent further alleges that the "vast majority" of ECT negotiating states recognized the principle of provisional application, yet "had to accommodate domestic law constraints through the 'to the extent' clause."[86]  In particular, the Respondent pleads that Germany limited provisional application to obligations that "were consistent with its legislation or within executive competence, not requiring parliamentary approval."[87] Likewise, the Netherlands only allowed the executive to agree to provisional application "if a treaty did not deviate, or necessitate deviation from, the Constitution, and to the extent its provisions did not deviate from Dutch legislation or necessitate such deviation."[88]  Similarly, the Respondent contends that France "recognized the principle of provisional application, but only permitted the provisional application of treaties on matters falling within the power of the executive or after parliamentary authorization had been granted."[89]

67.  The Respondent further contends that its interpretation is in line with "the circumstances of the ECT's conclusion and the signatories' practice in interpreting and applying Article 45(1) ECT."[90]  The Respondent highlights that, while a number of signatories of the ECT made declarations pursuant to Article 45(2)(a) when signing the ECT, others chose to expressly rely on the Domestic Law Inconsistency Clause of Article 45(1) to exclude or limit the provisional application of the ECT.[91]

---

[84] Reply, para. 79, *citing* U.S. Dept. of State Facsimile (**Exhibit R-15**); T1/17/9 – T1/18/2.

[85] Reply, para. 80.

[86] Reply, paras. 81, 84.

[87] Reply, para. 82.

[88] Reply, para. 82.

[89] Reply, para. 83.

[90] Reply, para. 97.

[91] Memorial, paras. 30-31.

68. The Respondent points out that, contrary to the Claimant's assertion,[92] the fact that "these ECT signatories invoked the 'to the extent' clause to exclude provisional application does not support an inference that they interpreted Article 45(1) ECT as an all-or-nothing provision."[93]   In fact, according to the Respondent, two of the relevant signatories "expressly stated that Article 45(1) ECT 'does not create any commitment beyond what is compatible with the existing legal order of the Signatories'."[94]

69. In addition, the Respondent contends that even where signatories made no declaration whatsoever, internal documents show that they shared the Respondent's interpretation of Article 45(1) of the ECT.   In particular, the Respondent refers to several documents prepared by the Finnish Government,[95] as well as a 1994 Statement by the Council, the Commission and the Member States of the European Community on Article 45 of the European Energy Charter Treaty (the **"1994 Joint EC Statement"**).[96]  The Respondent argues that, in the 1994 Joint EC Statement, the European Community and its then twelve Member States, by stating that Article 45(1) of the ECT "does not create any commitment beyond what is compatible with the existing internal legal order of the Signatories," relied on that provision to determine that a signatory of the ECT would not have to file a declaration of non-application pursuant to Article 45(2), in order to exclude the non-application of parts of the ECT not compatible with its legal order, as this is an automatic consequence from the text of Article 45(1).[97]  The Respondent adds that the Member States that adopted the 1994 Joint EC Statement did not communicate their position to the other ECT negotiating states, as such communication was not required of them.[98]

70. The Respondent also refers to the "'to the extent' clause in paragraph 1(b) of the Protocol of Provisional Application" of the General Agreement on Tariffs and Trade (**"GATT"**),

---

[92] Counter-Memorial, paras. 81-82. *See* para. 94 below.

[93] Reply, para. 108.

[94] Reply, para. 108.

[95] Memorial, para. 45; Reply, para. 99, *citing* Finnish Ministry of Foreign Affairs Memorandum (22 November 1994) (**Exhibit R-17**); Finnish Gov. Proposal HE 46/1997, para. 4.1 (**Exhibit R-16**); T1/13/22 – T1/14/11.

[96] Memorial, para. 46; Reply, para. 100, *referring to* "A" Item Note from the Permanent Representatives Committee to the Council of the European Union, Doc. 12165/94 (14 December 1994), Annex I, p. 3 (**Exhibit R-9**); T1/19/5 – T1/20/19.

[97] Memorial, para. 34; Reply, paras. 100-106.

[98] Reply, para. 107.

pointing out that there is a "consistent body of GATT case law" confirming that "GATT Contracting States were entitled to and did invoke specific inconsistencies of their domestic laws with particular GATT obligations."[99]  The Respondent also argues that there was "never any suggestion that consent by the executive to provisional application may suffice to eliminate inconsistencies" between domestic law and GATT obligations.[100]

71.   Furthermore, the Respondent disputes the Claimant's allegation[101] that the "Respondent 'at all relevant times made clear' that it applied the ECT provisionally as a whole."[102] The Respondent alleges that the "Claimant has failed to point to a single statement by Respondent in the course of the ECT negotiations or at the time of the Treaty's signature that 'made clear' that it would apply the ECT provisionally as a whole."[103]  In particular, the Respondent takes issue with the Claimant's "selective" and "out of context" quotation[104] of background information published on the website of the Ministry of Foreign Affairs, which according to the Respondent "does not state that Respondent applies the ECT as a whole."[105]  Likewise, the Respondent rejects the Claimant's argument[106] that a statement made by the Russian delegation at the 2002 Energy Charter Conference proves that the Respondent believed it was bound to provisionally apply the ECT as a whole.[107]  In contrast, the Respondent argues that the statement does not address the scope of provisional application.[108]

72.   The Respondent submits that the fact that the European Union and Energy Charter Secretariat and Conference pressured the Respondent to ratify the ECT "evidences that they appreciated that provisional application did not impose on Respondent the same obligations as ratification."[109]  In like manner, the Respondent contends that statements

---

[99] Reply, paras. 90-91; T1/20/20 – T1/21/12; T5/30/6-9.

[100] T5/30/15 – T5/31/17.

[101] *See* para. 96 below and Counter-Memorial, para. 90.

[102] Reply, para. 111.

[103] Reply, para. 111.

[104] *See* para. 96 below and Counter-Memorial, para. 89.

[105] Reply, paras. 111-112.

[106] *See* para. 96 below and Counter-Memorial, paras. 15, 88.

[107] Reply, para. 113.

[108] Reply, para. 113.

[109] Reply, paras. 114-116.

by the United Kingdom Secretary of State provide support for the Respondent's interpretation of the Domestic Law Inconsistency Clause.[110]   The Respondent recounts that the UK Secretary of State told the House of Commons in 2006 that Article 45 "places some obligations on the Russia[n] Federation, but only to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."[111]

73.   The Respondent also quotes the former chairman of the legal advisory committee to the European Energy Conference, Mr Bamberger.   In an article on the subject of the provisional application of the ECT's dispute resolution provisions in energy transit disputes, Mr Bamberger acknowledged that:

> [e]ven in the case of a state not making such a declaration [pursuant to Article 45(2)(a) of the ECT], it could prove extremely difficult to ascertain the extent to which the provisions of the ECT are inconsistent with the particular signatory's constitution, laws or regulations.[112]

74.   The Respondent submits that Mr Bamberger's article supports the proposition that "the operation and effectiveness of the transit dispute settlement mechanism . . . depends on the consistency of that mechanism with each signatory's domestic law."[113]

### (b) The Claimant's position

75.   Against the Respondent's position, the Claimant contends that Article 45(1) of the ECT permits a signatory to avoid provisional application of the ECT as a whole "only to the extent the principle of provisional application is inconsistent with their domestic law."[114] The Claimant contends, that this was "not the case with Russia, nor does Respondent suggest that it is."[115]   The Claimant additionally points out that, whilst a signatory to the ECT may elect not to apply the Treaty provisionally by making a declaration under

---

[110] Reply, paras. 116-117.

[111] Reply, paras. 116-117, *citing* House of Commons Hansard Written Answers, Part 3, Column 1045 W (7 February 2006) (**Exhibit R-20**).

[112] Memorial, para. 51, *citing* Craig S. Bamberger, *Adjudicatory Aspects Of Transit Dispute Conciliation Under The Energy Charter Treaty*, 3 TDM (April 2006) ("**Bamberger, Adjudicatory Aspects**"), pp. 16-17 (**Exhibit RL-45**). *See also* Reply, para. 118.

[113] Memorial, para. 51; Reply, para. 118; T1/21/13 – T1/22/11.

[114] Counter-Memorial, para. 4.

[115] Counter-Memorial, para. 4.

Article 45(2) ECT, "Respondent did not do so."[116]   The Claimant argues that the Respondent's interpretation of the Domestic Law Inconsistency Clause represents a "piecemeal argument" that would make "the specific scope of provisional application entirely dependent on the degree and nature of each signatory's invocation of its internal laws." Such an interpretation would "run[] counter to cardinal principles of international law."[117]

76.   The Claimant argues for an interpretation of Article 45(1) grounded in the "ordinary meaning" of the provision, emphasizing the need for reading the provision in the context of the ECT's object and purpose, in line with Article 31(1) of the VCLT.[118]   Accordingly, the Claimant contends that the limiting language of Article 45(1) "applies only to 'such provisional application'," the meaning of which must be the foundation of a proper interpretation of Article 45(1). [119]

77.   Interpreting Article 45(1) in this manner, the Claimant focuses on the word "such," which it alleges was "ignored by Respondent." [120]   The plain meaning of "such" in this context is, according to the Claimant, "of the kind specified." [121]   The Claimant further argues that "the kind of provisional application specified is that '[e]ach signatory agrees to apply [the ECT] provisionally pending its entry into force for such signatory'."[122] Therefore, as the Claimant contends, "the limiting 'to the extent' language ... operates only where applying '*this Treaty*' (i.e., the principle of provisional application itself) is inconsistent with the signatory's constitution, laws or regulations."[123]   The Claimant notes that such an interpretation is consistent with the findings of the tribunals in *Hulley Enterprises*[124] and *Kardassopoulos*.[125]

---

[116] Counter-Memorial, para. 4, n. 4.

[117] Counter-Memorial, paras. 58, 66.

[118] Counter-Memorial, paras. 39-42; Claimant's Rejoinder on Jurisdiction (15 June 2015) ("**Rejoinder**"), para. 28.

[119] Counter-Memorial, para. 41.

[120] Counter-Memorial, paras. 41-42.

[121] Counter-Memorial, para. 42.

[122] Counter-Memorial, para. 42.

[123] Counter-Memorial, para. 42 (emphasis in original); T1/145/4-5.

[124] Counter-Memorial, paras. 43, 50-51, *citing Hulley Enterprises*, paras. 308, 314-315 (**Exhibit CL-9**); Rejoinder, paras. 29-30.

[125] Counter-Memorial, paras. 44-45, *citing Kardassopoulos*, para. 210 (**Exhibit CL-11**); Rejoinder, paras. 30, 33.

78.   The Claimant further contends that "'provisional application' has the same meaning under both Articles 45(1) and 45(2)(a) (i.e. application of the Treaty as a whole)."[126] According to the Claimant, the Respondent concedes that the Claimant "is correct that the phrase 'such provisional application' refers to the provisional application previously mentioned in Article 45(1) ECT, namely the provisional application of 'this Treaty'."[127] After making such a concession, however, the Claimant asserts that the Respondent offers a rebuttal[128] that is no more than a tautology and a "confused commentary devoid of any apparent logic."[129] The Claimant adds that the Respondent's authorities in this regard do not support the Respondent's position.[130]

79.   The Claimant rejects the Respondent's assertion that the Claimant's interpretation of Article 45(1) "deprives the term 'to the extent' of any meaning and would effectively substitute for it 'if', 'unless' or 'where',"[131] noting that the Respondent's interpretation "cannot be gleaned from the language on any logical basis."[132] Although it accepts that deleting "such" or replacing it with "if" would also convey the meaning for which the Claimant contends, it maintains that this does not change the proper interpretation of the clause.[133]

80.   The Claimant also rejects the Respondent's reliance on the word "regulations" as being within the Domestic Law Inconsistency Clause,[134] noting that the word was added at the request of the Japanese delegation late in the drafting process and "attracted no attention."[135] The Claimant criticizes the Respondent's "very selective use of the *travaux*"[136] and sees no reason to conclude that "the addition of 'regulations' . . . somehow

---

[126] Counter-Memorial, para. 48.

[127] Rejoinder, para. 32, *referring to* Counter-Memorial, para. 42; Reply, paras. 53-54.

[128] *See* Reply, para. 54.

[129] Rejoinder, paras. 34-35.

[130] Rejoinder, paras. 36-37.

[131] *See* Reply, para. 55.

[132] Rejoinder, para. 40.

[133] T1/145/16-23.

[134] *See* Reply, para. 60.

[135] Rejoinder, paras. 41-42.

[136] Rejoinder, paras. 43-44.

signalled a consensus understanding that Article 45(1) would be subject to a piecemeal interpretation."[137]

81.    The Claimant also disputes the Respondent's contention that the Claimant's interpretation renders Article 45(1) "superfluous."[138]  The Claimant notes that, for signatories that do not make an opt-out declaration, Article 45(1) "provides a safety net that . . . permits [signatories] to . . . avoid provisional application if, and only if, it is inconsistent with their laws to so apply the Treaty," as opposed to opt out declarations made pursuant to Article 45(2)(a), which "may be made for any reason."[139]  So if any state had a concern with provisional application, they were free to opt out pursuant to that clause.[140]  They could also opt out of the 20 year tail.[141]

82.    The Claimant rejects the Respondent's interpretation of other provisions in Article 45 as well, finding the Respondent's contentions[142] regarding Article 45(3)(b) "impossible to comprehend."[143]  The Claimant criticizes the Respondent's interpretation as ignoring . . . the fact that Article 45(3)(b) holds that, under Article 45(1), there exists an "obligation . . . to apply Parts III and V," the effect of which is to "strip[] Article 45(3)(b) of all meaning for any signatory claiming that Parts III and V are inconsistent with its domestic law."[144]  What this conveys, according to the Claimant, is that "under any interpretation of Article 45(1), signatory states are applying provisionally Parts III and V."[145]

83.    Further, the Claimant finds the Respondent's arguments[146] regarding Article 45(2)(b) to be "unclear" and "circular and of no apparent significance," contending instead that "Article 45(2)(b) simply provides for reciprocity."[147]  According to the Claimant, the

---

[137] Rejoinder, para. 42.

[138] *See* Reply, para. 65.

[139] Rejoinder, para. 45.

[140] T5/123/22 – T5/124/5.

[141] T5/124/6-9.

[142] *See* Reply, para. 68.

[143] Rejoinder, para. 46.

[144] Rejoinder, para. 47.

[145] T1/148/5-8.

[146] *See* Reply, para. 70.

[147] Rejoinder, paras. 48-49.

Respondent's position[148] on Articles 45(1) and 45(2)(b) is a "piecemeal approach" in which "signatory states could invoke their own domestic law to determine which Treaty obligations they would apply provisionally."[149] Under the Respondent's interpretation, for states applying the ECT provisionally, "there would then be no legal obligation of reciprocity whatsoever, either to or from them: signatory states would be free to adopt (or not) their own subjective, non-transparent policies of reciprocity ... based upon their domestic-law infused provisional application," thereby creating a system in which investors would face the impossible job of deciphering a "non-reciprocal patchwork of 'reciprocity'."[150] The Claimant refers to commentary characterizing such a system as lacking "harmonisation, standardisation or unification of conduct" since "the reach of international law would be limited by approximately [40] internal legal orders."[151]

84.    As the Claimant notes, Article 17(1) of the VCLT provides that "the consent of a State to be bound by part of a treaty is effective only if the treaty so permits or the other contracting States so agree."[152] The Claimant contends that Article 45(2)(c) of the ECT is an example of a provision that expressly provides for provisional application of only part of the ECT, as it requires a signatory that has made a declaration under Article 45(2)(a) to "apply Part VII provisionally . . . to the extent that such provisional application is not inconsistent with [their] laws or regulations."[153] Thus, "Article 45(2)(c) creates a specific exception where parties are to apply only Part VII."[154] In contrast, the Claimant notes that Article 45(1) does not contain such express authorisation for a signatory to apply provisionally only a part of the Treaty, "mak[ing] clear that the use of 'provisional application' in Articles 45(1) and 45(2)(c) refers to application of the Treaty as a whole."[155]

85.    The Claimant cites Article 45(2)(a) of the ECT as support for this argument, since the provision entitles the signatory to deliver a declaration after signing the ECT that the

---

[148] *See* para. 63 above and Reply, paras. 72, 75.

[149] Rejoinder, para. 52.

[150] Rejoinder, para. 52; T1/146/14 – T1/147/10.

[151] Rejoinder, para. 53, *citing* Mertsch, p. 94 (Exhibit RL-117).

[152] Counter-Memorial, para. 46.

[153] Counter-Memorial, para. 52.

[154] Counter-Memorial, para. 52.

[155] Counter-Memorial, paras. 47, 52.

signatory "is not able to accept provisional application." According to the Claimant, Article 45(2)(a) therefore "provides that a declaration removes '[t]he obligation contained in paragraph (1),' making clear that 'provisional application' has the same meaning under both Articles 45(1) and 45(2)(a) (*i.e.*, application of the Treaty as a whole)."[156]

86.    The Claimant also cites Article 45(2)(b) of the ECT and its "reciprocity of obligations," providing that "investors of a signatory may not claim [ECT] benefits unless the signatory consents to apply [the ECT] provisionally (*i.e.*, in its entirety)."[157] On such obligations, the Claimant references *Hulley Enterprises* for the proposition that "[a]llowing a State to modulate . . . the obligation of provisional application . . . would undermine the principle that provisional application of a treaty creates binding obligations,"[158] thus "creat[ing] unacceptable uncertainty in international affairs."[159] It would also mean that one state could be "provisionally applying virtually nothing and receive all of the benefits from states that are applying the whole thing."[160]

87.    Commenting on the Respondent's submissions as to what provisions were provisionally applied by the Russian Federation, the Claimant suggests that "the Russian Federation provisionally applied nothing" but just invited investors to avail themselves of the protections available under existing Russian law.[161]

88.    The Claimant rejects the Respondent's critique[162] that the *Hulley Enterprises* tribunal's decision regarding Article 45(1) issues was based merely on policy considerations.[163] The Claimant notes that Articles 27 and 46 of the VCLT "reflect the strong presumption in international law of the separation of international law and domestic law," and that, in spite of the Respondent's arguments to the contrary,[164] these articles are relevant to the interpretation of the Domestic Law Inconsistency Clause.[165] Further, the Claimant notes

---

[156] Counter-Memorial, para. 48.

[157] Counter-Memorial, para. 49.

[158] Counter-Memorial, para. 50, *citing Hulley Enterprises*, para. 314 **(Exhibit CL-9)**.

[159] Counter-Memorial, para. 51, *citing Hulley Enterprises*, para. 315 **(Exhibit CL-9)**.

[160] T1/146/25 – T1/147/3.

[161] T5/125/7-11.

[162] *See* para. 63 above and Reply, paras. 75-76.

[163] Rejoinder, paras. 54-55.

[164] *See* para. 51 above and Reply, paras. 40-41.

[165] Rejoinder, para. 56.

that "legal certainty" is more than a policy issue, considering it instead "a fundamental principle of international and national law" that "informs" Articles 27 and 46 of the VCLT.[166] Thus, the Claimant argues that, "if Article 45(1) was to depart from [these principles of international law] it would need to expressly state that that is what it is doing," noting that Article 45(1) does not do so.[167]

89. The Claimant also rejects the Respondent's citation of Professor Reisman's critique of the same position that the Claimant has adopted in this arbitration,[168] noting that the Respondent omits a portion of Professor Reisman's analysis that shows that Professor Reisman, *Hulley Enterprises*, and *Kardassopoulos* are all in accord with the proposition that a signatory state wishing to avoid provisional application "must duly notify in advance that its constitution, laws or regulations disable it from provisional application" and that, for investors having already invested in a State, "Part III and Part V of the ECT remain in force for 20 years with regard to any investments made in that state during the provisional application unless a declaration rejecting the 'tail' is made at the time of signature."[169]

90. The Claimant also refers to Article 45(3) of the ECT as a provision allowing a signatory to stop provisionally applying the ECT, but nonetheless simultaneously requiring a signatory to apply Part III and Part V of the ECT with respect to investments that already had been made, unless that signatory is listed in Annex PA.[170] Accordingly, the Claimant sees Article 45(3) as evidence that "application of Parts III and V of the ECT is part of the obligation of provisional application found in Article 45(1)," as "it would otherwise be nonsensical."[171]

91. As additional support for its argument that the ECT envisions two categories of provisional application, the Claimant also cites Article 45(6) of the ECT, which states that "signatories shall, in accordance with and subject to the provisions of paragraph (1)

---

[166] Rejoinder, para. 57.
[167] Rejoinder, para. 58.
[168] *See* Reply, para. 56.
[169] Rejoinder, paras. 60-61.
[170] Counter-Memorial, para. 53.
[171] Counter-Memorial, para. 53.

or subparagraph (2)(c) as appropriate, contribute to the costs of the provisional Secretariat as if the signatories were Contracting Parties." The Claimant contends that Article 45(6) supports its argument that "there are two distinct categories of provisional application ... application of the Treaty as a whole under Article 45(1) or application only of Part VII under Article 45(2)(c)."[172]

92.  The Claimant also cites Article 27 of the VCLT to show that the Respondent is wrong to "invoke the provisions of its internal law as justification for its failure to perform a treaty."[173]  As authority for this proposition, the Claimant cites the legal opinions of Professor Crawford and Professor Reisman in *Hulley Enterprises*,[174] as well as the Constitutional Court.[175] The Claimant concedes that, under Article 46(1) of the VCLT, a "narrow exception" applies "[i]f a fundamental provision of internal law 'regarding competence to conclude treaties' ... manifestly precludes the giving of consent to so conclude ... the treaty."[176]  Nevertheless, the Claimant rejects the notion that the Respondent has suggested or could suggest that this exception applies to the Respondent here.[177] According to the Claimant, the interpretation advanced by the Respondent would give Article 45 of the ECT "the function of a reservation," and Article 46 of the ECT "precludes any reservations to individual Treaty provisions."[178]

93.  The Claimant further rejects the Respondent's interpretation arguments, noting that "[m]ost of the Respondent's arguments in support of its ... approach may be described as supplementary means of interpretation arguments."[179]  The Claimant contends that Article 45(1) of the ECT is not "ambiguous or obscure" and that interpreting the ECT using a plain language approach does not lead to a "manifestly absurd or unreasonable"

---

[172] Counter-Memorial, para. 54.

[173] Counter-Memorial, para. 56.

[174] Counter-Memorial, paras. 59-60, *citing Hulley Enterprises*, paras. 316-318 (**Exhibit CL-9**).

[175] Counter-Memorial, para. 57, *citing* Resolution No. 8-P, para. 6 (**Exhibit R-35**).

[176] Counter-Memorial, paras. 61-62, *citing* VCLT, Art. 46(1).

[177] Counter-Memorial, paras. 63-65.

[178] Rejoinder, para. 62.

[179] Counter-Memorial, para. 67.

result. Thus, according to the Claimant, the Respondent's arguments are "unnecessary and should not be considered pursuant to Article 32 of the [VCLT]."[180]

94. In any event, the Claimant considers the Respondent's interpretation arguments misguided for several reasons. Firstly, the Claimant notes that a UN General Assembly discussion to which the Respondent refers "concerns the *principle* of provisional application of treaties" but does not support the "piecemeal" provisional application for which the Respondent argues.[181]   Secondly, the Claimant avers that a work by René Lefeber – cited by the Respondent as authority for the proposition that "in the event of a conflict, domestic laws prevail over inconsistent treaty provisions" – does not, in reality, back up such a proposition.[182]  On the contrary, the Claimant notes, quoting Lefeber, that "if a competent organ agrees to the provisional application of a treaty in disregard of such domestic limitations, such disregard will normally not have legal effect at the international level."[183]  Thirdly, on the Respondent's argument regarding state practice, the Claimant notes that the states referred to by the Respondent invoked the "to the extent" language of Article 45(1) of the ECT "solely to exclude," not to limit, provisional application of the ECT.[184]

95. Moreover, the Claimant argues that the Respondent "at all relevant times made clear that it was provisionally applying 'the Treaty', not merely some unidentified part of it."[185]  As evidence for this proposition, the Claimant highlights the fact that the Respondent failed to notify the ECT Secretariat of any desire to be excepted from provisional application on the basis of either Article 45(1) or Article 45(2)(a) of the ECT, even though the Secretariat had "asked all delegations wishing to make a request to be excepted from provisional application to notify it."[186]

---

[180] Counter-Memorial, para. 67.

[181] Counter-Memorial, paras. 72-73 (emphasis in original).

[182] Counter-Memorial, para. 75.

[183] Counter-Memorial, para. 74, *citing* René Lefeber, "Treaties, Provisional Application," in MAX PLANCK ENCYCLOPAEDIA OF PUBLIC INTERNATIONAL LAW (2011), para. 17 (**Exhibit CL-37**).

[184] Counter-Memorial, para. 82.

[185] Counter-Memorial, paras. 84, 90, 95.

[186] Counter-Memorial, paras. 85-87.

96.  Furthermore, the Claimant notes that, at the Sixteenth Plenary Session of the Energy
     Charter Conference, the Respondent joined a declaration stating that "a party may not
     invoke the provisions of its internal law as justification for its failure to perform a
     treaty."[187]   Even further, the Claimant draws evidence from the Energy Charter
     Conference of December 2002, quoting the Russian delegation as saying that it had "yet
     to ratify the Energy Charter Treaty, but, as a Signatory Country, it implements the Treaty
     from the day it entered into force."[188]   The Claimant submits that the "Respondent's
     conduct during the treaty negotiations displayed nothing but complete enthusiasm for
     provisional application."[189]   The Claimant also cites an information bulletin from the
     website of the Russian Ministry of Foreign Affairs as evidence that the Respondent
     acknowledged that it was provisionally applying the ECT as a whole.[190]

97.  The Claimant further contends that, regarding state practice, the Respondent only
     analyzes the practice of one State – Finland – and that, moreover, the documents it relies
     on fail to "provide evidence of 'any agreement' between the parties or an instrument
     accepted by the other parties on signature or any 'subsequent agreement' or 'practice'
     establishing the agreement of the parties for purposes of Article 31 of the [VCLT]."[191]
     Additionally, the Claimant finds the other documents cited by the Respondent to be
     irrelevant and, "in any event, consistent with the Claimant's interpretation."[192]

98.  The Claimant argues that state practice in fact provides support for its interpretation,
     noting that, during the negotiating process, an "emphasis on legal certainty prevailed over
     opposition from various delegations"[193] and referring to the Energy Charter Conference
     Secretariat's request to the delegations that they notify the Secretariat of their intention

---

[187] Counter-Memorial, para. 87, *citing* ECT, pp. 157-158 (**Exhibit C-1**); Note from the European Energy Charter
Conference Secretariat, Document 42/94-CONF 115 (6 January 1995) ("**Note from the European Energy
Charter Conference Secretariat**"), p. 4 (**Exhibit C-145**).

[188] Counter-Memorial, para. 88, *citing* Statement by the Delegation of the Russian Federation to the Energy Charter
Conference (17-18 December 2002) ("**Statement by Delegation of Russia**") (**Exhibit C-118**); Rejoinder, para.
11.

[189] T5/172/6-8.

[190] Counter-Memorial, para. 89; Rejoinder, para. 12; T1/136/16 – T1/137/8

[191] Counter-Memorial, para. 91.

[192] Counter-Memorial, para. 92.

[193] Rejoinder, para. 63.

not to provisionally apply the ECT.[194]   The Claimant notes that nine states – Iceland, Malta, Bulgaria, Cyprus, Switzerland, Turkmenistan, Norway, Japan, and Poland – made declarations pursuant to Article 45(2)(a), and that Hungary made a declaration citing Article 45 without specifying a particular paragraph.[195]   The Claimant cites the *Hulley Enterprises* decision, which highlighted that no state relied on Article 45(1) for "selective or partial application of the ECT based on the non-application of only those individual provisions that are claimed to be inconsistent with a signatory's domestic law."[196] According to the Claimant, the Respondent has not provided evidence that any signatory that did not give notice or make a declaration adopted the Respondent's "piecemeal approach" to Article 45(1).[197]

99.   The Claimant also refers to the Decision of the Energy Charter Conference of 7 December 2000 recording the termination of certain transitional arrangements contained in Annex T by Armenia and Russia, noting that the decision does not suggest an understanding that, after the transitional arrangements were terminated, Russia would only apply in part the substantive obligations referred to in Article 32(1), since such a point would have been recorded.[198]   The Claimant sees further support for its interpretation of Article 45(1) in "the practice of the ECT Secretariat concerning transitional provisions in Article 32 in relation to, *inter alia*, Article 10(7) on non-discrimination."[199]

100.   The Claimant submits that GATT practice is not informative on this point because the provisional application regime is different.[200]

101.   The Claimant also rejects the Respondent's notion that the 1994 Joint EC Statement is relevant.[201]   Again turning to *Hulley Enterprises*, the Claimant argues that "[t]he [1994

---

[194] Rejoinder, para. 64.

[195] Rejoinder, para. 71.

[196] Rejoinder, para. 72, *citing Hulley Enterprises*, para. 321 (Exhibit CL-9). *See also* T1/151/19 – T1/153/6.

[197] Rejoinder, para. 84.

[198] Rejoinder, para. 74, *citing* Decision of the Energy Charter Conference, CCDEC 2000, 14 NOT Brussels (7 December 2000) (Exhibit R-104).

[199] Rejoinder, para. 74, *citing* European Commission, Communication from the Commission to the Council and the European Parliament on the signing and provisional application by the European Communities of the European Charter Treaty, COM(94) 405 final (21 September 1994) (Exhibit R-19).

[200] T5/149/7-15.

[201] Counter-Memorial, para. 94.

Joint EC Statement] does not say, and cannot be read as meaning, that certain elements of the ECT will not be provisionally applied by the European Community because they are inconsistent with the Community's internal legal order."[202]   Rather, the Tribunal in *Hulley Enterprises* found that "the [1994 Joint EC Statement] concludes that the European Community can safely sign the ECT, and accept the obligation of provisional application, without taking on any obligation to do anything that is beyond its competence."[203]   Accordingly, the 1994 Joint EC Statement is "not so much an example of partial provisional application of the ECT due to inconsistency with the EC's legal order, as . . . an example of the EC's partial jurisdiction for the provisional application of the whole ECT."[204]

102. The Claimant notes that there is no suggestion in the statement that the European Community thought that individual provisions of the ECT could be applied provisionally on a piecemeal basis.[205]   Rather, when the European Court of Justice issued Opinion 1/94, holding that there were certain categories of treaties that the European Commission did not have competence to commit to, the European Community took the view that each of the European Commission and Member States could commit to the provisions that they were competent to commit to, and the result was provisional application of the entire treaty.[206]

103. The Claimant additionally rejects that the Bamberger and Loibl articles referred to by the Respondent are relevant, since "[t]he opinions of publicists as to the interpretation of a treaty are not supplementary means of treaty interpretation."[207]

104. Regarding the Respondent's argument that it never received the benefits of provisional application, the Claimant disagrees, contending that Russia was "anxious to bind as many signatories as possible to immediate provisional application of the Treaty," since signing the ECT was one part of a larger plan to attract foreign capital following the collapse of

---

[202] Counter-Memorial, para. 94, *citing Hulley Enterprises*, para. 327 (**Exhibit CL-9**).
[203] Counter-Memorial, para. 94, *citing Hulley Enterprises*, para. 327 (**Exhibit CL-9**).
[204] Counter-Memorial, para. 94, *citing Hulley Enterprises*, para. 327 (**Exhibit CL-9**).
[205] T1/154/3-9.
[206] T1/155/2-25.
[207] Counter-Memorial, paras. 95-96.

the USSR.[208] The Claimant adds that the Respondent provisionally applied the ECT until it notified the ECT depository in 2009, a period in which it received "substantial foreign investment" in the energy sector.[209]

105. Further, the Claimant rejects the Respondent's citation of a 2006 statement by the Secretary of State for Foreign and Commonwealth Affairs to the UK House of Commons,[210] noting that the statement is "irrelevant" and contending that, in any event, the statement is consistent with the Claimant's interpretation.[211]

## 2. Is Article 26 or its provisional application inconsistent with Russia's constitution, laws or regulations?

### (a) The Respondent's position

106. The Respondent contends that Article 26 of the ECT is, for purposes of Article 45(1) of the ECT, inconsistent with the Russian Federation's "constitution, laws or regulations." It argues that any ECT provision that imposes an obligation that cannot be fulfilled in conformity with domestic law, or that grants a right that cannot be exercised in conformity with domestic law, is inconsistent with the signatory's domestic law for the purposes of Article 45(1).[212]

107. The Respondent argues that since "Article 26 ECT is a treaty provision that is inconsistent with Russian law," as long as the Russian Federation has not ratified the ECT,[213] the provisional application of Article 26 of the ECT "at least beyond six months" is inconsistent with the Russian Federation's "constitutions" and "laws" for the purposes of Article 45(1) of the ECT.[214] The Respondent further contends that the provisional application of Article 26 of the ECT "has at all relevant times been inconsistent with Russian laws prohibiting the arbitration of disputes arising out of public law relations,"

---

[208] Rejoinder, paras. 76-78.

[209] Rejoinder, para. 79.

[210] *See* para. 72 above and Reply, para. 116.

[211] Rejoinder, para. 86.

[212] T1/22/17-23.

[213] Memorial, para. 62.

[214] Memorial, para. 64.

and that, for this reason, the provisional application of Article 26 is inconsistent with the Respondent's laws for the purposes of Article 45(1) of the ECT.[215]

108. As support for this argument, the Respondent appeals to the principle of the separation of powers, citing the 1993 *Constitution of the Russian Federation* (the "**Constitution**") and the Russian *Federal Law on International Treaties of the Russian Federation* (the "**FLIT**").

109. Addressing the argumentation of the Claimant, the Respondent takes the view that the Claimant "conflates fundamentally different concepts of the law of treaties," thereby "repeatedly mischaracteriz[ing] Respondent's signature of the ECT as an expression of 'consent to be bound' by the ECT."[216] The Respondent notes that the ECT includes an express ratification requirement, pointing out that, as a consequence, the Respondent "never consented to be bound by the ECT, and the ECT never entered into force for Respondent."[217] According to the Respondent, "by signing the ECT, subject to ratification . . . , Respondent did not consent to be bound by the Treaty," but merely agreed to "apply the ECT provisionally 'to the extent that such provisional application is not inconsistent with its constitution, laws or regulations'."[218]

110. In particular, the Respondent refers to Article 106(d) of the Constitution, which provides that the State Duma (the lower chamber of the Federal Assembly) must adopt federal laws on the "ratification and denunciation of international treaties of the Russian Federation," pointing out that these laws are then subject to mandatory consideration by the Council of the Federation (the upper chamber of the Federal Assembly). When these constitutional requirements are not complied with, the fundamental principle of the separation of powers under the Constitution is violated.[219] Specifically, the Respondent states that the Russian Federation splits treaty-making powers between the executive and Parliament, with the President (or Government) having the power to negotiate and sign treaties, the Federal Assembly having authority to ratify treaties by adopting a federal

---

[215] Memorial, para. 65.

[216] Reply, para. 28.

[217] Reply, para. 31; T1/7/6-9.

[218] Reply, para. 32.

[219] Memorial, para. 56, *citing* the Constitution of the Russian Federation (12 December 1993) ("**Constitution**") (**Exhibit R-21 and Exhibit AVA-1**).

law, and the president having the power to sign that federal law as well as the ratification instrument prepared on the basis of that federal law.[220] Quoting from Professor Asoskov's second opinion, the Respondent concludes that the Russian Government "does not have the power to express consent to be bound by the treaty on behalf of the Russian Federation."[221]

111. The Respondent also refers to Articles 6(2), 14, 15(1)(a), and 15(2) of the FLIT, which implement the principle of separation of powers in the context of the treaty making process. These articles provide a requirement that certain categories of treaties, including those "whose implementation requires amendment of existing legislation or enactment of new federal laws, or that set out rules different from those provided for by a law" must be ratified through the enactment of a federal law.[222] The Respondent says that Professor Stephan accepts that the Government may not express the Russian Federation's consent to be bound by a treaty which sets out rules different from those provided for by federal law – except where there is provision for provisional application.[223] He thus accepts that the Government lacks competence to enact, amend or supplement federal laws – except to the extent that the Government is authorised to implement orders by the president under Article 90 of the Constitution that do not contradict Russian law.[224]

112. Additionally, Article 23(1) of the FLIT states that "[a]n international treaty or a part of a treaty may, prior to its entry into force, be applied by the Russian Federation provisionally if the treaty itself so provides or if an agreement to that effect has been reached with the parties that have signed the treaty."[225] The Respondent notes that Article 23(2) of the FLIT provides a requirement that the provisional application of a legislative treaty must be submitted to the State Duma within six months of the beginning of the treaty's provisional application;[226] Professor Asoskov's evidence was that this was to enable

---

[220] Reply, para. 158.

[221] Reply, para. 160.

[222] Memorial, para. 58, *citing* Law "On International Treaties of the Russian Federation" (15 July 1995) ("**FLIT**"), Art. 15(1)(a) (**Exhibit R-24 and Exhibit AVA-52**). *See also* Reply, para. 163.

[223] T2/166/14-22; T2/167/16 – T2/169/19.

[224] T2/167/6-15.

[225] Memorial, para. 59.

[226] Memorial, para. 59.

parliament to have the "final say," even though the treaty could not derogate from federal law by provisional application.[227]

113. The Respondent also notes that the FLIT's predecessor, the Law of the USSR dated 6 July 1978 "On the Procedure for Conclusion, Performance, and Denunciation of International Treaties of the USSR" (the "**USSR FLIT**"), which remained in force when the ECT was signed, contained ratification requirements that were similar to those of the future FLIT. These ratification requirements were "applicable, inter alia, to 'treaties providing for rules different from those contained in the USSR legislative acts,' as well as to 'international treaties of the USSR . . . where the contracting parties have agreed on subsequent ratification when concluding the treaty'."[228] The Respondent asserts that Professor Stephan agrees that the same wording is present in the 1978 and 1995 Laws (with the exception of the last sentence), but stresses that the constitutional order had changed significantly, including the creation of the institution of the president as part of the executive (whereas the Presidium had previously been part of the legislature).[229]

114. The Respondent rejects the Claimant's argument that, pursuant to Article 15(4) of the Constitution, "treaties are incorporated into the Russian legal system 'at the time of expression of valid consent' and automatically prevail over Russian law."[230] The Respondent notes that Article 15(4) of the Constitution is a conflict of law rule that "grant[s] priority in application to treaty provisions that establish 'other rules than those envisaged by law'" and "is not implicated where the terms of the treaty set a limit on its application by reference to inconsistent domestic law."[231]

115. Additionally, the Respondent contends that, whilst a treaty may be incorporated into Russian law pursuant to Article 15(4) of the Constitution, this "does not mean that its provisions prevail over Russian domestic law."[232] According to the Respondent, quoting from Professor Asoskov's Second Opinion, the "prevailing interpretation of Article 15(4)

---

[227] T2/117/7-13.

[228] Reply, para. 164, *citing* Law of the USSR "On the Procedure for Conclusion, Performance, and Denunciation of International Treaties of the USSR" (6 July 1978), Art. 12 (**Exhibit AVA-54**).

[229] T2/190/21 – T2/192/1.

[230] Reply, para. 131.

[231] Reply, paras. 133-137.

[232] Reply, para. 138.

of the Constitution, as applied by the Supreme Court and supported by the Constitutional Court, is that non-ratified treaties (including those applied on a provisional basis pending their entry into force for the Russian Federation) have no priority over federal laws and other legal acts having a higher rank in the hierarchy of sources of Russian law."[233]

116. Thus, the Respondent submits that it is "firmly established in Russian law that the executive is not authorized to express the Russian Federation's consent to be bound by a treaty that requires ratification through the enactment of a federal law by the Federal Assembly."[234]  Decisions to consent to be bound by a treaty shall be adopted by state authorities "in accordance with their competence" (Article 6(1) of the FLIT) so where ratification is within the exclusive competence of the Federal Assembly (pursuant to Article 160 of the Constitution and Article 14 of the FLIT), the executive may sign the treaty but may not express the Respondent's consent to be bound.[235]  The executive may also agree to provisional application, but in the absence of ratification such a treaty has the status of a treaty concluded without parliamentary approval and is accordingly hierarchically subordinate to federal laws.[236]

117. The Respondent further contends that "[i]n implementing an unratified treaty, including a provisionally applied treaty, the Government may . . . not amend, derogate from or supplement federal laws."[237]  Referring to a Supreme Court decision (the *Chinese trespassers case*),[238] the Respondent asserts that "if the Government expresses consent to be bound by a treaty containing rules different from those stipulated in federal laws . . . the provisions of the treaty may not be applied."[239]  That treaty provided for entry into force on the international level by an exchange of notes and not ratification, and had not been ratified domestically, and in those circumstances the treaty would not apply in the

---

[233] Reply, para. 141, *citing* Second Expert Report of Professor Anton V. Asoskov (2 March 2015) ("**Asoskov 2**"), para. 66. Professor Stephan accepts that Article 15(4) does not distinguish between a treaty in force and a treaty that is being applied provisionally "[a]s to the immediate impact in the Russian legal system"; T2/171/8-13.

[234] T1/40/9-13.

[235] T1/40/17 – T1/41/6.

[236] T1/41/7 – T1/42/3.

[237] Reply, para. 170.

[238] Cassation Ruling of the Supreme Court of the Russian Federation No. 59-O09-35 (29 December 2009) ("**Supreme Court Cassation Ruling**") (Exhibit AVA-61).

[239] Reply, para. 171.

domestic system to the extent that it provided rules different to those of federal law; the Respondent submits that Professor Stephan accepted that characterisation.[240]

118. According to the Respondent, these constitutional constraints "apply with equal force in the context of treaties that are applied on a provisional basis," meaning that the implementation of "treaty provisions that require amendment of existing or enactment of new legislation or that set out rules different from those provided for by law" is "inconsistent with the Russian Constitution."[241] So the Respondent cites a recent decision of the Constitutional Court for the proposition that a derogation from the requirement that a dispute must be heard in the arbitrazh courts cannot be adopted by the executive but must be provided by federal law.[242] According to the Respondent, these restrictions derive from the Constitution's limitation on executive powers and the principles of separation of powers, the rule of law and the requirement that the executive must act on the basis of federal laws.[243]

119. Referring to the *Chinese trespassers case*, the Respondent relies on Professor Asoskov's testimony to the effect that limitations on the implementation of a provisionally applied treaty translate into limitations on the executive's power to consent to provisional application, such that the executive is not authorised to consent to apply a treaty provisionally to the extent that it would lack the power to implement it.[244] So, pursuant to Article 15(4) of the Constitution, only a treaty consent to be bound which was given in the form of a federal law prevails over federal laws; in this respect, Professor Asoskov relies on Resolutions of the Plenum of the Supreme Court which are not concerned specifically with provisional application but are said to be generally applicable.[245] According to the Respondent, Professors Asoskov and Stephan agree that Article 15(4)

---

[240] T2/164/18 – T2/165/23.

[241] Reply, para. 173.

[242] T5/31/18 – T5/32/6.

[243] T5/37/9-21.

[244] T5/38/5-18.

[245] T5/39/6-10, *citing* Resolution of the Plenum of the Supreme Court No. 8 "On Certain Issues of Application by Courts of the Constitution of the Russian Federation in Administering Justice" (31 October 1995) (**Exhibit AVA-79**); Resolution of the Plenum of the Supreme Court No. 5 "On Application by Courts of General Jurisdiction of Generally Recognized Principles and Rules of International Law and International Treaties of the Russian Federation" (10 October 2003) ("**Ruling 2531-O**") (**Exhibit AVA-80**); Constitutional Court Ruling 2531-O (6 November 2014) (**Exhibit AVA-86**). *See* Professor Asoskov's testimony at T2/40/15-25.

applies to both treaties that have entered into force and provisionally applied treaties.[246]
The Respondent submits that Professor Osminin's opinion that the government may
derogate from federal law by consenting to provisional application is a minority view
based on disapproval of the relevant jurisprudence.[247]

120.  The Respondent contends that "[n]either of the two court decisions cited by Claimant and
its expert for the proposition that the terms of a provisionally applied treaty necessarily
apply *in lieu* of Russian federal law supports such a proposition."[248]  Resolution 8-P holds
that agreement to provisional application of a treaty means that the treaty becomes part
of Russian law and must be applied on the same basis as treaties that have entered into
force, but the Russian Federation may condition provisional application of a treaty prior
to its entry into force by compliance with the Constitution, laws and other regulatory acts
of the Russian Federation.[249]  The Respondent argues that Professor Stephan accepts that
this expression refers to the same three types of legal acts as Article 45(1) of the ECT:
the constitution, laws and regulations.[250]

121.  The Respondent submits that this confirms the general application of Article 15(4) of the
Constitution, but the treaty in question takes its place in the hierarchy of Russian law
according to the body that expressed consent to be bound by it.  So where consent to be
bound (or consent to provisional application) was expressed by the government, the treaty
is incorporated at the level of a government resolution and does not prevail over federal
law.[251]

122.  The Respondent also disputes the Claimant's assertion[252] that signatories of the ECT
expressly recognized, in the sixteenth understanding of the Final Act of the Energy
Charter Conference[253], the possibility that Article 26 of the ECT would be incorporated

---

[246] T5/39/24 – T5/440/4.

[247] T5/40/10-20.

[248] Reply, para. 142.

[249] Resolution No. 8-P (**Exhibit R-35**).

[250] T2/176/4-8.

[251] T5/43/10 – T5/45/20, *citing* Ruling 2135-O (**Exhibit AVA-86**). *See also* T2/113/10 – T2/114/5.

[252] *See* para. 96 above and Counter-Memorial, paras. 127-128.

[253] Understanding16: "With respect to Article 26(2)(a) Article 26(2)(a) should not be interpreted to require a
Contracting Party to enact Part III of the Treaty into its domestic law." (**Exhibit C-1**).

into domestic legal systems and would prevail over conflicting domestic law.[254]   The Respondent contends that, "[o]n its face, Understanding No. 16 does nothing more than clarify that an ECT Contracting Party is not required to enact the substantive investment protections in Part III into its domestic law in order to allow an investor to submit a dispute to its courts or administrative tribunals, recognizing that self-executing treaty provisions are directly applicable in the legal systems of many ECT Contracting Parties," and that "Understanding 16 thus does not go to the question whether or not arbitration of the present dispute is consistent with Respondent's 'constitution, laws or regulations'."[255]

123.  The Respondent further rejects the argument of the Claimant that Article 26 of the ECT and Russian law cannot possibly be inconsistent because President Yeltsin signed the ECT and thereby expressed the consent of the Respondent State to be bound by the ECT.[256]   The Respondent notes that the ECT was not signed by President Yeltsin but rather by the Deputy Chairman of the Government of the Russian Federation, Mr Davydov.[257]   It challenges Professor Stephan's opinion that the powers of the President to negotiate and to sign treaties are exclusive, and that Mr Davydov as a member of the Government was acting under a form of delegation.[258]   In addition, the Respondent points out that, since Article 39 of the ECT expressly required ratification of the Treaty, its signature was "only 'a stage in the conclusion of' the ECT."[259]

124.  The Respondent rejects the Claimant's view[260] that Russian domestic law and Article 26 of the ECT cannot be inconsistent since the Claimant seeks to enforce rights that arise under the ECT and that are interpreted pursuant to public international law.[261]   The Respondent submits that the Claimant ignores the fact that Article 26 of the ECT is qualified by the Domestic Law Inconsistency Clause of Article 45(1), and argues that the

---

[254] Reply, para. 150.

[255] Reply, para. 150.

[256] Reply, para. 152.

[257] Reply, paras. 152-153.

[258] T2/138/10 – T2/154/18.

[259] Reply, para. 157.

[260] See para. 144 below and Counter-Memorial, para. 116.

[261] Reply, para. 197.

two textbooks cited by the Claimant in this regard[262] are not relevant to addressing this issue.

125. The Respondent also rejects the Claimant's expert's contention that Yukos Capital's claims are arbitrable because the Claimant does not request the annulment of public acts such as tax assessments, enforcement measures, and decisions of the receiver in bankruptcy proceedings.[263]  Professor Stephan's evidence is that matters such as tax assessments must be challenged before the Russian courts "[a]bsent some derogation."[264] The Respondent cites Professor Asoskov as authority for the proposition that a review of the legality of such acts would be "inevitably" necessary to determining compensation claims derived from those acts of governmental authority.[265] The Respondent also quotes Professor Skvortsov in concluding that "a dispute for compensation of damages caused by the unlawful actions of State bodies and their officials exercising their public law functions may not be referred for resolution to an arbitral tribunal."[266]

126. The Respondent argues that disputes between a foreign investor and the host state are generally within the jurisdiction of the host state's courts, regardless of whether the investor invokes protections under treaty or domestic law.[267] Under Russian law, claims for the wrongful exercise of state power are heard by the courts of general jurisdiction and the arbitrazh courts.[268]

127. The Respondent further argues, citing the First Opinion of Professor Asoskov, that certain public law disputes "have always been non-arbitrable under Russian law," including disputes regarding tax assessment, sanctions levied by tax authorities, the enforcement of

---

[262] Counter-Memorial, para. 116, *citing* Campbell McLachlan, Laurence Shore, & Matthew Weiniger, INTERNATIONAL INVESTMENT ARBITRATION: SUBSTANTIVE PRINCIPLES (2007), para. 3.51 (**Exhibit CL-39**); Zachary Douglas, THE INTERNATIONAL LAW OF INVESTMENT CLAIMS (2009) ("**Douglas**"), para. 141 (**Exhibit CL-35 and Exhibit RL-64**).

[263] Reply, para. 199.

[264] T2/176/9 – T2/177/21.

[265] Reply, para. 199, *citing* Expert Report of Professor Anton V. Asoskov (28 July 2014) ("**Asoskov 1**"), paras. 69-70; Asoskov 2, paras. 95-96.

[266] Reply, para. 199, *citing* O. Yu. Skvortsov, "About Certain Matters Concerning Recovery of Damages in Arbitration Proceedings," in DAMAGES AND PRACTICE OF THEIR RECOVERY: COLLECTION OF PUBLICATIONS (M.A. Rozhkova, ed., 2006) ("**Skvortsov**"), pp. 525-526 (**Exhibit AVA-32**).

[267] T1/26/17-21.

[268] T1/27/4-7.

decisions by tax authorities, actions or omissions of state authorities in enforcement proceedings, and bankruptcy issues.[269]   Specifically, the Respondent claims that "arbitration of the present dispute is inconsistent with Russian federal laws, including the Tax Code, the Civil Procedure Code, the Arbitrazh Procedure Code, the Law 'On Enforcement Proceedings' and the Law 'On Insolvency (Bankruptcy) of Business Entities'."[270]

128.  Addressing the Claimant's view that limitations on arbitrability are not applicable to state authorities acting in a public law capacity,[271] the Respondent contends that this "turns the principle of non-arbitrability on its head."[272]  According to the Respondent, "[p]ublic law disputes are not arbitrable precisely because the principles of freedom of contract and procedural discretion, which allow parties to refer disputes to arbitration in the sphere of private law, are not present in the sphere of public law."[273]  As a consequence, the Respondent quotes Professor Asoskov to the effect that a legal regulation that involves an exercise of sovereign power is a public law regulation (alleging that the Claimant chose not to cross-examine Professor Asoskov on this point[274]) and "[p]ublic law disputes are not arbitrable unless a federal law expressly provides an exemption." [275]

129.  Specifically, the Respondent argues that this dispute is to be settled in the Moscow Arbitrazh Court pursuant to Article 35 of the 2002 Arbitrazh Procedure Code.[276]  Article 4(6) of that Code authorises parties to displace the jurisdiction of the arbitrazh courts by virtue of an arbitration agreement only if the dispute arises out of civil law relations, which, according to Professor Asoskov, are relations based on the principle of coordination, as opposed to public law relations, which are based on the principle of

---

[269] Memorial, para. 69, *citing* Asoskov 1, para. 12. *See also* Reply, para. 200.

[270] Reply, para. 175.

[271] *See* paras. 161-162 below.

[272] Reply, para. 178.

[273] Reply, para. 178.

[274] T5/3/19-24, *citing* Asoskov 1, paras. 30, 32.

[275] Reply, para. 179. *See also* T5/8/7-19, *citing* decisions annexed as Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 11535/13 (28 January 2014) (**Exhibits AVA-18**); Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 11059/13 (11 February 2014) (**AVA-19**); Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 3515/00 (10 April 2001) (**Exhibit AVA-20**).

[276] T1/27/11-22, *citing* Asoskov 2, para. 75.

subordination or involve a state party, public interest and the expenditure of public funds,[277] or otherwise "involves appreciation of [the] legality of the legal acts of state or municipality."[278]   The Respondent says that on either standard the present dispute that concerns taxation measures, tax enforcement measures and bankruptcy issues, arises out of public law relations and thus cannot be referred to arbitration.[279]   The consequence is that, according to the Constitutional Court, "the current legal system does not permit the arbitration of disputes arising out of administrative and other public law relations" unless there is a derogation provided by federal law.[280] Professor Stephan's response is that "'do not allow' is not the same as 'forbid'."[281] The Respondent cites a decision of the Supreme Arbitrazh Court and commentary in support, but accepts that there is no case holding that a claim based on the breach of an investment treaty is not arbitrable in Russia.[282] Professor Stephan accepts that neither the Civil Procedure Code nor the Arbitrazh Code contain any authorisation to refer disputes arising out of public law relations to arbitration, but says that nor do they contain any "language of prohibition."[283]

130.  The Respondent emphasizes that several laws on foreign investment, namely the *1991 Fundamentals of Legislation on Foreign Investments in the USSR* (the "**USSR Fundamentals**"), the *1991 Law on Foreign Investments in the RSFSR* (the "**1991 FI Law**") and the *1999 Law on Foreign Investments in the Russian Federation* (the "**1999 FI Law**"), do not provide any exception to this general rule of non-arbitrability of public law disputes.

131.  In the first place, the Respondent contends that these laws do not apply to the present dispute,[284] arguing that, in order for a transaction to qualify as a "foreign investment"

---

[277] T1/27/23 – T1/28/23.

[278] T2/102/24 – T2/103/4.

[279] T1/28/24 – T1/31/25.

[280] T5/2/24 – T5/3/1, *citing* Resolution of the Constitutional Court of the Russian Federation No. 10-P (26 May 2011) (**Exhibit AVA-2**). *See also* T2/181/1 – T2/184/2.

[281] T2/180/24-25. *See also* T2/181/1 – T2/182/18, *discussing* Ruling of the Constitutional Court of the Russian Federation No. 5-O (5 January 2015) (**Exhibit AVA-94**).

[282] T5/3/25 – T1/86, *citing* Resolution of the Presidium of the Supreme Arbitrazh Court of the Russian Federation No. 17043/11 (3 April 2012) (**Exhibit AVA-21**); Skvortsov (**Exhibit AVA-32**); S. Krupko, INVESTMENT DISPUTES BETWEEN A STATE AND A FOREIGN INVESTOR: A TRAINING AND PRACTICAL GUIDE (2002) (**Exhibit AVA-33**).

[283] T2/177/22 – T2/180/10.

[284] Memorial, paras. 70-71.

under Russian law, foreign capital must be injected into "objects of entrepreneurial activity" in the territory of the Russian Federation and result in a capital increase in the Russian economy from foreign resources.[285] The Loans do not meet these requirements for a "foreign investment" as they "were in fact profits made by Yukos Oil Company's trading subsidiaries and other entities controlled by Yukos Oil Company" and failed to involve any "injection of foreign capital into the Russian Federation."[286]

132. In any event, the Respondent submits that the abovementioned laws "do not authorize the submission of investment disputes arising out of public law relations to arbitration."[287] Thus, both Article 43 of the USSR Fundamentals and Article 9 of the 1991 FI Law would only allow investment disputes "arising out of civil law relations" to be submitted to arbitration, whilst state courts would have jurisdiction over disputes regarding sovereign acts or omissions unless (in the words of the 1991 FI Law) "another procedure is established by an international treaty in force in the territory of the RSFSR."[288]

133. In like manner, according to Article 10 of the 1999 FI Law, investment disputes would be arbitrable only "in accordance with international treaties of the Russian Federation and its federal laws."[289]

134. The Respondent argues that Article 10 of the 1999 FI Law itself "does not address the issue of arbitrability," as it merely "conditions an investor's right to submit investment disputes to arbitration on an international treaty or a federal law providing for such a right."[290] The Respondent submits that "[n]o federal law has been enacted that authorises the arbitration of disputes arising out of public law relations, including claims for compensation based on allegedly unlawful taxation measures, enforcement measures related to tax assessments or actions or omissions of State organs in bankruptcy

---

[285] Memorial, paras. 72-73; T1/36/9-18.

[286] Memorial, para. 73.

[287] Memorial, para. 74. *See also* Reply, paras. 176-181.

[288] Memorial, paras. 74-75, *citing* Fundamentals of Legislation on Foreign Investments in the USSR adopted by the Supreme Council of the USSR under No. 2302-1 (5 July 1991), Art. 43 (**Exhibit AVA-34**); Law of the RSFSR No. 1545-1 "On Foreign Investments in the RSFSR" (4 July 1991) ("**1991 FI Law**"), Art. 10 (**Exhibit AVA-35**). Federal Law No. 160-FZ "On Foreign Investments in the Russian Federation" (9 July 1999) ("**1999 FI Law**"), Art. 9 (**Exhibit AVA-36**).

[289] Memorial, para. 78, *citing* 1999 FI Law, Art. 10 (**Exhibit AVA-36**).

[290] Memorial, para. 78, *citing* Asoskov 1, paras. 98-110.

matters."[291]  The Respondent relies on Professor Asoskov's evidence that Article 10 is a "declaratory norm" or "blanket provision" which does not itself provide an independent basis for resort to arbitration.[292]  The consequence is that, although the provision does not prohibit arbitration, a claimant must be able to point to another federal law or treaty which provides for the right to arbitrate.[293]  Where a treaty provides for arbitration, it must either be ratified or (where provisionally applied) the treaty terms must be permitted by Russian law.[294]  The consequence is that, under current law, it is never possible to provide for provisional application of an international treaty's provision for investor-state dispute settlement through arbitration.[295]

135.  The Respondent submits that the reference to treaties in force in the 1991 FI Law means ratified treaties, consistent with the distinction in the VCLT between the entry into force of a treaty and its provisional application,[296] while the references to an "international treaty of the Russian Federation" in the 1999 Law means an international agreement concluded by Russia,[297] to which Russia had given consent to be bound.[298]  The ECT is not, according to the Respondent, a treaty to which the Respondent has consented to be bound.[299]

136.  The Respondent submits that it does not matter at which time piecemeal provisional application is assessed, since disputes such as the present dispute have always been non-arbitrable.  While states may have been free to change their law during the period of provisional application, it was expected that "more of it [would become] provisionally applicable over time."[300]  Nevertheless, the Respondent submits that the question of

---

[291] Memorial, para. 78.

[292] T5/9/13-21, *citing* Asoskov 1, paras. 91-111; T2/109/17-24.

[293] T5/46/7 – T5/47/11. *See also* T2/110/11-22.

[294] T5/49/4-25.

[295] T5/50/1-9.

[296] T5/12/14 – T5/13/16; T5/41/8 – T5/42/18.

[297] FLIT, Art. 2(a) **(Exhibit R-24)**.

[298] FLIT, Art. 2(d) **(Exhibit R-24)**.

[299] T5/42/19 – T5/43/9.

[300] T5/10/1 – T5/12/13; T5/60/1-13.

whether the Russian Federation consented to arbitration must be assessed by reference to the 1991 FI Law in force when the ECT was signed.[301]

137. The Respondent further argues that there are no federal laws that authorise arbitration of the present dispute. Because the ECT, "through the renvoi to Russian federal law" in Article 45(1), provides for arbitration only to the extent not inconsistent with Russian federal laws, the ECT does not "establish another procedure for the resolution of investment disputes"; such disputes are exclusively within the jurisdiction of domestic courts.[302]

138. According to the Respondent, the provisions that the Claimant relies on "do not delegate legislative power to the executive to derogate from the principle of non-arbitrability of public law disputes," but merely "refer to treaties that have been ratified by Parliament through the enactment of a federal law, as Respondent's consistent practice in the conclusion of bilateral investment treaties confirms."[303]  In other words, the laws on foreign investment do not authorise the executive to submit the present dispute to arbitration.[304]

139. The Respondent notes that it is a party to 57 bilateral investment treaties that were subject to ratification.[305]   The Russian ratification instruments regarding these BITs were accompanied by explanatory notes, which the Respondent argues demonstrate that "investor-State arbitration provisions 'set out rules different from those provided for by law' within the meaning of Article 15(1)(a) FLIT, i.e., they derogate from federal laws."[306]   The same position prevailed under the 1978 Law.[307]   According to the Respondent, the relevant arbitration provisions "require ratification because, absent

---

[301] T5/14/8 – T5/15/2.

[302] T1/37/3 – T1/37/19.

[303] Reply, para. 186. *See also* Memorial, paras. 62-64.

[304] T1/37/20-21.

[305] A number of the explanatory notes accompanying these treaties were put in evidence. The Respondent also referred to the texts of two of the treaties themselves, those between the USSR and the Netherlands (**Exhibit RL-174**) and between the Russian Federation and Denmark (**Exhibit CL-78**), both of which refer to the treaties entering into force on the completion of internal procedures: T2/194/2 – T2/195/17.

[306] Reply, para. 187, *citing* Memorial, paras. 62-63. *See also* T1/32/1 – T1/34/16; T2/187/14 – T2/190/16; T5/18/10 – T5/19/20.

[307] T1/35/19-23.

ratification, they are inconsistent with Russian law."[308] The Respondent notes that none of those BITs contained a provisional application clause (and all were ratified) and suggests that there is accordingly "no ... practice" of the Russian Federation provisionally applying investment treaties.[309] The Respondent notes that Professor Stephan testified that he was not aware of any investment treaty that was not subject to ratification at the international level: that is, that contemplated an ultimate method of consent and going into force other than through ratification.[310]

140. In the context of the ECT, the Respondent points out that the explanatory note prepared by the Government as part of its attempt to persuade the State Duma to ratify the ECT and relied on by the Claimant[311] "does not express a view on whether arbitration under Article 26 ECT, or the implementation of any other ECT provision, is inconsistent with Russian law for purposes of Article 45(1) ECT."[312] The Respondent submits that the Claimant relies on a mistaken English translation of the explanatory note, which, when properly translated, only states that Article 45(1) of the ECT (rather than the application of the ECT in general) conformed with Russian law.[313] The Respondent points out that Professor Stephan also accepted that, properly translated, the reference to "provisions on provisional application" should refer to "provision" in the singular, and understood that as a reference to Article 45.[314] Professor Stephan also accepted that the term "legal regime of foreign investments" was the same term as used in Article 6 of the [1991 FI Law] then linguistically it does not refer to "investor-state arbitration."[315]

---

[308] Memorial, para. 62.

[309] T1/33/20 – T1/34/16.

[310] T2/186/10 – T2/187/6

[311] See para. 148 below and Counter-Memorial, paras. 111, 129.

[312] Reply, para. 189. See also T5/24/2 – T5/28/7; T2/204/9 – T2/212/3.

[313] Reply, paras. 190-193. The Claimant's allegedly "mistaken" translation may be found at Explanatory Note to the Draft Federal Law "On Ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects" ("**Explanatory Note to the Draft Law**") (**Exhibit C-147**, annexed in a different translation as **Exhibit R-111**). The Respondent's allegedly "corrected" translation may be found at Reply, para. 191.

[314] T2/206/1 – T2/207/14.

[315] T2/211/1-10.

141. With regard to the Claimant's quotation of the explanatory note that "[t]he provisions of the ECT are consistent with Russian legislation,"[316] the Respondent claims that this has been taken out of context.[317]  The Respondent explains that there are three categories of legislative treaties whose ratification is contemplated by Article 15(1)(a) of the FLIT, namely, (i) treaties that require enacting federal laws to amend federal laws already in existence, (ii) treaties that require adopting new federal laws for implementing non-self-executing treaty provisions, and (iii) "treaties that provide for derogations from federal laws applicable solely in specific relations with other Contracting States and their citizens and nationals," which do not require adopting new federal laws or amending existing ones, instead being "appl[ied] directly in the Russian legal system and prevail[ing] over inconsistent federal laws pursuant to Article 15(4) of the Constitution."[318]

142. According to the Respondent, the explanatory note placed the ECT within the third category of treaties, with the consequence that it did "not require the enactment of any concessions or the adoption of any amendments" since if it "set out rules different from those provided for by a law, the rules of the international treaty shall apply."[319]  The fact that the ECT contained a number of provisions yet to be reflected in Russian legislation was not an obstacle to ratification because legislation aligning Russian law with GATT and WTO standards was in the process of being enacted.[320]  So the list of provisions relied on by the Claimant does not list all those provisions inconsistent with federal law, but rather contains a non-exhaustive list of provisions whose implementation will require the enactment of new federal laws.[321]

143. Article 26 falls into the category of ECT provisions that are inconsistent with federal law but will, following ratification, prevail over that federal law.[322]  So where the explanatory note records that inconsistent provisions of the ECT would prevail over domestic law in relations with other contracting parties pursuant to Article 15(4) of the Constitution, the

---

[316] *See* para. 148 below and Counter-Memorial, paras. 111, 129, *citing* Explanatory Note to the Draft Federal Law, pp. 1-4 (**Exhibit C-147**, corr. trans. **Exhibit R-111**).

[317] Reply, para. 193.

[318] Reply, para. 193.

[319] Reply, para. 194.

[320] T1/39/3-10.

[321] T5/26/13-20.

[322] T5/27/11-15.

Respondent contends that this is a "post-ratification analysis" that does not address whether the ECT is subject to ratification or contains provisions inconsistent with Russian law in the absence of ratification;[323] in other words, the explanatory note does not discuss whether ratification is required, but is based on the premise that it is.[324]

### (b) The Claimant's position

144. As a starting point, the Claimant submits that the question is not – as the Respondent is said to formulate it – whether individual treaty provisions are inconsistent with Russian law in the abstract.  Rather, the question is whether provisional application of such individual provisions is inconsistent with Russian law.[325]  The Claimant's case is that provisional application of Article 26 is not inconsistent with Russian law, either because the executive had authority to commit the Russian Federation to provisional application of the clause, or because the clause itself is not inconsistent with Russian law since the relevant foreign investment statutes contemplate the submission of international investment treaty disputes to arbitration.

145. The Claimant also stresses that "provisional application is an extraordinary thing" and an exception to the separation of powers: that explains the requirement under Russian law to submit provisionally-applied treaties to the State Duma within six months.[326]  Thus, provisional application in accordance with Article 25 of the VCLT means that a state agrees to apply provisions of the treaty even though they require ratification and implementing legislation to become part of domestic law.[327]

146. As a preliminary matter, the Claimant argues that the burden of proof to show that the provisional application of Article 26 of the ECT is inconsistent with Russian law is on the Respondent, and that the Claimant is not under any obligation to show that the arbitration of this dispute is consistent with Russian law.[328]  The Claimant asserts that, under the ordinary meaning of "inconsistent with" "only a direct conflict with Russian

---

[323] T1/39/11-21.
[324] T5/25/2-4.
[325] T5/126/23 – T5/127/15.
[326] T5/129/2-12.
[327] T5/132/12-18.
[328] Rejoinder, para. 90.

law existing at the time of the ECT's signature . . . would satisfy the limitation in Article 45," and that the Domestic Law Inconsistency Clause could do no more than "absolve[] Respondent from an obligation to pass new legislation or modify existing legislation in case of a direct conflict with ECT provisions."[329]   The Claimant notes that this "requirement of a positive conflict" is consistent with state practice.[330]

147.   Likewise, the Claimant contends that tribunals in investment treaty arbitrations also have required "express prohibition under domestic law" in their determination of whether an inconsistency exists between treaty provisions and domestic law.[331]   The Claimant refers to the decisions in *Kardassopoulos*,[332] *Achmea v. Slovak Republic*[333] (*"Achmea"*), *Electrabel v. Hungary*[334] (*"Electrabel"*), and *Khan Resources v. Mongolia*[335] as authority for this proposition.   In other words, only where domestic law "forbids compliance" will the necessary inconsistency exist – a vacuum is not sufficient.[336]   With these decisions in mind, the Claimant argues that the "Respondent fails to put forward any case to establish that Russian law existing at the time of ECT signature forbade arbitration of investment disputes or required Respondent to modify existing legislation – i.e., that a conflict existed."[337] The Claimant cites authority from the GATT context in support, arguing that it was not the case that the Russian Federation had "no choice but to violate the treaty."[338] So, where domestic law offers only one form of recourse, but the treaty provides an alternative, then provisional application will enable the claimant to take advantage of the treaty procedure.[339]

---

[329] Rejoinder, para. 91.

[330] Rejoinder, para. 96.

[331] Rejoinder, para. 97.

[332] Rejoinder para. 97, *citing Kardassopoulos*, paras. 237, 245 **(Exhibit CL-11)**.

[333] Rejoinder, para. 98, *citing Achmea B.V. v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension (26 October 2010) (*"Achmea"*), para. 274 **(Exhibit CL-56)**.

[334] Rejoinder, para. 99, *citing Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability (30 November 2012) (*"Electrabel"*), para. 4.175 **(Exhibit RL-76)**.

[335] Rejoinder, paras. 100-101, *citing Khan Resources Inc., Khan Resources B.V., CAUC Holding Company Ltd. v. The Government of Mongolia, MonAtom LLC*, PCA Case No. 2011-09, Decision on Jurisdiction (25 July 2012), para. 71 **(Exhibit CL-61)**.

[336] T1/124/15-21, *citing Eureko B.V. v. Poland*, Partial Award (19 August 2005) **(Exhibit RL-74)**; T5/159/8-12.

[337] Rejoinder, para. 102.

[338] T1/125/7-20, *citing* GATT ANALYTICAL INDEX: GUIDE TO GATT LAW AND PRACTICE **("GATT GUIDE")** **(Exhibit RL-139)**; T5/148/5 – T5/149/15.

[339] T5/133/2-19.

148. To the contrary, the Claimant points out that the Respondent sought to ratify the ECT in the State Duma of the Russian Federal Assembly, and that during that ratification process, the government of Russia made a "determination" (albeit not on the international plane[340]) confirming that "[t]he provisions of the ECT are consistent with Russian legislation."[341] The Claimant submits that the drafter of that note listed the provisions of the ECT that were in conflict with Russian law, and did not include Article 26.[342]

149. The Claimant submits that "Article 26 ECT is not inconsistent with Russian law,"[343] since "[t]reaties become incorporated into Russian law at the time of expression of valid consent," even without an incorporating act.[344] The Claimant maintains that this also holds true for treaties applied provisionally, as is the case with the ECT.[345] The Claimant argues that an inconsistency between international treaties and Russian domestic law "cannot exist as a matter of Russian law," since the terms of international treaties would "apply in lieu of the rules provided by domestic law."[346]

150. Contrary to allegations made by the Respondent,[347] the Claimant contends that it is not "conflating provisional application with final entry into force," but "simply set[ting] out the implications of a treaty mechanism that Russia cannot deny it has consented to by its signature."[348] The Claimant quotes from a Resolution of the Constitutional Court to support the proposition that "[a]greement to provisional application of an international treaty means that it . . . must be applied on the same basis as international treaties that have entered into force ... since otherwise, provisional application would be meaningless."[349] Further, the Claimant quotes the Russian delegate in the context of the ECT negotiations as understanding that there would be a "period of provisional

---

[340] T5/154/11-14.

[341] Counter-Memorial, paras. 110-111, *citing* Explanatory Note to the Draft Federal Law, pp. 1, 4 (**Exhibit C-147**, corr. trans. **Exhibit R-111**); Rejoinder, paras. 10, 104; T1/128/22 – T1/132/14.

[342] T1/132/1-6; T5/153/2-16.

[343] Counter-Memorial, para. 97; Rejoinder, para. 87.

[344] Counter-Memorial, paras. 105, 107, *citing* Expert Report of Professor Paul B. Stephan (28 October 2014) ("**Stephan 1**"), para. 29.

[345] Counter-Memorial, paras. 103, 106, 123.

[346] Counter-Memorial, paras. 107-108, *citing* Stephan 1, para. 29.

[347] *See* Reply, paras. 36-38.

[348] Rejoinder, para. 17.

[349] Rejoinder, para. 18, *citing* Resolution No. 8-P, para. 6 (**Exhibit R-35**).

application of the Treaty [that] would be a sort of running in period of the implementation of this most important instrument for international cooperation."[350]

151. Against the Respondent's arguments as to why Russia was not bound, the Claimant notes that "a provisionally applicable treaty is binding and constitutes a legally enforceable instrument among signatory states," citing the ILC Commentary to Article 25 of the VCLT.[351] The Claimant considers "irrelevant" the fact that President Yeltsin did not sign the ECT himself,[352] noting that the Constitution grants the President the authority to express consent to be bound to treaties, and that the signature of a duly authorized representative of the president "is equivalent to the President's personal signature."[353] The Claimant notes that no part of its case rests on an assumption that President Yeltsin himself signed the ECT.[354]

152. The Claimant also contends that the Respondent "conflates international ratification with domestic consent to ratification."[355] The Claimant cites Professor Stephan as authority for the proposition that "ratification of a treaty is an international process and occurs only when a treaty party renders the relevant documentation as specified by the treaty," noting that in the case of Russia the executive renders such documentation, not the legislature.[356] The Claimant adds that Russian law does not require legislative domestic ratification of all treaties and that "Russian law indisputably provides for provisional application of treaties with signature in advance of, and thus independent of, subsequent domestic ratification."[357]

153. Furthermore, the Claimant takes issue with the Respondent's argument that the ECT Secretariat's desire to see Russia's ratification of the ECT is evidence that the Secretariat recognized that "provisional application did not impose on Respondent the same

---

[350] Rejoinder, para. 19, *citing* Transcript of Energy Charter Conference (14 December 1993) (**Exhibit R-80**).

[351] Rejoinder, paras. 20-21, *citing* International Law Commission, DRAFT ARTICLES ON THE LAW OF TREATIES WITH COMMENTARIES (1966) Vol. II, Pt. II, ILC Yearbook ("DRAFT ARTICLES"), pp. 187, 210 (**Exhibit CL-46**).

[352] *See* Reply, paras. 152-153.

[353] Rejoinder, para. 22, *citing* Supplemental Expert Report of Professor Paul B. Stephan (15 June 2015) ("**Stephan 2**"), paras. 2-8.

[354] Rejoinder, para. 23.

[355] Rejoinder, para. 24.

[356] Rejoinder, para. 25.

[357] Rejoinder, para. 25.

obligations as ratification,"[358] proposing instead that the Secretariat wanted Russia to ratify the ECT in order to affirm Russia's political commitment and to increase the treaty regime's legal certainty and stability.[359]

154.  According to the Claimant, a signatory commits to provisional application of all treaty provisions to which that signing authority can commit the state.[360]  The executive branch has authority under Article 86 of the Constitution to negotiate and sign treaties.[361]  When a treaty provides for signature to have the effect of accepting a binding obligation, the Russian Federation is bound by that.[362]  The executive is empowered to determine whether to agree to provisional application and therefore commit Russia to so apply a treaty.[363]  None of those propositions are said to be disputed.  The only limitation, according to the Claimant, is that the executive may not agree to the provisional application of provisions that violate the Constitution itself.[364]

155.  This is because, the Claimant submits, Article 23 of the FLIT empowers the executive to commit to the provisional application of treaty provisions that conflict with domestic law provided that the treaty so provides.[365]  The Claimant cites a number of commentaries which opine that the purpose of provisional application is to apply a treaty immediately pending the fulfillment of specific procedures required for its entry into force (usually ratification),[366] and rejects Professor Asoskov's contention that these are a minority view in the absence of any dissenting commentary on the record.[367]

---

[358] *See* para. 72 above and Reply, para. 115.

[359] Rejoinder, para. 85.

[360] T1/113/21-24.

[361] T1/114/18-21.

[362] T1/114/22-25.

[363] T1/115/1-5.

[364] T1/115/6-11.

[365] T1/115/16-23.

[366] T1/118/6 – T1/124/7, *citing* FEDERAL LAW ON INTERNATIONAL TREATIES OF THE RUSSIAN FEDERATION (Vadim P. Zverkov & Boris I. Osminin, eds., 1996) ("**Zverkov & Osminin**") (**Exhibit CL-48**); Boris I. Osminin, ADOPTION AND IMPLEMENTATION OF TREATY OBLIGATIONS BY STATES (2006) ("**Osminin**") (**Exhibit RL-140**). *See* T2/29/11 – T2/56/7 where the Claimant put these commentaries to Professor Asoskov. *See also* Sergui M. Pounjin, "The New Federal Law on International Treaties of the Russian Federation," in CONSTITUTIONAL REFORM AND INTERNATIONAL LAW IN CENTRAL AND EASTERN EUROPE (Rein Müllerson, Malgosia Fitzmaurice, and Mads Andenas, eds., 1998) (**Exhibit RL-51**).

[367] T5/140/9 – T5/141/2. *See also* T2/78/13 – T2/79/25.

156. The Claimant also submits that in the only Russian decision on the record which addresses this point – the *Lufthansa* case – the court simply applies the treaty without regard to whether its provisions are consistent with domestic law,[368] while the decisions on which Professor Asoskov relies for the proposition that only ratified treaties can prevail over federal law do not concern provisional application.[369]  Professor Stephan testified that the *Chinese trespassers case* involved a treaty that had been brought into legal effect by an exchange of notes, and did not provide for provisional application.  In that context, the court's decision was that the exchange of notes did not substitute for ratification.[370]  The Claimant also put to Professor Asoskov a Council of Europe document which records the Russian Federation's statement that provisional application of a treaty is possible if the treaty so provides; Professor Asoskov's opinion was that the response was incomplete.[371]

157. Although Article 23 was enacted after Russia signed the ECT, with the exception of the six-month requirement it reflected Article 25 of the VCLT,[372] which Professor Asoskov testified had been ratified by the Soviet Union and thus formed part of Russian law.[373]  Professor Asoskov accepted there was no other restriction on the executive's power to commit to provisional application on the face of Article 23, but maintained that general principles on the limitations of the executive's power to conclude international treaties applied.[374]

---

[368] T5/139/7 – T5/140/8, *citing* Judgment of the High Arbitrazh Court of Russian Federation No. VAS-13594/09 re: Case No. A40-46399/08-29-480 and Joint Declaration (14 July 2003) (**Exhibit C-146**); put to Professor Asoskov at T2/80/9 – T2/86/10.

[369] T2/40/15 – T2/40/25 and T2/73/22 – T2/77/11, *citing* Constitution and Resolutions of Plenum of the Supreme Court Nos 8 (31 October 1995), Art. 15(4) (**Exhibit AVA-79**); Resolution of the Plenum of the Supreme Court No. 5 "On Application by Courts of General Jurisdiction of Generally Recognized Principles and Rules of International Law and International Treaties of the Russian Federation" (10 October 2003) (**Exhibit AVA-80**); Ruling 2531-O (**Exhibit AVA-86**). *See also* Stephan 2, paras. 36-39.

[370] T2/162/15-25, *citing* Supreme Court Cassation Ruling (**Exhibit AVA-61**).

[371] T2/56/8 – T2/63/25, *citing* "Russian Federation Country Report," in TREATY-MAKING- EXPRESSION OF CONSENT BY STATES TO BE BOUND BY A TREATY (Council of Europe, ed., 2001) (**Exhibit CL-42**).

[372] T2/24/14 – T2/25/15.

[373] T2/18/22 – T2/19/20.

[374] T2/29/4-10.

158. The consequence is that when the executive agrees to provisional application then the terms of the treaty become part of Russian law and are enforced as if the treaty were in force pursuant to Article 15(4) of the Constitution.[375]

159. The Claimant submits that if (as is not disputed) the executive can commit the Russian Federation to provisionally apply a treaty that determines territorial boundaries (including one that is required to be ratified by Article 15(3) of the FLIT), it is "inconceivable" that it would not have the power to commit the state to arbitrate with an investor.[376]

160. The Claimant accordingly rejects Professor Asoskov's "hierarchy argument," according to which a treaty in force in the Russian Federation that has not been ratified is subordinate to federal laws. The Claimant submits that none of the authorities on which Professor Asoskov bases this theory concerns provisional application. The "whole point" is that a provisionally applied treaty is applied as if it is in force,[377] and it assumes the same hierarchy as if it were in force.[378] Professor Asoskov's distinction between the authority of the Government and that of the President is beside the point, since although executive acts are subordinate to legislative acts the effect of provisional application is to apply the treaty as if it had been ratified.[379]

161. On the subject of whether Article 26 is in fact inconsistent with any provisions of Russian law, the Claimant rejects the Respondent's contention that "disputes about taxes, their enforcement and bankruptcy . . . cannot be arbitrated." It says this is relevant only for "arbitration in Russia within its domestic legal system," but not with regard to rights arising under a treaty and interpreted according to public international law.[380]

162. So, the Claimant disputes the Respondent's reliance on Professor Asoskov's theory of "the principle of non-arbitrability of public law disputes as a fundamental aspect of the Russian law."[381] The Claimant quotes Professor Stephan, arguing that Professor

---

[375] T1/126/23 – T1/127/4.

[376] T5/137/15-20, T5/138/11-14. It appears that this was intended to be a reference to Art. 15(1).

[377] T1/137/9 – T1/138/10.

[378] T5/141/3 – T5/142/16.

[379] T5/142/17 – T5/143/14.

[380] Counter-Memorial, paras. 115-116, 118-120.

[381] Rejoinder, para. 115, *citing* Asoskov 2, paras. 67-96.

Asoskov's "authorities involve only the interpretation of particular legislation, and do not indicate the existence of any broader principle barring the Russian Federation from submitting to binding arbitration."[382] The Claimant insists that Professor Asoskov makes a "misleading point" when he asserts[383] that certain disputes – concerning the assessment and collection of taxes and tax sanctions, the enforcement of tax authorities' decisions and the bankruptcy of Russian legal entities – must be resolved in Russian courts.[384] The Claimant maintains that the present dispute does not concern such matters: the Claimant is not "asking the Tribunal to try a bankruptcy case" or any of the other kinds of case dealt with in the laws on which Professor Asoskov relies.[385] The present dispute does not arise in the context of a relationship of subordination, but under a multilateral investment treaty,[386] and the Claimant alleges that Professor Asoskov has no authority for the extension of that principle to public international law disputes.[387]  Under cross-examination, Professor Asoskov accepted that none of the first four examples of disputes falling within the principle of non-arbitrability involved a dispute under public international law arising from a treaty entered into between states.[388]

163. Thus "[t]he fact that Russian public authorities used sovereign powers when effecting their expropriatory objectives does not disqualify this dispute as an investment dispute arbitrable under international law or somehow entrust its resolution to the Russian domestic legal order/system."[389] Rather, the Claimant quotes Professor Stephan to make the point that the fact that Russia took measures "in [the] exercise of its public authority" makes this dispute arbitrable rather than precluding it.[390]

164. On the contrary, and citing Professor Stephan's interpretation of the USSR Fundamentals, the 1991 FI Law and the 1999 FI Law, the Claimant argues that "Russian law positively recognizes that disputes under public international law instruments may be resolved by

---

[382] Rejoinder, para. 116, *citing* Stephan 2, paras. 54-56.

[383] *See* paras. 142 and 134 above and Asoskov 2, paras. 68, 72.

[384] Rejoinder, para. 117.

[385] T1/138/23 – T1/139/22. *See* Professor Asoskov's testimony at T2/94/11 – T2/97/13.

[386] T1/143/2-5.

[387] T5/167/11 – T5/168/23. *See* Professor Asoskov's testimony at T2/90/7 – T2/93/1.

[388] T2/101/8-13, *discussing* Asoskov 1, para. 39.

[389] Rejoinder, para. 118.

[390] Rejoinder, para. 119, *citing* Stephan 2, para. 57.

arbitration."[391]  The Claimant submits that the applicable foreign investment law is the one in force at the time Article 26 is invoked by the Claimant,[392] so that a state may change its domestic law as long as it increases the scope of provisional application.[393]

165.  So, the 1999 FI Law provides that such disputes may be arbitrated, "if the treaty says so."[394]  So far as the 1991 FI Law refers to treaties "in force," the Claimant's answer is that provisionally applied treaties are applied as if they are in force.[395]  It is on this basis that the Claimant argues that, even if the executive was not empowered to commit the Russian Federation to treaty provisions that conflicted with federal law, the foreign investment laws do in fact contemplate the submission of disputes such as the present one to arbitration and, therefore, there is no inconsistency.  In other words, the reference to "treaty" in those laws includes provisionally applied treaties[396] and in those circumstances there is "by definition, a consistency."[397]

166.  The Claimant also relies on Professor Asoskov's opinion that the law on production sharing agreements authorizes arbitration, and submits that the language of the foreign investment laws is identical.[398]

167.  The Claimant also disputes the Respondent's arguments regarding Article 23(2) of the FLIT, which requires that treaties that are provisionally applied be sent to the State Duma for ratification within six months of being signed.[399]  The Claimant argues that "Article 26 ECT did not require the amendment or supplementation of existing Russian law," as it "became part of Russian law by operation of the Russian Constitution."[400]  Additionally, the Claimant maintains that Article 23(2) of the FLIT did not exist at the time that the ECT was signed by the Respondent and cannot be applied retroactively, since such

---

[391] Counter-Memorial, para. 122, *citing* Stephan 1, paras. 55-57. *See also* Rejoinder, para. 103.

[392] T5/152/8-9.

[393] T5/165/5-21; T5/176/7 – T5/177/15.

[394] T1/140/1-13.

[395] T1/140/25 – T1/141/9.

[396] T5/161/9-24.

[397] T5/164/3-7.

[398] T5/159/1 – T5/160/19, *citing* Asoskov 2, para. 105; Professor Asoskov's testimony was that they were distinguishable because the production sharing law expressly authorized the conclusion of arbitration agreements: T2/105/21 – T2/110/2.

[399] Counter-Memorial, paras. 124-125.

[400] Counter-Memorial, para. 127.

retroactive reliance would be in violation of the Respondent's obligations pursuant to Article 27 of the VCLT.[401]

168. In any event, the Claimant explains that, contrary to the Respondent's position, Article 23(2) recognizes that the termination of the provisional application of treaties operates by notification to other Contracting States, a fact that was also appreciated by the Respondent when it "communicat[ed] its termination of provisional application by a notification to the ECT depository on 20 August 2009."[402]   The Claimant provides authority for this proposition via references to Professor Stephan's first report,[403] a note the Respondent submitted to the Secretariat of the ECT,[404] and the Respondent's compliance with the ECT after the passage of the six-month period.[405]

169. With regard to the Respondent's arguments based on Article 12 of the USSR FLIT,[406] the Claimant submits that this law is not applicable, as it is in conflict with the Constitution.[407] Even so, the Claimant maintains that the USSR FLIT did not preclude the provisional application of treaties.[408]

170. With respect to other treaty practice, the Claimant rejects the Respondent's contention that eight explanatory notes drawn from 57 BITs in force confirm that investor-state arbitration provisions set out rules different from those provided by law and therefore are subject to ratification.[409]   The Claimant argues that these explanatory notes are irrelevant, as the only relevant time is December 1994 and the only relevant "'inconsistency' analysis" involves the ECT.[410]   The Claimant also adds that none of the 57 BITs included

---

[401] Counter-Memorial, paras. 130-131.

[402] Counter-Memorial, paras. 132-136, *citing* William E. Butler, "National Treaty Law and Practice: Russia," in NATIONAL TREATY LAW AND PRACTICE (Duncan B. Hollis, Merritt R. Blakesee, and L. Benjamin Ederington, eds., 2005), pp. 537, 545 (Exhibit CL-30).

[403] Counter-Memorial, paras. 139-141, *citing* Stephan 1, paras. 74-75, 77.

[404] Counter-Memorial, para. 137, *citing* Note on the Legal Aspects of Provisional Application of International Treaties in the Territory of the Russian Federation (8 July 1997); Energy Charter Secretariat, List of Participants in the Charter Conference (8 July 1997) (Exhibit C-148).

[405] Counter-Memorial, paras. 143-144, *citing* *Hulley Enterprises*, para. 390 (Exhibit CL-9).

[406] *See* para. 113 above and Reply, para. 164.

[407] Rejoinder, para. 124, *citing* Stephan 2, paras. 18-22.

[408] Rejoinder, para. 125.

[409] *See* para. 138 above and Reply, para. 187.

[410] Rejoinder, para. 105.

a provision for provisional application, meaning that, in those cases, Russia would have to ratify the treaties in order to be bound.[411] Moreover, according to the Claimant, "most of the BITs concerned legislation that did not exist at the time of the ECT's signature."[412] The Claimant rejects the relevance of the authorities cited by Professor Asoskov to support the proposition that Article 26 of the ECT is inconsistent with Russian law,[413] contending that these authorities deal with "unratified treaties having no provisional application clause that include rules conflicting with existing legislation," compared with the current arbitration, which involves the ECT, "a treaty with a provisional application clause that has no rules conflicting with Russian investment legislation."[414] For the Claimant, Russian domestic law states that international treaties may be applied provisionally "if the treaty itself so provides" and that decisions on provisional application by the Russian Federation "shall be made by the body that has taken the decision to sign the international treaty according to the procedure set out in Article 11 of this Federal Law."[415]

171. The Claimant also takes issue with the Respondent's argument[416] that there was not a "pre-existing legal basis" in Russian law for the application of Article 26 because there were no investment treaties in force between Russia and 21 ECT contracting states.[417] The Claimant contends that the Respondent has not offered any support for the notion that there is a requirement that there must be a pre-existing legal basis for international obligations that states voluntarily assume, and notes that, even if valid, the principle does not establish any "inconsistency."[418]

172. The Claimant also disputes the Respondent's contention[419] that "several of Russia's BITs limited investor-State arbitration to civil law issues excluding arbitral review of sovereign

---

[411] Rejoinder, para. 105.
[412] Rejoinder, para. 105.
[413] *See* Asoskov 2, paras. 12-27.
[414] Rejoinder, paras. 107-109, *citing* Stephan 2, paras. 25-27, 36-39.
[415] Counter-Memorial, para. 102, *citing* FLIT, Art. 23(1)-(2) (**Exhibit R-24**); Rejoinder, para. 110.
[416] *See* Reply, para. 195.
[417] Rejoinder, para. 111.
[418] Rejoinder, para. 112.
[419] *See* Reply, paras. 178, 195, 199.

acts or omissions."[420]  The Claimant submits that the Respondent did have BITs with other ECT contracting states that provided for settlement of investment disputes via arbitration, including the France-USSR BIT.[421]  The Claimant also notes that a Model BIT approved by Resolution of the Government of the Russian Federation in 1992 provides for the settlement of investment disputes by arbitration without limitations regarding civil law issues.[422]

173. Finally, the Claimant argues that, if a state decides to invoke the Domestic Law Inconsistency Clause, it must do so in good faith.[423]  According to the Claimant, the Respondent has not done so, as its "'inconsistency' arguments are contrived with the aim to escape accountability for its actions."[424]

### 3.   The Tribunal's analysis

#### (a) Introduction

174. The Tribunal considers that the issue that arises for its decision under this head is:

> Did Russia's provisional application of the ECT "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" under the terms of Article 45(1) include its consent to international arbitration under Article 26(3)(a)?

175. The answer to this issue turns on the question whether the application of Article 26 is "not inconsistent with" Russia's "constitution, laws or regulations", since the Respondent accepts that, if there were no such inconsistency, there would be a treaty obligation assumed by the Respondent to apply that provision on a provisional basis.[425]

---

[420] Rejoinder, para. 111.

[421] Rejoinder, para. 113.

[422] Rejoinder, para. 113.

[423] Rejoinder, para. 121.

[424] Rejoinder, para. 122.

[425] T5/23/8-20.

176. The Tribunal is conscious of the fact that this issue is one that has generated differing views in the jurisprudence[426] and difficulty in the doctrine.[427] While remaining fully cognizant of the reasoning set forth in the decisions of other tribunals and of those publicists that have been cited to it, this Tribunal approaches the issue, as it is bound to do, in accordance with its power and duty to decide for itself upon its own jurisdiction. It addresses the question independently in the light of the evidence presented by the Parties before it and of the applicable law as it finds it to be.

177. The Tribunal will assess the question whether its jurisdiction has been established by reference to the law applicable at the time of the institution of proceedings, namely 15 February 2013, being the date on which the Claimant claimed to accept Russia's consent to arbitration of the present dispute. Such approach is in conformity with the constant practice of international courts and tribunals.[428]

178. This rule is also important in the present case in view of the nature of provisional application. Both Parties accept that states that have entered into a treaty that they have agreed will be provisionally applied "to the extent that such provisional application is not inconsistent" with domestic law may progressively remove any such inconsistencies during the period of provisional application.[429] As a result, the material time at which to determine whether the rule in Article 26 of the ECT is "not inconsistent with" Russian law is the time at which the Tribunal's jurisdiction is invoked.

179. The Tribunal analyses the issue in the following sections:

(a) Section (b) analyses the proper interpretation of the regime of provisional application under Article 45 of the ECT in accordance with the general rule of interpretation set forth in Article 31(1) of the VCLT.

---

[426] *Kardassopoulos*, paras. 71, 73-74 (**Exhibit CL-11**); *Hulley Enterprises* (**Exhibit CL-9**); cf. Action nos C/09/477160 / HA ZA 15-1, C/09/477162 / HA ZA 15-2 and C/09/481619 / HA ZA 15-112 re: *Hulley Enterprises Ltd/Yukos Universal Ltd (Isle of Man)/Veteran Petroleum Ltd (Cyprus) v. Russian Federation* (20 April 2016) ("**The Hague District Court Judgment**").

[427] Bamberger, Epilogue p. 602 (**Exhibit RL-1**); Bamberger, Adjudicatory Aspects, pp. 16-17 (**Exhibit RL-45**).

[428] *Nottebohm (Liechtenstein v. Guatamala)* [1953] ICJ Rep 123; *Arrest Warrant of 11 April 2000 (Democratic Republic of the Congo v. Belgium)* [2002] ICJ Rep 1.

[429] Respondent: T5/11/16 – T5/12/13; Claimant: T5/165/5-21.

(b) Section (c) considers that regime against the background of the institution of provisional application in general international law (pursuant to Article 31(3)(c) of the VCLT).

(c) Section (d) examines relevant practice of the ECT States at the conclusion of the Treaty (Article 31(2)) and the preparatory materials for the Treaty (Article 32) as to the construction of Article 45.

(d) Section (e) considers the evidence as to Russian practice under the ECT.

(e) Section (f) addresses the extent to which Article 26 is "not inconsistent" with Russian law.

### (b) The regime of provisional application under the ECT

180. It is common ground that the basis for jurisdiction of the present Tribunal that is invoked by the Claimant depends in the first instance upon the proper construction of the regime for provisional application of the ECT set forth in its Article 45. The Claimant brings its claim solely for alleged breach of rights contained in the ECT. It claims a right to choose to settle its dispute with the Respondent pursuant to the dispute settlement provisions of Article 26(2)(c) of the ECT, which includes submission to an arbitral tribunal under UNCITRAL Rules under Article 26(4)(b). It relies in particular upon the unconditional consent of the Respondent as a contracting party to international arbitration under Article 26(3)(a).

181. In view of the fact that Russia signed the ECT, but did not in the event decide to ratify it, the question whether it has consented to arbitration under Article 26 must be determined on the basis of the meaning and effect to be given to the provisions of Article 45 of the ECT, which prescribe a detailed regime for its provisional application.

182. Although this Article has been set out earlier in this Decision, it is necessary to repeat the terms of its paragraphs (1)–(3) for clarity of the analysis that is to follow:[430]

---

[430] Pursuant to ECT, Art. 50, the Treaty was signed in English and six other official languages "of which every text is equally authentic". The Parties agreed that the language of this arbitration is English: Terms of Appointment, para. 6(a). Neither Party submits or advances evidence that there is any material difference between the English text and the texts in the other official languages in which the ECT was concluded. The Respondent submits: "The

## Article 45—Provisional Application

(1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.

(2) (a) Notwithstanding paragraph (1) any signatory may, when signing, deliver to the Depository a declaration that it is not able to accept provisional application. The obligation contained in paragraph (1) shall not apply to a signatory making such a declaration. Any such signatory may at any time withdraw that declaration by written notification to the Depository.

   (b) Neither a signatory which makes a declaration in accordance with subparagraph (a) nor Investors of that signatory may claim the benefits of provisional application under paragraph (1).

   (c) Notwithstanding subparagraph (a), any signatory making a declaration referred to in subparagraph (a) shall apply Part VII provisionally pending the entry into force of the Treaty for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its laws or regulations.

(3) (a) Any signatory may terminate its provisional application of this Treaty by written notification to the Depository of its intention not to become a Contracting Party to the Treaty. Termination of provisional application for any signatory shall take effect upon the expiration of 60 days from the date on which such signatory's written notification is received by the Depository.

   (b) In the event that a signatory terminates provisional application under subparagraph (a), the obligation of the signatory under paragraph (1) to apply Parts III and V with respect to any Investments made in its Area during such provisional application by Investors of other signatories shall nevertheless remain in effect with respect to those Investments for twenty years following the effective date of termination, except as otherwise provided in subparagraph (c).

   (c) Subparagraph (b) shall not apply to any signatory listed in Annex PA. A signatory shall be removed from the list in Annex PA effective upon delivery to the Depository of its request therefor.

183. The Respondent's objection and the submissions of the Parties have focused on the proper construction of the final clause of Article 45(1), the Domestic Law Inconsistency Clause. By this clause, each signatory agrees to apply the Treaty provisionally prior to its entry into force for it "*to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.*"

---

ordinary meaning of the 'to the extent' clause in the other authentic language versions of the ECT is to the same effect": Memorial, para. 38.

184. The Tribunal approaches the task of interpreting Article 45(1) in the light of the general rule of treaty interpretation prescribed in Article 31 of the VCLT. This rule, which is accepted to be a statement of the customary international law rule of interpretation, was also expressly accepted by way of the declaration of a number of delegations (including Russia) at the Adoption Session of the ECT as supplying the relevant rules of interpretation for the ECT.[431] It will be necessary to refer to a number of the elements identified in Article 31 as relevant to interpretation.

185. The point of departure is Article 31(1), which requires interpretation "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*" Article 31(2) provides that the first element in the "context" is "the text, including its preamble and annexes."

186. Analysis of the text enables the following initial points to be made.

187. The Final Provisions of the ECT set forth in Part VIII draw a clear distinction between two types of unilateral acts by states which are to have legal consequences on the plane of international law: (i) signature of the Treaty under Article 38 by those States which have signed the Energy Charter; and (ii) ratification, acceptance or approval by those States under Article 39. That Article does not itself specify the consequences that flow from the act of signature.

188. The Treaty's entry into force – generally and in respect of any particular state – is determined by reference to ratification, acceptance or approval under Article 44 "Entry into Force."

189. Article 45 "Provisional Application" immediately follows the provision on entry into force. It introduces a separate form of legal obligation. This obligation is assumed by "[e]ach signatory"; that is to say, a state that has signed the Treaty in accordance with Article 38. Such signatory "agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."

---

[431] Chairman's Statement at Adoption Session, Annex 1 to Note from the European Energy Charter Conference Secretariat (6 January 1995) (**Exhibit C-145**).

Paragraph (1) could thus be described as determining the scope of provisional application *ratione materiae*.

190. The ensuing paragraphs (2) and (3) of Article 45 establish a specific regime governing the scope of provisional application *ratione personae* and *ratione temporis*.

191. *Ratione personae*. Article 45(2) permits a signatory to deposit a declaration upon signature "that it is not able to accept provisional application." Such a declaration produces a legal effect on both the burdens and the benefits of provisional application *ratione personae*:

   (a) It is effective to disapply the regime of provisional application generally in respect of that signatory: Article 45(2)(a).

   (b) It also precludes both that signatory *and its Investors* from claiming the benefits of provisional application: Article 45(2)(b).

192. *Ratione temporis*. Article 45(3) enables a signatory to terminate provisional application upon notification of its intention not to become a contracting party to the Treaty. It adds two provisions as to the effect of such a notification *ratione temporis*:

   (a) Termination of provisional application does not take effect until 60 days after receipt of notification by the Depositary: Article 45(3)(a).

   (b) In the event of such a termination, the obligation of the signatory under paragraph (1) to apply Parts III ("Investment Promotion and Protection") and V ("Dispute Settlement") "with respect to any Investments made in its Area during such provisional application by Investors of other signatories" remains in effect for those Investments for 20 years following the effective date of termination: Article 45(3)(b).

193. Each signatory had the option upon conclusion of the Treaty not to accept the obligation in Article 45(3)(b) by entering its name on the list in Annex PA: Article 45(3)(c).

194. *Provisional application generally under Article 45*. This initial review of Article 45(1)–(3) permits the following five preliminary observations about the scheme of the Treaty

vis-à-vis its provisional application (subject always to the effect of the Domestic Law Inconsistency Clause, to the construction of which the Tribunal will turn shortly).

195. <u>First</u>, the signatories expressly contemplated that, by signing the ECT, they were engaging in a set of mutual legal rights and obligations to apply the Treaty provisionally in accordance with its terms prior to its entry into force. The regime of provisional application contemplated by Article 45 is therefore separate and distinct from the legal relations between the Contracting Parties that will apply upon entry into force following ratification. The Domestic Law Inconsistency Clause in Article 45(1), which refers to "*such* provisional application" as being "not inconsistent with its constitution, laws or regulations" is a reference to the inconsistency with domestic law of the regime of provisional application created by virtue of Article 45. It does not relate to the requirements of domestic law applicable to the entry into force of a treaty.

196. <u>Second</u>, the concept of provisional application contemplated by Article 45 cannot be regarded as purely moral or a matter of diplomatic courtesy or option. It denotes a state of affairs intended to operate and produce legal effects. This is confirmed both by the ordinary meaning of the words used in paragraph (1) and the context of the other paragraphs of Article 45.

197. The *Oxford English Dictionary* defines "application" as "the action of putting something into operation" and "provisional" as "arranged or existing for the present, possibly to be changed later."[432] When these two concepts are put together, they refer to a state of affairs that, while it may be subject to later change, nevertheless exists and is in operation for the present.

198. This construction of provisional application under Article 45(1) as producing legal obligations prior to entry into force is further supported by reference to Article 45(3)(b). This sub-paragraph speaks of "the obligation of the signatory" under Parts III and V following a termination of provisional application remaining in effect for 20 years.

---

[432] Oxford English Dictionary, available at:
<http://www.oed.com/view/Entry/93864?redirectedFrom=application#eid> (accessed on 11 June 2015) (Exhibit C-209).

199. Parts III and V create legal obligations under international law dealing *ratione materiae* with (a) substantive rights of investors and (b) dispute settlement:

(a) Part III creates legal obligations under international law to afford investment promotion, protection and treatment of investments. Its obligations are expressed in terms that are mandatory and contemplate legal process. So, for example, Article 13 "Expropriation" provides that investments "*shall not* be nationalized [or] expropriated" save under the conditions there specified. These include that the expropriation be "carried out under due process of law" (Article 13(1)(c)) and that the investor has "a right to prompt review, under the law of the Contracting Party making the Expropriation by a judicial or other competent and independent authority" (Article 13(2)).

(b) Part V confirms "unconditional consent to the submission of a dispute to international arbitration" (Article 26(3)(a)). It provides that the tribunal so established "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" (Article 26(6)); that the resulting awards "shall be final and binding" (Article 26(8)).

200. Third, the signatories contemplate that the obligations arising for them upon signature by way of provisional application include obligations vis-à-vis Investors. Article 45(3)(b) expressly refers to the continued application of Parts III and V. Since Article 45(3)(b) speaks of the obligation of the signatory under these Parts "remain[ing] in effect" for 20 years after a signatory's termination, it follows that the signatory's obligations to Investors under Parts III and V are already in effect, having arisen upon signature as a matter of provisional application, provided always that such application was *ab initio* not inconsistent with the domestic laws of the signatory state. This notwithstanding that both Parts III and V constantly refer to "Contracting Parties" – an expression defined as "a state ... which has consented to be bound by this Treaty and for which the Treaty is in force": Article 1(2).

201. The conclusion that provisional application is capable of applying to the obligations of States to Investors is further reinforced by the express reference to Investors in Article 45(2). This reference would be unnecessary if provisional application could not apply to create legal duties of states to Investors. It is only because provisional application

otherwise is capable of so applying that it is necessary to confirm expressly that when a State opts out of the regime under Article 45(2), it is relieved from the obligation of provisional application *and* neither it nor its Investors may take the benefit of it vis-à-vis other signatories.

202. Fourth, the provisional application regime is designed to apply, if necessary, over a long period of time. Absent prior termination, the provisional application of the Treaty applies until its entry into force for that signatory. The cumulative entry-into-force provisions of Article 44 entail two 90-day periods: after collective ratification of at least 30 states and following individual ratification.

203. Further, and crucially, the ability that the negotiating states created for a signatory to decide to opt out of the provisional application regime altogether *after* signature upon its decision not to become a party to the Treaty does not enable such a state to avoid the obligations of Parts III and V in respect of investments made during the period of provisional application for 20 years after termination: Article 45(3)(b). The import of this provision is clear. Investments made during the period in which the ECT is provisionally applied in respect of a particular State and prior to any decision on the part of that State not to be become a party are (again subject to the domestic inconsistency clause) entitled to extended treaty protection. A signatory State may not encourage such investment by provisional application and then, by terminating provisional application, divest such investments already made during the period of provisional application of the treaty protections.

204. Fifth, in recognition of the potentially onerous nature of the obligations upon signatories arising by virtue of the Treaty's provisional application (not least those of Article 45(3)(b)), Article 45 makes liberal provision for any State to opt out of the regime altogether upon signature. This it may do by the simple expedient of a declaration under Article 45(2).[433] Such a declaration places the declaring State in the same position that it would be in upon signature under any other treaty that requires ratification. It excludes any possibility of provisional application. At the same time, it excludes the declaring

---

[433] Some States also declared that they would not apply the Treaty provisionally under Art. 45(1): Austria, Hungary, Italy, Luxembourg, Portugal, Romania and Turkey. *See* Updated List of Signatories to the ECT (1 March 1995) ("**Updated Signatories List**") (**Exhibit C-144**).

State and its Investors from any of the benefits of provisional application that would otherwise be opposable to other signatory States. Neither the declaring State nor its Investors can share in any of the benefits of the Treaty until its entry into force for that state under Article 44.

205. Further, a signatory also had the option upon signature (but not thereafter) to exclude the long tail provision in Article 45(3)(b), by entering its name on the list in Annex PA.

206. *The Domestic Law Inconsistency Clause.* Against this background, it is now possible to return to consideration of the Domestic Law Inconsistency Clause in Article 45(1) within the framework of the general rule of interpretation in Article 31(1) of the VCLT. The following preliminary observations may be made:

> (a) Each part of clause (1) must be interpreted in good faith. This means that the Tribunal must seek to give an effective meaning to the agreement of "[e]ach signatory ... to apply this Treaty provisionally pending its entry into force for such signatory" as well as to the proviso to that agreement "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations." An interpretation that would be so broad as to empty either the positive agreement of the relevant signatory or the Domestic Law Inconsistency Clause of any effect would not be consistent with an interpretation of the terms of Article 45(1) in good faith.

> (b) Such a signatory also has the option, without restriction, upon signature of delivering a declaration excluding the operation of provisional application of the ECT altogether under Article 45(2). The proviso to Article 45(1) must be given a meaning that preserves a distinct sphere of operation for it in contrast to the making of a declaration under Article 45(2). This is particularly so since both legal acts are to be undertaken by the same person on behalf of the same State at the same time.

> (c) The Clause contains an express *renvoi* to domestic law. Its terms require any person seeking to understand the nature and scope of the obligations assumed by a particular signatory State by way of provisional application to consider that State's "constitution, laws or regulations" in order to satisfy themselves as to

whether, and if so to what extent, the proviso applies to qualify the obligation. Nevertheless, this does not change the character of the obligation assumed by each signatory State under Article 45(1) as an obligation that is governed by international law. Domestic law is relevant because the international law obligation so provides and then only to that extent. Article 45(1) does not operate to convert a signatory's international law obligation into one of its own domestic law.

(d) The agreement to provisional application in Article 45(1) is one that is made by a signatory. The question whether provisional application as a consequence of such an agreement is "not inconsistent with [a State's] constitution, laws or regulations" must be determined by reference to whether, under the constitution, laws or regulations of the relevant State, an obligation of provisional application assumed by a signatory infringes the proviso. This is a question that is separate from the provisions of a State's constitution or laws relating to the ratification of a treaty for the purpose of its entry into force.

(e) The signatory's agreement is framed as giving rise to a positive obligation of the State. By contrast, the proviso is limited in two ways. First, it requires consideration of "the extent" to which provisional application is subject to domestic inconsistency. Second, the proviso is formulated as a double negative: "not inconsistent." The signatory agrees to give the Treaty provisional application, provided that such application does not give rise to an inconsistency with domestic law. The burden is on the signatory State invoking such an inconsistency to establish it.[434]

207. "*Not inconsistent with.*" The ordinary meaning of the words "not inconsistent with" requires careful consideration. The expression connects two sets of legal rules: (i) those assumed by each signatory under international law by way of provisional application of the Treaty and (ii) those under the signatory's "constitution, laws or regulations." It is necessary to analyse the relation between these two sets of legal obligations required by the connecting phrase. This is defined by reference to two cumulative elements: the to

---

[434] It is common ground between the Parties that the burden of establishing inconsistency rests upon the Respondent: T1/138/20-22; T5/91/18-22.

be determined by reference to lack of *consistency* and the use of the double negative form: "*not in*consistent with."

208. The *Oxford English Dictionary*[435] offers the following relevant definition of "consistent" as "[a]greeing or according in substance or form; congruous, compatible." It defines "inconsistent" as "[n]ot consisting; not agreeing in substance, spirit, or form: not in keeping; not consonant or in accordance; at variance, discordant, incompatible, incongruous." *Collins English Dictionary*[436] defines inconsistent relevantly as "lacking in consistency, agreement, or compatibility; at variance." It also adds a meaning applicable to a set of propositions in logic: "enabling an explicit contradiction to be validly derived."

209. The relation of compatibility required is affected by the use of the double negative form "not inconsistent with." A number of the examples given in the *Oxford English Dictionary* of the historical usage of "inconsistent" use it in its double negative form: "[r]esentment is not inconsistent with Good-will"; "[t]he benevolence of God ... is not inconsistent with his determination to punish." In these examples, the double negative is used to contrast two things that are not the same. They may have quite different content. Yet they may also be regarded as not inconsistent, since they may each exist side-by-side without coming into conflict between each other.

210. The use of the double negative form denotes in the first place a point about burden of proof: that the burden is on the party that wishes to establish *inconsistency*, rather than imposing a burden on the party that wishes to rely on the positive obligation to establish that it is *consistent* with the proviso. It also conveys a substantive element of the relation between the positive obligation and the proviso. A requirement that the positive obligation be *consistent* with the proviso might be said to denote complete identity or conformity between the two sets of legal obligations in question. By contrast, the purpose of the requirement that the positive obligation be *not inconsistent with* the domestic law

---

[435] Oxford English Dictionary, available at:
<http://www.oed.com/view/Entry/93864?redirectedFrom=inconsistent#eid> (accessed on 11 June 2015)
**(Exhibit C-209).**

[436] Collins English Dictionary, available at <http://www.collinsdictionary.com/dictionary/english/inconsistent>
(accessed on 11 June 2015) **(Exhibit C-208).**

proviso is to prevent a clash between the two systems, even if they differ in material respects.[437]

211. This consideration of the ordinary meaning of the phrase "not inconsistent with" enables the following conclusions to be drawn as to its ordinary meaning in the context of Article 45(1):

   (a) The relation that is contemplated is not one of equivalence between the two sets of legal obligations referred to Article 45(1). It does not require the obligations existing in one such set to exist also in the other. Nor does it require the obligations existing in one set to be expressly authorized or permitted by the rules of the other set. Rather the use of the term "not inconsistent" asks a different question. It is whether (and if so to what extent) the two bodies of law can live together: are they "compatible" or are they "discordant"? The enquiry that the interpreter is directed to undertake is one that requires identification of conflict, if any, between the two systems, rather than identity or equivalence.

   (b) The double negative form "not inconsistent with" in both ordinary and legal usage denotes both: (i) that the burden is on the party alleging the inconsistency to establish it; and (ii) that the extent of consistency required in the relation between the two sets of legal obligations is one that "prevents clashes" rather than one that "ensures conformity."

212. As will be seen, these conclusions are also supported by the manner in which the law has approached the use of the same or similar tests in other cognate areas of international law.

### (c) Provisional application in international law

213. The regime for the provisional application of the ECT under its Article 45 has a number of distinctive features. Yet provisional application is itself a well recognised institution in general international law, to which the Tribunal is directed by Article 31(3)(c) of the VCLT to refer in its interpretation of Article 45 of the ECT.

---

[437] For illustrative examples, *see* Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE (1995), p. 585.

214. *Provisional application generally under Article 25 of the VCLT.* The provisional application of treaties finds express recognition in Article 25 of the VCLT which provides:

Article 25—Provisional application

> (1) A treaty or part of a treaty is applied provisionally pending its entry into force if:
>
>     (a)  the treaty so provides; or
>
>     (b)  the negotiating States have in some other manner so agreed.
>
> (2) Unless the treaty otherwise provides or the negotiating States have otherwise agreed, the provisional application of a treaty or part of a treaty with respect to a State shall be terminated if that State notifies the other States between which the treaty is being applied provisionally of its intention not to become a party to the treaty.

215. Article 25 is found in Part II of the VCLT "Conclusion and Entry into Force of Treaties," Section 3 of which deals in particular with "Entry into Force and Provisional Application of Treaties." This Section precedes Part III, which, under the heading "Observance, Application and Interpretation of Treaties," deals in its Section 1 with the obligation upon parties to observe a treaty that is in force.

216. Part II Section 3 distinguishes between "Entry into force," which is provided for in Article 24 and "Provisional application" in Article 25. A treaty enters into force "in such manner and upon such date as it may provide or as the negotiating States may agree," failing which it is determined by reference to the consent of the states to be bound. Where the treaty so provides, entry into force requires the deposit of instruments of ratification, approval or accession.[438] By contrast, provisional application takes effect pending the entry into force of the treaty. It suffices for this purpose that the treaty itself so provides or that the negotiating states have so agreed.

217. Article 25 of the VCLT reflects the extensive practice of states. The final clauses of the two treaties comprising the Peace of Westphalia 1648 provided that, notwithstanding the requirement for ratification, the substantive provisions were to be carried out as soon as

---

[438] VCLT, Arts. 14(a), 16(a).

possible after signature and to the extent practicable before ratification.[439] There is much subsequent practice over the ensuing three centuries.

218. Of particular note is the GATT, which was subject to provisional application under a Protocol of Provisional Application for nearly 50 years from 1947 until the adoption of the Marrakesh Agreement establishing the WTO in 1994.[440] The provisional application of the GATT between the Parties included Articles XXII and XXIII, which formed the source of the signatory states' consent to the international settlement of disputes by GATT panels.

219. The legal effect of this practice was recognised and codified by the International Law Commission in its preparatory work for the VCLT. In its Commentary to draft Article 22 (which preceded Article 25 of the VCLT), the Commission noted:

> This article recognizes a practice which occurs with some frequency to-day and requires notice in the draft articles ... [T]here can be no doubt that such clauses have legal effect.[441]

220. When the Commission returned to the same topic in 2013, it emphasised to the Sixth Committee of the General Assembly that both the Special Rapporteurs on the Draft Articles on the Law of Treaties and members of the Commission took the view that "unless the parties agreed otherwise, agreement to provisionally apply a treaty implied that the parties concerned were bound by the same rights and obligations under the treaty in the same way *as if it were in force*."[442]

221. At the Vienna Diplomatic Conference to negotiate the VCLT, the ILC's draft Article 22 on provisional application was amended into the form now found in Article 25 of the VCLT. It was moved into Part II of the Convention, dealing with "Conclusion and Entry into Force of Treaties." One aspect of the amendments then made was to separate the

---

[439] Treaty of Peace between France and the Holy Roman Empire (signed Münster 24 October 1648) 1 Con TS 319, 349-350, Arts. CIV–CVI; Treaty of Peace between Sweden and the Holy Roman Empire (signed Osnabrück, 24 October 1648) 1 Con TS 119, 198, Art. XVI, *cited* in Robert E. Dalton, "Provisional Application of Treaties," in THE OXFORD GUIDE OF TREATIES (D. Hollis, ed., 2012) ("**Dalton**"), pp. 220, 222 (**Exhibit CL-34**).

[440] Protocol of Provisional Application of the GATT (30 October 1947) in GATT GUIDE (**Exhibit RL-139**); Dalton, pp. 236-237 (**Exhibit CL-34**).

[441] DRAFT ARTICLES, pp. 187, 210 (**Exhibit CL-46**).

[442] United Nations, General Assembly, Sixty-Eighth Session, Statement by Austria during the twenty-third session of the Sixth Committee (A/C.6/68/SR.23) (4 November 2013) (emphasis added) (**Exhibit RL-41**).

institution of the provisional application of a treaty, which by definition arises prior to the entry into force of the treaty and by virtue of a provision in the treaty or the agreement of the negotiating states, from the legal consequences of a treaty that is in force as between the states parties to it following their consent to such entry into force.  As the Tribunal will later explain, this distinction is reflected in Russian law.

222. The final form of the draft article was adopted by a majority of 87 votes to 1.[443]  Sir Humphrey Waldock (Special Consultant to the Conference) commented: "The practice of provisional application was now well established among a large number of States."[444]

223. Reference to other aspects of the law of treaties also sheds further light on the meaning of "not inconsistent with."  There are two lines of case-law interpreting treaties that, though not identical to the Domestic Law Inconsistency Clause in Article 45(1) of the ECT, are particularly germane to its construction: (i) the interpretation of Article 1(b) Protocol of Provisional Application of the GATT; and (ii) the consideration by ECT tribunals of the compatibility of successive treaties under Article 30 of the VCLT.

224. *Provisional application of the GATT.*  Article 1 of the Protocol of Provisional Application of the GATT provides that the governments of the signatory states "undertake … to apply provisionally on and after 1 January 1948:

> (a) Parts I and III of the General Agreement on Tariffs and Trade; and

> (b) Part II of that Agreement *to the fullest extent not inconsistent with existing legislation.*"[445]

225. This language is not identical to Article 45.  It refers to "existing legislation" and not to a signatory state's "constitution, laws and regulations."  It also reinforces the primary obligation, by requiring the signatory states to give provisional application "to the *fullest* extent."  Nevertheless, the clause sets the link between each state's international law

---

[443] Eleventh Plenary Meeting, United Nations Conference on the Law of Treaties Official Records A/CONF.39/11/Add.1, 43 (30 April 1969) ("**Eleventh Plenary Meeting**") (**Exhibit RL-39**).
[444] Eleventh Plenary Meeting (**Exhibit RL-39**).
[445] GATT GUIDE (emphasis added) (**Exhibit RL-139**).

obligations arising by virtue of their agreement provisionally to apply the GATT and their domestic law as determined by the former being "not inconsistent with" the latter.

226. In interpreting this requirement, GATT Panels, following a Working Party Report, adopted a construction that required that "the legislation on which [the reliance on the proviso] is based is by its terms or expressed intent of a mandatory character—that is, it imposes on the executive authority requirements which cannot be modified by executive action."[446] The proviso did not operate to give priority to all existing legislation. Where such legislation did not prohibit the executive from committing to the provisional application of a rule different to the domestic law, the signatory state was obliged to do so in order to meet the obligations of Part II GATT in accordance with its agreement to provisional application.

227. This approach is in accord with the interpretation of "not inconsistent with" that the Tribunal has already reached as a matter of ordinary interpretation. That is to say, it requires a conflict between the domestic legislation on the one hand and the provisional application of the treaty, given effect by decision of the executive, on the other. Such a conflict will only arise where the legislation contains a mandatory rule that has the effect of prohibiting the executive from proceeding to give provisional application to the relevant treaty obligation.

228. *Application of successive treaties.* Tribunals also have to consider the relation between two sets of legal rules, each of which is binding and applicable, when determining the relation between successive treaties relating to the same subject matter under Article 30(3) of the VCLT. This paragraph provides that "[w]hen all parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies *only to the extent that its provisions are compatible with* those of the later treaty."

229. This provision differs from Article 45(1) of the ECT. It uses "compatible" as the connecting factor rather than "not inconsistent." It is framed as a positive test, requiring

---

[446] GATT/CP.3/60/Rev.1, 10 August 1949, II/49, 62, para. 99, applied, *inter alia*, in GATT Panel Report, *Belgian Family Allowances* G/32 (7 November 1952), BISD 1S/59, para. 6-7 (**Exhibit RL-132**); GATT Working Party, *German Import Restrictions* (2 May 1958) L/821, para. 16 (**Exhibit CL-81**), and further references *cited* in GATT GUIDE, pp. 1074-1080 (**Exhibit RL-139**).

compatibility of the earlier treaty, rather than a negative assurance of "*not in*consistent." Article 30 is concerned with successive sets of international law obligations between parties *inter se,* not a qualification upon such obligations derived from a particular state's domestic law. These material differences noted, reference to the jurisprudence under this provision is also of some assistance. The ordinary meaning of "inconsistent" found above includes "incompatible." In both cases, the test contemplates a relation of continuing parallel sets of obligations, one to be applied "to the extent" of compatibility with the other.

230. In *Achmea*[447] and *Electrabel*[448] tribunals had to determine whether the obligations assumed by the respondent states under investment treaties were compatible with obligations that they had subsequently assumed under EU Treaties. In *Achmea,* the issue concerned compatibility of a submission to arbitration under a prior bilateral treaty with EU law. The Tribunal held that this question was to be determined by reference to whether such a submission violated EU law. It found that it did not, there being no rule of EU law that prohibits investor-state arbitration.[449] In *Electrabel,* the Tribunal considered whether the submission to arbitration under the ECT was compatible with the EU legal order. It found no "inconsistency," there being "no legal rule or principle of EU law that would *prevent* this Tribunal from exercising its functions in this arbitration under Article 26 of the ECT."[450]

231. In this context, the question of compatibility is answered by reference to whether the rule in the later treaty prevents the application of the rule in the earlier treaty, such that the application of the prior rule would violate the later treaty.

### (d) Other guides to interpretation of Article 45

232. The Parties also referred the Tribunal to materials prepared by the negotiating States either in the course of the drafting of the ECT or following its adoption that they considered may assist the Tribunal in the interpretation of Article 45 of the ECT. The Tribunal is entitled to consider such material to the extent that it properly forms part of:

---

[447] *Achmea* (**Exhibit CL-56**).

[448] *Electrabel* (**Exhibit RL-76**).

[449] *Achmea,* paras. 271-277 (**Exhibit CL-56**).

[450] *Electrabel,* paras. 4.166, 4.190 (**Exhibit RL-76**).

(a) any other element of the context in which the treaty was concluded (Article 31(2) of the VCLT); or (b) subsequent practice of the parties as to the interpretation of the treaty (Article 31(3) of the VCLT). It may also have recourse to the preparatory work of the treaty and the circumstances of its conclusion either in order to confirm a meaning arrived at or to determine such a meaning in cases of ambiguity or where the result would otherwise be absurd: Article 32 of the VCLT.

233. Two points deserve emphasis:

(a) The negotiating States agreed that "there should be a strong commitment to Provisional Application of the Energy Charter Treaty" and specifically requested those States that did not wish to apply the Treaty provisionally to make a declaration to that effect at the time of signature.[451] A number of negotiating States availed themselves of this option,[452] which, the Secretariat reminded them, was an action available to be taken upon signature.[453] Upon signature, states made three different kinds of declarations under Article 45:

(i) Some signatories declared that they could not accept provisional application of the Treaty in accordance with Article 45(2)(a).

(ii) A number of other signatories declared that they would not apply the Treaty provisionally in accordance with Article 45(1).[454]

---

[451] Message No. 239 from the Energy Charter Conference Secretariat (28 April 1994) (**Exhibit C-142**).

[452] *See* Letter from Canada to the Secretary-General of the ECT (**Exhibit C-188**); Letter from Austria to the European Energy Charter Conference Secretariat (**Exhibit C-189**); Letter from Romania to the Conference on European Energy Charter Secretariat (**Exhibit C-190**); Fax from Denmark to Clive Jones, Secretariat of the European Energy Charter (**Exhibit C-191**); Letter from Norway to Energy Charter Secretariat (**Exhibit C-192**); Letter from Portugal to Clive Jones, Secretariat of the European Energy Charter Conference (**Exhibit C-194**); Letter from Italy to the European Energy Charter (**Exhibit C-141**); Fax from Switzerland to the Charter Conference Secretariat (**Exhibit C-197**); Letter from Poland under Article 45(1) (**Exhibit C-200**); Declaration by Hungary under Article 45 (**Exhibit C-201**).

[453] ECT Note from the Conference Chairman, Document 27/94 CONF 104 (14 September 1994) (**Exhibit C-206**).

[454] Updated Signatories List (**Exhibit C-144**).

(iii) A third list of signatories declared that they did not accept the provisional application obligation of Article 45(3)(b) in accordance with Article 45(3)(c).[455]

(b) By the same token the negotiating States attached importance to inclusion of the Domestic Law Inconsistency Clause so as to ensure that provisional application "does not create any commitment beyond what is compatible with the existing internal legal order of the Signatories."[456]

### (e) Russian practice as a signatory to the ECT

234. Having considered the nature of provisional application as expressly provided in the ECT and under general international law, it is now necessary to consider the actions taken by the Respondent in connection with its signature and provisional application of the ECT.

235. Under the signature of Mr Chernomyrdin, Chairman, the Government of the Russian Federation resolved on 16 December 1994 to execute the ECT subject to certain specified declarations and to instruct Mr Davydov, its Deputy Chairman, to execute the Treaty.[457] The Government resolved to make a number of declarations with respect to separate articles of the ECT, as listed in an Appendix to the Resolution. This list did not include any declaration of the kind provided for in Article 45. By a certificate of the same date, the Russian Federation (under the signature of its Deputy Minister of Foreign Affairs) issued full powers to Mr Davydov to sign the ECT,[458] which he did on 17 December 1994.[459]

---

[455] The Czech Republic, Germany, Hungary, Lithuania, Poland and Slovakia: ECT, Annex PA, p. 115 (**Exhibit C-1**).

[456] "A" Item Note from the Permanent Representatives Committee to the Council of the European Union, Do. 12165/94, Annex 1 (14 December 1994) (**Exhibit R-9**). *See also* U.S. Dept. of State Facsimile (**Exhibit R-15**).

[457] Resolution of the Government of the Russian Federation No 1390 (16 December 1994) (**Exhibit R-23**).

[458] Russia's Full Powers for Signature of the Energy Charter Treaty, the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects, and the Final Act of the European Energy Charter Conference (16 December 1994) (**Exhibit R-110**).

[459] There was some dispute in the evidence about whether Mr Davydov signed the Treaty as a delegate of President Yeltsin, rather than on behalf of the Government. *See e.g.* T2/141/22 – T2/145/11.

236. A Note on the Legal Aspects of Provisional Application of International Treaties in Russia, apparently prepared on behalf of the Russian delegation to the Charter Conference of the ECT held in Brussels on 8 July 1997, states that:

> Provisional application of international treaties is quite common in Russian legal practice … When provisional application is foreseen in the text of the treaty, <u>no separate decision to this effect is taken.</u> The decision to sign a treaty includes the decision to apply it provisionally since the draft treaty is approved by the Decree of the President or by the Ruling of the Government. In this particular case the decision to sign the ECT in 1994 was approved by the Ruling of the Government of the RUF.[460]

237. The FLIT requires that a treaty presented for ratification be accompanied by an "analysis of the consistency of the treaty with the legislation of the Russian Federation."[461] The Treaty was presented to the Russian Parliament for ratification in 1996 under cover of the Government's Explanatory Note, which stated *inter alia*:

> Prior to the entry into force of the ECT, the majority of the Contracting Parties agreed to apply the treaty on a provisional basis. In this respect, it was decided that such provisional application of the ECT would be implemented to the extent that it would not be inconsistent with the constitution, laws and regulations of the country in question.
>
> At the time of signing of the ECT, the provision on provisional application was in conformity with the Russian legal acts. For that reason, the Russian side did not make declarations as to its inability to accept provisional application (such declarations were made by 12 of the 49 ECT signatories).
>
> …
>
> The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law of the RSFSR.[462]

---

[460] Note on the Legal Aspects of Provisional Application of International Treaties in the Territory of the Russian Federation (8 July 1997) (emphasis in original) (**Exhibit C-148**). The Respondent disputes the provenance and authorship of the Note: Rejoinder, para. 168.

[461] FLIT, Art. 16(4) (**Exhibit AVA-52**).

[462] Explanatory Note to the Draft Law (**Exhibit C-147**, corr. trans. **Exhibit R-111**).

238.    On 18 December 2002, the Delegation of the Russian Federation further stated to the
        Energy Charter Conference that "[t]he Russian Federation has yet to ratify the Energy
        Charter Treaty, but, as a Signatory Country, it implements the Treaty from the day it
        entered into force."[463]  At that stage, it proceeded on the premise that the ratification of
        the Treaty by the Russian Parliament would largely depend upon a successful finalization
        of the Transit Protocol.

239.    On 25 November 2005, the Ministry of Foreign Affairs of the Russian Federation issued
        background information on the ECT in which it stated: "[t]he Russian Federation applies
        [the ECT] on a provisional basis in accordance with Part II of the [VCLT] and Section II
        of the [FLIT]."[464]

240.    On 20 August 2009, the Russian Federation notified the depository of the ECT that it did
        not intend to become a Contracting Party to the Treaty.[465]  Pursuant to Article 45(3)(a) of
        the ECT, this notification had the effect of terminating Russia's provisional application
        of the Treaty on 19 October 2009, 60 days after notification.

241.    Pausing at this point in the analysis, the following observations may be made as to the
        factual position adopted by Russia vis-à-vis the Treaty's provisional application:

        (a) The Russian Government, in investing Mr Davydov with full powers to sign the
            ECT, did not avail itself to make any declaration of the kinds permitted by
            Article 45 that would have restricted the provisional application of the Treaty
            pending its entry into force for Russia following ratification.  The Energy
            Charter Secretariat had reminded all negotiating States of this option, which a
            number of other States exercised upon signature.

        (b) Russia took the view that, since provisional application was specifically
            provided for in the Treaty, and since the institution of provisional application

---

[463] Statement by Delegation of Russia (**Exhibit C-118**).
[464] Information Bulletin on the Energy Charter Treaty (25 November 2005) ("**ECT Information Bulletin**")
(**Exhibit C-119**).
[465] Notification of Russia to Portugal (**Exhibit R-5**).

was well known under Russian law, it was not necessary to make a specific decision as to provisional application.

(c) The Russian Government considered that no declaration was required since the ECT "was in conformity with the Russian legal acts" and "consistent with the provisions of the existing Law."[466] Contrary to the Respondent's submission that this is a "post-ratification analysis,"[467] the Tribunal considers this to be a statement of the relationship between the ECT and Russian law as at the date of the Note – that is, prior to the ECT's ratification.

(d) Russia continued to inform the Energy Charter Conference, even after the Russian Parliament had deferred its ratification of the Treaty, that it "implements"[468] and "applies"[469] the Treaty on a provisional basis. It did not suggest in so stating that its provisional application was qualified or partial.

(e) This continued to be Russia's position from conclusion and signature of the Treaty in December 1994 until its notification that it did not intend to become a contracting party nearly 15 years later in August 2009.

242. Nevertheless, Russia's obligation of provisional application that it voluntarily assumed upon signature in December 1994 under Article 45(1) of the ECT was always subject to the proviso: "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."

### (f) "Not inconsistent with" Russian constitution, laws or regulations

243. The Tribunal now turns to consider whether, and if so to what extent, such provisional application was "not inconsistent" with the Russian Constitution, laws or regulations (together "**Russian Law**"). It does so informed by the construction of the Domestic Law Inconsistency Clause that it has reached above, applying Articles 31-2 of the VCLT, which is in summary:

---

[466] Explanatory Note to the Draft Law (**Exhibit C-147**, corr. trans. **Exhibit R-111**).

[467] T1/39/11-21.

[468] Statement by Delegation of Russia (**Exhibit C-118**).

[469] ECT Information Bulletin (**Exhibit C-119**).

(a) The question is whether the <u>provisional application</u> of Article 26 of the ECT is not inconsistent with Russian law;

(b) The signatory States (including Russia) expressly contemplated that the dispute settlement provisions of Part V of the ECT (which contains Article 26) are capable of provisional application (para. 200 above), if not inconsistent with their respective national laws;

(c) Consistency does not require identity or equivalence. The question is whether the two legal orders are compatible or discordant. The test of "not inconsistent with" is designed to prevent clashes between the two legal orders. It does not ensure conformity or require express permission in domestic law (para. 210 above);

(d) This requires a conflict with a mandatory rule that precludes the executive from giving provisional application to Article 26 (para. 227 above).

244. In addressing the question whether the provisional application of Article 26 is not inconsistent with Russian law, the Tribunal has been assisted by experts called on behalf of the Parties: Professor Stephan for Claimant and Professor Asoskov for Respondent, each of whom was called for cross-examination and asked to answer questions from the Tribunal. It also has the benefit of an extensive file of primary materials of Russian law presented by the Parties, which contains relevant legislation, judicial decisions and commentary. Two preliminary points should be made about the Tribunal's approach to Russian law:

(i) The Tribunal is directed to address the application of Russian law by virtue of the *renvoi* found in the proviso to Article 45(1). In determining the content of Russian law, the Tribunal proceeds in light of the following consideration:

> Where the Tribunal is presented with a question of municipal law essential to the issues raised by the Parties for its decision, the Tribunal, whilst retaining its independent powers of assessment and decision, must seek to determine the content of the applicable law in accordance with evidence presented to it

as to the content of the law and the manner in which the law would be understood and applied by the municipal courts.[470]

(ii)    Having ascertained the content of Russian Law, it is then obliged to consider its application within the framework of the test posited in Article 45(1), the construction of which is determined under international law (para. 206(c) above).

245.  "*Constitution*" *and* "*laws*."   The Domestic Law Inconsistency Clause in Article 45(1) requires the Tribunal to determine whether Russia's provisional application of the Treaty is not inconsistent with three elements of its national legal system: (i) its Constitution, (ii) its laws, and (iii) its regulations.   Neither Party has relied upon specific Russian regulations as being relevant to this enquiry.   The Tribunal may therefore confine itself to the Russian Constitution and laws.

246.  The Treaty's distinct references to a signatory state's constitution and to its laws directs attention to two distinct ways in which it may be said that the Domestic Law Inconsistency Clause is engaged:

(i)    That the <u>institution</u> of the provisional application of a treaty is itself inconsistent with the State's constitutional arrangements in relation to the assumption of international law obligations under a treaty, because it is in conflict with a mandatory rule of the Constitution that has the effect of preventing the executive from exercising a power to agree to provisional application; or

(ii)    That the <u>subject-matter</u> of the international law obligation in question conflicts with a mandatory limitation imposed by domestic legislation upon the provisional application of the particular type of treaty obligation.

247.  The Tribunal will consider each of these possible forms of inconsistency, whilst noting that they are nevertheless closely interrelated:

---

[470] *Emmis International Holding BV v. Hungary* ICSID Case No. ARB/12/2, Award (16 April 2014) ("*Emmis*"), para. 175 (internal citations omitted) (**Exhibit CL-59**).

(a) As a matter of international law, they are both different aspects of the single question provoked by Article 45 of whether the provisional application of Article 26 of the ECT is or is not inconsistent with Russian Law as a whole.

(b) As a matter of Russian Law, there is an important distinction between Russia's Constitution[471] and laws adopted thereunder by the Russian Parliament. Nevertheless, in answering the question posed in paragraph 246(i) above, the Tribunal will find it necessary to refer in addition to certain federal legislation, notably the FLIT[472] and to judicial decisions of the competent Russian final courts of appeal on its interpretation. This legislation bears directly on the core constitutional law question of the distribution of powers between Parliament and the executive in relation to international treaties.

248. *Constitutional effect of provisional application under Russian law.* As noted above, the first step in the enquiry is to examine the general effect given to the institution of provisional application under the Russian Constitution and law.

249. The following general propositions as to the impact of the Constitution itself on the provisional application of treaties are not contentious and were accepted by Professor Asoskov, Russia's legal expert:

(a) Article 15(4) of the Constitution provides:

> The universally-recognised rules of international law and international treaties of the Russian Federation shall be a component part of its legal system. If an international treaty of the Russian Federation provides for other rules than those envisaged by law, the rules of the international treaty shall be applied.[473]

(b) The rule of incorporation and supremacy within the Russian legal system for international law includes the rules of the VCLT.[474]

---

[471] Constitution (Exhibit R-21).

[472] FLIT (Exhibit AVA-52).

[473] Constitution, Art. 15(4) (Exhibit AVA-1).

[474] *See* Professor Asoskov's testimony at T2/19/4-14.

(c) Article 15(4) of the Constitution applies equally to provisionally applicable treaties.[475]

250. The FLIT draws a distinction between the ratification of international treaties, which must be done by federal law in cases where ratification is required (Articles 14-15) and the provisional application of treaties by the Russian Federation (Article 23).

251. The effect given to the provisional application of treaties under Russian law is confirmed by Article 23 of the FLIT, which makes express provision for provisional application as follows:

> ### Article 23—Provisional application of international treaties by the Russian Federation
>
> 1. An international treaty or a part of a treaty may, prior to its entry into force, be applied by the Russian Federation provisionally if the treaty itself so provides or if an agreement to that effect has been reached with the parties that have signed the treaty.
>
> 2. Decisions on the provisional application of a treaty or a part thereof by the Russian Federation shall be made by the body that has taken the decision to sign the international treaty according to the procedure set out in Article 11 of this Federal Law.
>
>    If an international treaty – the decision on the consent to the binding character of which for the Russian Federation is, under this Federal Law, to be taken in the form of a Federal Law – provides for the provisional application of the treaty or a part thereof, or if an agreement to that effect was reached among the parties in some other manner, then this treaty shall be submitted to the State Duma within six months from the start of its provisional application. The term of provisional application may be prolonged by way of a decision taken in the form of a federal law according to the procedure set out in Article 17 of this Federal Law for the ratification of international treaties.
>
> 3. Unless the international treaty provides otherwise, or the respective States otherwise agree, the provisional application by the Russian Federation of a treaty or a part thereof shall be terminated upon notification to the other States that apply the treaty provisionally of the intention of the Russian Federation not to become a party to the treaty.

252. Both experts agree that Article 23(1) and the first sentence of Article 23(2) reflect the position that obtains pursuant to the VCLT and under prior Russian law.[476]   The

---

[475] *See* Professor Asoskov's testimony at T2/73/3-6; T2/76/5-16.

[476] *See* Professor Asoskov's testimony at T2/24/17 – T2/25/9. *See* Professor Stephan's testimony at T2/201/17-21.

consequence is that, in Russian practice, treaties requiring ratification are also capable of being applied provisionally.[477] As it was put in a scholarly *Commentary* on the FLIT:

> The provisional application of treaties has been widely used in Russian treaty practice. Before the Law entered into force, such practice was based on Article 25 of the [VCLT]. Article 23 of the Law was called upon to harmonize this practice; it introduces requirements in addition to those contained in the [VCLT].
>
> ...
>
> In Russian practice, treaties requiring ratification are likewise applied provisionally.[478]

253. The second sentence of Article 23(2) adds an additional procedural requirement of submission to the State Duma within six months from the start of a treaty's provisional application. It is common ground between the experts that this requirement was newly introduced by way of the FLIT in 1995; it was not found in the prior Russian law; its introduction did not have retrospective effect so as to apply to the provisional application of treaties undertaken on behalf of Russia prior to the enactment of the FLIT.[479] In any event, a failure to comply with this new requirement does not mean that the provisional application of a treaty in Russia is automatically terminated.[480] "Such a result would contradict Article 23 of the Law and Article 18 of the [VCLT] ... [S]uch a failure will not automatically entail any international legal consequences."[481]

254. The status of the provisional application of a treaty within the Russian legal system was the subject of authoritative determination by the Constitutional Court in Resolution 8-P upon a specific challenge to the constitutionality of Article 23 of the FLIT.[482] In that case, the applicant sought review of a decision on the part of the Government to impose customs duties upon him for the import of goods through Kazakhstan in accordance with

---

[477] *See* Professor Asoskov's testimony at T2/33/9-15-16.

[478] Zverkov & Osminin, pp. 73-74 (**Exhibit CL-48**).

[479] *See* Professor Asoskov's testimony at T2/33/22-25; *See* Professor Stephan's testimony at T2/201/6-20.

[480] *See* Professor Asoskov's testimony at T2/34/8-15.

[481] Zverkov & Osminin, p. 74 (**Exhibit CL-48**).

[482] Resolution No. 8-P, p. 6 (**Exhibit R-35**). Upon review of the constitutionality of FLIT, Art. 23(1) following the application of I.D. Ushakov (**Exhibit R-24**).

the higher rates prescribed in a customs union treaty between Russia and Kazakhstan. That treaty had not entered into force and was subject to provisional application. The Court had to review Article 23(1) of the FLIT in order to decide "the extent upon which the issue of possibility of review of provisional application of an international treaty of the Russian Federation (or any part thereof) prior to its entry into force, which affects the rights, freedoms and duties of man and citizen and establishes other rules than those provided by law and in case such treaty was not officially published, is resolved."[483]

255. The Constitutional Court held that provisional application has the following effect:

> The Russian Federation may agree to provisional application of an international treaty (whether in full or in part), may determine the maximum period of its provisional application and may condition provisional application of an international treaty (or any part thereof) prior to its entry into force by compliance with the Constitution of the Russian Federation, laws and other regulatory acts of the Russian Federation. Agreement to provisional application of an international treaty means that it becomes part of the legal system of the Russian Federation and must be applied on the same basis as international treaties that have entered into force (unless otherwise expressly stated by the Russian Federation), since otherwise, provisional application would be meaningless. That is why neither the [VCLT] nor the [FLIT] contains any exemptions from *pacta sunt servanda* with respect to provisional application of treaties: as follows from Article 25(2) of the Convention and Article 23(3) of the Federal Law, if a treaty does not provide otherwise or if the respective states have not agreed otherwise, provisional application of such international treaty or any part thereof with respect to the Russian Federation will cease if it notifies other states between which such treaty is provisionally applied of its intention not to become a party thereto.[484]

256. In consequence, the Court held that "provisions of a provisionally applied international treaty become part of the legal system of the Russian Federation and, like international treaties of the Russian Federation that have entered into force, have priority over Russian laws."[485]

---

[483] Resolution No. 8-P, p. 3 (**Exhibit R-35**).

[484] Resolution No. 8-P, pp. 8-9, para. 4 (**Exhibit R-35**).

[485] Resolution No. 8-P, p. 9, para. 4.1. (**Exhibit R-35**).

257. As a result, the Court upheld the constitutional validity of Article 23(1) of the FLIT "insofar as it permits provisional application prior to its entry into force of an international treaty of the Russian Federation (or any part thereof)." Such provisional application is valid even where the provisionally applied treaty is "establishing rules other than those provided by law,"[486] with the consequence that the treaty forms part of Russian law pending its ratification or the termination of provisional application.

258. The Tribunal attaches considerable weight to this Ruling of the apex Constitutional Court in the Russian legal system. It concludes from its Ruling that the institution of the provisional application of a treaty or part thereof is constitutionally valid under Russian law and gives rise to rights and duties within the Russian legal system that take precedence over other Russian laws. The Constitutional Court reached this conclusion, construing a treaty that was to be provisionally applied and contained no domestic law inconsistency proviso. When addressing the question whether there is a *constitutional* prohibition on provisional application, the Tribunal regards this Ruling as applicable *a fortiori* to a case, such as the present, where provisional application is subject to a domestic law inconsistency clause. The Ruling confirms that, irrespective of the inclusion or omission of a domestic law inconsistency clause, there is no objection under the Constitution to the provisional application of a treaty establishing rules other than those provided by law.[487]

259. It also follows from this Ruling that the institution of provisional application, as recognised and given effect in Russian law, provides grounds for an exception to federal law. This possibility is also confirmed in Russian doctrine. As Professor Osminin concludes in his treatise:

> The [FLIT] (Art 23) contains no restrictions limiting the scope of provisional application of treaties according to their subject-matter, permitting provisional application to be used for all categories of treaties subject to ratification, including treaties that establish rules different from those prescribed by law.[488]

---

[486] Resolution No. 8-P, p. 13, *dispositif* para. 1 (Exhibit R-35).

[487] Supreme Court Cassation Ruling (Exhibit AVA-61) cited by Respondent as authority for the contrary position is not in point. *See* paras. 117-119 above. The treaty in question in that case had not been ratified and contained no provisional application clause: Stephan: T2/162/15-25.

[488] Osminin, pp. 326-327 (Exhibit RL-140); *see also* Zvekkov & Osminin, p. 75 (Exhibit CL-48).

260. It is in this context that Article 15(1) of the FLIT falls to be interpreted.[489] That provision requires ratification, *inter alia*, of international treaties "that set out rules different from those provided by law." That is a separate question to provisional application of a treaty pending its ratification and entry into force. The FLIT does not prohibit the provisional application of such treaties pending ratification. Rather, it expressly contemplates it. The purpose of provisional application is to grant binding effect to treaties that must otherwise be ratified in order to take effect within Russia's legal system.

261. Article 23(2) also provides guidance as to which internal organ within the Russian Federation is empowered to take decisions on the provisional application of a treaty or part thereof. It requires such a decision to be made "by the body that has taken the decision to sign the international treaty according to the procedure set out in Article 11."

262. Article 11 provides:

> 1. Decisions to negotiate and to sign international treaties of the Russian Federation shall be made:
>
> a) with respect to treaties to be concluded on behalf of the Russian Federation, by the President of the Russian Federation, but with respect to treaties to be concluded on behalf of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation, by the Government of the Russian Federation;
>
> b) with respect to treaties to be concluded on behalf of the Government of the Russian Federation, by the Government of the Russian Federation.
>
> 2. Decisions to negotiate and to sign international treaties of the Russian Federation on matters under the jurisdiction of the Government of the Russian Federation shall be made by the President of the Russian Federation if circumstances so require.

263. Article 11 of the FLIT as a whole confirms that the decision to sign an international treaty on behalf of Russia is one within the competence of the executive, not for Parliament. In the present case, the decision to sign the ECT was taken by the Government of the Russian

---

[489] FLIT (Exhibit AVA-52).

Federation by Resolution, pursuant to which Mr Davydov was issued with full powers to sign on behalf of Russia.[490]

264. Against this background, it is possible to return to the place within the Russian constitution of treaties that may, if the treaty so provides, be provisionally applied. Article 23 permits such provisional application by the Russian Federation and empowers the body that has taken the decision to sign the treaty pursuant to Article 11 to make the decision to provisionally apply the treaty or a part thereof. Where such a treaty is provisionally applied, it becomes, to the extent of such provisional application "an international agreement concluded by the Russian Federation."[491]   For that purpose, "'conclusion' means the expression of the consent of the Russian Federation to be bound by an international treaty."[492]   In turn, the reference in Article 15(4) of the Constitution to "international treaties and agreements of the Russian Federation" includes treaties that are provisionally applied, as both Parties and their experts agree.

265. The Tribunal next tests whether this conclusion, arrived at by construction of the pertinent provisions of the Constitution and the FLIT, is also consistent with the principle of the separation of powers that may be said to underlie the requirement enshrined in Article 15 of the FLIT to subject "international treaties ... that set out rules different from those provided for by law" to ratification "through the enactment of federal law" by Parliament.

266. The FLIT draws a careful distinction between the entry into force of a treaty and the regime of provisional application prior to entry into force.[493]   The ECT does the same. It requires ratification by a State for the purpose of entry into force;[494] while provisional application operates "pending [the ECT's] entry into force for such signatory."[495]

---

[490] *See* para. 235 above.

[491] FLIT, Art. 2(a) (**Exhibit R-24**).

[492] FLIT, Art. 2(d) (**Exhibit R-24**).

[493] FLIT, Arts. 23-24 (**Exhibit R-24**).

[494] ECT, Art. 44 (**Exhibit C-1**).

[495] ECT, Art. 45(1) (**Exhibit C-1**).

267. Consistent with this structure, the question whether to ratify the ECT such that it may enter into force for Russia was one for the Russian Parliament. The executive accepted this, introducing a Bill into Parliament seeking ratification.[496]

268. The question here is different: it is whether the provisional application of the ECT pending ratification and entry into force itself offends the constitutional principle of the separation of powers.

269. The provisional application of a treaty prior to its ratification and entry into force is an institution that is expressly contemplated by the FLIT. It was Parliament that enacted the FLIT as a federal law. It is by virtue of that law that Parliament empowers the executive to commit Russia to such provisional application of treaties.

270. Professor Asoskov opines that, since Article 15(4) of the Constitution accords priority to international treaty obligations over federal law, only such obligations that have been ratified by Parliament and implemented by federal law can be given such effect.[497] Otherwise there would be the prospect of conflict between treaty obligations and federal law, each having the force of law within the Russian legal system.

271. In the present case, the Domestic Law Inconsistency Clause ensures that there is no such conflict, since the treaty obligations only apply "to the extent that such provisional application is not inconsistent" with Russian law.

272. In the Tribunal's view, provisional application of the ECT under Article 45(1) is not inconsistent with the Constitution, since (a) Russian law expressly contemplates that the executive may commit Russia to the provisional application of a treaty prior to its ratification and (b) there can be no conflict between the ECT and Russian law in a manner that might offend the priority necessarily accorded to Parliament as a matter of the separation of powers to enact federal law, since, to the extent of such a conflict with federal law, the Treaty would not provisionally apply.

---

[496] Decree of Russia (**Exhibit R-3**).

[497] Asoskov 1, paras. 48-66.

273. From the above analysis, the Tribunal concludes that the decision of the executive in Russia to give provisional application to the ECT was not inconsistent with its Constitution.

274. *"Not inconsistent with" Russian laws on the settlement of investment disputes?* That is not the end of the analysis. The Tribunal must also consider whether the provisional application of the dispute settlement provisions of Article 26 is itself "not inconsistent with" Russian law. Following the construction of Article 45 that the Tribunal has found above, this would have to be because such provisional application would conflict with mandatory provisions of Russian legislation that, expressly or impliedly, may not be derogated from by the executive by way of provisional application.

275. In light of its finding at paragraph 177 above, the Tribunal addresses Russian law pertinent to this question as at the date on which its jurisdiction was invoked, namely 15 February 2013. This is the date on which its jurisdiction falls to be determined, both Parties also accepting that a State applying the Treaty provisionally may progressively remove inconsistencies over time.

276. It is important to be clear about the scope of this enquiry: it is limited to the question whether there is a mandatory rule of Russian legislation that prohibits the executive from agreeing to the provisional application of Article 26 of the ECT.

277. Much of the evidence adduced on behalf of Respondent and relied upon by Professor Asoskov was directed towards establishing the non-arbitrability of public law disputes between private persons and the state within the Russian municipal legal order, including disputes concerning matters such as bankruptcy and taxation. This proposition is not germane to the issue before the Tribunal, which relates to whether there is any prohibition on an agreement made on the plane of international law to submit a category of disputes with foreign nationals to international arbitration. The fact that the subject matter of the Claimant's underlying allegations may relate, for example, to the application of bankruptcy legislation, does not change the character of the claim in respect of which this Tribunal's jurisdiction is invoked.

278. The Parties agree that Russian law permits the State to submit to binding resolution of such investment disputes by arbitration pursuant to an international treaty. The Tribunal

received evidence as to the extensive scope of Russia's programme of investment treaties, in which the Russian Federation does submit to binding international arbitration of disputes between it and foreign investors.[498]

279. The issue in dispute between the Parties that is submitted for the Tribunal's decision is whether Russian law prohibits the executive from agreeing to such a form of dispute resolution as provided by Article 26 *by way of provisional application* such that the provisional application of Article 26 is inconsistent with Russian law. This question is not addressed by reference to the record of Russian bilateral investment treaties. On the evidence before the Tribunal, none of these contained a clause providing for their provisional application. The fact that these treaties were each submitted for ratification to the Russian Parliament does not therefore address the question of whether Russian legislation prohibits the executive from provisionally applying a treaty clause providing for international arbitration prior to ratification. At the same time, the fact that Russia has consented to the submission of investment disputes to international arbitration by way of ratified treaties in other circumstances is not itself sufficient to establish that the provisional application of Article 26 is not inconsistent with Russian law.

280. The relevant provision of Russian legislation that was in force at the date on which the jurisdiction of this Tribunal is to be determined is Article 10 of the 1999 FI Law.[499] This states:

> A dispute of a foreign investor arising in connection with its investments and business activity conducted in the territory of the Russian Federation shall be resolved in accordance with international treaties of the Russian Federation and federal laws in courts, arbitrazh courts or through international arbitration (arbitral tribunal).

281. The Preamble to the 1999 FI Law states, *inter alia*, that it is aimed at "making sure that the legal treatment of foreign investment is consistent with the rules of international law and international practice of investment cooperation."

---

[498] *See* paras. 139 & 170 above.

[499] 1999 FI Law (Exhibit AVA-36).

282. Article 10 is a permissive rule as to *applicable law* and as to *available fora* for the resolution of investment disputes:

(a) It permits reference to international treaties of the Russian Federation as providing one source for rules concerning the resolution of a dispute of a foreign investor in connection with its investments in the Russian Federation.

(b) It offers international arbitration as one forum for the resolution of such disputes by way of an alternative to courts or arbitrazh courts.

283. "[I]nternational treaties of the Russian Federation" is to be construed as a reference to such treaties as are capable of creating legal obligations within the Russian legal system. In light of the evidence of Russian law cited above, a provisionally applied treaty also has the force of law within the Russian legal order. Unlike its predecessor the 1991 FI Law,[500] the 1999 FI Law does not qualify the reference to international treaties with the words "in force." As the Constitutional Court has confirmed, a treaty that is provisionally applied is applied on the same basis as treaties that have entered into force. The reference to "international arbitration" includes a treaty provision for the resolution of disputes through international arbitration, such as Article 26 of the ECT, in a treaty that is provisionally applied.

284. Russian legislation on the resolution of investment disputes does not prohibit the executive from provisionally applying a treaty that contains a reference of such disputes to international arbitration. The Tribunal accordingly concludes that the decision of the executive to give provisional application to the ECT was not inconsistent with Russia's "laws".

285. The Tribunal has reached the above conclusions following its own independent analysis of the law in the light of the evidence and the legal authorities adduced before it.

286. As mentioned earlier,[501] with the Parties' agreement, the Tribunal received into the record in these proceedings The Hague District Court Judgment dated 20 April 2016, setting

---

[500] 1991 FI Law, Art 9. (**Exhibit AVA-35**).

[501] *See* paras. 28-30 above.

aside the Awards in *Hulley Enterprises Ltd/Yukos Universal Ltd (Isle of Man)/Veteran Petroleum Ltd (Cyprus) v. Russian Federation.*[502] As that judgment also dealt with the provisional application of the ECT to the Russian Federation vis-à-vis an invocation of jurisdiction under Article 26, the Tribunal invited the Parties to make submissions on the relevance (if any) of the judgment in the present case. Both the Arbitral Tribunal and the District Court in that case necessarily had to decide the issue on the basis of the evidentiary record and submissions advanced before them, which may well differ materially from the record in the present proceedings. Nevertheless, in view of the fact that the present Tribunal has come to a different view on the application of Article 45(1) to that reached by the District Court, the Tribunal now indicates in outline where it respectfully differs from the District Court in its analysis of the law.

287. In the first place, the District Court holds that "not inconsistent with" is equivalent to "compatibility." It reasons that:

> Given in part the fact that the provisional application finds its legitimacy in the signing (and the sovereignty of the Signatories is at stake in a number of treaty provisions), the provisional application of the arbitral provision contained in Article 26 is also contrary to Russian law if there is no legal basis for such a method of dispute settlement or is irreconcilable with the starting points and principles that have been laid down in or can be derived from legislation.[503]

288. As a result of characterising the question as a search for compatibility with Russian law, the District Court considers that "incompatibility with Russian law can also exist if that law does not provide for the option of arbitration as laid down in Article 26 ECT."[504] It finds that the 1999 FI Law "does not provide a separate legal basis for the arbitration of disputes between an investor and a state in international arbitral proceedings, as provided for in Article 26 ECT."[505] The Court concludes that it "does not follow the Tribunal's

---

[502] *Hulley Enterprises* (**Exhibit CL-9**); *Veteran Petroleum Limited (Cyprus v. The Russian Federation*), PCA Case No. AA228, Interim Award on Jurisdiction and Admissibility, 30 November 2009 (**Exhibit CL-26**); *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA227, Interim Award on Jurisdiction and Admissibility, 30 October 2009 (**Exhibit CL-27**).

[503] The Hague District Court Judgment, para. 5.33.

[504] The Hague District Court Judgment, para. 5.41.

[505] The Hague District Court Judgment, para. 5.58.

opinion that such disputes, and therefore also the current dispute, can be arbitrated based on Russian law."[506]

289. The Respondent in the present case urged a similar interpretation upon the Tribunal. In answer to a question from the Tribunal as to which provisions of the ECT had been applied by the Respondent upon signature, it referred solely to a number of substantive provisions of Russian domestic law that were already in force at the time of signature and that contain obligations similar to those in the ECT, but were only enforceable in the Russian courts.[507]

290. For the reasons developed above,[508] the Tribunal considers that this approach is not in accordance with Article 45 of the ECT when interpreted in accordance with the general approach to interpretation of treaties in international law, codified in Articles 31-2 of the VCLT. The District Court's enquiry construes the test in Article 45 in a manner that does not give effect to the purpose of the provision, namely the agreement of the signatory States to apply the Treaty provisionally subject to the Domestic Law Inconsistency Clause. The approach of the District Court reverses the enquiry mandated by Article 45. Its approach requires the signatory State to have already made provision in its domestic law in terms that are in substance the same as the treaty obligation. Such an interpretation would mean that the provisional application of the ECT, as provided in Article 45, would add nothing to the pre-existing domestic law of the signatory States.

291. This would deprive Article 45 of its substantive effect, despite the clearly expressed intent of the signatories that the ECT was to be subject to provisional application, with the consequences spelled out in detail in the ensuing paragraphs of Article 45. As the Tribunal has shown, the institution of provisional application is well accepted in both international law and in Russian law as giving effect, on a provisional basis prior to ratification, to the obligations of *international* law assumed by the signatory states under the Treaty.

---

[506] The Hague District Court Judgment, para. 5.58.
[507] T5/51/7 – T5/56/7.
[508] *See* paras. 180-233 above.

292. For these reasons and in the light of the rest of its analysis above, the Tribunal differs in its interpretation of Article 45 of the ECT in its application to the present case.

293. The Tribunal concludes that, upon signature, the Respondent did agree to provisionally apply Article 26 of the ECT in accordance with – and with the consequences provided for in – Article 45.

294. In light of this conclusion, the Tribunal finds it unnecessary to decide whether provisional application must apply to the ECT as a whole or may apply piecemeal, since, for all of the reasons elaborated above, it is in any event satisfied that the Respondent's agreement to the provisional application of the ECT includes the obligation to submit a dispute to arbitration under Article 26.

### B. DID THE CLAIMANT MAKE A PROTECTED INVESTMENT UNDER THE ECT?

#### 1. Introduction and factual background

##### (a) The Respondent's objection

295. In its second principal objection to jurisdiction, the Respondent alleges that the Loans do not qualify as Investments in terms of Article 1(6) of the ECT.

296. The Respondent accepts that the Claimant is an "Investor" for the purpose of Article 1(7) of the ECT, being "a company or other organization organized in accordance with the law applicable in that Contracting Party."[509]

297. However, it submits that the Loans do not constitute an "Investment" on the grounds that the Loans:

   (a) Do not qualify as "other debt of a company" in terms of Article 1(6)(b), "claims to money" in terms of Article 1(6)(c) or "Returns" in terms of Article 1(6)(d);

   (b) Do not meet the characteristics of an Investment under Article 1(6); and

   (c) Are not "associated with an Economic Activity in the Energy Sector" in terms of Article 1(6).

---

[509] T5/118/24 – T5/119/1.

### (b) The relevant provisions of the ECT

298. The ECT provides the following relevant definition of "Investment":

#### Article 1—Definitions

(6) "Investment" means every kind of asset, owned or controlled directly or indirectly by an Investor and includes:

    (a) tangible and intangible, and moveable and immovable, property, and any property rights such as leases, mortgages, liens, and pledges;

    (b) a company or business enterprise, or shares, stock, or other forms of equity participation in a company or business enterprise, and bonds and other debt of a company or business enterprise;

    (c) claims to money and claims to performance pursuant to contract having an economic value and associated with an Investment;

    (d) ...

    (e) Returns;

    (f) any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.

...

"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.

299. "Economic activity in the Energy Sector" is defined in Article 1(5) to mean: "an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing, or sale of Energy Materials and Products."

300. "Area" means with respect to a state that is a contracting party both "the territory under its sovereignty" and the sea and sea-bed over which it exercises sovereign rights in accordance with the international law of the sea: Article 1(10).

301. "Returns," which are included within the definition of "Investment" by virtue of Article 1(6)(e), are defined in Article 1(9) to mean "the amounts derived from or associated with an Investment, irrespective of the form in which they are paid, including profits,

dividends, interest, capital gains, royalty payments, management, technical assistance or other fees and payments in kind."

302. An investment may be made by "establishing new Investments, acquiring all or part of existing Investments or moving into different fields of Investment activity": Article 1(8).

303. The requirement that there be "an Investment" forms an integral part of the agreement to submit disputes concerning an alleged breach of the Investment Promotion and Protection provisions of Part III of the ECT to international arbitration.   Article 26(1) defines the scope *ratione materiae* of the disputes capable of submission to arbitration under Article 26(3)(a) as "[d]isputes between a Contracting Party and an Investor of another Contracting Party *relating to an Investment* of the latter in the Area of the former."[510]

### (c) Summary of the Parties' characterisation of the Loans

304. A brief summary of the factual background to this arbitration was provided in Part III of this Award.  A closer understanding of the background, character and operation of the Loans is now necessary in order to understand the nature of the Respondent's objection and the Claimant's response.

305. The Tribunal briefly summarises the Parties' different positions on the characterisation of the primary facts before summarising the facts as it finds them to be.  It then outlines the Parties' detailed submissions on the question of whether the Claimant made a qualifying Investment.

306. The Respondent submits that the history, intent and terms of the Loans demonstrate that they were a repatriation to Yukos Oil in Russia of the profits of its own oil trading activities in Russia and the sale of its interest in a Russian gas company.[511]  The form of a loan was adopted to achieve tax benefits.  But, on the Respondent's case, the substance was not changed; the Loans did not contribute anything to the Russian economy.  Yukos Capital played no meaningful role in the transaction and should be disregarded.[512]

---

[510] ECT, Art. 26(3)(a) (emphasis added).
[511] T1/64/11-14.
[512] T1/45/8-19.

307. In order to illustrate the structure of the relevant transactions the Respondent produced an annotated demonstrative exhibit.[513]

308. The Respondent submits that, in those circumstances, the Loans do not qualify as an Investment in terms of Article 1(6). During the Hearing, the Respondent confirmed that for the purpose of this phase of the proceedings, it:

   (a) Does not object to the Tribunal's jurisdiction on the ground that Yukos Capital does not qualify as an Investor in terms of Article 1(7);[514] and

   (b) Does not argue that the payments from other companies in Yukos Group out of Russia were contrary to Russian law. It accepted (again for this purpose only) that the transfers from Russia to Cyprus (including the tax paid on them) were in accordance with the then treaty arrangements between Russia and Cyprus.[515]

309. The Claimant produced its own version of the Respondent's demonstrative exhibit.[516] The Claimant does not take issue with the basic structure of the transactions alleged by the Respondent. The primary difference is that the Claimant submits that funds upon which Yukos Capital drew in order to fund the Loans comprised – in addition to the dividends derived from trading subsidiaries' profits – funds from international investment, which together formed a pool of investments.[517]

310. The Claimant submits that there "was never anything remotely circular" about the path of the funds, which were never owned by Yukos Oil. This was not a strategy to "pop funds out of Russia just to stick them back in for tax purposes," and the original strategy was to use the funds for international expansion.[518]

---

[513] Demonstrative Exhibit Showing the Flow of Funds Transferred under the December 2003 and August 2004 Loan (**Exhibit R-115**). At the Tribunal's request, the Respondent annotated the exhibit with references to the evidential record, and produced the annotated version as **Exhibit R-115A**.

[514] T5/118/24 – T5/119/22.

[515] T5/65/25 – T5/66/25.

[516] Claimant's Demonstrative Exhibit Correcting Exhibit R-115 (7 September 2015) ("**Exhibit R-115 Correction**") (**Exhibit C-220**). The Claimant's exhibit only addresses the December 2003 Brittany Loan; Loan Facility Agreement between Brittany Assets Limited and Yukos Capital ("**Brittany Loan Agreement**"), para. 3 (**Exhibit C-130**).

[517] T5/213/22 – T5/214/6.

[518] T5/212/1-23.

### (d) The Tribunal's approach to the evidence

311. In addition to the documentary evidence submitted on the record in these proceedings relating to the Loans by both Parties, the Tribunal also had the benefit of witness evidence. The Claimant called Mr Misamore, who had been the Chief Financial Officer of Yukos Oil from April 2001 to December 2005. He submitted two witness statements and was tendered for cross-examination at the hearing. He also answered questions from the Tribunal. In addition, each Party produced experts on inter-company loan transactions: Mr Gleichenhaus and Mr Grantham for the Claimant, and Professor Lys for the Respondent. They each submitted reports and appeared before the Tribunal.

312. The Tribunal is mindful of the nature of its function at the jurisdictional stage in relation to contested matters of fact. Its draws a distinction that is well established in the jurisprudence of international courts and tribunals, both generally and in the specific context of investment disputes. That is the distinction between: (a) allegations of fact that go to the merits of the claim, which the Tribunal must take care not to prejudge at the jurisdictional stage and must instead approach on a *prima facie* basis; and (b) questions of fact that go directly to the scope of its jurisdiction, on which it is bound to make a final determination.

313. As the Annulment Committee in *Duke v. Peru* observed:

> [A]n arbitral tribunal must, for the purpose of its jurisdictional determination, presume the facts which found the claim on the merits as alleged by the claimant to be true (unless they are plainly without any foundation). In that sense, its determination may be said to be *prima facie*. But, in the application of those presumed facts to the legal question of jurisdiction before it, the tribunal must objectively characterise those facts in order to determine finally whether they fall within or outside the scope of the parties' consent. In making this determination, the tribunal may not simply adopt the claimant's characterisation without examination. In this way, a tribunal whose jurisdiction is contested strikes the balance between avoiding pre-judging the merits, on the one hand, and objectively determining the question of jurisdiction on the other.[519]

---

[519] *Duke Energy International Peru Investments No. 1 Ltd v. Peru* (Decision on Annulment) ICSID Case No. ARB/03/28 (1 March 2011), para. 118.

314. That an objective and final determination of its jurisdiction must be made was a central element in the reasoning of the International Court of Justice in *Oil Platforms* when it observed:

> [T]he Court cannot limit itself to noting that one of the Parties maintains that such a dispute exists, and the other denies it. It must ascertain whether the violations of the Treaty of 1955 pleaded by Iran do or do not fall within the provisions of the Treaty and whether, as a consequence, the dispute is one which the Court has jurisdiction *ratione materiae* to entertain, pursuant to Article XXI, paragraph 2. [520]

315. The distinction here drawn was well elucidated by Judge Higgins in her Separate Opinion, when she said:[521]

> Where the Court has to decide, on the basis of a treaty whose application and interpretation is contested, whether it has jurisdiction, that decision must be definitive .... It does not suffice, in the making of this definitive decision, for the Court to decide that it has heard claims relating to the various articles that are "arguable questions" or that are "bona fide questions of interpretation"....
>
> The only way in which, in the present case, it can be determined whether the claims of Iran are sufficiently plausibly based upon the 1955 Treaty is to accept pro tem the facts as alleged by Iran to be true and in that light to interpret Articles I, IV and X for jurisdictional purposes – that is to say, to see if on the basis of Iran's claims of fact there could occur a violation of one or more of them.

316. The same distinction was made in the investment arbitration context by the tribunal in *UPS v. Canada* when, distinguishing the two types of factual allegations for jurisdictional purposes, it observed, as to the second type, that "any ruling about the legal meaning of the jurisdictional provision, for instance about its outer limits, is binding on the parties."[522]

---

[520] *Oil Platforms (Islamic Republic of Iran v. United States of America)* (Preliminary Objection) [1996] ICJ Rep 803 ("**Oil Platforms**"), para. 16.

[521] *Oil Platforms*, Higgins Separate Opinion, para. 31.

[522] *United Parcel Service of America Inc v. Canada* (Award on Jurisdiction) (2002) 7 ICSID Rep, paras. 285, 296-7 (**Exhibit RL-92**). *See also*, to like effect: *Phoenix Action Ltd v. Czech Republic* ICSID Case No ARB/06/5, Award (15 April 2009) ("*Phoenix Action*"), paras. 60-61 (**Exhibit RL-65**); Douglas, paras. 502–527 (**Exhibit CL-35**).

### (e) The factual background

317. In this section, the Tribunal analyses the facts pleaded as relevant to this second jurisdictional objection in more detail. It makes findings on matters that are clearly established on the record and identifies remaining matters in dispute between the Parties as to the appropriate characterisation of the transactions or the implications to be drawn from them. It will return to those factual matters where the Parties are not in agreement at a later point in its analysis, once it has determined what issues of fact are essential to its reasoning for the purpose of deciding the specific jurisdictional objection before it. In light of the limited nature of a tribunal's fact-finding task at the jurisdictional stage outlined above, the Tribunal is not to be taken as pre-judging other issues of fact that may be germane to the merits.

318. Yukos Capital was incorporated in 2003 as a group finance company to serve the needs of the wider Yukos Group.[523] In 2005, its ownership structure was reorganised so that it was owned by Yukos International, which in turn was wholly owned by the *Stichting*. The purpose of this restructuring, according to the Claimant, was to protect Yukos Oil's foreign assets from being confiscated by the Russian State. Yukos Oil was dissolved in 2007 at the conclusion of bankruptcy proceedings in Russia.[524]

319. This proceeding concerns two Loans – the December 2003 Loan and the August 2004 Loan – under which Yukos Capital was the lender and Yukos Oil the borrower. In each case, the Loans were funded by non-recourse back-to-back loans from other entities in the Yukos Group. The structure of these loans and the source of the funds advanced under them are relevant to the Respondent's contention that they do not give rise to qualifying Investments in terms of the ECT.

320. *The December 2003 Loan.* The December 2003 Loan was made pursuant to a loan agreement dated 2 December 2003, whereby the Claimant agreed to loan Yukos Oil an amount not to exceed RUB 80 billion.[525] The December 2003 Loan carried a quarterly interest rate of 9 percent, and its repayment was due on 31 December 2008. Failure to

---

[523] Counter-Memorial, para. 24.

[524] Notice of Arbitration, para. 10.

[525] Loan Agreement between Yukos Oil Company and Yukos Capital S.a.r.l. (2 December 2003) ("2003 Loan Agreement"), Art. 1.1 (Exhibit C-9).

meet the repayment due date entitled the Claimant to a penalty of 0.1 percent of the amount overdue.[526] An amount of RUB 79.3 billion under the December 2003 Loan was disbursed to Yukos Oil during the period of December 2003 to June 2004.[527]

321. *The August 2004 Loan.* The August 2004 Loan was made pursuant to a loan agreement dated 19 August 2004, whereby the Claimant agreed to loan Yukos Oil an amount not to exceed USD 355 million.[528] The August 2004 Loan carried a semi-annual interest rate of six-month LIBOR plus 1.75 percent, and its repayment was due on 30 December 2009. Failure to meet the repayment due date entitled the Claimant to a penalty of 0.1 percent "of the amount overdue for each day of delay."[529] The August 2004 Loan was disbursed to Yukos Oil in full upon the execution of the loan agreement.

322. *Back-to-back loans.* Each of the Loans was backed by another loan agreement:

   (a) The December 2003 Loan was linked to a back-to-back agreement between Yukos Capital and Brittany Assets Ltd. ("**Brittany**");

   (b) The August 2004 Loan was linked to a back-to-back agreement between Yukos Capital and Hedgerow Ltd ("**Hedgerow**") which "extended to Yukos Capital a 'facility' up to a certain amount."[530]

323. Each of Brittany and Hedgerow was an indirectly-held wholly-owned subsidiary of Yukos Oil:

   (a) Brittany was incorporated in the British Virgin Islands. It was wholly owned by Yukos Oil through intermediate subsidiaries: Yukos Hydrocarbons Investments Ltd (BVI) and Yukos CIS Investment Co Ltd (Armenia).[531]

---

[526] Notice of Arbitration, para. 18; 2003 Loan Agreement, Art. 3.2 (**Exhibit C-9**); Counter-Memorial, para. 25.

[527] Notice of Arbitration, para. 18; Counter-Memorial, para. 26.

[528] Loan Agreement between Yukos Oil Company and Yukos Capital S.a.r.l. (19 August 2004) ("**2004 Loan Agreement**"), Art. 1.1 (**Exhibit C-30**).

[529] Notice of Arbitration, para. 19; *see* 2004 Loan Agreement, Art. 3.2 (**Exhibit C-30**).

[530] Reply, paras. 209-210, 286-288.

[531] **Exhibits R-115A** and **R-78-284.**

    (b) <u>Hedgerow</u> was incorporated in Cyprus. It was wholly owned by Yukos Oil through an intermediate subsidiary, Yukos UK Ltd, a British company.[532]

324. The agreements with Brittany and Hedgerow defined Yukos Capital as the "Sub-Lender" and determined the maximum amount to be sub-lent, the nominal interest rate, and the maturity.[533] In practice, the funds that Brittany and Hedgerow lent to Yukos Capital were equal to the amounts that Yukos Capital sub-lent to Yukos Oil, and, in most cases, these funds were transferred in and out of Yukos Capital's bank accounts in matching deposits and withdrawals made within one business day of each other.[534]

325. In both cases, there was a specified margin (described as the "spread") between the interest rate payable under the primary loan and the sub-loan:

    (a) The <u>December 2003 Loan</u> carried an interest rate on the sub-lending to Yukos Oil of 9 per cent. The interest rate payable on the corresponding loan from Brittany was 8.9375 per cent. That is a margin of one sixteenth of one per cent or 6.25 basis points (0.0625%).[535]

    (b) The <u>August 2004 Loan</u> carried an interest rate on the sub-lending of six-month LIBOR plus 175 basis points. The interest rate on the corresponding loan from Hedgerow was LIBOR plus 171.875 per cent. That is a margin of one thirty-second of one per cent, or 3.125 basis points, or half the margin applicable to the December 2003 Loan.

326. The Respondent submits that the spreads were calculated to be the minimum necessary to achieve approval of the arrangements from the Luxembourg tax authorities and avoid the risk of the tax authorities imputing to Yukos Capital receipt of a larger spread based on transfer pricing rules. Thus, the spread declined between the 2003 and 2004 loans

---

[532] Exhibits **R-115A** and **R-78-281.**

[533] Reply, para. 211, *citing* Expert Report of Professor Thomas Z. Lys, PH.D. ("**Lys**"), paras. 27, 29, 43, 45. Among the terms prescribed in the agreements with Brittany and Hedgerow were the identity of the sub-borrower (Yukos Oil), the maximum amount that could be sub-lent, the nominal interest rate, and the maturity of the loan: T3/46/7-21.

[534] Reply, paras. 210, 212.

[535] T1/57/2-13.

because the tax authorities agreed in the interim that the lower spread was acceptable. The Respondent claims that the spread was no more or less than an administrative fee.[536]

327.   The terms of the agreements with Brittany and Hedgerow were non-recourse. Yukos Capital did not have to repay the funds until Yukos Oil paid it pursuant to the sub-lending agreements of the Loans.[537] The Respondent alleges that Yukos Capital acknowledged this in 2004 in correspondence with Brittany and Hedgerow,[538] and it was reflected in a subsequent agreement with Fair Oaks (the assignee of Brittany's and Hedgerow's interests under the loans) in 2010.[539] These terms also prescribed that Brittany and Hedgerow "shall bear all risks associated with Sub-Lending."[540] The Respondent submits that this includes the risk of failing to receive the spread.[541] The Loans were unsecured.[542]

328.   Mr Gleichenhaus' evidence is that the Loans were accounted for as such in Yukos Capital's financial statements from 2003 to 2007.[543]

329.   The Respondent accepts that the Loans met the formal requirements to qualify as such. Nevertheless it submits that they should be treated as dividends for the purpose of determining whether they constitute an Investment in terms of the Treaty.[544]

330.   *Origin of the loan funds.* It was common ground that funds from profits of oil trading activities within the Yukos Group, including those of its Russian subsidiaries, Ratibor and Fargoil, were remitted to Brittany and provided a source of the funds used for its

---

[536] T1/57/6-13; T1/60/23 – T1/61/25; T1/86/6-11.

[537] Reply, para. 213, *citing* Brittany Loan Agreement, para. 3 (**Exhibit C-130**); Loan Agreement HgYCS-1808/04 between Hedgerow Limited and Yukos Capital (18 August 2004) ("**Hedgerow Loan Agreement**"), para. 3 (**Exhibit C-131**); Lys, paras. 31, 47; T3/45/24 – T3/47/10.

[538] T1/54/13-25, *citing* Letter from Yukos Capital to Brittany (15 November 2004) (**Exhibit R-118**); Letter from Yukos Capital to Hedgerow Limited (30 December 2004) (**Exhibit C-138**).

[539] T1/62/17 – T1/64/10; T1/82/21 – T1/83/23.

[540] Reply, paras. 214-215, *citing* 2003 Brittany Agreement, para. 5 (**Exhibit C-130**); Hedgerow Loan Agreement, para. 5 (**Exhibit C-131**); Lys, paras. 31-32, 47-48.

[541] T1/59/8-20, T5/108/14 – T5/109/14.

[542] T3/46/4-6; T3/47/18 – T3/48/9.

[543] Expert Report of Stuart B. Gleichenhaus (3 November 2014) ("**Gleichenhaus 1**"), para. 58.

[544] T5/79/21 – T5/80/2.

December 2003 loan to Yukos Capital, which Yukos Capital in turn applied to the December 2003 Loan to Yukos Oil: [545]

    (a) Yukos Oil's wholly owned Russian production subsidiaries produced oil, and sold it to various Yukos trading companies which traded the oil amongst themselves.[546] In this case, profits were accumulated in two companies, Fargoil and Ratibor, both Russian companies.

    (b) Yukos Oil was the ultimate owner of Fargoil and Ratibor through intermediate holding companies: Yukos CIS, which, in turn, owned Yukos Hydrocarbons, which, in turn, owned Brittany, which owned (through further British Virgin Island entities) two Cyprus entities, Nassaubridge and Dunsley. Those two companies owned Ratibor and Fargoil respectively.[547]

    (c) Trading profits accumulated by Ratibor and Fargoil were passed in the form of dividends to their Cyprus parents, which, in turn, passed the profits through their holding structures in the British Virgin Islands to Brittany.[548]

    (d) Brittany's funds were then lent to Yukos Capital, which then lent them to Yukos Oil.

331. An area of dispute between the Parties on the evidence concerns the extent to which, as Respondent alleges, these funds were sent in a loop that started and finished in Russia. The evidence that the Tribunal has received in this jurisdictional phase as to this is as follows:

    (a) The payment by Fargoil and Ratibor of dividends to their foreign parents constituted an expatriation of the profits of Russian oil trading subsidiaries of Yukos Oil.[549]

---

[545] Demonstrative Exhibit Showing the Flow of Funds Transferred under the December 2003 and August 2004 Loan (**Exhibit R-115A**); Exhibit R-115 Correction (**Exhibit C-220**)

[546] T1/49/2-9.

[547] T1/50/4-16.

[548] T1/50/17-25; T5/64/1-4, *citing* Mr Misamore's testimony.

[549] *See* Mr Misamore's testimony at T2/227/1-13; T2/231/20 – T2/232/23.

(b) Mr Misamore also accepts that, as he testified in Russian proceedings in 2009, the dividends derived from Fargoil and Ratibor formed at least *a* source of the funds loaned to Yukos Oil under the December 2003 Loan.[550] For example, Mr Misamore testified in 2009 that it was decided that the funds derived from Fargoil's 2003 dividend would be loaned by Brittany to Yukos Capital, and then to Yukos Oil.[551] To the same effect, Mr Gleichenhaus (an expert for the Claimant) noted that the funds lent to Yukos represented dividended profits from trading or treasury operations of Yukos subsidiaries.[552]

(c) At the same time, it is common ground that Yukos Capital loaned some of the funds generated by these dividends to production subsidiaries within the Yukos Group.[553] They were not simply routed directly to Yukos Oil *in toto*.

(d) The Fargoil and Ratibor dividends were paid over a period to June 2003,[554] while Brittany did not loan the funds to Yukos Capital until December 2003.

(e) Mr Misamore testifies that the funds Brittany lent to Yukos Capital came out of a pool that also included funds generated by the international entities from the investment of their own funds and profits passed from their international subsidiaries.[555] The Respondent rejects this evidence as unsubstantiated.[556] This evidence was not advanced in Mr Misamore's written witness statements, and largely emerged during his cross-examination. It receives support from a statement of Mr Wilson given for the purpose of the Russian criminal proceedings and exhibited in this arbitration. Mr Wilson states that he was until April 2002 an International Tax Director at PwC (Moscow) and tax advisor to Yukos Oil, before being appointed International Tax Director of Yukos Oil. He

---

[550] T2/233/14 – T2/234/12.

[551] Record of Interview of Bruce Misamore by Attorney Yelena Levina (9 March 2009) ("**Misamore Record of Interview**"), p. 37 (**Exhibit R-39**).

[552] T1/47/6-14, *citing* Gleichenhaus 1, para. 33. *See also* Statement of Stephen J. Wilson (16 April 2010) ("**Wilson Record of Interview**"), p. 8 (**Exhibit C-125**).

[553] Compass Lexecon Report (9 January 2009), para. 29 (**Exhibit R-38**), *cited* by Respondent: T5/67/2-23.

[554] T2/221/6-8; Mr Misamore referred to "early 2003" at T3/68/15-22; T5/67/24 – T5/68/8: Respondent, *citing* Compass Lexecon Report (9 January 2009) (**Exhibit R-38**).

[555] Exhibit R-115 Correction (**Exhibit C-220**); T3/70/2-22; T3/80/1-6.

[556] T5/214/12-25.

states that the dividends "together with the foreign trading profits and the profits from foreign treasury operations" would be available to Yukos Capital.[557]

332. At the present jurisdictional stage, there is insufficient documentary evidence on the record to enable the Tribunal to make a precise determination of the source of all of the funds received by Brittany that were in turn applied to the Loan. The Tribunal finds on the evidence that at least some of the funds advanced under the Loan were derived from profits originally generated by Russian subsidiaries of Yukos Oil. However, given that money is fungible and there was a delay of some six months between the dividends being paid and the Loan being advanced, it cannot simply equate the funds advanced under the December 2003 Loan with the dividends paid by Fargoil and Ratibor.

333. The funds advanced under the August 2004 Loan were derived from the sale of Hedgerow's 56 per cent shareholding in Rospan Overseas Ltd ("**Rospan**"), a Russian company. Yukos Oil was the ultimate owner of this equity interest through intermediate companies within the Yukos Group: Yukos UK Ltd, which, in turn, owned Hedgerow.[558] The funds were not passed to Yukos Oil by way of dividend through Hedgerow's immediate parent company Yukos UK Ltd. Instead, they were loaned to Yukos Capital and then to Yukos Oil. Yukos Oil used the funds to make a tax payment in Russia.[559]

334. *Control of the funds and the parties' intentions in making the Loans.* The Respondent submits that Yukos Oil remained in control of Yukos Capital, Brittany, and Hedgerow, and thus the funds that were moved via the Loans, at all times.[560] The Claimant does not dispute that all of the relevant Russian and international entities were subsidiaries of Yukos Oil.[561]

335. Yukos Capital was administered by TMF Corporate Services S.A. and TMF Management Luxembourg S.A. ("**TMF**") the Claimant's corporate and management service providers in Luxembourg. Mr Misamore accepted that TMF took instruction from the Yukos treasury group about what transactions to conduct and the terms on which to conduct

---

[557] Wilson Record of Interview, p. 8 (**Exhibit C-125**).

[558] Reply, para. 206; T1/53/6-19.

[559] T1/53/20 – T1/54/7.

[560] Reply, para. 207.

[561] **Exhibit R-115** Correction (Exhibit C-220).

them, including in relation to the Loans. He maintained that they exercised an independent function as professional managers including with respect to documentation.[562] Nevertheless, Mr Misamore accepted that TMF did not conduct credit checks or underwriting procedures before loaning funds, where Yukos Capital operated as an inter-company financing vehicle.[563] Claimant's expert, Mr Gleichenhaus, accepted that TMF played no role in cash management, except to the extent that it administered transactions involving funds going in or out of Hedgerow or Brittany.[564]

336. Mr Misamore testified that the funds were extended by way of loans because the repatriation was intended to be temporary, and that was a tax efficient means of achieving a temporary repatriation and management flexibility.[565] Interest payments were initially made under the December 2003 Loan.[566] No payments were made under the August 2004 Loan.[567] Mr Misamore stated at the time that this was because Yukos Oil's bank accounts had been frozen in the Russian tax proceedings.[568] Yukos Capital made formal demands for payment of the outstanding Loans,[569] but did not pursue further enforcement action.[570]

337. The Claimant emphasises that the legal ownership of the funds stayed with the party lending them – Brittany and then Yukos Capital – and those companies were located outside Russia.[571] Yukos Oil itself never owned the funds prior to the Loans being

---

[562] T3/34/6 – T3/40/22; T3/47/11-14.

[563] T3/37/17-20.

[564] T3/227/10-17.

[565] T3/24/16 – T3/25/13; T3/65/5-6.

[566] Gleichenhaus 1, para. 32; Yukos Oil response to Yukos Capital late payment notice (12 November 2004) (**Exhibit B-18**); Yukos Capital Transfers for Interest Payments, pp. 2, 5, 6 (**Exhibit B-19**); Yukos Capital – Financial Statements for Period Ended December 31, 2004, p. 7 (**Exhibit B-35**); Yukos Oil Audit Report, pp. 7, 12 (**Exhibit C-210**); Explanatory Note to the Financial Report of Yukos Oil (2004) ("**2004 Explanatory Note**"), pp. 17, 22 (**Exhibit C-137**).

[567] Gleichenhaus 1, para. 32.

[568] Yukos Oil response to Yukos Capital late payment notice (12 November 2004) (**Exhibit B-18**).

[569] Letter from Yukos Capital to Yukos Oil (19 October 2014) (**Exhibit C-155**); Letter from Yukos Capital to Yukos (20 January 2005) (**Exhibit C-156**); Notice of Default from Yukos Oil to Yukos Capital (11 November 2005) (**Exhibit C-139**).

[570] T5/83/15-22.

[571] T5/197/1-3.

made.[572]  Likewise, the fact that Yukos Capital borrowed the funds in order to lend them does not change their legal ownership.[573]

338.  The Respondent invites the Tribunal to conclude that Yukos Capital had no role of economic substance in the transactions, describing it as a "transfer agent" or "delivery agent," ultimately of Yukos Oil, but within the structure of the transaction, as an agent of Brittany or Hedgerow.[574]  The Tribunal will return to consider this submission when it analyses the economic materialization of the Loans.[575]

339.  The Respondent does not dispute in the present jurisdictional phase that the transactions by which the funds were transferred out of Russia were made in accordance with the relevant tax conventions, including the Russia-Cyprus Double Tax Agreement.[576]  Withholding tax at the rate agreed between Russia and Cyprus under that Treaty was paid on those dividends.[577]

340.  There is no evidence adduced before this Tribunal, for the purpose of determining the present jurisdictional issue of whether an "Investment" was made, that the Loans would have been treated as dividends under the Double Tax Agreement between Russia and Luxembourg.[578]  Article 10(3) of this Treaty expressly excludes loans from its definition of dividends providing that: "[le] terme "dividendes" employé dans le présent article désigne les revenus provenant d'actions, actions ou bons de jouissance, parts de mine, parts de fondateur ou autres parts bénéficiaires à l'exception des créances."[579]

341.  This leaves for consideration the overall purpose of the transactions.  The Tribunal returns to this issue after summarising the Parties' submissions.

---

[572] T5/212/1-6.

[573] Gleichenhaus 1, paras. 35, 55.

[574] T1/65/18 – T1/66/9.

[575] See paras. 456 – 513 below.

[576] T5/65/25 – T5/66/25.

[577] See Mr Misamore's testimony at T2/227/5 – T2/228/12.

[578] Double Tax Treaty between Luxembourg and the Russian Federation (28 June 1993) ("**Double Tax Treaty**") (**Exhibit N-14**); T5/88/18-25.

[579] Double Tax Treaty, Art. 10(3) (emphasis added) (**Exhibit N-14**).

### 2. The Parties' submissions

342. The Tribunal now summarises the Parties' submissions on the question of whether the Claimant made a qualifying Investment.

#### (a) The Respondent's submissions

##### (i) Do the Loans constitute "other debt of a company," "claims to money" or "Returns"?

343. The Respondent rejects the Claimant's assertion to the effect that the "Loans" are "debts of Yukos Oil's" and, as such, constitute "debt of a company or business enterprise" within the meaning of Article 1(6)(b) of the ECT.[580]   According to the Respondent, the Loans were the "economic equivalent of a dividend," since the funds in question were profits generated by Yukos Oil's subsidiaries, which were at all relevant times controlled by Yukos Oil and accounted for in its consolidated financial statements.[581]

344. The Respondent asserts that Article 1(6)(b) of the ECT only covers "equity and debt interests in a company, but not claims to money under a loan agreement."[582]  This results from a contextual interpretation, given that, whilst "other types of assets listed in Article 1(6)(b) ECT are separated by commas," the formulation "'other debt of a company or business enterprise' is not set off by commas and is thus to be treated as within the same asset class as 'bonds'."[583]  In accordance with the *ejusdem generis* principle, the general term "debt" must belong to the same genus as the specific word "bond" that precedes it, implying that "other debt of a company" only refers to "debt instruments issued by a company."[584]

345. The Respondent also refers to the principle of *effet utile*, contending that the Claimant's suggested interpretation would both render Article 1(6)(c) and the reference to "claims to money" contained therein "largely redundant" and "deprive the express limitation" to claims "associated with an Investment" in that Article of any meaning, since all claims to

---

[580] Memorial, para. 137.

[581] Memorial, para. 137.

[582] Memorial, para. 142.

[583] Memorial, para. 140.

[584] Memorial, paras. 141-142.

money against a company—whether associated with an investment or not—would be covered by Article 1(6)(b) of the ECT.[585] Claims to money are covered, therefore, only by Article 1(6)(c), with Article 1(6)(b) being limited to equity and debt interests in a company.[586]

346. Arguing that *Electrabel* does not support the Claimant's position in its Counter-Memorial, the Respondent rejects the Claimant's contention that the Loans may be seen as debt interests in Yukos Oil, meaning the Loans do not come under the scope of Article 1(6)(b) of the ECT.[587] The Respondent also notes that none of the cases cited by the Claimant for the proposition that loans are protected investments concern "stand-alone loans … that did not form part of the investor's economic venture in the host state."[588]

347. To the extent that the Claimant alleges that the Loans qualify as Returns in terms of Article 1(6)(e) and Article 1(9), they must be amounts derived from or associated with an Investment.[589] If anything, the Respondent submits, the funds were returns of a Russian company (Yukos Oil) and granting "treaty protection to funds associated with shareholdings of a Russian company in its Russian subsidiaries would be at odds with the investment treaty system" since investment treaties are not deemed to create protection for rights involved in purely domestic claims.[590]

348. The Respondent contends that Article 1(6)(c) of the ECT only covers claims to money that form part of an "overall investment" in the host state.[591] The Respondent cites the decision in *Electrabel* to support the idea that there needs to be an "overall investment," which must be an "investment other than the one addressed" in the particular sub-paragraph.[592] The Respondent claims that, since the Claimant's alleged "Investment" only consists of the two Loans, there is no "overall investment" that claims to money

---

[585] Memorial, para. 143, citing, *inter alia*, OPPENHEIM'S INTERNATIONAL LAW, Vol 1. (Robert Jennings & Arthur Watts, eds., 1996), p. 1280 (**Exhibit RL-71**).

[586] Memorial, para. 144.

[587] Reply, paras. 302-313.

[588] T5/115/2-20.

[589] T1/88/3-16.

[590] T1/88/17 – T1/89/5, *citing Phoenix Action*, para. 97 (**Exhibit RL-65**).

[591] Memorial, para. 146.

[592] Memorial, para. 147, *citing Electrabel*, para. 5.53 (**Exhibit RL-76**).

could be associated with and that, accordingly, the Loans cannot be covered by Article 1(6)(c) of the ECT.[593]

### (ii) Do the Loans bear the characteristics of an Investment in terms of Article 1(6)?

349. The Respondent contends that the Loans are not protected under the ECT because they do not qualify as "Investments" under Article 1(6) of the ECT.[594]

350. The Respondent maintains that, pursuant to Article 31(1) of the VCLT, Article 1(6) of the ECT must be interpreted in good faith, in accordance with its ordinary meaning, in its context, and in light of the ECT's object and purpose,[595] which involves consideration of "the concept of investment under general international law."[596]

351. The Respondent cites the tribunal in *Alps Finance v. Slovak Republic* (*"Alps Finance"*) for the proposition that "[t]he term investment has an inherent meaning," which entails "a commitment of resources, a certain duration, and an element of risk."[597]   In *Alps Finance*, the tribunal found that it is insufficient merely to establish that an asset falls within the category of "claims and rights to any performance having an economic value." The Respondent quotes from the decision of the tribunal in *Nova Scotia v. Venezuela* to similar effect.[598]

352. The Respondent also points out that a contextual interpretation of "Investment" backs up the contention that there is a need to give the notion of "Investment" an "objective meaning."[599]   The Respondent argues that this interpretation is corroborated by the use of the term "Investment" elsewhere, particularly in Article 10(1) of the ECT and in the ECT Contracting States' Understanding with respect to Article 1(6) of the ECT.[600]

---

[593] Memorial, para. 148.

[594] Memorial, para. 83.

[595] Memorial, para. 88.

[596] Memorial, para. 88.

[597] Memorial, para. 89; Reply, para. 246, *citing Alps Finance and Trade AG v. Slovak Republic* (UNCITRAL Award) (5 March 2011) (*"Alps Finance"*) (**Exhibit RL-55**).

[598] Reply, para. 247, *citing Nova Scotia Power Incorporated (Canada) v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)11/1, Award (30 April 2014), para. 80 (**Exhibit RL-179**).

[599] Memorial, paras. 92-93.

[600] Memorial, para. 94.

353. The Respondent submits that, from Article 1(6) of the ECT, it is clear that "the term 'Investment' cannot be dissociated from its ordinary meaning."[601]  In spite of the broad list which precedes Article 1(6) and which describes the various forms that an investment may take, Article 1(6) "does not dispense with the requirement that an investment have certain inherent characteristics, which derive from the term's ordinary meaning."[602]  The Respondent highlights, in particular, the fact that Articles 1(6), 1(8), and 10(1) of the ECT refer to the "making" of investments.[603]  Accordingly, "for an investor to have made an investment, the assets listed in Article 1(6) ECT must have been invested."[604]

354. The Respondent argues that this interpretation conforms with the object and purpose of the ECT, which is expressed at Article 2 as "long-term cooperation in the energy field, based on complementarities and mutual benefits."[605]  Such an object and purpose would remain unrealized "if any asset held by any company incorporated in one ECT Contracting State benefited from ECT investment protection" without regard as to "whether it engaged in any investment activity in another ECT Contracting State, had control or direction over the asset, or transferred any value to another ECT Contracting State."[606]  Referring to the communication from the European Commission cited by the Claimant for the proposition that the ECT was intended to protect repatriation of profits, the Respondent submits that the concern was the protection of profits of foreign investors investing in Eastern Europe, and that the ECT "was never intended to and does not protect the repatriation of profits of a host state company ... arising from its activities in the host state, back to the host state."[607]

355. It submits that the cases cited by the Claimant, including *Stati v. Kazakhstan* ("*Stati*") and *Alpha Projektholding v. Ukraine*, were concerned with reinvested profits, not repatriated profits, that the Claimant contradicts itself by claiming that the funds were both a repatriation of profits and the injection of capital into Russia, and submits that the

---

[601] Reply, paras. 250-251.

[602] Reply, paras. 250-251.

[603] Reply, paras. 251-252.

[604] Reply, paras. 251-252.

[605] Memorial, para. 95.

[606] Memorial, para. 96.

[607] T5/95/9 – T5/96/21.

Claimant has failed "to demonstrate that the source of funds is irrelevant as a matter of law."[608] Other cases cited by the Claimant do not concern "round-tripping" of funds.[609] The Respondent was asked whether, if the transfer of the funds by Fargoil and Ratibor out of Russia resulted in the money being lost to the Russian economy in a lawful manner, the return of that money was a benefit to the Russian economy. The Respondent's response was that this did not qualify for protection because there is no association with an original protected investment.[610]

356. Citing *Romak S.A. (Switzerland) v. The Republic of Uzbekistan* ("*Romak*"), the Respondent contends that a "mechanical application" of the categories of assets listed in an investment definition without regard for the "objective requirements of an investment" would lead to a "result which is manifestly absurd or unreasonable."[611] In response to the Claimant's argument that tribunals endorsing the objective requirements of an investment have done so only to decline jurisdiction over "one-off sale of goods contract[s] akin to ordinary commercial transaction[s]," the Respondent says that it is precisely the "principled" approach of these tribunals that allowed them to distinguish between an investment and an ordinary commercial transaction.[612]

357. The Respondent describes an investor's contribution to the economy as a "*quid pro quo*" of the right to bring a claim to international arbitration[613] and refers to several tribunals in investment treaty arbitrations that found that they did not have jurisdiction in the absence of such a contribution.[614] In particular, the Respondent quotes from the decision rendered in *Phoenix Action v. Czech Republic* ("*Phoenix Action*"), where the tribunal

---

[608] T5/97/3 – T5/98/2, *citing Stati v. The Republic of Kazakhstan*, SCC Case No. 116/2010, Award (19 December 2013) ("*Stati*"), para. 806 (Exhibit CL-3) and *Alpha Projektholding GmbH v. Ukraine* ICSID Case No. ARB/07/16, Award (8 November 2010) ("*Alpha*") (Exhibit CL-57).

[609] T5/98/8 – T5/100/22, *citing, inter alia, Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Award (5 June 2012) ("*Caratube*"), paras. 350, 435 (Exhibit RL-59).

[610] T5/100/23 – T5/101/18.

[611] Memorial, para. 97, *citing Romak S.A. (Switzerland) v. Uzbekistan*, PCA Case No. AA280, UNCITRAL, Award (26 November 2009) ("*Romak*"), para. 184 (Exhibit RL-54); Reply, paras. 254-256.

[612] T1/74/11-21.

[613] Memorial, para. 118, *citing Douglas*, paras. 335-336 (Exhibit CL-35).

[614] Memorial, paras. 119-122, citing *Phoenix Action*, para. 97 (Exhibit RL-65); *Quiborax S.A. v. Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction (27 September 2012), paras. 232-233 (Exhibit RL-57); *Caratube*, paras. 350, 435 (Exhibit RL-59); *KT Asia Investment Group B.V. v. Kazakhstan*, ICSID Case No. ARB/09/8, Award (17 October 2013) ("*KT Asia*"), paras. 203-206 (Exhibit RL-56).

held that there could be no protection for rights "not involving any significant flow of capital, resources or activity into the host State's economy."[615] It also submits that *KT Asia Investment Group B.V. v. Kazakhstan* ("*KT Asia*") is analogous, arguing that Yukos Capital was only an "instrument in this game of revolving door" where Yukos Oil shifted assets between its "various pockets."[616]

358. Similarly, with regard to the notion of risk, the Respondent refers to several arbitral decisions[617] as well as publicist commentary[618] that support the idea that risk is a necessary element of an "investment."[619]

359. With regard to such citations of authority, the Respondent rejects the Claimant's assertion[620] that awards in non-ECT arbitrations are "irrelevant" to this Tribunal's determination.[621] The Respondent notes that the Claimant "has not been able to point to any difference in language in the investment definitions applied by the tribunals cited by Respondent that would render their decisions or awards 'irrelevant' to the interpretation of Article 1(6) ECT."[622] None of the ECT cases on which the Claimant relies except one, *Stati*, dealt with an objection that the assets did not meet the inherent characteristics of an investment, and that case is inapposite.[623]

360. The Respondent also rejects the Claimant's argument[624] that contribution, duration, and risk are not relevant to determining whether an asset is an investment, noting that "out of the seven ECT decisions and awards cited by Claimant for the proposition that the term 'investment' lacks an objective meaning under Article 1(6) of the ECT, only one ECT tribunal so stated, but in a factual context that is clearly distinguishable from that in the

---

[615] Memorial, para. 119, *citing Phoenix Action*, para. 97 (**Exhibit RL-65**).

[616] T1/84/22 – T1/86/5; T5/104/21 – T5/108/13, *citing KT Asia* (**Exhibit RL-56**).

[617] *See e.g. Toto Costruzioni Generali S.p.A. v. Lebanon*, Decision on Jurisdiction (11 September 2009) ("*Toto Costruzioni*"), para. 84 (**Exhibit RL-66**); *KT Asia*, paras. 220-221 (**Exhibit RL-56**).

[618] *See e.g.* Douglas, para. 403 (**Exhibit CL-35**).

[619] Memorial, paras. 130-133.

[620] *See* para. 398 and Counter-Memorial, para. 194.

[621] Reply, para. 257.

[622] Reply, paras. 257-260.

[623] T1/75/23 – T1/76/23.

[624] *See* paras. 395ff below and Counter-Memorial, paras. 179-193.

present case."[625]   The Respondent contends that the Claimant "did not attempt to rebut any of the authorities cited by Respondent that confirm that risk is a necessary element of an investment," except for one, the rebuttal of which was "misleading," according to the Respondent.[626]

361.   According to the Respondent, the Loans do not meet the objective requirements of an investment under the ECT. The Respondent submitted in closing that it was the intention from the start that the dividends paid by Fargoil and Ratibor representing Russian oil trading profits would be repatriated in the form of loans.[627]   Since the loaned funds essentially consisted of profits made by Yukos Oil's trading subsidiaries and other entities controlled by Yukos Oil and the Claimant "merely acted as a conduit in back-to-back transactions to funnel [these profits] to Yukos Oil Company," the Claimant made no contribution to the Russian Federation and did not incur any risk.[628]

362.   As the Respondent argues, the agreements with Brittany and Hedgerow "reveal that Yukos Capital never made any decision with respect to the 'Loans', had no control over the funds that transited through its bank accounts, and never had any economic interest in those funds."[629]   The Respondent submits that no value was transferred through the Loans from Luxembourg to the Russian Federation.[630]   The Respondent recalls that the *Phoenix Action* tribunal rejected a claim in which a restructuring of domestic investments was merely "a rearrangement of assets within a family" rather than being a part of a "significant flow of capital, resources or activity into the host State's economy."[631]

363.   The Respondent alleges that the funds of both the December 2003 Loan and the August 2004 Loan were "in substance" dividends to Yukos Oil, dressed up as loans to avoid Russian taxes.[632]   In the case of the December 2003 Loan, the funds were "profits arising from the production and sale of oil produced by Yukos Oil Company's subsidiaries,"

---

[625] Reply, paras. 266, 274.

[626] Reply, paras. 296-297.

[627] T5/102/21-25.

[628] Memorial, paras. 83, 99.

[629] Reply, para. 287.

[630] Reply, para. 290.

[631] Reply, paras. 291-293, *citing Phoenix Action,* paras. 97, 140 (**Exhibit RL-65**).

[632] Memorial, paras. 110, 114.

whilst in the case of the August 2004 Loan they were the "proceeds of the sale of Yukos Oil Company's indirect interest in another Russian oil and gas company," Rospan.[633] To the extent that interest payments were made (which would be inconsistent with the transactions' characterisation as dividends), the Respondent submits that this had no impact on the economic position of the Yukos Group.[634]

364. The Respondent denies the Claimant's assertion that the Respondent "recognized that the Loans were valid intercompany loans, not dividends," asserting that Yukos' filing of a financial statement did not involve recognition or approval by the Respondent and that Yukos never disclosed to the Russian Federation details about the "loan" in its tax filings.[635]

365. Against this backdrop, the Respondent argues that the Claimant failed to show "that it made a personal contribution to the 'Loans' and that the 'Loans' involve a 'contribution to, or relevant economic activity within' the Russian Federation."[636] In particular, the Respondent points out that the decision of the tribunal in *Romak*, upon which the Claimant relies,[637] did not imply "that any commitment of funds, or transfer of title to funds, fulfills the contribution requirement."[638] According to the Respondent, the Claimant must show, but has not shown, that "it committed funds 'in furtherance of a venture', *i.e.,* that it had an economic interest in the 'Loans' and committed its funds in order to 'obtain an economic benefit'."[639]

366. As the Respondent argues, the Claimant never had any control over the funds it received from other Yukos Oil subsidiaries, which were rather "at all relevant times controlled by Yukos Oil Company."[640] The purpose of the Loans was not to engage in economic activity, but to avoid Russian taxes that would have been due if dividends had instead

---

[633] Memorial, paras. 110, 114, 116.

[634] T5/82/3-9.

[635] Reply, paras. 234-238.

[636] Memorial, para. 123; Reply, para. 276.

[637] Counter-Memorial, para. 204, *citing Romak,* paras. 177, 214 (**Exhibit RL-54**).

[638] Reply, para. 278, *citing Romak,* para. 222 (**Exhibit RL-54**).

[639] Reply, para. 279, *citing Romak,* para. 206 (**Exhibit RL-54**).

[640] Memorial, para. 125; Reply, paras. 207, 287-288.

been paid by the subsidiaries.[641]  The Loans also did not transfer any value from any ECT contracting state to the Russian Federation, but, if anything, "withheld value from the Respondent since they were designed to and did avoid Russian taxes on profits."[642]

367.  The Respondent asserts that, in spite of the Claimant's arguments to the contrary, the fact that Yukos Capital was a "passive conduit" is "not irrelevant," citing *Standard Chartered Bank v. Tanzania*, in which "[t]he tribunal required that there be an 'active relationship between the investor and the investment' in the sense that 'the investment was made at the claimant's direction, that the claimant funded the investment or that the claimant controlled the investment in an active and direct manner'."[643]  The Respondent also rejects as inapposite the authorities the Claimant cites on this point.[644]

368.  Addressing the Claimant's argument that a dividend payment was necessary to facilitate the merger between Yukos Oil and Sibneft, a joint stock company incorporated in the Russian Federation in 1995 ("**Sibneft**"),[645] the Respondent points out that this cannot be the case, since Yukos and Sibneft called off the merger before the December 2003 Loan was made.[646]  The Respondent relies on Mr Misamore's statement in 2009 Russian court proceedings that the money was loaned to Yukos Oil or other Group companies for their "cash needs."[647]

369.  The Respondent points out that the Claimant has been unable to provide any documentary evidence that supports the Claimant's assertion that some of the funds from the December 2003 Loan "were used to fund Yukos Oil's continuing operations."[648]

---

[641] Memorial, para. 127.

[642] Memorial, para. 128. *See also* Reply, para. 290.

[643] Reply, para. 282, citing *Standard Chartered Bank v. Tanzania*, ICSID Case No. ARB/10/12, Award (2 November 2012), para. 200 ("*Standard Chartered Bank*") (**Exhibit RL-193**).

[644] Reply, paras. 283-285. *See ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award (2 Oct. 2006), paras. 332-362 (**Exhibit CL-1**); *The Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility (18 April 2008), para. 97 (**Exhibit CL-23**).

[645] *See* para. 405 below.

[646] Reply, para. 241.

[647] T5/65/3-12, *citing* Misamore Record of Interview, p. 37 (**Exhibit R-39**).

[648] Reply, para. 242.

370. The Respondent likewise claims that the Claimant did not incur any risk, as it was merely "effectuating back-to-back payments on a non-recourse basis."[649] The Respondent cites *Toto Costruzioni v. Lebanon* for the proposition that investment "implies an economical operation initiated and conducted by an entrepreneur using its own financial means and at its own financial risk," something that, according to the Respondent, Yukos Capital did not do.[650] The Respondent also argues that the interest rate spreads between the Loans and the back-to-back agreements were "trivial," implying that the Claimant "did not expect a commercial return."[651] Thus, the Respondent contends, the only purpose for interposing Yukos Capital was to minimise tax, not for any "economic motivation or purpose,"[652] since Yukos Capital played no role in cash management, produced no efficiencies, was not used to collect group funds and (as explained below) did not perform a foreign exchange function because it bore no risk.[653]

371. So, in spite of the Claimant's arguments to the contrary,[654] the Respondent contends that one cannot view the back-to-back agreements as "hedges" nor can one view interest rate spreads as evidence of risk-taking by Yukos Capital, as "Yukos Capital paid nothing . . . in exchange for the non-recourse or indemnification terms" and the "minuscule spreads are the cost that Yukos Oil Company chose to pay to be able to gain tax benefits in Luxembourg."[655] The Respondent submits that "[t]he non-recourse provisions in the Brittany and Hedgerow agreements were an inherent feature of the scheme, and Yukos Capital was never meant to have any role other than that of a passive conduit," as Brittany and Hedgerow bore all risk associated with the Loans.[656]

372. Further, despite the Claimant's insistence otherwise, the Respondent notes that the Claimant has "fail[ed] to produce a single document showing any negotiation about the [back to back payment agreements]," demonstrating that "the interest rate spreads on the

---

[649] Memorial, para. 134; Reply, paras. 209-211, 213-215.

[650] Reply, para. 295, *citing Toto Costruzioni*, para. 84 (**Exhibit RL-66**).

[651] Reply, paras. 297-298, citing *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction (29 April 2004), para. 75 (**Exhibit CL-24**); *Romak*, para. 206 (**Exhibit RL-54**).

[652] T5/72/9 – T5/75/7, *citing* Mr Misamore's testimony at T3/24/2-17 and Mr Gleichenhaus' testimony at T3/238/13-22.

[653] T5/75/2 – T5/77/10.

[654] *See* Counter-Memorial, para. 213.

[655] Reply, paras. 216-221, 299.

[656] Reply, paras. 299-300.

'Loans' were not on 'arm's length terms' or determined with a 'view to generate profits'."[657] Yukos Capital's lack of economic interest in the loans is further shown by the fact that "Yukos Capital's litigation efforts have been paid for by other Yukos Group subsidiaries."[658]

373. In those circumstances, the Respondent says that because the Claimant played no active role in the making of the investment, made no contribution and incurred no risk, it cannot say that it made the "so-called 'loans'" – and this is "true irrespective of whether the funds originated from the sale of oil and gas in Russia and the sale of a Russian company, which in any event the Claimant does not dispute; and this is also true irrespective of whether these back-to-back transactions amounted in substance to a repatriation of dividends rather than a lending of funds."[659]  The Respondent submits that the transactions were always conceived as the repatriation of profits, there was no economic purpose to the transaction and Yukos Capital's role was not "in accordance with its economic interests."[660]  In particular, "there was no genuine intent to collect because there was no genuine intent to repay,"[661] which the Respondent submits is demonstrated by Yukos Capital's conduct when stress on the Loan arose.[662]  It also submits that the "economic imperatives that existed for repatriation at the inception of the loan will remain the same in the future, leading to rollover or forgiveness"; thus, all the Respondent is "asking the Tribunal to do is … take account of the true economic position."[663]

374. For all these reasons, the Respondent contends, the Loans do not qualify for protection under Article 1(6) of the ECT.

### (iii)   Are the Loans associated with an Economic Activity in the Energy Sector?

375. The Respondent further argues that, for an investment to be "associated with an Economic Activity in the Energy Sector" (set out in Article 1(5) of the ECT), as required under

---

[657] Reply, para. 224.
[658] Reply, para. 228.
[659] T1/81/18 – T1/82/3.
[660] T5/78/18-25.
[661] T5/82/13-17.
[662] T5/82/18 – T5/84/12.
[663] T5/79/4-16.

Article 1(6) of the ECT, there must be a "functional relationship" between the investment and that activity, rather than merely a "contractual relationship with a company engaged in economic activities in the Energy Sector."[664] The Respondent disputes the Claimant's proposition that "any financing provided to an energy company is necessarily '[a]ssociated with an economic activity in the energy sector'," pointing out that the Claimant has cited no authority in this regard.[665]

376. The Respondent refers to the decision rendered in *Amto v. Ukraine* ("*Amto*"), where the tribunal had to decide whether shares in a Ukrainian company that had concluded contracts with a nuclear power generating company for the provision of technical services constituted an investment protected under Article 1(6) of the ECT.[666] The tribunal took the view that "[a] mere contractual relationship with an energy producer is insufficient to attract ECT protection where the subject matter of the contract has no functional relationship with the energy sector."[667] Since energy producers have "dozens, if not hundreds, of contracts and contractual counter-parties," it could "not be in line with the object and purpose of the ECT to extend its investment protection provisions to all these contractual counter-parties and their contractual rights without a functional qualification."[668]

377. The Respondent suggests that the Loans were not used to engage in any of the economic activities set out as illustrative of an "Economic Activity in the Energy Sector" in the ECT Contracting Parties' Understanding on Article 1(5) ECT.[669] They were, according to the Respondent, rather made to avoid taxes, whilst paying "a massive dividend to Yukos Oil Company's majority shareholders" (in the case of the December 2003 Loan) or "allegedly . . . to pay a small portion of Yukos Oil Company's back taxes."[670] To the extent that the Claimant asserts that money from the Loans was used to fund the

---

[664] Memorial, para. 152.

[665] Reply, para. 315.

[666] Memorial, para. 153, *citing Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005, Final Award (26 March 2008) ("*Amto*"), para. 42 (**Exhibit RL-77**).

[667] Memorial, para. 153, *citing Amto*, para. 42 (**Exhibit RL-77**).

[668] Memorial, para. 155.

[669] Memorial, para. 157; Reply, para. 318.

[670] Memorial, paras. 159-160; Reply, para. 319.

operations of Yukos Oil and to pay overdue taxes,[671] the Respondent points out that the Claimant has not produced evidence in this regard.[672]  As such, the Respondent concludes, the Loans constituted a "disinvestment" without any "functional relationship" with an "Economic Activity in the Energy Sector."[673]

### (b) The Claimant's submissions

#### (i) Do the Loans constitute "other debt of a company," "claims to money" or "Returns"?

378.  The Claimant dismisses the Respondent's reliance on the *ejusdem generis* principle in its interpretation of Article 1(6)(b) of the ECT as "literally nonsensical."[674]  Loans include, so the Claimant submits, "'other debt of a company', 'debt instruments issued by a company' and 'debt interests in a company'."  Furthermore, the Claimant adds that "[it] is aware of no investment treaty anywhere (whether ECT or otherwise) where 'investment' definitions relating to debt obligations have been interpreted to exclude loans."[675]

379.  In response to the Respondent's characterization of the Loans as dividends, the Claimant notes that there are two separate issues: first, whether these are loans or dividends, and second, whether Yukos Capital should be considered to be the lender as a matter of tax or accounting treatment.  The Claimant accepts that the first issue is relevant to the present analysis, and that if the Respondent can satisfy the Tribunal that the Loans are really dividends, then the Claimant will fail.  But the second question relates to the allocation of risk between Yukos Capital and its lenders, and is irrelevant to the Tribunal's task.[676]

380.  On the second issue, the Claimant contends that it need only establish legal ownership — that Yukos Capital made the Loans — and that matters that go to the degree of control exercised by Yukos Capital are irrelevant.[677]  For this reason, the Claimant submits that

---

[671] *See* para. 414 below and Counter-Memorial, paras. 228, 243.

[672] Reply, paras. 319-320.

[673] Memorial, paras. 159-160.

[674] Counter-Memorial, paras. 157-158.

[675] Counter-Memorial, para. 158.

[676] T1/160/12 – T1/161/21.

[677] T1/161/22 – T1/162/11.

Yukos Capital could have been (but was not) a conduit, since beneficial ownership and the source of the funds is irrelevant.[678] Whether Yukos Capital was or was not a conduit (including the question of when interest began to accrue under the two legs) is "legally irrelevant."[679]

381. The Loans meet, so the Claimant argues, "virtually uniform" legal tests that distinguish them from dividends.[680]  Relying on Mr Gleichenhaus' evidence, the Claimant asserts that, notwithstanding their inter-company characteristic, the Loans "are consistent with the substance, form and requirements of debt instruments," which include "defined interest payments and a defined maturity date"; "defined rights to enforce the payment of principal and interest"; "a defined obligation to repay the loans"; "the existence of formal and duly executed loan agreements"; and "the intention of Yukos Capital and Yukos Oil to establish a debtor-creditor relationship."[681]    The Claimant submits that Mr Gleichenhaus' evidence that the Loans were made on "arm's length market terms" is not disputed.[682] The Claimant asserts that Rosneft, a joint stock company incorporated in the Russian Federation,[683] as well as the Respondent's tax authorities recognized the Loans as loans and not dividends.[684]

382. The Claimant further posits that the reliance "on intercompany loans for tax effective financing" is "ubiquitous" and "commonplace in the world of commerce,"[685] and that the fact that the Loans were accounted for in Yukos Oil's consolidated financial statements "has nothing to do with, and cannot alter, the legal nature" of the transactions between Yukos Capital and Yukos Oil.[686]  Indeed, the Claimant relies on the fact that the Loans were recorded as a debt of Yukos Oil on the latter's financial statements – on Yukos Oil's

---

[678] T1/162/12 – T1/163/19.

[679] T5/202/25 – T5/205/15, citing, inter alia, Hulley Enterprises; Saluka Investments BV (The Netherlands) v. The Czech Republic, UNCITRAL, Partial Award (17 March 2006) ("Saluka") (**Exhibit CL-20**).

[680] Counter-Memorial, para. 163.

[681] Counter-Memorial, paras. 164-167, citing Gleichenhaus 1, paras. 12-14, 24.

[682] T1/164/6-18.

[683] Counter-Memorial, para. 168; Rosneft Consolidated Financial Statements, Years-Ended 2003, 2004, 2005, pp. 39, 41 (**Exhibit C-149**).

[684] Counter-Memorial, para. 169.

[685] Counter-Memorial, paras. 166-167, citing Gleichenhaus 1, paras. 20-23; Saluka, para. 228 (**Exhibit CL-20**).

[686] Counter-Memorial, para. 170.

balance sheet as a liability and on Yukos Capital's balance sheet as an asset -- in support of the contention that they are loans.[687]

383. The Claimant rejects the Respondent's *effet utile* argument,[688] contending that it "distorts the principles of effectiveness, by denying the treatment of money as an asset within the ECT capable of investment and failing to distinguish between the (in common law terms) intangible property right or chose in action, and the action to enforce it."[689]

384. The Claimant submits that the Respondent's characterization of the Loans as dividends is "dishonest," as the Respondent has known about the Loans since they were made but at no time tried to re-characterize them as dividends prior to these arbitral proceedings.[690] Specifically, the Claimant notes that the Russian tax authorities were given copies of Yukos Oil's 2003 and 2004 financial statements in which the Loans were clearly disclosed.[691] Even further, the Claimant notes that, in their December 2003 reassessment for additional tax, the Russian tax authorities never suggested that the Loans were really dividends.[692] The Claimant points to similar instances where the character of the Loans was not brought into question, including in a submission by the Russian Federal Tax Service and a ruling by the Moscow City Arbitration Court.[693] The Claimant dismisses the contention that the tax authorities did not have sufficient access to information on the Loans as "laughable given Yukos Oil's premises were repeatedly raided [and] all documents were seized" and asserts that the Tribunal should disregard that contention since the Respondent has not submitted relevant fact witness testimony.[694]

385. The Claimant further submits that the Respondent also engages in "similar intercompany lending practices" yet does not characterize those loans as anything but loans.[695] The Claimant cites the example of O.J.S.C. Gazprom ("**Gazprom**"), which submitted to

---

[687] T1/165/19 –T1/166/8, *citing* 2004 Explanatory Note (**Exhibit C-137**).

[688] *See* para. 345 above.

[689] Rejoinder, para. 174.

[690] Rejoinder, paras. 126-127.

[691] Rejoinder, para. 127.

[692] Rejoinder, paras. 128-129.

[693] Rejoinder, para. 130, *citing* Ruling of the Moscow City Arbitration Court (17 July 2006) (**Exhibit C-71**).

[694] Rejoinder, para. 131.

[695] Rejoinder, para. 132.

Luxembourg authorities a request for approval of tax treatment. That request describes an arrangement whereby Gazprom incorporated Gazprom ECP S.A. (**"Gazprom ECP"**) as an orphan entity in Luxembourg.[696] The arrangements with Gazprom ECP involved back-to-back loans and interest rate spreads, with Gazprom ECP earning a margin on its loans to Gazprom.[697] Further, Gazprom ECP board meetings and shareholder meetings were held in Luxembourg, and corporate records were kept there. The Claimant notes that, in the submission to authorities, PricewaterhouseCoopers submitted that "Gazprom ECP is effectively managed from Luxembourg and qualifies as a Luxembourg tax resident company."[698] The Claimant further notes that the Gazprom ECP loans were taxed by Russia as loans and not as dividends.[699]

386. On the question of whether the Loans were really loans, the Claimant further disputes the testimony of Professor Lys, the conclusion of which "is based upon a manipulation of the facts and grossly flawed applications of tax and accounting rules."[700] The Claimant calls into question the accuracy of the facts as told by Professor Lys, arguing that the sources to which Professor Lys cites – principally, prior statements by officers of Yukos Oil – do not support his position.[701] Instead, the Loans "were undoubtedly loans," and there is nothing in the statements cited by Professor Lys that suggests that the investment of funds into Russia would have been made by dividend if Yukos Capital had not existed.[702] The Claimant takes issue with Professor Lys' methodology of analysis, disagreeing with his "substance over form" analysis and his focus on the question of whether Yukos Capital assumed the role of a "typical commercial lender," an issue that is, according to the Claimant, "completely irrelevant."[703] The Claimant criticizes Professor Lys' report for acknowledging that Mr Gleichenhaus' report focuses on how the Loans have "several trademark characteristics of loans," but nevertheless failing to address this observation,

---

[696] Rejoinder, para. 133.

[697] Rejoinder, paras. 134-136.

[698] Rejoinder, para. 136.

[699] Rejoinder, para. 137.

[700] Rejoinder, paras. 139-141, *citing* Lys.

[701] Rejoinder, paras. 142-143.

[702] Rejoinder, para. 144.

[703] Rejoinder, paras. 145-148.

even failing to identify "the defining characteristics that distinguish loans from dividends."[704]

387. Further, the Claimant takes issue with Professor Lys' "substance over form" analysis that concluded that Yukos Capital did not bear risk associated with the Loans.[705] The Claimant maintains that, first, it is an irrelevant test.[706] Citing Professor Shay, the Claimant contends that the "substance over form" doctrine is relevant only to determining the tax treatment applicable to a particular transaction, such that "even if some tax authority were to conclude that the Yukos Oil Loans should be taxed as dividends, and none ever did, they would still be loans as a legal matter."[707] The Claimant and Professor Shay submit that, if the "substance over form" doctrine were relevant, such analysis properly concluded would show that "the Yukos Loans would be respected as indebtedness and such doctrines would not operate to recast the Yukos Loans as dividends or as anything other than loans."[708]

388. The Claimant further rejects Professor Lys' determination that "Yukos Capital should simply be ignored" and the Loans treated as one single loan from Brittany and/or Hedgerow to Yukos Oil, accepting Professor Shay's view that, properly analyzed, "Yukos Capital should be respected as a separate entity and the Yukos Loans should be respected as separate transactions."[709] The Claimant thus submits that there is "no evidence on which you could make any kind of a finding that Yukos Capital should be disregarded."[710]

389. The Claimant also criticizes Professor Lys' "loose" referral to the rules of accounting and principles applied by tax authorities, noting that the Claimant's own expert, Mr Andrew Grantham, concludes that Russia and Luxembourg applied "form over substance" rules, making it such that "there is no proper accounting basis on which to suggest the Yukos

---

[704] Rejoinder, para. 149; T1/177/18 – T1/178/3.

[705] Rejoinder, paras. 150-151.

[706] Rejoinder, para. 152.

[707] Rejoinder, paras. 153-155, *citing* Expert Report of Stephen E. Shay (31 October 2014) ("**Shay**"), paras. 14, 50.

[708] Rejoinder, paras. 157-161, *citing* Shay, para. 85.

[709] Rejoinder, paras. 162-163, *citing* Shay, paras. 77-78.

[710] T5/201/24 – T5/202/2.

Oil Loans are anything other than loans."[711]   The Claimant notes that, with respect to substance over form, Mr Grantham concludes that "in substance, the Loans provided by Yukos Capital to Yukos Oil were loans, and not dividends."[712]   The Claimant notes that Professor Lys' "interpretation" of the substance over form doctrine "would likely cripple the corporate finance structures" of United States based international companies.[713]   The Claimant also notes that none of its experts were cross-examined on the substance of their opinion that these were loans.[714]

390.   On the basis of the authorities discussed by these witnesses, the Claimant submits that the "only relevant enquiry" is whether the borrower intended to repay the funds advanced, that the Respondent has not alleged a lack of intent to repay,[715] and the "evidence in the record … is unequivocal that there was an intent to repay at all relevant times."[716]   To the extent that the Respondent addressed in closing submissions the "intent to recover," the Claimant submits that some of this material was not in the record and was, in any case, irrelevant.[717]

391.   The Claimant also submits that, as defined in Article 1(9) of the ECT, the Loans "are an 'asset' owned by Yukos Capital and the obligation of Yukos Oil to repay the Loans, together with interest thereon, constitute 'Returns' as that term is defined in Article 1(9) ECT."[718]   The Loans constitute, so the Claimant asserts, "valid, legal indebtedness of Yukos Oil."[719]

392.   The Claimant submits that "claims to money" covers purchase and sale transactions rather than loans "as *Electrabel v. Hungary* makes clear."[720]   According to the Claimant, "[l]oans are covered by the specific category of 'other debt' in Article 1(6)(b) ECT and

---

[711] The Claimant notes that "the answer would be the same" under US GAAP "form over substance" principles: Rejoinder, paras. 164-265, *citing* Expert Report of Andrew Grantham (15 June 2015) ("**Grantham**").

[712] Rejoinder, para. 166, *citing* Grantham, paras. 2.3.3-2.3.4.

[713] Rejoinder, para. 168, *citing* Supplemental Expert Report of Stuart B. Gleichenhaus (15 June 2015), para. 19.

[714] T5/186/17-19.

[715] T5/185/11-12.

[716] T1/179/1-16, citing, *inter alia*, Letter from Yukos Oil to Yukos Capital (12 November 2004) (**Exhibit C-135**).

[717] T5/185/19-25.

[718] Counter-Memorial, para. 153.

[719] Counter-Memorial, para. 155.

[720] Counter-Memorial, para. 159.

... the 'overall investment' test of *Electrabel* has no application."[721]   Citing Professor
Douglas's opinion, the Claimant argues that there is a "fundamental distinction between
'claims to money' and 'loans'" and submits that "[a] loan is the form of credit that features
most prominently as an investment in the corpus of investment treaty precedents."[722]   In
this light, the Claimant contends that the Loans are in effect "substantial loans" that fall
under the ECT's protection.[723]

393. The Claimant maintains that Article 1(6) makes it clear that the list in that provision "is
supposed to be a broad, illustrative, non-exclusive list of the examples of assets
considered by the parties to be investments, and that "other debt" and "claims to money"
are broad, catch-all terms which may refer to a variety of transactions, in line with the
treaty's purpose and the broad definition in Article 1(6)."[724]   Further, "[t]here is no reason
why a particular 'loan agreement' cannot comprise or give rise to more than one of the
assets listed in Article 1(6)."[725]   In other words, the Loans constitute both debt of a
company and a claim to money.[726]   The Claimant submits that sources cited by the
Respondent, such as the German Model BIT, confirm that loans are considered claims to
money "only 'when investment definitions do not expressly mention loans," a situation
that does not arise with the ECT, since Article 1(6)(b) has a special category for "debt of
a company."[727]

394. To the extent that the Respondent suggests that the Loans can only be a "claim to money,"
and thus have to meet the additional requirement of being "pursuant to contract having
an economic value and associated with an Investment," the Claimant submits that the
Respondent's authority supports the contention that loans can constitute "debt of a
company."[728]

---

[721] Counter-Memorial, para. 159.

[722] Counter-Memorial, paras. 161-162, *citing* Douglas, paras. 381, 383.

[723] Counter-Memorial, para. 162.

[724] Rejoinder, para. 174.

[725] Rejoinder, para. 175.

[726] T1/166/5-11.

[727] Rejoinder, para. 176.

[728] T1/168/20 – T1/171/4, *citing* Kenneth J. Vandervelde, BILATERAL INVESTMENT TREATIES : HISTORY, POLICY
AND INTERPRETATION (2010) (**Exhibit RL-75**).

(ii)   **Do the Loans bear the characteristics of an Investment in terms of Article 1(6)?**

395.   The Claimant begins by noting that the Respondent does not dispute that it meets the definition of "Investor" in Article 1(7) of the ECT.[729]

396.   The Claimant contends that, in light of Article 31(1) of the VCLT, the "'ordinary meaning' of the terms employed in Article 1(6) is that the definition of 'Investment' is wide and open-ended: an investment is 'every kind of asset'."[730] The Claimant further argues that, in spite of the Respondent's submissions to the contrary, "[n]o tribunal has emphasized 'the need to interpret the term "Investment" [*i.e.* Article 1(6) of the ECT] in accordance with the concept of investment under general international law'" and, therefore, dismisses the Respondent's reliance on the *Salini* test.[731]

397.   The Claimant disputes the Respondent's focus on the "inherent meaning" of "Investment,"[732] arguing that the concerns that motivated the tribunals cited by the Respondent do not exist in the current arbitration.[733] Accordingly, the Claimant asserts that it is not necessary for the Tribunal to express its view on whether it is proper for an investment tribunal to "legislate treaty meaning" by way of "inherent" principles.[734]

398.   The Claimant notably highlights *Electrabel*, an arbitration under both the ECT and the ICSID Convention, in which the tribunal "recognized that Article 25 of the ICSID Convention and Article 1(6) ECT each has its own test for an investment" and stated that "[t]he tribunal did not conflate the two tests, or suggest that the *Salini* or any similar test had independent significance under the ECT, but correctly proceeded to analyse them separately."[735] The Claimant also quotes *Stati v. Kazakhstan*, an arbitration in which the tribunal concluded that "the so-called *Salini* test . . . cannot be used for the definition of

---

[729] T1/158/1-18.

[730] Counter-Memorial, para. 151.

[731] Counter-Memorial, paras. 178, 180 (emphasis in original). On this point, the Claimant cites various decisions. *See e.g. Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction (8 February 2005), paras. 125, 128 ("*Plama*") (**Exhibit RL-88**). *See also* Rejoinder, paras. 186-192.

[732] *See* para. 351 above.

[733] Rejoinder, paras. 193-197.

[734] Rejoinder, para. 197.

[735] Counter-Memorial, paras. 188-189, *citing Electrabel*, paras. 5.43-5.45, 5.47-5.48 (**Exhibit RL-76**).

investment under the ECT or, likewise, in the present case."[736]  In addition, the Claimant dismisses the Respondent's authorities[737]– including *Romak* – for "supplementing the ECT's terms" as being essentially "irrelevant."[738]   The Claimant also contends that (contrary to the Respondent's assertions) extending treaty protection to "any asset" under Article 1(6) of the ECT does not run counter to the ECT's object and purpose.[739]

399. The Claimant notes that none of the ECT cases in the record applied an inherent characteristics test to Article 1(6) (the two which did so applying it to Article 25 of the ICSID Convention).[740]   Overall, all but two of the awards where the inherent characteristics test was applied were ICSID cases, where Article 25 gives rise to special considerations because it uses "investment" in lower case, whereas in the ECT "Investment" is specifically defined.[741] So the Claimant submits that there is "no general international principle for the application of inherent characteristics, and in fact there is a positive avoidance of it outside the ICSID context."[742]  Thus, the Claimant rejects the Respondent's argument that the Claimant must establish that it made an "active contribution of money or other assets to Respondent's economy,"[743] contending that neither the ECT nor the authorities cited by the Respondent mention such a requirement.[744]

400. The Claimant also suggests that the two non-ECT, non-ICSID cases that applied an inherent characteristics test involved distinguishable facts.[745] The Claimant submits that the *KT Asia* case and the other authorities cited by the Respondent are "sham transaction

---

[736] Counter-Memorial, paras. 190-191, *citing Stati*, para. 806 (Exhibit CL-3). *See also* Rejoinder, para. 189.
[737] *See* paras. 351-354 above.
[738] Counter-Memorial, paras. 194-195, *referring to* the Respondent's citation of *Romak* (Exhibit RL-54) and *Alps Finance* (Exhibit RL-55).
[739] Counter-Memorial, paras. 199-201.
[740] T1/185/2-9.
[741] T1/186/3-13.
[742] T1/186/14 – T1/187/3, *citing inter alia Guaracachi America, Inc. and Rurelec PLC v. The Plurinational State of Bolivia*, PCA Case No. 2011-17, UNCITRAL, Award (31 January 2014) ("*Guaracachi*") (Exhibit CL-80); *Stati* (Exhibit CL-3).
[743] *See* para. 365 above and Reply, para. 276.
[744] Rejoinder, paras. 237-238.
[745] T5/207/22 – T5/208/21.

cases": for example, in *KT Asia* the purchase price was not "even remotely arm's length" and was met by the manufacture of sham loans.[746]

401. Asked by the Tribunal whether, in order to constitute an Investment under Article 1(6), one has to establish not merely that there is something which takes the legal form of an asset, but also that there is an economic materialisation of that, in the form of an asset passing into the territory of the contracting state, the Claimant submitted that it needed to establish ownership or control of an asset which creates rights and obligations which are deemed to have their location in the host state.[747] There is, the Claimant's submits, no need to establish a contribution or flow of funds, noting that if an investor purchases shares in a public listed company on the exchange, it may have contributed nothing to the company itself, but would nevertheless still hold an investment in that company.[748]

402. In any event, the Claimant asserts that the Loans satisfy the "*Salini* test."[749] The Claimant argues that "[it] committed funds, indeed, approximately US$ 3.2 billion, to Yukos Oil with the purpose to receive repayment plus interest and profit from the interest rate spread between the Loans and Yukos Capital's own cost of funds,"[750] which ultimately flowed into the Respondent's economy[751] at "a real risk" that effectively materialized.[752]

403. On the subject of contribution, the Claimant asserts that the principal amounts of the Loans "were in fact disbursed into the Respondent's economy and used for Yukos Oil's business in Russia's energy sector."[753] The Loans transferred from outside Russia into Russia US$3.5 billion of capital, so that would satisfy any requirement to establish a flow of funds or some contribution of value.[754]

---

[746] T5/209/20 – T5/210/13.

[747] T5/187/13 – T5/190/10.

[748] T5/190/13 – T5/192/9.

[749] Counter-Memorial, paras. 202-203; Rejoinder, para. 218.

[750] Counter-Memorial, para. 205.

[751] Counter-Memorial, para. 209.

[752] Counter-Memorial, paras. 210-216.

[753] Rejoinder, para. 239.

[754] T5/195/24 – T5/196/8.

404. That those funds represented the repatriation of profits, or may have originated at one point in time in the host state, is legally irrelevant.[755] These were Yukos Capital's funds, they were never the property of Yukos Oil, and the origin of the funds and whether Yukos Capital controlled them is immaterial.[756] Citing the report of Professor Lys, the Claimant says that the funds originated in the "earnings" of international companies.[757] Those funds belong as a matter of law and property to those companies, a decision was made to invest those funds in Russia in a tax-efficient way, and the result was an international injection of funds.[758] In the Claimant's submission, the Respondent has not identified "a single authority that suggests the origin and source of funds is relevant" to the Tribunal's decision.[759] In any case, there was nothing about the funds loaned under the August 2004 Loan that were Russian, since they represented the proceeds of the sale by an international company of an asset that happened to be located in Russia.[760]

405. The Claimant admits that "[i]f one takes only a short term/snap view of Yukos Oil's treasury operations at the time," an amount of RUR 26 billion disbursed on 8 December 2003 pursuant to the December 2003 Loan "could be said to have been applied toward a dividend payment to Yukos Oil's shareholders."[761] However, that dividend payment would have been "required to implement a merger between Yukos Oil and Sibneft"[762] by adjusting Yukos' debt leverage ratio.[763]

406. The remaining proceeds of the December 2003 Loan were used, according to the Claimant, "for working capital to fund the continuing operations of Yukos Oil" against the backdrop of "the increasingly hostile and illegal acts of the Russian authorities."[764] The proceeds of the August 2004 Loan "were to be used by Yukos Oil to make a partial

---

[755] T1/188/9 – T1/189/22, *citing Stati* (Exhibit CL-3); *Alpha* (Exhibit CL-57); *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Decision on Jurisdiction and Recommendation on Provisional Measures (21 March 2007) (Exhibit RL-95).

[756] T1/189/21 – T1/193/16, *citing Caratube* (Exhibit RL-59); *Standard Chartered Bank* (Exhibit RL-193).

[757] T5/197/4-15, *citing* Lys, para. 131.

[758] T5/197/13 – T5/198/6.

[759] T5/210/17 – T5/211/1.

[760] T5/213/7-20.

[761] Counter-Memorial, para. 27.

[762] Counter-Memorial, para. 27.

[763] T5/212/24 – T5/213/6.

[764] Counter-Memorial, para. 27, *citing* Misamore 1, para. 36.

payment toward the immense . . . tax assessments that formed part of the Respondent's strategy for the expropriation of Yukos assets and destruction of . . . Yukos Oil."[765]

407. As for the Respondent's argument that the contribution must be made "in furtherance of a venture,"[766] the Claimant argues that the decision from which the Respondent took the criterion (*Romak*) may be distinguished from the present arbitration and that, in any event, Yukos Oil qualified as a "venture."[767]

408. On the subject of risk, the Claimant submits that the only issue is how the risk was allocated between Yukos Capital and Brittany and Hedgerow, but that this has "nothing to do with whether the loans had risk."[768] Moreover, Yukos Capital had its own risk because it had its own expected profits.[769] The Claimant describes as "ridiculous" the suggestion that Yukos Capital was protected against the risk of not receiving the spread, arguing that there is nothing in the record to suggest that the non-recourse nature of the back-to-back Loans was intended to function as an indemnification of Yukos Capital.[770]

409. Moreover, the Claimant posits that "the source of funds for an investment is not relevant even in non-ECT cases"[771] nor is it "relevant to an assessment of the legal relationship created between Yukos Capital and Yukos Oil or the nature of that indebtedness."[772] The Claimant contends that "Respondent's conception of whether the funds advanced pursuant to the Yukos Oil Loans were Claimant's funds makes little sense in the context of commercial lending" as it "would effectively require tribunals to make detailed forensic examinations into the source of funds to determine on some unarticulated test whose funds were loaned."[773] The Claimant distinguishes the investment treaty awards that the Respondent cites in this regard from the circumstances of the present case.[774]

---

[765] Counter-Memorial, para. 30.

[766] *See* para. 365 above and Reply, para. 278.

[767] Rejoinder, para. 240.

[768] T1/193/24 – T1/194/5.

[769] T1/194/6-7.

[770] T1/195/11 – T1/197/3.

[771] Counter-Memorial, para. 206.

[772] Counter-Memorial, para. 207, *citing* Gleichenhaus 1, para. 35.

[773] Rejoinder, para. 223.

[774] *See* Rejoinder, paras. 224-225.

410. Additionally, the Claimant rejects the Respondent's apparent complaint that the Loans represent an "ordinary commercial transaction," as they bear no resemblance to a sale of goods contract, such that the authorities relied upon by the Respondent in this regard "are clearly distinguishable and therefore irrelevant."[775]   The Claimant quotes Professor Douglas for the proposition that "[a] loan is the form of credit that features most prominently as an investment in the corpus of investment treaty precedents."[776]

411. As for the Respondent's argument that the funds loaned by Yukos Capital to Yukos Oil were "profits generated . . . in Russia," the Claimant first argues that there was no alleged circular flow of funds, as "Yukos Oil never owned the funds at issue until it received them in its capacity as a borrower from Yukos Capital."[777]   The Claimant adds that, in any event, the source of the funds is irrelevant, a proposition it seeks to support by several past investment treaty awards.[778]   Additionally, the Claimant points out that the object and purpose of the ECT "strongly counsel against any restrictive reading that might deprive [intercompany lending] of protection" under the ECT.[779]

### (iii)   Are the Loans associated with an Economic Activity in the Energy Sector?

412. The Claimant submits that "the purpose of the Loans was to advance billions of dollars to a major oil company whose only activities were in the energy sector."[780]

413. The Claimant emphasizes the importance of the factual context in the interpretation of Article 1(6) in light of the ECT's object and purpose.[781]   The Claimant dismisses the Respondent's reliance on the decision in *Amto* on the basis that the "Claimant invested directly in an energy company" in contrast to the claimant in *Amto*.[782]   Moreover, the Claimant asserts that "[it] is aware of no authority, and Respondent cites none, where a tribunal has examined the use of proceeds of equity or debt financing provided directly

---

[775] Rejoinder, paras. 196, 213.

[776] Rejoinder, para. 214, *citing* Douglas, para. 381 (**Exhibit RL-64**).

[777] Rejoinder, paras. 227-228.

[778] Rejoinder, paras. 229-230.

[779] Rejoinder, paras. 231-234.

[780] Counter-Memorial, para. 219. *See also* Rejoinder, para. 179.

[781] Counter-Memorial, paras. 221-222, *citing Amto*, para. 42 (**Exhibit RL-77**).

[782] Counter-Memorial, para. 223.

to an energy company to determine whether that financing was 'associated with' activity in the energy sector."[783]

414. The ECT Contracting Parties' Understanding on Article 1(5) of the ECT is, so the Claimant argues, merely "illustrative" and cannot be construed so as to "only attract protection under the ECT if the funds are used by [a] company specifically for the physical or actual exploration, production, transportation, marketing or sale of oil and not the related necessary ancillary tasks of running a company dedicated to those activities."[784]  The Claimant argues that such an interpretation would be "unworkable and . . . produces absurd results."[785]  While reiterating that the December 2003 Loan "was necessary" for the financing of the Yukos Oil and Sibneft merger, and the August 2004 Loan for the payment of taxes,[786] the Claimant concludes that "[t]here is no question that direct equity and debt investments in energy companies are associated with their activities and attract the protection of the Treaty."[787]

415. The Claimant cites *British Caribbean Bank v. Belize* as authority for the proposition that "the benefit of a loan agreement is to be found in the location to which the funds were disbursed."[788]

416. The Claimant rejects the suggestion that a different test applies to equity and debt, noting that if an investor purchases equity in a public listed oil company on the exchange, then the company usually never sees the money at all.  Accordingly, there is no place for a "use of proceeds" test.[789]

417. The Claimant disputes the Respondent's allegation that the Claimant has not provided evidence supporting its statement as to the use of the Loans, noting that the witness statements of Mr Misamore shed light on such use and that it is the Respondent's burden

---

[783] Counter-Memorial, para. 223.

[784] Counter-Memorial, para. 224.

[785] Counter-Memorial, para. 225.

[786] Counter-Memorial, para. 228.

[787] Counter-Memorial, para. 226.

[788] Rejoinder, para. 180, *citing British Caribbean Bank Limited v. The Government of Belize*, PCA Case No. 2010-18, Award (19 December 2014), para. 207 (**Exhibit CL-58**).

[789] T1/172/14 – T1/173/22.

to establish that he is being untruthful.[790]  Moreover, even if the Claimant had the burden of establishing the use of the Loans (which Claimant maintains it does not), the burden would have shifted to the Respondent because the Respondent has control of the relevant documents (following the seizure of Yukos Oil's records).[791]

418. Further, the Claimant maintains that, in spite of the Respondent's arguments to the contrary,[792] the merger with Sibneft had not been called off before the execution of the December 2003 Loan.[793]  The rest of the funds were used for Yukos Oil's ongoing business, which can be interpreted as nothing other than "activity in the energy sector."[794]  The Claimant adds that the payment of dividends "is part of the normal and necessary activities of an energy company" and does not constitute "disinvestment."[795]

### 3.  The Tribunal's analysis

#### (a)  The material issues

419. The question before the Tribunal under this challenge to its jurisdiction *ratione materiae* may conveniently be stated, in the pertinent terms of Articles 1(6) and 26(1) of the ECT, as:

> Whether the Claimant "own[s]" an "asset" constituted by a "debt of a company" "associated with an Economic Activity in the Energy Sector" in the "Area" of the Respondent such that it has made an "Investment" to which the present dispute with the Respondent "relat[es]."

420. The definition of "Investment" in Article 1(6) of the ECT "means every kind of asset, owned directly or indirectly by an Investor." The definition then sets out a non-exhaustive list of categories of asset.  The Tribunal has framed the issue in terms that are derived from Article 1(6)(b), which refers, *inter alia*, to the "debt of a company."

---

[790] T1/174/8-21.

[791] Rejoinder, para. 183.

[792] *See* para. 368 above.

[793] Rejoinder, para. 184.

[794] T1/173/23 – T1/174/14.

[795] Rejoinder, para. 185.

421. The Claimant also submits that its "asset" is comprised by either "claims to money" under Article 1(6)(c) or "[r]eturns" under Article 1(6)(e). The Tribunal approaches the issue by reference to whether the Claimant owns the "debt of a company" under Article 1(6)(b), since, for reasons that are developed below, this characterisation appears to the Tribunal to be the most apt description of the Claimant's Loans. It would only be if the Loans did not meet that characterisation that it would be necessary to go on to consider whether in the alternative they might be characterised as "claims to money" or "[r]eturns."

422. In light of the specific arguments that have been developed before the Tribunal in relation to the facts and circumstances of this case, this major question gives rise on the Tribunal's analysis to two distinct sub-issues:

   (i)   Whether the sums that the Claimant paid to Yukos Oil under the Loans were not advanced as a loan, and therefore did not constitute a "debt of a company" but rather amounted to dividends.

   (ii)  Alternatively, if the sums advanced were by way of loan, whether it is not the Claimant but rather Brittany and Hedgerow that own that asset.

423. If the answer to either of these sub-issues were "yes," the consequence would be that the Tribunal would have no jurisdiction because the Claimant would not "own" an "asset" constituting an "Investment" upon which it could in law found a claim:

   (a)   In the first case that would be because, upon disbursement of the funds, the Claimant would have irrevocably relinquished any claim to repayment. It would no longer own an asset constituted by the chose in action under the Loan. Rather the funds would, from the moment of their transfer, be an asset of Yukos Oil. The Claimant accepts that, if this were the case, it would not have an "Investment."[796]

   (b)   In the second case, if the sums were to be treated as having been extended by way of loan, there would be an asset remaining in the hands of the lender, but the lender would not be the Claimant.

---

[796] Rejoinder, para. 126.

424. In both cases, but in different ways, the Respondent invites the Tribunal to look beyond the form of the particular Loans to consider the alleged economic substance of the transactions at issue. It invites the Tribunal to treat the transaction as including wider elements from the context beyond the specific transfers from the Claimant to Yukos Oil. It relies on both:

(a) Steps in the transfer of assets *prior* to Yukos Capital's receipt of the funds. The Respondent alleges that the funds may be traced from Russian subsidiaries of Yukos Oil. In particular, it alleges that the true transferors are Brittany and Hedgerow, not the Claimant; and,

(b) Steps *subsequent* to the receipt of the funds by Yukos Oil. In particular, it relies upon a contemporaneous payment by Yukos Oil of a dividend to its shareholders. Claimant alleges that this payment was made in connection with the planned merger between Yukos Oil and Sibneft.[797]

425. It is important to be clear about precisely what it is that the Respondent invites the Tribunal to find in this respect and what it does not.

426. The Respondent's case in this regard is not that the Loans should be treated as shams. It submits that it is not necessary for the Tribunal to obliterate the legal rights and duties of the Parties under the legal regime applicable to the Loans. Rather those Loans should be *re*-characterised for the specific and different purpose of considering whether they constitute an "Investment" under the ECT.

427. The essence of this submission is well explained in the following passage from the transcript. There are two steps in the Respondent's submission:

(a) The Respondent first invites the Tribunal to find that the two possible ways of re-characterising the transaction identified in paragraph 422 above result "when analysed in economic substance" in a single transaction: a dividend payment from Brittany or Hedgerow as the case may be to Yukos Oil:

---

[797] Respondent: para. 368 above; Claimant: paras. 405 – 406 above.

> [W]hat appear to be two loan transactions are at most one: from Brittany to Yukos and from Hedgerow to Yukos. And then when analysed in economic substance, we suggest that that is equivalent to and always was intended to have the effect of a dividend to Yukos Oil.

> [Tribunal Member]: So when you said "to Yukos", you meant to Yukos Oil?

> [Counsel for Respondent]: Correct.[798]

(b) The Respondent then submits that such re-characterisation does not affect the legal obligations of the Parties "in other spheres."  It is limited to a finding of "the true transaction" for the purpose of the question whether there is an "Investment" under the ECT:

> [I]t is quite possible for one legal regime to disregard the legal form of an arrangement to test its true economic substance for purposes of determining the significance of those arrangements for a different legal regime. ...

> [R]echaracterisation of these transactions for purposes of analysis under the ECT does not mean that you're piercing the corporate veil, does not mean that you're obliterating what legal obligations or rights those parties might have in other spheres. It means that you're analysing the true transaction for the purposes of determining whether there is a protected investment under the Energy Charter Treaty.

> ...

> [A]ny decision that you make about whether this is a protected investment has no consequence for the parties to the transaction as to their legal obligations. That's something for them to deal with in a different setting. Just as a recharacterisation for tax purposes would not affect the legal obligations of the parties in a different setting.[799]

---

[798] T5/79/22 – T5/80/5.
[799] T5/80/14 – T5/81/22.

428. In order to address these submissions, the Tribunal must therefore decide, on the evidence before it, as to the particular character of the transaction at issue and for the purpose of jurisdiction (and not otherwise):

    (a) Whether the extent of the jurisdiction *ratione materiae* granted under the ECT requires it to re-characterise a transaction (the legality of which is not disputed) in terms of "economic substance"; and,

    (b) If so, whether that would have the consequence that the Claimant does not have an "Investment" that can found a claim under the ECT before this Tribunal.

### (b) A loan associated with an Economic Activity in the Energy Sector

429. In approaching this question, it is necessary for the Tribunal to make preliminary findings of law on two other aspects of the issue that were traversed in argument. These findings will only be relevant if and to the extent that the transaction is properly to be characterised as a loan. Nevertheless they will assist in focusing on the specific nature of the central issues for decision. These issues are:

    (a) Whether a loan that is associated with an Economic Activity in the Energy Sector is capable of constituting an "Investment" for the purpose of the ECT; and,

    (b) What is the content of the connecting factor denoted by "associated with an Economic Activity in the Energy Sector."

430. *A loan as a form of "Investment."* In the first place, the Tribunal finds that, where a company makes a loan that is "associated with an Economic Activity in the Energy Sector," such a loan is capable of constituting "debt" that is an "Investment" for the purpose of the ECT.

431. This conclusion results from the ordinary meaning of Article 1(6)(b) of the ECT. The Tribunal does not accept the Respondent's submission that, as a matter of construction, Article 1(6)(b) is incapable of including such a loan. It does not accept that "other debt of a company" is to be read down to include only instruments equivalent to a "bond." The Respondent's argument that "other debt of a company" must be limited to "debt instruments issued by a company" would involve reading into Article 1(6) words that are

not there. The use in the Treaty of the word "other debt of a company" refers, in its ordinary meaning, to the existence of an obligation of indebtedness on the part of a company. In the hands of the "Investor" such a debt is capable of constituting an "asset" for the purpose of the definition of "Investment."

432. Such a debt is not purely, as Respondent submitted, a "claim[] to money … pursuant to contract" under Article 1(6)(c). The debt will give rise to a contractual relationship of debtor and creditor, the incidents of which are determined by reference to the terms of such a contract. The debt also gives rise to a chose in action that is an "asset" – a property interest of the "Investor."

433. This conclusion, arrived at as a matter of the construction of the ordinary meaning of Article 1(6)(b) pursuant to Article 31(1) of the VCLT, is further supported by consideration of the approach that has been taken to the question whether loans that are linked to an economic venture may be considered as an investment in general international law, to which the Tribunal makes reference pursuant to Article 31(3)(c) of the VCLT.

434. It is not the case that a loan, considered in isolation, is *ipso facto* an investment; rather reference to these authorities supports the Tribunal's view that the critical distinction is the extent to which the loan is linked to an economic venture in the host state.

435. This point has been emphasised in both the jurisprudence and the doctrine. In *CSOB v. Slovak Republic*, the tribunal held:

> Loans as such are therefore not excluded from the notion of an investment under Article 1(1) of the BIT. It does not follow therefrom, however, that any loan and, in particular, the loan granted by CSOB to the Slovak Collection Company meets the requirements of an investment … under Article 1(1) of the BIT, which speaks of an "asset invested or obtained by an investor of one Party in the territory of the other Party."

> …

> The contractual scheme embodied in the Consolidation Agreement shows, however, that the CSOB loan to the Slovak Collection Company is closely related to and

cannot be disassociated from all other transactions involving the restructuring of
CSOB.

...

The basic feature of the Consolidation Agreement was not the financial consolidation
of CSOB as such, but the development of the role and activities of CSOB in both
Republics.[800]

436. By contrast, in *Joy Mining Machinery Ltd v. Egypt*[801] and in *Alps Finance*[802] the loan was
linked respectively with a contract of sale and a contract of assignment. It was not linked
with an underlying economic venture capable of constituting an investment. It followed
that the loan itself could not constitute an investment.

437. Doctrine also supports the proposition that a loan may constitute an investment, provided
that it is linked to an underlying economic venture in the host state. Douglas explains the
point in the following way:

The provision of credit by the investor to an entrepreneur or enterprise engaged in
commercial activities in the host state qualifies as an investment. The investor
acquires rights to a debt, which can be assigned and thus has the feature of a right *in
rem*. Credit can take the form of a loan....

A loan is the payment of money by the investor to the debtor (an entrepreneur or
enterprise engaged in commercial activities in the host state) upon terms that the sum
advanced, with any stipulated interest, must be repaid by the debtor in due course.

...

A loan is the form of credit that features most prominently as an investment in the
corpus of investment treaty precedents.[803]

---

[800] *Ceskoslovenska Obchodni Banka, A.S. v. The Slovak Republic*, ICSID Case No. ARB/97/4, Decision on
Jurisdiction (24 May 1999), paras. 77, 80, 83 (**Exhibit CL-4**).

[801] *Joy Mining Machinery Ltd v. Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction (6 August 2004)
(**Exhibit RL-67**).

[802] *Alps Finance* (**Exhibit RL-55**).

[803] Douglas, paras. 381-383 (**Exhibit CL-35**).

438. *"Associated with an Economic Activity in the Energy Sector."* Within the framework of the ECT, the nature of the requisite link is prescribed by the final paragraph of Article 1(6), which specifies: "'Investment' refers to any investment associated with an Economic Activity in the Energy Sector." Such Activity is further defined in Article 1(5) as "an economic activity concerning the exploration, extraction, refining, production, storage, land transport, transmission, distribution, trade, marketing or sale of Energy Materials and Products."

439. The connecting factor "associated with" is relevantly defined in the *Oxford English Dictionary* as "connected with an organization or business."[804] The consequence of the use of this phrase by the treaty drafters is that it suffices that the contribution made by way of loan in turn contributes to an enterprise that is itself engaged in an Economic Activity in the Energy Sector.

440. The business of Yukos Oil is described in its audited 2004 Accounts as "exploring of oil and gas deposits, extracting of oil and gas, selling of oil and other products, and providing of services."[805] This activity falls squarely within the ECT definition of an Economic Activity in the Energy Sector. This is further confirmed by the Understanding of Article 1(5) that the representatives agreed to by signing the Final Act, which refers specifically to (i) "prospecting and exploration for, and extraction of, e.g., oil [and] gas" as well as (iii) its "land transportation, distribution, storage and supply" and (vi) "marketing and sale of, and trade in Energy Materials and Products, e.g. retail sales of gasoline," together with (vii) "research, consulting, planning, management and design activities related to the activities mentioned above."[806]

441. The Tribunal does not accept the Respondent's submission that the loan itself must be devoted to the activity. The term used in the Treaty is "associated with," which, as the Tribunal has found, is met where the investment by way of loan goes to support an

---

[804] Oxford English Dictionary, available at
<http://www.oed.com/view/Entry/93864?redirectedFrom=association#eid> (accessed on 11 June 2015) **(Exhibit C-209)**.

[805] 2004 Explanatory Note **(Exhibit C-137)**.

[806] Understandings, Final Act of the European Energy Charter Conference (17 December 1994), p. 28 **(Exhibit C-1)**.

enterprise that itself carries out the defined economic activities in the area of the relevant state.

442. The construction placed on this phrase by the Tribunal in *Amto,* an authority relied upon by the Respondent, is consistent with this interpretation when read in its proper context. In that case, the tribunal was addressing a submission that a mere contractual relationship with an energy company (such as "contracts of a power station for publishing, advertising or security services") would not be "associated with" an Economic Activity in the Energy Sector.[807] The tribunal held:

> [T]he interpretation of the words 'associated with' involves a question of degree, and refers primarily to the factual rather than legal association between the alleged investment and an Economic Activity in the Energy Sector. A mere contractual relationship with an energy producer is insufficient to attract ECT protection where the subject matter of the contract has no functional relationship with the energy sector. The open-textured phrase 'associated with' must be interpreted in accordance with the object and purpose of the ECT, as expressed in Article 2. The associated activity of any alleged investment must be energy related, *without itself needing to satisfy the definition in Article 1(5) of an Economic Activity in the Energy Sector.*[808]

443. In *Amto* itself, the contribution made by the claimant was in the form of the provision of technical services directly related to the production of electrical energy, which services the tribunal held amounted to an "Investment."

444. The present case concerns a direct financial contribution to an enterprise that is engaged in an Economic Activity in the Energy Sector. An interpretation in accordance with the purpose of the ECT, is, as Article 2 states, to be "in accordance with the objectives and principles of the Charter." The Objectives of the European Energy Charter itself include "to create a climate favourable to the operation of enterprises and to the flow of investments" and "promoting best possible access to capital."[809] A loan to an enterprise that is engaged in an Economic Activity in the Energy Sector meets this objective.

---

[807] *Amto,* para. 42 (Exhibit RL-77).

[808] *Amto,* para. 42 (emphasis added) (Exhibit RL-77).

[809] Concluding Document of the Hague Conference on the European Energy Charter (17 December 1991), p. 216 (Exhibit C-1).

445. These preliminary findings are subject to the issues of law and fact as to the economic substance of the transaction that have already been identified, to which the Tribunal must now turn.

### (c) The materialization of an "Investment"

446. The Tribunal takes as its point of departure for analysis of the "economic substance" argument the premise that inherent in the concept of "Investment" is both a legal and an economic materialization.

447. This requirement is reflected in Article 1(6) of the ECT:

(a) The list at the outset of Article 1(6) is concerned with identifying "assets." Its focus is on proprietary rights "owned or controlled" by the Investor. Such rights form the legal basis of a right the invasion of which by a respondent state may be the subject of a claim under the Treaty.

(b) The final paragraph of Article 1(6) then adds an economic element in stating that "'Investment' refers to any investment associated with an Economic Activity in the Energy Sector."

448. The use in this last sentence of "investment" in lower case emphasises that the drafters of the Treaty desired to distinguish the legal materialization of the asset from the factual enquiry into its association with economic activity – both elements being required.[810]

449. This dual aspect of "Investment" in investment treaties has been expressed in the cases as being between:

(a) The legal aspect: "the asset belonging to the claimant" or "fruits and assets resulting from the investment"; and

(b) The economic aspect: "a commitment of resources" or "contributions that have created such fruits and assets."[811]

---

[810] The Parties consider the general significance of this reference to "investment": Memorial, para. 93; Counter-Memorial, para. 198; Reply, para. 251. The Tribunal here makes a more specific finding on construction of this sentence.

[811] *KT Asia*, paras. 166-167 (**Exhibit RL-56**), *citing Malicorp Ltd v. Egypt* ICSID Case No ARB/08/18, Award (7 February 2011) ("*Malicorp*"), para. 110. *See also* Douglas, Rules 22 & 23 (**Exhibit CL-35**).

450. Both elements must be present to constitute an investment. As it was put in *KT Asia*:

> The assets listed in Article 1(1)(a) of the BIT are the result of the act of investing. They presuppose an investment in the sense of a commitment of resources. Without such a commitment of resources, the asset belonging to the claimant cannot constitute an investment within the meaning of ... the BIT.
>
> ...
>
> [A]ssets cannot be protected unless they result from contributions, and contributions will not be protected unless they have actually produced the assets of which the investor claims to have been deprived.[812]

451. Each of these elements entails a different type of enquiry.

452. The <u>legal materialization</u> of the Investment is to be determined according to the law applicable to the asset in question, which requires a *renvoi* to municipal law. The tribunal in *Emmis International Holding BV v. Hungary* explained this point in the following way:

> The need to identify a proprietary interest ... is confirmed by the definition of 'investment' in the Treaties. In each case, the Treaty refers compendiously to 'every kind of asset[s]'. The Oxford English Dictionary definition of 'asset' is:
>
> > (usually assets) an item of property owned by a person or company, regarded as having value and available to meet debts, commitments or legacies.
>
> The definitions in the Treaties go on to provide particular examples of types of property or rights that may constitute an asset for this purpose. But these examples are not exhaustive.
>
> In order to determine whether an investor/claimant holds property or assets capable of constituting an investment it is necessary in the first place to refer to host State law. Public international law does not create property rights. Rather, it accords certain protections to property rights created according to municipal law. As the *EnCana* Tribunal put it:

---

[812] *KT Asia*, paras. 166-167 (**Exhibit RL-56**), *citing Malicorp*, para. 110. *See also* Douglas, Rules 22 & 23 (**Exhibit CL-35**).

> [F]or there to have been an expropriation of an investment or return ... the
> rights affected must exist under the law which creates them. [ ... ].[813]

453. In its challenge to the jurisdiction of the Tribunal, the Respondent does not seek to challenge the validity of the Loans according to the law applicable to them.[814] The result is that the legal materialization of the Loans must be treated as having been satisfied for the purpose of determining this element of "Investment."

454. The concept of the economic materialization of an investment is concerned with an essentially factual question, namely whether the investor has in fact made a "commitment of resources." In the case of the ECT, such a contribution must be "associated with an Economic Activity in the Energy Sector."

455. In the present case, the fact that funds extended under the Loans were transferred to Yukos Oil in Russia is undisputed. The Respondent nevertheless submits that inherent in the ECT concept of "Investment" are the twin elements of "contribution" and "risk" and that assessment of these requires consideration of the "economic substance" of the transaction. The Tribunal will take each of these elements in turn.

### (d) Contribution

456. The Tribunal has already found that the economic materialization of an investment within the ECT assumes that the Investor makes a contribution associated with an Economic Activity in the Energy Sector.

457. The Respondent advances its argument under this head on two bases: origin of capital and the alleged economic effect of the loans as a dividend. Each of these submissions may be summarised as follows:

(a) *Origin of capital.* In economic terms, the funds that were used originated in Russia. The Respondent submits that the funds were being "round-tripped from the Russian Federation to the Russian Federation at the request of the Russian

---

[813] *Emmis*, paras. 161-162 (**Exhibit CL-59**) *citing EnCana Corp v Ecuador*, LCIA Case No. UN3481, Award (3 February 2006), para. 184.

[814] *See* para. 427(b) above.

parent company."[815]   The return of the same funds to Russia thus affords no "contribution" to economic activities within Russia.

(b) *Economic effect of a loan as a dividend.* The Respondent argues that the loan was in economic substance a dividend to Yukos Oil, the parent company of the group; that being the objective that Yukos Oil desired to achieve.

458. These allegations raise questions of fact to which the Tribunal will shortly turn. It is first necessary to consider the parameters of the issues as a matter of law.

459. The first of the arguments raises two preliminary questions:

(a) The relevance as a matter of law of the origin of the capital utilised by an investor to make its investment.

(b) The extent to which an intra-group loan, funded within a corporate group, may itself constitute an "Investment."

460. *Origin of capital.* Construction of the terms of the ECT does not indicate that the jurisdictional requirement of an "Investment" is to be tested by reference to the origin of the funds drawn upon by the Investor for the purpose of making its investment. The requirement is simply that the Investment be "owned or controlled directly or indirectly by an Investor." An "Investor" means relevantly "a company or other organization organized in accordance with the law applicable in that Contracting Party."[816] It is not disputed in this case that the Claimant is an "Investor."

461. Generally, the origin of the funds used by an investor is legally irrelevant to the jurisdictional question of whether that person has made an investment, absent an express provision to the contrary. The tribunal in *Caratube International Oil Company LLP v. Republic of Kazakhstan* ("**Caratube**") summarises the position:

> [S]ubject to express provisions to the contrary, the origin of capital used to make an investment is immaterial for jurisdiction purposes. However, there still needs to be

---

[815] T5/100/15-22.
[816] ECT, Art. 1(7).

some economic link between that capital and the purported investor that enables the Tribunal to find that a given investment is an investment of that particular investor.[817]

462. The *Caratube* tribunal adds an important footnote to this passage: "*The capital can come from the investor's own funds located in any country, from its subsidiaries or affiliates located in any country, from loan, credit or other arrangements.*"[818]

463. This principle confirms the interpretation arrived at by reference to the ordinary meaning of the words of Article 1 of the ECT. That this is necessarily so (absent an express decision on the part of treaty parties to create a special contrary regime) results from consideration both of the nature of capital and the purpose of investment promotion and protection by treaty. Money is by its nature fungible, and, save in exceptional circumstances, it will not usually be possible to trace funds so as to be able to find that sums in the account of one person are the same as, or specifically derived from, those in the account of another person. In both cases they are likely in the nature of things to have been mixed with funds from other sources.

464. Tracing the origin of funds is not the concern of investment treaties. Such treaties do not ask how the investor raised the funds that it drew upon in order to invest. It might do so on the capital markets; or by borrowing funds from a commercial bank or from a related company. The investor is not restricted to utilising funds from its own commercial operations (funds that may in any event "originate" with third parties with which it trades). What matters for the purpose of an investment treaty is that the investor has decided to contribute those funds towards an enterprise or economic activity in the host state and in the process has acquired and owns an asset that leaves the investor with a stake in that enterprise or economic activity.

465. It would be contrary to the object and purpose of the ECT to circumscribe the ways in which an investor is permitted to acquire the capital needed to make an investment. That would not "create a climate favourable to the operation of enterprises and to the flow of investments" or "promot[e] best possible access to capital."[819]

---

[817] *Caratube*, para. 355 (internal citation of additional authorities omitted) (**Exhibit RL-59**).

[818] *Caratube*, n. 25 (emphasis added) (**Exhibit RL-59**).

[819] Concluding Document of The Hague Conference on the European Energy Charter (17 December 1991), p. 216 (**Exhibit C-1**).

466. *Intra-group loans.* Does it matter for this purpose if the funds that are utilised are derived from intra-group transfers within a group of companies? The award on which the Respondent places particular reliance in this regard is *KT Asia*. In that case, the tribunal had to address the question whether the claimant "must itself have made a contribution or whether it can benefit from a contribution made by someone else."[820] The claimant did not dispute that it made no injection of fresh capital. It argued that an inter-company transfer in the context of an internal restructuring within a group of companies still amounts to a contribution. The tribunal assumed for the sake of discussion that no new investment is required where an investment is transferred from one group affiliate to another. It then addressed whether there was in the case before it "a corporate group as this concept is generally understood in corporate and tax law as well as under accounting and financial reporting standards."[821]

467. The tribunal in *KT Asia* characterised the concept of a group of companies in the following terms:

> It is common knowledge that a group of companies – such as Exxon Mobil in the first case invoked by the Claimant or Nomura in the second – exists when two or more corporations are under common corporate ownership or control. Ordinarily, companies owned or controlled by one individual do not qualify as a corporate group though sometimes national legislation may so treat them. Although composed of separate legal entities, which must comply with the legal and regulatory requirements applicable to them, groups generally operate as a single economic entity with a common objective and strategy and a group management. In such a case, the group may report its financial results on a consolidated basis; its group status may be taken into account for tax purposes (subject to dealing at arms' length); and national law may impose certain liabilities to sanction any misuse of the group structure.[822]

468. It then contrasted the position in the facts before it:

> In the present case, Mr Ablyazov beneficially owned and controlled many companies through nominees and individuals whom he trusted and who (directly or indirectly)

---

[820] *KT Asia*, para. 192 (**Exhibit RL-56**).

[821] *KT Asia*, para. 194 (**Exhibit RL-56**).

[822] *KT Asia*, para. 195 (**Exhibit RL-56**).

owned or controlled the shares. These nominees and other individuals acted on Mr Ablyazov's instructions and were required not to disclose that they held or controlled the shares for his benefit. Mr Ablyazov was never himself a shareholder in any of the companies. Indeed, it is the Tribunal's understanding that there was no single person (whether corporate or individual) who had legal title to the shares in the companies held for the ultimate benefit of Mr Ablyazov.

Consequently, there was no holding company and no single individual shareholder directly or indirectly connecting all the companies of which Mr Ablyazov was the beneficial owner. Neither was there a single economic unity, not to speak of consolidation for financial reporting or tax purposes. This aggregation of assets in the form of a myriad of companies is in reality the antithesis of a group. To treat Mr Ablyazov's ultimate beneficial ownership of all the various companies via nominees and trusted agents as a sufficient connecting factor to create a group would be nonsensical. Indeed, the whole purpose of the structure was to conceal Mr Ablyazov's interest and make it look as if the different entities that held blocks of shares in BTA were independent of him and of each other.[823]

469. The tribunal concluded that:

[T]here was a number of entities all owned by nominees of Mr Ablyazov, who disposed of the companies and their assets as of his own without regard to their separate legal personalities …. Mr Ablyazov used the companies as his 'pockets' shifting assets from one to the other solely to suit his own purposes …. There may be nothing unlawful in Mr Ablyazov treating the assets of companies formally owned by other persons as his personal property. However, he cannot do so and at the same time argue that the companies should be treated as a conventional commercial group when it comes to claiming treaty protection.[824]

470. The essence of the tribunal's finding in *KT Asia* is that the assets in question were the property of Mr Ablyazov and not that of the claimant, which was a bare nominee or sham designed to conceal Mr Ablyazov's true beneficial interest. In making this finding, the tribunal contrasted the position with that of inter-company transfers within a corporate group. While the *KT Asia* tribunal was not called upon to decide the circumstances in

---

[823] *KT Asia*, paras. 196-197 (**Exhibit RL-56**).

[824] *KT Asia*, paras. 204-205 (**Exhibit RL-56**).

which an inter-company transfer within a corporate group might amount to a contribution for the purpose of finding an "Investment," it did not decide that such an arrangement *per se* fails to qualify.

471. The Tribunal does not consider that an inter-company transfer within a corporate group can be excluded as such from qualifying as a contribution for the purpose of investment law. As the first cited passage from the *KT Asia* award explains very well, there may be a real distinction between the treatment of a corporate group as a "single economic entity" in economic terms and for purposes of consolidated group accounting and the legal and regulatory requirements applicable to the separate legal entities within such a group. There is no inconsistency in this distinction. It reflects the simple fact that the disciplines of economics and consolidated accounting on the one hand, and law on the other, are addressed to different aspects of business activity.

472. The ECT promotes and protects "Investments" "associated with Economic Activities in the Energy Sector" within the "Area" of each signatory State, being "the territory under its sovereignty."[825] These objectives proceed from the premise that states will benefit under the ECT by the flow of investments and capital into economic activities in their territory.

473. This structure reflects an elementary fact of the organisation of contemporary economic life in the relation between commercial enterprises and sovereign states. A corporate group may be organised into numerous different companies that operate in diverse different states. By contrast, a state is defined in part by reference to territory. This is reflected in the terms of the ECT, which, in Article 1(10), defines "Area" with respect to a state that is a Contracting Party by reference to "the territory under its sovereignty." The objectives that the signatories to the European Energy Charter sought to achieve for each participating state are objectives that must produce their effects within the territory of that state. "Investment" is therefore inherently concerned with a contribution associated with economic activities in such territory.

474. In approaching this question, the Tribunal does not consider that the concept of the economic materialization of an Investment protected under Article 1(6) of the ECT is

---

[825] ECT, Art. 1(10) **(Exhibit C-1).**

limited in such a way that it would exclude loans made between two companies within the same corporate group. A decision on the part of one subsidiary company within a multinational oil and gas group to make a loan to another group company that is engaged in economic activities in the energy sector in another state party to the ECT would (in principle and absent other contrary evidence) constitute an "Investment." It would be a "contribution" to those economic activities in the energy sector within the host state and thus meet the object and purpose of the Treaty. If the loan had not been made, the funds may still be within the multinational group in economic terms (and for the purpose of consolidated group accounts). The funds, however, not having been applied by way of a loan, would lack both of the elements of an Investment. There would be no legal materialization. Nor would the funds have given rise to an economic materialization by being associated with an economic activity within the territory of the host state.

475. The Tribunal must therefore now analyse on the facts as adduced before it whether the particular features of this transaction operate in such a way that these particular Loans, though their legal materialization is not disputed, cannot be regarded as making an economic contribution to Russia.

476. The Tribunal has already found on the facts that funds advanced under the December 2003 Loan came to Yukos Capital through Brittany from the profits of oil trading activities within the Yukos Group, including those held by two of its Russian subsidiaries, Ratibor and Fargoil.[826]

477. The funds advanced under the August 2004 Loan were derived from the sale of Hedgerow's shareholding in Rospan, a Russian company. Yukos Oil was the ultimate owner of that equity interest through intermediate holding companies.[827]

478. Mr Misamore explained that he took a deliberate decision to repatriate the proceeds of these sales as loans for the following reason:

> The only reason why the funds were repatriated to Yukos [Oil] in Russia through the use of intra-company loans is simple: tax minimization and cash management flexibility strategy, which was and continues to be today a common practice not only

---

[826] *See* para. 330 above; Gleichenhaus 1, para. 33; Misamore Record of Interview, p. 37 (**Exhibit R-39**).
[827] *See* para. 333 above.

for Russian companies, but by virtually all companies involved in international commerce.

...

Specifically, if a foreign subsidiary of a multi-national corporation repatriates its funds in the offshore accounts to a parent in Russia permanently, such as through a dividend payment, the company must pay withholding tax in the jurisdiction where the company is incorporated and/or domiciled. If, on the other hand, the foreign entity loans the funds to either a holding company or its subsidiary in Russia, then the transfer qualifies for either 0% or a minimal, depending on a local tax regime, withholding tax.[828]

479. It follows from this that the Treasury Department of Yukos Oil identified that it had to make a specific choice between making inter-group company payments by way of dividend and by way of loan.

480. The initial payments from the Russian trading subsidiaries Ratibor and Fargoil to their Cyprus affiliates were made by dividend. Those payments were taxed at the rate prescribed in the Russia-Cyprus Double Tax Treaty.[829] It forms no part of the evidence before the Tribunal at this jurisdictional stage to suggest that this expatriation of funds was unlawful under Russian law.[830] At that point, these funds had left the sovereign territory of Russia. They were no longer devoted to economic activities within the energy sector in Russia. They could have been applied to the economic activities of the Yukos group outside Russia.[831]

481. At the second stage of the transfers from Brittany or Hedgerow to the Claimant and from the Claimant to Yukos Oil, the sums were transferred by way of loan. The Claimant admits that this was a deliberate decision in order to make the working capital available to Yukos Oil without having to pay tax on it, as would have been the case were the sums to have been paid as a dividend.

---

[828] Misamore Record of Interview, p. 34 (Exhibit R-39).

[829] *See* para. 339 above.

[830] *See* para. 308(b) above.

[831] T5/102/18 – T5/103//13.

482. Such a choice would, in the Tribunal's view, only fall outside the concept of "Investment" when either: (a) the Loans were found to be invalid or a sham as a matter of their legal materialization (which is not alleged here); or (b) if the Loans were to be treated as in substance a dividend because there was no intent to repay.

483. The evidence before the Tribunal is that the transactions were treated as loans:

    (a) They appear as a contingent liability in the 2004 audited accounts of Yukos Oil.[832]

    (b) Yukos Oil made scheduled repayments under the Loans until its accounts in Russia were frozen, and the Claimant made subsequent demands for payment.[833]

    (c) The Moscow City Arbitration Court did not call into question that the Loans should be treated as such when ruling on their admissibility in the Yukos Oil bankruptcy proceedings. Rather, it decided that the claim was premature, the due date for fulfillment of the obligations under the Loans not having arisen as at the date of the receivership.[834]

484. This evidence is all consistent with an intent on the part of Yukos Oil to repay the Claimant and thus with a subsisting asset in the form of a loan held by Yukos Capital.

485. This is not negated by the fact that these sums were liable to consolidation in the Consolidated Group Accounts of the Yukos Group. This follows from the nature of consolidated accounts as presenting the global economic position of a group of companies, not the economic position of any particular company within the group.

486. Nor is the position affected by the fact that part of the loan to Yukos Oil was used by it in turn to pay a dividend to its shareholders. The evidence advanced by the Claimant on this aspect is that this dividend was paid in order to support the proposed merger between

---

[832] 2004 Explanatory Note, pp. 17-18 (Exhibit C-137).

[833] *See* para. 336 above.

[834] Moscow City Arbitration Court Ruling (19 July 2006), p. 2 (Exhibit C-71).

Yukos Oil and Sibneft.[835]  Mr Misamore gave detailed evidence about this in his witness statements.[836]  His account was not challenged on cross-examination.

487.  The Tribunal finds that, to the extent that part of the loan proceeds were at the time intended to be used for this purpose, that would also be "associated with an Economic Activity in the Energy Sector."

488.  Accordingly, the Tribunal finds that the Loans are a "debt of a company" that constitutes an "Investment" for the purpose of Article 1(6) of the ECT.  This finding, however, does not conclude its enquiry.

### (e) Risk

489.  The second aspect of the Respondent's argument as to the economic substance of the transaction is that the Claimant did not make an investment, since it bore no risk under the Loans.  Such risk, it is said, was passed on to Brittany or Hedgerow by virtue of the back-to-back nature of the loan documentation.  As a result, the asset is not to be treated in economic terms as "owned" by the Claimant.

490.  It is a commonplace to observe that an element of risk is inherent in the economic materialization of an investment.  This is another ground upon which an investment is distinguished from a sales transaction.

491.  The Tribunal is bound to observe, however, that, in its view, there are two difficulties that arise on the Respondent's legal case under this head.

492.  In the first place, the factor of risk, however useful it may be as an indicator to distinguish a sale from an investment, can have only limited value where the investor makes its investment by way of a loan.  In the case of a sale transaction, there is no investment because the seller retains, by virtue of a contract of sale, no proprietary interest in an economic venture in the host state.  By contrast, as the Tribunal has already found,[837] an investment is commonly made by way of a debt, provided that such a debt is associated

---

[835] *See* paras. 405 & 418 above.

[836] Misamore 1, paras. 23-36; Misamore 2, paras. 35-44.

[837] *See* paras. 430-437 above.

with an enterprise or economic activity in the host state.  This form of legal materialization of an investment is expressly contemplated by Article 1(6)(b) of the ECT.

493.  Where the mechanism of a loan is used, the investor retains the right to repayment of capital; has the ability to fix its returns through a specified interest rate; and may also have other legal mechanisms open to it to limit its risk.  This form of investment is therefore of its nature quite different from an equity investment, in which the value of the investment will be much more directly influenced by the success or failure of the economic venture.  In the case of an equity investment, the risk element constitutes a much more direct connection between the investor's asset and the venture in which it owns a stake.

494.  These differences do not make a loan any the less an investment.  A loan to an enterprise or economic venture in the host state still involves risk as to the success or failure of the venture.  At the point that the investor disburses funds under the loan to the venture, it is committed to its success or failure.  The investor has a stake in that venture.  Its risk materializes in a failure to repay.  That is a risk of a different order to non-payment for specific goods delivered under a contract of sale.  The element of risk is, therefore, in reality another way of expressing the same underlying concept of "contribution" already discussed.

495.  There is a second difficulty in the instant case with the specific way in which the Respondent advances its case.  The Respondent does not for this purpose challenge the legal materialization of the investment.  It does not seek to argue that the Loans are invalid or to be set aside under their applicable law.  Yet the requirement of Article 1(6) of the ECT to which its submissions on the back-to-back nature of the loan transactions must be directed is the requirement that the Investment be "owned" by the Investor.

496.  Ownership is a legal estate. It describes a legal relationship between person and property. As the Tribunal has already held,[838] international law does not create rights in property. It must refer to national law to do so.  Although the Respondent suggested that the

---

[838] *See* para. 452 above.

Claimant was to be treated as an "agent" of Brittany or Hedgerow,[839] it developed no legal case under the applicable law in this respect.

497. Nor did the Respondent submit that there was any other basis for treating Brittany or Hedgerow as the owner – legal or beneficial – of the chose in action constituted by the debt. On the contrary, the Respondent emphasises that its case "does not mean that you're piercing the corporate veil, does not mean that you're obliterating what legal obligations or rights those parties might have in other spheres."[840] It adds that the finding that it seeks "has no consequence for the parties to the transaction as to their legal obligations."[841] Nor, it bears repeating, did the Respondent submit that the Claimant was not an Investor. It did not argue that the Claimant was a sham or a shell company established to disguise the real owner (as was found to be the case in *KT Asia*). It did not submit that Brittany or Hedgerow was to be treated as the owner of the debt.[842]

498. The Respondent's case is not founded upon the legal character of the arrangements, but on a submission as to what it submitted was the "true economic position": that Brittany or Hedgerow were "the economic actors" and that Yukos Capital was "just a passive conduit."[843] Since the Respondent does not advance a submission impugning the legal character of the arrangements, and since the Tribunal has not been presented with evidence on the arbitration file for this jurisdiction hearing that might support such a submission, it must approach the determination of its jurisdiction on the basis that the legal arrangements between the Claimant and Brittany/Hedgerow are valid and carry the legal incidents and consequences that appear on their face.

---

[839] *See* para. 338 above.

[840] T5/80/22-25.

[841] T5/81/16-18.

[842] When a member of the Tribunal put this possible analysis to counsel for Respondent, he submitted: "One *might analogize* to beneficial ownership, but I think *the true economic position* here is that Brittany and Hedgerow were the *economic actors*.": T5/87/9-11 (emphasis added). Neither Party introduced into the record *Occidental Petroleum Corporation v. The Republic of Ecuador* (Award) ICSID Case No ARB/06/11 (5 October 2012, Fortier P, Williams & Stern (dissenting)). The Decision on Annulment in that case (2 November 2015, Fernandez-Armesto P, Feliciano & Oreamuno) was rendered after the hearing on jurisdiction in the present case. Neither Party applied for leave to introduce that Decision into the record or to make submissions on it. For the substantive reasons set out in this part of the Award, a majority of the Tribunal does not consider the principle stated in that Decision at paras. 262-4 (referred to in the Dissenting Opinion of Arbitrator Stern at paras. 124 & 141) to be applicable to the present case, because, in the view of the majority, neither Brittany nor Hedgerow owned any beneficial interest in the Loans.

[843] T5/87/10-13.

499. Seen in this light, there is no doubt that the loans from Brittany/Hedgerow provided the capital to the Claimant that it, in turn, used to extend the Loans to Yukos Oil. The Brittany/Hedgerow loan agreements did so on terms that closely matched the Loans between the Claimant and Yukos Oil. As described above,[844] the Claimant's agreements with Brittany and Hedgerow provided that they had no recourse against the Claimant in the event that the Claimant was unable to make payment because it had not been paid by Yukos Oil.[845]

500. Does that have the consequence that the Claimant was not itself a lender with an Investment that is capable of founding the Tribunal's jurisdiction? A majority of the Tribunal does not consider that this is so.

501. In order to explain why it has reached this conclusion, it is now necessary for the Tribunal to analyse the nature of the relationships between Yukos Capital and, respectively, its borrower and lender. For this purpose, it suffices to take the Yukos Oil and Brittany pair of loan transactions.

502. The Agreement between Yukos Capital and Yukos Oil dated 2 December 2003 (the **"Yukos Capital Loan Agreement"**) establishes a loan between Yukos Capital (defined as "Lender") and Yukos Oil (defined as "Borrower"). It provides in relevant part:[846]

> 1. SUBJECT
>
> 1.1 During the term hereof the Lender undertakes to grant to the Borrower interest bearing loans with total amount (hereinafter referred to as "Loan Amount") not exceeding 80'000'000'000-00 (Eighty billion) Russian Rubles, and the Borrower undertakes to repay such loans and to pay interest for use of funds hereunder at the rate of 9% per annum.
>
> 1.2. Each loan designated to be granted by the Lender to the Borrower hereunder shall be lent as a separate drawdown.
>
> 1.3. Each loan designated to be granted by the Lender to the Borrower within Loan Amount Stipulated in paragraph 1.1. hereof, shall be requested by a separate Notice of Drawdown, stating terms of such drawdown.

---

[844] *See* para. 327 above.

[845] *See* further para. 504 below.

[846] 2003 Loan Agreement (**Exhibit C-9**).

## 2. RIGHTS AND OBLIGATIONS OF THE PARTIES

2.1. The Lender undertakes to grant loans to the Borrower within 2 (two) business days from the date when the Borrower submitted to the Lender a Notice of Drawdown, stating drawdown amount, which neither separately nor in aggregate with other loans granted earlier hereunder may exceed Loan Amount as defined in paragraph 1.1. hereof, and other terms of such drawdown.

A loan shall be deemed to have been granted by the Lender at the time when the funds have been credited to the Borrower's bank account.

2.2. The Borrower is entitled to return loans obtained hereunder prior to their maturity (before expiration of terms, stipulated in respective Notice of Drawdown, submitted by the Borrower to the Lender)

2.3. The Borrower undertakes to submit to the Lender a copy of its quarterly balance sheet with stamp of tax office evidencing its acceptance by the latter not later than the 10th of second month following the end of each quarter.

2.4. The Borrower undertakes to repay all loans, borrowed hereunder, to the Lender not later than 31st December 2008. Such term of maturity of the loans may be adjusted by mutual agreement of the Parties made in writing. The interest on the loans granted hereunder shall accrue quarterly and shall be payable not later than last business day of the last month in the quarter. The loan shall be deemed to be repaid in full at the time when respective funds have been credited to the Lender's bank account. At the request of the Lender the Borrower shall return the loan before maturity as stated above in the events as follows:

2.4.1. the Lender shall sufficient grounds to reckon that financial position of the Borrower does not allow timely repayment of the loan.

2.4.2 in other events, defined by the laws of the Russian Federation from time to time in force being.

## 3. RESPONSIBILITY OF THE PARTIES

3.1. In the event of nonfulfillment and/or not due fulfillment of obligations, hereunder the parties shall be liable in accordance with civil legislation of the Russian Federation from time to time in force being.

3.2. In the event of delay in the repayment of the loan by the Borrower the Lender is entitled to require that penalty be payable by the Borrower in the amount of 0,1 (zero point one) per cent of the amount overdue. The payment of the penalty shall not relieve the Borrower from fulfillment of the obligation in kind (i.e. of the repayment

of the loan and/or of payment of interest for using the loan).

### 4. FORCE MAJEURE

4.1. The Parties shall not bear responsibility for non-fulfillment or not due fulfillment of their obligations should such hereunder breach be caused events beyond their control (force majeure), i.e. extraordinary and unforeseen circumstances, which being beyond control of the Party in breach prevented such Party from due fulfillment of its obligations.

503. The Agreement between Yukos Capital and Brittany dated 20 November 2003 (the "**Brittany Loan Agreement**")[847] establishes a loan between Brittany (defined as "Lender") and Yukos Capital (defined as "Borrower"). It provides in relevant part:

WHEREAS:

(a) Borrower intends to provide a loan facility to OAO "NK "YUKOS", a company duly organized and validly existing under the laws of the Russian Federation (hereinafter referred to as "Sub-Borrower"), such loan facility to be granted shall not exceed 80'000'000'000-00 (Eighty billion) Russian Rubles, shall bear interest at the rate of 9% per annum and shall mature not later than 31st December 2008 (hereinafter referred to as "Sub-Lending", and respective loan agreement documenting such Sub-Lending to be hereinafter referred to as Sub-Lending Agreement);

(b) Lender has agreed to make available this Loan Facility on the terms set forth herein.

NOW, THEREFORE, the Parties have agreed as follows:

**1. Definitions**

As used herein, the following terms shall have the following respective meanings:

**Advance**

Shall mean any advance made or to be made by Lender hereunder which Borrower undertakes to use for Sub-Lending.

**Business day**

Shall mean any day, other than Saturday or Sunday, on which banks are not required or authorised to close in the city or cities specified; provided if no city is specified, Business day shall mean a Business day in Cyprus, in New York and in Luxembourg.

---

[847] Brittany Loan Agreement (**Exhibit C-130**).

**Debt**

Means all indebtedness of Borrower in respect of outstanding amounts under this Agreement.

**Drawdown Date**

Means the day when Borrower transfers funds to Sub-Borrower at the request of the latter under Sub-Lending Agreement.

**Disbursement date**

Shall mean the date on which the Loan amount is credited in cleared funds to Borrower's account.

**Facility amount**

Means 80'000'000'000-00 (Eighty billion) Russian Rubles.

**Final Repayment date**

2nd January 2009, which date may be either accelerated or postponed by mutual agreement in miring by the Parties hereto. Such Final Repayment date will not be later than one Business Day after the date on which the Sub-Lending is redeemed.

**Interest rate**

Means 8,9375% per annum payable quarterly and on the Final Repayment date. Such interest rate may be reduced by any Russian withholding taxes and other statutory deductions from the interest on Sub-Lending.


**2. Commitments**

Lender agrees on the terms and conditions herein, to make available to Borrower a loan facility equal to the Facility amount. Lender undertakes to transfer Advances hereunder in US Dollars to the account of Borrower in total Facility amount in order to make feasible Sub-Lending by Borrower, which accumulation in the amount sufficient to meet Sub-Borrower's request is to be completed in any case prior to any of the Drawdown date (should Sub-Lending be effected in several advances).


**3. Repayment**

Borrower shall repay the amount outstanding within one Business Day upon redemption of any part of Sub-Lending. The indebtedness shall be repaid in Russian Rubles or, on the mutual agreement between the Parties, in another currency as if converted using the Central Bank of the Russian Federation exchange rate on the date of repayment. Repayment may be made in installments.

**4. Interest**

The loan shall accrue interest at the interest rate determined above with effect from each Drawdown date for actual number of days elapsed thereupon on the basis of actual calendar year. The interest shall accrue quarterly and shall be payable on the next Business Days upon receipt of respective quarterly interest from Sub-Borrower, or on final Repayment Date together with repayment of last outstanding balance to Lender.

**5. Hedge**

Notwithstanding the foregoing and for the avoidance of doubt Lender shall bear all risks associated with Sub-Lending, including, but not limited to the following:

(a) Failure to pay, which means the failure by Sub-Borrower to make, when and where due, any payments under Sub-Lending Agreement;

(b) Sovereign risk, which means any of the following;

(i) the enactment, imposition, enforcement or modification of any governmental or regulatory restriction on the payment of any portion of the principal or interest due on Sub-Lending;

(ii) the existence, enactment, imposition, enforcement, or modification of any governmental or regulatory restriction on the payment or receipt of any amounts by non Russian residents;

(iii) the adoption, enactment or implementation of any rule, regulation or statute by any Governmental Authority, any modification thereof or any action whatsoever, which has the effect of imposing any exchange controls, limitations or restrictions on the transfer of securities and any other holding of Sub-Lending, or cash proceeds arising from the maintenance, redemption, purchase sale or holding of Sub-Lending;

(c) Foreign exchange risk, which means the risk that Lender may either not be able to convert proceeds in Russian Rubles into hard currency upon repayment hereunder by Borrower or proceeds from such conversion may not be sufficient to recover funds advanced by Lender as Advances under this Agreement or that non Russian Rubles proceeds when translated into Russian Rubles are less than the funds advanced by Lender as Advances under this Agreement;

(d) Tax risk, which means that interest receivable by Borrower on Sub-Lending may be reduced by any Russian withholding taxes and other statutory deductions.

504. What was the substance of this set of transactions? Undoubtedly, Yukos Capital's obligation to repay Brittany only arose if and to the extent that Yukos Oil repaid its debt

to Yukos Capital.[848]  As between Brittany and Yukos Capital, it is Brittany that bears the risk of default associated with Yukos Capital's loan to Yukos Oil, in terms of Yukos Oil's failure to pay and of Russian sovereign, foreign exchange and tax risks.[849]  Brittany has no right of recourse against Yukos Capital if and to the extent that Yukos Oil does not repay its loan to Yukos Capital.

505. Does this affect the substance of the transaction between Yukos Capital and Yukos Oil? A majority of the Tribunal's view is that it does not.  The only person that holds the right to claim repayment of the debt represented by Yukos Capital's loan to Yukos Oil is Yukos Capital.  It is Yukos Capital that advances the loans to Yukos Oil under the Yukos Capital Loan Agreement.  Yukos Oil's undertaking to repay those loans with interest is made to Yukos Capital alone.[850]  Yukos Capital does, therefore, have an economic interest in the Loans, since it is Yukos Capital that holds the debt.

506. Those synallagmatic obligations between Yukos Oil and Yukos Capital are not held by the latter on behalf of Brittany or any other third party.  This conclusion is confirmed by reference to both the Yukos Capital Loan Agreement and the Brittany Loan Agreement. Brittany has no right to claim recovery of Yukos Oil's debt.  Yukos Capital has not transferred that right – legally or beneficially – to Brittany.  Brittany does not receive under the Brittany Loan Agreement any right to Yukos Oil's debt to Yukos Capital or any ability to pursue a claim against Yukos Oil in respect of that debt.  It merely limits its own rights of recovery vis-à-vis Yukos Capital by assuming the risk if and to the extent that Yukos Capital is not repaid.

507. Nor has Brittany indemnified Yukos Capital under the Brittany Loan Agreement against any loss that Yukos Capital may suffer as a result of default by Yukos Oil under the Yukos Capital Agreement.  The right to seek repayment – and to invoke Yukos Oil's liability for nonfulfilment of its obligations[851] – remains solely held by Yukos Capital on its own behalf.

---

[848] Brittany Loan Agreement, cl. 3 (Exhibit C-130).

[849] Brittany Loan Agreement, cl. 5 (Exhibit C-130).

[850] 2003 Loan Agreement, cls. 1.1 & 2.4 (Exhibit C-9).

[851] 2003 Loan Agreement, cl. 3.1 (Exhibit C-9).

508. The fact that Yukos Capital's own liability to its lender, Brittany, is limited by the terms
of the Brittany Loan Agreement, may potentially give rise to questions as to the extent of
its loss. In the present proceedings, that would be a question to be determined in the event
that the Tribunal were to find liability. It does not shift the right to reclaim the debt owed
by Yukos Oil from Yukos Capital to Brittany.

509. In addition, the Claimant holds the right to its own return on the Loans, the loss of which
it risked in the event of the failure of Yukos Oil, being the spread or difference between
the interest that it earned and that was earned by Brittany/Hedgerow.[852] This spread was
not covered by the back-to-back arrangements. It was specifically notified to the
Luxembourg tax authorities and treated by them as sufficient to justify the
characterisation of the transaction as a valid loan made by a Luxembourg company for
the purpose of the double tax treaty with Russia.[853] The Tribunal's analysis of the nature
and incidents of the Loans has an important consequence in the context of the larger issue
with which the Tribunal is presently concerned, namely the question whether Yukos
Capital made an investment associated with an economic activity in the Respondent's
Area sufficient to meet the jurisdictional threshold required by the ECT.

510. The Tribunal has already held that the origin of capital used to make an investment is not
germane to the enquiry whether the Investor has in fact made such an Investment. This
is so including where another company within a corporate group supplies the capital and
including where (as will often be the case) the Investor raises the capital by borrowing
the funds. It follows that the terms upon which the capital is raised are not relevant to the
question at hand, unless exceptionally they lead to an argument of the kind successfully
raised in *KT Asia* that would support a finding that the investment company is a sham or
shell used to hide the identity of the true beneficial owner.

511. The effect of the Loans was to take funds that were outside Russia and to invest those
funds in the Area of the Respondent in an enterprise, Yukos Oil, which was engaged in
an Economic Activity in the Energy Sector. The result of this investment was that the
lender assumed the *operational* risk that the funds might not be repaid. The funds were

---

[852] *See* para. 325 above.

[853] Loyens & Loeff Letter to Luxembourg Revenue (27 February 2003) (**Exhibit B-22**); Loyens & Loeff Letter to
Luxembourg Revenue (9 April 2004) (**Exhibit B-23**).

at the risk of any factor that might affect Yukos Oil's economic activity in Russia. The Loans were placed at risk of the failure of that business to deliver sufficient returns to enable repayment. Such risk includes the risks of sovereign intervention, the protection against which is the function of Part III of the ECT. This fundamental risk remains irrespective of the internal inter-group arrangements between the Claimant and its lenders.

512. In reaching these conclusions for the purpose of determining its jurisdiction, the Tribunal emphasises that it leaves open for the merits phase of the proceedings the questions that arise from the nature of these arrangements as to what loss the Claimant may have suffered in the event that the Tribunal were to find in its favour on liability.

513. For these reasons, the Tribunal finds that the Claimant "own[s]" an "asset" constituted by a "debt of a company" "associated with an Economic Activity in the Energy Sector" in the "Area" of the Respondent such that it has made an "Investment" to which the present dispute with the Respondent "relat[es]."

### C. DOES THE "DENIAL-OF-BENEFITS" PROVISION (ARTICLE 17) OF THE ECT BAR THE CLAIMS?

514. The third objection to jurisdiction for consideration in this phase of the arbitration concerns Article 17 of the ECT. That Article comes within Part III of the ECT and provides, in relevant part:

> Each Contracting Party reserves the right to deny the advantages of this Part to:
>
> (1)    a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;

515. The Respondent says that it was entitled to deny the benefits of Part III of the ECT to the Claimant at any time before the deadline for raising jurisdictional objections. It says that the Claimant has at relevant times been controlled by nationals of a third state (namely the United States) and has not had substantial business activities in Luxembourg. As a consequence, the Respondent says that, the Claimant having been denied the benefits of

Part III, it has no claim that it may assert before the Tribunal, which must dismiss the claims for lack of jurisdiction or declare them inadmissible.[854]

516. The Claimant maintains that the Respondent's purported denial of benefits cannot constitute a challenge to jurisdiction; its invocation of Article 17 of the ECT after the commencement of the arbitration cannot have retrospective effect; and the two cumulative requirements of Article 17(1) of the ECT have not been met.[855]

### 1.   The Parties' submissions

517. The Tribunal now summarises the Parties' arguments.

#### (a) Can Article 17(1) give rise to a jurisdictional challenge?

##### (i) The Respondent's position

518. According to the Respondent, denying the benefits under Article 17(1) of the ECT can lead to a jurisdictional challenge.[856] The Respondent argues that "[a] Contracting Party's consent to arbitration under Article 26 ECT extends only to '[d]isputes . . . which concern an alleged breach of an obligation of [a Contracting Party] under Part III'," thus making such an alleged breach "a necessary predicate of jurisdiction."[857] An "investor that has been denied the advantages of Part III is not owed any obligations under Part III," and its allegations of fact are thus not capable of amounting to a breach of an obligation under Part III;[858] in those circumstances there cannot be a dispute concerning an alleged breach of an obligation under Part III.[859]

##### (ii)   The Claimant's position

519. The Claimant maintains, referring to Article 31(1) of the VCLT, that the reservation of the right to deny benefits pursuant to Article 17(1) of the ECT applies only to Part III, but

---

[854] Memorial, para. 187.

[855] Counter-Memorial, para. 230; Rejoinder, paras. 245-246.

[856] Reply, para. 331.

[857] Reply, para. 331, *citing* ECT, Art. 26(1) (**Exhibit C-1**).

[858] Reply, paras. 331-337, *citing* various awards and submitting that there is no consistent jurisprudence on the matter.

[859] Reply, para. 338.

that the reservation does not apply to Part V, in which Article 26 sets forth the right to arbitration.[860]   The Claimant submits that the awards cited by the Respondent are all "irrelevant, as in each case the denial of benefits provisions expressly applied to the contracting parties' consent to arbitrate"[861] and thus the state had the right to deny the benefit of consent to arbitration.   This does not retrospectively deny the other benefits, but removes the avenue for addressing the breach of those provisions.[862]

### (b) Was the Respondent entitled to invoke Article 17(1) after the commencement of the arbitration?

#### (i) The Respondent's position

520.  The Respondent argues that it has the right, by virtue of Article 17(1) of the ECT, to deny to the Claimant the benefits of Part III of the ECT "at any time" within the period prescribed by the applicable arbitration rules for raising objections to jurisdiction or admissibility,[863] as long as the Respondent fulfills the provision's requirements;[864] and, accordingly, that it is entitled to invoke Article 17(1) in these proceedings.   It invokes a number of awards in support.   Criticising the *Plama v. Bulgaria* decision, it submits that restricting the provision to having prospective effect denies it of any meaningful application.[865]   It submits that the Claimant's interpretation would render the clause nugatory, and would require a respondent state to attempt to monitor in the territories of each of the 48 ECT contracting states the ownership and control structures of potential claimants.[866]

521.  The Respondent submits that "a shell company owned or controlled by third State citizens or nationals could have had no legitimate expectation that it will not be denied the advantages of Part III of the ECT unless it has been upfront about its ownership and control and its lack of substantial business activities and obtained a specific representation

---

[860] Counter-Memorial, paras. 231-235, *citing* various awards; Rejoinder, paras. 248, 257.

[861] Rejoinder, paras. 250-251.

[862] T1/209/1 – T1/211/18; T/229/9-16. The Claimant submits that the ECT cases on which the Respondent relies did not address this issue: T1/211/19 – T1/216/18. *See also* T1/216/19 – T1/218/6 with respect to commentary.

[863] T1/94/1-5.

[864] Memorial, para. 163-167; Reply, paras. 329-330; T1/94/6 – T/95/20.

[865] Reply, para. 348-356, *citing Plama* (**Exhibit RL-88**); Douglas, paras. 879-880 (**Exhibit RL-64**).

[866] T1/96/3-13.

from the Contracting Party concerned that it will not be denied benefits," something that Yukos Capital did not do.[867]

### (ii)   The Claimant's position

522.   The Claimant maintains that Article 17(1) of the ECT does not operate automatically but is a right reserved to states that must be positively exercised; that it has no effect until then and is not retrospective.[868]   By the time the Respondent exercised this right on 11 April 2014, the benefit of the protections had been enjoyed and the breach of those protections perpetrated.[869] The Respondent's interpretation would be to "retrospectively introduce conditions to its unconditional consent to arbitrate."[870]   This would have the effect of negating all the other benefits of the Treaty that the Claimant had enjoyed and depriving it of the ability to enforce those rights.[871]   While "a contracting party's obligations under Part III are a corollary of an investor's advantages," the Claimant alleges that "it does not follow that such obligations automatically evaporate once advantages are unilaterally denied, nor that the host states are the judges of this determination."[872]   It cites jurisprudence in support[873] and distinguishes the authorities cited by the Respondent.[874]

523.   Any investor has a legitimate expectation that it is entitled to the benefits of the ECT until they are denied. The object and purpose of the ECT in promoting "long-term co-operation in the energy field" supports the proposition that Article 17 has prospective effect.[875]   A requirement that an investor seek a representation from the state that it would not be

---

[867] Reply, para. 352.

[868] Counter-Memorial, paras. 240-244, *citing Plama*, paras. 155-158 (**Exhibit RL-88**); *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan*, ICSID Case No. ARB/07/14, Excerpts of Award (22 June 2010), para. 224 (**Exhibit CL-13**); *Hulley Enterprises*, paras. 455-456 (**Exhibit CL-9**); Rejoinder, para. 288.

[869] Counter-Memorial, para. 248.

[870] Rejoinder, paras. 259-260.

[871] T1/222/9-23, contrasting cases where the treaty gives the state the right to deny the benefit of an arbitration clause; T1/229/9-24.

[872] Rejoinder, paras. 264, 268.

[873] Rejoinder, paras. 271-274, 277-8, 298.

[874] Counter-Memorial, paras. 245, 247, *referring to* the Respondent's citation of *Guaracachi* (**Exhibit CL-80**); *Ulysseas, Inc. v. The Republic of Ecuador*, UNCITRAL, Final Award (12 June 2012) and *Pac Rim Cayman LLC v. Republic of El Salvador*, ICSID Case No. ARB/09/12, Award (14 October 2016), paras. 4.2-4.4.

[875] Counter-Memorial, paras. 249, 251, 285.

denied the benefits of Part III would "require a revision of the whole structure of the ECT."[876]

### (c) Is the Claimant owned or controlled by nationals of a third state?

#### (i) The Respondent's position

524.  The Respondent submits that "control" in Article 17(1) of the ECT "includes control in fact, including a financial or equity interest in a company, the ability to exercise substantial influence over its management and operation, and the selection of members of its board of directors or other managing body."[877]  The Respondent disputes that questions of "control" are always based on the ownership of a shareholding interest in the relevant person, which conflates ownership and control and deprives the latter concept of meaning.[878]  The Respondent argues that control over a legal entity may be asserted through an ability to exercise substantial influence over the entity's management and operation or the selection of the members of its managing body,[879] and that in the ECT context control means control in fact.[880]  The Respondent distinguishes the cases cited by the Claimant, which concern companies controlled by direct or indirect shareholders, from the current arbitration, which concerns a *Stichting* that "has no owners and is managed and controlled solely by its Board."[881]

525.  The Respondent says that the *Stichting* controls Yukos Capital through its 100% shareholding in Yukos International, which, in turn, owns 100% of Yukos Capital.[882]  The Respondent submits that the purpose of a *Stichting Administratiekantoor* is to transfer control over a limited liability company from the company's shareholders to the members of the *Stichting*'s board, who exercise the combined powers of the company's

---

[876] Rejoinder, para. 295.

[877] Memorial, paras. 177, 185; Reply, para. 397.

[878] Reply, paras. 399, 403-404.

[879] Reply, paras. 400-401, *citing* cases; Reply, para. 402, *citing* Understandings, Final Act of the European Energy Charter Conference (17 December 1994), para. IV(3) (**Exhibit C-1**).

[880] Reply, para. 402, *citing* Understandings, Final Act of the European Energy Charter Conference (17 December 1994), para. IV(3) (**Exhibit C-1**).

[881] Reply, para. 405.

[882] Memorial, paras. 180-181 (footnote omitted).  *See also* Reply, para. 398.

management and its shareholders.[883]   The *Stichting* exercises its voting and other shareholder rights "at its sole discretion," and controls the selection of the Claimant's managing directors.[884]  The *Stichting* has no owners and is managed and controlled solely by its Board, which "represents the Stichting" and adopts resolutions by absolute majority of its members.[885]  Thus the members of the *Stichting*'s board have sole control over the assets transferred to the *Stichting*.[886]  The majority of the *Stichting*'s Board members have at all times been American citizens.[887]  The United States is not a contracting party to the ECT.[888]

526.   The Respondent further rejects the Claimant's argument that the nationality of Board members is irrelevant because they act collectively as the Board; because the Board is subject to the supervision of the Dutch courts; and because the Board members have a duty to consider the interests of the Claimant and the other entities and shareholders of the Yukos Group.  It says that the nationality of the majority of Board members is what determines whether nationals of a third state control the *Stichting*.[889]   The Board members' duty to comply with Dutch law does not mean they do not control the *Stichting*,[890] and the concepts of beneficial ownership and control must not be conflated.[891]

### (ii)   The Claimant's position

527.  The Claimant says that the Respondent wrongly leaps from the Board having control of the *Stichting*, to control being exercised by the individual directors that comprise the

---

[883] T1/98/5 – T1/101/8, *citing* Expert Opinion of Professor Dr. Riemert Pieter Jan Lucris Tjittes (2 March 2015) ("**Tjittes**"); *Stichting* Articles of Association (19 March 2008) (**Exhibit R-74**); *Stichting* Articles of Association (**Exhibit R-166**).

[884] Memorial, para. 181.

[885] Memorial, para. 182.

[886] T/97/20 – T/98/4.

[887] T1/101/8-15, *citing Stichting* Excerpt from the Dutch Trade Register (**Exhibit R-70**).

[888] Memorial, paras. 178, 185; Reply, para. 414.

[889] Reply, paras. 409-410.

[890] Reply, paras. 409, 411-412.

[891] Reply, para. 413, *citing Hulley Enterprises*, paras. 465-466 (**Exhibit CL-9**). The Respondent also notes that the majority of the members of the board are also interested parties whose interests the *Stichting* must further pursuant to Article 2(2) of the Articles of Association (**Exhibit R-74**): T1/101/16 – T1/102/6.

Board.[892]   Individual directors do not control the *Stichting*.  Rather the Board is a Dutch body subject to the ultimate supervision of the Dutch courts that makes decisions over the *Stichting*.[893]

528.  The Claimant says that the question of control is based on ownership of a shareholding interest.[894]  In this case, the Board collectively pursues its line of business in the interests of all its stakeholders and to the extent that the *Stichting* exercises control over Yukos Capital, such control is exercised by the legal person of the *Stichting*.[895]  Without the necessary participating ownership interest, no person could draw on the benefits of Part III or would have standing to make a claim.[896]  Article 17(1) is concerned with cases "where the 'real' investor is from a third state which benefits from the Investment but would not afford the same protection to the Investors of the host state."  The United States does not benefit from an investment protected under the ECT just because some American nationals are directors of the *Stichting*, and the directors are not the "real" investors.[897]

529.  The fact that the Board has corporate powers similar to those held by shareholders under Dutch law does not transform the directors of such Board into pseudo-shareholders within the meaning of Article 17.[898]  Professor Tjittes' expert report does not support the conclusion that individual Board members can control the *Stichting* such that the nationality of the majority of the Board members would determine whether the *Stichting* is controlled by a third state.  Board members have a fiduciary duty to act in the best interests of the *Stichting*, which is different from the liberty that shareholders hold to pursue their own interests as long as such pursuit does not harm other shareholders.[899]

---

[892] Counter-Memorial, para. 293.

[893] Counter-Memorial, paras. 296-299, 304, *citing* Expert Report of Prof. Justice J.H.M. (HUUB) Willems LLM (31 October 2014) ("Willems 1"), paras. 20-21, 23, 27-29, 35-38.

[894] Counter-Memorial, para. 301.

[895] Counter-Memorial, paras. 303-304.

[896] Rejoinder, paras. 362-366.

[897] Rejoinder, paras. 368-369; T1/232/5-9.

[898] Rejoinder, para. 372.

[899] Rejoinder, paras. 373-374. *See also* T1/234/20 – T1/235/21.

530. The Board is an organ within the *Stichting* and not a separate legal entity,[900] and has no economic interest in the *Stichting* or standing to make claims.[901] So the "board doesn't own or control the stichting or Yukos Capital, and individual board members do not have rights of ownership or control."[902]

531. The Claimant rejects the submission that, since the *Stichting* does not have any shareholders, it must be the nationality of the majority of the members of the *Stichting* Board that determines control.[903] The lack of shareholders does not "suddenly invest the board ... or individual investors with rights of shareholders just because there are no shareholders."[904]

### (d) Has the Respondent established that the Claimant had "no substantial business activities" in Luxembourg?

#### (i) The Respondent's position

532. The Respondent argues that the Claimant "is a paradigmatic shell company," with activities in Luxembourg that "meet only the bare legal requirements for its corporate existence" and, therefore, did not have "substantial business activities" in terms of Article 17(1) of the ECT.[905] The mere fact of registration does not connote a real presence. A registration certificate from the Russian Ministry for Tax referred to by the Claimant does not show the level of business activity conducted in Luxembourg, only that Yukos Capital was incorporated there.[906]

533. The Respondent notes that whether or not the Claimant's loan agreements were executed in Luxembourg (which it questions[907]) the Claimant did not lend to or borrow from Luxembourg entities;[908] its decision-making activities also being performed out of

---

[900] T1/233/8-20, *citing* Willems 1, paras. 4, 10, 11.

[901] T1/234/1-6.

[902] T1/233/21-25.

[903] Rejoinder, para. 383.

[904] Rejoinder, paras. 384-385; T1/233/4-7; T1/236/3-6, *discussing, inter alia, Hulley Enterprises* (Exhibit CL-9).

[905] Memorial, para. 170.

[906] Reply, paras. 392-393. *See* Counter-Memorial, para. 286, *citing* Certificate of Registration, Russian Tax Authority (20 January 2004) (Exhibit C-127), which the Respondent says proves nothing more than incorporation.

[907] Reply, para. 381.

[908] Reply, paras. 376-378.

Luxembourg, and loan letters signed by TMF employees or by Mr Feldman apparently outside Luxembourg.[909]  Its "sole manifestation" in the country, according to the Respondent, is "as a client of the Luxembourg branch of TMF Group ... a corporate services provider ... to shell companies," whose address, phone and fax numbers the Claimant is using as contact points.[910]

534.  Four of the eight activities cited by the Claimant – filing accounts, signing board resolutions and holding board and shareholders' meetings – are merely activities that Yukos Capital had to do to remain a corporation and, as such, cannot constitute "substantial business activities."[911]  The board resolutions,[912] board meetings (of which there is inadequate proof),[913] shareholders' meetings and resolutions (post-dating the notice of dispute, and only one of which was executed in Luxembourg by TMF),[914] do not evidence substantial business activities.  Rather they show that the Claimant's activities were being conducted by Mr Godfrey, "who never resided or worked in Luxembourg."[915]

535.  "[T]he passive receipt" of interest rate spreads cannot qualify as "substantial business activity," and the money received was never intended to flow into Luxembourg.[916]  The Claimant only contends that bank accounts were "opened and closed" from Luxembourg, not used there.[917]  Authority to operate them was, it is submitted, outside Luxembourg and the Claimant's banking was not conducted from Luxembourg.[918]

536.  Evidence of tax filing and tax paying cannot be used to prove that substantial business activities took place.[919]  Yukos Capital paid "no taxes related to actual operations" and

---

[909] Memorial, paras. 171-174 (footnote omitted); Reply, paras. 377-378, 383.

[910] Memorial, para. 173; Reply, paras. 374-375, *citing* Expert Report of Mr. Lionel Noguera (2 March 2015) ("Noguera Report"), para. 28.

[911] Reply, para. 363.

[912] Reply, paras. 362-368.

[913] Reply, paras. 369-371.

[914] Reply, paras. 372-373; T1/105/12 – 106/2.

[915] Reply, paras. 362, 368.

[916] Reply, para. 379.

[917] Reply, para. 386.

[918] Reply, paras. 386-389.

[919] Reply, para. 390.

tax residence does not demonstrate substantial business activities, contrasting the position with a traditional holding company that "actively holds shares in subsidiaries which employ personnel and produce goods or services to third parties."[920]

### (ii)  The Claimant's position

537.  The Claimant says that it was not the kind of "mailbox investor" which Article 17 was aimed at controlling. Rather it was established as a lucrative Luxembourg-based group finance company.[921] TMF conducted substantial everyday business activities in Luxembourg on its behalf.[922] The Claimant's business activities and ownership structure had to change as a direct result of the Respondent's breaches and the Respondent cannot deny the Claimant the benefit of protections in reliance on them.[923]

538.  The Claimant says the ordinary meaning of "business activities" "encompasses a wide range of commercial and administrative actions taken by or on behalf of an enterprise."[924] The "substantial" threshold must be assessed in the context of the Claimant's business, and means "of substance, not merely of form"; materiality not magnitude is the test.[925]

539.  The Claimant notes that the Luxembourg law on incorporation requires that a company has a "real" presence in Luxembourg.[926] The Claimant rejects the Noguera Report's conclusion that Yukos Capital could not satisfy the minimum criteria for business activity in Luxembourg.[927] There is no basis for casting any doubt on the representations made to the tax authorities.[928] At the relevant time, the "Claimant was resident in Luxembourg within the meaning of Article 4 of the Tax Convention between Luxembourg and Russia,

---

[920] Reply, paras. 390-391, 394.

[921] T1/230/5-8.

[922] Counter-Memorial, para. 287; Rejoinder, paras. 308-310.

[923] T1/230/5-15.

[924] Counter-Memorial, para. 267.

[925] Counter-Memorial, paras. 266-267, *citing Amto*, para. 69 (**Exhibit RL-77**).

[926] Counter-Memorial, para. 269, *citing* Luxembourg Law of 10 August 1915 on Commercial Companies, Art. 2 (**Exhibit CL-50**); Luxembourg Law of 31 May 1999 governing the Domiciliation of Companies, Art. 1(1) (**Exhibit CL-51**).

[927] Rejoinder, paras. 312-316, *citing* Noguera Report.

[928] Rejoinder, para. 315.

was not a holding company and had no permanent establishment in Russia."[929]  With respect to the certificate of residency, the Claimant says the Luxembourg authorities approved its business activities in Luxembourg on the basis of full and honest disclosure by the Claimant, and the existence or lack of inquiry is a matter for the Luxembourg authorities to decide.[930]

540.  The Claimant submits that it was established as an active company incorporated to provide financing to companies within the same group, with "a designated functioning office in Luxembourg," a Luxembourg address and contact details; that its sole director until 6 February 2007, TMF Luxembourg, executed corporate documents and commercial transactions on behalf of the Claimant in Luxembourg; and that Board meetings as well as shareholder meetings "have been and continue to be held in Luxembourg."[931]  This includes 40 loan agreements, including the Loans.[932]  Whether or not the Claimant lent to or borrowed from Luxembourg companies is irrelevant, because it was established as an intra-group finance company.[933]  It is beside the point that business operations were being conducted by TMF rather than by direct employees,[934] and the engagement of a full-time corporate director is evidence of substantial business activities in Luxembourg and contribution to the Luxembourg economy by paying fees.[935]

541.  The Claimant refers to minutes from an extraordinary general shareholders' meeting in 2004, and notes that until February 2007, TMF was Yukos Capital's sole director and thus did not need to hold and document formal meetings.[936]  Yukos Capital intended to make a profit on its lending and did so.  To the extent that such profits were not realized ultimately was because of the expropriation.[937]  Its "main business activity by necessity consisted in the enforcement and recovery of debts deprived by Respondent's

---

[929] Counter-Memorial, paras. 280-286, *citing e.g.*, Certificate of Residence (9 February 2004) (**Exhibit C-126**); Certificate of Registration (20 January 2004) (**Exhibit C-127**).

[930] Rejoinder, paras. 356-357.

[931] Counter-Memorial, paras. 272-276, 289(a)-(f) (in relation to (c) *citing* Letter from Loyens and Loeff to the Luxembourg Tax Authority (27 February 2003) (**Exhibit C-128**)).

[932] Counter-Memorial, para. 270; Rejoinder, para. 350.

[933] Rejoinder, paras. 327, 344-345.

[934] Rejoinder, paras. 331-332.

[935] T1/237/16 – T1/240/1.

[936] Rejoinder, paras. 337-339.

[937] Rejoinder, para. 351; T1/240/2 – T2/241/19.

expropriatory actions."[938]  Likewise, its lack of taxable outputs directly resulted from the Respondent's expropriation.[939]

### 2. The Tribunal's analysis

#### (a) The issue

542. In PO No 1, the Tribunal ruled that the following objection to jurisdiction and admissibility (as formulated in the Respondent's letter dated 11 April 2014) should be determined in a preliminary phase (together with the two issues already dealt with above):

> Since Claimant is a shell company with no substantial business activities in Luxembourg and is ultimately controlled by nationals of a third State, Respondent is entitled to deny Claimant the advantages of Part III of the ECT pursuant to Article 17 ECT.[940]

543. The Tribunal considers that the specific issue that it is necessary for it to decide under this head is:

> Did "citizens or nationals of a third state ... control" the Claimant on 11 April 2014 when the Respondent sought to deny it the benefits of Part III ECT pursuant to Article 17(1)?

This corresponds to issue (c) of the pleaded issues summarised above.

544. In framing the issue in this way, the Tribunal acknowledges that the Parties also presented arguments on several other aspects of the construction and application of Article 17(1) of the ECT in the present case.

545. The second condition for the invocation of a denial of advantages under Article 17(1) of the ECT – that the entity "has no substantial business activities" in Luxembourg (pleaded issue (d) above) – is additional to the requirement of ownership or control by nationals of a third state.  Both requirements must be met in order for a contracting state to be entitled validly to deny a legal entity the advantages of Part III of the ECT.  If either one or the

---

[938] Rejoinder, para. 319.

[939] Rejoinder, para. 355.

[940] PO No. 1, para. 2.1(c), *citing* Letter from the Respondent (11 April 2014).

other element is not present, Article 17(1) may not be invoked. The Tribunal proposes first to examine the issue of control by nationals of a third state, since, if this were not established on the evidence, it would be unnecessary to consider whether the second element of no substantial business activities were made out.

546. The question whether Article 17(1) has retrospective or merely prospective effect (pleaded issue (b) above) would only arise for decision in the event that the Tribunal were to find that both of the two factual predicates for a valid invocation of Article 17(1) were established on the evidence. If the Tribunal were satisfied that the two conditions were met, it would have to proceed to decide whether, on its proper construction, a denial of the advantages of Part III of the ECT under Article 17(1) is capable of applying to alleged breaches of Part III that had occurred prior to the notice of denial. Conversely, this question will be academic in the present case, if the factual predicates to Article 17(1) are not made out in any event.

547. The Parties also differ on the question whether the issue raised by the Respondent under Article 17(1) is properly a matter that is to be resolved as a question of jurisdiction or admissibility and is thus capable of determination at this stage in the proceedings (pleaded issue (a) above). The Respondent invites the Tribunal to determine the issue at this stage, arguing that the jurisdiction of the Tribunal under Article 26 of the ECT extends only to a dispute concerning "an alleged breach of an obligation ... under Part III." If the advantages of Part III have been effectively denied to the Claimant, there can be no dispute that arises for the Tribunal's determination and thus no jurisdiction. By contrast, the Claimant submits that, Article 17 being expressly confined to Part III, it is by its terms concerned only with the substantive protections of the Treaty. This is a merits issue, it argues, and does not relate to the jurisdiction of the Tribunal, which is conferred by Article 26 under Part V "Dispute Settlement".

548. On this question, the Tribunal agrees with the Respondent. The provisions of Article 17 determine the jurisdictional scope *ratione personae* of the ECT. That is to say, where Article 17 is validly invoked, it excludes from the scope of the Treaty a person that would otherwise be entitled to invoke the Treaty as an "Investor."

549. The essential interrelation between Article 17 and the operative provisions of the Treaty may be seen from an analysis of the Treaty text. Article 26 provides for the settlement of

disputes according to arbitration between a contracting party and an "Investor of another Contracting Party ... which concern an alleged breach of an obligation of the former under Part III."

550. "Investor" is defined in Article 1(7) as meaning:

> (a) with respect to a Contracting Party:
>
>> (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
>>
>> (ii) a company of other organization organized in accordance with the law applicable in that Contracting Party;
>
> (b) with respect to a "third state", natural person, company or other organization which fulfils, mutatis mutandis, the conditions specified in subparagraph (a) for a Contracting Party.

551. Where a Contracting Party denies advantages under Article 17(1), the effect is that:

> (a) A legal entity that would otherwise meet the criteria to be an Investor under Article 1(7) and be entitled as such to pursue a claim for breach of the Treaty may not do so; and,
>
> (b) The contracting state no longer owes that entity any obligation under Part III that may form the subject of a dispute.

552. The result is that the question whether the advantages of Part III have been denied to a particular person determines the scope *ratione personae* of the claims that the Tribunal may entertain, not the merits of any such claim. For this reason, the Tribunal remains of the view that it took in PO No 1 that the Respondent's objection under Article 17 is properly regarded as a jurisdictional objection and is ripe for determination in this present preliminary phase.

553. The Tribunal will now turn to consider the evidence on the issue identified above at paragraph 543 and to rule on it.

### (b) Control by nationals of a third state

554. The Respondent alleges that the Claimant was, at the time of the denial of benefits, as a result of a corporate re-organisation, controlled in fact by nationals of a third state, namely the United States of America.[941]

555. The basic facts relevant to this case are not in dispute:

    (a) From its incorporation in January 2003 until April 2005, Yukos Capital was owned by Yukos Oil through Yukos Finance, a Dutch subsidiary of Yukos Oil.[942]

    (b) In 2005, the ownership of Yukos Capital was reorganised. A Dutch *stichting* was created on 14 April 2005.[943] The *Stichting* became the sole shareholder of Yukos Capital through Yukos International, another Dutch company in the Yukos Group.[944]

    (c) As at 29 May 2014, four of the five members of the Board of the *Stichting* were nationals of the United States of America (Messrs Theede, Godfrey, Misamore and Fleischman) and the Board has always consisted of a majority of United States citizens.[945]

556. The issue is whether these undisputed facts suffice to establish control in fact by nationals of a third state.

557. The Claimant is owned by an entity that is a national of a contracting party, namely, the *Stichting*, which is an "organization organized in accordance with the law applicable" in The Netherlands.

---

[941] Memorial, para. 177.

[942] Notice of Arbitration, para. 10; Memorial, para. 179.

[943] *Stichting* Excerpt from Dutch Trade Register (**Exhibit R-70**).

[944] Notice of Arbitration, para. 10; Memorial, para. 180; Yukos Capital Financial Statements 2011 (20 July 2012), p. 4 (**Exhibit R-75**).

[945] Memorial, para. 185, *citing Stichting* Excerpt from Dutch Trade Register (**Exhibit R-70**); *Stichting* History Excerpt from Dutch Trade Register (**Exhibit R-71**). The fifth, Mr de Guillenschmidt, is a national of France. Mr Misamore deposed that he resigned from the board on 14 August 2015: T2/214/20 – T2/215/2.

558. Pursuant to Article 2:285 of the Dutch Civil Code, the *Stichting* has no owners and is managed and controlled solely by its Board, which represents the *Stichting*.[946]

559. The Respondent's challenge therefore turns on whether it suffices in order to establish control by nationals of a third state that a majority of the members of the owner's Board are nationals of a third state.

560. This question requires consideration of the manner in which a *stichting* is itself controlled as a matter of Dutch law.

561. On this question, the Tribunal had the benefit of expert evidence of two distinguished Dutch jurists: Professor Justice J. H. M. Willems for the Claimant and Professor Dr. R. P. J. L. Tjittes for the Respondent. Each expert filed reports.[947]

562. The Parties agreed to dispense with cross-examination, but tendered the experts in the event that the Tribunal had any questions for them.[948] With the agreement of the Parties, the Tribunal took the opportunity to address its own questions to them together on one point.[949]

563. The relevant passage in the transcript of the hearing is as follows: [950]

> THE CHAIRMAN: We have been much assisted by our reading of both of your respective reports in our understanding of the legal structure and incidence of the Dutch institution of the stichting, and this particular type of stichting that was created for the purpose of holding the assets ultimately in the Claimant company.
>
> The general understanding which we derive from your respective reports, which I wish to test in order to ensure that our understanding is correct, is that the organ of the stichting which exercises the deliberative powers of the stichting, makes its decisions, is the board. Is that correct Professor Tjittes?

---

[946] Dutch Civil Code, Art. 2:285 (**Exhibit R-66**): – 1. "A Foundation ("stichting") is a legal person formed by means of a juridical act, that has no members"; – 3. "The objective (purpose) of a Foundation ("stichting") may not include the making of distributions to its founders (incorporators) or to those who are participating in its bodies"; Memorial, para. 182; *Stichting* Articles of Association (19 March 2008) (**Exhibit R-74**).

[947] Willems 1, Willems 2; Tittjes 1.

[948] T4/96/1-13: The parties were given the opportunity to ask questions arising out of the Tribunal's questions.

[949] T4/96/15 – T4/97/14.

[950] T4/99/10 – T4/101/8.

A. (Professor Tjittes) That's correct, Mr Chairman.

THE CHAIRMAN: And Professor Willems?

A. (Professor Willems) That is correct, Mr Chairman.

THE CHAIRMAN: And that in exercising its powers, the board is obliged to act as a collectivity; is that right, Professor Tjittes?

A. (Professor Tjittes) That is correct, Mr Chairman.

A. (Professor Willems) That is correct, Mr Chairman.

THE CHAIRMAN: In that sense, therefore, the board operates as an organ which is distinct from the individual natural persons that comprise its individual members; is that right, Professor Tjittes?

A. (Professor Tjittes) That is correct, Mr Chairman; although individual members may have some obligations individually towards the stichting itself, or towards third parties, like creditors of the stichting. But as such, your presumption is correct.

THE CHAIRMAN: Professor Willems?

A. (Professor Willems) That is correct, what you have put, Mr Chairman. I wouldn't use the terminology my colleague has used concerning individual obligations. In my opinion, it is possible to divide more or less the working load between the different members of the board, but that does not make that specific member having a separate duty or position or whatever. It's a sort of practical way of organising your system; I would frame it like that.

THE CHAIRMAN: Yes, of course. One moment. (Pause) We understand that the board itself nominates and appoints board members. Is that right, Professor Tjittes?

A. (Professor Tjittes) That is correct, Mr Chairman.

THE CHAIRMAN: Professor Willems?

A. (Professor Willems) That is correct, Mr Chairman.

564. This agreed evidence from both experts confirms that, as a matter of Dutch law, it is the board as an organ that controls the *stichting* and not the individual natural persons that comprise its members.

565. In the present case, this has the necessary consequence that the "control" of Yukos Capital for the purposes of Article 17(1) of the ECT is exercised by an organisation organised under the laws of a Contracting State, namely the *Stichting* acting by its Board. It is not controlled by nationals of a third state, since it is the Board as a collective organ and not its individual members that exercise control over the *Stichting*'s affairs.

566. Having reached the conclusion that the first of the two factual predicates for the valid invocation of a denial of advantages is not made out, it is unnecessary for the Tribunal to determine whether the additional requirement – that the Claimant "has no substantial business activities" in Luxembourg – was also present.

## VIII. DECISION

567. **For all of the foregoing reasons, the Tribunal hereby DECIDES that:**

    **(1) The Respondent's provisional application of the Energy Charter Treaty under the terms of Article 45(1) does include its consent to international arbitration under Article 26(3)(a) (by majority).**

    **(2) The Claimant does own an asset constituted by a debt of a company associated with an Economic Activity in the Energy Sector in the Area of the Respondent such that it has made an Investment to which the present dispute with the Respondent relates (by majority).**

    **(3) Citizens or nationals of a third state did not control the Claimant on 11 April 2014 when the Respondent sought to deny the Claimant the advantages of Part III of the Energy Charter Treaty, such that the Respondent was not entitled to invoke the provisions of Article 17(1).**

    **(4) The three objections to jurisdiction and admissibility raised by Respondent in its Notice dated 11 April 2014 that the Tribunal set down for determination in**

a preliminary phase by Procedural Order No 1 dated 24 April 2014 are therefore dismissed (by majority in respect of objections (1) and (2)).

(5) Any other objections to jurisdiction and admissibility are, pursuant to Procedural Order No 1, joined to the merits.

(6) The stay of proceedings on the merits ordered in Procedural Order No 1 is lifted with effect from 28 days following the communication of this Interim Award on Jurisdiction to the Parties.

(7) The Tribunal shall thereafter fix by procedural order, after consultation with the Parties, a revised timetable for further pleadings and a hearing on the merits.

(8) All costs of and occasioned by the hearing of these objections to jurisdiction shall be reserved.

Yukos Capital S.à. r. l. (Luxembourg) v Russian Federation
PCA Case No. 2013-31
Interim Award on Jurisdiction

Geneva, Switzerland

18 January 2017

Mr J William Rowley QC

Professor Brigitte Stern

Professor Campbell McLachlan QC
Chairman

PCA Case N° 2013-31

**IN THE MATTER OF**
**AN ARBITRATION PURSUANT TO**
**ARTICLE 26 OF THE ENERGY CHARTER TREATY**

**BEFORE**
**A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH**
**THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON**
**INTERNATIONAL TRADE LAW OF 1976**

–between–

**YUKOS CAPITAL S.À R.L. (LUXEMBOURG)**

(the "Claimant")

–and–

**THE RUSSIAN FEDERATION**

(the "Respondent" and, together with the Claimant, the "Parties")

---

**DISSENTING OPINION OF PROFESSOR BRIGITTE STERN**

---

**Arbitral Tribunal**

Professor Campbell McLachlan QC (Chairman)
Mr J. William Rowley QC
Professor Brigitte Stern

Jack L. W. Wass, Assistant to the Tribunal

**Claimant's Counsel**

Mr Cyrus Benson
Ms Ceyda Knoebel
Ms Gail Elman
Ms Penny Madden QC
Mr Piers Plumptre
Ms Sophie Cuss
*Gibson, Dunn & Crutcher LLP*

**Respondent's Counsel**

Mr David G. Sabel
Ms Claudia Annacker
Mr Cameron Murphy
Ms Laurie Achtouk-Spivak
*Cleary Gottlieb Steen & Hamilton LLP*

1.  This is an important and complex case and although the three members of the Tribunal had lengthy and challenging exchanges of views, they could not at the end of the day arrive at a unanimous analysis both on the interpretation of Article 45 and its consequences and on the question of the existence of an investment protected under the ECT, and therefore on the Tribunal's jurisdiction *ratione voluntatis* and *ratione materiae*.

### DISSENT ON ARTICLE 45 OF THE ECT

2.  The necessary starting-point for the analysis is that the Tribunal has been seized as an international tribunal by a Notice of Arbitration made by the Claimant against the Respondent under Article 26 of the ECT:

    > The agreement to arbitrate on which Yukos Capital relies is set forth in Article 26 of the Energy Charter Treaty of 1994 (the ECT).[1]

    It is common ground that the Russian Federation did sign the ECT at the time it was adopted in 1994, and that it not only abstained from ratifying it, but that the Duma positively refused to ratify it in 1997. It is also on record that the Russian Federation terminated the provisional application of the ECT in 2009.

3.  The question to be solved is, therefore, whether Article 26 is binding for the Russian Federation, so that the jurisdiction of the Tribunal can be based on it. The Claimant considers that it is binding as a result of the Russian Federation's signing of the ECT and the application of Article 45 (1) concerning provisional application of the Treaty by the Signatories. The Respondent alleges that the provisional application of Article 26 is excluded by application of the limitation clause in Article 45 (1) of the ECT providing for provisional application only "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations."

### I. THE MEANING OF PROVISIONAL APPLICATION OF THE ECT

4.  Before entering into the interpretation of Article 45 (1) of the ECT, it appears necessary to ascertain the distinction between a treaty in force and a treaty provisionally applied in general international law as well as in the Russian legal order.

---

[1] Notice of Arbitration, 15 February 2013, § 1. See also Interim Award on Jurisdiction (hereinafter "Award"), § 180: "It is common ground that the basis for jurisdiction of the present Tribunal that is invoked by the Claimant depends in the first instance upon the proper construction of the regime for provisional application of the ECT set forth in its Article 45. The Claimant brings its claim solely for alleged breach of rights contained in the ECT. It claims a right to choose to settle its dispute with the Respondent pursuant to the dispute settlement provisions of Article 26(2)(c) of the ECT, which includes submission to an arbitral tribunal under UNCITRAL Rules under Article 26(4)(b). It relies in particular upon the unconditional consent of the Respondent as a contracting party to international arbitration under Article 26(3)(a)."

## A. THE DISTINCTION BETWEEN A TREATY IN FORCE AND A TREATY PROVISIONALLY APPLIED

### The distinction in international law

5.   It is uncontested that a treaty provisionally applied is not a treaty in force. This is consistent with the distinction made in the Vienna Convention on the Law of Treaties (VCLT) between the entry into force of a treaty and its provisional application, in Articles 24 and 25, respectively:

> *Article 24 Entry into force*
>
> 1. A treaty **enters into force** in such manner and upon such date as it may provide or as the negotiating States may agree.
> 2. Failing any such provision or agreement, a treaty enters into force as soon as consent to be bound by the treaty has been established for all the negotiating States.
> ...
> *Article 25 Provisional application*
>
> 1. A treaty or a part of a **treaty is applied provisionally <u>pending its entry into force</u>** if:
>     (a) the treaty itself so provides; or
>     (b) the negotiating States have in some other manner so agreed.
> 2. Unless the treaty otherwise provides or the negotiating States have otherwise agreed, **the provisional application of a treaty <u>or a part of a treaty</u>** with respect to a State shall be terminated if that State notifies the other States between which the treaty is being applied provisionally of its intention not to become a party to the treaty. (Emphasis added)

6.   It should be noted here that the Claimant has somehow tried to blur this distinction in relying on a concept of "provisional entry into force." This is what can be read in its Rejoinder:

> Similarly, as noted in the ILC Commentary to Article 25 of the Vienna Convention, a provisionally applicable treaty is binding and constitutes a legally enforceable instrument among signatory states: "[...] *there can be no doubt that such clauses have legal effect and bring the treaty into force on a provisional basis.*"

> Thus,

> > "[...] *from a drafting point of view, it seemed necessary to specify that it is the treaties in force in accordance with the provisions of the present articles to which the pacta sunt servanda rule applies. **The words 'in force' of course cover treaties in force provisionally under Article 22 as well as treaties which enter into force definitively under Article 21.**"*[2]

7.   However, Claimant's reliance on a notion of "treaties in force provisionally" or "treaty into force on a provisional basis" is based on a draft of the article on provisional application dated 1966, **which is entirely different from the one finally adopted.** The text commented by Claimant, on the basis of the ILC's comment[3] of an article which was not finally adopted, is the following:

---

[2] Claimant's Rejoinder, §§ 20-21. Footnotes omitted. Emphasis in the original.
[3] Yearbook of International Law Commission, 1966, Vol II, pp. 210-211, **Exhibit CL-46.**

*Article 22.  Entry into force provisionally*

1. A treaty may enter into force provisionally if:
> *(a)* The treaty itself prescribes that it shall enter into force provisionally ending ratification, acceptance, approval or accession by the contracting States; or
> *(b)* The negotiating States have in some other manner so agreed.
2. The same rule applies to the entry into force provisionally of part of a treaty.

8.      Article 22 as just quoted referred indeed to the notion of provisional entry into force, while the final adopted text clearly rejected that concept and introduced a dramatic change in the vocabulary speaking of provisional application "pending entry into force." This means **that the States have expressly rejected the idea of a "provisional entry into force."**

9.      In other words, it is beyond doubt that a provisionally applied treaty cannot be considered as a treaty in force under international law.

**The distinction in the Russian legal system**

10.     It can also be mentioned here that this understanding that there is a difference between a treaty provisionally applied and a treaty in force – as well as the idea that a provisional application can be of the whole treaty or part thereof – has been adopted by the Federal Law On International Treaties of the Russian Federation of 16 June 1995 (FLIT)[4], which reproduced the distinction found in the VCLT and whose Article 23 reads:

> *Article 23 Provisional application of international treaties by the Russian Federation*
>
> 1. An international treaty **or a part of a treaty** may, **prior to its entry into force, be applied by the Russian Federation provisionally** if the treaty itself so provides or if an agreement to that effect has been reached with the parties that have signed the treaty. (Emphasis added)

**The distinction in the ECT**

11.     In fact, no one really contests the fundamental difference between a treaty in force and a treaty provisionally applied. The ECT itself embodies that distinction, as indeed mentioned in the Award:

> The Final Provisions of the ECT set forth in Part VIII draw a clear distinction between two types of unilateral acts by states which are to have legal consequences on the plane of international law: (i) signature of the Treaty under Article 38 by those states which have signed the Energy Charter; and (ii) ratification, acceptance or approval by those states under Article 39.  That Article does not itself specify the consequences that flow from the act of signature.[5]

The consequences are indeed specified in Article 45.

---

[4] **Exhibit R-24.**

[5] Award, § 187.

12. Having this important distinction between a treaty in force and a treaty provisionally applied in mind, it is for the Tribunal to make explicit the consequences that flow from the interpretation of Article 45, which it will do in due course.

## B. THE INTERPRETATION OF ARTICLE 45 (1) OF THE ECT

13. The point of departure of the analysis must be the text of Article 45, of which the first paragraph is reproduced here:

> ### ARTICLE 45 PROVISIONAL APPLICATION
>
> (1) Each signatory agrees to apply this Treaty provisionally pending its entry into force for such signatory in accordance with Article 44, **to the extent that such provisional application is not inconsistent with its constitution, laws or regulations.** (Emphasis added)[6]

14. The rules of interpretation of an international treaty are well known and embodied in Article 31 of the VCLT. On this point, I fully subscribe to the following statement in the Award:

> The point of departure is Article 31(1), which requires interpretation "*in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*"[7]

### Interpretation in good faith

15. The fact that any interpretation has to be made in good faith does not raise discussion. I, therefore, fully agree here on what is said in the Award under § 206(a) and have nothing to add to these thoughtful considerations:

> Each part of clause (1) must be interpreted in good faith. This means that the Tribunal must seek to give an effective meaning to the agreement of "[e]ach signatory ... to apply this Treaty provisionally pending its entry into force for such signatory" as well as to the proviso to that agreement "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations." An interpretation that would be so broad as to empty either the positive agreement of the relevant signatory or the domestic inconsistency proviso of any effect would not be consistent with an interpretation of the terms of Article 45 (1) in good faith.

### Interpretation of the text

16. It seems to me that the use of the words "to the extent" indicates that the extent of the provisional application of the ECT will depend on the absence of its inconsistency with the totality of the internal legal order, *i.e.*, the constitution, laws and regulations. In other words, the rules of the Treaty will be provisionally applied to the extent they are **not inconsistent** with any norm of the Russian legal system, or, to say it differently, if they

---

[6] The full article is cited in the Award in § 39 and again in § 182.
[7] Award, § 185.

are **consistent** with that legal order[8] and will not be provisionally applied if they are inconsistent – or, to say it differently, if they are not consistent – with any norm of the Russian legal system.

**Interpretation in the context of the adoption of the text**

17. To interpret the meaning of Article 45 (1), an important reference is to the views of representatives of the European Community[9] and the States during the finalization of the negotiations in 1994 or thereafter, of an authorized legal commentator of the ECT, and, last but not least, of the respective structures of the national legal orders and the international legal system, which shed some light on the object and purpose of the Treaty, and in particular its Article 26. Some guidelines can also be found for the interpretation of the ECT article on provisional application in the interpretation given to a similar article in the GATT, which, as is well known, was provisionally applied from 1948 to 1994, the date of the adoption of the Marrakesh Agreement establishing the WTO.

*Common view of the European Community and the Member States at the time of the adoption of the ECT*

18. The views expressed in a Joint Statement by the Council, the Commission and the Member States indicate both that the test for provisional application is whether or not a commitment in the Treaty is compatible with the existing legal order of the Signatories and that the European Community could only apply provisionally parts of the Treaty:[10]

> Article 45 (1) of the European Energy Charter Treaty should be interpreted as defining the conditions and **limits** for the provisional application of the ECT by the Signatories:
>
> > (a) it does not create **any commitment beyond what is compatible** with the existing internal legal order of the Signatories;
> >
> > ...

---

[8] I confess that I have some difficulty to follow the linguistic considerations on the interpretation of the expression "not inconsistent" as implying what has been called a double negative form in §§ 207-211 of the Award, especially in light of a further statement found in the Award, in § 233 (b), to the effect that "the negotiating states attached importance to inclusion of the Domestic Law Inconsistency Clause so as to ensure that provisional application 'does not create any commitment beyond what is compatible with the existing internal legal order of the Signatories.'"(Emphasis added), which seems to equate "not inconsistent" with "compatible." I would also like to add that it seems that there is no double negation in the Russian text, which by definition has some relevance here. The full Russian text reads: Каждая подписавшая сторона соглашается временно применять настоящий Договор впредь до его вступления в силу для такой подписавшей стороны в соответствии со Статьей, в той степени, в которой такое временное применение не противоречит ее конституции, законам или нормативным актам. The expression corresponding to what in the English text is "is not inconsistent" is "не противоречит", which means "does not contradict."

[9] As it was then called.

[10] Strangely, the *Hulley* tribunal did not consider that these statements contradicted its view of an all-or-nothing application of the ECT and the impossibility of a partial provisional application with the following self-contradictory statement: "This is therefore not so much an example of partial provisional application of the ECT due to inconsistency with the EC's legal order, as it is an example of the EC's partial jurisdiction for the provisional application of the whole ECT – meaning, necessarily, that **some parts of the ECT simply cannot be provisionally applied by the EC.**" (Emphasis added), *Hulley Enterprises Limited (Cyprus) v. The Russian Federation,* UNCITRAL, PCA Case No. AA 226, Interim Award on Jurisdiction and Admissibility, 30 November 2009, § 327. **Exhibit CL-9.**

> (c) this interpretation allows the Community to limit the provisional application to the **matters which fall under its competence**. (Emphasis added)[11]

19. A Council Decision in respect of the provisional application of the ECT by the European Community confirmed that provisional application could concern only parts of the Treaty:

> Whereas the provisional application of the Energy Charter Treaty will help attain the objectives of the European Community;
>
> Whereas the European Community has competence for **parts of the Energy Charter Treaty**;
> . . .
> The European Community shall apply on a provisional basis from the time of signature the Energy Charter Treaty to the extent that it has competence for the matters governed by the Treaty. (Emphasis added)[12]

20. The conclusion which flows from these statements is that it is possible to apply only parts of the Treaty and not others – for example Article 26.

*Some views of States during the negotiations of the ECT*

21. Can be quoted here, for example, what the American delegation stated in a fax dated 24 February 1994, during the discussion of the wording of Article 45 (1):

> As I noted during the last plenary, we do not have any legal difficulty with provisional application per se, so long as it is carefully qualified **to ensure that no party is obliged to do, or to refrain from doing, anything for which that party's constitution or law requires an appropriately ratified treaty**. Our law, for example, generally speaking prohibits expenditure of funds to pay the U.S. share of the expenses of an international organization absent the express approval of the Congress. For such reasons language along the lines 'to the extent permitted by its constitution or laws' is essential to any provisional application obligation. (Emphasis added)[13]

22. The same position was reiterated in a fax dated 4 August 1994 from the American Ambassador to the Dutch Ambassador during the finalization of the text of the ECT, on 4 August 1994:

> … most national and subnational laws provide for disputes under those laws to go to the local courts, **not through international arbitration** unless there is special provision. Accordingly I imagine that provisional application does not, by and large, bind the signatory to Articles 30 and 31. But both these are really matters for lawyers. If I am wrong, however, the US position could be eased if there were specific provision in Article 50 under

---

[11] Joint Statement on Article 45 of the European Energy Charter Treaty, made by the Council, Commission, and Member States of the European Community, 14 December 1994, **Exhibit R-9.**
[12] Council Decision of 15 December 1994 on the provisional application of the Energy Charter Treaty by the European Community, **Exhibit RL-157.**
[13] Facsimile from the U.S. Department of State to the Energy Charter Conference Secretariat, 24 February 1994, **Exhibit R-15.**

which a signatory could declare that it is not able to accept provisional application with respect to particular sub-federal bodies or to Articles 30 and 31. (Emphasis added)[14]

*Some general views of States on the limits of provisional application*

23.   The German Foreign Office Guidelines on the Treatment of International Treaties also indicate that some commitments can only be made by the Legislative body and not through an administrative act:

> On the German side, unrestricted provisional application of a treaty may, in principle, only be agreed to if the treaty does not require either parliamentary consent in accordance with Article 59(2) of the German Constitution (Grundgesetz) or any other domestic implementation. **Otherwise, provisional application would infringe the legislature's exclusive sphere of competence.** [...] This question is closely connected with the question of the need for a law granting parliamentary consent to a treaty (treaty law (Vertragsgesetz)): to the extent that treaty provisions trigger the aforesaid requirement, they can, in principle, not be applied provisionally. **The provisional application of a treaty may in such cases only be agreed to, if made dependent on a unilateral statement that the domestic requirements for provisional application are fulfilled, or if it is agreed upon that provisional application is only foreseen within the limits of domestic law.** (Emphasis added)[15]

*Views of an authorized legal commentator of the ECT*

24.   The following comments have quite some weight, as their author was the chair of the legal advisory committee to the Energy Charter Treaty negotiation. It is, therefore, quite striking that both before the entry into force of the ECT for the States that had ratified the Treaty in 1998 and ten years later he expressed some doubts on the applicability on a provisional basis of Article 26.

25.   The first expression of doubt can be found in an article published in 1996:

> It is presently unclear, however, to what extent additional commitments to the Energy Charter Treaty's substantive rights and obligations flow from the Treaty's "provisional" application commitments.
>
> ...
>
> And it should be borne in mind that even after the Treaty has entered into force for at least 30 states, there is no predicting how long it will take before it is in force for all of the signatories, some of whom could continue to apply it "provisionally" for a period of uncertain duration. Thus, it could become important to clarify the duties owed between a Treaty signatory for which the Treaty is in force and one that is applying the Treaty provisionally, the duties owed to their respective investors, and **the extent to which these relationships are subject to the Treaty's dispute settlement mechanisms.** (Emphasis added)[16]

---

[14] Facsimile from the American Ambassador to the Dutch Ambassador, 4 August 1994, **Exhibit R-114**. Article 30 and 31 were to become in the final text Article 26 and 27 relating to Settlement of Disputes respectively between an investor and a Contracting Party and between Contracting Parties.

[15] German Foreign Office Guidelines on the Treatment of International Treaties (RvV) According to § 72 paragraph 6 GGO, p. 27, **Exhibit R-18**.

[16] Craig S. Bamberger, Chapter 27 Epilogue: The Energy Charter Treaty as a Work in Progress, in The Energy Charter Treaty – An East-West Gateway for Investment and Trade, (Thomas Wälde, ed. 1996), pp. 601-602, **Exhibit RL-1**.

26.    The same views were expressed again in 2006:

>    At the present time the ECT is in a phase of "provisional application." The term of course refers to a treaty signatory's commitment to comply with a treaty, **in whole or in part**, before completion of the ratification process. Article 25 of the Vienna Convention allows for provisional application, which can create obligations going beyond those that Article 18 of the Convention imposes to "refrain from acts which would defeat the object and purpose" of a treaty. In states where the Legislative Branch of the Government has not been asked to consent to provisional application, such a commitment often rests on the actual or implied authority of the Executive Branch, the scope of which may not be clear, and which **may be especially problematical as concerns the acceptance of legally binding resolution in an international forum of disputes over domestic matters.** (Emphasis added)[17]

27.    What these writings convey is at least the fact that it was far from self-evident that Article 26 could be applied provisionally.

*Interpretation of the GATT's clause on provisional application*

28.    Because of great similarities between the clauses relating to provisional application in the ECT and in the GATT, it is worth referring to the manner in which the analysis of the consistency of GATT's provisionally applied rules with the internal legal orders has been performed, as excellently presented in the Award:

>    *Provisional application of the GATT.* Article 1 of the Protocol of Provisional Application of the GATT provides that the governments of the signatory states "undertake ... to apply provisionally on and after 1 January 1948:
>
>    (a)    Parts I and III of the General Agreement on Tariffs and Trade; and
>
>    (b)    Part II of that Agreement *to the fullest extent not inconsistent with existing legislation.*"
>
>    This language is not identical to Article 45. It refers to "existing legislation" and not to a signatory state's "constitution, laws and regulations." It also reinforces the primary obligation, by requiring the signatory states to give provisional application "to the *fullest* extent." Nevertheless, the clause sets the link between each state's international law obligations arising by virtue of their agreement to apply the GATT provisionally and their domestic law as determined by the former being "not inconsistent with" the latter.
>
>    In interpreting this requirement, GATT Panels, following a Working Party Report, adopted a construction that required that "the legislation on which [the reliance on the proviso] is based is **by its terms or expressed intent of a mandatory character** – that is, it imposes on the executive authority requirements which cannot be modified by executive action." The proviso did not operate to give priority to all existing legislation. Where such legislation did not prohibit the executive from committing to the provisional application of a rule different to the domestic law, the signatory state was obliged to do so in order to

---

[17] Craig S. Bamberger, Adjudicatory Aspects of Transit Dispute Conciliation Under the Energy Charter Treaty, 3 TDM, April 2006, p. 16, **Exhibit RL-45.**

meet the obligations of Part II GATT in accordance with its agreement to provisional application. (Emphasis added) [18]

## Interpretation in light of the object and purpose of Article 26 of the ECT

29.   When interpreting Article 45 (1), the respective structures of the international legal order and the Russian legal order must not be lost sight of, in order to fully understand the object and purpose of Article 26.

30.   As far as the international legal order is concerned, it must be emphasized that to give a foreign private investor the right to sue a State in which it has invested through a mechanism of investment arbitration is quite an extraordinary commitment. It is indeed of utmost importance not to forget that no participant in the international community, be it a State, an international organization, a physical or a legal person, has an inherent right of access to a jurisdictional recourse. There is no general rule providing a jurisdictional or arbitral forum to implement the substantive rights that might exist at the international level. An arbitral tribunal – just as the ICJ or any international court – does not have a general jurisdiction, **an international arbitral tribunal only has a "***compétence d'attribution***", which has to respect the limits provided for by the States.**

31.   And in order to appreciate how a State gives such exceptional power to an international arbitral tribunal, reference must be made to the national legal order, which distributes the powers among its different components. In the case of Russia – as probably many other States – giving such a consent to international investment arbitration is a prerogative of Parliament either through the enactment of a federal law or the ratification of a treaty, as will be explained in more detail below.

32.   In sum, it results from this approach of the interpretation of Article 45 (1), according to the international principles of interpretation, that this article permits the application of the parts of the Treaty which are consistent with the Russian legal order, and that it must be carefully verified that Article 26 can be a part provisionally applied.

33.   The next step is, therefore, to verify to what extent the Russian legal order permits provisional application of the rules of the ECT, and in particular of Article 26.

## II. THE CONTENT OF THE RUSSIAN LEGAL ORDER

34.   The international rule – Article 45 (1) – provides that the scope of the provisional application of the ECT extends only to the rules which are consistent with the constitution, laws and regulations of the concerned country.

35.   The Award's approach was to first analyze the consequences of provisional application in general [19] and to then verify that this provisional application is not inconsistent with the Russian legal order. It seems to me, however, that the consistency test has to be performed before the consequences of the provisional application are analyzed and not after. The required consistency with the Russian legal order is a condition for the possibility of

---

[18] Award, §§ 224-226. Footnotes omitted. Emphasis added.
[19] That is without a limitation clause.

provisional application not a consequence or afterthought of a performed provisional application.

36.   Therefore, in order to determine whether it is possible to apply provisionally the ECT and, in particular, Article 26, the structure of the Russian legal order has to be examined.

37.   It is necessary to specify here the respective roles played by the national legal order and the international legal order. A mere reading of Article 45 – the international rule – shows that it proceeds to a *renvoi* to the national legal orders. This has been aptly summarized in the Award,[20] when stating that "(d)omestic law is relevant because the international law obligation so provides and then only to that extent."[21]

38.   It is, therefore, necessary to look at the Russian legal order, as the ECT directs. For reasons of procedural efficiency, the analysis will concentrate on the question of whether the provisional application of Article 26 was consistent or not with the Russian legal order.

### The general questions raised

39.   The Award formulated the central issue in the following way:

> The Tribunal considers that the principal issue that arises for its decision under this head is:
>
>> Did Russia's provisional application of the ECT "to the extent that such provisional application is not inconsistent with its constitution, laws or regulations" under the terms of Article 45 (1) include its consent to international arbitration under Article 26 (3) (a)?
>
>> The answer to this issue turns principally on the question whether the application of Article 26 is "not inconsistent with" Russia's "constitution, laws or regulations", since Respondent accepts that, if there were no such inconsistency, there would be a treaty obligation assumed by Respondent to apply that provision on a provisional basis.

---

[20] Award, § 206 (c).

[21] It can be noted here that the *Hulley* tribunal considered that because of the international rule of *pacta sunt servanda*, national law could not be taken into account, which seems to be a complete misunderstanding of what Article 45 provides. This is what the tribunal said, in § 313 of the award: "Under the *pacta sunt servanda* rule and Article 27 of the VCLT, a State is prohibited from invoking its internal legislation as a justification for failure to perform a treaty. In the Tribunal's opinion, this cardinal principle of international law strongly militates against an interpretation of Article 45 (1) that would open the door to a signatory, whose domestic regime recognizes the concept of provisional application, to avoid the provisional application of a treaty (to which it has agreed) on the basis that one or more provisions of the treaty is contrary to its internal law." To the contrary, the Dutch court understood correctly the interplay between international and national law: "Even while it is possible that provisions of national law can stand in the way of the performance of one or more provisions of the ECT, the basis for doing so is encased in the ECT itself – *i.e.*, at treaty level. In other words: a state that relies on a conflict between a treaty provision and national law, on sound grounds and referencing the Limitation Clause, does not act contrary to the *pacta sunt servanda* principle, nor to the principle of Article 27 VCLT." The Hague District Court Judgment dated 20 April 2016, § 5.19.

> The Tribunal is conscious of the fact that this issue is one that has generated differing views in the jurisprudence and difficulty in the doctrine. While remaining fully cognizant of the reasoning set forth in the decisions of other tribunals and of those publicists that have been cited to it, this Tribunal approaches the issue, as it is bound to do, in accordance with its power and duty to decide for itself upon its own jurisdiction. It addresses the question independently in the light of the evidence presented by the Parties before it and of the applicable law as it finds it to be.[22]

40. As far as the methodology adopted is concerned, I follow the same approach as the majority, referring only marginally to the positions of other bodies on the questions raised.

41. In order to answer the question of whether Article 26 was consistent or not with the Russian legal order, two complementary questions can be raised, as indicated in the Award:

> The Tribunal therefore now turns to consider whether, and if so to what extent, such provisional application was "not inconsistent" with the Russian Constitution, laws or regulations
>
> ...
>
> (d) This requires a conflict with **a mandatory rule** that precludes the executive from giving provisional application to Article 26
>
> The Treaty's distinct references to a signatory state's constitution and to its laws directs attention to two distinct ways in which it may be said that the Domestic Law Inconsistency Clause is engaged:
>
> > (i) That the <u>institution</u> of the provisional application of a treaty is itself inconsistent with the state's constitutional arrangements in relation to the assumption of international law obligations under a treaty, because it is in conflict with a mandatory rule of the Constitution that has the effect of preventing the executive from exercising a power to agree to provisional application; or
> >
> > (ii) That the <u>subject-matter</u> of the international law obligation in question conflicts with **a mandatory limitation** imposed by domestic legislation upon the provisional application of the particular type of treaty obligation.[23]

42. A distinction must indeed be made between the consistency with the national legal order of the **procedure** for introducing an international mechanism of investment arbitration in the national legal order and the consistency of such **mechanism itself** with the national legal order.

43. And, in my understanding, the answer to this dual question is that Article 26 providing for investor-State international arbitration is not inconsistent *as such* with the Russian legal order, but that the introduction of this extraordinary mechanism in the Russian legal order by an act of the executive power is required, as will be explained now.

44. The mechanism of international arbitration is well-known and accepted as a mechanism to resolve disputes between a foreign investor and the Russian State. As mentioned in the Award, "(t)he Tribunal received evidence as to the extensive scope of Russia's program

---

[22] Award, §§ 174-176. Footnotes omitted.
[23] Award, §§ 243-246. Emphasis in bold added, underlined in the original.

of investment treaties, in which the Russian Federation does submit to binding international arbitration of disputes between it and foreign investors."[24] It appears from the file that the State has ratified 57 BITs providing for a mechanism of investor-State arbitration. The mechanism in itself is thus not contrary to the Russian legal order.

45.   The same cannot be said of the introduction of such mechanism in the Russian legal order.

**The existence of a mandatory rule prohibiting provisional application of Article 26**

46.   It is sufficient that a rule be inconsistent with either the constitution, or some laws or regulations, in order for such rule not to be able to be provisionally applied.

47.   There has been no submission to the effect that Article 26 would be inconsistent with any Russian regulation. The inquiry is thus limited to the consistency or not of the introduction of Article 26 in the Russian legal order with the Russian constitution or laws.

48.   As the reason for such choice will become apparent in due time, when the analysis of the Russian laws on international investment will have been performed, I start the analysis not with the consistency or not of Article 26 with the constitution, but with the consistency or not of the said provision with some Russian laws dealing with investor-State arbitration.

49.   Applying the same analysis as was performed for the GATT, it must be verified whether there exists in the Russian legal order a law of a mandatory character prohibiting the provisional application of a mechanism of investor-State arbitration, such as the one provided for in Article 26 of the ECT through an executive act.

50.   It can be noted that the Award recognizes that provisional application of a rule would not be consistent with the Russian legal order "where the legislation contains **a mandatory rule** that has the effect of prohibiting the executive from proceeding to give provisional application to the relevant treaty obligation."[25]

51.   I state that such laws exist, and I refer here to the Law on Foreign Investment in RSFSR (Russian Soviet Federative Socialist Republic) of 4 July 1991 (1991 FI Law)[26], and the Law on Foreign Investment in the Russian Federation of 9 July 1999 (1999 FI Law).[27]

52.   First, it must be mentioned that it was the 1991 FI Law which was applicable when the ECT was signed. That Law provided the following:

> Article 9. Dispute Resolution
>
> Investment disputes, including disputes over the amount, conditions and procedure of the payment of compensation, shall be resolved by the Supreme Court of the RSFSR or the Supreme Arbitrazh Court of the RSFSR, **unless another procedure is established by an international treaty in force in the territory of the RSFSR.**

---

[24] Award, § 278.
[25] Award, § 227. Emphasis added.
[26] **Exhibits AVA-35 and AVA-55.**
[27] **Exhibit AVA-36.**

> ...
> International <u>treaties in force</u> in the territory of the <u>**RSFSR**</u> may provide for recourse to international means of resolution of disputes arising in connection with foreign investments in the territory of the RSFSR. (Emphasis added)

53.   The first compelling conclusion is that in 1994, **at the time of the signature** by the Russian Federation of the ECT and its agreement to apply it provisionally to the extent that such provisional application is not inconsistent with its constitution, laws or regulations, **the introduction into the Russian legal order of Article 26 by an act of the executive was inconsistent with the Law on Foreign Investment of the RSFSR of 1991,**[28] which provided that such disputes were in principle to be decided by the Russian court **but could by exception be decided through arbitration, if so provided by a federal law or a treaty in force**, in other words, a ratified treaty. There was absolutely no room in 1994 for the possibility to introduce in the Russian legal order a mechanism of international investment arbitration such as the one provided for in Article 26, through an executive act, because such an introduction needed the intervention of Parliament. In other words, if "international treaties in force in the territory of the RSFSR may provide for recourse to international means of resolution of disputes arising in connection with foreign investments in the territory of the RSFSR," it means that **this cannot be provided by a treaty which is not in force and only applied provisionally.**

54.   The Law on Foreign Investment of the Russian Federation of 1999,[29] which was in force **at the time of the institution of the proceedings**, was adopted in order to acknowledge the replacement of the RSFSR by the Russian Federation, and provides as follows:

> A dispute of a foreign investor arising in connection with its investments and business activity conducted in the territory of the Russian Federation shall be resolved in accordance with **international treaties of the** <u>**Russian Federation**</u> and federal laws in court, arbitrazh court or through international arbitration (arbitral tribunal). (Emphasis added)

55.   I am aware that the law of 1999 does not explicitly refer to treaties in force, but I do not think that this changes the preceding conclusion. Before explaining why, some words should be said here, as a background, on the extremely complex situation created by the end of the RSFSR. A series of agreements have been adopted, and it is not clear exactly when the Russian Federation and the other successor States replaced the RSFSR, but it can be no earlier than 8 December 1991, the date of the Minsk Accords.[30] What is certain is that the 1991 FI Law was dated 4 July 1991, and the 1999 FI Law was dated 9 July 1999, and that between those two dates, the RSFSR disappeared, which explains the need to have a new law replacing the old one. The purpose of the new law was to acknowledge the change of sovereign, not a change in the respective powers of the legislative and executive powers.

---

[28] **Exhibit AVA-35.**

[29] **Exhibit AVA-36.**

[30] See on this issue, Brigitte Stern, *La succession d'Etats*, Hague Academy Collected Courses, *RCADI*, volume 262, La Haye, Kluwer, 2000, p. 220 : « *Quelle est la date de la disparition de l'URSS ?* Est-ce la date des Accords de Minsk – le 8 décembre 1991 – par lesquels trois républiques seulement sur quinze constatent que l'URSS a cessé d'exister ? La date des Accords d'Alma-Ata – le 21 décembre 1991 – où onze républiques prennent la même position ? Ou encore celle du 24 décembre 1991, par laquelle la Russie a fait savoir qu'elle remplaçait l'URSS en vertu du principe de continuité dans son siège de membre permanent du Conseil de sécurité ? Ou encore le 25 décembre, jour de la démission de Gorbatchev ? Ou encore le 26 décembre 1991, date d'une résolution du Parlement soviétique dans laquelle il prend acte de la disparition de l'URSS ? ... »

56.     The reason why the 1999 FI Law does not differ from the 1991 FI Law is, firstly, that
        routinely a reference to an international treaty is a reference to a treaty which is ratified
        or, in other words, in force. A provisional application is something special that needs to
        be mentioned. **A reference to an international treaty, without specification, is, in my
        view, a reference to a treaty which is in force** following a consent given by the different
        methods accepted by international law. The provisional application of a treaty is a
        modality of existence of the treaty as if it were in force, but such a treaty cannot be equated
        to a "treaty of" the relevant country.

57.     Secondly, the context of the adoption of the new law supports this analysis. There is no
        trace in the record indicating that, suddenly, in the 1999 FI Law, the Duma would have
        divested itself of its exclusive existing right to create a mechanism of international
        arbitration under the 1991 FI Law, without specifying clearly such a dramatic change, for
        example in stating in Article 10 that such a mechanism could from now on, in the future,
        be created "by international treaties in force adopted by the Duma or international treaties
        put in provisional application by the Executive" or "by international treaties of the
        Russian Federation, including provisionally applied treaties."

58.     The majority adopts another interpretation of Article 10 of the 1999 FI Law in the Award
        and concludes that because the words "in force" are not there, the concept of international
        treaty contains a treaty that is provisionally applied. But, in my view, the exception – a
        treaty provisionally applied – cannot be included by implication in the rule, lest there
        would be no difference between the rule – a ratified treaty – and its exception – a
        provisionally applied treaty.

59.     If such a Copernican change had occurred between the two laws, no doubt there would
        have been a lot of political discussion as well as many academic papers commenting on
        this major change of paradigm. I am aware of no such document in the file.

60.     There are, however, indicia going in the reverse direction and supporting the view that
        the 1999 FI Law did not introduce any change. In the Explanatory Note of 1997 by which
        the Government submitted the ECT to the Duma in order for it to ratify it,[31] it explained
        that once ratified, "(t)he provisions of the ECT are consistent with Russian legislation."
        And when referring to Russian legislation, the Note makes no difference between the
        existing FI Law of 1991 and the upcoming FI Law under discussion in the Duma, which
        was to become the 1999 FI Law:

                The legal regime of foreign investments envisaged under the ECT **is consistent with the
                provisions of the existing Law** of the RSFSR on Foreign Investments in the RSFSR, **as
                well as with the amended version of the Law** currently being discussed in the State Duma,
                and does not require the enactment of any concessions or the adoption of any amendments
                to the abovementioned Law. (Emphasis added)

        No distinction is made here between the 1991 FI Law and the 1999 FI Law.

---

[31] Explanatory Note to the Draft Federal Law "On Ratification of the Energy Charter Treaty and the Energy Charter
Protocol on Energy Efficiency and Related Environmental Aspects" **Exhibit C-147,** annexed in a different
translation as **Exhibit R-111.**

61.   Although it is sufficient that the introduction of Article 26, through a mere executive act, be inconsistent with the Russian laws on international investment to prevent the provisional application of Article 26 and render the analysis of the consistency with the constitution superfluous, some comments can be made on the approach of this question in the Award.

**The jurisprudence of the Russian Constitutional Court**

62.   The jurisprudence of the Russian Constitutional Court (CC) also has to be taken into account in order to ascertain the content and interpretation of the Russian legal system, as indeed underscored in the Award.[32] The Award relies principally on one decision to analyze the consistency of the introduction of Article 26 in the Russian legal order under Article 23 of the FLIT with the constitution.

63.   In this regard, the Award puts great emphasis on a decision of the Constitutional Court dealing with the provisional application of a treaty.[33] The question raised in that case was the constitutionality of Article 23 (1). This article provides:

> Article 23. Provisional application of international treaties by the Russian Federation
>
> 1. An international treaty or a part of a treaty may, prior to its entry into force, be applied by the Russian Federation provisionally **if the treaty itself so provides** or if an agreement to that effect has been reached with the parties that have signed the treaty. (Emphasis added)

64.   The Award states the following in relation to that case:

> The Tribunal attaches considerable weight to this Ruling of the apex Constitutional Court in the Russian legal system. It concludes from its Ruling that the institution of the provisional application of a treaty or part thereof is constitutionally valid under Russian law and gives rise to rights and duties within the Russian legal system that take precedence over other Russian laws. The Constitutional Court reached this conclusion, construing a treaty that was to be provisionally applied and **contained no domestic law inconsistency proviso**. When addressing the question whether there is a constitutional prohibition on provisional application, the Tribunal regards this Ruling as applicable *a fortiori* to a case, such as the present, where provisional application is subject to a domestic law inconsistency clause. The Ruling confirms that, irrespective of the inclusion or omission of a domestic law inconsistency clause, there is no objection under the Constitution to the provisional application of a treaty establishing rules other than those provided by law. (Emphasis added)[34]

65.   Several comments need to be made here. The first one is that this decision was accompanied by two dissents, which is a factor that might be taken into account with regard to the weight to be attached to the decision of the majority. The second comment is that the decision of the Constitutional Court is not exactly what the majority has summarized when stating that "the provisional application of a treaty or part thereof is constitutionally valid under Russian law and gives rise to rights and duties within the

---

[32] Award, § 244 (i).

[33] Resolution No. 8-P dated March 27, 2012, Upon review of constitutionality of Article 23 (1) of the federal law "On international treaties of the Russian Federation" following the application of I.D. Ushakov, **Exhibit R-35.**

[34] Award, § 258.

Russian legal system that take precedence over other Russian laws" as my colleagues ignored an important *caveat*, which is that the applicability of rules provisionally applied and their precedence over other Russian laws exist only if the provisionally applied rules have been duly published in the same manner as a ratified treaty has to be published, in order to respect the rule of law. This is what the CC said on this question:

> In this regard, direct implementation of provisions of a provisionally applied international treaty of the Russian Federation affecting the rights, freedoms and duties of man and citizen and establishing rules other than those provided by law, shall be preceded, **on a mandatory basis,** by its official publication ...

> The necessity of the official publication of provisionally applied international treaties of the Russian Federation affecting the rights, freedoms and duties of man and citizen and establishing rules other than those provided by law is also dictated by the requirements for certainty, clarity and unambiguity of a legal rule, as well as its consistency with the existing system of legal regulation arising from constitutional principles of a rule-of-law state, supremacy of law, legal equality and justice ... (Emphasis added)[35]

66. There is no evidence, to my understanding, that the ECT has been so published. But more importantly, the only thing that the CC really decided is that Article 23 allowing provisional application of a treaty – without a limitation clause – was not contrary to the constitution, as long as the provisionally applied treaty was published, so that such provisional application is not inconsistent with "the constitutional principle of the rule-of-law state, supremacy of law, legal equality and justice."

67. The CC did not discuss the issue of a treaty with a limitation clause, but the Award considers that the same solution applies. In fact, the third, and probably the most important, comment relates to the application of a decision concerning a treaty without a limitation clause to the very different situation of a treaty with a limitation clause. In my view, the solution of the Constitutional Court is not applicable *a fortiori* to the situation of Article 45 (1), but the reverse solution should apply *a contrario*. Indeed, Article 23 provides for provisional application **if so provided by the treaty.** When there is a limitation clause, the provisional application is not possible if it is inconsistent with the national legal order, and, in my view, the CC should apply Article 45 as a provisionally applicable article and respect the limitations provided there to the provisional application.

68. To illustrate what I consider to be a serious logical error, I think it best to take a more practical example. Firstly, let us take the case of a provisionally applied treaty without any limitation clause saying: "Alcoholic drinks are authorized for everyone." Applying the CC's analysis, this rule could apply even if the Russian legal order contained a rule stating that alcoholic drinks are not authorized under the age of 18, and minors have therefore a right stemming from the treaty to drink alcohol. Secondly, let us then take the case of a provisionally applied treaty with a limitation clause saying: "Alcoholic drinks are authorized for everyone, to the extent it is not inconsistent with the national legal order." Assuming that according to the Russian legal order, alcoholic drinks are not authorized under the age of 18, the reasoning of the Award still implies that even in this

---

[35] Resolution No. 8-P dated March 27, 2012, Upon review of constitutionality of Article 23 (1) of the federal law "On international treaties of the Russian Federation" following the application of I.D. Ushakov, **Exhibit R-35.**

situation, minors can drink alcohol, in violation of the Russian laws. But this conclusion is in plain contradiction with the treaty.

69.   My analysis would be the following: the treaty in this second situation makes a *renvoi* to national law; national law makes a *renvoi* to the treaty, which creates some circularity, which has been at the root of many misunderstandings or misrepresentations of the applicable rules all along in these proceedings. In such situation, as an international Tribunal, we have to give precedence to the treaty and if the treaty says that it does not apply if it is inconsistent with the national legal order, so be it. Going back to my example, in the second situation, contrary to the first one, minors are not allowed to drink alcohol.

70.   In other words, I do not think that the conclusion drawn by the majority from the mentioned decision of the CC is right, and find to the contrary that it confirms that the provisional application according to Russian law (Article 23 (1)) depends on the extent that the ECT allows such application, and, as is not controversial, the ECT only applies provisionally if not inconsistent with the Russian legal order. The conclusion is that Article 26 cannot be applied provisionally, because it is inconsistent with the mandatory rule found in the FI laws requiring a treaty in force as was demonstrated earlier.

71.   In other words, the Russian executive may commit Respondent to the provisional application of treaty provisions that may be inconsistent with domestic law BUT NOT if the Treaty itself says that the provisional application is only possible if it is not inconsistent with the national legal order.

72.   To confirm this evident interpretation, it is interesting to look at the Russian practice vis-à-vis the ECT or provisional application in general.

**The Russian practice towards the provisional application of the ECT**

73.   I will review here the main documents relating to the practice of the Russian Federation, which have been analyzed in the Award. [36]

*Resolution regarding the execution of the Energy Charter Treaty and related documents, 1994*[37]

74.   The first document that should be looked at is the Resolution of the Government of the Russian Federation by which it decided to sign the ECT. All it says is that "[t]he Government of the Russian Federation hereby resolves … **to execute** the Energy Charter Treaty." This is in contrast with the Explanatory Notes relating to the introduction of investor-State disputes in bilateral treaties, which says that these BITs are **ratified**.[38]

---

[36] Award, §§ 234 and ff.

[37] **Exhibit R-23.**

[38] The fact that the annexes to the Note do not deal with Article 26 is irrelevant in my view, as the non-application of Article 26 was necessarily covered by the Limitation Clause. The Declarations were mainly concerned with reservations related to other international law rules, not with internal rules, as this was unnecessary because of the wording of Article 45 (1).

*Note on the Legal Aspects of Provisional Application of International Treaties in Russia, 1997*[39]

75.   According to the Award, this note was "apparently prepared on behalf of the Russian delegation to the Charter Conference of the ECT held in Brussels on 8 July 1997." [40] Some extracts – different from the one cited in the Award at § 236 – are given here:

> From Art. 23 it follows that the treaties, entry into force of which requires certain lengthy procedures in the State (e.g. ratification), can be applied provisionally.
>
> Provisional application means putting the treaty into effect, applying its provisions in reality i.e. performing actions foreseen in the treaty **to the extent provided for in the treaty**.
>
> ... **provisional application until entry into force and implementation of the treaty is not the same**.
>
> ... Art. 31 (3) of the Law is of principal importance. It states that an international treaty is subject to implementation by the Russian Federation from its entry into force for the Russian Federation.
>
> Analysis of **provisional (till entry into force) application** of international treaties by the Russian Federation shows that **in each specific case a detailed study of the legal scope of provisional application** of the treaty is necessary.  (Emphasis added)

76.   This confirms the understanding by the Russian authorities that provisional application of a treaty was different from implementation of a treaty in force. It also suggests that one has to look at the different provisions of the treaty ("a detailed study of the legal scope of provisional application") to see which rules are and which rules are not consistent with the Russian legal order.

*Statement by the Delegation of the Russian Federation to the Energy Charter Conference, 2002*[41]

> The Russian Federation has yet to ratify the Energy Charter Treaty, but as a Signatory Country, it implements the Treaty from the day it entered into force.
>
> We proceed on the premise that the ratification of the Energy Charter Treaty by the Russian Parliament would largely depend on a successful finalization of the Transit Protocol ...

77.   This harmless political statement made in an international conference should not be considered to mean more than what it means. It means indeed that the Russian Federation applies provisionally the Treaty since the treaty has entered into force, not since the treaty has entered into force for the Russian Federation. The Energy Charter Treaty was signed in December 1994 but only entered into legal force on 16 April 1998, by application of its Article 44. What this document means, therefore, is that the Russian Federation applies the ECT, with the limitation clause, since 1998. This document also reiterates simply the distinction between a State, which has only signed the treaty and a State, which has

---

[39] Exhibit C-148.
[40] Award, § 236.
[41] Exhibit C-118.

ratified it, and indicates that it is hoped that a constructive dialogue concerning some protocol to which the Russian Federation was attached would permit the ratification.

*Explanatory Note to the Draft Federal Law "On Ratification of the Energy Charter Treaty, 1997*[42]

78. The Claimant has insisted heavily on this Explanatory Note in order to support its argument according to which the Russian Federation never considered that the introduction of Article 26 by an executive act was contrary to the Russian legal order. The Respondent, on the other hand, has given an explanation according to which the different statements have to be put in context and mean essentially that once ratified, the ECT is consistent with the Russian legal order.

79. This is a Note prepared for the Parliament, in order to encourage it to ratify the ECT. In order to understand it correctly, one must be attentive to its structure in two quite distinct parts: the first part is a background presentation of the ECT at the time it was signed; the second part analyzes all the effects and consequences of the ratification.

80. In the first part of the document, the position of the Russian Federation as a signatory was described as follows:

> Prior to the entry into force of the ECT, the majority of the Contracting Parties agreed to apply the treaty on a provisional basis. In this respect, it was decided that such provisional application of **the ECT would be implemented to the extent that it would not be inconsistent** with the constitution, laws and regulations of the country in question.
>
> **At the time of the signing of the ECT, the provision on provisional application was in conformity with the Russian legal acts.** For that reason, the Russian side did not make declarations as to its inability to accept provisional application (such declarations were made by 12 of the 49 ECT signatories). (Emphasis added)

81. This means indeed that the principle of provisional application limited by the necessity to be consistent with the Russian constitution, laws and regulations was accepted in the Russian legal system. This is indeed so, as, at the time of signature, the RSFSR was applying Article 25 of the VCLT, later embodied in Article 23 of the FLIT cited above. Russia clearly indicates that if the principle of provisional application had not been permitted under Russian law, the State would have made the declaration provided for in Article 45(3).

82. From the textual analysis, it results clearly that what is declared here to be in conformity with the Russian legal system is "the provision on provisional application." It does not say that the different provisions included in the ECT were in conformity with the Russian legal system.

83. In the second part of the Explanatory Note[43], all the benefits of the ratification and the conditions of ratification were enumerated. This part should, in my view, be interpreted

---

[42] Explanatory Note to the Draft Federal Law "On Ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects". **Exhibit C-147**, annexed in a different translation as **Exhibit R-111**.

[43] This second part starts on p. 3 of the document.

so as to mean, first, what will be the benefits of the ECT once ratified and, second, what will be the relation of the ECT once ratified – in other words, once in force – with the Russian legal system.

84.   First, all the benefits are enumerated:

> Ratification of the ECT will contribute to:
>
> - improvement of the investment climate and the creation of conditions for attracting foreign investments …[44]
> - the creation of favorable conditions for export …
> - the acceleration of Russia's accession to the GATT/WTO …
> - the resolution of the problem of transit of energy resources …
> - the facilitation of access of Russian capital to the energy sector of other countries …
> - … and so on
>
> Ratification of the ECT will also enable:
>
> - Russia's national sovereignty over its natural resources
> - Recognition of the transitional state of the Russian economy …
>
> Ratification of the ECT will have a major foreign policy impact …

85.   And after this long list of the benefits of ratification, the Explanatory Note confirms that this ratification does not necessitate any change in the existing laws[45], precisely because these laws authorize the Parliament to provide for international investment arbitration, in the following terms:

> The provisions of the ECT are consistent with Russian legislation.
>
> The ECT provisions touch upon legal principles which are envisaged by such legal acts as the Law of the RSFSR on Foreign Investments in the RSFSR …
>
> The legal regime of foreign investments envisaged under the ECT is consistent with the provisions of the existing Law of the RSFSR on Foreign Investments in the RSFSR, as well as with the amended version of the Law currently being discussed in the State Duma, and **does not require the enactment of any concessions or the adoption of any amendments to the abovementioned Law.** The ECT is also consistent with the provisions of Russian bilateral international treaties on the promotion and protection of investment. (Emphasis added)

86.   As summarized during the hearing by Respondent's counsel, this is a **"post-ratification analysis"[46]**, meaning that, once ratified, the rules of the ECT on arbitration will apply and

---

[44] This benefit post-ratification gives credit to the analysis according to which, before ratification, Article 26 did not improve the investment climate and create conditions for attracting foreign investments.

[45] This has been aptly explained by the Respondent in its Reply, § 193: "Second, Claimant's citation to the statement "[t]*he provisions of the ECT are consistent with Russian legislation*" is misleading and taken out of context. This statement forms part of the Government's assessment whether the ECT's ratification requires the amendment of existing or the enactment of new Russian laws. …"

[46] Hearing, Tr. Day 1, page 39, lines 11-21.

will not be inconsistent with Russian law, as Russian law accepts that international arbitration can be introduced by federal laws or ratified international treaties.[47]

87.    As a consequence of the preceding developments, Article 26 cannot be introduced in the Russian legal order through an administrative act and, therefore, cannot be provisionally applied on the international level. As a consequence, Yukos Capital can have no recourse to investment arbitration, since Article 26 cannot serve as a basis for our Tribunal's jurisdiction. In other words, the conclusion is that the Tribunal has no jurisdiction *ratione temporis*.

### DISSENT ON JURISDICTION *RATIONE MATERIAE*

88.    To make things clear, I am not in disagreement – on the contrary – with the general theoretical analysis of a loan being able to qualify as an investment if it is associated with an economic enterprise. In this sense, I fully agree with the following statement in the Award:

> It is not the case that a loan, considered in isolation, is *ipso facto* an investment; rather ... the critical distinction is the extent to which the loan is linked to an economic venture in the host state.[48]

89.    An investment must be linked with a process of creation of value, which distinguishes it clearly from a sale, which is a process of exchange of value, or a loan, which is a process of selling of money for a given price, in other words, a process of provisional transfer of value for a fixed remuneration. As a consequence, a loan *per se* is not an investment[49], a loan participating in an economic enterprise is an investment.

90.    I am neither in disagreement with the fact that it is irrelevant for purposes of the definition of investment to ascertain the origin of the funds, *i.e.*, whether they are dividends or not, whether they come from the investor's own funds or are borrowed or whether they come from abroad or not. A *caveat* here being that, in this specific case, if the loans themselves were to be requalified as dividends they would not be considered as an investment, a point on which the Claimant agrees.[50] I also agree with the fact that, under the applicable law,

---

[47] This understanding has also been endorsed by the The Hague District Court Judgment dated 20 April 2016, setting aside the Awards in *Hulley Enterprises Ltd/Yukos Universal Ltd (Isle of Man)/Veteran Petroleum Ltd (Cyprus) v. Russian Federation*, in its § 5.60: "Whether or not the ratification of the ECT and more specifically of Article 26 would require and adjustment of Russian legislation, is a wholly different question than the question whether the provisional application of this provision is in accordance with Russian law. The latter question is not answered in the explanatory memorandum."
[48] Award, § 434. I also agree with the references to case law and doctrine to support this view mentioned in §§ 435-437.
[49] This has been in particular stated in *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Award, 9 April 2015, where the bonds of the Greek Government were not considered as an investment, as they were not associated with an economic undertaking: "361. If an "objective" test is applied, in the absence of a contribution to an economic venture, there could be no investment. ... 371. ... under the objective approach of the definition of what constitutes an investment, *i.e.*, a contribution to an economic venture of a certain duration implying an operational risk, the acquisition by Poštová banka of the interests in GGBs would not constitute an investment ..."
[50] See for example, Claimant's Rejoinder, § 126: "A central plank of Respondent's argument that Claimant has no protected Investment under Article 1(6) ECT is its contention that the Yukos Oil Loans are not loans at all, but

and taking into account the facts, the operations by which money was transferred from Yukos Capital to Yukos Oil have to be qualified as loans, and not as dividends.

91.   My dissent is based on the disregard by the majority of the Tribunal of the global legal operation in which the discussed Loans were included, which, in my view, creates an unprecedented twist of the concept of what constitutes an investment protected by international law.

92.   The Award characterizes the central issue relating to jurisdiction *ratione materiae* in the following way:

> Whether the Claimant "own[s]" an "asset" constituted by a "debt of a company" "associated with an Economic Activity in the Energy Sector" in the "Area" of the Respondent such that it has made an "Investment" to which the present dispute with the Respondent "relat[es]."[51]

93.   I would slightly amend this in order to be even more precise by putting the emphasis on the act of investing rather than on the result of such activity:

> Whether the Claimant "own[s]" an "asset", **which it has invested**, constituted by a "debt of a company" "associated with an Economic Activity in the Energy Sector" in the "Area" of the Respondent such that it has made an "Investment" to which the present dispute with the Respondent "relat[es]."

94.   This precision is taken from Article 1(6) of the ECT, which states in relevant part:

> A change in **the form in which assets are invested** does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party **of the Investor making the investment** and that for the Contracting Party **in the Area of which the investment is made** (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date. (Emphasis added)[52]

95.   The Decision in fact acknowledges this aspect,[53] but, in my view does not draw all the consequences of this utmost important element present in Article 1(6) of the ECT, which is the "making" of an investment.  If looked at through this lens, the Loans of Yukos Capital cannot, in my view, be considered as investments.

96.   The conclusion reached in § 513 of the Award, according to which "the Tribunal finds that the Claimant 'own[s]' an 'asset' constituted by a 'debt of a company' 'associated with an Economic Activity in the Energy Sector' in the 'Area' of the Respondent such that it has made an 'Investment' to which the present dispute with the Respondent 'relat[es]'", could seem *prima facie* convincing, especially as the different steps of the reasoning are excellentInly presented, but for the fact that the analysis is stopped one step too early. In other words, the majority's approach would be acceptable if there existed

---

dividends. Claimant does not dispute that if Respondent is correct, the Yukos Oil Loans cannot be characterized as an Investment of the Claimant."

[51] Award, § 419.

[52] The full article 1(6) of the ECT is cited in the Award, § 39.

[53] Award, §§ 448-449.

two sets of completely independent loans, each having its own *rationale*; but the analysis is flawed under the circumstances of this case, because it does not really consider exhaustively the legal construction created by the back-to-back loans.

97. Before analyzing these instruments, it deserves mentioning that the Claimant tried, in a first move, to conceal from the Tribunal, and, in a second move, to ignore the existence of, the back stage loans. Indeed, as is the case in the *Notice of Arbitration*, there is no mention of the back-to-back loans agreements in *Claimant's Counter-Memorial on Jurisdiction*, when presenting the loans which are the basis of the claim.[54] This, in spite of the fact that the Respondent has discovered the scheme and had raised the issue in *Respondent's Memorial on Jurisdiction*. This tends to raise the question whether the existence of the back-to-back loans permits to support the Claimant's argument that it has performed an investment in Yukos Oil.

98. Coming then to the analysis of the back-to-back loans, I will concentrate my comments on the loan flowing from Brittany to Yukos Capital and then to Yukos Oil. I rely here on the citations of the loan contracts which can be found in §§ 502-503 of the Award. A similar analysis on all counts can be performed concerning the loan from Hedgerow.

99. In my view, the two loans are so inextricably linked that they have to be considered as a **unique global unified transaction**: the first loan conditions the second one and *vice versa*. It is indeed a "game of mirrors", but the source of the image is Brittany: the Brittany loan was only made in order to have the Yukos Capital loan made to Yukos Oil, and the repayment or non-repayment of the Yukos Oil debt is immediately reflected in the equivalent repayment or non-repayment of the Yukos Capital debt to Brittany. Not to mention, of course, their concomitance in time, 12 days for the Brittany loan and 1 day for the Hedgerow loan. But the links are far more important than that.

**The two loans from Brittany to Yukos Capital and from Yukos Capital to Yukos Oil were quasi simultaneous**

100. The first loan agreement on which Yukos Capital bases a claim is the loan agreement dated 2 December 2003, in which Claimant agreed to loan Yukos Oil an amount not to exceed RUR 80 billion (US$ 2.7 billion).[55] This loan was linked to a back-up agreement dated a few days earlier, on 20 November 2003.[56]

101. A very similar analysis can be performed for the Hedgerow loan agreement, which was signed on 19 August 2004, only one day before the second loan agreement to Yukos Oil on which the Claimant bases its claim,[57] while the back-up agreement between Hedgerow and Yukos Capital was signed on 18 August 2004.[58] This loan was in an amount not to exceed US$ 355.000.000.

---

[54] There is only a mention of Exhibit C-130 and Exhibit C-131, among many others, in footnote 16 and footnote 307 to illustrate the fact that Yukos Capital entered into more than 40 loans agreements in 2003-2004.
[55] Loan Agreement between Yukos Oil and Yukos Capital, 2 December 2003, **Exhibit C-9.**
[56] Loan Facility Agreement between Brittany Assets Limited and Yukos Capital, 20 November 2003, **Exhibit C-130.**
[57] Loan Agreement between Yukos Oil Company and Yukos Capital, 19 August 2004, **Exhibit C-30.**
[58] Loan Agreement between Hedgerow Limited and Yukos Capital, 18 August 2004, **Exhibit C-131.**

**The two loans from Brittany to Yukos Capital and from Yukos Capital to Yukos Oil had linked purposes**

102.  In the first leg of the operation, the Brittany loan to Yukos Capital, its purpose is already indicated to be in fact the purpose of the second leg, as is made clear by different references in that document, the Lender being Brittany and the Borrower Yukos Oil:

> WHEREAS:
>
> (a) **Borrower intends to provide a loan facility to OAO "NK "YUKOS"** [this is Yukos Oil], a company duly organized and validly existing under the laws of the Russian Federation (hereinafter referred to as **"Sub-Borrower"**), such loan facility to be granted shall not exceed **80'000'000'000-00 (Eighty billion) Russian Rubles**, shall bear interest at the rate of **9% per annum** and shall mature not later than **31st December 2008** (hereinafter referred to as "**Sub-Lending**", and respective loan agreement documenting such Sub-Lending to be hereinafter referred to as Sub-Lending Agreement);
>
> (b) Lender has agreed to make available this Loan Facility on the terms set forth herein.
>
> NOW, THEREFORE, the Parties have agreed as follows:
> ...
> **Advance**
> Shall mean any advance made or to be made by Lender hereunder which **Borrower undertakes to use for Sub-Lending.**
> ...
> **2. Commitments**
> Lender agrees on the terms and conditions herein, to make available to Borrower a loan facility equal to the Facility amount. Lender undertakes to transfer Advances hereunder in US Dollars to the account of Borrower in total Facility amount **in order to make feasible Sub-Lending by Borrower.** (Emphasis added)[59]

103.  Thus, the absolute first thing mentioned in the loan from Brittany to Yukos Capital was that it was made so that Yukos Capital could – and, in fact, had to – lend the money received to Yukos Oil. In other words, the purpose of the agreement was not for Brittany (the Lender) to lend money to Yukos Capital (the Borrower), which could use that money to invest how it deemed fit; **the asserted goal was to lend money to Yukos Oil** (the Sub-Borrower) and this was achieved by linking the two loans together. In the first loan, the final recipient was already nominally designed. The sole purpose of the Lending by Brittany was the Sub-Lending Agreement to Yukos Oil.

104.  This purpose was then fulfilled almost word for word in the Loan from Yukos Capital (the Lender) to Yukos Oil (the Borrower):

> 1. SUBJECT
>
> 1.1 During the term hereof the Lender undertakes to grant to the Borrower interest bearing loans with total amount (hereinafter referred to as "Loan Amount") not exceeding **80'000'000'000-00 (Eighty billion) Russian Rubles** ... and the Borrower undertakes to

---

[59] Loan Facility Agreement between Brittany Assets Limited and Yukos Capital, 20 November 2003, **Exhibit C-130.**

repay such loans and to pay interest for use of funds hereunder at the rate of 9% per annum. (Emphasis added)[60]

105.  In order to fulfill such purpose, some conditions were set forth; some concerning the loan of Brittany to Yukos Capital, some concerning in advance the loan from Yukos Capital to Yukos Oil.

106.  As far as the conditions of the loan from Brittany to Yukos Oil are concerned, the interest was set at 8,9375%. The difference with the forecasted 9% of the Loan from Yukos Capital to Yukos Oil was described during the proceeding as the "spread", whose role will be discussed later.

**The two loans from Brittany to Yukos Capital and from Yukos Capital to Yukos Oil had linked conditions**

107.  As far as the conditions of the second leg of the operation, the Loan from Yukos Capital to Yukos Oil are concerned, these were entirely pre-determined in the first leg of the operation, the Brittany loan to Yukos Capital, in the following terms:

> (a) … such loan facility … shall bear interest at the rate of **9 % per annum** and shall mature not later than **31st December 2008** (hereinafter referred to as "Sub-Lending", and respective loan agreement documenting such Sub-Lending to be hereinafter referred to as Sub-Lending Agreement
>
> **1. Definitions**
>
> **Drawdown Date**
> Means **the day when Borrower transfers funds to Sub-Borrower** at the request of the latter under Sub-Lending Agreement.
> …
>
> **3. Repayments**
> Borrower shall repay the amount outstanding within one Business Day upon redemption of any part of Sub-Lending.
>
> **4. Interest**
> The loan shall accrue interest at **the interest rate determined above with effect from each Drawdown date** for actual number of days elapsed thereupon on the basis of actual calendar year. The interest shall accrue quarterly and shall be payable on the next Business Days upon receipt of respective quarterly interest from Sub-Borrower, or on final Repayment Date together with repayment of last outstanding balance to Lender. (Emphasis added)[61]

108.  These conditions set forth in the first leg were mirrored in the second leg:

> 1. SUBJECT

---

[60]Loan Agreement between Yukos Oil and Yukos Capital, 2 December 2003, **Exhibit C-9.**
[61] Loan Facility Agreement between Brittany Assets Limited and Yukos Capital, 20 November 2003, **Exhibit C-130.**

1.1 ... the Borrower undertakes to repay such loans and to pay interest for use of funds hereunder at the rate of **9% per annum.**

2. RIGHTS AND OBLIGATIONS OF THE PARTIES

2.4. The Borrower undertakes to repay all loans, borrowed hereunder, to the Lender not later than **31st December 2008.** (Emphasis added)[62]

109. All the parameters of the second leg were already pre-determined in the first leg: the identical amounts to be loaned, the rate of interest of the second leg, the maturity date of the loan to Yukos Oil (31 December 2008) and the linked maturity date of the loan to Yukos Capital (2nd January 2009).

**The drawdown dates and the repayment dates of the loan from Brittany are the drawdown dates and the repayment dates of the Yukos Capital Loan to Yukos Oil**

110. Last, but not least, what shows clearly that the two legal instruments are to be construed as **a unique legal operation** is the fact that the drawdown date of the loan from Brittany to Yukos Capital is not the date when the funds are transferred from Brittany to Yukos Capital, as it should be if it were an independent loan, but the date when the funds reach Yukos Oil, through the second Loan; and, therefore, the interests to be paid on the first loan start only to run on the date when the second loan is performed, which is another way of saying that the money from Brittany received only interest when the money reached the final intended recipient, Yukos Oil.

111. It seems clear that, in this scheme, the initial actor as well as the final beneficiary of the whole operation was to be Brittany.

**Yukos Capital has no "right" of its own to the interest on and the repayment of the loans to Yukos Oil protected in international law**

112. The majority based itself on the mere legal ownership to assert that the Claimant has made an investment. The majority considered that the investment of Yukos Oil was its right to interests and repayment of its loan to Yukos Oil, as stated in § 505 of the Award:

> The only person that holds the right to claim repayment of the debt represented by Yukos Capital's loan to Yukos Oil is Yukos Capital. It is Yukos Capital that advances the loans to Yukos Oil under the Yukos Capital Loan Agreement. Yukos Oil's undertaking to repay those loans with interest is made to Yukos Capital alone. Yukos Capital does, therefore, have an economic interest in the Loans, since it is Yukos Capital that holds the debt. (Footnotes omitted)

113. It could indeed be argued, as it is by the majority of the Tribunal, that only Yukos Capital had a "right" to claim the interests and reimbursement of the loan, and that it was the only entity capable under the contractual arrangement with Yukos Oil to sue Yukos Oil for the money. This could *prima facie* seem correct, but it is not if the overall picture is not lost of sight. Again, this is an analysis restricted to the second Loan without any consideration of the first loan.

---

[62] Loan Agreement between Yukos Oil and Yukos Capital, 2 December 2003, **Exhibit C-9.**

114. There are indeed mutual obligations in the loan from Yukos Capital to Yukos Oil:

> 1.1… the Lender [Yukos Capital] undertakes to grant to the Borrower [Yukos Oil] interest bearing loans … and the Borrower undertakes to repay such loans and to pay interest for the use of funds …

> 1.23.1. In the event of non-fulfillment and/or not due fulfilment of obligations hereunder, the Parties shall be liable …

115. In other words, if looked in isolation, this agreement seems to grant to Yukos Capital a right to receive interests and the return of the money loaned, and therefore a claim against Yukos Oil. However, if looked at in the framework of the unified operation, the "right" of Yukos to receive the money back is instantly emptied of any substance as it has the concomitant obligation to hand it the next day to Brittany.

116. To say it differently, the right to sue Yukos Capital, if exercised, would be in favor of Brittany, as it was the entity having the right to recuperate the money that initially flowed from it to Yukos Oil, in passing through Yukos Capital. In other words, **the only "right" that Yukos Capital has is to ask for the money from Yukos Oil in order to transfer it to Brittany**, it does not have a right to receive money for itself, which could be expropriated, it only had the right to collect the interests and recuperate the loan for Brittany. This results from § 3 of the loan from Brittany to Yukos Capital stating that "Borrower (Yukos Capital) shall repay the amount outstanding within one Business Day upon redemption of any part of Sub-Lending (Yukos Oil)."

117. Moreover, if Yukos Oil does not pay, Yukos Capital has no obligation towards Brittany and therefore does not sustain any loss resulting from the non-fulfilment of its repayment to Brittany. This is indeed acknowledged by the majority in § 504:

> … Undoubtedly, Yukos Capital's obligation to repay Brittany only arose if and to the extent that Yukos Oil repaid its debt to Yukos Capital. As between Brittany and Yukos Capital, it is Brittany that bears the risk of default associated with Yukos Capital's loan to Yukos Oil, in terms of Yukos Oil's failure to pay …

118. This was indeed clearly stated in the loan from Brittany to Yukos Capital:

> Lender shall bear all risks associated with Sub-Lending, including, but not limited to the following:

> (a) Failure to pay, which means the failure by Sub-Borrower to make, when and where due, any payments under Sub-Lending Agreement;[63]

119. The substance of Yukos Capital "right" was to transfer whatever it receives from Yukos Oil to Brittany: if it receives nothing, it has to transmit nothing; if it receives something, it must transfer it. For me, this is not a substantial right that can be expropriated. The real owner of the rights and obligations under the set of contracts was Brittany. If Brittany had not lent money to Yukos Capital, the latter had no obligation to lend money to Yukos Oil.

---

[63] Loan Facility Agreement between Brittany Assets Limited and Yukos Capital, 20 November 2003, **Exhibit C-130**.

If Yukos Oil did not repay its loan from Yukos Capital, the latter had no obligation to repay its loan to Brittany.

120. During the Hearing, answering a question on the difference between a legal owner and a beneficial owner, counsel for Respondent answered in the following way:

> One might analogise to beneficial ownership, but I think that the true economic position here is that **Brittany and Hedgerow were the economic actors**, and that, as we've tried to establish in these proceedings, Yukos Capital was just a passive conduit: it received a fee for transmitting funds back to Brittany and Hedgerow if and as it received them." (Emphasis added)[64]

121. Although the Respondent was not entirely clear on its position, it asserted that the true economic actors were Brittany and Hedgerow, and this is sufficient in my view to consider them as the beneficial owners: they were undoubtedly the ultimate beneficiaries of the circular back-to-back arrangement.

122. It is well known that, in cases where the legal title and the beneficial ownership are split, as far as the position of international law towards beneficial owners is concerned, it is quite uncontroversial that international law grants relief to the owner of the economic interest and not to the one having a mere legal title.

123. This is how Elihu Lauterpacht summarized the position of international law on this distinction in his pleadings for Belgium in the *Barcelona Traction* case:

> Precedents recognizes that in cases where there is an apparent division of ownership as between a formal and legal owner, on the one hand, and a beneficial, substantive actual or equitable owner on the other, international law ... has concerned itself with the beneficial, the substantive, the actual, the equitable or the real ownership.[65]

124. It is also important here to quote the *Occidental Petroleum* ad hoc Committee Decision:

> 262. The position as regards beneficial ownership is a reflection of a more general principle of international investment law: claimants are only permitted to submit their own claims, **held for their own benefit**, not those held (be it as nominees, agents **or otherwise**) on behalf of third parties not protected by the relevant treaty. And tribunals exceed their jurisdiction if they grant compensation to third parties whose investments are not entitled to protection under the relevant instrument. (Emphasis added)[66]

125. This means, in my understanding, that the concept of beneficial owner extends the meaning of a nominee or agent beyond the strictly legal concept of such persons, to encompass also persons who are considered to be in a comparable position, which is exactly the situation encountered here.

---

[64] Hearing, Tr. Day 5, page 87, lines 9-15.
[65] *Barcelona Traction, Light and Power Co., Ltd. (New application) (Belgium v. Spain)*, Merits, Second Phase, Judgment, 5 February 1970, I.C.J. REPORTS, Pleadings, 1970, p. 444.
[66] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 November 2015.

126. The Claimant did not have the full legal right to use and enjoy either the loan that was granted to it or the debt that Yukos Oil had towards it, as it was constrained by intertwined contractual obligations, which made Brittany the initial actor of the loan to Yukos Oil and the ultimate beneficiary of the debt of Yukos Oil. It cannot, in my view, be denied that Yukos Capital was a mere passive conduit company, having no autonomous right to enforce.

127. It appears that indeed counsel for Claimant has recognized as much during the Hearing, when he insisted on the unique relevance of legal ownership and stated: "Yukos Capital is an investor under this treaty, and the fact that the beneficial owner is somebody else is irrelevant."[67]

128. I consider that this montage is not far from the situation of the kind successfully raised in *KT Asia*[68] that would support a finding that the investment company is a shell or conduit used to conceal[69] the identity of the true beneficial owner.[70]

**Yukos Capital has no right to the "spread" provided for in the Loan, which is not an investment protected in international law**

129. It could also be argued, as has been done by the majority, that Yukos Capital had a "right" to the spread as an investor having made an investment. One of the arguments relied upon in the Award is indeed that "(i)n addition, the Claimant holds the right to its own return on the Loans, the loss of which it risked in the event of the failure of Yukos Oil, being the spread or difference between the interest that it earned and that was earned by Brittany/Hedgerow."[71]

130. This could seems again *prima facie* correct, but a closer look at the global operation gives another picture.

131. The spread represents one sixteenth of one per cent or 0.0625% of the sums of money loaned under the 2003 Brittany/Yukos Capital/Yukos Oil loan and one thirty-second of one per cent, or 0.03125% of the sums of money loaned under the 2004 Hedgerow/Yukos Capital/Yukos Oil loan.

132. The spread was not the result of the investment. The result of the investment – if there had been an investment – would have been an interest of 9%. If Yukos Capital had made by contract a loan of money A obtained through a loan B in an entirely distinct loan contract, it could indeed be said that it earned an interest of 9% on loan A and could use that money to reinvest or to repay the other loan B. However, this is not the result of the working together of the two linked back-to-back contracts. What mechanism did they create? They created a differential mechanism: the spread has to be considered for what it is: it is the payment of the service rendered by Yukos Capital (for non-illegitimate tax purposes) to the Yukos group, the service of shifting forth and back certain sums of money from Brittany to Yukos Oil and from Yukos Oil to Brittany. Further, the amount

---

[67] Hearing, Tr. Day 5, page 205, lines 3-5.

[68] *KT Asia Investment Group B.V. v. Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013.

[69] See what is stated on this issue in § 11 of this Opinion.

[70] Contrary to the analysis in § 510 of the Award.

[71] Award, § 509.

of the payment of this service was in fact, according to counsel for Respondent, "the tariff that was charged by Luxembourg for the privilege of using it for its tax advantages, not for any economic motivation or purpose in the transaction."[72] As the Award acknowledges in § 326:

> The Respondent submits that the spreads were calculated to be the minimum necessary to achieve approval of the arrangements from the Luxembourg tax authorities and avoid the risk of the tax authorities imputing to Yukos Capital receipt of a larger spread based on transfer pricing rules. Thus, the spread declined between the 2003 and 2004 loans because the tax authorities agreed in the interim that the lower spread was acceptable.

133. Moreover, it clearly appears that **Yukos Capital was only entitled to this money, if it fulfilled the whole cycle** of conveying the money from Brittany/Hedgerow to Yukos Oil and back to Brittany/Hedgerow. The spread was not a profit on the Loan, it was not a return on an investment; it was a payment which was independent of the loan, a remuneration for being an intermediary. Being a passive intermediary is not "making an investment."

134. There have been divergent analyses of whether the loss of the spread was a risk taken by Yukos Capital.

135. Looking at the loan from Brittany to Yukos Capital, it appears clear to me that the risk of the loss of the spread was not to be borne by Yukos Capital. As already mentioned,[73] it provided that:

> Lender shall bear **all risks** associated with Sub-Lending, including, but not limited to the following:
>
> (a) **Failure to pay**, which means the failure by Sub-Borrower to make, when and where due, any payments under Sub-Lending Agreement; (Emphasis added)

136. The loss of the spread was included generally in the reference to "all risks" and was more precisely linked to the "failure to pay" by the Sub-Borrower, *i.e.*, Yukos Oil.

137. It is worth noting here the following exchange between my co-arbitrator and counsel for Respondent concerning the risks assumed by Brittany:

> Q. Does that capture any failure to receive the spread?
>
> A. Yes, because it's any payments under the sub-lending arrangement, and the spread only arises if there are payments under the sub-lending arrangement and then a repayment to Brittany.
>
> Q. So there's no risk of not achieving the profit?
>
> A. As I read those terms, that's correct.
>
> Q. When I say there's no risk associated, it's a question, and you are answering that that is correct?

---

[72] Hearing, Tr. Day 5, page 73, lines 5-9.
[73] In § 118 of this Opinion.

A. Correct.[74]

138. This is corroborated, in my view, by the fact that it is indeed the entity Fair Oaks to which the 2003 Brittany Agreement and 2004 Hedgerow Agreement were assigned, which is paying for the expenses linked with the recovery of the so-called "right" of Yukos Capital. This was explained by Respondent, and not denied by Claimant:

> Consistent with Yukos Capital's lack of an economic interest in the "Loans," the record shows that Yukos Capital's litigation efforts have been paid for by other Yukos Group subsidiaries. For instance, in November 2010, Yukos Capital and Fair Oaks entered into a so-called "*Loan Agreement*" by which Fair Oaks gave Yukos Capital US$ 10 million interest free, for Yukos Capital to pay lawyers ("2010 Fair Oaks Agreement"). The stated reason for this arrangement was that "*in accordance with Section 5 of the Loan Agreements, Lender has agreed to bear all risks associated with Sub-Loans and to indemnify Borrower* [Yukos Capital] *for legal and related expenses involved with the recovery thereof and to compensate Borrower for legal and related expenses incurred by Borrower in the course of seeking remedies for the default of Sub-Borrowers*.[75]

139. There is a strong presumption that the entity paying to vindicate a right is the person to whom this right belongs. No compelling element has been submitted to reverse this presumption.

140. In conclusion, the Claimant cannot be considered as having made an autonomous investment and the Tribunal, in my view, has no jurisdiction *ratione materiae* to deal with the case. Were it to grant the relief requested by Claimant, the latter is, in the framework of the global operation analyzed so far, under the concomitant contractual obligation to hand it over to Brittany/Hedgerow. It is particularly important in this case to delineate precisely the rights at stake, as the Tribunal has no jurisdiction over the rights of Brittany or Hedgerow, as they are not parties to this arbitration.

141. The importance of the respect of the limited jurisdiction of international arbitral tribunals – whether jurisdiction *ratione personae* or *ratione materiae* – has been aptly emphasized by the *Occidental Petroleum* ad hoc Committee Decision:

> 263. This subjective limitation of ICSID jurisdiction is a natural consequence of international investment law. Arbitral tribunals are not courts of justice holding unfettered jurisdiction. The role of arbitral tribunals is not to redress torts worldwide. Arbitral tribunals are instruments created by and subject to the consent of States, as formalized in the relevant instrument, and are only empowered to adjudicate disputes between protected investors and consenting States. Other disputes are outside their remit. Investors cannot expand the jurisdiction *ratione personae* of arbitral tribunals by executing private contracts with third parties.

> 264. Specifically, protected investors cannot transfer beneficial ownership and control in a protected investment to an unprotected third party, and expect that the arbitral tribunal retains jurisdiction to adjudicate the dispute between the third party and the host State. To

---

[74] Hearing, Tr. Day 1, page 59, lines 11-20.
[75] Respondent's Reply, § 228 citing the 2010 Fair Oaks Agreement, Fifth Whereas Clause, **Exhibit R-119**.

hold the contrary would open the floodgates to an uncontrolled expansion of jurisdiction *ratione personae*, beyond the limits agreed by the States when executing the treaty. [76]

142. To be clear, the conclusion that the Tribunal has no jurisdiction *ratione materiae* in this case is not the result of the application of a so-called theory or doctrine of substance over form; it is the result of an objective analysis of the concrete result in real life of the legal structuring of the linked loans.

Geneva, Switzerland

Date: 22 December 2016

Brigitte Stern.
_____

Professor Brigitte Stern

---

[76] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 November 2015.