IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Yukos Capital Limited
(f/k/a Yukos Capital S.à.r.l.),

        *Petitioner*,

   v.

The Russian Federation,

        *Respondent*.

**Civil Action No. 1:22-cv-00798-CJN**

**<u>Petitioner Yukos Capital Limited's Reply in Support of Its Motion for Default Judgment and Opposition to Respondent's Cross-Motion to Set Aside the Default</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

GLOSSARY ..................................................................................................................... ix

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 4

I.    The Clerk Properly Entered Default Under Rule 55(a) .................................................. 4

II.    Russia Fails To Show "Good Cause" To Set Aside The Default Under Rule 55(c) ...................................................................................................................... 7

    A.    Russia's Default Was Willful Because It Received Notice Of This Enforcement Action But Failed To Timely Respond ............................................ 7

    B.    Yukos Capital Would Be Prejudiced In Its Efforts To Enforce The Arbitral Award If Russia's Default Were Set Aside .......................................... 12

    C.    Russia Fails To Identify Any Plausible Defenses On The Merits That Have Not Already Been Litigated And Rejected ............................................... 15

        1.    Russia's Underlying Arguments Were Already Raised And Rejected ...... 17

        2.    Russia Cannot Relitigate Its Failed Arguments By Reframing Them As Jurisdictional Defenses Under The FSIA .............................................. 29

        3.    Russia Cannot Relitigate Its Failed Arguments By Reframing Them As Defenses Against Confirmation Under The New York Convention. ... 43

    D.    Equitable Factors Do Not Warrant Setting Aside Russia's Default .................. 43

III.    The Court Should Enter Default Judgment In Favor Of Yukos Capital ..................... 45

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africa Growth Corp. v. Republic of Angola,*
    2018 WL 6329453 (D.D.C. Dec. 3, 2018)...............................................................14

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 428 (1989)...........................................................................................32, 33

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................................16

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
    668 F.3d 724 (D.C. Cir. 2012)...................................................................................15

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
    794 F.3d 99 (D.C. Cir. 2015).....................................................................................35

*Bell v. Davis,*
    430 F. Supp. 3d 718 (D. Or. 2019) .............................................................................5

*Belmont Partners, LLC v. Mina Mar Grp., Inc.,*
    741 F. Supp. 2d 743 (W.D. Va. 2010) .......................................................................41

*BG Grp., PLC v. Republic of Argentina,*
    572 U.S. 25 (2014).....................................................................................................30

*Binns v. City of Marietta Hous. Auth.,*
    2007 WL 2746695 (N.D. Ga. Sept. 18, 2007) ............................................................8

*Blue Ridge Invs., L.L.C. v. Republic of Argentina,*
    735 F.3d 72 (2d Cir. 2013).................................................................................32, 34

*Bonte v. U.S. Bank, N.A.,*
    624 F.3d 461 (7th Cir. 2010) ....................................................................................35

*Cabiri v. Gov't of Republic of Ghana,*
    165 F.3d 193 (2d Cir. 1999).......................................................................................31

*CapitalKeys, LLC v. Democratic Republic of Congo,*
    2020 WL 7029934 (D.D.C. Feb. 14, 2020) ..............................................................44

*Chevron Corp. v. Republic of Ecuador,*
    795 F.3d 200 (D.C. Cir. 2015)........................................................................36, 38, 39

*Chevron Corp. v. Republic of Ecuador*,
   949 F. Supp. 2d 57 (D.D.C. 2013) ........................................................................36

*Chiejina v. Fed. Republic of Nigeria*,
   2022 WL 3646377 (D.D.C. Aug. 24, 2022) ....................................................38, 39, 40

*ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venezuela*,
   2022 WL 3576193 (D.D.C. Aug. 19, 2022) ...........................................................7, 32

*Creighton Ltd. v. Government of State of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) .......................................................31, 32, 33, 34

*Crestek, Inc. & Subsidiaries v. IRS*,
   322 F. Supp. 3d 188 (D.D.C. 2018) ....................................................................35

*Durso v. Mod. Food Ctr., Inc.*,
   2019 WL 2150424 (S.D.N.Y. May 17, 2019) ....................................................15, 43

*Egypt Dep't of Def. v. Alboghdady*,
   2021 WL 3737682 (D.D.C. Aug. 24, 2021) ...........................................7, 9, 10, 11

*Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*,
   406 F. Supp. 3d 84 (D.D.C. 2019) ................................................................14, 44

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
   844 F.3d 281 (D.C. Cir. 2016) ...........................................................................30

*Est. of Scherban v. SunTrust Bank*,
   2016 WL 10749642 (D.D.C. Jan. 4, 2016) .............................................................9

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
   156 F.3d 310 (2d Cir. 1998) ...............................................................................42

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995) ...............................................................................36, 38

*Flanagan v. Islamic Rep. of Iran*,
   190 F. Supp. 3d 138 (D.D.C. 2016) .......................................................................7

*Flynn v. Pulaski Constr. Co.*,
   2006 WL 3755218 (D.D.C. Dec. 19, 2006) ............................................................7

*Gilmore v. Palestinian Interim Self-Government Auth.*,
   675 F. Supp. 2d 104 (D.D.C. 2009) .....................................................................14

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*,
   146 F. Supp. 3d 112 (D.D.C. 2015) .....................................................................30

*In re Grant*,
 635 F.3d 1227 (D.C. Cir. 2011) ................................................................32

*Gray v. Staley*,
 310 F.R.D. 32 (D.D.C. 2015) ...................................................................14

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
 139 S. Ct. 524 (2019) ...............................................................................36

*Hicks v. Miranda*,
 422 U.S. 332 (1975) ..................................................................................32

*Hulley Enters. v. Russian Federation*,
 2022 WL 1102200 (D.D.C. Apr. 13, 2022) .......................................13, 14

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
 474 F. Supp. 2d 19 (D.D.C. 2007) ......................................................41, 42

*Imperial Ethiopian Gov't v. Baruch-Foster Corp.*,
 535 F.2d 334 (5th Cir. 1976) ....................................................................15

*Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*,
 288 F. Supp. 2d 22 (D.D.C. 2003) ............................................................16

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*,
 763 F. Supp. 2d 12 (D.D.C. 2011) ......................................................15, 30

*Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*,
 744 F.2d 118 (D.C. Cir. 1984) ..................................................................42

*John v. Sotheby's, Inc.*,
 141 F.R.D. 29 (S.D.N.Y. 1992) ...................................................................6

*Keegel v. Key W. & Caribbean Trading Co.*,
 627 F.2d 372 (D.C. Cir. 1980) .......................................................7, 12, 15

*Khochinsky v. Republic of Poland*,
 2019 WL 5789740 (D.D.C. Nov. 6, 2019) ................................................44

*Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*,
 514 F. Supp. 3d 20 (D.D.C. 2020) ............................................................13

*Konoike Constr. Co. v. Ministry of Works, Tanzania*,
 2019 WL 1082337 (D.D.C. Mar. 7, 2019) .....................................13, 14, 15

*LLC Komstroy v. Republic of Moldova*,
 2019 WL 3997385 (D.D.C. Aug. 23, 2019) ..............................................37

*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021) ................................................................................ 37, 38, 39

*Maurizi v. Callaghan*,
    2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022) ..................................................................... 11

*McMillen v. J.C. Penney Co.*,
    205 F.R.D. 557 (D. Nev. 2002) .......................................................................................... 6

*Meyers v. Pfizer, Inc.*,
    581 F. App'x 708 (10th Cir. 2014) ...................................................................................... 5

*Mgmt. & Tech. Consultants S.A. v. Parsons-Jurden Int'l Corp.*,
    820 F.2d 1531 (9th Cir. 1987) ......................................................................................... 29

*Nat'l Rest. Ass'n Educ. Found. v. Shain*,
    287 F.R.D. 83 (D.D.C. 2012) ............................................................................. 14, 15, 16, 43

*Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*,
    990 F.2d 957 (7th Cir. 1993) .......................................................................................... 42

*Nippon Shinyaku Co. v. Iancu*,
    369 F. Supp. 3d 226 (D.D.C. 2019) .................................................................................... 9

*OJSC Ukrnafta v. Carpatsky Petroleum Corp.*,
    957 F.3d 487 (5th Cir. 2020) .......................................................................................... 42

*Ottley v. Schwartzberg*,
    819 F.2d 373 (2d Cir. 1987) ........................................................................................... 15

*Owens v. Sudan*,
    374 F.Supp.2d 1 (D.D.C. 2005) ......................................................................................... 7

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013) ................................................................................................... 35

*Patrick v. Local 51, American Postal Workers Union, AFL-CIO*,
    2020 WL 2192682 (S.D.N.Y. May 6, 2020) ........................................................................... 11

*Preston v. Ferrer*,
    552 U.S. 346 (2008) ................................................................................................... 30

*Princz v. Fed. Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ......................................................................................... 31

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    506 F. Supp. 3d 1 (D.D.C. Dec. 4, 2020) .............................................................................. 32

*Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*,
   27 F.4th 771 (D.C. Cir. 2022) ................................................................................32

*Rent-A-Ctr., W., Inc. v. Jackson*,
   561 U.S. 63 (2010) .......................................................................................35, 38, 39

*S & Davis Int'l, Inc. v. Republic of Yemen*,
   218 F.3d 1292 (11th Cir. 2000) ...........................................................................33

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ...............................................................................................30

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
   Kommanditgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993) .................................................................................32

*Simon v. Republic of Hungary*,
   2012 WL 13069771 (D.D.C. Sept. 30, 2012) ......................................................9

*In re Smith*,
   463 B.R. 144 (Bankr. D.D.C. 2012) ......................................................................6

*Stati v. Republic of Kazakhstan*,
   199 F. Supp. 3d 179 (D.D.C. 2016) .....................................................................32

*Stati v. Republic of Kazakhstan*,
   302 F. Supp. 3d 187 (D.D.C. 2018) .....................................................................39

*Tatneft v. Ukraine*,
   301 F. Supp. 3d 175 (D.D.C. 2018) .....................................................................30

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019) .........................................................31, 32, 33, 34

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) .............................................................................40

*Tethyan Copper Co. PTY Ltd. v. Islamic Republic of Pakistan*,
   590 F. Supp. 3d 262 (D.D.C. 2022) ................................................................38, 39

*Zisman v. Sieger*,
   106 F.R.D. 194 (N.D. Ill. 1985) .............................................................................9

**Foreign Judicial and Administrative Decisions**

*HVY v. The Russian Federation*, Court of Appeal of The Hague,
   200.197. 079/01, Feb. 18, 2020, tinyurl.com/yckvatap .......................................28

*The Russian Federation v. HVY*,
  Public Attorney's Office at the Supreme Court, ECLI:EN:PHR:2021:425,
  Apr. 24, 2021, tinyurl.com/ym9cz337 ........................................................................28, 29, 42

*Moldova v. Komstroy*,
  EUCJ Case No. C-741/19 (Sept. 2, 2021) ...........................................................................25

**Arbitration Decisions**

*Hulley Enters. Ltd. (Cyprus) v. Russian Federation*,
  PCA Case No. 2005-03/AA226, Interim Award (Nov. 30, 2009),
  tinyurl.com/az83m498 ......................................................................................................12, 28

*Loewen Group, Inc. v. United States*,
  ICSID Case No. ARB(AF)/98/3, Award (June 26, 2003) ......................................................22

*Luxtona v. Russia*,
  PCA Case No. 2014-09, Interim Award on Jurisdiction (Mar. 22, 2017),
  tinyurl.com/mr2kxmtw ..........................................................................................................29

*Standard Chartered Bank v. Tanzania*,
  ICSID Case No. ARB/10/12, Award (Nov. 2, 2012)........................................................24, 25

**Statutes and Rules**

9 U.S.C. § 201 ...............................................................................................................................29

9 U.S.C. § 207 ...............................................................................................................................29

28 U.S.C. § 1330(a) .......................................................................................................................30

28 U.S.C. § 1605(a)(1).............................................................................................................3, 31, 34

28 U.S.C. § 1608(a)(3)......................................................................................................................1, 8

28 U.S.C. § 1605(a)(6).............................................................................................................3, 34, 35

28 U.S.C. § 1608(d) ........................................................................................................................5, 9

D.C. Cir. R. 32.1(b)(1)(B).............................................................................................................32

Fed. R. Civ. P. 12(a) .......................................................................................................................5

Fed. R. Civ. P. 12(b)(5)....................................................................................................................8

Fed. R. Civ. P. 12(g)(2)....................................................................................................................8

Fed. R. Civ. P. 12(h)(1)(A)...............................................................................................................8

Fed. R. Civ. P. 55(a) ...........................................................................................5, 6

LCvR 5.4(a) ...........................................................................................................6

Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law
    Accountability Act of 2012, H.R. 6156-9, Title IV, § 402(a)(13)...........................44

**Treaties**

Energy Charter Treaty, art. 1 ...............................................................................27, 28

Energy Charter Treaty, art. 26 ............................................2, 17, 18, 27, 28, 29, 35, 37

Energy Charter Treaty, art. 45 .....................................................2, 17, 18, 20, 29

N.Y. Convention, art. III...........................................................................................29

N.Y. Convention, art. V ...........................................................................................30

**Treatises**

5B Federal Practice & Procedure § 1353 (3d ed.) ...........................................................9

10A Federal Practice & Procedure § 2682 (4th ed.)........................................................5

**Other Authorities**

*Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin.*
    *Law & Gov. Relations of the H. Comm. on the Judiciary,* 99th Cong. 92 (1986)..................33

*Claim of Am. Sec. & Tr. Co.,* Claim No. HUNG-20,540, Decision No. HUNG-51,
    U.S. Foreign Claims Settlement Commission (Mar. 20, 1957) ...................................21

Maxi Scherer, *Effects of Foreign Judgments Relating to International Arbitral Awards:*
    *Is the 'Judgment Route' the Wrong Road?* J. Int'l Dispute Settlement 587 (2013) ...............41

Restatement (Third) U.S. Law of International Commercial Arbitration,
    Proposed Final Draft § 4.8 (2019). .......................................................................41

Restatement (Third) U.S. Law of International Commercial Arbitration,
    Proposed Final Draft § 4.23 (2019) ......................................................................42

U.S. Embassy & Consulates in Russia, *G7 Foreign Ministers' Statement on the Illegal*
    *Annexation of Sovereign Ukrainian Territory* (Sept. 30, 2022), tinyurl.com/wzpadp ...........10

White House, *Remarks by President Biden on Russia's Unprovoked and*
    *Unjustified Attack on Ukraine* (Feb. 24, 2022)........................................................10

## GLOSSARY

**1991 FIS** ................................................................1991 Law on Foreign Investments in the RSFSR

**1999 FIS** ......................................... 1991 Law on Foreign Investments in the Russian Federation

**ECT**…………………………………………………………...……………Energy Charter Treaty

**FSIA**……………………………………………………………...Foreign Sovereign Immunities Act

**ICSID**…………………………..………International Centre for Settlement of Investment Disputes

**PCA**…………………………………………………………………….Permanent Court of Arbitration

## INTRODUCTION

Petitioner Yukos Capital Limited ("Yukos Capital") has waited nearly two decades for relief from Russia's expropriation of its loans to Yukos Oil Company ("Yukos Oil"). Yukos Capital initiated arbitration nearly a decade ago; the arbitral tribunal (the "Tribunal") issued its $5,033,254,794.28 arbitral award (the "Final Award," ECF No. 1-2, at 1-316) more than a year ago; and the Swiss Supreme Court—which has primary jurisdiction over the award because the arbitration was seated in Switzerland—denied Russia's motion to set aside the Final Award this past August. Yet Russia stubbornly refuses to pay.

