**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

YUKOS CAPITAL LIMITED
(f/k/a/ Yukos Capital S.à.r.l.),

*Petitioner*

v.                                                    Civil Action No. 1: 22-cv-00798 (CJN)

THE RUSSIAN FEDERATION,


*Respondent.*

**<u>MEMORANDUM OPINION</u>**

Yukos Capital Limited, a former wholly-owned subsidiary of the now-defunct Yukos Oil,

initiated this action to confirm an arbitral award that it secured against the Russian Federation after

Russia came into possession of Yukos Oil's investment assets in what was allegedly a sham

bankruptcy proceeding.  Russia has moved to dismiss on two grounds—lack of subject matter

jurisdiction and failure to effect proper service of process—and also to stay further proceedings.

For the reasons that follow, the Court denies those motions.

**I.      Background**

Yukos Oil was one of the largest producers of crude oil in Russia during the early 2000's.

ECF 1 at 3.  But in 2004, the Russian Federation conducted a "re-audit" of Yukos Oil's taxes for

the previous four years, allegedly in retaliation for statements by Mikhail Khodorovsky, Yukos'

chairman, disparaging the Putin regime.  *Id.*  The audits purportedly revealed that Yukos Oil owed

the government enough in back taxes to bankrupt the company outright.  *Id.*  And, in short order,

that's exactly what happened:  Russian courts ultimately placed the company into what Yukos

calls a "sham bankruptcy" and began selling off its assets to the highest bidder—which in almost every instance happened to be Russia itself. *Id.* at 4.

Yukos Oil's collapse came only a year after it had engaged in a major expansion process that included a series of important mergers. *Id.* The company had financed that expansion with several loans, two of which came from the Petitioner in this case, Yukos Oil's wholly-owned subsidiary Yukos Capital Limited. *Id.* This case involves both loans. The first, executed in December 2003, was for a maximum of $2.7 billion dollars to be repaid quarterly at a rate of 9%, the borrowed principal to be repaid by December 31, 2008. *Id.* at 5. Perhaps unsurprisingly, Yukos Oil's sudden battle with the Putin regime quickly depleted the proceeds of the first loan, such that the company had spent the full $2.7 billion by June of 2004. In August 2004, Yukos Capital gave Yukos Oil a second loan, this time for up to $355 million. *Id.* Whereas the first loan was to fund Yukos Oil's expansion, the second was to fund its efforts against Russia. This second loan was to be repaid semiannually at a rate of six-month LIBOR plus 1.75%, with the principal to be repaid in full by December 30, 2009. *Id.* at 5–6. Any delay in payment was to result in a daily penalty of 0.1% of the amount overdue.

Neither loan was repaid. Instead, in November 2005, Yukos Oil formally defaulted on both. *Id.* at 6. In 2006, during the bankruptcy proceedings described above, Yukos Capital filed an application in Russian court for the creditors' claims to include its claims under both loans. *Id.* That application was denied. *Id.* When Yukos Capital appealed the denial, Russia initiated a criminal case against it and certain of its officers. *Id.* Then, citing the pendency of a criminal investigation, the Russian courts denied the appeal; Yukos Capital filed a second application and found its claims denied yet again. *Id.*

When the dust settled, practically all of Yukos Oil's former assets belonged to Russia, and in November 2007, the Yukos Oil bankruptcy proceeding was terminated, including with a declaration that all unsatisfied creditor claims were expired. *Id.* Yukos Capital's challenge to that decision was also denied.

By November 21, 2007, Yukos Oil no longer existed. *Id.*

### A.    Arbitral Proceedings

Having run out of options in Russia, Yukos Capital turned to international arbitration. In 1994 Russia had signed, and in 1998 had become officially bound by, the Energy Charter Treaty (ECT). *Id.* at 7. The ECT is a multilateral framework designed to promote open and competitive energy markets and cross-border cooperation in the energy sector, including by protecting foreign investors and encouraging stable, fair and transparent conditions for foreign investments. *Id.* Under the ECT, in the event of a "[d]ispute[] between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former," "the Investor party to the dispute" is entitled to "provide its consent in writing for the dispute to be submitted to," *inter alia*, an "ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law." *See* ECT, art. 26(1)-(4). *Id.*