Instead, Russia has seized every opportunity to delay this enforcement proceeding. Though Russia concedes that it has been aware of this action since late June, when Yukos Capital effected service of process through the Clerk of this Court pursuant to § 1608(a)(3) of the Foreign Sovereign Immunities Act ("FSIA"), Russia failed to timely respond to Yukos Capital's enforcement petition. Instead, it waited until after Yukos Capital requested entry of a default judgment. Only then did Russia move to dismiss, raising meritless objections to service of process that it plainly received. Now that the Clerk has entered Russia's default, and Yukos Capital has moved for default judgment, Russia has also filed this motion to set aside the default.

Russia's motion makes clear that if the default is lifted, Russia intends to continue to delay enforcement in every way possible, including by seeking to retry "*de novo*" large swaths of the issues that it raised and lost in the arbitration. RF Br. 16-17. If allowed to retry these issues, there is no doubt that Russia will drag out that process in every way possible to avoid paying its lawful debts—undercutting the speed and efficiency that international arbitration is designed to achieve—including by seeking a prolonged period of discovery and attempting separate trips to the D.C. Circuit first on jurisdictional issues and then on the merits arguments that it hopes to "reserve[e]" for later in the case. *Id*. at 42. Holding Russia to its default and granting Yukos Capital's motion

1

for default judgment is the only way to avoid that delay.

Russia's motion also makes clear that Russia has no meritorious defense and that Yukos Capital is in fact entitled to judgment.  Put to its burden of proving that is has meritorious defenses, Russia has now laid out the legal arguments it intends to pursue if its default is set aside.  Not surprisingly, however, Russia's attempt to articulate those defenses succeeds only in confirming that it has no new arguments to offer.  Instead, Russia spends the bulk of its brief rehashing the same arguments—supported by precisely the same points and authorities—that it raised unsuccessfully in the arbitration and in its failed attempt to set aside the Award in Swiss courts.

Beginning in its Introduction and Background section, for example, Russia doubles down on the same, thoroughly discredited agitprop campaign that the Kremlin used to justify its unlawful expropriation of Yukos Capital's loans after Yukos Oil's Chairman and controlling shareholder openly criticized Vladimir Putin's regime in 2003.  Russia casts the loans as part of an illegal tax scheme, but the Tribunal rejected these allegations, finding no evidence that the loans were part of a "scheme established with the criminal intent to evade Russian tax," Final Award ¶ 558, and concluding instead that Russia's actions against Yukos Capital were part of an "orchestrated campaign" to "deprive companies in the Yukos Group of their property."  *Id.* ¶¶ 465, 475.

Piggybacking off of these discredited allegations, Russia's merits arguments each seek to relitigate objections to the Tribunal's jurisdiction that Russia raised in the arbitration and in Swiss court.  The Tribunal grounded its jurisdiction on two provisions of the Energy Charter Treaty (ECF No. 1-5, "ECT"):  Article 26, which provides for arbitration of investment disputes under the treaty, and Article 45(1), by which signatories to the ECT agreed to apply the treaty on a provisional basis prior to ratification, except to the extent that doing so would be "inconsistent with [their] constitution, laws, or regulations."  ECT, art. 45(1).  Russia argues that the Tribunal lacked

jurisdiction for three reasons:  (1) the ECT's arbitration clause did not apply to Russia provisionally because such application was inconsistent with Russia's constitution and laws; and the underlying dispute fell outside of that arbitration provision because (2) Yukos Capital was not a qualifying investor; and (3) Yukos Capital's loans were not qualifying investments.

The immediate problem with these arguments is that they track directly the arguments that Russia raised in the arbitration.  Indeed, at many points, Russia's principal authority for these arguments is a citation to its arbitration briefs or to dissenting opinions from the arbitration.  The Tribunal carefully considered Russia's arguments and soundly rejected them in two opinions with hundreds of pages of detailed analysis.  Russia then raised two of its three arguments to the Swiss Supreme Court in moving to set aside the Final Award—while forfeiting the third—and that Court again rejected those arguments in a 75-page decision.

The rest of Russia's merits discussion is devoted to arguing that the FSIA requires this Court to reconsider these three underlying arguments *de novo* despite the Tribunal and Swiss Supreme Court decisions rejecting them.  But that premise is simply incorrect, and is foreclosed by controlling D.C. Circuit precedent, which makes clear that this Court has subject-matter jurisdiction under both the FSIA's waiver exception and its arbitration exception, 28 U.S.C. § 1605(a)(1), (6), without regard to Russia's collateral attack on the Tribunal's jurisdictional rulings.  The result, therefore, is that Russia's merits arguments are futile, and lifting the default would only prolong the inevitable at the cost of significant delay and wasted litigation expenses and judicial resources.

In these circumstances, this Court has ample discretion to deny Russia's motion to lift the default and grant Yukos Capital's motion for default judgment.  Though Russia denies that it defaulted—citing its attempt to file a motion to dismiss for lack of service of process a few hours before the Clerk entered default—it ignores that the deadline to respond to Yukos Capital's

enforcement petition had already expired eleven days earlier.  Russia's failure to respond by that deadline establishes its default, so Russia's only remedy is to move under Federal Rule of Civil Procedure 55(c) to set aside the default for good cause.  "[G]ood cause," in turn, requires Russia to show that its default was not willful, setting aside the default would not prejudice Yukos Capital, and Russia has meritorious defenses.  But Russia's excuses for its default—which include the acknowledged fallout from its unlawful war of aggression against Ukraine—are insufficient.  And lifting the default currently in place would significantly prejudice Yukos Capital, especially given the additional hurdles to enforcing a judgment in the face of worldwide sanctions against Russia as a result of that same war.  In any event, the bottom line is that lifting the default would serve no purpose, as Russia has no plausible defense against confirmation of the Award by this Court.  This Court accordingly should not hesitate to deny Russia's motion and enter default judgment.

Alternatively, should the Court determine that that this action should not be resolved on default judgment and should proceed to the merits phase, Russia should be ordered to accept service in exchange for default being lifted.  There is no reason why Russia should need to be served anew via diplomatic channels, when it has already appeared in this action.  The parties should be able to proceed directly to relitigating Russia's jurisdictional defenses, if necessary.

## ARGUMENT

## I.      The Clerk Properly Entered Default Under Rule 55(a)

Russia's threshold argument seeks to avoid the standard for setting aside its default by arguing that "[i]t was error for the default to have been entered" in the first place.  RF Br. 8.  That argument is meritless.  Under Federal Rule of Civil Procedure 55(a), the Clerk of this Court properly entered default against Russia when Russia failed to respond to Yukos Capital's Petition to Enforce Arbitral Award within the statutory deadline.  Russia's late appearance *after* that deadline did not prevent entry of default.  Instead, Russia must satisfy the "good cause" standard for

setting aside a properly entered default.

Rule 55(a)'s text is clear and mandatory.  "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk *must* enter the party's default."  Fed. R. Civ. P. 55(a) (emphasis added).  To avoid entry of default, therefore, the defendant must "plead or otherwise defend" the action.  *Id.*  That standard is widely understood to require a "timely" response to the complaint.  *E.g.*, *Meyers v. Pfizer, Inc.*, 581 F. App'x 708, 710 (10th Cir. 2014) ("If the defendant fails to timely respond to the complaint, the plaintiff can request entry of a default by the court clerk."); *Bell v. Davis*, 430 F. Supp. 3d 718, 720 (D. Or. 2019) ("[T]he clerk of the court must enter an order of default if a party against whom affirmative relief is sought fails to timely file an answer or otherwise defend an action.").  Thus, for example, in an ordinary civil action—where the deadline to respond to the complaint is 21 days, *see* Fed. R. Civ. P. 12(a)—Rule 55(a) "authorizes a default to be entered against any party who fails to plead or otherwise defen[d] within the 21 days allowed by Rule 12(a)."  10A Federal Practice & Procedure § 2682 (4th ed.).  Although the FSIA extends the response period to 60 days when the defendant is a foreign state, 28 U.S.C. § 1608(d), the principle is the same:  Default occurs when the defendant "fails to plead or otherwise defen[d] within the [period] allowed."  10A Federal Practice & Procedure § 2682.

Under this standard, Russia's default occurred on August 29, 2022 when it failed to timely answer or respond to Yukos Capital's Petition.  Yukos Capital effected service on June 29, 2022, ECF No. 14-1 ("First Rozen Decl.") ¶ 5; ECF No. 13, so Russia was required to "serve an answer or other responsive pleading … within sixty days" of that date, 28 U.S.C. § 1608(d).  Because the sixtieth day was a Sunday, Russia's response was due the following business day, August 29, 2022.  First Rozen Decl. ¶ 8.  Russia does not dispute that it failed to answer or otherwise respond by that

date.  RF Br. 8-9; *see also* First Rozen Decl. ¶ 9.  Yet even then, Yukos Capital waited an additional week after the deadline, until September 6, 2022, before filing its request for entry of default, along with the required affidavit.  *See* ECF No. 14.  Because that affidavit correctly "show[ed]" that Russia "ha[d]" defaulted, the Clerk was obligated to enter the default.  Fed. R. Civ. P. 55(a).

Russia's later filing of an untimely motion to dismiss does not erase its default.  By its own admission, Russia did not even attempt to file that motion until September 9, 2022—11 days after the deadline to respond.  ECF No. 27-1 ("First Kondakov Decl.") ¶ 26.  Even then, Russia failed to follow this Court's electronic filing requirement, LCvR 5.4(a)—instead improperly submitting its motion by letter to this Court—and the filing was not actually accepted and docketed until September 19, 2022, ten days after default was entered, ECF No. 18.  Yet Russia never requested or received an extension of the August 29, 2022 deadline.  Its motion to dismiss was thus untimely.

Russia's assertion that its request for leave to file its motion to dismiss technically arrived a few hours before the Clerk *entered* the Russia's default on September 9, 2022, RF Br. 8 & n.12, is of no moment.  At that point, the default had already occurred.  "[A] defendant's late answer d[oes] not alter the fact that there [was] a failure to defend."  *In re Smith*, 463 B.R. 144, 145 (Bankr. D.D.C. 2012).  Instead, "[t]he proper vehicle for addressing whether the default should stand is a motion under Fed. R. Civ. P. 55(c) to set aside the entry of default for good cause."  *Id*. at 146.  Indeed, even where default has *not* yet been entered, "[t]he filing of a late answer is analogous to a motion to vacate a default," and "the party filing the late answer" merely "receives 'the same opportunity to present mitigating circumstances that [it] would have had if a default had been entered and [it] had moved … to set it aside.'"  *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 35 (S.D.N.Y. 1992); *see also McMillen v. J.C. Penney Co.*, 205 F.R.D. 557, 558 (D. Nev. 2002) (same).  Regardless of the precise timing of when default was entered, therefore, Russia can avoid default

only by meeting the standard for setting its default aside.[1]

## II.     Russia Fails To Show "Good Cause" To Set Aside The Default Under Rule 55(c)

Because Russia indisputably defaulted on the deadline for response to Yukos Capital's

Petition, its motion to vacate the default must be judged by the ordinary standard applicable to

such motions.   While default judgments are generally disfavored by courts, the decision as to

whether an entry of default should be vacated is committed to the sound discretion of the trial

court.   Under Federal Rule of Civil Procedure 55(c), an entry of default may only be set aside for

"'good cause.'"   *Flynn v. Pulaski Constr. Co.*, 2006 WL 3755218, at *1 (D.D.C. Dec. 19, 2006).

"A district court exercising its discretion to set aside an entry of default or a non-final default

judgment must consider, and balance: 'whether (1) the default was willful, (2) a set-aside would

prejudice plaintiff, and (3) the alleged defense [is] meritorious.'"   *Flanagan v. Islamic Rep. of Iran*,

190 F. Supp. 3d 138, 150 (D.D.C. 2016) (quoting *Keegel v. Key W. & Caribbean Trading Co.,* 627

F.2d 372, 373 (D.C. Cir. 1980)).   Here, all three factors weigh against setting aside the default.