Though primarily active in Russia, Yukos Capital was, at all relevant times, incorporated in Luxembourg, a party to the Treaty. *Id.* at 8. Accordingly, invoking Article 26(4)(b) of the ECT and the 1976 Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL"), Yukos Capital initiated arbitration proceedings against Russia on February 15, 2013, seeking to recover the approximately $3 billion still due on the loans. *Id.* at 8. Yukos Capital alleged that Russia had breached various obligations under Part III of the ECT, including a duty to provide fair and equitable treatment; a duty to provide constant protection and security; a duty not

to impair the use, enjoyment, or disposal of an investment by unreasonable or discriminatory measures; a duty to accord treatment less favorable than that required by international law; a duty not to accord treatment less favorable than that accorded to other investors; a duty to provide effective means for the assertion of claims and the enforcement of rights; and a duty not to expropriate investments or subject them to measures having an effect equivalent to expropriation. *Id.* at 8–9; ECT, art. 10(1), 10(7), 10(12), 13(1).

Russia participated actively in the arbitration, appointing one of three arbitrators to the tribunal and signing terms of appointment expressly providing, among other things, that "the members of the Tribunal had been validly appointed in accordance with the ECT and the UNCITRAL Rules"; the proceedings would be governed by the UNCITRAL Rules; "the Tribunal shall determine the legal seat of the arbitration … after hearing the Parties on the issue"; and "the issues in dispute shall be decided in accordance with the ECT and applicable rules and principles of international law." ECF 1-2 at 15. In April 2014, the tribunal determined that the arbitration would be seated in Geneva, Switzerland, and that it would proceed in two phases: one for jurisdictional questions, and a second one on the merits. *Id.* at 16–17.

In January 2017 the tribunal concluded the first phase by rejecting all objections to its jurisdiction. In particular, Russia had raised three primary arguments: First, that it had "never ratified the ECT and applied the ECT until October 18, 2009 on a provisional basis pursuant to Article 45(1) ECT only to the extent that such provisional application is not inconsistent with its constitution, laws or regulations"; second, that "[t]he intra-company loans allegedly made by Claimant to Yukos Oil Company are not 'investments' within the meaning of Article 1(6) ECT"; and third, that Article 17 of the ECT entitled it "to deny [Yukos Capital] the advantages of" Part III of the treaty because Yukos Capital "is a shell company with no substantial business activities

in Luxembourg and is ultimately controlled by nationals of" the United States, which is was not an ECT signatory.  ECF 1-2 at 17.  The tribunal rejected these arguments, holding that Russia's "provisional" application of the ECT constituted consent to arbitrate disputes under Article 26(3)(a); that intra-company loans qualified as investments under the ECT; and that Yukos was now primarily controlled by an entity based in the Netherlands, an ECT party.  *Id.* at 10–11.

The arbitration proceeded to its merits phase, in which Russia argued Yukos Capitol was not a protected investor under the ECT because it was "controlled by Russian nationals" and "no longer a national of an ECT contracting state."  The tribunal rejected that argument on the ground that Yukos Capital is now controlled by a Netherlands-based entity and that it had previously been a Luxembourg-based entity—both nations being ECT parties.  ECF 1-2 at 70.  The tribunal further held that "the disallowance of the proof of debt of Yukos Capital in the bankruptcy of Yukos Oil constituted expropriation of that debt by [Russia] because the taking was without 'due process of law' and was discriminatory, amounting to a denial of justice."  *Id.* at 171.  These actions, the Tribunal held, formed "part of . . . an orchestrated campaign against the Yukos Group as a whole," as exemplified by two "particularly relevant" circumstances:  the imposition of tax assessments against Yukos Oil, resulting in its bankruptcy, in the face of uncontroverted, exculpatory evidence; and the "actions taken against [Yukos Capital's] Russian lawyers and the effect on [Yukos Capital's] ability to defend its interests before the Russian courts in the bankruptcy."  *Id.* at 182, 185.  Accordingly, the tribunal awarded Yukos Capital a total (including interest) of almost $5 billion.

Russia has never paid Yukos Capital any amount of that award.  ECF 1 at 13.  Instead, Russia filed an application in the First Civil Court of the Swiss Federal Tribunal seeking to set aside the tribunal's interim and final awards and to stay enforcement of both pending resolution of

Russia's set-aside application.  *Id.*  The Swiss Tribunal determined on November 1, 2021, that it would not stay enforcement pending resolution of the remainder of the application since "it [could not have been] said, prima facie, . . . that [the remainder of Russia's application] will in all likelihood have to be accepted."  ECF 1-1 at 3.