### A.     Russia's Default Was Willful Because It Received Notice Of This Enforcement Action But Failed To Timely Respond

The first reason for denying Russia's request to lift the default is that its default was "will-

ful."   *Keegel*, 627 F.2d at 373.   "'The boundary of willfulness lies somewhere between a negligent

filing error … and a deliberate decision to default, which is generally not excusable.'"   *Egypt Dep't*

*of Def. v. Alboghdady*, 2021 WL 3737682, at *4 (D.D.C. Aug. 24, 2021).

Here, Russia's actions fall on the "deliberate" end of the scale.   Tellingly, Russia does not

contend that its failure to timely respond resulted from negligence, inadvertence, or mistake.   *See*

---

[1]   Russia's authorities (at 8-9) are not to the contrary.   In *ConocoPhillips Petrozuata B.V. v. Bol-ivarian Republic  of Venezuela*, this Court granted a motion for default judgment against Venezuela after it failed to appear.   2022 WL 3576193, at *3, 7 (D.D.C. Aug. 19, 2022).   The Court did not address the effect of an untimely motion to dismiss, as none was filed.   *Id.* at *6.   In *Owens v. Sudan*, this Court vacated a default judgment only after applying the ordinary good cause standard that Yukos Capital contends should apply here.   374 F. Supp. 2d 1, 9-10 & n.5 (D.D.C. 2005).

RF Br. 10-13.  In fact, Russia concedes that its Ministry of Foreign Affairs received Yukos Capital's petition "on or about June 29, 2022," ECF No. 31 ("Second Kondakov Decl.") ¶ 7, more than ten weeks before it attempted to respond, First Kondakov Decl. ¶¶ 24-26.  As a regular litigant before this Court and other U.S. courts, *see, e.g.*, RF Br. 12 n.17 (discussing other matters before this Court, including *Hulley Enterprises v. Russian Federation*, No. 1:14-cv-1996 (D.D.C.)), Russia cannot plead ignorance to its duty to respond in a timely manner.  And the excuses Russia does provide do not alter the fact that Russia's delinquency was the result of its own deliberate choices.

*First*, relying on its still-pending motion to dismiss, ECF No. 18 ("MTD"), Russia argues that it never received proper service and therefore was not required to respond.  RF Br. 11.  But Yukos Capital fully rebutted that argument in opposing that motion.  ECF No. 19 ("MTD Opp.").  As Yukos Capital explained, service was properly effected on Russia under 28 U.S.C. § 1608(a)(3) via direct service initiated by the Clerk of this Court.  *Id*. at 8-16.  Russia's assertion that it opted out of § 1608(a)(3) service by objecting to mail service under the Hague Service Convention misconstrues that Convention and the FSIA.  *Id.* at 8-13.  And Russia waived that objection by refusing to permit any kind of service from the United States pursuant to the Convention.  *Id.* at 13-16.

In its reply brief in support of dismissal, Russia also attempted to raise for the first time several additional objections to the sufficiency of service.  *See* ECF No. 27, at 15-20.  But Russia's failure to raise these "specific objection[s] in its initial responsive pleading" means "the objection[s] [are] deemed waived."  *Binns v. City of Marietta Hous. Auth.*, 2007 WL 2746695, at *2 (N.D. Ga. Sept. 18, 2007).  A party that moves to dismiss pursuant to Federal Rule of Civil Procedure 12 "waives any defense" of "insufficient service of process" that "was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(b)(5), (g)(2), (h)(1)(A).  And a motion to dismiss for insufficient service must "point out specifically in what manner the plaintiff has failed

to satisfy the requirements of the [applicable] service provision."  5B Fed. Prac. & Proc. Civ. § 1353 (3d ed.).  As a result, even when a defendant has raised some objections to insufficient service in its motion to dismiss, its "[f]ailure to raise [other] objection[s] … constitutes a waiver of th[ose] issue[s]."  *Zisman v. Sieger*, 106 F.R.D. 194, 197 (N.D. Ill. 1985).  It is well settled, moreover, that "[a]rguments raised for the first time in a reply brief are waived."  *Nippon Shinyaku Co. v. Iancu*, 369 F. Supp. 3d 226, 239 n.8 (D.D.C. 2019).  Russia's motion to dismiss therefore lacks merit, and Russia's belated objections to service provides no excuse for Russia's default.

 *Second*, Russia claims that even if its arguments regarding service are "incorrect," they are made in "good faith" and therefore its default is not willful.  RF Br. 11-12.  But a meritless belief that a defendant "was [not] properly served," is no defense to a finding of willfulness.  *Alboghdady*, 2021 WL 3737682, at *5.  Russia cites no case to the contrary, and instead relies entirely on cases addressing the availability of meritorious defenses—the *third* factor for evaluating motions to set aside a default—not the first factor, willfulness.  *See Simon v. Republic of Hungary*, 2012 WL 13069771, at *6 (D.D.C. Sept. 30, 2012); *Est. of Scherban v. SunTrust Bank*, 2016 WL 10749642, at *1 (D.D.C. Jan. 4, 2016).  In fact, *Estate of Scherban* expressly declined to address willfulness.  2016 WL 10749642, at *1.  Here too, Russia's service objections are irrelevant to willfulness, and also lack legal merit, so they provide no cause for excusing Russia's default.

 In any event, Russia's belief that it had legal grounds for objecting to service does not explain why it waited to raise those grounds until after the deadline to raise them had expired.  Russia had actual notice of Yukos Capital's petition since at least June 29, 2022.  Second Kondakov Decl. ¶ 7.  If Russia believed it had meritorious objections to Yukos Capital's method of service, the proper course would have been to move to dismiss for lack of proper service *before* the sixty days period provided by 28 U.S.C. § 1608(d) expired—not *after*.  Had it done so, Russia

could have preserved its objection while avoiding default.  Russia offers no colorable excuse for failing to raise these arguments before it defaulted.  RF Br. 10-13.

*Third*, Russia claims its default was not willful because it was delayed in finding counsel. RF Br. 12-13.  But Russia's purported inability to find counsel is no excuse because it is the direct and foreseeable consequence of Russia's own willful conduct in unlawfully invading the sovereign nation of Ukraine.  Russia admits that its "difficulty obtaining qualified American counsel" was "[d]ue to the conflict between the RF and Ukraine," RF Br. 12, which led to "various 'sanctions regimes' against the RF" and caused its former counsel to "withdr[a]w from represent[ing]" Russia, Second Kondakov Decl. ¶¶ 5-6.  What Russia fails to mention is that its "conflict" with Ukraine, RF Br. 12, is entirely of Russia's own making, and a flagrant violation of international law, as recognized in official statements by both the White House and the G7 Foreign Ministers of Canada, France, Germany, Italy, Japan, the United Kingdom, and the United States, together with the High Representative of the European Union.  *See* The White House, *Remarks by President Biden on Russia's Unprovoked and Unjustified Attack on Ukraine* (Feb. 24, 2022), tinyurl.com/3xap2u8v (calling the attack "premeditated," "without provocation," "without justification," and "without necessity"); U.S. Embassy & Consulates in Russia, *G7 Foreign Ministers' Statement on the Illegal Annexation of Sovereign Ukrainian Territory* (Sept. 30, 2022), tinyurl.com/64wzpadp (labeling Russia's actions a "war of aggression" and an "illegal annexation").  Russia cannot avoid default by blaming its delinquency on a war of aggression it started unlawfully.

Even setting aside Russia's willful invasion of Ukraine, Russia's purported inability to secure counsel fails to explain or justify its delay.  This Court recently rejected a similar argument that a default was not willful because it was caused by the "time … needed to engage local counsel."  *Alboghdady*, 2021 WL 3737682, at *4.  The Court found this "excus[e]" to be "meritless"

because the "action should not have come as a surprise to defendants" and even if they "needed some time to retain counsel," "that does not come close to explaining the 50-day gap between service of process and the filing of defendants' first motion." *Id.*  At a minimum, "[e]ven if [the defendants] were not able timely to respond, they could have sought an extension." *Id.*

Russia likewise fails to justify its delay based on its purported difficulty in finding U.S. counsel.  As an initial matter, Russia could have easily anticipated that Yukos Capital would seek to enforce its arbitral award.  And it should have come as no surprise that, given its war of aggression in Ukraine and the resulting sanctions against it, Russia might have trouble quickly securing U.S. counsel to represent it in that inevitable enforcement action.  But rather than lining up counsel in advance or moving promptly after receiving service, Russia concedes that it did not reach out to its current U.S. counsel until "early September," which was already *after* the time for responding to Yukos Capital's petition had expired, even though the firm it retained has been "involved in Russia related matters" for nearly 25 years.  Second Kondakov Decl. ¶ 8.  Russia attempts to justify this delay by citing its prior counsel's withdrawal from the related Swiss proceedings.  RF Br. 12; Second Kondakov Decl. ¶ 5.  But Russia acknowledges that its prior counsel withdrew "prior to the filing of this case."  RF Br. 12; Second Kondakov Decl. ¶ 5.  That prior counsel withdrew before the 60-day time to respond commenced thus provides no explanation for Russia's delay.[2]

Moreover, Russia filed its initial response in this case—its motion to dismiss—without

---

[2]  The out-of-district cases Russia cites are thus distinguishable.  In *Maurizi v. Callaghan*, the defendant "lacked the funds necessary to retain an attorney" and discovered "the existence of an insurance policy" that would cover his representation only *after* "default was entered against him." 2022 WL 1446500, at *8 (W.D.N.Y. Feb. 25, 2022).  And in *Patrick v. Local 51, American Postal Workers Union, AFL-CIO*, the defendants detailed lengthy efforts to find, obtain approval for, and retain counsel.  2020 WL 2192682, at *2 (S.D.N.Y. May 6, 2020).  Here, Russia cursorily explains that it has "worked diligently to engage competent counsel" but provides no details of these efforts, when they began (other than at some point "after learning of this matter"), or why Russia did not reach out to its current counsel until "early September."  Second Kondakov Decl. ¶¶ 7-8.

U.S. counsel.  *See* MTD at 3 (signed by the Director General of the General Directorate for International Legal Cooperation in Russia's Prosecutor General's Office).  That filing confirms that Russia was able to respond to Yukos Capital's petition, or ask for an extension, without the aid of U.S. counsel.  At a minimum, Russia could have contacted counsel for Yukos Capital—either directly or through its U.S. counsel in *Hulley*—to negotiate an extension of its deadline to respond. Russia's decision to instead file its motion to dismiss after the time to respond had elapsed demonstrates that its failure to timely respond was not the result of events outside its control.

*Finally*, in a footnote, Russia offers the conclusory statement that its default is not willful because "'there is no indication that [it] deliberately tried to delay th[e] case or acted with wanton or willful disregard for [its] legal responsibilities.'"  RF Br. 13 n.18.  That claim is belied by Russia's actions in this case.  In particular, Russia insists on being re-served via diplomatic channels— a useless, time-consuming formality given that Russia received notice of Yukos Capital's petition months ago and has now appeared in the case.  And Russia's conduct since its appearance confirms that it seeks only to delay the case.  Yukos Capital offered to stipulate to lifting this default in exchange for Russia dropping its motion to dismiss based on service.  Second Declaration of Matthew S. Rozen ("Second Rozen Decl."), submitted herewith, ¶¶ 7, 10.  By declining that offer, *id.* ¶¶ 9, 11, and proceeding with this motion, Russia confirmed it does not actually desire a speedy resolution of the merits of this case but rather to unnecessarily prolong these proceedings.  Russia is a sophisticated, repeat litigant in this and other U.S. courts.  It offers no plausible excuse for its delinquency in responding to the petition.  Its default is therefore willful, and should not be set aside.

### B.    Yukos Capital Would Be Prejudiced In Its Efforts To Enforce The Arbitral Award If Russia's Default Were Set Aside

Russia's request to set aside the default should also be denied based on the second relevant factor, because "a set-aside would prejudice plaintiff."  *Keegel*, 627 F.2d at 373.  While ordinary

delay "in and of itself" does not constitute prejudice, *Konoike Constr. Co. v. Ministry of Works, Tanzania*, 2019 WL 1082337, at *3 (D.D.C. Mar. 7, 2019), "there is a limiting principle": "'[*U*]*nnecessarily* drawing out proceedings" does "unfairly prejudice[e] [a] plaintiff.'" *Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 41 (D.D.C. 2020) (third alteration in original).  That prejudice "is particularly strong" in "[p]roceedings to confirm arbitral awards" under the New York Convention, which are "'summary … in nature' and 'not intended to involve complex factual determinations.'"  *Konoike Constr.*, 2019 WL 1082337, at *3.

Setting aside the default would needlessly prolong Yukos Capital's ability to confirm and enforce its arbitral award against Russia, undercutting the speed and efficiency that is one of arbitration's central purposes.  Under the New York Convention, the Court's analysis on the merits is "confined to an analysis of 'the limited statutory conditions for confirmation or grounds for refusal to confirm.'"  *Konoike Constr.*, 2019 WL 1082337, at *3.  Russia has already availed itself of all of these arguments in its opposition to Yukos Capital's motion for default judgment.  *See* RF Br. 14-43.  As a result, setting aside the default "allows little more than the chance to raise the same arguments again."  *Konoike Constr.*, 2019 WL 1082337, at *3.  Because Russia's arguments can be disposed of in Yukos Capital's favor based on the current briefing alone, *see infra* at 15-43, setting aside the default would accomplish nothing except to "'unnecessarily dra[w] out proceedings" and prejudice Yukos Capital.  *Koch Minerals*, 514 F. Supp. 3d at 41 (emphasis added).