> ### B.    District Court Proceedings

In March 2022 Yukos Capital initiated this action.  Following early motions practice (*see, e.g.,* ECF 18, 20, 33) the parties ultimately entered into a set of stipulations, approved by the Court on June 16, 2023, that certain motions and cross motions had been withdrawn; that the clerk's entry of default against Russia was stricken; and that Yukos would serve Russia pursuant to 28 U.S.C. § 1608(a)(4) (that is, through "diplomatic channels").  ECF 56.  Yukos then served the Russian Federation via a U.S. Department of State diplomatic note to the Russian Embassy in Washington, DC.  ECF 57.

Russia rejected service of that note.  ECF 60.  It then moved to dismiss, both on the ground that it still has not been properly served and also that the Court lacks subject matter jurisdiction.  ECF 61.  It has separately sought to stay further proceedings on various grounds.  *See* ECF 85, ECF 99.

## II.    Legal Standards

"[O]n a motion to dismiss under the [Foreign Sovereign Immunities Act] where [the foreign sovereign] ha[s] not disputed any facts," courts "must assume the truth of [the petitioner's] allegations, make all reasonable inferences in [its] favor, and . . . place the ultimate burden of proof with [the sovereign]."  *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018).  "Thus, where the [foreign sovereign] contests only the legal sufficiency of [the petitioner's] jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is

warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). A foreign state "bears the burden of proving sovereign immunity, including that the [petitioner's] allegations do not bring its case within a statutory exemption to immunity." *Schubarth*, 891 F.3d at 398 (quotation marks omitted).

With respect to Russia's stay motion, courts have an inherent "power to stay proceedings" in order to control their dockets "with economy of time and effort for [the judicial system], for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 38–39 (D.D.C. 2019). In determining whether a stay is warranted, courts must "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (quotation marks and citations omitted).

### III.    Motion to Dismiss

"Federal courts may exercise jurisdiction over claims against a foreign state" like Russia "only pursuant to the FSIA." *Schubarth*, 891 F.3d at 398 (citing 28 U.S.C. § 1604). The FSIA "establishes a default rule of foreign sovereign immunity," *id.*, thereby depriving courts of subject matter jurisdiction in "every action against a foreign sovereign" unless one of the FSIA's textually enumerated "exceptions to foreign sovereign immunity" applies. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (citing 28 U.S.C. § 1330(a)); *see* 28 U.S.C. §§ 1605, 1607. The FSIA also governs the exercise of personal jurisdiction over a foreign state, requiring as preconditions for personal jurisdiction that (1) subject matter jurisdiction be "satisfied" via a

specified immunity exception and (2) service be proper.  *Schubarth*, 891 F.3d at 397 n.1 (*citing* 28 U.S.C. § 1330(b))

In its motion to dismiss Yukos' confirmation petition, Russia challenges the Court's exercise of both subject matter jurisdiction and personal jurisdiction.  Neither challenge has merit.

### A.    Subject Matter Jurisdiction

As noted, the FSIA's default rule of foreign sovereign immunity is subject to several exceptions.  One provides that foreign states are subject to federal jurisdiction in actions brought "to confirm an award made pursuant to . . . an agreement to arbitrate," as long as the agreement is "made by the foreign state with or for the benefit of a private party" and "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).  To proceed under this so-called "arbitration exception," a petitioner must "satisfy a burden of production" as to three "jurisdictional facts": "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement."  *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024); *see also JSC DTEK Krymenergo v. Russian Fed'n*, No. 1:23-CV-03330 (CJN), 2025 WL 1148347, at *3 (D.D.C. Apr. 17, 2025).  If the petitioner carries that burden, the exception applies unless the foreign state "establish[es] the absence of the factual basis by a preponderance of the evidence."  *Id.*

Yukos has met its initial burden of production by pointing to (1) the ECT, (2) the arbitral award issued under that treaty, and (3) the New York Convention—"an international treaty obligating member states," including Russia, the United States, the Netherlands, and Luxembourg, "to recognize and enforce arbitral awards issued in other member states."  *Process & Indus. Dev. (P&ID) v. Fed. Rep. of Nigeria*, 27 F.4th 771, 772 (D.C. Cir. 2022) (citing June 10, 1958, 21 U.S.T.