Further prolonged proceedings would inflict unique harms on Yukos Capital's ability to enforce its arbitral award due to Russia's unlawful actions in invading Ukraine.  As this Court recently recognized, "economic sanctions and other penalties imposed by the international community against the Russian Federation following its invasion of Ukraine" have limited the ability "'to locate and execute on Russian Federation assets' in the United States."  *Hulley Enters. Ltd.,*

*v. Russian Federation*, 2022 WL 1102200, at *9 (D.D.C. Apr. 13, 2022). And this "impair[ment]" in the ability "to satisfy a favorable judgment" against Russia will likely only continue to "deteriorate" if Russia's ongoing conduct "'incurs yet further international sanctions.'" *Id.* Setting aside the default here would thus prejudice not only Yukos Capital's right to efficient confirmation proceedings but also its practical ability to recover Russian assets in this country.

Russia's response on this factor—that its delay "was minimal" and that other courts have "set aside defaults when delays were greater," RF Br. 13 & n.19—ignores the unique aspects of this case, including the enforcement hurdles arising from Russia's unlawful invasion of Ukraine, which readily distinguish this case from those that Russia cites in its opposition.[3]

In any event, the Court "does not need to decide the sufficiency of plaintiffs' showing" of "prejudice" if the other factors weigh against lifting the default—*i.e.*, if "'the default was willful' and there are 'no meritorious defenses.'" *Nat'l Rest. Ass'n Educ. Found. v. Shain*, 287 F.R.D. 83, 87 (D.D.C. 2012). In *Konoike Construction*, for example, the Court denied a motion to set aside default in a New York Convention case because the default was willful and the defenses non-meritorious, even though the prejudice factor was "neutral." 2019 WL 1082337, at *3-4. Although Yukos Capital has shown prejudice here, even if the Court were to disagree, Russia's willfulness and lack of meritorious defenses would still warrant denying its motion to set aside the default.

---

[3] Russia cites only one case involving arbitration enforcement, and plaintiffs there did not "claim … any prejudice if the default is vacated." *Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*, 406 F. Supp. 3d 84, 89 (D.D.C. 2019). Of Russia's three other cases, one found prejudiced, *Gilmore v. Palestinian Interim Self-Government Auth.*, 675 F. Supp. 2d 104, 110-11 (D.D.C. 2009), and the other two are distinguishable. Russia selectively quotes *Gray v. Staley*, 310 F.R.D. 32 (D.D.C. 2015) for the proposition that "'a two-month delay'" is not prejudicial. RF Br. 13 n.19. But Russia omits that the events at issue in that case "occurred nearly 30 years ago" and thus it was "hard to conceive" how the two-month delay would "substantially prejudice Plaintiff's pursuit of claims *rooted in events that occurred decades ago*." *Gray*, 310 F.R.D. at 36 (emphasis added). *Gray* thus does not address whether Russia's delay in this case is prejudicial. And in *Africa Growth Corp. v. Republic of Angola*, the plaintiff—unlike Yukos Capital here—failed to "sho[w] some harm *beyond* mere delay in obtaining such relief." 2018 WL 6329453, at *6 (D.D.C. Dec. 3, 2018).

### C.   Russia Fails To Identify Any Plausible Defenses On The Merits That Have Not Already Been Litigated And Rejected

The final reason why Russia's default should not be set aside is that Russia has no possible "meritorious" defense to this enforcement action.  *Keegel*, 627 F.2d at 373.  For "[a] defendant's allegations [to be] considered meritorious" in this context, "they must be 'good at law so as to give the factfinder some determination to make.'"  *Shain*, 287 F.R.D. at 87 (denying defendants motion to vacate entry of default).  Further, Russia must "'articulate a defense with a degree of specificity which directly relates that defense to the allegations set forth in the plaintiff's pleadings and raises a serious question as to the validity of those allegations."  *Durso v. Mod. Food Ctr., Inc.*, 2019 WL 2150424, at *9 (S.D.N.Y. May 17, 2019).

Here, Russia cannot meet this burden because its defenses each fail as a matter of law and can be resolved in Yukos Capital's favor on the current default judgment briefing without any need for further litigation.  This is an action to enforce an arbitration award pursuant to the FAA and New York Convention.  As courts in this and other circuits have said repeatedly, confirmation of an award is a "summary" proceeding, *Konoike Constr.*, 2019 WL 1082337, at *3, and "'the showing required to avoid summary confirmation is high,'" *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) (quoting *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987), and citing *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976)).  The "'emphatic federal policy in favor of arbitral dispute resolution … appl[ies] with special force in the field of international commerce,'" and "affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012).

The "'summary … nature'" of arbitration enforcement proceedings—which are "'not intended to involve complex factual determinations,'" *Konoike Constr.*, 2019 WL 1082337, at *3—

vitiates Russia's invocation of the "federal policy favoring trial over default judgment," RF Br. 14. This Court does not face the choice between trial and default judgment because there are no factual disputes to try.  For the same reason, Russia's assertion that "a 'meritorious' defense need only be 'plausible,'" RF Br. 9, is unavailing.  Plausibility is a *factual* standard.  Just as a "claim" is "'plausible'" when the facts alleged support a "reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a defense lacks sufficient plausibility to justify setting aside a default if the facts alleged would not "constitut[e] a complete defense even if they could be proven," *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co.*, 288 F. Supp. 2d 22, 28 (D.D.C. 2003).

Russia's lengthy discussion of purported merits defenses, RF Br. 14-43, only confirms that Russia has no defense that is "'good at law.'"  *Shain*, 287 F.R.D. at 87.  Instead, Russia simply rehashes arguments it arbitrated and lost before the Tribunal.  Russia also had another opportunity to litigate these same arguments before the Swiss Supreme Court, when it moved unsuccessfully to set aside the Award—and it actually raised some of those arguments and lost, while declining to raise and thus forfeiting the others.  Should the Court lift the default, Yukos Capital is prepared to again defeat Russia's arguments on their merits with the benefit of a full briefing schedule and expert testimony on foreign and international law.  But there is no need for any of that because this case does not present any occasion for Russia to revive arguments it previously lost.

The parties have already spent more than eight years disputing these issues before the Tribunal and another year addressing them in the Swiss proceeding.  Allowing Russia to drag out enforcement and further delay relief to Yukos Capital by litigating the same issue yet again would annul the benefits of arbitration.  Neither the FSIA, *see* RF Br. 15-42, nor the FAA and the New York Convention, *see id.* at 42-43, provide any basis for doing so, and Russia's attempt to rely on

those authorities to justify *de novo* review simply misconceives the law.  This Court should therefore reject Russia's defenses as a matter of law and deny its motion to set aside the default.

### 1. Russia's Underlying Arguments Were Already Raised And Rejected

The crux of Russia's purported defenses is its assertion that there never was an "agreement to arbitrate" this dispute.  RF Br. 18.  The Tribunal found that Russia "consent[ed] to international arbitration under Article 26" of the ECT, Final Award ¶ 28(1), which provides for arbitration of "[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former," ECT, art. 26(1), (3)-(5).  The Tribunal found that under Article 45(1) of the ECT, this arbitration clause applied provisionally to Russia once it signed the treaty, even though Russia ultimately did not ratify the treaty.  Interim Award on Jurisdiction (ECF No. 1-2, at 360-563, "Jx. Award") ¶¶ 193-203.  Russia contests these conclusions on three grounds, arguing that: "(1) the ECT's arbitration clause did not apply provisionally absent the RF's ratification because it was 'inconsistent' with Russian laws; (2) [Yukos Capital] was not a eligible investor; and (3) [Yukos Capital]'s loans were not an eligible investment."  RF Br. 2.

The immediate problem with these arguments is that Russia raised each of them during the arbitration, the parties fully briefed them, and the Tribunal rejected each argument in a thoroughly reasoned decision.  Were that not enough, Russia had a full and fair opportunity to relitigate these arguments *de novo* in the Swiss Supreme Court, it raised two of them, and the court again rejected them in denying Russia's motion to set aside the Award.  On top of that, two other arbitral tribunals and the Dutch Court of Appeal and Supreme Court have all rejected Russia's arguments about provisional application of the ECT's arbitration clause.  Russia's arguments thus lack merit.

#### a. The Tribunal Considered And Rejected Each Of Russia's Challenges To Arbitrability

Russia makes no secret that its core arguments in this case simply rehash arguments that

failed in the arbitration.  It relies liberally on its arbitration briefing and on *dissents* to the Tribunal's Interim Award on Jurisdiction and Final Award, representing arguments and viewpoints that the Tribunal rejected.  RF 3-7, 18, 22-25, 27-28, 30, 32-36 & nn.10, 27, 38, 40.  Indeed, Russia cites its arbitration briefs—its Memorial on Jurisdiction (ECF No. 32-5), its Counter-Memorial on the Merits (ECF No. 32-7), and its Reply and Rejoinder in support of those Memorials (ECF Nos. 32-6, 32-8)—more than forty times.  As Exhibit 1 to the Second Rozen Decl. illustrates, nearly every authority cited in support of Russia's three objections to arbitrability was cited in one of these arbitration briefs.[4]  And as Exhibit 2 to the Second Rozen Decl. shows, the Tribunal carefully considered and rejected each of those objections—including every point Russia now raises in support of them—in two decisions totaling 520 pages.  *See generally* Jx. Award; Final Award.

    **i.**      The Tribunal first rejected Russia's argument that it never "consented to ECT arbitration under Article 26"—the ECT's arbitration clause—because it "never ratified" the ECT.  RF Br. 17.  As here (*id.*), Russia acknowledged in the arbitration that in Article 45(1) of the ECT, it agreed to apply the treaty on a "provisiona[l]" basis prior to ratification "'to the extent that such provisional application is not inconsistent with its constitution, laws, or regulations.'"  Jx. Award ¶ 50 (quoting ECT, art. 45(1)).  Russia nonetheless argued that arbitration would be "inconsistent" with Russia's "'constitution' and 'laws,'" so "the obligation to provisionally apply the ECT did not extend to Article 26."  *Id.* ¶ 40(i).  But the Tribunal rejected this argument, holding that "provisional application [of] the ECT was not inconsistent with Russia's 'laws.'"  *Id.* ¶ 284.

    Russia's response starts from the misguided premise that under Article 15(4) of the Russian constitution and Russia's Federal Statutes on International Treaties (as enacted in 1978 and amended in 1995), "unratified treaties may not contradict [federal] statutes," and in the event of a

---

[4]  The three minor exceptions merely restate propositions that Russia advanced in the arbitration, relying on similar authorities, and that the Tribunal rejected.  *See infra* at 21-22, 25 & nn.5-6, 8.

conflict, the treaties "do not apply."  RF Br. 18-20; *see id.* at 18-22.  Russia made this same argu-

ment in the arbitration, stating "that non-ratified treaties … have no priority over federal laws" and

"would not apply" if they "provided rules different to those of federal law."  Jx. Award ¶¶ 115,

117.  But the Tribunal rejected these arguments, finding instead that "provisional application of a

treaty … is constitutionally valid under Russian law and gives rise to rights and duties within the

Russian legal system that take precedence over other Russian laws."  *Id*. ¶ 258.  The Tribunal

reasoned that the relevant Russian statute on international treaties was the 1995 statute—the one

in place when arbitration was initiated—not the 1978 statute.  *Id*. ¶ 275.  Russia does not dispute

that premise here.  RF Br. 20-22.  The Tribunal then explained that the 1995 statute permits unrat-

ified treaties to create "rights and duties … that take precedence over other Russian laws," and that

Russia's Constitutional Court had "upheld" that application of the statute as "constitutional[ly]

vali[d]."  Jx. Award ¶ 257-58.  The Tribunal thus squarely rejected Russia's assertion that under

Russian law, "unratified treaties may not contradict [federal] statutes."  RF Br. 20.

　　In any event, the Tribunal found no conflict with Russia's statutes.  *E.g.*, Jx. Award ¶ 284.

Russia identifies two purported conflicts here, but the Tribunal rejected them both.

　　*First*, Russia argued to the Tribunal—as it argues here (at 22)—that its foreign investment

statutes do not permit arbitration against Russia pursuant to an investment treaty that has not been

"ratified."  Jx. Award ¶ 135.  As here, Russia relied mainly on the 1991 version of the statutes, *id*.

¶ 136, which permits arbitration if "'provided by an international treaty in force'" in Russia, RF

Br. 22 (quoting 1991 FIS, art. 9).  The Tribunal held instead that the 1999 version of the statutes—

which provides broadly for "arbitration" pursuant to "international treaties" without limitation, *id.*

(quoting 1999 FIS, art. 10)—applied for purposes of determining arbitrability because that statute

was in force at the time Yukos Capital initiated arbitration.  Jx. Award ¶¶ 275, 280.  The Tribunal

rejected Russia's argument that "international treaties" included only "ratified" treaties, RF Br. 22, explaining that the term instead encompasses all treaties "capable of creating legal obligations within the Russian legal system," including "provisionally applied treat[ies]," which "ha[ve] the force of law within the Russian legal order."  Jx. Award ¶ 283.