2517); *Contracting States*, New York Arbitration Convention, *available at* https://www.newyorkconvention.org/countries (last visited April 14, 2025); *see Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) ("Chevron has met its burden of production by producing the BIT, Chevron's notice of arbitration against Ecuador, and the tribunal's arbitration decision."); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 n.3 (D.C. Cir. 2021) ("Nor is there doubt that the New York Convention, ratified by the United States, calls for the enforcement of arbitral awards.").

Russia challenges the first jurisdictional fact. ECF 61-1 at 19. As relevant here, the arbitration exception "requires a valid 'agreement . . . to submit to arbitration,'" and "whether a valid arbitration agreement exists" is a question for courts, not arbitrators, to resolve. *Gov't of Belize*, 794 F.3d at 102 (quoting 28 U.S.C. § 1605(a)(6)); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021).

Russia argues that it signed but didn't ratify the ECT; therefore, it claims, the treaty's arbitration clause only applies "provisionally pending [the ECT's] entry into force… to the extent that such provisional application is not inconsistent with [Russia's] constitution, laws or regulations." ECT Art. 45(1). It also raises numerous conflicts between Russian law and the arbitration at issue. But Russia's arguments are really about whether Russia agreed to arbitrate this particular dispute. Russia therefore incorrectly conflates the "arbitrability" of its dispute with Yukos—that is, whether Russia "agreed to arbitrate *this particular* dispute"—with the *jurisdictional* question of whether an arbitration agreement exists, which is just whether Russia agreed to arbitrate some disputes. *Stileks*, 985 F.3d at 878 (second emphasis added). In *Stileks*, for example, the Court of Appeals confronted Moldova's argument that the arbitral award in question was not "made pursuant to . . . an agreement to arbitrate" under 28 U.S.C. § 1605(a)(6)

because the claimant was "not a qualifying investor" under the relevant bilateral arbitration treaty.[1]  *Id.* at 877–78.  The Court explained that, "[i]f Moldova [wa]s correct, it might have a defense to confirmation under the New York Convention, which provides for non-recognition of an award if '. . . it contains decisions on matters beyond the scope of the submission to arbitration.'"  *Id.* at 878 (quoting New York Convention, art. V(1)(c)).  But the Court held that Moldova did not have a *jurisdictional* defense, because "*the arbitrability of a dispute is not a jurisdictional question under the FSIA*."  *Id.* (emphasis added); *see also NextEra*, 112 F.4th at 1101 ("It is well established in this Circuit that *disputes about the scope of an arbitration agreement, such as whether [it] covers a particular dispute, are not jurisdictional questions under the FSIA*.") (emphasis added).  "For jurisdictional purposes, the FSIA's arbitration exception requires that the arbitral tribunal purported to make an award pursuant to the [treaty], not that it in fact did so."  *NextEra*, 112 F.4th at 1104 (quotation marks omitted).

Only one of Russia's domestic law arguments even plausibly goes to existence rather than scope: That Russian Law generally prohibits arbitration of "public law" disputes.  ECF 61-1 at 20. But the law it cites for that premise, Arbitrazh Procedural Code Art. 198(3), simply states:

> The applications for recognizing as invalidated non-normative legal acts, and as unlawful the decisions and actions (inaction) shall be examined in the arbitration court, if their examination is not referred, in conformity with the federal law, to the competence of other courts.[2]

This language only suggests that arbitrability depends on Russian federal law; it doesn't state when that law bars arbitration, let alone demonstrate that Russia didn't enter an agreement to arbitrate *some* disputes. And, as reflected in the Stephan declaration, this language "provides no

---

[1] Russia thus errs in arguing that, in *Stileks*, it was "unquestionabl[e]" that "[t]he claimants were investors with authority to accept the standing offer to arbitrate."  ECF No. 15 (MTD Reply) at 13.