*Second*, Russia argued to the Tribunal—as here (at 23-25)—that Russian law "does not permit the arbitration of disputes arising out of administrative and other public law relations" absent authorization by "federal law or [ratified] treaty."  Jx. Award ¶ 129.  On that basis, Russia argued that Yukos Capital's claims "cannot be referred to arbitration," because they concerned "tax enforcement measures," "bankruptcy issues," and "State bodies and their officials exercising their public law functions."  *Id*. ¶¶ 125, 129.  The Tribunal rejected these arguments, concluding that "Russian law permits the State to submit to binding resolution of such investment disputes by arbitration pursuant to an international treaty"—as evidenced by Russia's numerous investment treaties.  *Id.* ¶¶ 277-78.  The fact that the "subject matter" of the dispute "may relate" to "bankruptcy" or other public law issues "does not change the character of the claim" so as to prohibit arbitration.  *Id*.  In any event, under a proper interpretation of Article 45(1) of the ECT, *id.* ¶ 243(c)-(d)—which Russia has not challenged here—the only relevant question was "whether there is a mandatory rule of Russian legislation that *prohibits* the executive from agreeing" to arbitrate investment disputes under "international law," *id.* ¶ 276-77 (emphasis added).  Russia failed to show such a prohibition.  It merely established that public law disputes were "non-arbitrab[le] … *within the Russian municipal legal order*"—that is in domestic arbitration.  *Id.* ¶ 277 (emphasis added).

As a result, nothing in Russia's constitution or law prohibited Russia from agreeing to apply the ECT's arbitration clause provisionally prior to ratification.

**ii.**   The Tribunal next rejected Russia's argument that Yukos Capital "was not an

eligible 'Investor,'" RF Br. 25, including each of the grounds for that argument offered here.

*First*, Russia argued (as it does here at 25-28) that Yukos Capital "does not qualify as a protected 'investor'" because at the time of the investment, the company was purportedly "controlled by Russian nationals," and "the ECT does not protect investments made by host States' own nationals." Final Award ¶¶ 171-73. In the arbitration, Russia focused on control of Yukos Capital by the individuals who owned and controlled Yukos Oil, *see id.* ¶ 177; Counter-Memorial on Merits ¶ 6, whereas here, Russia focuses on control by Yukos Oil itself, RF Br. 25-28. Either way, the argument is the same and fails for the same reason: It focuses on the wrong time period.

The Tribunal determined that the relevant date for "determining the jurisdiction of the Tribunal … was 15 February 2013," when Yukos Capital submitted its Notice of Arbitration. Final Award ¶ 198. By that date, Yukos Oil no longer owned Yukos Capital. Instead, in April 2005, a Dutch entity—the "Stichting"—"became the sole shareholder of Yukos Capital." *Id.* ¶ 199. As a result, the Tribunal concluded that "even if" ownership or control of Yukos Capital could be "taken into account," doing so would not affect arbitrability because "at the material time, [Yukos Capital] was not … owned or controlled" by any Russian entity or individual. *Id.* ¶ 202.[5]

*Second*, Russia argued (as it does here at 29-30) that even after the Dutch Stichting's acquisition of Yukos Capital, the company was not owned or control by eligible investors because "the majority of [its] Board members" were citizens of the United States—a non-party to the ECT—and Yukos Capital lacked "substantial business activities" in Luxembourg, where it was

---

[5] Russia adds a new authority, not cited in the arbitration—*Claim of Am. Sec. & Tr. Co*., Claim No. HUNG-20,540, Decision No. HUNG-51, U.S. Foreign Claims Settlement Commission (Mar. 20, 1957)—for the proposition that protection for an investment hinges on "the nationality of the individual holding a beneficial interest," rather than "of the nominal or record holder of the claim." RF Br. 26. But Russia made the same point in the arbitration with different authorities, Counter-Memorial on the Merits ¶ 248; Final Award ¶ 175, and the Tribunal rejected the proposition as irrelevant because Yukos Capital "was owned and controlled by a Dutch Stichting" at the relevant time, Final Award ¶ 202. Russia's new authority thus changes nothing.

incorporated, Jx. Award ¶¶ 524-26, 532-36.  The Tribunal rejected these arguments too, conclud-

ing that the Stichting was controlled by its "board as an organ"—"not the individual nature persons

that comprise its members."  *Id.* ¶ 564.  Because the board was a Dutch entity—*i.e.*, organized

under the laws of the Netherlands—the presence of U.S. nationals on the Board was irrelevant.  *Id.*

¶ 565.  And absent proof of U.S. control, Russia's allegation that Yukos Capital lacked substantial

business activities in Luxembourg was irrelevant.  *Id.* ¶ 566.  The only theory Russia articulated

based on that allegation was predicated on proving *both* that Yukos Capital was controlled by a

non-party to the ECT *and* that it lacked business activities in Luxembourg, *id.* ¶ 545; once the first

predicate failed, the second was immaterial, *id.* ¶ 566.  Russia cites no authority suggesting that

lack of business activity in Luxembourg alone would mean Yukos Capital is not an Investor.

 *Third*—as here (at 28-29)—Russia objected that Yukos ceased to be an eligible Investor

during the course of the arbitration, when it merged in 2016 into an entity in the British Virgin

Islands—a non-party to the ECT.  Final Award ¶ 204.  Russia claimed that "to invoke the jurisdic-

tion of the Tribunal," Yukos Capital "must maintain the nationality of a Contracting State contin-

uously until the date of the Award."  *Id.*  But the Tribunal "rejected" that argument "as a matter of

law," emphasizing that "the constant practice of international courts and tribunals is to determine

jurisdiction as at the date of institution of the proceedings," without regard to whether the investor

maintains "continuous nationality … to the date of the Award."  *Id*. ¶¶ 205-06.[6]  The Tribunal

distinguished *Loewen Group, Inc. v. United States*, International Centre for Settlement of Invest-

ment Disputes ("ICSID") Case No. ARB(AF)/98/3, Award (June 26, 2003)—the same case Russia

relies on here—because the investor there became a "nationa[l] *of the State against which the claim*

---

[6]  Russia notes that the United States advocated for a continuous nationality requirement "in its
Comments and Observations to the U.N. International Law Commission" ("ILC").  RF Br. 29.
But that proposal was not adopted into law.  Instead, as the Tribunal noted, the ILC rejected the
notion that "nationality must be maintained until final resolution."  Final Award ¶ 207-08.

[*wa*]*s brought*," not a third state, as Yukos Capital did here.  Final Award ¶ 207 (emphasis added).

*Fourth*, Russia accused Yukos Capital of "abuse of process," Final Award ¶ 582, invoking the same allegations that it now calls "treaty abuse," RF Br. 30-33.  As here (at 31), Russia argued that "tribunals have dismissed claims where a claimant has restructured its investment to benefit from the protection of an investment treaty 'at a point in time when a specific dispute was foresee-able.'"  Final Award ¶ 567(i).  And as here, Russia argued that Yukos Capital "never" had "any legitimate expectation" that its Loans "would be repaid," and instead "the Loans were simply cre-ated to shift money around the Yukos Group," and to provide Yukos Oil's owners "with (sham) legal rights to recover the funds in legal proceedings."  Counter-Memorial on the Merits ¶ 271.

As a threshold matter, Russia's "treaty abuse" theory has nothing to do with whether the parties "agreed to arbitrate" this dispute.  RF Br. 37.  Because Russia claims that disputes about its agreement to arbitrate are subject to *de novo* review, *id.* at 16-17 & n.22; *see infra* at 29-40, it tries to link treaty abuse to that issue by framing it as a reason why Yukos Capital does not qualify as an "eligible investor."  RF Br. 30.  But Russia did not frame the argument that way in the arbitration, and it cites no authority linking treaty abuse to Yukos Capitals' status as an Investor.

Russia did argue in the arbitration that its treaty abuse theory went to the Tribunal's "juris-diction," but the Tribunal rejected that argument.  Final Award ¶¶ 601-02.  The Tribunal acknowledge that its jurisdiction might be implicated if Yukos Capital had "change[d] its corporate nationality between incorporation and the events of which it makes complaint in order to seek to take the benefit of an investment treaty to which it had not previously been entitled."  *Id.* ¶¶ 598-99.  But Russia did not and does not make any such allegation, nor could it, since "on any view" Yukos Capital was "incorporated in Luxembourg before the dispute arose."  *Id.* ¶ 599.

As for Russia's remaining allegations, the Tribunal recognized that they were not "properly

characterised as abuse of process"—*i.e.*, treaty abuse—and they went only to the "merits" of the arbitration, not "the jurisdiction of the Tribunal."  Final Award ¶¶ 601-02.  The Tribunal went on, in any event, to reject Russia's arguments on the merits, concluding that their central premise— that the dispute with Russia was "foreseeable," *id.* ¶ 666—was not supported as to Yukos Capital's 2003 loan to Yukos Oil because it "was not reasonably foreseeable" when that loan was made that "Yukos Oil would default on repayment because of [Russia's] actions," *id.* ¶ 669.[7]  The Tribunal thus squarely rejected Russia's argument here, that the loans were "structured in bad faith to benefit from a treaty's protections 'at a point in time when a specific dispute was foreseeable.'"  RF Br. 31.

**iii.**     Finally, the Tribunal rejected Russia's argument that Yukos Capital's Loan to Yukos Oil "lacked inherent characteristics of an "Investment'" protected by the ECT because: (1) Yukos Capital "lacked control" over the Loan; and (2) the Loan did not involve a "commitment of resources" with a sufficient "duration," "element of risk," and "economic benefit."  RF Br. 34.

*First*, Russia argued (as it does here at 34) that under *Standard Chartered Bank v. Tanzania*, ICSID Case No. ARB/10/12, Award (Nov. 2, 2012), Yukos Capital never made any investment because it was "'had no control over the funds'" loaned to Yukos Oil and instead merely served as a "passive conduit" for a loan originated by another Yukos affiliate—Brittany—which lent Yukos Capital the money that it later lent to Yukos Oil.  Jx. Award ¶¶ 362, 367.  The Tribunal concluded, however, that this back-to-back loan structure "would … only fall outside the concept of 'Investment'" if "either: (a) the Loans were found to be invalid or a sham as a matter of their legal materialization"; or (b) "the Loans were to be treated as in substance a dividend because there was no intent to repay."  *Id.* ¶ 482.  But the first of these grounds was not met because Russia did

---

[7]  The Tribunal did conclude that Russia's actions had become "reasonably foreseeable" by the time of Yukos Capital's 2004 loan to Yukos Oil, so it declined to award any damages for that loan. Final Award ¶¶ 698-99.  As a result, as Russia concedes, the 2004 loan "is not at issue," and Russia is not arguing that this loan constituted treaty abuse.  RF Br. 4 n.7.

not—and does not here—"challenge the legal materialization of the investment" or "seek to argue that the Loans are invalid or to be set aside under their applicable law." *Id.* ¶ 495; *see also id.* ¶¶ 482, 498.  And the second ground was not met because the "evidence" showed "that the transactions were treated as loans" and that Yukos Oil "inten[ded] … to repay." *Id.* ¶¶ 483-84.

*Second*, Russia argued that the Loan did not entail a sufficient "'commitment of resources,'" "'duration,'" and "'element of risk'" to qualify as an investment, Jx. Award ¶ 351, citing largely the factors it cites here (at 35-36):  (1) the funds' origin as a loan from Brittany to Yukos Capital, Jx. Award ¶ 363; (2) the "non-recourse" nature of that loan, *id.* ¶ 370; and (3) the purportedly "trivial" "sprea[d]" between the interest rate on Brittany's loan to Yukos Capital and the rate on Yukos Capital's loan to Yukos Oil, *id.*.[8]  Again, the Tribunal rejected these arguments, concluding that:  (1) "the origin of the funds used by an investor is legally irrelevant to the jurisdictional question of whether that person has made an investment," *id.* ¶ 461; (2) the non-recourse nature of the loan did not "affect the substance of the transaction" because "[t]he right to seek repayment … remain[ed] solely held" by Yukos Capital, not Brittany, and Yukos Capital risked losing both that right and the "spread" it earned by charging a higher interest to Yukos Oil than it paid to Brittany, *id.* ¶¶ 505-09; and (3) "Luxembourg tax authorities" had recognized that this "spread" was "sufficient to justify the characterisation of the transaction as a valid loan," *id.* ¶ 509. More generally, the Tribunal emphasized that "[t]he effect of the Loans was to take funds that were outside Russia and to invest [them] in" Russia, exposing those funds to precisely the types of risks against which the ECT was designed to protect. *Id.* ¶ 511.  The Tribunal thus concluded

---

[8]  Russia also compares the loans to a supply contract, citing a decision postdating the Award—*Moldova v. Komstroy*, EUCJ Case No. C-741/19 (Sept. 2, 2021)—for the proposition that a supply contract "does not constitute an investment."  RF Br. 34.  But Russia raised the same point in the arbitration, citing different authority.  *See* Reply on Jurisdiction ¶ 278.  The Tribunal rejected the analogy, finding that "'debt'"—unlike a supply contract—expressly meets the ECT's definition of "'Investment.'"  Jx. Award ¶ 488.  Russia's new authority on supply contracts is thus inapposite.

that Yukos Capital had "made an 'Investment'" protected by the ECT.  *Id*. ¶ 513.[9]

### b.     The Swiss Supreme Court Rejected Russia's Attempts To Relitigate Arbitrability

If losing these arguments before the Tribunal were not enough, Russia also had a full and fair opportunity to litigate them a second time in the Swiss Supreme Court.  After the Tribunal issued the Final Award, Russia applied to the Swiss Supreme Court to set aside the Interim and Final Awards, raising two of its three challenges to arbitrability: that (1) "provisional application" of the ECT's arbitration clause "is inconsistent with Russian law," ECF No. 32-4 ("Swiss Dec.") § 6.3.1; and (2) Yukos Capital made no "investments protected by the ECT," *id.* § 7.  On August 24, 2022, the Swiss Supreme Court—reviewing the Tribunal's determinations *de novo*, *id.* § 6.4.1—carefully considered Russia's arguments in a 75-page opinion, joined the Tribunal in rejecting those arguments, and thus denied Russia's set-aside request in full, *id.* § 11.