[2] Located at https://www.wto.org/english/thewto_e/acc_e/rus_e/wtaccrus58_leg_61.pdf.

evidence that the principle of non-arbitrability of public law disputes… has any bearing on the provisional application of the ECT," as that provisional application is, itself, a component of Russian law.  ECF 72-4 at 28.[3]

### B.    Personal Jurisdiction

Russia also argues that it was never properly served under § 1608(a)(4) of the Foreign Sovereign Immunities Act—and thus that this Court lacks personal jurisdiction over it.  The parties agree, and courts in this District have held, that for "jurisdiction over a foreign state, a plaintiff must effect service in compliance with the [FSIA]."  *Von Pezold v. Rep. of Zimbabwe*, 2022 U.S. Dist. Lexis 159797, at *3 (D.D.C. 2022).

The FSIA offers different methods for serving foreign states.  § 1608(a)(1) allows service "in accordance with any special arrangement for service made between the plaintiff and the foreign state"; "if no special arrangement exists," § 1608(a)(2) allows service "in accordance with an

---

[3] The FSIA's   waiver exception—which nullifies sovereign immunity if the foreign state "has waived its immunity either explicitly or by implication," 28 U.S.C. § 1605(a)(1)—likely also applies here.  In 1960 Russia ratified the New York Convention.  ECF 69 at 13.  Article III of that Convention states that contracting states "shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon."

To waive immunity by implication, a state need only "indicat[e] its amenability to suit" in U.S. courts (*Princz v. Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994)) by: (a) showing "a subjective intent to waive immunity"; (b) "tak[ing] an act that objectively can be interpreted as exhibiting [such] an intent to waive immunity"; or (c) "tak[ing] acts that forfeit its right to immunity, irrespective of whether it has intended to do so," *Cabiri v. Ghana*, 165 F.3d 193, 202 (2d Cir. 1999); *see Creighton Ltd. v. Qatar*, 181 F.3d 118, 122-23 (D.C. Cir. 1999) ("follow[ing] the Second Circuit" in "construing the implied waiver provision").   Russia argues that the New York Convention only ever makes reference to "private arbitration disputes" rather than public arbitrations, but that language appears only in the Convention's prefatory materials.  ECF 41-6 at 5.  Article III itself mentions "arbitral awards," and the Court of Appeals has read that text to its full breadth, endorsing the Second Circuit's position that "when a country becomes a signatory to the [New York] Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999).

applicable international convention on service of judicial documents"; "if service cannot be made under paragraphs (1)( or (2)," § 1608(a)(3) allows service "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned"; and finally, "if service cannot be made within 30 days under paragraph (3), § 1608(a)(4) allows service by "dispatch[ing]" the service documents "to the Secretary of State," who shall then "transmit one copy of the papers through diplomatic channels to the foreign state."

So normally Yukos Capital would only be able to serve Russia pursuant to § 1608(a)(4) if § 1608(a)(1)-(3) were unavailable.  But recall that, after briefing on whether Yukos Capital had initially effected service on Russia, the parties stipulated to service "pursuant to § 1608(a)(4)." ECF 56 at 2.  Thus, Yukos Capital needed only to serve Russia via "diplomatic channels."

Here, Yukos Capital dispatched the service documents to the Secretary of State on June 16, 2023; then, on October 11, 2023, the Secretary delivered the documents to the Russian embassy in Washington, DC.  ECF 52, 53, 57, 58.  But did that process utilize a "diplomatic channel"?  On the one hand, the plain meaning of that term suggests a channel "of, relating to, or concerned with the art and practice of conducting negotiations between nations"[4]—and serving an embassy almost certainly counts.

But a regulation of the State Department, 22 C.F.R. § 93.1, interprets § 1608(a)(4) to require a component within the Department of State to first deliver materials to be served to the U.S. embassy in the foreign state, so that the U.S. embassy can "promptly deliver [service] to the foreign ministry… of the foreign state."  22 C.F.R. § 93.1(c)(1).  The regulation also contains an exception:  "If the foreign state so requests or if otherwise appropriate," the State Department may

---

[4] https://www.merriam-webster.com/dictionary/diplomatic#:~:text=%3A%20of%2C%20relating%20to%2C%20or,especially%20in%20situations%20of%20stress.

direct service "to the embassy of the foreign state in the District of Columbia."  22 C.F.R. § 93.1(c)(2).