Critically, Russia's arguments on each of these issues tracked its arguments here, which the Tribunal rejected.  On provisional application, for example, Russia argued that:  (1) Russian law does not "allow an international treaty applied on a provisional basis to be an exception from rules adopted by the legislative power"; (2) Russia's statutes on international treaties did not allow Russia "to apply the ECT provisionally" (and applying the 1995 version of the statute was error as it "did not exist at the time of the signature of the ECT"); (3) Russian's 1991 and 1999 foreign investment statutes did not "gran[t] an exception to the rule of ineligibility for arbitration of disputes under public law" based on the unratified ECT; and (4) Yukos Capital's claims indirectly "related to bankruptcy proceedings and alleged expropriation measures," and thus arbitrating them

---

[9]  Russia also argues briefly that the Loan was not a protected investment because it included a provision that permitted Yukos Capital and Yukos Oil to "'adjus[t]'" the loan term by "'mutual agreement.'"  RF Br. 36.  But Russia never raised this factor in the arbitration, and it cites no authority supporting its relevance.  The parties' ability to modify the loan term thus presents no basis to revisit the Tribunal's conclusion that the Loan was a protected investment.

would be inconsistent with the rule "in Russian law that disputes under public law cannot be submitted to arbitration."  Swiss Dec. § 6.3.1; *compare supra* at 18-20; RF Br. 18-25.  The Swiss Supreme Court carefully considered and rejected each of these arguments—addressing: (1) the status of provisional treaties under Russian law, Swiss Dec. § 6.4.11; (2) Russia's statutes on international treaties, *id.* §§ 6.4.11-12; (3) Russia's foreign investment statutes, § 6.4.12; and (4) the arbitrability of "disputes under public law," *id.*—and concluded that Russia had failed to "establis[h] that the provisional application of Art. 26 ECT was inconsistent with its domestic law."  *Id.*

Similarly, with respect to whether Yukos Capital's loans qualified as a protected investment, Russia again tracked its current arguments, arguing that the loans were not "investments protected by the ECT," Swiss Dec. § 7, because Yukos Capital purportedly: (1) "was only a bridge company," *id.* § 7.3.1; and (2) "made no contribution" and "did not run any risk when it granted loans to Yukos Oil," *id.* § 7.3.1.  The Swiss Supreme Court carefully considered and rejected these arguments, too.  "[E]mphasi[zing] that the definition of investment provided in Art. 1 (6) ECT is extremely broad," the court found it "not necessary to question the origin of the funds invested and the method of financing used by the investor to determine whether" an investment is protected under the ECT.  *Id.* §§7.4.2-3.  Rather, the fact that Yukos Capital "was the legal holder … of sums of money it loaned to a Russian company carrying out an economic activity in the energy sector" sufficed for the Loans to "meet the requirements" under Article 1(6) of the ECT.  *Id.* §§ 7.4.4-5.

The court cast doubt on Russia's contention that an investment eligible for protection under the ECT must entail some "contribution," "risk," and "economic benefit"—the premise underlying Russia's argument here, *see* RF Br. 36 & 37-38—as those requirements "are not apparent from the terms of the [ECT]."  Swiss Dec. § 7.4.6.  Regardless, the court held that even under its own proposed test Russia's argument still failed:  The "economic substance of the [Loans] cannot be

denied, since they were intended to be repaid," *Id.* § 7.4.7; "investors are often groups of companies covering multiple entities located in a range of States," *id.*; "nothing in the wording of the ECT … limit[s] the scope of the protection afforded to certain investments in the light of the [investor's] aim," *id.*; and Yukos Capital "was indeed incurring an operational risk related to the non-repayment of the loans made to Yukos Oil," *id.* §§ 7.4.7 & 10.4.

Finally, Russia declined to raise in its appeal the argument, rejected by the Tribunal, that Yukos Capital was not a protected investor.  The Swiss Supreme Court thus stated that "it is not and cannot be disputed that [Yukos Capital] is an investor within the meaning of Art. 1 (7) ECT," since it "was organised in accordance with the legislation of a contracting party to the ECT (Luxembourg) when it loaned funds to Yukos Oil."  Swiss Dec. § 7.4.5.

### c.  Multiple Other Tribunals Have Rejected Russia's Argument That It Did Not Agree To Arbitrate Under The ECT

Several other tribunals have joined the Tribunal and Swiss court in rejecting Russia's first argument challenging provisional application of the ECT.  Russia first raised the argument in arbitration in *Hulley Enterprises Ltd. (Cyprus) v. Russian Federation*, Permanent Court of Arbitration ("PCA") Case No. 2005-03/AA226, Interim Award ¶ 247 (Nov. 30, 2009), tinyurl.com/az83m498, but the arbitral panel concluded that the ECT "applied provisionally" and "bound [Russia] by the Investor-State arbitration provision," *id.* ¶ 395.  After a court in the Netherlands—where the arbitration was seated—initially set that award aside, the Dutch Court of Appeal reinstated it, holding that Russia "is bound by the arbitration clause" and rejecting Russia's argument that "provisional application of Article 26 ECT is inconsistent with" Russian law.  *HVY v. The Russian Federation*, Court of Appeal of The Hague, 200.197. 079/01, Feb. 18, 2020, §§ 4.5.42, 4.7.11, tinyurl.com/yckvatap.  The Dutch Supreme Court affirmed, again rejecting Russia's challenge to provisional application.  *The Russian Federation v. HVY*, Public Attorney's

Office at the Supreme Court, ECLI:EN:PHR:2021:425, Apr. 24, 2021, tinyurl.com/ym9cz337.

Russia also raised the same arguments in a second arbitration, arguing that "arbitration of the present dispute is inconsistent with [Russia's] 'constitution' and 'laws' for the purposes of Article 45(1)." *Luxtona v. Russia*, PCA Case No. 2014-09, Interim Award on Jurisdiction ¶ 30 (Mar. 22, 2017), tinyurl.com/mr2kxmtw.  But the "[t]ribunal conclude[d] that … [it] has jurisdiction under Article 26" and that Russia "failed to show that provisional application of Article 26 ECT is inconsistent with" Russian law.  *Id.* ¶ 225.

In sum, three arbitral panels and appellate courts in two nations have independently considered and found no merit to Russia's arguments that it did not agree to arbitrate under the ECT.

### 2. Russia Cannot Relitigate Its Failed Arguments By Reframing Them As Jurisdictional Defenses Under The FSIA

Although Russia already litigated its challenges to the Tribunal's jurisdiction before both the Tribunal and the Swiss Supreme Court, it now seeks to relitigate those issues "*de novo*" in this forum by collaterally attacking the Tribunal's determination that the parties "were bound by an arbitration agreement."  RF Br. 16-17.  Yukos Capital is prepared to defend the Tribunal's rulings on their merits should this Court vacate Russia's default and conduct a *de novo* review.  But the default should stand because Russia offers no valid basis to delve into these long-settled issues.

Under the New York Convention's plain terms, the United States, as a Contracting State, "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."  New York Convention, art. III.  Congress codified the New York Convention in the FAA, 9 U.S.C. §§ 201-208.  Under the FAA, the court "*shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  *Id*. § 207 (emphasis added).  Those grounds largely "trac[k]" those in the FAA, *Mgmt. & Tech. Consultants S.A. v. Parsons-Jurden*

*Int'l Corp.*, 820 F.2d 1531, 1534 (9th Cir. 1987), and courts applying them give arbitrators the same "'considerable deference'" as under the FAA, *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016).  The same "considerable deference" applies when the parties are foreign states and the arbitration agreement at issue is a treaty:  Courts will not "treat treaties as warranting a different kind of analysis."  *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 42 (2014).

Given the "narrow circumstances" the Convention provides for refusing enforcement, *Int'l Trading & Indus. Inv. Co.*, 763 F. Supp. 2d at 20, federal courts have "minimal discretion to refuse to confirm an arbitration award under the FAA," *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 184 (D.D.C. 2018).  To hold otherwise would undermine arbitration's basic objective of "'streamlined proceedings and expeditious results.'"  *Preston v. Ferrer*, 552 U.S. 346, 357 (2008).  The party resisting confirmation thus bears a "heavy burden" in "establishing that one of the grounds for denying confirmation in Article V [of the Convention] applies."  *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 120 (D.D.C. 2015).

Russia seeks to avoid these clear limitations by framing its challenge to the Award as an argument that this Court lacks subject-matter jurisdiction under the FSIA.  But the FSIA creates subject-matter jurisdiction over Yukos Capital's petition to enforce the Award without regard to any challenge to the Tribunal's determination that Russia lawfully consented to binding arbitration under the ECT.  Under the FSIA, foreign states are "presumptively immune" from suit in U.S. courts, unless one of its specific, enumerated exceptions applies.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Where an exception applies, the FSIA creates subject-matter jurisdiction over the action.  28 U.S.C. § 1330(a).  Two independent exceptions to Russia's immunity from suit apply and create jurisdiction here, each without regard to any challenge to Russia's consent to

arbitrate this dispute based on Russia's incorrect view of EU and international law.

          **a.**       **The Court Has Jurisdiction Under The FSIA's Waiver Exception Because Russia's Signing Of The New York Convention Waived Its Immunity To Enforcement Under That Convention**

Under the FSIA's waiver exception, a foreign state is subject to jurisdiction in any case in which it "has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  Because the New York Convention expressly contemplates enforcement of foreign arbitral awards against signatory states in the courts of other signatories, including the United States, Russia's signing of the Convention necessarily waived its immunity from such enforcement in U.S. courts.  That waiver is based on Russia's consent to *enforcement* in *the New York Convention*, so jurisdiction in no way depends on whether Russia consented to *arbitration* in *the ECT*.

Russia's argument (at 40) that it "did not 'explicitly' waive its FSIA immunity" is irrelevant, as this case involves waiver "by implication."  As Russia admits (at 41), to waive immunity by implication, a state need only "indicat[e] its amenability to suit" in U.S. courts, *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994), by: (a) showing "a subjective intent to waive immunity"; (b) "tak[ing] an act that objectively can be interpreted as exhibiting an intent to waive immunity"; or (c) "tak[ing] acts that forfeit its right to immunity, irrespective of whether it has intended to do so," *Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 202 (2d Cir. 1999).

Based on these principles, it is well-settled that when a foreign state joins a treaty that "contemplate[s] arbitration-enforcement actions in other signatory countries, including the United States"—as the New York Convention plainly does, *see* ECF No. 20-1, at 10—it "waives its immunity from arbitration-enforcement actions" under the FSIA.  *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019).  The D.C. Circuit held that this principle was "correc[t]" in *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999).  And in *Tatneft*, the D.C. Circuit applied *Creighton* to hold that Ukraine waived its immunity to enforcement under the New

York Convention by signing that Convention, because signatories to the Convention "agree to enforce arbitral awards made in other signatory countries." 771 F. App'x at 9. The Second Circuit has applied the same rule to find waivers under the New York Convention, *e.g.*, *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578-79 (2d Cir. 1993), and other arbitration enforcement conventions, *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2d Cir. 2013) (ICSID Convention). This Court has often applied the same rule, while emphasizing that a contrary rule could seriously "diminish other Nations' ability to attract investment in the future by committing themselves to resolving investment disputes through arbitration." *ConocoPhillips Petrozuata B.V. v. Bolivarian Republic of Venezuela*, 2022 WL 3576193, at *4 (D.D.C. Aug. 19, 2022) (Nichols, J.); *see also Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 190 (D.D.C. 2016); *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 8-9 (D.D.C. Dec. 4, 2020) ("*P&ID*").[10]

Russia's contrary arguments were squarely (and correctly) rejected in *Creighton* and *Tatneft*. Both decisions reject, for example, Russia's proposition that under *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), "being a signatory to a Convention does not create 'an exception to the FSIA,'" RF Br. 40. The crux of *Amerada Hess*, as recognized in both *Creighton*, 181 F.3d at 123, and *Tatneft*, 771 F. App'x at 10, was that the international agreement

---

[10]  The D.C. Circuit recently affirmed *P&ID* on alternate grounds in *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771 (D.C. Cir. 2022). Contrary to Russia's assertion (at 41-42), the D.C. Circuit's brief discussion of the waiver exception in *dicta* in that decision does not diminish the persuasive value of *Tatneft* and *Creighton* or their binding effect on this Court. The D.C. Circuit declined to "wade into" the waiver exception, and instead affirmed the district court's jurisdiction under the FSIA's arbitration exception. 27 F.4th at 774-76 & n.3. Although the panel noted that *Tatneft* is "unpublished"—and therefore did not "formally" bind the panel, *id.* at 774; *see also* RF Br. 41-42—*Tatneft* is nonetheless binding on *this Court*. Unpublished decisions that postdate January 1, 2002 "may be cited as precedent" in this circuit, D.C. Cir. R. 32.1(b)(1)(B), and have the same "precedential value" that "the Supreme Court grants to its own … summary affirmances," *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011), which are binding on "lower courts," *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975).

in that case "contain[ed] no mention of … a cause of action in the United States," 488 U.S. at 442-43. *Tatneft* and *Creighton* "distinguished" *Amerada Hess* on that basis, 771 F. App'x at 10, contrasting the Convention there with the New York Convention, which "contemplate[s] enforcement actions" in the United States, which suffices to waive immunity, *Creighton*, 181 F.3d at 123.

*Tatneft* likewise rejects Russia argument that applying the waiver exception in an arbitration enforcement case would improperly "conflat[e] the FSIA arbitration and waiver exceptions." RF Br. 41-42. As the D.C. Circuit explained, applying the waiver exception in arbitration cases would not "swallow up the … arbitration exception" because "each [exception] contains its own unique elements" and "the overlap is incomplete." 771 F. App'x at 9-10. The arbitration exception remains, for example, the exclusive jurisdictional basis for enforcing arbitration awards against foreign states that have not waived immunity from suit by signing a treaty that provides for enforcement of arbitration awards in the courts of the United States. *E.g.*, *Creighton*, 181 F.3d at 121, 123-24 (separately considering waiver exception and arbitration exception); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1301-02 (11th Cir. 2000) (finding award enforceable against foreign state by treaty even though foreign state had not agreed to arbitrate).