Here, Russia agreed through the stipulation to service under § 1608(a)(4), but that doesn't mean it specifically agreed to (or requested) service at its embassy in the United States.  And without an express request (or agreement) from Russia, the regulation suggests that the State Department could serve the Russian embassy here only "if otherwise appropriate."  Relying on the Vienna Convention on Diplomatic Relations, Russia contends that its embassy here is "inviolable" by the foreign sovereign; that is, that the sovereign cannot cause an item (like a process document) to enter the embassy if the embassy refuses receipt.  ECF 60 at 47.  And thus, Russia argues, service on its embassy here was affirmatively inappropriate.

This is a close question, but Yukos raises two arguments that the Court finds persuasive. To begin, the regulation is not the FSIA; it instead governs the State Department's internal processes, and thus whether the State Department followed the regulation does not mean service was improper under § 1608(a)(4).  More important, reading 22 C.F.R. § 93.1(c) into § 1608(a) would create surplusage as between § 1608(a)(3) and § 1608(a)(4).  Recall that § 1608(a)(3) covers service upon the foreign ministry on the foreign state's soil; § 1608(a)(4) omits any mention of foreign ministries, instead covering service through (the much more general) "diplomatic channels."  Under Russia's reading, both § 1608(a)(3) and § 1608(a)(4) would require service upon its foreign ministry.  That redundancy counsels strongly against Russia's position.  Moreover, the State Department has frequently served foreign embassies in similar circumstances, and no other court has held such service ineffective.  *See, e.g., ConocoPhillips Petrozuata B.V. v. Venezuela,* 628 F. Supp. 3d 1, 9 (D.D.C. 2022); *Altana Credit Opportunities Fund SPC v. Venezuela*, 2023 WL 5051884 at 48 *2 (S.D.N.Y. July 5, 2023); *Neuhauser v. Venezuela*, 2023 WL 4350614 at *2

(S.D.N.Y. July 3, 2023); *Syracuse Mountains Corp. v. Venezuela*, 2023 WL 5051913 at *2 (S.D.N.Y. July 5, 2023); *Chickpen, S.A. v. Venezuela*, 2022 WL 1684275 at *2 (S.D.N.Y. May 26, 2022); *Pharo Gaia Fund, Ltd. v. Venezuela*, 2021 WL 5322968 at *2 (S.D.N.Y. Oct. 7, 2021).

## IV.    Motions to Stay

Russia also argues that this matter should be stayed until four cases are (or may be) decided by the Supreme Court. However, only one of those four cases has any real relevance here—and, at this point, it's already been decided.[5] That case is *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, No. 23-1201, 2025 WL 1583292, at *5 (U.S. June 5, 2025), in which the Court held that the exercise of personal jurisdiction over a foreign state under the FSIA does not require satisfaction of the minimum-contacts test. *See* Oral Arg. Tr. 32:47–25:36, *Devas,* WL 1583292, at *5. Accordingly, Russia's motions to stay are denied.

## V.    Conclusion

For the foregoing reasons, Russia's Motion to Dismiss (ECF 61), Motion to Stay (ECF 85), and Supplemental Motion to Stay (ECF 99) are denied. Within two weeks of the issuance of this Opinion, the parties shall file a Joint Proposed Scheduling Order governing further proceedings in this matter. An Order will accompany this Opinion.

---

[5] Russia also argues that a stay is warranted due to the pendency of (1) *Hungary v. Simon*, 604 U.S. ___ (2025), (2) the petition for rehearing in *NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024), and (3) the petition for certiorari in *Zhongshan Fucheng Indus. Inv. Co. Ltd. v. Fed. Republic of Nigeria*, 112 F.4th 1054 (D.C. Cir. 2024). Russia argues that *Simon* could disrupt Circuit precedent holding that a foreign state bears the ultimate burden of proving that an exception to immunity under the FSIA does not apply. But *Simon*—which in any event pertained to the expropriation rather than arbitration exception to the FSIA—has now been decided and expressly did not reach "who bears the burden of production to prove (or disprove) that expropriated property has a commercial nexus with the United States" and "[w]ho bears the burden of persuasion on that issue." 604 U.S. at 9–10, n.1. As for *NextEra* and *Zhongshan*, the petition for rehearing was denied and the petition for certiorari was dismissed, respectively. Those cases' applications of the arbitration exception are thus final and binding on the Court.

DATE:  June 11, 2025

_____
CARL J. NICHOLS
United States District Judge