While the waiver and arbitration exceptions may both apply when a foreign state *both* agrees to arbitrate *and* agrees by treaty to enforcement of arbitral awards in the United States, such overlap is demonstrably what Congress intended. The FSIA's legislative history indicates that even before the arbitration exception was enacted, "Congress expected arbitration awards to be executed against the commercial assets of foreign states under [the waiver exception]." *Arbitral Awards: Hearing on H.R. 3106, et al. Before the Subcomm. on Admin. Law & Gov. Relations of the H. Comm. on the Judiciary*, 99th Cong. 92 (1986) (statement of Mark B. Feldman). When courts reached conflicting views about the circumstances in which the waiver exception applied,

33

Congress enacted the arbitration exception to resolve the "uncertainty." *Id.* at 92-94.  But far from "replac[ing]" the waiver exception with the arbitration exception, the legislative history reflects Congress's intent that courts "may still hold that a particular agreement to arbitrate constitutes a waiver of immunity and consent to the jurisdiction of the court." *Id.* at 96.  Indeed, the arbitration exception *expressly* provides that it applies in some cases in which the waiver exception "is otherwise applicable." 28 U.S.C. § 1605(a)(6)(D) (referencing *id.* § 1605(a)(1)).

Finally, Russia's waiver of immunity in no way depends, as Russia argues, on whether it "agreed to arbitration" of the underlying dispute.  RF Br. 41.  The waiver occurs "'when [the] country becomes a signatory to the Convention,'" *Creighton*, 181 F.3d at 123—"by becoming a party," *Blue Ridge*, 735 F.3d at 84—not later, by signing an arbitration agreement (like the ECT).  Ukraine's waiver in *Tatneft* was based on its consent to "enforcement" under the New York Convention, 771 F. App'x at 9—not, as Russia suggests (at 41), on its "agreement to arbitrate" the specific dispute.  The D.C. Circuit upheld jurisdiction in *Tatneft* without *mentioning*, much less rejecting, Ukraine's assertion that it "did not agree to arbitrate th[e] dispute"—and that "[n]o agreement to arbitrate" the claims of two of the parties was ever "formed," Br. for Appellant at 43, 46, *Tatneft v. Ukraine*, No. 18-7057, Doc. ID 1748825 (D.C. Cir. Sept. 4, 2018) (cleaned up).  That consideration is irrelevant to the Court's jurisdictional analysis under the waiver exception.  RF Br. 41-42.  Russia's consent to enforcement proceedings depends solely on whether the Tribunal found jurisdiction and entered an award—not whether the Tribunal was correct to do so.

This Court thus has jurisdiction under the FSIA's waiver exception, and Russia's collateral challenge to the Tribunal's jurisdiction should have no bearing on this enforcement petition.

### b.   Russia Cannot Dispute This Court's Jurisdiction Under The FSIA's Arbitration Exception By Raising Arguments That It Already Litigated And Lost

This Court also has jurisdiction under the FSIA's arbitration exception, which permits a

proceeding against a foreign state to "confirm an award" made pursuant to an agreement "by the foreign state," "with or for the benefit of a private party," to "submit to arbitration," if the "award is … governed by a treaty," such as the New York Convention, that is "in force for the United States" and that "call[s] for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).  Russia does not dispute that this is a proceeding to "confirm an award" under the ECT.  And Yukos Capital's motion for default judgment has already demonstrated that the Award is "governed by" the New York Convention.  ECF No. 20-1, at 11-13.[11]  Russia nonetheless opposes jurisdiction under the arbitration exception by seeking to relitigate—on the three grounds discussed *supra* at 18-29—the Tribunal's determination that the parties "were bound by an arbitration agreement," RF Br. 16-17.  Because those grounds were already disposed of by the Tribunal's rulings and the Swiss Supreme Court proceeding, Russia cannot relitigate them here.

    **i.**      To start, this Court is required to defer to the Tribunal's determination affirming its own jurisdiction because the ECT delegates this question to the Tribunal, not the courts.  It is well settled that "parties can agree to arbitrate 'gateway' questions of 'arbitrability,'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010), including "'whether [the] parties have a valid arbitration agreement'" and whether that agreement "applies to [the] … controversy" at hand, *Oxford*

---

[11]  Russia's one-sentence argument that the New York Convention does not apply because the Award does not involve a "commercial dispute," RF Br. 36, is insubstantial.  Russia cites no legal authority, and does not respond to Yukos Capital's arguments on this issue, ECF No. 20-1, at 12-13, so the argument is forfeited.  *See Crestek, Inc. & Subsidiaries v. IRS*, 322 F. Supp. 3d 188, 200 n.8 (D.D.C. 2018) (party that raised argument in a brief "without citation to authority" "forfeited this argument by failing to brief it adequately"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver.").  The argument is also meritless.  As Yukos Capital has explained, the ECT expressly provides that "[c]laims submitted to arbitration hereunder shall be considered to arise out of a commercial relationship or transaction" for purposes of the New York Convention.  ECT, art. 26(5)(b).  And even without this provision, Yukos Capital's pursuit of compensation for Russia's theft of funds loaned through commercial transactions easily establishes a "connection to commerce," which is all the New York Convention requires.  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015).

*Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013).  "[P]arties may agree to have an arbi-

trator decide … 'whether the parties have agreed to arbitrate,'" *Henry Schein, Inc. v. Archer &*

*White Sales, Inc.*, 139 S. Ct. 524, 529 (2019), and when they do, courts "must defer to [the] arbi-

trator's arbitrability decision," *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995).

 The same analysis applies under the FSIA's arbitration exception.  The D.C. Circuit made

that crystal clear in *Chevron Corp. v. Republic of Ecuador*, which, like this case, involved enforce-

ment under the New York Convention of an arbitration award issued under the UNCITRAL Rules.

795 F.3d 200, 203 (D.C. Cir. 2015).  The court explained that a plaintiff meets its "initial burden"

of establishing that a foreign state has "agreed to arbitrate" simply by "producing" the agreement,

the "notice of arbitration," and "the tribunal's arbitration decision," *id.* at 204-05—as Yukos Cap-

ital unquestionably did here.  *See* ECF No. 20-1, at 12.  The "burden" then "shift[s]" to the foreign

state to show that there is not "a valid arbitration agreement between the parties."  *Id.* at 205.  In

*Chevron*, the district court made this arbitrability determination applying the New York Conven-

tion's "deferential standard of review" because the UNCITRAL Rules provide for the arbitral tri-

bunal to "resolve issues of arbitrability."  *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d

57, 64, 67 (D.D.C. 2013).[12]  The D.C. Circuit affirmed, agreeing that Ecuador's challenge to arbi-

trability was "properly considered … under the New York Convention" standard—not "*de novo*,"

which would "conflat[e] … jurisdictio[n]" with the merits.  795 F.3d at 205-06.  The D.C. Circuit

thus relied on the district court's deferential analysis in finding jurisdiction under the arbitration

exception.  *Id*. at 205 n.3 (citing 949 F. Supp. 2d at 63 and 67).  *Chevron* thereby "rejected Ecua-

dor's assertion that 'the arbitrability question is … a jurisdictional question'" that must be assessed

---

[12]  The Court stated that it was applying this "deferential standard" in holding that "Ecuador did
consent to arbitration."  *Chevron*, 949 F. Supp. 2d at 64.  It later applied this deferential standard
in holding that the dispute involved an "investment" covered by the arbitration agreement, *id.* at
67-69, and expressly relied on that holding in finding "a valid agreement to arbitrate," *id.* at 67.

*de novo* independent from the standard of review applicable to a tribunal's merits determinations. *LLC Komstroy v. Republic of Moldova*, 2019 WL 3997385, at *5 (D.D.C. Aug. 23, 2019).

In *LLC SPC Stileks v. Republic of Moldova*, another New York Convention case, the D.C. Circuit reaffirmed *Chevron*'s holding that the "arbitrability of a dispute is not a jurisdictional question under the FSIA."  985 F.3d 871, 878 (D.C. Cir. 2021).  If the arbitration rules selected by the parties allow the arbitral tribunal to "'rule on its own jurisdiction'" (as the UNCITRAL Rules do, *see* art. 23), the tribunal's decision on that issue is entitled to "more than mere deference," and "'a court possesses no power to decide the … issue.'"  *Id.*  Because the arbitral tribunal in *Stileks* had deemed the dispute arbitrable, the D.C. Circuit upheld jurisdiction under the arbitration exception and affirmed in relevant part a judgment enforcing an award against Moldova.

Critically, the award enforced in *Stileks* arose from the very same arbitration agreement at issue here (the ECT).  As Russia does here, Moldova argued in *Stileks* that it had never "agreed to arbitrate th[e] particular dispute" decided in the award.  985 F.3d at 878 (emphasis omitted).  Like Russia, Moldova argued that this supposed lack of consent defeated jurisdiction under the FSIA's arbitration exception.  *Id.* at 877.  The D.C. Circuit rejected this argument, concluding that it was required to "accept the arbitral tribunal's determination" that the arbitration dispute "fell within the ECT" because Moldova—by joining the ECT—had "agreed to assign arbitrability determinations to the [arbitral] tribunal."  *Id.* at 878-79.  *Stileks* therefore makes clear that the existence of a valid arbitration agreement is among the issues that Russia may not relitigate *de novo* in determining jurisdiction under the FSIA's arbitration exception.

*Stileks* and *Chevron* foreclose any doubt that the parties have clearly and unmistakably agreed to arbitrate arbitrability.  Under Article 26 of the ECT, all parties agree to arbitration under UNCITRAL's rules.  *See* ECT, art. 26(4)(b).  And "the parties' adoption of UNCITRAL's

arbitration rules" in the ECT is "'clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" *Stileks*, 985 F.3d at 878-79 (quoting *Chevron*, 795 F.3d at 208). While Russia claims "other Circuits" have reached different conclusions in interpreting different arbitration agreements, RF Br. 38, *Stileks* specifically addressed the ECT, and it (along with *Chevron*) is binding on this Court.[13] Arbitrability was thus for the Tribunal to decide, and this Court "cannot disturb" the Tribunals determination on that issue. *Tethyan Copper Co. PTY Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262, 275 (D.D.C. 2022).[14]

Nor is Russia helped by its attempt to distinguish between "questions regarding the *scope* of the arbitration agreement" and those "with respect to the *existence* of an agreement to arbitrate"—or between disputes about "whether 'investments' were made under the treaty at issue" and disputes about "whether the petitioners were qualified 'investors.'" RF Br. 38-39. Under controlling Supreme Court precedent, all of these questions are "arbitrability" issues that the "parties can agree to arbitrate," resulting in judicial deference to the arbitrator's decisions. *Rent-A-Ctr*, 561 U.S. at 68-69. "[Q]uestions of 'arbitrability'" include "whether the parties have agreed to

_____

[13] The Swiss Supreme Court's decision to review the Tribunal's rulings on arbitrability "*de novo*," RF Br. 37, is even further afield because Swiss courts apply a broader standard of review to arbitral award than U.S. courts: Whereas Swiss courts may "freely examin[e] … the jurisdiction or the lack thereof of the arbitral tribunal" in all circumstances, Swiss Dec. § 6.4.1, U.S. courts "must defer to [the] arbitrator's arbitrability decision" when the parties have delegated the question of arbitrability to the arbitrator, *First Options*, 514 U.S. at 943-44.

[14] Russia's suggestion that *Chevron* and *Stileks* "should be limited to their facts" because the foreign state defendants in those cases never argued that their challenges to arbitrability were "jurisdictional," RF Br. 39, is simply false. Ecuador expressly argued in *Chevron* that "if Chevron's claims are not covered" by the investment treaty at issue in that case, "then Ecuador never agreed to arbitrate with Chevron, *and the District Court consequently lacked jurisdiction*." 795 F.3d at 205 (emphasis added). And Moldova likewise argued in *Stileks* that "the district court lacked jurisdiction under the [FSIA]" because Moldova purported never agreed "to arbitrate th[e] particular dispute" decided in the award. 985 F.3d at 876, 878 (emphasis omitted). This Court thus regularly follows *Chevron* and *Stileks* in finding jurisdiction under the FSIA without first wading into disputes about arbitrability. *E.g.*, *Chiejina v. Fed. Republic of Nigeria*, 2022 WL 3646377, at *5 (D.D.C. Aug. 24, 2022); *Tethyan*, 590 F. Supp. 3d at 272-75.

arbitrate or whether their agreement covers a particular controversy." *Id.* And *Stileks* is clear that "arbitrability … is not a jurisdictional question under the FSIA." 985 F.3d at 878.

The D.C. Circuit and this Court have thus applied *Stileks*'s framework—treating arbitrability issues as merits issues subject to deferential review where delegated to the arbitrator—to each of the three types of attacks Russia raises to the Tribunal's jurisdiction here:

Existence of an arbitration agreement: This Court applied *Stileks* to a dispute about "the existence of an arbitration agreement" in *Tethyan*, deferring to the arbitral tribunal's contested "conclusion that Pakistan had given written consent" to arbitrate and finding jurisdiction under the FISA's arbitration exception on that basis. 590 F. Supp. 3d at 273. *Chevron* itself also affirmed the district court's holding that a "'valid agreement to arbitrate'" existed, 795 F.3d at 205 n.3, even though that holding was premised in part on deference to the arbitrator. *See supra* at 36 n.12. The same deference is due to the Tribunal's determination that Russia became provisionally bound by the ECT's arbitration clause when it signed the ECT. RF Br. 17-25; *see supra* at 18-20.

Definition of Investor: In *Stati v. Republic of Kazakhstan*, this Court treated as a merits question (not a jurisdictional issue) Kazakhstan's argument that the petitioner "d[id] not qualify as an 'investor' under the [ECT], and therefore, Kazakhstan was not bound by a valid agreement to arbitrate with the company." 302 F. Supp. 3d 187, 204 (D.D.C. 2018). The Court thus deferred to the tribunal's decision rejecting this argument, stating it would not "second-guess the tribunal's conclusion" that "the ECT provides protections to investors from Gibraltar." *Id.* This Court also applied *Stileks* in *Chiejina* to a similar argument that the Court lacked jurisdiction under the FSIA's arbitration exception because the petitioner was not party to the arbitration agreement. 2022 WL 3646377, at *4-5. The Court explained that arguments that "a given *petitioner or claim* was not encompassed by the underlying agreement to arbitrate with the foreign sovereign … implicate only

the merits of the petition, rather than the court's jurisdiction under the FSIA. *Id.* at *5 (emphasis added). For the same reasons, Russia's argument that Yukos Capital is not an "investor" under the ECT, RF Br. 25-33, are merely merits issues, and this Court should defer to the Tribunal's decision rejecting those arguments, *see supra* at 20-24.

<u>Definition of Investment</u>: Finally, Russia concedes that *Chevron* and *Stileks* themselves involved dispute about "whether 'investments' were made under the treaty at issue." RF Br. 39. As in those cases, therefore, this Court should defer to the Tribunal's determination the investments at issue here were protected by the ECT. *Id*. 33-35; *see also supra* at 24-26.

**ii.** Even if the Tribunal's conclusions on Russia's three challenges to arbitrability were not binding, Russia would still be precluded from renewing those arguments here because it had a full and fair opportunity to litigate them before the Swiss Supreme Court. There, Russia raised two of its three arguments—that the ECT did not apply provisionally and that Yukos Capital did not make a covered "investment," RF Br. 17-25, 33-35—and the Swiss Supreme Court rejected both arguments. *See supra* at 26-28. Principles of issue preclusion and comity thus bar Russia from relitigating those issues. And by staying silent in the Swiss action on the third argument—that Yukos Capital is not an investor, RF Br. 25-33—Russia waived that argument and cannot raise it here.

The Swiss proceeding is of central importance because the arbitration was seated in Switzerland. Final Award ¶ 19. The New York Convention distinguishes between the country where the arbitration was seated, which has "primary jurisdiction" over the award, and other courts where enforcement is sought, which have "secondary" jurisdiction. *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007). Judicial proceedings in the "primary jurisdiction" have special weight because only the primary jurisdiction's courts can set aside an award. *Id.* The D.C. Circuit has thus cautioned U.S. courts—"in determining whether to enforce an award"—against

"second-guess[ing] the judgment of a court in a primary State." *Id.* at 937.

Deference to the primary jurisdiction applies equally when that jurisdiction denies a request to set aside an award. "National courts in different jurisdictions have granted preclusive effect to foreign confirmation judgments, under the doctrines of *res judicata* or claim/issue estoppel." Maxi Scherer, *Effects of Foreign Judgments Relating to International Arbitral Awards: Is the 'Judgment Route' the Wrong Road?*, 4 J. Int'l Dispute Settlement 587, 603 (2013); *see, e.g.*, *Belmont Partners, LLC v. Mina Mar Grp., Inc.*, 741 F. Supp. 2d 743, 750-53 (W.D. Va. 2010) (denying application to set aside arbitral award because award-debtor had litigated and lost the issue whether award was procured by fraud in Canadian enforcement proceedings). And the case for preclusion is strongest as to decisions by "the jurisdiction having exclusive authority to entertain actions to set aside an award." Restatement (Third) U.S. Law of Int'l Comm. Arb., Proposed Final Draft § 4.8 (2019). "If forum issue preclusion standards are satisfied, the foreign court's determination of those grounds may have preclusive effect in the U.S. post-award action." *Id.*

Deferring to the Swiss Supreme Court is consistent with "[t]he standards for issue preclusion." *Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 34 (D.D.C. 2007). A "foreign judgment meets th[ose] standards" where: (a) "there has been an opportunity for a full and fair trial in a foreign court of competent jurisdiction after proper service or voluntary appearance by the defendant and under a judicial system which does not violate U.S. public policy," as necessary for comity to be extended; and (b) the issue "has been (1) actually litigated and (2) necessarily determined by a court of competent jurisdiction in the first trial; (3) and … its use in the second trial would not work an unfairness," as necessary under the U.S. test for issue preclusion. *Id.* The Swiss Supreme Court's decision easily satisfies these requirements. Having voluntarily initiated and appeared in the set-aside proceeding, Russia indisputably had an opportunity for a

full and fair adjudication of its objections to the Award in Swiss court, under a judicial system that regularly produces judgments recognized in U.S. courts, and it cannot complain that applying issue preclusion would be "unfai[r]." *Id*. Because Russia actually litigated in the Swiss proceeding two of its challenges to arbitrability—concerning provisional application and the definition of "invest-ment"—and the Swiss Supreme Court expressly and necessarily rejected them in refusing to set aside the Award, *see supra* at 26-28, Russia cannot revive those same arguments here.[15]

As for Russia's remaining defense—that Yukos Capital was not an eligible investor under the ECT—Russia forfeited that defense by failing to timely raise it in the Swiss set-aside proceed-ings. A party opposing enforcement of a foreign arbitral award ordinarily is "not required to seek to have an award set aside in order to preserve an objection." Restatement (Third) U.S. Law of Int'l Comm. Arb., Proposed Final Draft § 4.23 (2019). But "when the losing party *actually brings* or otherwise participates as a party in a set-aside action," yet "in doing so fails to assert a ground despite the fact that the underlying facts relevant to that ground were known or should have been known to it at the time, that party will be deemed to have waived that particular ground for denying recognition or enforcement of the award." *Id.* (emphasis added).[16] Because Russia did not appeal

---

[15]  The Dutch Supreme Court decision in *HVY* also bars Russia from contesting provisional ap-plication of the ECT's arbitration clause. *See supra* at 28-29. It is immaterial that Yukos Capital was not a party to that Dutch proceeding, because Russia had a full and fair opportunity to litigate this issue, and the same provisional application defense that Russia raises here was litigated and rejected by the Dutch Supreme Court. *See Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984) (barring defendant "from relitigating identical issues that the de-fendant litigated and lost against another plaintiff").

[16]  The rule is a corollary of the bedrock rule that a party waives an issue in proceedings to enforce an arbitral award if it failed to raise the same issue to the arbitral tribunal in the first instance. *See, e.g.*, *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998); *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 498 (5th Cir. 2020). "Permitting parties to keep silent during arbitration and raise arguments in enforcement proceedings would 'undermine the purpose of arbitration' which is to provide a fast and inexpensive method" for resolving dis-putes. *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Loc. 731*, 990 F.2d 957, 960-61 (7th Cir. 1993). Enforcing waiver rules forestalls the "gamesmanship that would result" if a party could

the Tribunal's conclusion that Yukos Capital was a protected investor under the ECT, *see* Swiss Dec. § 7.4.5, that conclusion is now binding in subsequent proceedings.

### 3.   Russia Cannot Relitigate Its Failed Arguments By Reframing Them As Defenses Against Confirmation Under The New York Convention.

Russia's attempt to relitigate its agreement to arbitrate fares no better as a merits argument under the New York Convention.  Russia purports to "reserv[e] all defenses under the New York Convention," RF Br. 42, but it never attempts to "'articulate [those] defense[s] with [the] degree of specificity'" required to justify setting aside a default, *Durso*, 2019 WL 2150424, at *9.  At most, Russia suggests that it "will assert its defenses described above"—*i.e.*, the same arbitrability arguments it raised in challenging jurisdiction under the FSIA—plus a handful of other defenses that Russia never explains.  RF Br. 43.  But Russia's challenges to arbitrability fail under the New York Convention for the same reasons that they fail under the FSIA:  The Tribunal's determinations are entitled to deference, *see supra* at 35-40, and Russia's arguments are each barred by collateral estoppel or waiver as a result of the Swiss set-aside proceeding, *see supra* at 40-43.  Because any additional defense lacks "'specificity,'" *Durso*, 2019 WL 2150424, at *9, or "'any basis in fact'"— and instead "'amount to nothing more than conclusory denials,'" they cannot meet Russia's burden, in seeking to lift its default, to show meritorious defenses, *Shain*, 287 F.R.D. at 87-88.

### D.   Equitable Factors Do Not Warrant Setting Aside Russia's Default

Russia's attempt to invoke equitable considerations outside of the three factors addressed above is also meritless.  Russia mostly restates that it has "plausible FSIA and/or New York Convention defenses."  RF Br. 43; *see also id.* at 45 (arguing that "'even a hint of a suggestion' that a defense can be proven is sufficient").  This argument merely restates the third factor, and the cases

---

sandbag arguments for enforcement proceedings.  *OJSC*, 957 F.3d at 498.  Those rationales apply with no less force when a party participates in *appellate* proceedings stemming from an arbitration—in the forum specifically designated, with Russia's support, for those proceedings—yet fails to properly raise defenses it later seeks to press in enforcement proceedings elsewhere.

Russia cites turn on that factor.  *See Enka Insaat*, 406 F. Supp. 3d at 90 (discussing whether respondents' "defenses are meritorious" under third factor); *Africa Growth*, 2018 WL 6329453, at *7 (same); *CapitalKeys, LLC v. Democratic Republic of Congo*, 2020 WL 7029934, at *3 (D.D.C. Feb. 14, 2020) (same); *Khochinsky v. Republic of Poland*, 2019 WL 5789740, at *4 (D.D.C. Nov. 6, 2019) (same).  Russia's arguments under this factor fail for the reasons stated *supra* at 15-43.

The only truly distinct factor Russia cites is its status as a foreign state.  RF Br. 44.  But as Russia recognizes, the general presumption against entering a default judgment against a foreign state mainly serves to "'encourage foreign states to appear before [U.S.] courts,'" *Enka Inssat*, 406 F. Supp. 3d at 87, and the one case Russia cites from the arbitral award enforcement context explains that this presumption ensures that a foreign state's "'defenses [are] considered carefully and, if possible, that the dispute [is] resolved on the basis of all relevant legal arguments,'" *id*.  These purposes have already been satisfied here:  Russia *has* appeared and had a full opportunity to assert its defenses, which can be considered and decided as a matter of law in Yukos Capital's favor, *see supra* at 17-29.  Russia is instead trying to have it both ways—by taking advantage of litigating in U.S. court while disregarding the statutory deadlines that come with that opportunity.

In any event, this presumption is outweighed by other equitable considerations.  Yukos Capital is the victim of Russia's illegal expropriation that took place over 10 years ago.  Final Award ¶¶ 157-73.  Many authorities globally, including the U.S. Government, have recognized that Russia's expropriation of Yukos Oil was illegal.  *See, e.g.*, The Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012, H.R. 6156-9, Title IV, Sec. 402(a)(13) ("The lack of credible charges, intimidation of witnesses, violations of due process and procedural norms, falsification or withholding of documents, denial of attorney-client privilege, and illegal detention in the Yukos case are highly troubling.").  Even though Yukos

Capital obtained a $5-billion arbitral award—notwithstanding Russia's scorched-earth defense tactics in both the arbitration and the Swiss set-aside proceeding—Yukos Capital has still not received any compensation.  Moreover, the same regime that expropriated Yukos Capital's investment is the same regime that invaded Ukraine and is now attempting to invoke the international sanctions arising from its unlawful invasion as an excuse for its default.  *See supra* at 10.  These equities do not favor setting aside Russia's willful default.

As a final defense, Russia suggests that setting aside the default is necessary to ensure that its arguments "'see the light of day.'"  RF Br. 44.  That claim ignores reality.  Russia has fully arbitrated those arguments before the Tribunal, separately litigated them in the Swiss set-aside proceedings, and raised them yet again in briefing the current default judgment motion.  Russia has had its day in court, and the equities do not require giving Russia a fourth bite at the apple.

## III.  The Court Should Enter Default Judgment In Favor Of Yukos Capital

Should the Court agree that Russia has not shown good cause to set aside its default, the Court should enter default judgment for the reasons stated in Yukos Capital's default judgment motion.  ECF No. 20-1.  Russia's failure to articulate meritorious defenses, *see supra* at 15-43, confirms that Yukos Capital is entitled to entry of judgment, and Russia does not contest Yukos Capital's arguments about the appropriate interest rate.  *See* ECF No. 20-1, at 19-20.

## CONCLUSION

The Court should deny Russia's motion to set aside the default and enter a default judgment confirming the arbitral award.  Alternatively, should Russia's motion to set aside the default be granted, the Court should lift the default only on the condition that Russia agrees that it has been served in accordance with the FSIA.

Dated: December 23, 2022

Respectfully submitted,

/s/ *Matthew S. Rozen*

Robert Weigel (*pro hac vice*)
rweigel@gibsondunn.com
Jason Myatt (*pro hac vice*)
jmyatt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  212.351.4000
Facsimile:  212.351.4035

Matthew S. Rozen, D.C. Bar #1023209
mrozen@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:    202.955.8500
Facsimile:    202.467.0539

*Attorneys for Yukos Capital Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 23, 2022, I caused the foregoing Petitioner's Reply in Support of Motion for Default Judgment and Opposition to Respondent's Cross-Motion to Set Aside the Default, as well as the Second Declaration of Matthew S. Rozen and exhibits thereto, to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

 /s/ *Matthew S. Rozen*
Matthew S. Rozen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mrozen@gibsondunn.com